1  Jay M. Spillane (Bar No. 126364)
2  jspillane@spillaneplc.com
   SPILLANE TRIAL GROUP PLC
3  468 N. Camden Drive
   Second Floor
4  Beverly Hills, CA 90210
   (424) 217-5980
5  (888) 590-1683 (fax)

6  Attorneys for Plaintiff ALS Scan, Inc.

7

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10  ALS SCAN, INC., a Maryland          Case No.: 2:16-cv-05051-GW-AFM
11  corporation,
                                        **MEMORANDUM OF POINTS AND**
12            Plaintiff,                **AUTHORITIES IN SUPPORT OF**
                                        **MOTION BY PLAINTIFF ALS**
13      vs.                             **SCAN, INC. FOR A PRELIMINARY**
                                        **INJUNCTION AGAINST**
14                                      **DEFENDANT TIGER MEDIA, INC.**

15  CLOUDFLARE, INC., a Delaware        **[Filed Concurrently: Motion and**
16  corporation; TIGER MEDIA, INC., a   **Notice of Hearing; Walsh**
    Saskatchewan provincial corporation; **Declaration, Penn Declaration;**
17  GERARDUS VAN GINNEKEN aka           **Easton Declaration; Spillane**
    "JUICY JAY," an individual; and DOES **Declaration, Notice of Manual Filing,**
18  1-10, inclusive,                    **(Proposed) Preliminary Injunction]**
19
              Defendants.               Date: September 8, 2016
20                                      Time: 8:30 a.m.
21                                      Place: Courtroom 10
                                               312 N. Spring Street
22                                             Los Angeles, CA
23
24
25
26
27
28

# Table of Contents

SUMMARY OF MOTION ...................................................................1

STATEMENT OF FACTS ................................................................3

PRELIMINARY INJUNCTION STANDARDS .............................................12

ARGUMENT .................................................................................13

I.   ALS HAS SHOWN A LIKELIHOOD OF SUCCESS ON ITS CLAIM
AGAINST TIGER MEDIA FOR CONTRIBUTORY COPYRIGHT
INFRINGEMENT. .....................................................................13

  A.   ALS is Likely to Succeed Under the "Material Contribution" Prong of
Contributory Liability. ............................................................13

  B.   ALS is Likely to Succeed Under the "Inducement" Prong of
Contributory Liability. ............................................................19

II.   ALS HAS SHOWN A LIKELIHOOD OF SUCCESS ON ITS CLAIM
AGAINST TIGER MEDIA FOR VICARIOUS COPYRIGHT
INFRINGEMENT. .....................................................................21

III.   ALS IS LIKELY TO PREVAIL ON ITS CLAIMS FOR SECONDARY
TRADEMARK INFRINGEMENT. ....................................................22

IV.   ALS HAS SHOWN IRREPARABLE HARM IN THE ABSENCE OF
INJUNCTIVE RELIEF. ...............................................................22

V.   THE BALANCE OF EQUITIES TIP SHARPLY IN FAVOR OF ALS. 23

VI.   THE PUBLIC INTEREST FACTOR IS EITHER NEUTRAL OR
WEIGHS IN FAVOR OF ALS. .......................................................24

VII.   THE REQUESTED INJUNCTIVE RELIEF IS WARRANTED. ........24

VIII.   THE COURT SHOULD ORDER NO, OR A MINIMAL, BOND....25

CONCLUSION ..............................................................................25

1

**Table of Authorities**

2

**Cases**

3

*A&M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896 (N.D. Cal. 2000),

4

    *aff'd* 239 F.3d 1004 (9th Cir. 2001) ................................................. 13, 14, 23

5

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ........... 13, 21

6

*Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).................13

7

*BMG Rights Management v. Cox Communications*, __ F.Supp.3d __,

8

    2015 WL 7756130 (E.D. Va. 2015)....................................................15

9

*Capitol Records, Inc. v. MP3Tunes, LLC*, 48 F.Supp.3d 703 (S.D.N.Y. 2014) 18

10

*Capitol Records, LLC v. Escape Media Group Inc.*, 2015 WL 1402049

11

    (S.D.N.Y. 2015) ..............................................................................15

12

*Columbia Pictures Industries Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013)........19

13

*Davis. v. E.I. DuPont de Nemours & Co.*, 240 F.Supp. 612 (S.D.N.Y. 1965)...21

14

*Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561 (1975)........................22

15

*Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)........ 14, 17, 18, 21

16

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159

17

    (2d Cir.1971) ..................................................................................13

18

*GoTo.com, Inc. v. Walt Disney*, 202 F.3d 1199 (9th Cir. 2002)........................25

19

*Grand River Enterprises Six Nations, Ltd. v. Pryor*, 481 F.3d 60

20

    (2d Cir. 2007) ................................................................................22

21

*Louis Vuitton Malletier v. Akanoc Solutions, Inc.*, 658 F.3d 936

22

    (9th Cir. 2011) ................................................................................22

23

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ...................................24

24

*Metro-Golden-Mayer Studios, Inc. v. Grokster, Ltd.* 545 U.S. 913,

25

    125 S.Ct. 2764 (2005) ............................................................. 17, 19

26

*Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190

27

    (2d Cir. 1971) ................................................................................23

28

*Perfect 10 v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146

(C.D. Cal. 2002) ...................................................................... passim

*Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788 (9th Cir. 2007) ..............18

*Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007) ........... 17, 18

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,

944 F.2d 597 (9th Cir. 1991) ......................................................22

*Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*,

256 F.Supp. 399 (S.D.N.Y. 1966) ...............................................15

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ..................................24

*Winter v. Natural Resources Defense Council*, Inc., 555 U.S. 7,

129 S.Ct. 365 (2008) ..................................................................13

*WPIX, Inc. v. ivi, Inc.*, 765 F.Supp.2d 594 (S.D.N.Y. 2011)..............................23

**Statutes**

*15 U.S.C. § 1116* ..................................................................................12

*17 U.S.C. § 502* ....................................................................................12

**Rules**

*FRCP R. 65(a)* .......................................................................................12

## SUMMARY OF MOTION

Plaintiff ALS Scan, Inc. ("ALS") moves for a preliminary injunction against Tiger Media, Inc. ("Tiger"), a company that created and operates a virtual "marketplace" known as "JuicyAds."  Tiger provides the virtual site and facilities wherein pirate websites display infringing adult content.

Webmasters apply through the JuicyAds website to become "Publishers," sites that sell Internet traffic, in the vast JuicyAds "network."  Prospective Publishers inform JuicyAds of the URL of their website, receive a PIN from JuicyAds then use that PIN to receive computer code that permits the Publisher to place an ad served by JuicyAds on the Publisher's website.  JuicyAds' network also includes "Advertisers," traffic buyers, who can use JuicyAds' robust search capabilities to locate and review Publisher sites, including detailed analytics regarding the traffic to each such site.  Advertisers can choose to purchase traffic either from specific Publishers or across the entire run of Publishers.  Publishers choose the price for their traffic, from which JuicyAds takes a 25% commission.  JuicyAds provides extensive customer support to its network of Publisher and Advertisers, including a personal account representative, online live support and online answers to frequently asked questions.

When a consumer clicks on a JuicyAds ad served on a Publisher's website, s/he is transported momentarily to the JuicyAds server then to the site of a purchasing Advertiser.

ALS, through its authorized agent Steve Easton, sent 195 separate email notifications to JuicyAds with multiple hyperlinks of entire galleries of infringing ALS images on imgchili.net, a site on which JuicyAds' ads were routinely placed proximate to stolen ALS content.  Concerned, ALS employee Eric Penn obtained a personal JuicyAds account and used JuicyAds' detailed online search tools to locate eight additional Publishers in the JuicyAds network

1  that chronically display infringing ALS content.  Steve Easton sent numerous

2  additional notifications of infringement to JuicyAds concerning these eight

3  additional sites.

4  Tiger states a policy on the JuicyAds site to "remove or block access to

5  material that it believes in good faith to be copyrighted material that has been

6  illegally copied and distributed by any of our customers, advertisers and

7  publishers" and to "discontinue service to repeat infringers."  However, Tiger

8  maintained this policy for show.  Tiger not only steadfastly refused to terminate

9  imghili.net or any of the other eight repeat infringers, but responded to Mr.

10  Easton's notifications with derision and threats of liability.

11  To test Tiger's willingness to turn a blind eye to infringing content, Penn

12  disclosed to JuicyAds that his website was www.stolenalspictures.com, a site

13  that proclaimed its content was infringing and available for free because of

14  advertisers willing to pay for traffic drawn through the lure of infringing

15  content.  The site was accepted as a JuicyAds "Publisher" site and has been in

16  the JuicyAds' network for months.

17  Only after Tiger learned of the existence of this lawsuit did it finally

18  apply its own repeat infringer policy and terminate the nine sites complained of

19  in this action from its network.

20  Though Tiger has terminated the nine repeat infringers located to date,

21  ALS is still threatened with irreparable harm.  Tiger ignores red flags of

22  infringing activity and has made no effort to review its network of Publishers

23  for evidence of infringement.  Tiger could do this, because its principal, who

24  goes by "Juicy Jay," admitted to Steve Easton that he can spot a pirate website

25  at a glance.  ALS therefore has moved for a preliminary injunction requiring

26  Tiger to actually maintain and enforce a reliable repeat infringer policy and to

27  take concrete steps to locate and terminate from its network any existing

28  Publishers that also display infringing ALS content.  ALS also prays that the

injunction require Tiger to review potential Publisher websites in the intake process to weed out infringement at inception.

ALS is without an adequate remedy at law.  The balance of equities tip in ALS's favor.  ALS urges the Court to order preliminary injunctive relief, pending trial, in the form submitted herewith.

## STATEMENT OF FACTS

### ALS Background

ALS was founded in 1996.  ALS owns a substantial library of adult entertainment works.  ALS charges consumers fees in consideration for a user identification and password which will provide the consumer with access to proprietary content on ALS's secure Internet sites.  ALS displays its trademark and copyright information on its works.  (Walsh Dec. ¶ 2.)

ALS has submitted hundreds of registrations for its copyrighted works to the U.S. Copyright Office, including registrations covering all of the works referenced in the notices of infringement submitted in connection with this motion.  (Walsh Dec. ¶ 3; Complaint Ex. 1; see generally Easton Dec.)

ALS is the owner of registered trademarks for the mark "ALS Scan" in connection with adult entertainment.  (Walsh Decl. ¶ 4; Complaint Ex. 2.)

### Pirate Sites, Ad Networks and the Impact on Copyright Owners

ALS's receipts and net profits from exploitation of its proprietary content grew steadily and impressively from 1996 through about 2001.  (Walsh Decl. ¶ 5.)  Since then, and continuing to the present, such receipts and net profits have declined.  In this time, ALS has increasingly observed ALS works on growing numbers of adult content websites, all without the knowledge of or license from ALS.  The ascendancy of infringing ALS works on the Internet has increased as high speed Internet access has been made increasingly available to consumers and businesses.  (Walsh Decl. ¶ 6.)

This case exemplifies a serious problem, namely, the creation and maintenance of virtual networks built upon "pirate" websites, wherein the network participants all profit from traffic drawn through the lure of infringement.  ALS releases new content on its subscription websites to maintain the interest of its paid subscribers.  Within days or even hours after such a release, entire galleries of such ALS content appear, without the knowledge of or any license from ALS, on websites that appear to have no activity other than to display infringing content and which participate in networks such as the one maintained by Tiger.  (Walsh Decl. ¶ 8; Easton Decl. generally; Penn Decl. generally.)

Pirate sites monetize their traffic through advertisements.  Clicking on these banners causes the web page resolve momentarily to a server maintained by an advertising network, such as JuicyAds, before resolving to a page maintained by another network member offering content for purchase.  The pirates continuously steal copyrighted content to lure consumers, direct Internet traffic through banner advertisements, receive remuneration from the traffic networks and then repeat the cycle.  In this fashion the advertising networks induce pirate sites to continuously infringe copyright. (Walsh Decl. ¶¶ 9, 10.)

The observed growth of infringing content on these networks has coincided with noticeable decline in ALS's revenues and profits since 2001.  There are no material factors other than rampant infringement on the Internet that correlates to this drop in profits.  Rampant infringement on the Internet has caused ALS to incur increasing expenses in connection with sending notifications of infringement and retaining counsel.  ALS has had to ask employees to work longer hours for lower wages and has laid people off because of the pressure of infringing content. (Walsh Decl. ¶¶ 7, 13-15.)

Motion for Preliminary Injunction – Memorandum

**The JuicyAds Network**

Tiger owns and operates the "JuicyAds" advertising network.  (Spillane Decl. ¶¶ 2-10, Exs. 1-6; Easton Decl. ¶¶ 37-45, Exs. 10-16.)

Tiger explains on the JuicyAds web page that it is far more than a mere advertiser.  Tiger says JuicyAds is a "network," a "marketplace," a "community" and a "platform."

JuicyAds' home page says: "JuicyAds is the sexy advertising network.  It is a marketplace for Publishers to increase their revenues by selling ad space to Advertisers."  (Penn Decl. ¶ 48 Ex. 11.)[1]

In JuicyAds' parlance, according to its Terms of Service: "'JuicyAds' is an advertising brokerage service, accessible at www.juicyads.com, which allows website Publishers to place ads on their websites and for Advertisers to buy the space.  All aspects of this service are collectively referred to herein as 'JuicyAds'."  "'Users' are individuals or companies registered through the JuicyAds service as either an Advertiser or a Publisher."  "'Publishers' are Users who sell advertising through the JuicyAds service."  "'Advertisers' are Users who buy advertising through the JuicyAds service."  (Penn Decl. ¶ 50 Ex. 13.)

JuicyAds' "About" page says: "We have one of the best and most easy to use interfaces for purchasing ads in the industry and one of the only with purchasing in seconds and instant approval**."**  "We deliver over one Billion impressions daily and always growing."  "Serving 172,000+ websites and 92,000+ clients, and more joining daily."  "We protect our clients

---

[1] Printed screen captures from www.juicyads.com are admissible in evidence given the evidence that Tiger owns the advertising network called "JuicyAds" and the information on the screen captures showing that they came from pages on the juicyads.com website.  Printouts of information on the web "are the only practical method by which the allegations of the complaint can be brought before the Court and there is generally a reduced evidentiary standard in preliminary injunction motions." *Perfect 10 v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1154 (C.D. Cal. 2002).

with the strongest click fraud detection in the industry.   Your profits matter to us.  So sit back, relax, get Juicy and make money!"  "We stand alone and in front as the most favorite, highest-rated, most respected, and most trusted Ad Network."  "We always choose the needs and expectations of our Publishers and Advertisers above making a 'quick buck.'  We care about your traffic as much as you do.  That means that as an advertising platform, our goal is to provide income for both the advertisers and publisher without annoying surfers or disrupting the surfing experience."  "We provide personal service and help to Publishers and Advertisers everyday [sic].  Answering questions, helping people setup or buy ads, and giving advice for using our service is just what we do.  If you need help, just ask."  (Penn Decl. ¶ 49 Ex. 12.)

JuicyAds' "Lifestyle" page invites member of the JuicyAds network to "Become a part of the JuicyAds Lifestyle!"  "We are building a better advertising network, not just a bigger one.  Our community of Publishers and Advertisers and the lifestyle they enjoy with us unparalleled in the industry [sic]."  The page goes on to invite Users to members-only JuicyAds events. (Penn Decl. ¶ 51 Ex. 14.)

JuicyAds reserves sole discretion and ability to suspend or terminate any Users' account at any time.  JuicyAds' Terms of Service prohibit websites that engage in "Distribution of any Copyrighted materials without permission (Copyright Infringement), or linking to any Copyrighted materials (Contributory or Vicarious Infringement)."  TOS ¶ IV.(a)(vii). JuicyAds reserves the right to "investigate any aspect of any account at any time without notice" and suspend payments and access to the JuicyAds service.  TOS ¶ XI. (Penn Decl. ¶ 50 Ex. 13.)

According to JuicyAds' DMCA page: "It is JuicyAds' policy to (1) remove or block access to material that it believes in good faith to be copyrighted material that has been illegally copied and distributed by any of our

customers, advertisers, publishers, affiliates, members or users; (2) remove or disable access to material that is claimed in good faith to be infringing upon copyrighted material upon notification to our Designated Agent with terms in the notice required by the DMCA; and (3) remove and discontinue service to repeat offenders." (Penn Decl. ¶ 52 Ex. 15.)

### Becoming a User in the JuicyAds Network

Webmasters apply through the JuicyAds website to become Publishers in the vast JuicyAds network. Prospective Publishers inform JuicyAds of the URL of their website, receive a PIN from JuicyAds then use that PIN to receive computer code that permits the Publisher to place an ad served by JuicyAds on the Publisher's website. The process by which a User can get his site registered as a Publisher in the JuicyAds network is fast and automated, without contact from JuicyAds personnel. (Penn Decl. ¶¶ 53-57, Ex. 16.)

JuicyAds' Advertisers can use robust search capabilities on juicyads.com to locate and review Publisher sites, including detailed analytics regarding the traffic to each such site. JuicyAds offers Users various ways to frame searches for Publisher sites, including by categories of content types (e.g. "Asian" or "Pornstar"), Alexa rating,[2] content rating, sites per page and website types (e.g. "Blog" or "Dating/Casual"). JuicyAds displays analytics for each of its Publisher sites including Alexa rankings, daily views and daily clicks. (Penn Decl. ¶¶ 58-64, Exs. 17-21.)

Publishers choose the price for their traffic, from which JuicyAds takes a 25% commission. (Penn Decl. ¶¶ 67, 68, Exs. 23-24.) Advertisers can choose to purchase traffic either from specific Publishers or across the entire run of Publishers. (Penn Decl. ¶ 73, Ex. 29.)

---

[2] "Alexa" is a service located at www.alexa.com that provides data and analytics for ranking websites according to amount of traffic they receive.

When a consumer clicks on a JuicyAds ad on a Publisher site, s/he is transported momentarily to the JuicyAds server then to the site of a purchasing Advertiser.  (Penn Decl. ¶¶ 2-44, Exs. 1-9.)

JuicyAds provides extensive customer support to its network of Publisher and Advertisers, including a personal account representative, online live support and online answers to frequently asked questions.  (Penn Decl. ¶¶ 65-74, Exs. 22-30.)

### JuicyAds' Site Enables ALS to Locate Repeat Infringers

ALS, through its authorized agent Steve Easton, sent 195 separate email notifications to JuicyAds with multiple hyperlinks of entire galleries of infringing ALS images on imgchili.net, a site on which JuicyAds' ads were routinely placed proximate to stolen ALS content.  However, JuicyAds refused to apply its repeat infringer policy to imgchili.net.  (Penn Decl. ¶¶ 18-20, Ex. 1, ¶¶ 45-47 Ex. 10; Easton Decl. ¶¶ 9-12, Ex. 1; Notice of Manual Filing.)

Concerned about JuicyAds' attitude and the possibility that JuicyAds harbored other repeat infringers in its network, ALS employee Eric Penn obtained a personal JuicyAds account and used JuicyAds' detailed online search tools to locate eight additional Publishers in the JuicyAds network that chronically display infringing ALS content.  (Penn Decl. ¶¶ 58-64, Exs. 17-21.)

### StolenALSpictures.com

Concerned about JuicyAds' toleration for repeat infringement, and to test their system, if any, for reviewing websites, Penn submitted information to JuicyAds that his Publisher website within the JuicyAds network was www.stolenalspictures.com.  In response, JuicyAds sent Penn information and hyperlinks that permitted him to place JuicyAds ads on stolenalspictures.com. (Penn Decl. ¶¶ 53-57, Ex. 16.)

The landing page on stolenalspictures.com.says at the top: "StolenALSImages.com – Infringing ALS Photos Made Free."  The subtitle

says: "Why Pay for Porn When You Get it Free?"  The first paragraph says: "StolenALSImages.com features the same popular picture sets you can get with the purchase of ALSScan.com and ALSAngels.com memberships, for FREE! How do we do this?  First, we stole these copyrighted images from ALS without paying a license fee. –Then, we get advertisers who profit from copyright infringement to pay us for traffic.  So if you enjoy having free access to these ALSScan.com and ALSAngels.com photo sets, please be sure to click on one of our ads!"  (Penn Decl. ¶ 54, Ex. 16 p.1.)

### **Actual Notice of Infringement and JuicyAds' "Response"**

Steve Easton, authorized agent for ALS, and Eric Penn, ALS employee, observed numerous instances in which infringing ALS content appeared on Publisher sites in the JuicyAds' network, wherein ads served on the Publisher site by JuicyAds were placed proximate to infringing ALS works.  These were imgchili.net and the eight additional sites found using JuicyAds' online information about its Publishers.  (Easton Decl. ¶¶ 4-36, Exs. 1-9; Penn Decl. ¶¶ 2-44, Exs. 1-9.)

In response to these observations, Mr. Easton sent numerous email notifications to JuicyAds of the presence of infringing ALS images on JuicyAds' Publisher sites.  The notices often identified long lists of pages on which such infringing images appeared, each page of which often displayed hundreds of infringing images.  Mr. Easton sent the following number of notices of infringing ALS images on the following JuicyAds Publisher sites.  In no case prior to the Complaint did JuicyAds apply its repeat infringer policy by terminating these accounts:

a. Imgchili.net (195 notices) (Easton Decl. ¶¶ 9-12, Ex. 1; Penn Decl. ¶¶ 18-20, Ex. 1; Notice of Manual Filing)

b. Slimpics.com (22 notices) (Easton Decl. ¶¶ 13-15, Ex. 2; Penn Decl. ¶¶ 21-23, Ex. 2; Notice of Manual Filing)

c.  Namethatpornstar.com (11 notices) (Easton Decl. ¶¶ 16-18, Ex. 3; Penn Decl. ¶¶ 24-26, Ex. 3; Notice of Manual Filing)

d.  Cumonmy.com (11 notices) (Easton Decl. ¶¶ 19-21, Ex. 4; Penn Decl. ¶¶ 27-29, Ex. 4; Notice of Manual Filing)

e.  Bestofsexpics.com (nine notices) (Easton Decl. ¶¶ 22-24, Ex. 5; Penn Decl. ¶¶ 30-32, Ex. 5; Notice of Manual Filing)

f.  Teenbe.com (nine notices) (Easton Decl. ¶¶ 25-27, Ex. 6; Penn Decl. ¶¶ 33-35, Ex. 6; Notice of Manual Filing)

g.  Mymaturespace.com (nine notices) (Easton Decl. ¶¶ 28-30, Ex. 7; Penn Decl. ¶¶ 36-38, Ex. 7; Notice of Manual Filing)

h.  Spankwiki.net (ten notices) (Easton Decl. ¶¶ 31-33, Ex. 8; Penn Decl. ¶¶ 39-41, Ex. 8; Notice of Manual Filing)

i.  Stoorage.com (22 notices) (Easton Decl. ¶¶ 34-36, Ex. 1; Penn Decl. ¶¶ 42-44, Ex. 9; Notice of Manual Filing)

## **JuicyAds Induced Cycles of Continuous Infringement**

Imgchili.net was a particularly egregious infringer.  That site pays its users for image views of uploaded material.  Imgchili.net users would subscribe to ALS and other adult content sites, download the content from secure members' pages then upload the content without permission to Imgchili.net. When Mr. Easton sent an infringement notification pertaining to Imgchili.net, the pages identified in Mr. Easton's notice would go down, but as soon as the next day the same or other infringing ALS images would appear on Imgchili.net.  JuicyAds' refusal to terminate imgchili.net induced a continuous cycle of uploads of fresh infringing material, forcing ALS to play a frustrating game of "whack-a-mole."  (Penn Decl. ¶¶ 18-20, Ex. 1, ¶¶ 45-47, Ex. 10; Easton Decl. ¶¶ 9-12, Ex. 1; Notice of Manual Filing.)

### JuicyAds' Correspondence with Mr. Easton

Mr. Easton has corresponded with Juicy Jay concerning infringement on JuicyAds' Publisher sites.  At first, Juicy Jay's correspondence reflected his willingness to enforce JuicyAds' policy to terminate repeat infringers.  On July 21, 2011 Juicy Jay said about an infringing site in the JuicyAds network: "I have suspended this domain from our network due to the repeated infringements."  (Easton Decl. ¶ 39, Ex. 10.)  In a July 26, 2011 email concerning infringements on freebirdnet.org, Juicy Jay said "I suspended this website from our network . . I took a look at the site <u>and it was all stolen content</u>."  (Emphasis added.)  He further said "Unfortunately, for the most part the ad networks seem to care about profits, not piracy. . . . We have taken a position to try and combat blatant piracy for those who refuse to comply or chronic offenders. . . . Ultimately, anyone we don't service in our network, is a potential client for them.  These pirates jump from network to network . . whoever will take them."  (Easton Decl. ¶ 40, Ex. 11.)

By 2012, Juicy Jay withdrew from his willingness to enforce JuicyAds repeat infringer policy, admitting that "it costs me money every time we take action."  Juicy Jay began to mouth the position that JuicyAds supposedly had no responsibility to act in relation to notification of infringements on its network.  "As a third party service its [sic] not really our responsibility to answer to DMCA requests on a website we have no ownership or direct connection to."  (Easton Decl. ¶ 41, Ex. 12.)  By 2013 Juicy Jay responded to Easton's infringement notifications with open hostility, even threatening him with legal action for continuing to send his infringement notices.  (Easton Decl. ¶¶ 42, 44, Exs. 13, 15.)

On November 27, 2015 Mr. Easton sent an email to Juicy Jay, pointing out that he had sent well over one hundred notifications of infringement on imgchili.net, that JuicyAds' own Terms of Service say they terminate repeat

infringers, yet they had not terminated imgchili.net.  Juicy Jay responded with

contempt and aggression, stating "[t]his behaviour appears to be abusive in

nature" and demanding that Easton supply yet another copy of the notifications

that had been sent for Juicy Jay's "review."  (Easton Decl. ¶ 45, Ex. 16.)

### JuicyAds Can Identify Pirate Sites with a "Look"

Juicy Jay says he can "look" at a site and tell it is a pirate site.  He is

right.  Sites that lure traffic through the draw of infringement, and then

monetize this traffic through virtual networks like JuicyAds, are easy to spot.

First, pirate websites don't charge a subscription fee to view their content.

Second, a pirate site often displays content by multiple copyright owners,

sometimes leaving the owners' copyright notification on the image.  Third, a

pirate site displays entire galleries of ALS models, perhaps 200 or more images,

rather than the sixteen or so images we authorize our affiliates to use.  Fourth,

the images are available for download, sometimes with a convenient zip

download feature that permits a user to download an entire ALS gallery in one

click.  Fifth, the site is not pointing traffic to ALS but to third parties.  (Walsh

Decl. ¶¶ 18-22; Easton Decl. ¶ 3.)

### JuicyAds Enforces its Repeat Infringer Policy Only After Being Sued

Tiger found out about this case after it was filed.  Only after learning that

it was being sued did Tiger enforce its own repeat infringer policy and

terminate services to the sites identified in Mr. Easton's notices.  (Spillane Decl.

¶ 10, Ex. 6.)

### PRELIMINARY INJUNCTION STANDARDS

The Court may "grant temporary and final injunctions on such terms as it

may deem reasonable to prevent or restrain infringement of a copyright."  *17

U.S.C. § 502*.  The Court has the same powers to restrain infringement of

registered trademarks.  *15 U.S.C. § 1116.  See also FRCP R. 65(a).*

In ruling on a request for preliminary injunction, a court must weigh: (1) likelihood of success on the merits; (2) irreparable harm in the absence of injunctive relief; (3) the balance of equities; and (4) the public interest. *Winter v. Natural Resources Defense Council*, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 374 (2008). Alternatively, serious questions going to the merits and a balance of hardships that tilts sharply toward the plaintiff may support preliminary injunctive relief. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

## ARGUMENT

## I.   ALS HAS SHOWN A LIKELIHOOD OF SUCCESS ON ITS CLAIM AGAINST TIGER MEDIA FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT.

ALS has demonstrated that Tiger constructed, maintains and profits from a "network," a "marketplace," a "community" and a "platform" wherein Tiger provides valuable assistance, services, code, search capabilities and payments to Tiger clients, "Publishers" who draw traffic through the lure of infringing works and "Advertisers" who buy the traffic. Tiger is probably liable for contributory copyright infringement.

### A.   ALS is Likely to Succeed Under the "Material Contribution" Prong of Contributory Liability.

"[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001), citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971); *Ninth Circuit Manual of Model Civil Jury Instructions 17.20.* "Courts do not require actual knowledge; rather, a defendant incurs contributory copyright liability if he has reason to know of the third party's direct infringement." *A&M Records, Inc. v. Napster, Inc.*, 114

1  F.Supp.2d 896, 918 (N.D. Cal. 2000), *aff'd* 239 F.3d 1004 (9th Cir. 2001); *see*

2  *Gershwin,* 443 F.2d at 1163 (general knowledge that third parties performed

3  copyrighted works satisfied knowledge element of contributory infringement).

4      In *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) Cherry

5  Auction operated a swap meet.  Vendors paid a fee for booth space.  The sheriff

6  raided the swap meet and seized thousands of counterfeit recordings.  The

7  following year, finding that vendors were still selling counterfeit recordings, the

8  sheriff notified Cherry Auction of ongoing sales of infringing materials.  The

9  plaintiff sent an investigator to the Cherry Auction site and observed sales of

10  counterfeit recordings.  Cherry Auction was liable for contributory infringement

11  because, with actual knowledge of direct infringement by vendors, Cherry

12  Auction continued to provide support services to such vendors including

13  "space, utilities, parking, advertisement, plumbing and customers."

14  "[P]roviding the site and facilities for known infringing activity is sufficient to

15  establish contributory liability."

16      Napster maintained a website through which users could search for and

17  download music files.  Napster had actual notice of direct infringement because

18  the Recording Industry Association of America ("RIAA") informed Napster of

19  the location of thousands of infringing files.  *Napster*, 114 F.Supp.2d at 918.

20  The court rejected Napster's argument that the title of a music file did not

21  permit Napster to determine the infringing nature of each such file, as the

22  majority of the music files made accessible by Napster were copyrighted to

23  RIAA members.  *Napster*, 114 F.Supp.2d at 918-19.  Napster had constructive

24  knowledge of direct infringements because its executives had recording

25  industry experience and were sophisticated about intellectual property laws.

26  *Napster*, 114 F.Supp.2d at 919.  Napster materially contributed to direct

27  infringement because "Napster [] supplie[d] the proprietary software, search

28  engine, servers, and means of establishing a connection between users'

- 14 -

computers.   Without the support services defendant provide[d], Napster users could not find and download the music they want with the ease of which defendant boasts." *Napster*, 114 F.Supp.2d at 920.

In *Perfect 10 v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146 (2002), Cybernet Ventures maintained and promoted a network of "300,000 'regular' sites and 14,000 'Gold' sites."  213 F.Supp.2d at 1158.  Each member of the Cybernet network was responsible for maintaining and hosting its own site.  *Id.* When a consumer visited a site in the Cybernet network, consumers were directed to Cybernet for payment.  *Id.*  Cybernet advertised and provided means by which consumers could search for websites in the Cybernet network.  213 F.Supp.2d at 1158-59.  Cybernet had actual knowledge of direct infringement and materially contributed to such infringement by continuing to provide advertising services and paying commissions to webmasters in its network.  213 F.Supp.2d at 1169-70.

This case would not be the first time that a party supplying advertising to direct infringers would be held contributorily liable for copyright infringement. In *Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*, 256 F.Supp. 399 (S.D.N.Y. 1966) (advertiser had actual notice of infringing songs on bootleg album and the low price of the album was a red flag of infringement, yet advertiser continued to earn commission by purchasing radio time for the infringing album).

In contributory liability cases such as these, maintenance and enforcement of a repeat infringer policy, or lack thereof, is important.  *See BMG Rights Management v. Cox Communications*, __ F.Supp.3d __, 2015 WL 7756130 (E.D. Va. 2015) (ISP lost its protections under the DMCA because it failed to maintain a log of information contained in infringement notices and failed to terminate repeat infringers under appropriate circumstances); *Capitol Records, LLC v. Escape Media Group Inc.*, 2015 WL 1402049 (S.D.N.Y. 2015)

- 15 -

1   (defendant lost DMCA protections because it failed to keep adequate records of

2   infringement notices or terminate repeat infringers).

3          Here, there can be no doubt that Tiger had actual notice of infringements

4   on its client sites.  Steve Easton sent numerous notifications to Tiger setting

5   forth the web pages on JuicyAds Publisher sites containing ALS infringements.

6   Further, Tiger had constructive notice of infringements.  Its own principal,

7   Juicy Jay, admitted that he can look at a Publisher site and tell whether it has

8   stolen content.  Imgchili.net, the subject of nearly two hundred infringement

9   notices, patently maintained a system where it paid users to upload infringing

10   works, yet it lingered as a Publisher in the JuicyAds network even after many

11   notices.  JuicyAds even admitted stolenalspictures.com as a Publisher in its

12   network, even though the site proclaims that it displays stolen content and seeks

13   to profit from infringement.

14          Similarly, Tiger materially contributed to the infringing conduct of its

15   Publishers.  Tiger built and maintained a "network," a "marketplace," a

16   "community" and a "platform" of Users, Publishers who sell traffic and

17   Advertisers who buy traffic from Publishers.  Tiger requires potential users to

18   apply for membership in its network.  Tiger advertises, and provides valuable

19   search tools and data regarding, each of its Publishers.  Tiger's search tools

20   allowed ALS to find numerous additional cases of repeat infringement of ALS

21   works by Publishers in the JuicyAds' network.  Tiger provides customer service

22   and detailed technical support for its Users.  Tiger provides code that permits

23   Publishers to put JuicyAds ads on their sites, next to infringing content.

24   JuicyAds serves the ads on Publisher sites, then redirects traffic to purchasing

25   Advertisers when a consumer clicks on the JuicyAds ad.  Tiger charges

26   Advertisers and pays Publishers for this traffic.

27          Juicy Jay initially admitted that his own Terms of Service required Tiger

28   to terminate repeat infringers.  However, when Juicy Jay realized that the policy

cost Tiger money, he orchestrated a Tiger policy of ignoring infringement notices and failing to enforce Tiger's own repeat infringer policy.  It was only when Tiger realized it had been sued for ignoring its own repeat infringer policy that Tiger enforced the policy.

Tiger maintained the online version of a flea market and provided numerous services to Users, just as in *Fonovisa*.  Tiger maintained a network of users and webmasters that it assisted and advertised, just as in *Napster* and *Cybernet Ventures*.  Tiger rendered advertising services to companies patently engaging in infringing conduct, just as in *Mark-Fi Records.*

Tiger may say it can ignore its own repeat infringer policy with impunity because the infringing ALS works did not reside on or pass through Tiger's servers.  They would not be right.  First, Tiger admits on its DMCA page that it can "remove or block access to material that it believes in good faith to be copyrighted material that has been illegally copied and distributed."  Second, in the online world, courts have not constrained contributory liability for copyright infringement to a strict server test.  In *Metro-Golden-Mayer Studios, Inc. v. Grokster, Ltd.* 545 U.S. 913, 125 S.Ct. 2764 (2005), Grokster was held secondarily liable for distributing software that enabled users to locate infringing files on a peer-to-peer network even though said files did not reside on or pass through a Grokster server.  In *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007), Perfect 10, also an adult content provider, sought to hold Google secondarily liable for direct copyright infringement by providing users with the means to search for and locate infringing content.  There, even though Google did not itself host the infringing sites, the court held:

> "There is no dispute that Google substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access infringing materials. . . .

> [Therefore,] Google could be held contributorily liable if it had knowledge that infringing Perfect 10 images were available using its search engine, could take simple measures to prevent further damage to Perfect 10's copyrighted works, and failed to take such steps."

487 F.3d at 729. Similarly, in *Cybernet Ventures, supra*, Cybernet Ventures did not itself serve the infringing images, but rather, like Tiger, maintained a network of client sites which actually hosted the infringing images. 213 F.Supp.2d at 1158-59, 1169-70. *See also Capitol Records, Inc. v. MP3Tunes, LLC*, 48 F.Supp.3d 703, 713 (S.D.N.Y. 2014) (principal of MP3Tunes and related Sideload service was contributorily liable for copyright infringement because he had knowledge that user were storing infringing MP3 files through MP3Tunes and Sideload, encouraged use of the system, was aware of takedown notices and formulated company policy to ignore certain notices).

Tiger may say that it provides no material contribution to infringement merely because it enables infringers to monetize illegal conduct. *Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788 (9th Cir. 2007). Tiger certainly does enable its Publishers to profit from infringement, but it does much more. Visa's business relationship was with merchant banks, not websites with infringements. Tiger has formed a direct client relationship with Publishers, who publish infringing content in a network created and maintained by Tiger. Tiger admits that it can "remove or block access to material that it believes in good faith to be copyrighted material that has been illegally copied and distributed." Visa could not. Tiger maintains search functions on its website that can "assist or enable Internet users to locate infringing material." 494 F.3d at 797. Visa did not. Here, "'it would be difficult for the [Publishers'] infringing activity to take place in the massive quantities alleged without the support services provided by [Tiger]." 494 F.3d at 798, citing *Fonovisa, supra*. Visa did not provide comparable support services. Tiger has created a "virtual"

"centralized place . . . where infringing works could be collected, sorted [and] found."  494 F.3d at 798.  Visa did not.  Here, Tiger "advertise[s] [and] otherwise promote[s]" its Publisher websites.  494 F.3d at 799-800.  Visa did not.  Tiger constructed and maintained a network in which it encouraged Publishers to become clients.  Visa did not.  Tiger served ads on the Publisher sites.  Visa did not.  Tiger transported traffic driven to its servers from Publisher sites to purchasing Advertisers.  Visa did not.  Tiger directly paid Publishers. Visa did not.  Tiger admitted into its network a site that proclaimed it published stolen content.  Visa did not.  Tiger said it would terminate repeat infringers. Visa did not say that.  Tiger ignored its own policy.  Visa did not.  This case is distant from *Visa*.

> **B.     ALS is Likely to Succeed Under the "Inducement" Prong of Contributory Liability.**

"[O]ne who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties."  *Metro-Golden-Mayer Studios, Inc. v. Grokster, Ltd.* 545 U.S. 913, 936-37, 125 S.Ct. 2764 (2005) (distributor of software enabling search and download of infringing files through peer-to-peer network).  Since the *Grokster* court drew this doctrine from patent law, and since "[u]nlike patents, copyrights protect expression, not products or devices," inducement liability extends to provision of not only software but also services.  *Columbia Pictures Industries Inc. v. Fung*, 710 F.3d 1020, 1033 (9th Cir. 2013) (Fung provided torrent files that enabled users to search for and download infringing works stored on other's computers).

This case is akin to *Grokster* and *Fung*.  In those two cases, as in this one, Tiger made no effort to use "filtering tools or other mechanisms" to detect infringing activity by Publishers.  710 F.3d at 1035, citing *Grokster*, 545 U.S. at

939.  Indeed, the JuicyAds system is so lacking in any form of filter or monitoring that a Publisher can gain access to the network even when proclaiming that its site features stolen content.  Here, as in *Grokster* and *Fung,* Tiger "'makes money by selling advertising space'" and thus relies upon "'high-volume use."  710 F.3d at 1035, citing *Grokster*, 545 U.S. at 940. JuicyAds encouraged Publishers to join its network in droves.  JuicyAds touts the speedy and automated nature of its signup process, resulting in JuicyAds' network containing "172,000+ websites and 92,000+ clients, and more joining daily."  Realizing that enforcement of its own repeat infringer policy cost money, and knowing that sites with infringement could be detected at a glance, JuicyAds employed zero discretion in taking in Publishers and signaled to its Publishers that it would not enforce its repeat infringer policy.

Tiger and Juicy Jay manifested a sophisticated understanding of copyright law, including direct and contributory liability, yet made a decision to ignore infringement notices and encourage Publishers to continue use of JuicyAds' system.  Tiger's heedless intake of Publishers, even evident infringers, together with its refusal to terminate repeat infringers, induced a continuous cycle of infringement by its Publishers.  The best example is imgchili.net.  Tiger received nearly two hundred notifications of infringement on imgchili.net.  Imgchili.net pays for page views, a clear signal that users were not uploading their vacation pictures but rather infringing content that would induce page views.  Tiger's policies encouraged a continuous cycle of notice from ALS, nominal take down and repeat infringement, relegating ALS to a frustrating and never-ending game of "whack-a-mole" trying to stop this chronic cycle of infringement.   A jury would likely find Tiger liable for inducing infringement under these circumstances.

## II.   ALS HAS SHOWN A LIKELIHOOD OF SUCCESS ON ITS CLAIM AGAINST TIGER MEDIA FOR VICARIOUS COPYRIGHT INFRINGEMENT.

Vicarious copyright liability exists where a defendant "'has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'"  *Napster,* 239 F.3d at 1022, quoting *Fonovisa,* 76 F.3d at 262.

The right and ability to supervise infringing activity is **not** limited by a strict server test; "right and ability to supervise" extends beyond the ability to pull a work off the Internet, and exists where the defendant has retained the right to police or terminate accounts engaged in copyright infringement. Cybernet had the right and ability to supervise the infringing activity because Cybernet retained the right to admit webmasters into, and terminate them from, its network, even though the infringing images did not reside on Cybernet servers.  *Cybernet*, 213 F.Supp.2d at 1173-74.  *See also Napster, supra,* 239 F.3d at 1023; *Fonovisa,* 76 F.3d at 263-64.

"Financial benefit exists where the availability of infringing material 'acts as a "draw" for customers.'"  *Napster,* 239 F.3d at 1023, quoting *Fonovisa,* 76 F.3d at 263-64.

Advertising companies have been found liable for vicarious copyright infringement. *See Davis. v. E.I. DuPont de Nemours & Co.*, 240 F.Supp. 612 (S.D.N.Y. 1965) (sponsor of infringing television show and its advertising agency were vicariously liable for copyright infringement).

Here, Tiger had the right and ability to supervise the infringing activity, in that, just as in *Napster* and *Cybernet*, it retained the right and ability to terminate a Publisher from its network.  Tiger had the requisite ability even though the infringing images resided on Publisher websites.  Further, Tiger had a direct financial interest in the infringing activity, in that it continued to earn

money from placing ads on Publisher sites that relied upon the draw of infringing content.  A jury would likely find Tiger liable for vicarious infringement under these circumstances.

**III.   ALS IS LIKELY TO PREVAIL ON ITS CLAIMS FOR SECONDARY TRADEMARK INFRINGEMENT.**

One may be secondarily liable for trademark infringement when it "continue[s] to supply its services to one who it knew or had reason to know was engaging in trademark infringement."  *Louis Vuitton Malletier v. Akanoc Solutions, Inc.*, 658 F.3d 936 (9th Cir. 2011).  There, a web host and its manager were secondarily liable in connection with sale of products infringing on the Louis Vuitton mark on hosted sites.

Here, although Tiger did not literally host the Publisher sites, it had the requisite degree of control over such sites in that it retained the ability to terminate any Publisher from its network.  *Cf. Napster, Cybernet Ventures, supra.*  Tiger maintained Publishers within its network and continued to provide advertising services and payments even after repeated actual notification that Publisher sites were engaging in trademark infringement.

**IV.   ALS HAS SHOWN IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF.**

Irreparable harm justifying injunctive relief may be demonstrated by: substantial loss of business, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 2568 (1975); loss of current or future market share, *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007); damage to goodwill of a business, *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); or injury to reputation. *United Healthcare Ins. Co. v. Advance-PCS*, 316 F.3d 737, 741 (8th Cir. 2002).  Additionally, damages from copyright infringement may be difficult to prove.  *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d

1190, 1195 (2d Cir. 1971) (courts tend to issue injunctions in the copyright context because "to prove the loss of sales due to infringement is . . . notoriously difficult").

Here, ALS has shown steady decline in revenues, profits and market share directly attributable to chronic piracy on the Internet. The pervasive presence of infringing ALS images on sites in the JuicyAds' network has damaged ALS's goodwill and reputation. Its losses from the chronic infringement tolerated by Tiger may be hard to prove at trial.

## V. THE BALANCE OF EQUITIES TIP SHARPLY IN FAVOR OF ALS.

In *Napster* the equities tipped in favor of the record companies due to the evidence that thousands of infringing files belonging to the plaintiffs were downloaded through the Napster system. Napster's lament that the proposed injunction would eviscerate its business did not tip the balance in its favor. *Napster*, 114 F.Supp.2d at 926-27. *See also WPIX, Inc. v. ivi, Inc.*, 765 F.Supp.2d 594, 621 (S.D.N.Y. 2011) ("Having found that [defendant] has infringed plaintiffs' copyrights, it follows that [defendant] is not legally harmed by the fact that it cannot continue streaming plaintiffs' programming, even if this ultimately puts [defendant] out of business.").

Similarly, in *Cybernet Ventures*, the equities tipped in favor of Perfect 10, the party whose works were infringed:

> "Cybernet profits from the infringing and unlawful activities of its webmasters without shouldering any of the undesired burdens associated with protection of intellectual property rights. The Court finds this willful blindness harms Perfect 10 . . . and skews the online adult market."

*Cybernet*, 213 F.Supp.2d at 1191.

1  Here, ALS will be injured absent injunctive relief.  Chronic infringement

2  of ALS works has occurred on the JuicyAds' network, wholly ignored by

3  JuicyAds.  Tiger has admitted a proclaiming infringer of ALS work, refused to

4  enforce its repeat infringer policy, refused to review its own Publishers for red

5  flags of infringement and is likely to admit other infringers of ALS work as

6  Publishers.  On the other hand, the relief sought by ALS merely requires Tiger

7  to enforce its already existing Terms of Service.

8  **VI.   THE PUBLIC INTEREST FACTOR IS EITHER NEUTRAL OR**

9  **WEIGHS IN FAVOR OF ALS.**

10  Where an injunction only reaches private parties, public interest may be a

11  neutral factor.  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).

12  It is always in the public interest to protect constitutional rights.  *Cf. Melendres*

13  *v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (Fourth Amendment rights).

14  Here, the public interest factor is either neutral or in favor of ALS.

15  **VII.   THE REQUESTED INJUNCTIVE RELIEF IS WARRANTED.**

16  The relief requested herein is not unlike that ordered in *Cybernet, supra*,

17  where the court not only barred Cybernet and its participating webmasters from

18  displaying content the rights to which were held by Perfect 10 ("Prohibited

19  Content"), but Cybernet and those acting in concert with it were required to: 1)

20  review websites prior to admission to the Cybernet network not only for

21  Prohibited Content but also red flags of infringement; 2) review on a monthly

22  basis the content on any participating website that had removed content based

23  on a notification of infringement and had not submitted a counter-notification of

24  rights to the content in question, for evidence of Prohibited Content; 3) within

25  ninety days review the content of each participating website for reasonably

26  identifiable Prohibited Content; and 4) file with the court and serve on Perfect

27  10 periodic reports of compliance with the order.  *Cybernet*, 213 F.Supp.2d at

28  1194-95.

## VIII.  THE COURT SHOULD ORDER NO, OR A MINIMAL, BOND.

ALS has demonstrated a high likelihood of success and profound irreparable injury.  The Court should not erect a practical barrier to the relief to which ALS is entitled by ordering an unaffordable bond.  ALS urges a zero or nominal bond.  *GoTo.com, Inc. v. Walt Disney*, 202 F.3d 1199, 1211 (9th Cir. 2002) (court properly ordered nominal bond where higher amount would effectively preclude injunctive relief).

## CONCLUSION

ALS urges the Court to order a preliminary injunction in the form submitted concurrently.

DATED:  July 25, 2016                     SPILLANE TRIAL GROUP PLC

By: _____

Jay M. Spillane
Attorneys for Plaintiff ALS Scan, Inc.

Motion for Preliminary Injunction – Memorandum