1  Jay M. Spillane (Bar No. 126364)
2  jspillane@spillaneplc.com
   SPILLANE TRIAL GROUP PLC
3  468 N. Camden Drive
   Second Floor
4  Beverly Hills, CA 90210
   (424) 217-5980
5  (888) 590-1683 (fax)

6  Attorneys for Plaintiff ALS Scan, Inc.

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10 ALS SCAN, INC., a Maryland              Case No.: 2:16-cv-05051-GW-AFM
11 corporation,
                                           **DECLARATION OF SARAH**
12                                         **WALSH IN SUPPORT OF MOTION**
              Plaintiff,                   **BY PLAINTIFF ALS SCAN, INC.**
13                                         **FOR A PRELIMINARY**
                                           **INJUNCTION**
14    vs.
                                           **[Filed Concurrently: Motion and**
15 CLOUDFLARE, INC., a Delaware            **Notice, Memorandum, Spillane**
16 corporation; TIGER MEDIA, INC., a       **Declaration, Easton Declaration,**
   Saskatchewan provincial corporation;    **Penn Declaration, Notice of Manual**
17 GERARDUS VAN GINNEKEN aka               **Filing, (Proposed) Preliminary**
                                           **Injunction]**
18 "JUICY JAY," an individual; and DOES
   1-10, inclusive,                        Date: September 8, 2016
19                                         Time: 8:30 a.m.
20            Defendants.                  Place: Courtroom 10
                                                  312 N. Spring Street
21                                                Los Angeles, CA

22

23

24

25

26

27

28

---

Motion for Preliminary Injunction – Walsh Declaration

I, Sarah Walsh, declare:

1. I am the President of ALS Scan, Inc. ("ALS"). The following facts are stated on my personal knowledge.

**ALS Background**

2. ALS was founded in 1996. ALS owns a substantial library of self-produced adult entertainment images and videos. ALS was one of the first companies to provide consumers with access to proprietary adult entertainment on secure websites. ALS charges consumers fees in consideration for a user id and password which will provide the consumer with access to the content on ALS's secure sites. ALS has also provided consumers with proprietary ALS content on CD-Roms, videotape and DVDs.

3. ALS has registered for copyright protection for all of its still proprietary content. Attached to the Complaint as Exhibit 1 is a true and correct summation from the website maintained by the U.S. Copyright Office of all of the copyright registrations obtained by ALS for collections of its images and videos, as well as a summation of certain pending registrations. ALS has hundreds of registrations in total.

4. ALS is the owner of Trademark Reg. No. 2137225, registered February 17, 1998 for the mark "ALS Scan" in connection with CD Roms featuring adult entertainment. ALS is the owner of Trademark Reg. No. 3062202, registered February 28, 2006 for the mark "ALS Scan" in connection with web sites and multimedia materials featuring adult entertainment. True and correct copies of screen shots reflecting these registrations are attached to the Complaint as Exhibit 2.

**Irreparable Harm to ALS Inflicted by Infringement on the Internet**

5. ALS's receipts and net profits from exploitation of its proprietary content grew steadily and impressively from 1996 through about 2001. Since 2001 to the present, by contrast, those receipts and profits have decreased.

Motion for Preliminary Injunction – Walsh Declaration

6. Beginning around 2000, and continuing to the present, I have increasingly observed ALS images and videos on growing numbers of adult content websites, all without the knowledge of or license from ALS. I know from personal experience and numerous discussions with people in the adult industry that around this time consumers began to graduate from relatively slow dial-up Internet access to dedicated higher speed Internet connections. Also, I observed the emergence of peer-to-peer file sharing networks and "newsgroups" grow in use and popularity. These networks allowed consumers to upload and share content with others. I observed enormous quantities of infringing ALS content posted on these file sharing and newsgroup sites.

7. The observed growth of infringing content on these networks coincided with noticeable decline in ALS's profits. Profits declined 10-15% in 2002 and more than 30% in 2003. This trend has continued through today. I am not aware of any factors for this decline in profit other than the increasingly ubiquitous availability of infringing ALS content on the Internet. For example, there was no decrease in the quantity of quality of ALS's offerings. If anything, the quality of our offering increased while our profits decreased. We transitioned from shooting with print film to high resolution digital images in 2001. Nor were there any shifts in consumer preferences that I am aware of that would account for this decrease in profits, other than possibly any preference to view infringing ALS content for free rather than pay to view this content on ALS's sites.

8. This case is an example of a recent business problem ALS faces, namely, support for pirate websites from networks which pay for traffic from the pirate site from consumers drawn through the lure of free infringing content. I have observed the following process on multiple occasions. ALS releases new content on its subscription websites to maintain the interest of its paid subscribers. I have personally witnessed that, within days or even hours after

1 such a release, entire galleries of such ALS content appear, without the
2 knowledge of or any license from ALS, on websites that appear to have no
3 activity other than to display infringing content, what I call "pirate" sites. My
4 basis for saying this is, first, I have not been asked to pay to view the content on
5 any of these pirate sites. Second, when looking at the pages featuring ALS
6 content, its infringing nature is apparent at a glance. In almost all cases each
7 image is watermarked with the ALS mark and copyright symbol, yet none of
8 the traffic driven by the advertisements on these sites points to any ALS site.
9 Third, I personally know that ALS did not grant licenses to any of these pirate
10 sites.

11     9. The pages on these pirate sites are almost always framed with
12 banner advertisements for other adult websites. I have personally clicked on
13 these banners and have often seen the web page resolve momentarily to the site
14 of an adult advertising network, such as JuicyAds, before resolving to a page
15 maintained by an adult content provider asking for a fee for services.

16     10. I know from discussion with many adult industry executives and
17 through personal observation that the pirates continuously steal copyrighted
18 content to lure consumers, direct Internet traffic through banner advertisements,
19 receive remuneration from the traffic networks or companies receiving the
20 Internet traffic and then repeat the cycle. In this fashion these networks
21 engaging with the pirate sites keep the pirate sites in business.

22     11. At our request and on our behalf, Steve Easton has sent thousands
23 of notices of infringement on ALS's copyrights to these pirate sites and to all
24 other parties who appear to provide an advertising network, hosting services or
25 other support for these sites. It has been my personal observation that some of
26 these pirate sites don't remove infringing content even when provided
27 notification. Some remove the content but then I have witnessed other
28

- 3 -
Motion for Preliminary Injunction – Walsh Declaration

1 infringing ALS content appear on the same pirate site shortly thereafter,
2 sometimes the next day.

3     12. One of the business problems I have observed is that few of these
4 other parties who appear to provide advertising networks, hosting services or
5 other support for these pirate sites terminate services to the pirate site even after
6 repeated notices of infringement.

7     13. Just as the emergence of file sharing sites like "Napster" and
8 "Grokster" brought declining sales to the record industry, and just as pirate sites
9 offering bootleg copies of movies have brought declining sales to the movie
10 industry, the same phenomena have brought declining sales and profits to the
11 adult industry generally and ALS specifically.

12     14. As a direct result of the growing problem of infringing copies of
13 ALS works on the Internet, ALS has suffered continuously decreasing profits.
14 We have incurred additional expenses hiring counsel to assert our rights. We
15 have engaged Steve Easton at our expense as our agent to send notices of
16 infringement on our behalf. ALS has had to ask employees to work longer
17 hours for lower wages and has laid people off because of the pressure of
18 infringing content.

19     15. ALS is concerned that without help from the courts in the form of
20 injunctive relief, ALS may not be able to continue in business and will have to
21 lay off all remaining employees. Not only will this be a disservice to all ALS
22 personnel, but the consuming public would be deprived of the high quality adult
23 entertainment provided by ALS for the last twenty years. I can appreciate that
24 an award of damages could provide a measure of relief, but this would require
25 ALS to go through trial, any appeals and collection efforts before any
26 realization. Preliminary injunctive relief would help ease the irreparable injury
27 with which ALS is faced.
28

**Notices Sent in this Case by Mr. Easton**

16. ALS has engaged Steve Easton of APIC Worldwide as its agent to send notices of infringement on behalf of ALS.

17. I am familiar with Mr. Easton's declaration in this case and the notifications of infringement he references in and attaches to his declaration. Those emails were sent on ALS' behalf with our authority. None of the content referenced in Mr. Easton's emails was displayed with the knowledge or permission of ALS.

**Red Flags of Infringement on Adult Entertainment Sites**

18. I started working for ALS in 1998. I've been in the adult online entertainment business for eighteen years.

19. I am familiar with and have had numerous discussions with the owners of other major owners of copyrighted adult content. One of the biggest topics of conversation with these business owners and at industry conferences is what copyright owners are supposed to do to deal with the problem of ubiquitous copyright infringement.

20. ALS, like many other adult entertainment sites, maintains an "affiliate" advertising program. "Affiliates" are webmasters who, with ALS's knowledge and authority, advertise ALS's proprietary sites on their websites and are paid for directing traffic to ALS's sites. Webmasters who become ALS affiliates are given limited samples of ALS content to place on their websites to be used in conjunction with banner advertisements that, when clicked, drive traffic to ALS sites. In those cases we provide participating webmasters with a limited selection of images of a model, say sixteen images, as opposed to an entire gallery of images of that model that are maintained on our subscription sites, often in the range of 200 photos. Images that we make available for authorized use by our affiliates are not available for download.

21. Whenever I see a website that has ALS images and advertising banners, I can tell in an instant whether the site is one of our affiliates using images with our consent or a pirate site. First, pirate websites don't charge a subscription fee to view their content. Second, a pirate site often displays content by multiple copyright owners, sometimes leaving the owners' copyright notification on the image. Third, a pirate site displays entire galleries of ALS models, perhaps 200 or more images, rather than the sixteen or so images we authorize our affiliates to use. Fourth, the images are available for download, sometimes with a convenient zip download feature that permits a user to download an entire ALS gallery in one click. Fifth, the site is not pointing traffic to ALS but to third parties.

22. Any business receiving or paying for traffic from advertising sites could apply these factors to review their account holders' sites and conclude with a high degree of confidence whether the site is displaying authorized or pirated content.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. This declaration was executed on July 22, 2016, at Woodstock, Maryland.

_____
Sarah Walsh