Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE TRIAL GROUP PLC
468 N. Camden Drive, Second Floor
Beverly Hills, CA 90210
(424) 217-5980
(888) 590-1683 (fax)

Attorneys for Plaintiff ALS Scan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALS SCAN, INC., a Maryland corporation,<br><br>           Plaintiff,<br><br>   vs.<br><br>CLOUDFLARE, INC., a Delaware corporation; TIGER MEDIA, INC., a Saskatchewan provincial corporation; OVH SAS, a French corporation; HEBERGEMENT OVH INC., a Québec provincial corporation; DOLPHIN MEDIA LTD., a Hong Kong company; HIVELOCITY VENTURES CORPORATION, a Florida corporation; STEADFAST NETWORKS, LLC, a Delaware limited liability company; DUODECAD IT SERVICES LUXEMBOURG S.à.R.L., a Luxembourg company; and DOES 1-10, inclusive,<br><br>           Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**1. DIRECT COPYRIGHT INFRINGEMENT;**<br>**2. CONTRIBUTORY COPYRIGHT INFRINGEMENT;**<br>**3. VICARIOUS COPYRIGHT INFRINGEMENT;**<br>**4. TRADEMARK INFRINGEMENT;**<br>**5. TRADEMARK COUNTERFEITING;**<br>**6. INDUCING TRADEMARK INFRINGEMENT; AND**<br>**7. UNFAIR COMPETITION**<br><br>Demand for Jury Trial |

Plaintiff ALS Scan, Inc. ("ALS") avers:

**Jurisdiction and Venue**

1.      The Court has jurisdiction over this action because it arises under the Copyright Act and Lanham Act, 28 U.S.C. § 1338(a).  The Court has jurisdiction over the claim for unfair competition asserted herein under 28 U.S.C. §§ 1338(b) and 1367(a).

2.      Venue is proper in this District, in that the Defendants may be found in this District, 28 U.S.C. § 1400(a).

**Nature of Action**

3.      ALS owns a substantial library of copyrighted and trademark works of adult entertainment.

4.      This case involves chronic and willful infringement of ALS's copyrighted works on "pirate" Internet sites, those with no apparent function other than to display infringing adult content.

5.      Attempting to enforce copyright laws against pirate sites can be taxing.  They tend to be shadowy companies in far-flung jurisdictions.  Often the pirates register their web domains with a private registry, thus masking their identity.  Pirate websites or their hosts engage the services of content delivery networks, who cache a copy of a website and who are identified in searches as the situs for that website, yet who when contacted refuse to disclose the identity of the host or site owner.  The effort and expense of haling these pirate sites into Court may not be warranted, as they are likely to find it cheaper and easier to disappear and resume services on some other website under some other entity.

6.      The pirate sites would not be able to thrive were it not for third party service providers who provide valuable services to these sites.  These third party providers include hosts, content delivery networks, advertising networks and affiliate programs.  These companies display terms of service saying they don't allow copyright or trademark infringement and reserve the

right to terminate service to offenders.  These terms are for public consumption, however, for even in the face of red flags of infringement, as well as actual notice of infringement, the companies named herein have continued to provide valuable services to pirate sites, thus continuing to profit from the draw of infringement.  None of the companies named herein have implemented a policy of terminating service to repeat infringers.

7.     To make matters worse, these third party providers confound the efforts of copyright owners like ALS who seek to terminate chronic infringement by pirate sites by asserting meritless defenses, claiming a distant relationship from the pirate sites and in some cases refusing to disclose information known to them about which persons or companies directly own, control or host the pirate sites.

8.     On information and belief, certain of the Defendants named herein have directly infringed upon ALS's copyrights and trademarks.  On information and belief, certain of the Defendants named herein have, with actual and/or constructive knowledge of direct infringements of ALS works, materially contributed to or aided in such infringement.  On information and belief, certain of the Defendants named herein, with the right and ability to control or supervise such infringing activity, have continued to profit from such activity.  For these reasons, the parties named herein should be held liable for direct, contributory and vicarious copyright infringement and direct and contributory trademark infringement.

**Parties**

9.     ALS is a Maryland corporation with its principal office in Woodstock, Maryland.  ALS is the sole owner of the copyrighted works that are the subject of this action, all of which have been registered with the U.S. Copyright Office.  ALS is the sole owner of the trademarks at issue in this action, which have been registered with the US Patent and Trademark Office.

10.     On information and belief, CloudFlare, Inc. ("Cloudflare") is a Delaware corporation with its principal offices at 101 Townsend, San Francisco, CA 94107.  On information and belief, CloudFlare provides a variety of Internet services to clients, including provision of a "content delivery network" that delivers services to hosts of pirate sites.

11.     On information and belief, Tiger Media, Inc. ("Tiger") is a corporation organized as a provincial Saskatchewan corporation with its principal office in Regina, Saskatchewan.  On information and belief, Tiger owns and operates the online advertising network known as "Juicy Ads," www.juicyads.com.  On information and belief, Tiger maintains a number of clients in this District, who are able to obtain client accounts and conduct commerce with Tiger from this District through the interactive Juicy Ads website.

12.     On information and belief, Defendant OVH SAS is a French corporation with offices at 2 Rue Kellerman, 59100 Roubaix France.

13.     On information and belief, Defendant Hebergement OVH Inc. is a Québec provincial corporation with offices at 800-1801 av. McGill College, Montréal, Québec H3A2N4 Canada.  On information and belief, the OVH companies provide web hosting and related services to pirate sites.

14.     On information and belief, Defendant Dolphin Media, Ltd. ("Dolphin") is a Hong Kong company with offices at Suite 801, 8/F, Singga Commercial Centre, 144-151 Connaught Road West, Hong Kong.  On information and belief, Dolphin owns and operates a pirate site, imgchili.net.

15.     On information and belief, Defendant Hivelocity Ventures Corporation ("Hivelocity") is a Florida corporation with offices at 8010 Woodlands Center Blvd., Suite 700, Tampa, Florida 33614.  On information and belief, Hivelocity hosts pirate sites, including namethatpornstar.com.

First Amended Complaint

16.     On information and belief, Steadfast Networks, LLC ("Steadfast") is a Delaware limited liability company with offices at 800 S. Wells St., Suite 190, Chicago, IL 60607.  On information and belief, Steadfast hosts pirate sites, including imagebam.com.

17.     On information and belief, Defendant Duodecad IT Services Luxembourg S.à.R.L. ("Duodecad") is a company organized under the laws of the Grand Duchy of Luxembourg company with its principal office at 44 Avenue John F. Kennedy, L-1855 Luxembourg.  On information and belief, Duodecad owns and operates the online advertising business known as "AWEmpire," www.awempire.com.  On information and belief, AWEmpire is the advertising program for other sites owned and operated by Duodecad, prominently www.livejasmin.com.  On information and belief, Duodecad routinely accepts and pays for traffic driven to Duodecad through the draw of infringing content.

18.     ALS has no knowledge of the true names and capacities of the parties sued as Doe Defendants 1-10, inclusive, and therefore sues them using fictitious names.  ALS will amend this Complaint to identify these Doe Defendants specifically if and when their true names and capacities are ascertained.

19.     On information and belief, through their acts or omissions, Does 1-10 are responsible, along with the other specifically-named defendants, for the injuries alleged, and therefore are liable for them.  On information and belief, at all times, the specifically-named defendants and Does 1-10 were principals, agents, and representatives of each other, or acting in concert with one another, such that the acts or omissions of any of them can be ascribed to the others.

**ALS Background**

20.     ALS was founded in 1996.  ALS owns a substantial library of self-produced adult entertainment images and videos.  ALS was one of the first

- 4 -

companies to provide consumers with access to adult entertainment on secure websites.  ALS charges consumers fees in consideration for a user identification and password which will provide the consumer with access to proprietary content on ALS's secure Internet sites.  ALS also sells proprietary ALS content on DVDs.  ALS displays its trademark and copyright information on its works.

21.     ALS has submitted hundreds of registrations for its copyrighted works to the U.S. Copyright Office, including registrations covering all of the works referenced in the notices of infringement averred herein.  A true and correct summary of the hundreds of copyright registrations submitted by ALS is attached hereto as Exhibit 1.

22.     ALS is the owner of Trademark Reg. No. 2137225, registered February 17, 1998 for the mark "ALS Scan" in connection with CD Roms featuring adult entertainment.  ALS is the owner of Trademark Reg. No. 3062202, registered February 28, 2006 for the mark "ALS Scan" in connection with web sites and multimedia materials featuring adult entertainment.  True and correct copies of screen shots reflecting these registrations are attached hereto as Exhibit 2.

23.     ALS content display both a copyright notification indicating that the work is copyrighted to ALS and the year of the work's creation, as well as ALS's registered "ALS Scan" trademark.

### The Challenge Posed by Infringement on the Internet

24.     One of the most significant business threats faced by ALS is widespread infringement of its copyrighted works and trademarks on the Internet.  Beginning around 2000, and continuing to the present, ALS images have been displayed on growing numbers of illicit websites, without the knowledge of or license from ALS.  Around this time consumers began to graduate from relatively slow dial-up Internet access to dedicated higher speed Internet connections.  The emergence of peer-to-peer file sharing networks and

"newsgroups" grew in use and popularity. These networks allowed consumers to upload and share content with others. Enormous quantities of infringing ALS content have been posted on these file sharing and newsgroup sites. High connection speeds have permitted massive download and upload of libraries of infringing content.

25.    The observed growth of infringing content on these networks coincided with noticeable decline in ALS's profits. During this time ALS has continued to produce high quality adult entertainment content, transitioning from shooting with print film to high resolution digital content. Despite these efforts, sales have declined. There are no material factors to explain this decline other than the ubiquitous presence of infringing ALS content on the Internet.

26.    Attempting to enforce copyright laws against pirate sites can be taxing. They tend to be shadowy companies in far-flung jurisdictions. Often the pirates register their web domains with a private registry, thus masking their identity. Pirate websites or their hosts engage the services of content delivery networks, who cache a copy of a website and who are identified in searches as the situs for that website, yet who when contacted refuse to disclose the identity of the host or site owner. The effort and expense of haling these pirate sites into Court may not be warranted, as they are likely to find it cheaper and easier to disappear and resume services on some other website under some other entity.

27.    The pirate sites would not be able to thrive were it not for third party service providers who provide valuable services to these sites. These third party providers include hosts, content delivery networks, advertising networks and affiliate programs. These companies display terms of service saying they don't allow copyright or trademark infringement and reserve the right to terminate service to offenders. These terms are for public consumption, however, for even in the face of red flags of infringement, as well as actual

First Amended Complaint

notice of infringement, the companies named herein have continued to provide valuable services to pirate sites, thus continuing to profit from the draw of infringement.  None of the companies named herein have implemented a policy of terminating service to repeat infringers.

28.     To make matters worse, these third party providers confound the efforts of copyright owners like ALS who seek to terminate chronic infringement by pirate sites by asserting meritless defenses, claiming a distant relationship from the pirate sites and in some cases refusing to disclose information known to them about which persons or companies directly own, control or host the pirate sites.This case raises the problem of service providers who continue to do commerce with pirate sites even after receipt of actual knowledge of repetitive acts of infringement on such sites.  As averred below, these service provides turn a blind eye to actual notice that these sites are repeat infringers and continue to profit from doing business with these sites.  They have systematically failed to implement or enforce a repeat infringer policy.

**Cloudflare**

29.     CloudFlare, according to www.cloudflare.com, is a "web performance and security company."  Cloudflare says it offers: (1) a content delivery network ("CDN"); (2) web content optimization; (3) website security; (4) DDoS (denial of service) protection; and (5) a managed domain name system (DNS) network.

30.     Cloudflare says: "Once your website is a part of the CloudFlare community, its web traffic is routed through our intelligent global network. We automatically optimize the delivery of your web pages so your visitors get the fastest page load times and best performance. We also block threats and limit abusive bots and crawlers from wasting your bandwidth and server resources. The result: CloudFlare-powered websites see a significant improvement in performance and a decrease in spam and other attacks."

31.     CloudFlare's Terms of Service provides that it retains the right to investigate its customers, their sites and "the materials comprising the sites" at any time.  The Terms further provide that any violation of law will justify termination of CloudFlare's services. "CloudFlare's policy is to investigate violations of these Terms of Service and terminate repeat infringers."

32.     On information and belief, Cloudflare's CDN is a service offered to website hosts and operators.  The point is to speed a consumer's access to the website of Cloudflare's client through a series of data centers maintained by Cloudflare that cache mirror copies of that site.  Thus, consumers seeking to access the website of a Cloudflare client would retrieve the site from the closest Cloudflare data center rather than accessing the site from the primary host.  In Cloudflare's words: "CloudFlare operates out of 86 data centers around the world. Our CDN automatically caches your static files at our edge nodes so these files are stored closer to your visitors while delivering your dynamic content directly from your web server. CloudFlare then uses a technology called Anycast to route your visitors to the nearest data center. The result is that your website, on average, loads twice as fast for your visitors regardless of where they are located."

33.     On information and belief, another feature of Cloudflare's service is to allow pirate sites and their hosts to conceal their identity from copyright owners.  The domain registration information for some of the pirate sites referenced herein indicate that the sites reside on a Cloudflare server in Phoenix, Arizona.  When presented with a notice of infringement, however, Cloudflare asserts that it is itself unable to remove any infringing content, that it supposedly has legal immunities if it does not terminate services to its clients and refuses to disclose the identity of the primary host and site owner.  In this fashion Cloudflare acts as a firewall protecting pirate sites and their hosts from legal recourse by copyright owners.

34.     ALS's agent for infringement notifications, Mr. Easton, sent numerous notices to Cloudflare and others of infringement of ALS works on sites wherein publicly available information reflected that the sites resided on a server maintained by Cloudflare.  "Pinging" certain of the pirate websites as averred below also return data reflecting that the sites reside on a server maintained by Cloudflare.

35.     On information and belief, Cloudflare has persisted in offering CDN and related services in relation to pirate websites, notwithstanding numerous notifications of infringement on such sites.

36.     When Cloudflare learned about this lawsuit, it contacted counsel for ALS and offered to reveal its information concerning the owner(s) of the sites of which ALS complained, but only in exchange for a release of liability in favor of Cloudflare.

37.     On information and belief, Cloudflare continues to provide services to The Pirate Bay, even though The Pirate Bay has been raided by authorities and the site's owner has been arrested for chronic copyright infringement.

38.     The Digital Citizens Alliance, a Hollywood-affiliated group, has published a report highly critical of Cloudflare's role in providing invaluable services and cover for pirate sites.

39.     Cloudflare may defend itself by claiming it is at least one party removed from the direct site owner, in that Cloudflare may be contracting with the pirate site hosts rather than the pirate sites themselves.  However, as averred herein, Cloudflare has induced, contributed to, profited from, aided and abetted infringement, failing and refusing all along to implement or enforce a repeat infringer policy, and is thus liable for the infringements alleged herein.

**Tiger Media – JuicyAds**

40.     Tiger owns and operates the "JuicyAds" advertising network.

41.     Tiger explains on the JuicyAds web page that it is far more than a mere advertiser.  Tiger says JuicyAds is a "network," a "marketplace," a "community" and a "platform."

42.     JuicyAds' home page says: "JuicyAds is the sexy advertising network.  It is a marketplace for Publishers to increase their revenues by selling ad space to Advertisers."

43.     In JuicyAds' parlance, according to its Terms of Service: "'JuicyAds' is an advertising brokerage service, accessible at www.juicyads.com, which allows website Publishers to place ads on their websites and for Advertisers to buy the space.  All aspects of this service are collectively referred to herein as 'JuicyAds'."  "'Users' are individuals or companies registered through the JuicyAds service as either an Advertiser or a Publisher."  "'Publishers' are Users who sell advertising through the JuicyAds service."  "'Advertisers' are Users who buy advertising through the JuicyAds service."

44.     JuicyAds' "About" page says: "We have one of the best and most easy to use interfaces for purchasing ads in the industry and one of the only with purchasing in seconds and instant approval."  "We deliver over one Billion impressions daily and always growing."  "Serving 172,000+ websites and 92,000+ clients, and more joining daily."  "We protect our clients with the strongest click fraud detection in the industry.   Your profits matter to us.  So sit back, relax, get Juicy and make money!"  "We stand alone and in front as the most favorite, highest-rated, most respected, and most trusted Ad Network."  "We always choose the needs and expectations of our Publishers and Advertisers above making a 'quick buck.'  We care about your traffic as much as you do.  That means that as an advertising platform, our goal is to provide income for both the advertisers and publisher without annoying surfers or disrupting the surfing experience."  "We provide personal service and help to

Publishers and Advertisers everyday [sic].  Answering questions, helping people setup or buy ads, and giving advice for using our service is just what we do.  If you need help, just ask."

45.    JuicyAds' "Lifestyle" page invites member of the JuicyAds network to "Become a part of the JuicyAds Lifestyle!"  "We are building a better advertising network, not just a bigger one.  Our community of Publishers and Advertisers and the lifestyle they enjoy with us unparalleled in the industry [sic]."  The page goes on to invite Users to members-only JuicyAds events.

46.    JuicyAds reserves sole discretion and ability to suspend or terminate any Users' account at any time.  JuicyAds' Terms of Service prohibit websites that engage in "Distribution of any Copyrighted materials without permission (Copyright Infringement), or linking to any Copyrighted materials (Contributory or Vicarious Infringement)."  TOS ¶ IV.(a)(vii). JuicyAds reserves the right to "investigate any aspect of any account at any time without notice" and suspend payments and access to the JuicyAds service.  TOS ¶ XI.

47.    According to JuicyAds' DMCA page: "It is JuicyAds' policy to (1) remove or block access to material that it believes in good faith to be copyrighted material that has been illegally copied and distributed by any of our customers, advertisers, publishers, affiliates, members or users; (2) remove or disable access to material that is claimed in good faith to be infringing upon copyrighted material upon notification to our Designated Agent with terms in the notice required by the DMCA; and (3) remove and discontinue service to repeat offenders."

48.    Webmasters apply through the JuicyAds website to become Publishers in the vast JuicyAds network.  Prospective Publishers inform JuicyAds of the URL of their website, receive a PIN from JuicyAds then use that PIN to receive computer code that permits the Publisher to place an ad served by JuicyAds on the Publisher's website.  The process by which a User

1  can get his site registered as a Publisher in the JuicyAds network is fast and
2  automated, without contact from JuicyAds personnel.

3    49.    JuicyAds' Advertisers can use robust search capabilities on
4  juicyads.com to locate and review Publisher sites, including detailed analytics
5  regarding the traffic to each such site.  JuicyAds offers Users various ways to
6  frame searches for Publisher sites, including by categories of content types (e.g.
7  "Asian" or "Pornstar"), Alexa rating, content rating, sites per page and website
8  types (e.g. "Blog" or "Dating/Casual").  JuicyAds displays analytics for each of
9  its Publisher sites including Alexa rankings, daily views and daily clicks.

10    50.    Publishers choose the price for their traffic, from which JuicyAds
11  takes a 25% commission.  Advertisers can choose to purchase traffic either
12  from specific Publishers or across the entire run of Publishers.

13    51.    When a consumer clicks on a JuicyAds ad on a Publisher site, s/he
14  is transported momentarily to the JuicyAds server then to the site of a
15  purchasing Advertiser.

16    52.    JuicyAds provides extensive customer support to its network of
17  Publisher and Advertisers, including a personal account representative, online
18  live support and online answers to frequently asked questions.

19    53.    ALS, through its authorized agent Steve Easton, sent 195 separate
20  email notifications to JuicyAds with multiple hyperlinks of entire galleries of
21  infringing ALS images on imgchili.net, a site on which JuicyAds' ads were
22  routinely placed proximate to stolen ALS content.  However, JuicyAds refused
23  to apply its repeat infringer policy to imgchili.net.

24    54.    Concerned about JuicyAds' attitude and the possibility that
25  JuicyAds harbored other repeat infringers in its network, ALS employee Eric
26  Penn obtained a personal JuicyAds account and used JuicyAds' detailed online
27  search tools to locate eight additional Publishers in the JuicyAds network that
28  chronically display infringing ALS content.

55.     Penn submitted information to JuicyAds that his Publisher website within the JuicyAds network was www.stolenalspictures.com.  In response, JuicyAds sent Penn information and hyperlinks that permitted him to place JuicyAds ads on stolenalspictures.com.

56.     The landing page on stolenalspictures.com.says at the top: "StolenALSImages.com – Infringing ALS Photos Made Free."  The subtitle says: "Why Pay for Porn When You Get it Free?"  The first paragraph says: "StolenALSImages.com features the same popular picture sets you can get with the purchase of ALSScan.com and ALSAngels.com memberships, for FREE! How do we do this?  First, we stole these copyrighted images from ALS without paying a license fee.  –Then, we get advertisers who profit from copyright infringement to pay us for traffic.  So if you enjoy having free access to these ALSScan.com and ALSAngels.com photo sets, please be sure to click on one of our ads!"

57.     Stolenalspictures.com has been and remains a Publisher in the JuicyAds network.

58.     JuicyAds was first relatively compliant in response to ALS's notices.  ALS's agent for infringement notifications, Mr. Easton has corresponded with Juicy Ads' principal, Gerardus Van Ginneken, who goes by "Juicy Jay," concerning infringement on JuicyAds' Publisher sites.  At first, Juicy Jay's correspondence reflected his willingness to enforce JuicyAds' policy to terminate repeat infringers.  On July 21, 2011 Juicy Jay said about an infringing site in the JuicyAds network: "I have suspended this domain from our network due to the repeated infringements."  In a July 26, 2011 email concerning infringements on freebirdnet.org, Juicy Jay said "I suspended this website from our network . . I took a look at the site and it was all stolen content."  (Emphasis added.)  He further said "Unfortunately, for the most part the ad networks seem to care about profits, not piracy. . . . We have taken a

position to try and combat blatant piracy for those who refuse to comply or chronic offenders. . . . Ultimately, anyone we don't service in our network, is a potential client for them.  These pirates jump from network to network . . whoever will take them."

59.    By 2012, Juicy Jay withdrew from his willingness to enforce JuicyAds repeat infringer policy, admitting that "it costs me money every time we take action."  Juicy Jay began to mouth the position that JuicyAds supposedly had no responsibility to act in relation to notification of infringements on its network.  "As a third party service its [sic] not really our responsibility to answer to DMCA requests on a website we have no ownership or direct connection to."  By 2013 Juicy Jay responded to Easton's infringement notifications with open hostility, even threatening him with legal action for continuing to send his infringement notices.

60.    On November 27, 2015 Mr. Easton sent an email to Juicy Jay, pointing out that he had sent well over one hundred notifications of infringement on imgchili.net, that JuicyAds' own Terms of Service say they terminate repeat infringers, yet they had not terminated imgchili.net.  Juicy Jay responded with contempt and aggression, stating "[t]his behaviour appears to be abusive in nature" and demanding that Easton supply yet another copy of the notifications that had been sent for Juicy Jay's "review."

61.    Juicy Jay says he can "look" at a site and tell it is a pirate site.  He is right.  Sites that lure traffic through the draw of infringement, and then monetize this traffic through virtual networks like JuicyAds, are easy to spot.  First, pirate websites don't charge a subscription fee to view their content.  Second, a pirate site often displays content by multiple copyright owners, sometimes leaving the owners' copyright notification on the image.  Third, a pirate site displays entire galleries of ALS models, perhaps 200 or more images, rather than the sixteen or so images we authorize our affiliates to use.  Fourth,

the images are available for download, sometimes with a convenient zip download feature that permits a user to download an entire ALS gallery in one click.  Fifth, the site is not pointing traffic to ALS but to third parties.

62.  Tiger materially contributed to the infringing conduct of its Publishers.  Tiger built and maintained a "network," a "marketplace," a "community" and a "platform" of Users, Publishers who sell traffic and Advertisers who buy traffic from Publishers.  Tiger requires potential users to apply for membership in its network.  Tiger advertises, and provides valuable search tools and data regarding, each of its Publishers.  Tiger's search tools allowed ALS to find numerous additional cases of repeat infringement of ALS works by Publishers in the JuicyAds' network.  Tiger provides customer service and detailed technical support for its Users.  Tiger provides code that permits Publishers to put JuicyAds ads on their sites, next to infringing content.  JuicyAds serves the ads on Publisher sites, then redirects traffic to purchasing Advertisers when a consumer clicks on the JuicyAds ad.  Tiger charges Advertisers and pays Publishers for this traffic.

63.  Tiger has formed a direct client relationship with Publishers, who publish infringing content in a network created and maintained by Tiger.  Tiger admits that it can "remove or block access to material that it believes in good faith to be copyrighted material that has been illegally copied and distributed."  Tiger maintains search functions on its website that can assist or enable Internet users to locate infringing material.  It would be difficult for the Publishers' infringing activity to take place in the massive quantities alleged without the support services provided by Tiger.  Tiger has created a virtual centralized place where infringing works could be collected, sorted and found.  Tiger advertises and otherwise promotes its Publisher websites.  Tiger constructs and maintains a network in which it encouraged Publishers to become clients.  Tiger serves ads on the Publisher sites.  Tiger transports traffic driven to its servers from

- 15 -

First Amended Complaint

1  Publisher sites to purchasing Advertisers.  Tiger directly pays Publishers.  Tiger

2  admitted into its network a site that proclaimed it published stolen content.

3  Tiger said it would terminate repeat infringers.  Tiger ignored its own policy.

4  **OVH Companies**

5  64.     With respect to pirate sites wherein Cloudflare was identified as

6  serving the site, Cloudflare at first stonewalled Easton in terms of providing

7  information concerning the primary host.  Eventually Cloudflare identified the

8  OVH Companies as the primary host of the sites in question.  Once revealed,

9  Mr. Easton included the OVH Companies on his notifications of infringement.

10  65.     On information and belief, the OVH Companies have continued to

11  provide hosting services to pirate sites notwithstanding numerous notifications

12  of infringement.  On information and belief, the OVH Companies have failed to

13  implement and enforce a repeat infringer policy.

14  **Dolphin**

15  66.     On information and belief, Dolphin owns and operates the most

16  egregious pirate site averred herein, imgchili.net.  The publicly available

17  domain registration information for imgchili.net reflects only a private registry.

18  ALS found out about Dolphin only because Dolphin may have overlooked

19  using a private registry service for imgchili.com, a subsidiary domain that

20  redirects to imgchili.net.

21  67.     On numerous occasions, shortly after Mr. Easton sent an

22  infringement notification of multiple pages of infringing ALS works on

23  imgchili.net, usually by the next day fresh sets of infringing galleries of ALS

24  images were up on another imgchili.net page.  Mr. Easton played a frustrating

25  game of "whack-a-mole" wherein infringing galleries of ALS images simply

26  rotated around various pages on the imgchili.net site.

27  68.     Almost nothing about the imgchili.net site can be seen by looking

28  at the home page.  It contains spare information suggesting that users can sign

up for an account and upload content.  This is no site like dropbox.com, however, which caters to consumers who want to share family pictures or personal oversize files.  Instead, Dolphin offers to pay imgchili.net members $4.50 per thousand views of images uploaded to imgchili.net.  Dolphin is not offering to pay members money for page views of uploaded materials to encourage consumers to share pictures of their vacations.  On information and belief, Dolphin provides monetary incentives to induce members to steal and upload massive galleries of infringing adult content.

**Hivelocity**

69.    On information and belief, Hivelocity hosts pirate sites, including namethatpornstar.com.  ALS has sent numerous notifications to Hivelocity of infringing ALS content on namethatpornstar.com, but Hivelocity has failed to implement or enforce a repeat infringer policy by removing namethatpornstar.com from its servers.

**Steadfast**

70.    On information and belief, Steadfast hosts pirate sites, including imagebam.com.  ALS has sent numerous notifications to Steadfast of infringing ALS content on imagebam.com, but Steadfast has failed to implement or enforce a repeat infringer policy by removing imagebam.com from its servers.

**AWEmpire**

71.    On information and belief, Duodecad owns and operates the "AWE" or "AWEmpire" service, www.awempire.com.  According to awempire.com, "AWE is the official partner and exclusive affiliate program of LiveJasmin.com, the world's most visited webcam community."  "AWE offers some of the highest possible affiliate commissions . . . based on domain tracking! Not only that, but our payouts have also been punctual and reliable in the last ten years."

72.     According to Duodecad's Terms of Service, it owns, operates or controls "Company Websites."  A "Program Participant" or "Applicant" has the right to send Internet traffic to the Company Websites.  The Applicant has the right to access, download and use promotional banners and links on the Applicant's website that will direct traffic to the Company Websites.

73.     Duodecad's Terms of Service say that Applicants are forbidden from maintaining infringing uses on their websites.  The Applicant received fees for sending traffic to the Company Websites.  Duodecad reserves the right to terminate the Applicant's account at any time for violation of the Terms of Service.

74.     According to awempire.com, Duodecad offers various methods of compensation for sending Internet traffic to livejasmin.com or other "webcam" sites listed by AWEmpire, sites featuring people who offer a live adult entertainment performance for a fee.

75.     Notwithstanding its Terms of Service, Doudecad has received numerous notifications of infringement of ALS works on sites delivering advertisements through AWEmpire, yet Duodecad has failed to implement or enforce a repeat infringer policy by terminating its advertising relationship with these sites.

### Notifications of Infringement of ALS's Copyrights and Trademarks

76.     ALS, through its authorized agent Steve Easton, has sent numerous notifications alerting various of the Defendants in this action of the existence and location of works on pirate sites that infringe upon copyrights and trademarks owned by ALS.  Easton followed the below method.

77.     First, he personally observed that one or more pages on an adult website displayed infringing ALS images, often bearing the ALS copyright notification and "ALS Scan" trademark.  Easton knows from ALS which sites have authority to display ALS images, and which do not.

- 18 -

78.     Second, each time Easton encountered a pirate site with infringing ALS images, he personally observe which companies appear to own or be providing services to the site.  These third parties included web hosts, content delivery networks and advertising networks.

79.     Third, Easton prepared a notification to each of the parties that owns or provides services to a site on which infringing content appears of the location of the infringing images.  The notice contains links to the web pages on which ALS infringing content appears.

80.     Fourth, Easton followed up to observe what happened after he sent notifications of infringement.  For some sites the infringing content remained.  In some cases the content in the notification went down but other infringing ALS content appeared on the site shortly thereafter.  In all cases, except as noted below, the parties sued herein continued to provide services

81.     The following sites have been the subject of numerous notifications to the Defendants in this action of infringement of ALS's copyrights and trademarks.  In all of these cases, the notifications alerted the Defendants to thousands of pages on pirate sites displaying ALS's copyrighted works and the "ALS Scan" trademarks.  As noted below the following Defendants owned or provided services to the pirate sites.

         a.  imgchili.net (Dolphin, Cloudflare, OVH, AWEmpire, JuicyAds)

         b.  namethatpornstar.com (JuicyAds, Hivelocity)

         c.  slimpics.com (JuicyAds, Cloudflare)

         d.  cumonmy.com (JuicyAds, Cloudflare)

         e.  bestofsexpics.com (JuicyAds, Cloudflare)

         f.  teenbe.com (JuicyAds)

         g.  mymaturespace.com (JuicyAds)

         h.  spankwiki.net (JuicyAds)

i.  stooorage.com (JuicyAds, Cloudflare, OVH)

j.  greenpiccs.com (Cloudflare)

k.  imagebam.com (Steadfast, AWEmpire)

l.  imgsen.se (Cloudflare)

m.  imgspice.com (Cloudflare, AWEmpire)

n.  imgspot.org (Cloudflare)

o.  uploadhouse.com (JuicyAds)

p.  img.yt (Cloudflare)

q.  vipergirls.to (Cloudflare, AWEmpire)

r.  urlgalleries.net (AWEmpire)

s.  imagefap.com (AWEmpire)

t.  others as shown by proof at trial.

82.     In some of these cases, the direct infringer responded to the notices by taking down the works pinpointed in the notice, but as early as the next day the same set of infringing ALS images or a different set of infringing ALS images is uploaded to the same site.  In other cases the direct infringer ignored the notification and continued to display the infringing works.

83.     Even though the law requires parties to terminate business with repeat infringers, and even though Defendants' own terms state that they will terminate business with repeat infringers, with the following exceptions, none of the Defendants have terminated its business accounts with these chronic direct infringers.  On information and belief, this is because they make money by continuing to do commerce with sites that draw traffic through the lure of free infringing content.

84.     The only exceptions of which ALS is aware is that after JuicyAds was served with the Complaint in this action it appeared to have terminated services to the sites listed in the Complaint.  Also, at some point in time, but

First Amended Complaint

only after many infringement notifications, AWEmpire appears to have ceased advertising with imgchili.net

85.     The infringing ALS works that are the subject of the notifications averred above bear the registered ALS Scan trademarks.  The pirate sites listed above have directly infringed ALS's trademarks by using ALS's registered marks without ALS's knowledge or consent in a manner likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation or approval of such works.  The works being published by the direct infringers are counterfeits bearing the ALS marks without authority.  The third party defendants named herein have induced or contributed to such trademark infringement by continuing to provide services, including services as advertising brokers and Internet services, to the directly infringing sites after actual or constructive knowledge of their acts of infringement.

86.     Many of the sites listed above reside on servers and/or content delivery networks within the United States.

87.     Some of the Defendants may claim safe harbors under 17 USC § 512.  ALS denies that any would apply, but if they do, such safe harbors have been lost through ignoring red flags of infringement, ignoring actual notifications of infringement, failure to adopt and reasonably implement a repeat infringer policy and failure to accommodate, and interference with, standard technical measures.

## First Claim for Relief – Against Dolphin and Does 1-5
## Direct Copyright Infringement

88.     For its First Claim for Relief, ALS incorporates by reference the averments of ¶¶ 1-87 above.

89.     Dolphin, on information and belief the owner and operator of imgchili.net, and Does 1-5, on information and belief the owners or operators of

1  the above-listed pirate sites, have directly infringed on ALS's copyrighted
2  works.

3        90.    As a result of these Defendants' acts of infringement, ALS is
4  entitled to injunctive relief, damages, disgorgement of profits, statutory
5  damages and attorneys' fees.

6        **<u>Second Claim for Relief – Against All Defendants</u>**
7        **<u>(other than Dolphin) and Does 6-10</u>**
8        **<u>Contributory Copyright Infringement</u>**

9        91.    For its Second Claim for Relief, ALS incorporates by reference the
10 averments of ¶¶ 1-90 above.

11       92.    All named Defendants (other than Dolphin), and Does 6-10, have,
12 with actual and/or constructive knowledge of direct infringements of ALS's
13 copyrighted works, materially contributed to or aided in such infringement.
14 Such defendants are thus liable for contributory copyright infringement.

15       93.    All named Defendants (other than Dolphin), and Does 6-10, have
16 induced infringement of ALS's copyrights.

17       94.    As a result of these Defendants' acts of infringement, ALS is
18 entitled to injunctive relief, damages, disgorgement of profits, statutory
19 damages and attorneys' fees.

20       **<u>Third Claim for Relief – Against All Defendants</u>**
21       **<u>(other than Dolphin) and Does 6-10</u>**
22       **<u>Vicarious Copyright Infringement</u>**

23       95.    For its Third Claim for Relief, ALS incorporates by reference the
24 averments of ¶¶ 1-94 above.

25       96.    All named Defendants (other than Dolphin), and Does 6-10, have,
26 with the right and ability to control or supervise the direct infringement averred
27 herein, failed to exercise such right and ability and have directly benefited

28

financially from such infringing activity.  Said Defendants are thus liable for vicarious copyright infringement.

97.     As a result of these Defendants' acts of infringement, ALS is entitled to injunctive relief, damages, disgorgement of profits, statutory damages and attorneys' fees.

### Fourth Claim for Relief – Against Dolphin and Does 1-5
### Direct Trademark Infringement

98.     For its Fourth Claim for Relief, ALS incorporates by reference the averments of ¶¶ 1-97 above.

99.     Dolphin and Does 1-5 have directly infringed ALS's trademarks by using in commerce reproductions, counterfeits and copies of ALS's registered marks in a fashion likely to cause confusion, mistake or deception.

100.    As a result of these Defendants' acts of infringement, ALS is entitled to injunctive relief, treble damages, disgorgement of profits and attorneys' fees.

### Fifth Claim for Relief – Against Dolphin and Does 1-5
### Direct Trademark Counterfeiting

101.    For its Fifth Claim for Relief, ALS incorporates by reference the averments of ¶¶ 1-100 above.

102.    Dolphin and Does 1-5 have used counterfeits of ALS's registered marks in connection with the sale, offering for sale or distribution of goods or services.

103.    As a result of these Defendants' acts of counterfeiting, ALS is entitled to injunctive relief, treble damages, disgorgement of profits, statutory damages and attorneys' fees.

**Sixth Claim for Relief – Against All Defendants**

**(other than Dolphin) and Does 6-10**

**Contributory Trademark Infringement**

104.   For its Sixth Claim for Relief, ALS incorporates by reference the averments of ¶¶ 1-103 above.

105.   All named Defendants (other than Dolphin), and Does 6-10,  have continued to provide services to the above sites with actual and constructive knowledge of those sites' infringement of ALS's trademark, and are thus liable for inducing and contributing to direct trademark infringement.

106.   As a result of these Defendants' acts of inducing and contributing to trademark infringement and counterfeiting, ALS is entitled to injunctive relief, treble damages, disgorgement of profits, statutory damages and attorneys' fees.

**Seventh Claim for Relief – Against All Defendants**

**Unfair Competition**

107.   For its Seventh Claim for Relief, ALS incorporates by reference the averments of ¶¶ 1-106 above.

108.   The foregoing acts of trademark infringement, direct and secondary, constitute unfair competition under Cal. Bus. & Prof. Code § 17200.

109.   ALS has suffered injury in fact and has lost money or property as a result of these acts of unfair competition.

110.   ALS is entitled to temporary, preliminary and injunctive relief.

111.   ALS is entitled to an order requiring the Defendants to restore any money or property that may have been acquired through the foregoing acts of unfair competition.

## **PRAYER**

ALS prays for entry of judgment including the following relief:

A.      Actual damages in a sum to be proven at time of trial, in no event less than $10,000,000;

B.      Statutory damages;

C.      Disgorgement of Defendants' profits from their infringing activities;

D.      Trebling of damages;

E.      Costs and attorneys' fees;

F.      Preliminary and permanent injunctive relief;

G.      An order requiring the Defendants to restore any money or property that may have been acquired through the foregoing acts of unfair competition

H.      Such other and further relief as the Court deems appropriate.

DATED:  August 26, 2016                    SPILLANE TRIAL GROUP PLC

By: _____
                  Jay M. Spillane
      Attorneys for Plaintiff ALS Scan, Inc.

## **JURY DEMAND**

ALS demands trial by jury.

DATED:  August 26, 2016                    SPILLANE TRIAL GROUP PLC

By: _____
                  Jay M. Spillane
      Attorneys for Plaintiff ALS Scan, Inc.

First Amended Complaint

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this action.  My business address is: 468 N. Camden Drive, Second Floor, Beverly Hills, CA 90210-4507.  A true and correct copy of the foregoing document entitled (*specify*): **FIRST AMENDED COMPLAINT FOR:**
**1. DIRECT COPYRIGHT INFRINGEMENT;**
**2. CONTRIBUTORY COPYRIGHT INFRINGEMENT;**
**3. VICARIOUS COPYRIGHT INFRINGEMENT;**
**4. TRADEMARK INFRINGEMENT;**
**5. TRADEMARK COUNTERFEITING;**
**6. INDUCING TRADEMARK INFRINGEMENT; AND**
**7. UNFAIR COMPETITION**
 will be served or was served **(a)** on the judge in chambers in the form and manner required by Local Rules and **(b)** in the manner stated below:

1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and Local Rules, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 26, 2016, I checked the CM/ECF docket for this action and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Gary L. Bostwick– gbostwick@B1Law.com
Kevin S. Toll – kevin@silversteinlegal.com
Lawrence G. Walters – larry@firstamendment.com

☐ Service information continued on attached page

2.  **SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3.  **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) August 26, 2016, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served by Overnight Mail***
Hon. George H. Wu
U.S. District Court
312 N. Spring Street
Courtroom 10 – Spring St. Floor
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 8/26/2016 | Jessie Gietl | *Jessie Gietl* |
| --- | --- | --- |
| *Date* | *Printed Name* | *Signature* |