Gary L. Bostwick (Bar. No. 79000)
gbostwick@B1Law.com
**BOSTWICK LAW**
12400 Wilshire Blvd., Ste. 400
Los Angeles, CA 90025
(310) 979-6059

Corey D. Silverstein (appearing *pro hac vice*)
corey@silversteinlegal.com
Kevin S. Toll (appearing *pro hac vice*)
kevin@silversteinlegal.com
**SILVERSTEIN LEGAL**
30150 Telegraph Rd., Ste. 444
Bingham Farms, MI 48025
(248) 290-0655

Lawrence G. Walters (appearing *pro hac vice*)
larry@firstamendment.com
**WALTERS LAW GROUP**
195 W. Pine Ave.
Longwood, FL 32750
(407) 975-9150

Attorneys for Defendant Tiger Media Inc.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| **ALS SCAN, INC.**, <br><br> *Plaintiff*, <br><br> v. <br><br> **CLOUDFLARE, INC.**, et al., <br><br> *Defendants*. | Case No. 2:16-cv-05051-GW-AFM <br><br> **Memorandum of Points and Authorities in Opposition of Plaintiff ALS Scan, Inc.'s Motion for Preliminary Injunction Against Defendant Tiger Media Inc.** <br><br> Date: October 3, 2016 <br> Time: 8:30 a.m. <br> Place: Courtroom 10 |

# Table of Contents

Table of Authorities ................................................................................ iii

Introduction ........................................................................................... 1

Statement of Facts ................................................................................. 1

Standard of Review ............................................................................... 5

Argument ............................................................................................... 6

I.  ALS cannot establish that the law and facts clearly favor its position on its copyright and trademark infringement claims .......................................... 6

   A.  ALS cannot establish that the law and facts clearly favor its position on its contributory copyright infringement claim where Tiger has not materially contributed to any copyright infringement ......................................................... 7

   B.  ALS cannot establish that the law and facts clearly favor its position on inducement liability where no evidence exists that Tiger distributed JuicyAds with the object of promoting its use to infringe copyright ........................................................ 14

   C.  ALS cannot establish that the law and facts clearly favor its position on its vicarious copyright infringement claim where Tiger does not have the requisite right and ability to supervise and control infringing activity ........................................... 17

   D.  ALS cannot establish that the law and facts clearly favor its position on its contributory trademark infringement claim where Tiger does not have direct control and monitoring of the

i

instrumentality used to infringe ....................................... 22

II.    ALS fails to show it is likely to suffer irreparable harm ................................23

III.   The balance of equities disfavors an injunction .......................................... 24

IV.   Public interest does not favor mandatory injunctions .................................25

V.    Court should order substantial bond ........................................................25

Conclusion.......................................................................................................25

## Table of Authorities

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ...................................................................passim

*Columbia Pictures Indus., Inc. v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) ................................................. 15, 16, 17

*Demetriades v. Kaufman*,
   690 F. Supp. 289 (S.D.N.Y. 1988) .....................................................14

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ..............................................................7

*Elsevier Ltd. v. Chitika, Inc.*,
   826 F. Supp. 2d 398 (D. Mass. 2011) ........................................... 9, 13

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
   76 F.3d 259 (9th Cir. 1996) ...................................................7, 11, 12, 13

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015)...........................................................6, 25

*Goldie's Bookstore, Inc. v. Superior Ct.*,
   739 F.2d 466 (9th Cir. 1984) ...............................................................23

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
   456 U.S. 844 (1982) .......................................................................... 22

*Kolbe v. Trudel*,
   945 F. Supp. 1268 (D. Ariz. 1996)........................................................7

*Lockheed Martin Corp. v. Network Sols., Inc.*,
  194 F.3d 980 (9th Cir. 1999) ................................................................. 22

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
  658 F.3d 936 (9th Cir. 2011) ................................................ 8, 22, 23

*Lydo Enters. v. City of Las Vegas*,
  745 F.2d 1211 (9th Cir. 1984) ............................................... 23, 24

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
  571 F.3d 873 (9th Cir. 2009) ................................................................. 6

*Media.net Advertising FZ-LLC v. NetSeer, Inc.*,
  156 F. Supp. 3d 1052 (N.D. Cal. 2016) .............................................7

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ..............................................................passim

*Munaf v. Geren*,
  553 U.S. 674 (2008) ..............................................................5

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ........................................ 18, 19, 20, 21

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) ............................................... 14, 24

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
  213 F. Supp. 2d 1146 (C.D. Cal. 2002)................................ 13, 18, 20, 21

*Perfect 10, Inc. v. Google, Inc.*,
  416 F. Supp. 2d 828 (C.D. Cal. 2006)..............................................9

iv

*Perfect 10, Inc. v. Google, Inc.*,

   653 F.3d 976 (9th Cir. 2011)............................................................... 23, 24

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,

   494 F.3d 788 (9th Cir. 2007) ......................................................passim

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,

   No. 04-0371, 2004 WL 1773349 (C.D. Cal. Aug. 5, 2004)...................................7

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,

   907 F. Supp. 1361 (N.D. Cal. 1995) ...................................................... 8

*Routt v. Amazon.com, Inc.*,

   584 F. App'x 713 (9th Cir. 2014) ........................................... 18, 19, 21

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,

   718 F.3d 1006 (9th Cir. 2013)............................................... 9, 14, 24

*Winter v. Nat. Res. Def. Council, Inc.*,

   555 U.S. 7 (2008)........................................................................5, 6

**Statutes**

17 U.S.C. § 512 ........................................................................ 8, 17, 24

**Rules**

Fed. R. Civ. P. 65 ...........................................................................25

**Treatises**

C. Wright, A. Miller, & M. Kane,

   *Federal Practice and Procedure* (2d ed. 1995)..........................................5

Ian C. Ballon,

   *E-Commerce and Internet Law* (2015 update) .................................. 8, 17

### Introduction

Plaintiff ALS Scan, Inc. has filed this lawsuit and moved for a mandatory preliminary injunction designed to force Defendant Tiger Media Inc. to endure a process by which ALS may continuously dictate to Tiger how it must run its online advertising network. The proposed injunction would force Tiger to implement wide-ranging content review protocols for all existing and potential publisher customers, in an ongoing effort to identify and "weed out" any potential infringement of ALS's content by third parties. This breathtaking request for Tiger to police the Internet is unwarranted because ALS's motion fails every criterion relating to imposition of a preliminary injunction. ALS has not met its heavy burden of showing that the law and facts clearly favor its position, let alone a likelihood of success on the merits. It cannot show irreparable harm. The balance of hardships weighs against an injunction. Finally, the public interest disfavors an injunction that would hobble Tiger's ad network.

### Statement of Facts

Tiger is an online advertising brokerage company. Van Ginneken Decl. ¶ 3. Tiger acts as a middleman between "advertisers" who buy ad space, and "publishers" who operate independent websites. *Id.* The model is similar to a real estate agent, who does not own the property and simply connects a buyer with a seller. *Id.* Publishers and advertisers use their own independent hosting, domains, software, and other infrastructure to operate their websites and distribute their content. *Id.*

In 2006, Tiger created the JuicyAds online ad platform, which automates the delivery of ads (referred to as an ad network). *Id.* at ¶ 4. Participating publishers and

1  advertisers use JuicyAds to buy and sell ad space and raw traffic. *Id*. The JuicyAds
2  service is widely available to businesses and individuals, who may sign up at Juicy-
3  Ads.com by completing the registration form and accepting the Terms of Service
4  ("TOS") online. *Id*. Over 93,000 advertisers and publishers participate in the Juicy-
5  Ads ad network. *Id*.

6      JuicyAds is a self-serve platform, which gives advertisers the ability to place their
7  own ads on third-party publisher sites without the assistance of sales representatives.
8  *Id*. at ¶ 5. The JuicyAds platform provides a "marketplace" displaying the ad spots
9  available for purchase on participating publisher sites (only sites with volumes of over
10  1,000 visitors per day are included), similar to what Zillow.com does for real estate.
11  *Id*. Only registered JuicyAds users can access the information relating to publisher
12  sites listed in the JuicyAds "marketplace." *Id*. at ¶ 6.

13      In the JuicyAds ad network, the publisher's role is limited to signing up with Juicy-
14  Ads.com, adding its websites, adding ad zones (i.e., the location where the ad will be
15  displayed on the publisher's site) for sale, and placing JuicyAds ad code (which calls
16  the ad) in the code for the publisher site. *Id*. at ¶ 9. The publisher site's functionality,
17  content, and distribution are not affected by the addition or removal of the JuicyAds
18  ad code. *Id*. at ¶ 10. Publishers can add, move, modify, or completely remove ad spots
19  from their sites at any time, without notice to Tiger. *Id*. The ad code is fully inde-
20  pendent of the publisher site and even if the ad code is suspended (or removed), the
21  publisher's site continues to operate unaffected by the suspension (or removal). *Id*.

22      In the TOS, Tiger prohibits participating publishers and advertisers from violat-
23  ing Tiger's or any third party's intellectual-property rights. *Id*. at ¶ 11 (citing TOS
24

¶¶ IV(a)(vii), X(a)). Under the TOS, each "[u]ser takes full responsibility for the selection and use of the JuicyAds' service." *Id.* at ¶ 12 (quoting TOS ¶ III). In addition, "All [u]sers agree to use JuicyAds' service for purposes that are lawful within their jurisdiction, and agree not to use JuicyAds to distribute … unlawful content." *Id.*

Under the TOS, JuicyAds users remain "solely responsible for the development, operation[,] and maintenance of their website and all materials that appear on [u]sers' websites used in connection with the JuicyAds service." *Id.* at ¶ 13 (quoting TOS ¶ XIII). In addition, "JuicyAds expressly disclaims any ownership or control of [u]sers' sites or content." *Id.* Further, each "[u]ser acknowledges full responsibility for their websites and their activities in conjunction." *Id.* And each "[u]ser shall be responsible for ensuring materials made available through their websites do not violate or infringe upon … the rights of any third party." *Id.* "JuicyAds reserves the right … to terminate its services to any [w]ebsite at any time, at its sole and exclusive discretion." *Id.* (quoting TOS ¶ IV).

Tiger does not create, operate, or control any of the third-party publisher sites that participate in the JuicyAds ad network, including the third-party publisher sites that ALS identified in the First Amended Complaint ("FAC"). *Id.* at ¶ 14. Tiger does not advertise or otherwise promote to consumers any of the third-party publisher sites that participate in the JuicyAds ad network, including the third-party publisher sites that ALS identified in the FAC. *Id.* Tiger's actions are limited to promoting to advertisers the availability of ad space on participating publisher sites. *Id.*

Tiger does not host or operate the servers on which third-party publisher sites

3

reside, including the publisher sites that ALS identified in the FAC. *Id.* at ¶ 15. Tiger does not provide JuicyAds customers (or anyone else) with tools to locate infringing material; nor does any infringing material ever reside on or pass through any network or computer Tiger owns or operates. *Id.* None of the alleged infringing materials identified by ALS are stored, maintained, or available on systems or facilities operated by Tiger. *Id.* Nor does Tiger make software available that facilitates infringement or the distribution or location of infringing material. *Id.* Finally, Tiger does not facilitate or control consumer access to third-party publisher sites, or offer a site or a service through which consumers could search for or download infringing content. *Id.*

Tiger does not direct any activity within any third-party publisher site, preapprove any content on any third-party publisher site, or have the ability to affect or control conduct by third-party publishers or any other third party. *Id.* at ¶ 16. Any instructions or support Tiger gives regarding how to use the JuicyAds ad network are focused on how to use the platform not on how publishers should operate their websites. *Id.* Tiger does not control the layout, appearance, or content of third-party publisher sites. *Id.* Nor does Tiger have the right or ability to remove, disable, or block access to infringing material located on third-party publisher sites, *id.*, let alone have the right or ability to require third-party publishers to do the same. *Id.*

Tiger's only recourse for publisher misbehavior is to suspend or terminate the publisher's account and discontinue payment of any ad revenues to the publisher. *Id.* at ¶ 17. When Tiger suspends or terminates a publisher's account, JuicyAds stops serving ads to the publisher's site. *Id.* But the ad zones and ad code remain on the publisher's site because Tiger does not have the ability to remove ad zones or ad

1    code from third-party websites. *Id.*

2    Suspending or terminating a publisher from the JuicyAds ad network does not

3 stop that publisher from continuing to reproduce, display, and distribute infringing

4 material on its site. *Id.* at ¶ 18. Nor does it terminate that publisher's ability to host

5 and serve any infringing content on its site. *Id.* The terminated or suspended pub-

6 lisher may still reproduce a third party's copyrighted works (including ALS's) and

7 post them on its site, all without Tiger's aid, approval, or even knowledge. *Id.* Thus,

8 although it can terminate or suspend a publisher's account, Tiger cannot stop the

9 publisher from continuing its infringing activity on its site. *Id.*

10 **Standard of Review**

11    "A preliminary injunction is an 'extraordinary and drastic remedy' …; it is never

12 awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). "A plaintiff

13 seeking a preliminary injunction must establish that he is likely to succeed on the

14 merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

15 that the balance of equities tips in his favor, and that an injunction is in the public

16 interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In each case,

17 courts 'must balance the competing claims of injury and must consider the effect on

18 each party of the granting or withholding of the requested relief.'" *Id.* at 24 (cita-

19 tion omitted). "The policy against the imposition of judicial restraints prior to an

20 adjudication of the merits becomes more significant when there is reason to believe

21 that the decree will be burdensome[.]" 11A C. Wright, A. Miller, & M. Kane, *Federal*

22 *Practice and Procedure* § 2948.2 (2d ed. 1995).

23    "A preliminary injunction can take two forms. A prohibitory injunction prohibits

24

5

a party from taking action and 'preserve[s] the status quo pending a determination of the action on the merits.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) (citation omitted). "A mandatory injunction 'orders a responsible party to "take action."'" *Id.* at 879 (citations omitted). "A mandatory injunction '"goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored."'" *Id.* (citations omitted). "In general, mandatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.'" *Id.* (citations omitted).

Because ALS's proposed injunction requires Tiger to take affirmative action, ALS is seeking a mandatory injunction and "must establish that the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (emphasis in original).

### Argument

### I. ALS cannot establish that the law and facts clearly favor its position on its copyright and trademark infringement claims

"The first factor under *Winter* is the most important—likely success on the merits." *Id.* "Because it is a threshold inquiry, when 'a plaintiff has failed to show the likelihood of success on the merits, [the court] "need not consider the remaining three [*Winter* elements]."'" *Id.* (citations omitted). But ALS's "burden here is doubly demanding: Because [ALS] seeks a mandatory injunction, [it] must establish that the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Id.* For the reasons stated below, ALS cannot do so.

**A. ALS cannot establish that the law and facts clearly favor its position on its contributory copyright infringement claim where Tiger has not materially contributed to any copyright infringement**

To prevail on its claim for contributory copyright infringement,[1] ALS must show that Tiger "(1) has knowledge of a third party's infringing activity, and (2) 'induces, causes, or materially contributes to the infringing conduct.'" *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007) (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)). ALS cannot establish material contribution here.

ALS fails to show that Tiger materially contributed to any copyright infringement by any third-party publisher. "Material contribution" is more than passive participation. *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996). And mere contribution to an infringer's general business is insufficient; "'the … assistance must bear some direct relationship to the infringing acts.'" *Perfect 10, Inc. v. Visa*, 2004 WL 1773349, at *3 (C.D. Cal. Aug. 5, 2004) (citation omitted).

Material contribution may be found only when the defendant "engages in personal conduct that ***encourages*** or ***assists*** the infringement." *A&M Records, Inc. v.*

---

[1] ALS also fails to establish direct copyright infringement because the FAC does not identify the works ALS claims the defendants allegedly infringed, let alone allege that a specific registration was infringed. Instead, ALS attaches a list of "the hundreds of copyright registrations submitted by ALS[.]" FAC ¶ 21. This is insufficient. *See Media.net Advertising FZ-LLC v. NetSeer, Inc.*, 156 F. Supp. 3d 1052, 1068 (N.D. Cal. 2016) ("Dismissal is thus warranted as Plaintiff fails to identify which sections it alleges Defendant copyrighted."). Nor does ALS adequately allege that the infringing acts occurred within the United States. Instead, ALS alleges that "[m]any of the sites listed above reside on servers and/or content delivery networks within the United States." FAC ¶ 86. This is also insufficient. *See Kolbe v. Trudel*, 945 F. Supp. 1268, 1270 (D. Ariz. 1996) ("plaintiff can only state a claim fully cognizable under the copyright laws by alleging an act of infringement within the United States.").

1   *Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001) (emphasis added). Material con-

2   tribution has been found in limited circumstances where a defendant has provided

3   hosting services that are engaged in distribution of the infringing material. *See, e.g.*,

4   *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1375

5   (N.D. Cal. 1995) (hosting services engaged in distribution of infringing images); *see*

6   *also Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 943 (9th Cir.

7   2011) (providing direct infringers with server space satisfies the material contribu-

8   tion standard). But the defendant's "[p]articipation must be substantial." *Netcom*,

9   907 F. Supp. at 1375. Thus, "Material contribution turns on whether the activity in

10   question 'substantially assists' direct infringement."[2] *Louis Vuitton*, 658 F.3d at 943.

11   ALS argues that Tiger materially contributed to publishers' infringing conduct.

12   *See* Pl.'s Mem. Supp. Prelim. Inj. 16. ALS identifies (and mischaracterize) various

13   features of the JuicyAds platform that it claims "materially contribute to the infring-

14   ing conduct" of the publishers of the third-party sites ALS identifies in the FAC. But

15   the JuicyAds platform features that ALS identifies have nothing to do with a third-

16   party publisher's alleged infringing activity, let alone substantially assist a third-party

17   publisher's direct copyright infringement.

18   _____

19   [2] ALS argues that "[i]n contributory liability cases such as these, maintenance and <u>enforcement</u> of a repeat infringer policy, or lack thereof, is important." Pl.'s Mem.

20   Supp. Prelim. Inj. 15. While a repeat infringer policy is required under the DMCA, *see* 17 U.S.C. § 512(i)(1)(A), "Compliance with the DMCA is optional." 1 Ian C.

21   Ballon, *E-Commerce and Internet Law* § 4.12[1] (2015 update). Because Tiger is not seeking DMCA safe harbor protection, the "maintenance and enforcement of a re-

22   peat infringer policy" is not relevant. *See* 17 U.S.C. § 512(l) ("The failure of a service provider's conduct to qualify for limitation of liability under [the DMCA] shall not

23   bear adversely upon the consideration of a defense by the service provider that the

24   service provider's conduct is not infringing under this title or any other defense.").

1    For example, ALS argues that "Tiger built and maintained a 'network,' a 'mar-

2    ketplace,' a 'community' and a 'platform' of Users, Publishers who sell traffic and

3    Advertisers who buy traffic from Publishers." *Id.* But Tiger's building and maintain-

4    ing an ad network does not substantially assist a publisher's direct infringement. Nor

5    does "require[ing] potential users to apply for membership in [the JuicyAds ad] net-

6    work," "provid[ing] customer service and detailed technical support for [JuicyAds]

7    Users," "provid[ing] code that permits Publishers to put JuicyAds ads on their

8    sites," "serv[ing] the ads on Publisher sites,"[3] "redirect[ing] traffic to purchasing

9    Advertisers when a consumer clicks on the JuicyAds ad," or "charg[ing] Advertisers

10   and pay[ing] Publishers for this traffic" substantially assist a publisher's direct cop-

11   yright infringement.[4] *Id.* These features do not relate to the alleged infringing acts.

12   _____

     [3] Serving ads on the alleged infringing sites does not relate to infringement at all,

13   because the publishers of these sites could earn ad revenue regardless of the content

     offered on their sites. *See Elsevier Ltd. v. Chitika, Inc.*, 826 F. Supp. 2d 398, 406 n.19

14   (D. Mass. 2011) ("'Pharmatext earned advertising income when users clicked on ads

15   that lead them *away* from the Pharmatext site.' Thus, there is not a clear link between

     the advertising income and the furthering of Pharmatext's … infringing activities.").

16   [4] A court in this District has already rejected the argument that revenue stream re-

     ceived from ads constitutes "material contribution." In *Perfect 10, Inc. v. Google, Inc.*,

17   Perfect 10 sought to hold Google contributorily liable on the theory that Google

18   "provid[es] a revenue stream to infringing websites … [by] placing … advertise-

     ments … on the[] … websites … [.]" 416 F. Supp. 2d 828, 856 (C.D. Cal. 2006),

19   *aff'd in part, rev'd in part sub nom. Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146

20   (9th Cir. 2007). The court rejected this theory because although Google's AdSense

     program provided some revenue to the infringing sites, "There is no evidence that

21   these sites rely on Google AdSense for their continued existence or that they were

     created with the purpose of profiting from the display of AdSense advertisements."

22   *Id.* Google's AdSense ads thus did not materially contribute to the infringement by

     others. *Id. Accord UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d

23   1006, 1032 (9th Cir. 2013) ("funding alone cannot satisfy the material assistance re-

24   quirement.").

ALS also claims that "Tiger advertises, and provides valuable search tools and data regarding, each of its Publishers." *Id.* Assuming arguendo that this statement is accurate, which it's not, *see* Van Ginneken Decl. ¶¶ 6–7, 14, providing information to advertisers about participating publishers and search tools to allow advertisers to filter through available ad space does not substantially assist a publisher's direct copyright infringement. This is because consumers cannot use the data or the search tools to search for or locate infringing content. *See id.* at ¶ 15.

Yet ALS claims that "Tiger's search tools allowed ALS to find numerous additional cases of repeat infringement of ALS works by Publishers in the JuicyAds' network." Pl.'s Mem. Supp. Prelim. Inj. 16. This statement is misleading. The JuicyAds search filters narrow down the list of publisher sites and their associated ad zones by metrics that have no relation to the individual images or content on those publisher websites. Van Ginneken Decl. ¶ 7. The filter or "search tool" does not search the actual content of a publisher's site, as Tiger does not index each page or image of a site like Google or another search engine would. *Id.* The "search tool" is limited to the information regarding the site itself—the domain name, title, and metatags such as keywords and descriptions in the site's source code. *Id.* It is not possible to use the "search tool" to scan or find infringing content on publisher sites in the JuicyAds. *Id.* Thus, ALS could not have found "numerous additional cases of repeat infringement of ALS works by Publishers in the JuicyAds' network," Pl.'s Mem. Supp. Prelim. Inj. 16, unless those sites used "ALS" in their domain name, title, or metatags.[5]

_____

[5] To the extent that Mr. Penn claims he found "an infringing ALS video" using "the JuicyAds search utility," this is false. Exhibit 21 (Doc. 12-21) to his declaration shows that Mr. Penn picked a publisher site from the list of "Featured Websites" and ***then***

1    In short, ALS claims that Tiger provides support (by facilitating the sale of ad

2  space) for the businesses it challenges, but it does not show (and cannot show) that

3  Tiger substantially participates in the alleged *infringing activity*. This distinction is

4  critical. Copyright law does not demand a blockade of companies that are alleged to

5  engage in infringing activity by imposing contributory infringement liability on ven-

6  dors that do business with those companies. Copyright law merely forbids the sub-

7  stantial participation by others in infringing activity. *See, e.g.*, *Metro-Goldwyn-Mayer*

8  *Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937–40 (2005); *Napster*, 239 F.3d at 1022;

9  *Fonovisa*, 76 F.3d 264.

10    The defendants in *Napster*, *Grokster*, and *Fonovisa* shared a common attribute

11  missing here—the infringing materials at issue were stored, maintained, and availa-

12  ble on or through systems or facilities *actually operated by the defendants*. Grokster

13  and Napster made and distributed software that was known and intended to be used

14  to store and share infringing music files. *Fonovisa* involved a lower-tech operation—

15  a swap meet where the sale of pirated music proliferated. *See Visa*, 494 F.3d at 800.

16    The Ninth Circuit soundly rejected ALS's theory of contributory liability nearly

17  ten years ago in *Visa*. In that case, the owner of the copyrights in images of nude

18  models sought to impose contributory liability on Visa and other payment processors

19  for processing credit card payments for the proprietors of numerous sites that had

20  "stolen [Perfect 10's] … images, altered them, and illegally offered them for sale

21  online." *Id.* at 793. Although the defendants' payment systems "ma[d]e it easier for

22  

---

23  ran a search on that third-party site (pornve.com) for "alsscan" using that site's
search utility. *See* Penn Decl., Ex. 21, p. 3 (Doc. 12-21, Page ID # 501). He did not

24  use "the JuicyAds search utility" to "find" the "infringing ALS video."

1  … infringement to be profitable, and … therefore had the effect of increasing such

2  infringement," *id.* at 799, the Ninth Circuit declined to find material contribution.

3  In doing so, the Ninth Circuit distinguished *Grokster*, *Napster*, and *Fonovisa*:

4      The actual display, location, and distribution of infringing images in this

5      case occurs on websites that organize, display, and transmit information

6      over the wires and wireless instruments that make up the Internet. The

7      *websites* are the "site" of the infringement, not Defendants' payment

8      networks. Defendants do not create, operate, advertise, or otherwise

9      promote these websites. They do not operate the servers on which they

10     reside. … Defendants merely provide a method of payment, not a

11     "site" or "facility" of infringement.

12  *Visa*, 494 F.3d at 799–800 (emphasis in original).

13     ALS advances the same arguments the Ninth Circuit rejected in *Visa*. As in *Visa*,

14  the actual display, location, and distribution of infringing images in this case occurs

15  on third-party publisher websites that organize, display, and transmit information

16  over the wires and wireless instruments that make up the Internet. *Id.* at 799. As in

17  *Visa*, the ***websites*** are the "site" of the infringement, not Tiger's ad network. *Id.* As

18  in *Visa*, Tiger does not create, operate, advertise, or otherwise promote these web-

19  sites. Van Ginneken Decl. ¶ 14. As in *Visa*, Tiger does not operate the servers on

20  which these sites reside. *Id.* at ¶ 15. As in *Visa*, Tiger does not provide users the tools

21  to locate infringing material; nor does any infringing material ever reside on or pass

22  through any network or computer Tiger operates. *Id.* And as in *Visa*, Tiger merely

23  provides a method to buy and sell ad space not a "site" or "facility" of infringement.

24

*See Visa*, 494 F.3d at 800; *see also Elsevier*, 826 F. Supp. 2d at 405 ("while Chitika's advertising payments might make it easier for Saggi's infringement to be profitable, Chitika did not create, operate, advertise, or promote the infringing website, and its advertisements were not the 'site' of the infringement"). Even without ads on publisher sites, the infringing activity could continue, and thus serving ads is not a material contribution. *See Visa*, 494 F.3d at 798 ("because infringement … can occur without using Defendants' payment system, we hold that payment processing by the Defendants … does not constitute a 'material contribution' …").

To avoid *Visa*, ALS argues that "Tiger maintained the online version of a flea market and provided numerous services to Users, just as in *Fonovisa*." Pl.'s Mem. Supp. Prelim. Inj. 17. But users do not come to JuicyAds to buy, sell, or "swap" infringing content; users come to JuicyAds to buy and sell ad space and raw traffic. *See* Van Ginneken Decl. ¶ 4. No infringing materials are stored, maintained, or available on systems or facilities operated by Tiger, *see id.* at ¶ 14, as was the case in *Napster*, *Grokster*, and *Fonovisa*. Nor does Tiger make software available that facilitates infringement or the distribution or location of infringing material, *see id.*, as was the case in *Napster* and *Grokster*. And Tiger's business model is not "premised on harnessing the competitive pressures between individual webmasters into a cooperative system that benefits the webmasters by increasing the overall value to consumers," as was the case in *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1170 (C.D. Cal. 2002).

In sum, like the credit card companies in *Visa*, Tiger "cannot be said to materially contribute to the infringement in this case because [it] ha[s] no direct connection to

13

that infringement." 494 F.3d at 796. ALS offers no evidence that Tiger encouraged or assisted infringement, let alone that any of the alleged assistance bore a direct relationship to the infringing acts or substantially assisted direct infringers in obtaining access to or distributing infringing content. Thus, ALS's claim for contributory copyright infringement fails as a matter of law. *See id.* (plaintiff failed to allege that "any infringing material passes over Defendants' payment network or through their payment processing systems"); *UMG Recordings*, 718 F.3d at 1032 (no contributory infringement against investors in file-sharing company where complaint alleged they helped fund infringement); *Demetriades v. Kaufman*, 690 F. Supp. 289, 294 (S.D.N.Y. 1988) ("that the Doernberg defendants brokered a real estate transaction that ultimately was connected to a copyright infringement is not enough.").[6]

## B. ALS cannot establish that the law and facts clearly favor its position on inducement liability where no evidence exists that Tiger distributed JuicyAds with the object of promoting its use to infringe copyright

In *Grokster*, the Supreme Court held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." 545 U.S. at 936–37. Because ALS has demonstrated no "affirmative steps taken to foster infringement" and proved no facts suggesting

---

[6] ALS claims that "Tiger admitted into its network a site that proclaimed it published stolen content." Pl.'s Mem. Supp. Prelim. Inj. 19. But as the Ninth Circuit has explained, "When a website traffics in pictures that are titillating by nature, describing photographs as 'illegal' or 'stolen' may be an attempt to increase their salacious appeal, rather than an admission that the photographs are actually illegal or stolen. We do not place the burden of determining whether photographs are actually illegal on a service provider." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007).

14

1    that Tiger promoted its ad network as a means to infringe, "its claim is premised on

2    a fundamental misreading of *Grokster* that would render the concept of 'inducement'

3    virtually meaningless." *Visa*, 494 F.3d at 800–01.

4         To establish inducement liability, ALS must show: (1) the distribution of a device

5    or product, (2) acts of infringement, (3) an object of promoting its use to infringe

6    copyright, and (4) causation." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020,

7    1032 (9th Cir. 2013). "The third, usually dispositive, requirement for inducement

8    liability is that the 'device' or service be distributed 'with the object of promoting its

9    use to infringe copyright, as shown by clear expression or other affirmative steps

10   taken to foster infringement.' " *Id.* at 1034 (quoting *Grokster*, 545 U.S. at 936–37).

11        As the Supreme Court explained, "mere knowledge of infringing potential or ac-

12   tual infringing uses would not be enough … to subject [a defendant] to liability."

13   *Grokster*, 545 U.S. at 937. Instead, inducement "premises liability on purposeful, cul-

14   pable expression and conduct, and thus does nothing to compromise legitimate com-

15   merce or discourage innovation having a lawful promise." *Id.* Further, "to establish

16   inducement liability, it is crucial to establish that the distributors 'communicated an

17   inducing message to their … users,' the classic example of which is an 'advertise-

18   ment or solicitation that broadcasts a message designed to stimulate others to com-

19   mit violations." *Visa*, 494 F.3d at 801 (quoting *Grokster*, 545 U.S. at 937).

20        ALS fails to establish that any of these standards are met or that any of these con-

21   siderations are present here. Tiger does, of course, market JuicyAds as a means for

22   publishers to sell ad space. But it does not follow that Tiger affirmatively promotes

23   each publisher site that participates in JuicyAds. "The software systems in *Napster*

24

1    and *Grokster* were engineered, disseminated, and promoted explicitly for the purpose

2    of facilitating piracy of copyrighted music and reducing legitimate sales of such mu-

3    sic to that extent." *Id.* In addition, "the Grokster operators explicitly targeted then-

4    current users of the Napster program by sending them ads for its OpenNap pro-

5    gram." *Id.* Here, ALS does not (and cannot) show that Tiger created or promotes its

6    ad network as a means to break laws.

7        Yet ALS argues that this case is akin to *Grokster* and *Fung*, because "Tiger made

8    no effort to use 'filtering tools or other mechanisms' to detect infringing activity by

9    Publishers." Pl.'s Mem. Supp. Prelim. Inj. 19. But this ignores the Supreme Court's

10   "caution that 'in the absence of other evidence of intent, a court would be unable to

11   find contributory infringement liability merely based on a failure to take affirmative

12   steps to prevent infringement.'" *Fung*, 710 F.3d at 1035 (quoting *Grokster*, 545 U.S.

13   at 939 n.12). ALS points to no "clear expression" or "affirmative acts" by Tiger

14   with any specific intent to foster infringement. Infringing material is not available

15   using JuicyAds. JuicyAds does not facilitate access to websites; infringers do not use

16   JuicyAds to copy, alter, distribute, or display infringing material; and consumers do

17   not use JuicyAds to locate, view, or download the infringing images. *See* Van

18   Ginneken Decl. ¶ 15. Rather, third-party publishers use JuicyAds merely to sell ad

19   space to third-party advertisers who want to buy it. *See id.* at ¶¶ 3-4.

20       ALS claims that "as in *Grokster* and *Fung*, Tiger 'makes money by selling adver-

21   tising space'" and thus relies on "'high-volume use.'" Pl.'s Mem. Supp. Prelim.

22   Inj. 20. First, Tiger does not sell ad space; publishers do. *See* Van Ginneken Decl.

23   ¶ 3. Tiger merely brokers the sale similar to a real estate agent. *See id.* Second, ALS

24

1   again ignores the Supreme Court's caution that "[t]his evidence alone would not

2   justify an inference of unlawful intent." *Grokster*, 545 U.S. at 940. While ALS argues

3   that "JuicyAds encouraged Publishers to join its network in droves," Pl.'s Mem.

4   Supp. Prelim. Inj. 20, it offers ***no evidence*** that JuicyAds encouraged publishers to

5   join its network in droves to commit copyright infringement.

6       In sum, ALS has not offered any evidence that Tiger "provides a service that

7   could be used to infringe copyrights, with the manifested intent that the service ac-

8   tually be used in that matter." *Fung*, 710 F.3d at 1037. Nor has ALS offered any evi-

9   dence that Tiger "acted with a purpose to cause copyright violations by use" of its

10   services, *Grokster*, 545 U.S. at 938, let alone that the JuicyAds service "was used to

11   infringe [ALS's] copyrights." *Fung*, 710 F.3d at 1037. While ALS points to the Juicy-

12   Ads "repeat infringer policy," "Compliance with the DMCA is optional." *Ballon*,

13   *supra*, at § 4.12[1]. Thus, Tiger's alleged failure to comply with the DMCA cannot

14   be cited as evidence of infringement. *See* 17 U.S.C. § 512(l).

15       Because ALS offers no evidence showing Tiger had a "clear expression" of spe-

16   cific intent to foster infringement, ALS cannot establish inducement liability.

17   **C. ALS cannot establish that the law and facts clearly favor its position on**

18   **its vicarious copyright infringement claim where Tiger does not have the**

19   **requisite right and ability to supervise and control infringing activity**

20       Vicarious infringement "is a concept related to, but distinct from, contributory

21   infringement." *Visa*, 494 F.3d at 802. Vicarious copyright infringement exists where

22   a "defendant has (1) the right and ability to supervise the infringing conduct and (2)

23   a direct financial interest in the infringing activity." *Id.* ALS fails to establish that

24

1   Tiger has the right and ability to supervise publishers' infringing activity.[7]

2   "[A] defendant exercises control over a direct infringer when he has both a legal

3   right to stop or limit the directly infringing conduct, as well as the practical ability to

4   do so." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007); *accord*

5   *Routt v. Amazon.com, Inc.*, 584 F. App'x 713, 715 (9th Cir. 2014) ("A defendant has

6   control … when the defendant can directly put an end to that conduct."). "For vi-

7   carious liability to attach," Tiger "must have the right and ability to *supervise* and

8   *control* the infringement, not just affect it." *Visa*, 494 F.3d at 805 (emphasis in origi-

9   nal). Tiger does not have this right or ability.

10   Here, Tiger does not direct any infringing activity within the infringing sites, pre-

11   approve any infringing content, or have the ability to affect or control infringing con-

12   duct by third parties. Van Ginneken Decl. ¶ 16. The TOS bars publishers from vio-

13   lating third parties' intellectual-property rights. *Id.* at ¶ 11 (citing TOS ¶¶ IV(a)(vii),

14   X(a)). The TOS make publishers "solely responsible" for the content of their sites.

15   *Id.* at ¶ 13 (quoting TOS ¶ XIII). If Tiger discovers a publisher is infringing a third

16   party's rights, ***it can only suspend or terminate the publisher's account***. *Id.* at ¶ 17.

17   Simply put, Tiger does not have any editorial or other control rights over the design,

18   hosting, or transmission of any graphical materials, or any ability to dictate content.

19   Yet ALS claims in a conclusory fashion that "Tiger had the right and ability to

20   supervise the infringing activity, in that, just as in *Napster* and *Cybernet*, it retained

21   the right and ability to terminate a Publisher from its network." Pl.'s Mem. Supp.

22

---

23   [7] ALS also fails to show Tiger's direct financial interest in the infringing activity, but
     space constraints prevent Tiger from addressing this further in light of ALS's failure

24   on the control prong of the test. *See Visa*, 494 F.3d at 806.

Prelim. Inj. 21. But the Ninth Circuit has specifically rejected this argument. For example, Perfect 10 made this argument against Google, whose AdSense agreements gave it "the right to monitor and terminate partnerships with entities that violate others' copyrights." *Amazon.com*, 508 F.3d at 1173. The court rejected this argument. *See id.* Because "Google's right to terminate an AdSense partnership [did] not give Google the right to stop direct infringement by third-party websites," and Google could not "terminate those third-party websites or block their ability to host and serve infringing [content] on the Internet," Google lacked any ability to supervise and control the infringement, and thus could not be liable for vicarious infringement. *Id.* at 1173–74. *Accord Routt*, 584 F. App'x at 715.

The Ninth Circuit reached the same conclusion in *Visa*. In that case, Perfect 10 alleged that the defendant credit card companies had the right and ability to control the allegedly infringing acts of websites by not processing payments on those sites. 494 F.3d at 802. But the court found these allegations insufficient. The "mere ability to withdraw a financial 'carrot,'" it found, "does not create the 'stick' of 'right and ability to control' that vicarious infringement requires." *Id.* at 803. Thus, Visa's ability to stop processing payments and thereby reduce profitability of infringement did not amount to an ability to control the infringement because the infringement "does not turn on the payment; it turns on the reproduction … and distribution of the images, which [credit card processors] do not do …." *Id.* at 806.

ALS's claims are indistinguishable from the claims asserted and rejected in *Amazon.com* and *Visa*. As in *Visa*, Tiger "cannot take away the tools the offending websites use to produce, alter, and distribute the infringing images over the Internet."

494 F.3d at 804. As in *Amazon.com*, while Tiger can terminate a publisher's account, it is powerless to stop the publisher from continuing its infringing activity. 508 F.3d at 1173–74. The publisher may still copy ALS's photos and post them on its site, without Tiger's aid, approval, or even knowledge. *See id.* at 1174. Thus, Tiger's "ability to exert financial pressure does not give [it] the right or ability to control the actual infringing activity at issue." *Visa*, 494 F.3d at 804.

This binding precedent forecloses ALS's theory, and for good reason. The Internet is not a swap meet. It is an open system not under Tiger's control. Tiger has no practical ability to police the Internet or its publishers, which independently operate their own sites. *See* Van Ginneken Decl. ¶ 3. Moreover, to hold Tiger responsible under the circumstances here would create absurd results. For example, if the TOS creates vicarious liability because it prohibits publishers from infringing others' intellectual-property rights (as ALS contends), Tiger would be better off *not* to insist that publishers refrain from illegal conduct. It would be similarly illogical to afford protection to a site that promptly removes infringing content on notice by rights holders, but *not* to provide protection when a site has no ability to remove the offending material on a third-party site. *See Visa*, 494 F.3d at 795 n.4.

ALS's reliance on *Napster* and *Cybernet* is misplaced. In *Napster*, the Ninth Circuit found that a software operator could control its users' transmission of pirated music because it had the ability to block access to its software, thus ending the users' ability to transmit the infringing files. 239 F.3d at 1023–24. Here, Tiger "cannot stop any of the third-party websites from reproducing, displaying, and distributing unauthorized copies of [ALS's] images because that infringing conduct takes place on the

1   third-party websites. [Tiger] cannot terminate those third-party websites or block

2   their ability to 'host and serve infringing … images' on the Internet." *Amazon.com*,

3   508 F.3d at 1174. Tiger has "no ability to actually remove infringing material from

4   the Internet or directly block its distribution." *Visa*, 494 F.3d at 804 n.15. "Without

5   image-recognition technology, [Tiger] lacks the practical ability to police the infring-

6   ing activities of third-party websites." *Amazon.com*, 508 F.3d at 1174.

7       In *Cybernet*, Cybernet had a "monitoring program in place," under which "par-

8   ticipating sites receive detailed instructions regard[ing] issues of layout, appearance,

9   and content." 213 F. Supp. 2d at 1173. In granting injunctive relief, the court found

10  significant that (1) "Cybernet ha[d] refused to allow sites to use its system until they

11  comply with its dictates;" (2) "it monitor[ed] images to make sure that celebrity

12  images do not oversaturate the content found within the sites that make up Adult

13  Check;" and (3) Cybernet "not only ha[d] the right to terminate webmasters at will,

14  it control[ed] consumer access, and promote[d] its services." *Id.* at 1173–74. No such

15  evidence exists here—Tiger has no ability to control "consumer access" to pub-

16  lisher sites and does not control the layout, appearance, or content of publisher sites.

17  *See* Van Ginneken Decl. ¶¶ 15–16.

18      Because Tiger does not have the right or ability to supervise and control infringe-

19  ment, let alone the practical ability to do so, it cannot be vicariously liable. *See Ama-*

20  *zon.com*, 508 F.3d at 1173–74; *Visa*, 494 F.3d at 804; *Routt*, 584 F. App'x at 715–16.

21

22

23

24

21

**D. ALS cannot establish that the law and facts clearly favor its position on its contributory trademark infringement claim where Tiger does not have direct control and monitoring of the instrumentality used to infringe**

ALS's trademark claim fails for the same reasons as its copyright claims. Liability for indirect infringers is even narrower under trademark law than under copyright law. *See Visa*, 494 F.3d at 806. Because ALS fails to establish contributory copyright infringement, it cannot establish secondary contributory trademark infringement.

To establish contributory infringement, ALS must show that Tiger (1) "intentionally induced" another to infringe or (2) continued to supply an infringing product to an infringer with knowledge of infringement. *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982). When the direct infringer supplies a service rather than a product, there must be "[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark." *Visa*, 494 F.3d at 807.

ALS only argues the second basis here. Under the second basis, ALS must show that Tiger (1) "continued to supply its services to one who it knew or had reason to know was engaging in trademark infringement," *Louis Vuitton*, 658 F.3d at 942, and (2) "had '[d]irect control and monitoring of the instrumentality used by a third party to infringe'" ALS's marks, *id.* (quoting *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 984 (9th Cir. 1999)). ALS cannot establish the second prong.

Here, Tiger has no control over publishers' infringing actions. No Tiger product or service is allegedly used in or as part of any infringing act, as required by *Inwood* and *Lockheed Martin*. Unlike *Louis Vuitton*, where the web hosting businesses "had direct control over the 'master switch' that kept the websites online and available,"

958 F.3d at 943, Tiger does not have "direct control," let alone any control, "over the 'master switch' that [keeps] the [publishers'] websites online and available." *Id.*

Because ALS fails to show that Tiger has any control over the "instrumentality" used by publishers to allegedly infringe ALS's trademarks, its contributory trademark claim fails as a matter of law.

**II. ALS fails to show it is likely to suffer irreparable harm**

ALS also fails to establish that it is likely to suffer irreparable harm in the absence of preliminary relief. ALS's brief discussion of harm offers a speculative conclusion without evidence and should carry no weight. *See Goldie's Bookstore, Inc. v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984). The pure economic losses ALS alleges typically do not form the basis for a finding of irreparable injury. *See Lydo Enters. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984).

Indeed, ALS's own evidence undercuts its claims of irreparable harm. First, ALS admits that since 2001, "receipts and profits have decreased." Walsh Decl. ¶ 5. ALS also admits that "[p]rofits declined 10–15% in 2002 and more than 30% in 2003." *Id.* at ¶ 7. All of this happened **before** JuicyAds came into existence in 2006.

Second, while ALS claims that it is "not aware of any factors for this decline in profits other than the increasingly ubiquitous availability of infringing ALS content on the Internet," *id.*, ALS does not submit evidence "from even a single former subscriber who ceased paying for [ALS's] service because of the content freely available via" third-party sites. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011). It could just as easily be true that around the time consumers graduated from slow dial-up Internet access to dedicated higher speed Internet connections, consumers

1   moved on from recorded content ALS offers to newer forms of interactive content

2   such as live webcams.

3        Third, ALS "has not established that the requested injunction would forestall"

4   its "steady decline in revenues, profits and market share directly attributable to

5   chronic piracy on the Internet." *Id.* In short, ALS "has not shown a sufficient causal

6   connection between irreparable harm to [ALS's] business and [Tiger's] operation of

7   its [ad network]." *Id.* at 982. Thus, this factor weighs against ALS.

8   **III.   The balance of equities disfavors an injunction**

9        The balance of the equities tip in Tiger's favor. The requested injunction would

10  impose a heavy and continuous, if not impossible, burden on Tiger. ALS's proposed

11  injunction is not only unduly burdensome and drastically overbroad, it requires Tiger

12  to actively search for potentially infringing ALS content contrary to the DMCA and

13  binding Ninth Circuit precedent. *See* 17 U.S.C. § 512(m)(1); *CCBill*, 488 F.3d at

14  1113. The proposed injunction requires Tiger to manually review each month all pub-

15  lisher sites to determine the presence of "ALS Content" or "red flags of infringe-

16  ment." This will put JuicyAds out of business. *See* Van Ginneken Decl. ¶¶ 25, 28.

17  But just as the Ninth Circuit has "decline[d] to shift [this] substantial burden [of

18  policing copyright infringement] from the copyright owner to the provider," *CCBill*,

19  488 F.3d at 1113, this Court should decline ALS's request to do the same. *See id.* at

20  1114; *see also UMG Recordings*, 718 F.3d at 1022. Further, ALS's substantial delay in

21  filing its Complaint and seeking a preliminary injunction weighs against it when con-

22  sidering the propriety of the relief. *See Lydo*, 745 F.2d at 1213.

23

24

**IV.    Public interest does not favor mandatory injunctions**

Finally, the public interest does not favor ALS. Initially, entry of a mandatory injunction "is particularly disfavored." *See Garcia*, 786 F.3d at 740. While ALS argues that it is in the public interest to protect constitutional rights, Pl.'s Mem. Supp. Prelim. Inj. 24, it fails to identify a constitutional right that will be impacted in the absence of injunctive relief. The public interest disfavors the proposed injunction.

**V. Court should order substantial bond**

Under Rule 65(c), "The court may issue a preliminary injunction … only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined …." Fed. R. Civ. P. 65(c). ALS seeks entry of an order that requires Tiger to do what the law does not require it to do, and more significantly, will threaten the survival of Tiger's business. *See* Van Ginneken Decl. ¶¶ 25, 28. Because ALS is unlikely to prevail in a trial on the merits in light of binding Ninth Circuit authority, coupled with the substantial losses Tiger will suffer by the proposed injunction, this Court should require ALS to post a significant bond.

**Conclusion**

For all these reasons, the Court should deny ALS's motion.

Respectfully submitted,

By:    /s/Kevin S. Toll

KEVIN S. TOLL (appearing *pro hac vice*)
SILVERSTEIN LEGAL
*Attorneys for Defendant Tiger Media Inc.*

Dated: September 12, 2016

25
