Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE TRIAL GROUP PLC
468 N. Camden Drive
Second Floor
Beverly Hills, CA 90210
(424) 217-5980
(888) 590-1683 (fax)

Attorneys for Plaintiff ALS Scan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALS SCAN, INC., a Maryland corporation,<br><br>       Plaintiff,<br><br>  vs.<br><br>CLOUDFLARE, INC., a Delaware corporation; TIGER MEDIA, INC., a Saskatchewan provincial corporation; GERARDUS VAN GINNEKEN aka "JUICY JAY," an individual; and DOES 1-10, inclusive,<br><br>      Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS BY DEFENDANT TIGER MEDIA, INC.**<br><br>Date: October 3, 2016<br>Time: 8:30 a.m.<br>Place: Courtroom 10<br>     312 N. Spring Street<br>     Los Angeles, CA |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Contents

SUMMARY OF OPPOSITION ...............................................................1

STATEMENT OF ALLEGED FACTS...................................................2

MOTION TO DISMISS STANDARDS ...............................................10

ARGUMENT ......................................................................................10

I.   ALS HAS PLEADED A CLAIM AGAINST TIGER MEDIA FOR
CONTRIBUTORY COPYRIGHT INFRINGEMENT. ...................................10

  A.   ALS Has Adequately Pleaded "Material Contribution" to Direct
  Infringement. ...................................................................11

  B.   ALS Has Adequately Pleaded "Inducement" of Direct Infringement...19

II.   ALS HAS ADEQUATELY PLEADED CLAIMS FOR VICARIOUS
COPYRIGHT INFRINGEMENT....................................................21

  A.   ALS Has Adequately Pleaded Right and Ability to Supervise.............21

  B.   ALS Has Adequately Pleaded Financial Benefit. ...............................23

III.   ALS HAS ADEQUATELY PLEADED CLAIMS FOR SECONDARY
TRADEMARK INFRINGEMENT. ................................................23

  A.   ALS Has Adequately Pleaded a Claim for Inducing Trademark
  Infringement. ...................................................................23

  B.   ALS Has Adequately Pleaded a Claim for Material Contribution to
  Trademark Infringement...................................................24

IV.   ALS HAS ADEQUATELY PLEADED A CLAIM FOR UNFAIR
COMPETITION....................................................................25

CONCLUSION....................................................................25

## Table of Authorities

**Cases**

*A&M Records v. Napster*, 114 F.Supp.2d 896 (N.D. Cal. 2000), *aff'd in part*, 239 F.3d 1004 (9th Cir. 2001) .................................................................15

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ..................................................... 11, 21, 22, 23

*Arista Records v. Lime Group*, 784 F.Supp.2d 398 (S.D.N.Y. 2011) ...............15

*Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir. 2001) ......10

*BMG Rights Management (US) LLC v. Cox Communications*, Inc., 149 F.Supp.3d 634 (E.D. Va. 2015) ...........................................................10

*Columbia Pictures Industries Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) ................................................................... 16, 20

*Elsevier Ltd v. Chitika, Inc.*, 826 F.Supp.2d 398 (D. Mass. 2011) ...................19

*Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)........ 12, 18, 21, 23

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159 (2d Cir.1971) ................................................... 11, 12, 13

*Gucci America, Inc. v. Frontline Processing Corp.*, 721 F.Supp.2d 228 (S.D.N.Y. 2010) ..................................................................................24

*Inwood Lab. V. Ives Lab.*, 456 U.S. 844 (1982) ...............................................23

*Perfect 10 v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146 (C.D. Cal. 2002) ................................................................. 14, 17

*Perfect 10 v. Google, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ..................................19

*Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788 (9th Cir. 2007) .............18

*Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007) ........... 13, 14

*Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*, 256 F.Supp. 399 (S.D.N.Y. 1966) .................................................................12

*Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378 (9th Cir.1984) .........................24

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) .................................................10

*Zadrozny v. Bank of N.Y. Mellon*, 720 F.3d 1163 (9th Cir. 2013) .................... 10

**Other Authorities**

*Ninth Circuit Manual of Model Civil Jury Instructions 15.18* ......................... 23

*Ninth Circuit Manual of Model Civil Jury Instructions 17.20* ......................... 10

**Rules**

*Fed R. Civ. P. 12(i)* ....................................................................... 10, 21

*Fed R. Civ. P. 15(a)(2)* ................................................................. 10

## SUMMARY OF OPPOSITION

The Court should deny the motion by Defendant Tiger Media, Inc. ("Tiger") to dismiss the First Amended Complaint ("FAC") filed by Plaintiff ALS Scan, Inc. ("ALS").

Tiger created and maintains JuicyAds, an online "network," "marketplace," "community" and "platform," members of which are Tiger, its Publishers and Advertisers. Tiger admits it received numerous notifications of copyright and trademark infringement on sites in its "JuicyAds" network. Publishers are accepted into the JuicyAds network at high speed with no scrutiny whatsoever, even a site proclaiming that its content infringes copyright. Publishers contract with Tiger to sell traffic to Advertisers. Advertisers contract with Tiger to pay for traffic from Publishers, from which Tiger takes a commission. Tiger creates, serves and maintains search capabilities permitting Advertisers to search for and review Publisher sites using various criteria, search engines that enabled ALS to find infringement in Tiger's network. Tiger provides detailed analytics regarding its Publishers' sites. Advertisers pay for traffic from Publisher sites based upon the perceived traffic to and strength of the site. Tiger provides code to Publishers that Publishers place on their website, code which enables placement by Tiger of a JuicyAds ad on the Publisher's site. In all cases Tiger's servers provide the indispensable connection between Publisher and Advertiser sites, as consumers who click on a JuicyAds ad pass through Tiger's servers on the way between Publisher and Advertiser sites. Tiger provides technical advice and customer assistance to members of its network. Tiger requires Publishers and Advertisers to agree to terms of service, pursuant to which copyright and trademark infringement is forbidden.

Tiger encourages Publishers to maximize traffic to their sites. Some have increased their traffic through the draw of infringing content, including content

stolen from ALS.  Though Tiger has been repeatedly informed of the location of infringing ALS works on Publisher sites, Tiger failed to remove such Publishers from its network, permitted Publishers to retain JuicyAds ads on their sites, continued to transport users drawn to Publisher sites through the lure of infringing content through its servers to Advertiser sites, continued to accept payment from Advertisers for such traffic, continued to retain its percentage of such payment and continued to remit net payments to such Publishers.  Though Tiger told its Publishers it has the right to remove infringing content and eject Publishers from the JuicyAds network, and though Tiger initially exercised these rights, once Tiger realized that enforcing its own policies caused Tiger to lose money, Tiger ceased enforcing its own terms.

These facts plausibly plead claims for secondary copyright and trademark infringement.

In the unlikely event the Court sees merit in Tiger's motion, ALS requests leave to amend the FAC.  As a second alternative, if the Court believes that discovery could enable ALS to plead a plausible claim, ALS moves the Court to continue the question of dismissal of the FAC to a later time, or to trial.

### STATEMENT OF ALLEGED FACTS

Tiger spins the alleged facts, asserts facts nowhere plead in the FAC and assures the Court in repeated footnotes that the alleged facts are untrue.  Tiger did not fairly summarize what the FAC actually pleads.  ALS does so below.

### ALS Background

ALS was founded in 1996.  ALS owns a substantial library of adult entertainment works.  ALS charges consumers fees to access ALS's adult content on ALS's secure Internet sites.  ALS displays its trademark and copyright information on its works.  (FAC ¶ 20.)

ALS has submitted hundreds of registrations for its copyrighted works to the U.S. Copyright Office, including registrations covering all of the works referenced in the notices of infringement submitted in connection with this motion.  (FAC ¶ 21, Ex. 1.)  ALS is the owner of registered trademarks for the mark "ALS Scan" in connection with adult entertainment.  (FAC ¶ 22, Ex. 2.)

**The Challenge Posed by Infringement on the Internet**

One of the most significant business threats faced by ALS is widespread infringement of its copyrighted works and trademarks on the Internet.  Beginning around 2000, and continuing to the present, ALS images have been displayed on growing numbers of illicit websites, without the knowledge of or license from ALS.  Increasing Internet connection speeds have permitted massive download and upload of infringing ALS content.  (FAC ¶ 24.)

The observed growth of infringing content on these networks coincided with noticeable decline in ALS's profits.  There are no material factors to explain this decline other than the ubiquitous presence of infringing ALS content on the Internet.  (FAC ¶ 25.)

Attempting to enforce copyright laws against pirate sites can be taxing.  They tend to be shadowy companies in far-flung jurisdictions.  Often the pirates register their web domains with a private registry, thus masking their identity.  The effort and expense of haling these pirate sites into Court may not be warranted, as they are likely to find it cheaper and easier to disappear and resume services on some other website under some other entity.  (FAC ¶ 26.)

The pirate sites would not be able to thrive were it not for third party service providers who provide valuable services to these sites.  These third party providers include advertising networks such as those provided by Tiger. (FAC ¶¶ 27, 28.)

1    **The JuicyAds Network**

2        Tiger owns and operates the "JuicyAds" advertising network.  (FAC ¶

3    40.)  Tiger says JuicyAds is a "network," a "marketplace," a "community" and

4    a "platform."  (FAC ¶¶ 41, 42, 62.)

5        According to JuicyAds' Terms of Service: "'JuicyAds' is an advertising

6    brokerage service, accessible at www.juicyads.com, which allows website

7    Publishers to place ads on their websites and for Advertisers to buy the space."

8    "'Users' are individuals or companies registered through the JuicyAds service

9    as either an Advertiser or a Publisher."  "'Publishers' are Users who sell

10   advertising through the JuicyAds service."  "'Advertisers' are Users who buy

11   advertising through the JuicyAds service."  (FAC ¶ 43.)

12       JuicyAds' "About" page says: "We have one of the best and most easy to

13   use interfaces for purchasing ads in the industry and one of the only with

14   purchasing in seconds and instant approval**."**  "We deliver over one

15   Billion impressions daily and always growing."  "Serving 172,000+

16   websites and 92,000+ clients, and more joining daily."  "Your profits matter to

17   us.  So sit back, relax, get Juicy and make money!"  "We care about your traffic

18   as much as you do.  That means that as an advertising platform, our goal is to

19   provide income for both the advertisers and publisher without annoying surfers

20   or disrupting the surfing experience."  "We provide personal service and help to

21   Publishers and Advertisers everyday [sic].  Answering questions, helping

22   people setup or buy ads, and giving advice for using our service is just what we

23   do.  If you need help, just ask."  (FAC ¶ 44.)

24       JuicyAds' "Lifestyle" page invites member of the JuicyAds network to

25   "Become a part of the JuicyAds Lifestyle!"  "We are building a better

26   advertising network, not just a bigger one.  Our community of Publishers and

27   Advertisers and the lifestyle they enjoy with us unparalleled in the industry

28

[sic]."  The page goes on to invite Users to members-only JuicyAds events. (FAC ¶ 45.)

JuicyAds' Terms of Service prohibit websites that engage in "Distribution of any Copyrighted materials without permission (Copyright Infringement), or linking to any Copyrighted materials (Contributory or Vicarious Infringement)."  TOS ¶ IV.(a)(vii). JuicyAds reserves the right to "investigate any aspect of any account at any time without notice" and suspend payments and access to the JuicyAds service.  TOS ¶ XI.  (FAC 46.)

According to JuicyAds' DMCA page: "It is JuicyAds' policy to (1) remove or block access to material that it believes in good faith to be copyrighted material that has been illegally copied and distributed by any of our customers, advertisers, publishers, affiliates, members or users; (2) remove or disable access to material that is claimed in good faith to be infringing upon copyrighted material upon notification to our Designated Agent with terms in the notice required by the DMCA; and (3) remove and discontinue service to repeat offenders."  (FAC ¶ 47.)

### Becoming a User in the JuicyAds Network

Tiger has formed a direct client relationship with Publishers, who publish infringing content in a network created and maintained by Tiger.  (FAC ¶ 63.)

Webmasters apply through the JuicyAds website to become Publishers in the vast JuicyAds network.  Prospective Publishers inform JuicyAds of the URL of their website, receive a PIN from JuicyAds then use that PIN to receive computer code that permits the Publisher to place an ad served by JuicyAds on the Publisher's website.  The process by which a User can get his site registered as a Publisher in the JuicyAds network is fast and automated, without contact from JuicyAds personnel.  (FAC ¶ 48.)

JuicyAds' Advertisers can use robust search capabilities on juicyads.com to locate and review Publisher sites, including detailed analytics regarding the

traffic to each such site.  JuicyAds offers Users various ways to frame searches for Publisher sites, including by categories of content types (e.g. "Asian" or "Pornstar"), Alexa rating, content rating, sites per page and website types (e.g. "Blog" or "Dating/Casual").  JuicyAds displays analytics for each of its Publisher sites including Alexa rankings, daily views and daily clicks.  (FAC ¶ 49.)

Publishers choose the price for their traffic, from which JuicyAds takes a 25% commission.  Advertisers can choose to purchase traffic either from specific Publishers or across the entire run of Publishers.  (FAC ¶ 50.)

When a consumer clicks on a JuicyAds ad on a Publisher site, s/he is transported momentarily to the JuicyAds server, then to the site of a purchasing Advertiser.  (FAC ¶ 51.)

JuicyAds provides extensive customer support to its network of Publisher and Advertisers, including a personal account representative, online live support and online answers to frequently asked questions.  (FAC ¶ 52.)

### **JuicyAds' Site Enables ALS to Locate Repeat Infringers**

ALS, through its authorized agent Steve Easton, sent 195 separate email notifications to JuicyAds with multiple hyperlinks of entire galleries of infringing ALS images on imgchili.net, a site on which JuicyAds' ads were routinely placed proximate to stolen ALS content.  However, JuicyAds refused to apply its repeat infringer policy to imgchili.net.  (FAC ¶ 53.)

Concerned about JuicyAds' attitude and the possibility that JuicyAds harbored other repeat infringers in its network, ALS employee Eric Penn obtained a personal JuicyAds account and used JuicyAds' detailed online search tools to locate numerous additional Publishers in the JuicyAds network that chronically display infringing ALS content.  (FAC ¶¶ 54, 81.)

**StolenALSpictures.com**

Penn submitted information to JuicyAds that his Publisher website within the JuicyAds network was www.stolenalspictures.com. In response, JuicyAds sent Penn information and hyperlinks that permitted him to place JuicyAds ads on stolenalspictures.com. (FAC ¶ 55.)

The landing page on stolenalspictures.com.says at the top: "StolenALSImages.com – Infringing ALS Photos Made Free." The subtitle says: "Why Pay for Porn When You Get it Free?" The first paragraph says: "StolenALSImages.com features the same popular picture sets you can get with the purchase of ALSScan.com and ALSAngels.com memberships, for FREE! How do we do this? First, we stole these copyrighted images from ALS without paying a license fee. –Then, we get advertisers who profit from copyright infringement to pay us for traffic. So if you enjoy having free access to these ALSScan.com and ALSAngels.com photo sets, please be sure to click on one of our ads!" (FAC ¶ 56.) Stolenalspictures.com has been and remains a Publisher in the JuicyAds network. (FAC ¶ 57.)

**JuicyAds' Correspondence with Mr. Easton**

ALS's agent for infringement notifications, Mr. Easton has corresponded with Juicy Ads' principal, Gerardus Van Ginneken, who goes by "Juicy Jay." At first, Juicy Jay's correspondence reflected his willingness to enforce Tiger's policy to terminate repeat infringers. On July 21, 2011 Juicy Jay said about an infringing site in the JuicyAds network: "I have suspended this domain from our network due to the repeated infringements." In a July 26, 2011 email concerning infringements on freebirdnet.org, Juicy Jay said "I suspended this website from our network . . I took a look at the site and it was all stolen content." (Emphasis added.) He further said "Unfortunately, for the most part the ad networks seem to care about profits, not piracy. . . . We have taken a position to try and combat blatant piracy for those who refuse to comply or

chronic offenders. . . . Ultimately, anyone we don't service in our network, is a potential client for them.  These pirates jump from network to network . . whoever will take them."  (FAC ¶ 58.)

By 2012, Juicy Jay withdrew from his willingness to enforce JuicyAds repeat infringer policy, admitting that "it costs me money every time we take action."  Juicy Jay began to mouth the position that JuicyAds supposedly had no responsibility to act in relation to notification of infringements on its network.  "As a third party service its [sic] not really our responsibility to answer to DMCA requests on a website we have no ownership or direct connection to."  By 2013 Juicy Jay responded to Easton's infringement notifications with open hostility, even threatening him with legal action for continuing to send his infringement notices.  (FAC ¶ 59.)

On November 27, 2015 Mr. Easton sent an email to Juicy Jay, pointing out that he had sent well over one hundred notifications of infringement on imgchili.net, that JuicyAds' own Terms of Service say they terminate repeat infringers, yet they had not terminated imgchili.net.  Juicy Jay responded with contempt and aggression, stating "[t]his behaviour appears to be abusive in nature" and demanding that Easton supply yet another copy of the notifications that had been sent for Juicy Jay's "review."  (FAC ¶ 60.)

### **Pirate Sites on JuicyAds' Network Can be Identified with a "Look"**

Juicy Jay says he can "look" at a site and tell it is a pirate site.  He is right.  Sites that lure traffic through the draw of infringement, and then monetize this traffic through virtual networks like JuicyAds, are easy to spot.  First, pirate websites don't charge a subscription fee to view their content.  Second, a pirate site often displays content by multiple copyright owners, sometimes leaving the owners' copyright notification on the image.  Third, a pirate site displays entire galleries of models, perhaps 200 or more images, rather than the sixteen or so images copyright owners typically authorize their

1    affiliates to use.  Fourth, the images are available for download, sometimes with

2    a convenient zip download feature that permits a user to download an entire

3    gallery in one click.  Fifth, the site is not pointing traffic to the copyright

4    owner's site but to third parties.  (FAC ¶ 61.)

5    **Actual Notices of Infringement and JuicyAds' "Response"**

6    ALS sent to Tiger numerous notifications of infringement of ALS

7    copyright and trademarks on sites within the JuicyAds network.  In relation to

8    JuicyAds, ALS sent numerous notifications to Tiger concerning infringements

9    on the following sites: imgchili.net; slimpics.com; namethatpornstar.com;

10   cumonmy.com; bestofsexpics.com; teenbe.com; mymaturespace.com;

11   spankwiki.net; stoorage.com; and uploadhouse.com.  (FAC ¶¶ 76-82.)

12   In no case prior to the filing of the Complaint did JuicyAds apply its

13   repeat infringer policy by terminating these accounts.  (FAC ¶¶ 83-84.)

14   **Imgchili.net and the Cycle of Continuous Infringement**

15   Imgchili.net was a particularly egregious infringer.  That site pays its

16   users for image views of uploaded material.  Imgchili.net users would subscribe

17   to ALS and other adult content sites, download the content from secure

18   members' pages then upload the content without permission to Imgchili.net.

19   When Mr. Easton sent an infringement notification pertaining to Imgchili.net,

20   the pages identified in Mr. Easton's notice would go down, but as soon as the

21   next day the same or other infringing ALS images would appear on

22   Imgchili.net.  JuicyAds' refusal to terminate imgchili.net induced a continuous

23   cycle of uploads of fresh infringing material, forcing ALS to play a frustrating

24   game of "whack-a-mole."  (FAC ¶¶ 53, 66-68.)

25   **The Infringements Include ALS's Trademarks**

26   The infringing ALS works that are the subject of the notifications averred

27   above bear the registered ALS Scan trademarks.  The pirate sites listed above

28   have directly infringed ALS's trademarks by using ALS's registered marks

without ALS's knowledge or consent in a manner likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation or approval of such works.  The works being published by the direct infringers are counterfeits bearing the ALS marks without authority.  (FAC ¶ 85.)

## MOTION TO DISMISS STANDARDS

In ruling on a motion to dismiss, a court may not consider materials outside the challenged pleading.  *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).  The Court must "accept as true all well pleaded facts in the complaint and construe them in the light most favorable to the nonmoving party."  *Zadrozny v. Bank of N.Y. Mellon*, 720 F.3d 1163, 1167 (9th Cir. 2013).  When a pleading's allegations are susceptible of more than one inference, the court must adopt whichever plausible inference supports a valid claim.  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

If the court believes that any defect in the pleadings may be cured by amendment, leave to amend should be freely granted.  *Fed R. Civ. P. 15(a)(2)*. Additionally, if the conduct of discovery could help a plaintiff plead a plausible claim, the Court may defer ruling on a motion under Rule 12(b) until later in the case or to trial.  *Fed R. Civ. P. 12(i)*.

## ARGUMENT

## I.   ALS HAS PLEADED A CLAIM AGAINST TIGER MEDIA FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT.

ALS has pleaded claims against Tiger for both the "material contribution" prong and the "inducement" prong of contributory copyright infringement. *BMG Rights Management (US) LLC v. Cox Communications*, *Inc.*, 149 F.Supp.3d 634, 671 (E.D. Va. 2015) (inducement and material contribution are two branches of contributory infringement); *Ninth Circuit Manual of Model Civil Jury Instructions 17.20* (inducement and material contribution are alternatives).

### A. ALS Has Adequately Pleaded "Material Contribution" to Direct Infringement.

"[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001), citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971).

### 1. Tiger Concedes the Knowledge Element.

Tiger concedes that ALS has adequately pleaded Tiger's knowledge of infringement by Publishers in its network.  Tiger contends solely that ALS has not pleaded the second element, material contribution.  MTD § I.A.

### 2. ALS has Adequately Pleaded Material Contribution.

Tiger concocts a sweeping theory of immunity from contributory liability such that Tiger, with ample knowledge of repeated infringements by Publishers in its network, may supposedly encourage Publishers to become members of its network in automated fashion without any form of screening, maintain such Publishers in its network, continue to provide advertising services and customer assistance to such Publishers, continue to pay such Publishers and refuse to terminate such Publishers from its network, all so long as the infringing content does not reside on or pass through Tiger's servers.  (MTD Memo. 1:10-12, 11:10-12.)  This is not the law.  Tiger's sweeping assertions that storage or transmission of infringing files is the only actionable means of material contribution to direct infringement lack citation to authority.  While the storage or transmission of infringing works <u>can</u> constitute material contribution to infringement, the courts have <u>not</u> held that these are the <u>only</u> contributions that can be material in an online environment.

Courts have long held that advertising or promotional services to direct infringers can be a material contribution for purposes of contributory liability.

In the seminal case of *Gershwin Publ'g Corp., supra,* Columbia Artists Management, Inc. ("CAMI") promoted concerts at which musical works owned by Gershwin Publishing Company were performed without its consent.  CAMI both managed artists and managed concerts series at which CAMI-managed artists appeared.  The participating artists paid CAMI fees for promoting the concerts.  443 F.2d at 1160-61.  CAMI knew that copyrighted works were being performed without a license.  Through its "pervasive participation" in the promotion of the concerts, CAMI was held contributorily liable for the direct infringement of its artists.  443 F.2d at 1162-63.

The *Gershwin* court relied in part on *Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*, 256 F.Supp. 399 (S.D.N.Y. 1966).  There, an advertising agency had actual notice of infringing songs on a bootleg album the agency was promoting.  The low price of the album was also a red flag of infringement.  Yet, with this actual and constructive knowledge of direct infringement, the advertising agency continued to earn commissions by purchasing radio time for the infringing album.  The agency was held contributorily liable for copyright infringement.

A party may be contributorily liable for infringement for providing a host of customer services to direct infringers, including but not limited to advertisement.  *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996).  There, Cherry Auction operated a swap meet.  "The vendors pay a daily rental fee to the swap meet operators in exchange for booth space. Cherry Auction supplies parking, conducts advertising and retains the right to exclude any vendor for any reason, at any time, and thus can exclude vendors for patent and trademark infringement."  76 F.3d at 261.  The sheriff raided the swap meet and seized thousands of counterfeit recordings from vendors.  The following year, finding that vendors were still selling counterfeit recordings, the sheriff notified Cherry Auction of ongoing sales of infringing materials.  The plaintiff record

company sent an investigator to the Cherry Auction site and observed sales of counterfeit recordings. *Id.* Cherry Auction was held liable for contributory infringement because, with actual knowledge of direct infringement by vendors, Cherry Auction continued to provide support services to such vendors including "space, utilities, parking, advertisement, plumbing and customers." *Id.* at 264. "Cherry Auction actively strives to provide the environment and the market for counterfeit recording sales to thrive." *Id.* "[P]roviding the site and facilities for known infringing activity is sufficient to establish contributory liability." *Id.*

Tiger has cited no case reversing or otherwise limiting the holdings of *Gershwin* or *Screen Gems* that promotional and advertising services may be material contribution to direct infringement. Here, Tiger has provided promotional and advertising services to known infringers. Tiger has cited no case limiting the holding of *Fonovisa* such that the only online means of providing the "site and facilities" for infringement is serving or transmitting infringing files. Here, Tiger has created a network wherein Publishers sell traffic drawn through the lure of infringement to Advertisers, a virtual "environment" and "market" not unlike the Cherry Auction site.

Providing search capabilities potentially enabling users to find infringing files may also be a sufficient material contribution for purposes of contributory copyright liability. In *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007), Perfect 10, also an adult content provider, sought to hold Google secondarily liable for direct copyright infringement by providing users with the means to search for and locate infringing content. There, even though Google did not itself host the infringing sites, the court held:

> "There is no dispute that Google substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access infringing materials. . . . [Therefore,] Google could be held contributorily liable if it had knowledge that infringing Perfect 10 images were available using

its search engine, could take simple measures to prevent further damage to Perfect 10's copyrighted works, and failed to take such steps."

487 F.3d at 729.

Tiger's thesis is directly contradicted by one of the early Internet cases, *Perfect 10 v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146 (C.D. Cal. 2002). There, much like Tiger here, Cybernet Ventures provided promotional and advertising services to a network of client websites. Cybernet Ventures maintained and promoted a network of "300,000 'regular' sites and 14,000 'Gold' sites." 213 F.Supp.2d at 1158. Each member of the Cybernet network was responsible for maintaining and hosting its own site; thus Cybernet <u>never served or transmitted the infringing works</u>. *Id.* When a consumer visited a site in the Cybernet network, consumers were directed to Cybernet for payment. *Id.* Cybernet advertised and provided means by which consumers could search for websites in the Cybernet network. 213 F.Supp.2d at 1158-59. The court held that Cybernet had actual knowledge of direct infringement on websites in its network and materially contributed to such infringement by continuing to provide advertising services and paying commissions to webmasters displaying infringing works. 213 F.Supp.2d at 1169-70.

Tiger's key assertion is wrong: "The defendants in *Napster*, *Grokster*, and *Fonovisa* shared a common attribute missing here – the infringing materials at issue were stored, maintained and available on systems or facilities ***actually operated by the defendants***." (MTD Memo. 11:10-12) (emphasis in original). Tiger directly misstates the facts and holdings of each of these cases.

In *Fonovisa, supra*, while it is true that vendors sold infringing works on land owned or leased by the swap meet, the operator was found liable for supplying not only "space" but also "utilities, parking, advertisement, plumbing and customers" to vendors selling infringing works.

Neither Napster nor Grokster served or transmitted infringing works.

- 14 -

1    Napster enabled users to find MP3 files on the computers of other users

2    in two ways, one involving a search using Napster's proprietary search engine

3    and the second involving a "hotlist tool" allowing users to archive other user

4    names and learn when they were online. *A&M Records v. Napster*, 114

5    F.Supp.2d 896, 906 (N.D. Cal. 2000), *aff'd in part*, 239 F.3d 1004 (9th Cir.

6    2001).  Once one user selected a file on the computer of another user for

7    download, the Napster network facilitated the user to user connection, however,

8    "[t]he content of the actual MP3 file is transferred over the Internet between

9    users, not through the Napster servers."  114 F.Supp.2d at 906-07.

10    As technology evolved, companies found ways to enable users to find

11    and download files on the computers of other users without the company itself

12    maintaining or operating centralized search and connection utilities -- peer-to-

13    peer ("P2P") and bit torrent technologies.  *Metro-Golden-Mayer Studios, Inc. v.*

14    *Grokster, Ltd.* 545 U.S. 913, 125 S.Ct. 2764 (2005) was a P2P case.  Grokster

15    "distribute[d] free software products that allow[ed] computer users to share

16    electronic files through peer-to-peer networks, so called because users'

17    computers communicate directly with each other, not through central servers."

18    545 U.S. at 919-20.  Peer-to-peer networks "need no central computer server to

19    mediate the exchange of information among file users."  545 U.S. at 920.

20    Grokster's software, FastTrack, was downloaded and installed by users, which

21    software created a "network" of computers, each using the FastTrack program.

22    545 U.S. at 921.  Notwithstanding that Grokster never served or transmitted

23    infringing works, the Supreme Court held that Grokster could be contributorily

24    liable for inducing infringement.  545 U.S. at 936-37.

25    Defendants were also held contributorily liable for distributing P2P and

26    bit torrent technologies, without ever serving or transmitting infringing filed, in

27    *Arista Records v. Lime Group*, 784 F.Supp.2d 398, 434 (S.D.N.Y. 2011) (Lime

28    Group contributorily liable for employing P2P technology permitting users to

- 15 -

share digital files through the "Gnutella network"—Lime Group "'materially contributed' to the infringement by designing, distributing, supporting and maintaining the program") and *Columbia Pictures Industries Inc. v. Fung*, 710 F.3d 1020, 1033 (9th Cir. 2013) (Fung contributorily liable by providing torrent files that enabled users to search for and download infringing works stored on other's computers).

Here, ALS has averred facts plausibly forming a basis to hold Tiger contributorily liable for infringement.  Tiger created and maintains JuicyAds, an online "network," "marketplace," "community" and "platform," members of which are Tiger, its Publishers and Advertisers.  Even though Tiger's principle, Juicy Jay, admitted he can tell pirate sites with a "look," Publishers are accepted into the JuicyAds network at high speed with no scrutiny whatsoever.  Even a site such as stolenalsimages.com that proclaims that its content infringes copyright can gain automated access to the JuicyAds network.  Publishers contract with Tiger to become members of Tiger's JuicyAds network.  Advertisers contract with Tiger to pay for traffic from Publishers in Tiger's network.  Tiger creates, serves and maintains search capabilities permitting Advertisers to search for and review Publisher sites using various criteria.  Tiger provides detailed analytics regarding its Publishers' sites.  Advertisers pay for traffic from Publisher sites based upon the perceived traffic to and strength of the site.  Tiger provides code to Publishers that Publishers place on their website, code which enables placement by Tiger of a JuicyAds ad on the Publisher's site.  Those ads direct Internet traffic to Advertisers who pay for traffic from Publishers within Tiger's network.  In all cases Tiger's servers provide the indispensable connection between Publisher and Advertiser site, as users pass through Tiger's servers on the way between Publisher and Advertiser sites.  Tiger provides technical advice and customer assistance to members of its network.  Tiger requires Publishers and Advertisers to agree to terms of

- 16 -

1  service, pursuant to which copyright and trademark infringement is forbidden.

2  Tiger reserves the right in its terms to terminate services to members of its

3  network or even remove infringing uses.

4  Tiger's "network," "marketplace," "community" and "platform"

5  encourages Publishers to maximize traffic to their sites.  Some have increased

6  their traffic through the draw of infringing content, including content stolen

7  from ALS.  Though Tiger has been repeatedly informed of the location of

8  infringing ALS works on Publisher sites, Tiger failed to remove such Publishers

9  from its network, permitted Publishers to retain JuicyAds ads on their sites,

10  continued to transport users drawn to Publisher sites through the lure of

11  infringing content through its servers to Advertiser sites, continued to accept

12  payment from Advertisers for such traffic, continued to retain its percentage of

13  such payment and continued to remit net payments to such Publishers.  Though

14  Tiger told its Publishers it has the right to remove infringing content and eject

15  Publishers from the JuicyAds network, and though Tiger initially exercised

16  these rights, once Tiger realized that enforcing its own policies caused Tiger to

17  lose money, Tiger ceased enforcing its own terms.

18  Tiger's JuicyAds network is akin to the networks maintained by Cybernet

19  Ventures, Napster, Grokster, Lime Group and Fung.  In no case did these

20  defendants serve or transmit infringing works, yet in each of these cases their

21  networks materially contributed to direct infringement.  The same is true with

22  Tiger.  Without Tiger's connections, services and support the JuicyAds network

23  would cease to exist.  Further, just as with Google, Tiger provides search

24  facilities enabling users to locate infringing works.

25  Tiger's fallacious reading of the law centers on *Perfect 10 v. Visa Intern.*

26  *Service Ass'n*, 494 F.3d 788 (9th Cir. 2007).  That case is factually far from this

27  one.  There, the Visa card association was many steps removed from merchants

28  allegedly infringing copyrights.  Visa contracted with issuing banks to issue

1   Visa-branded credit cards to consumers.  The issuing banks contracted with

2   acquiring or merchant banks to settle transactions using Visa-branded cards.

3   The acquiring or merchant banks contracted with merchants.  Thus, Visa was

4   three steps removed from merchants with allegedly infringing works: merchant

5   → merchant bank → issuing bank → Visa.  494 F.3d at 793.  The Visa case

6   was terminated on a 12(b)(6) motion.  494 F.3d at 792-93.  The only averment

7   concerning material contribution to infringement was that Visa indirectly

8   facilitated payment to merchants with infringing content.  494 F.3d at 796.

9            While neither Tiger nor Visa served or transmitted infringing works, the

10  *Visa* court did not hold that serving or transmitting works are the only

11  actionable forms of material contribution to infringement.  While both Tiger

12  and Visa facilitate payment to infringers, here Tiger is alleged to have done

13  much more.  Visa did not deal directly with merchants.  Here, Tiger has direct

14  contractual and business relationships with Publishers and Advertisers.  Tiger

15  maintained a network including Publishers with infringing works, serving as the

16  central hub without which the network would cease to exist.  Visa did not.

17  Tiger can "remove or block access to material that it believes in good faith to be

18  copyrighted material that has been illegally copied and distributed."  Visa could

19  not.  Tiger maintains search functions on its website that can "assist or enable

20  Internet users to locate infringing material."  494 F.3d at 797.  Visa did not.

21  Here, "'it would be difficult for the [Publishers'] infringing activity to take

22  place in the massive quantities alleged without the support services provided by

23  [Tiger]."  494 F.3d at 798, citing *Fonovisa, supra*.  Visa did not provide

24  comparable support services.  Tiger has created a "virtual" "centralized place . .

25  . where infringing works could be collected, sorted [and] found."  494 F.3d at

26  798.  Visa did not.  Tiger "advertise[s] [and] otherwise promote[s]" its

27  Publisher websites.  494 F.3d at 799-800.  Visa did not.  Tiger served ads on the

28  Publisher sites.  Visa did not.  Tiger transported traffic driven to its servers from

Publisher sites to purchasing Advertisers.  Visa did not.  Tiger directly paid Publishers.  Visa did not.  Tiger directly retained monies paid by Advertisers for traffic from sites drawn through the lure of infringing content.  Visa did not. Tiger admitted into its network a site that proclaimed it published infringing content.  Visa did not.  Tiger said it would terminate repeat infringers.  Visa did not.  Tiger ignored its own policy.  Visa did not.  This case is distant from *Visa*.

Tiger's reliance on *Elsevier Ltd v. Chitika, Inc.*, 826 F.Supp.2d 398 (D. Mass. 2011) is also unpersuasive.  There was no averment that Chitika created, supported and served as the central hub of a network through which network members could purchase traffic drawn through the lure of infringements on network sites.  Additionally, as there was no averment that Chitika had actual or constructive knowledge of infringement, the court did not reach the question of material contribution.  826 F.Supp.2d at 406.

### B.     ALS Has Adequately Pleaded "Inducement" of Direct Infringement.

"'Liability under our jurisprudence may be predicated on actively encouraging (or inducing) infringement through specific acts.'"  *Perfect 10 v. Google, Inc.*, 508 F.3d 1146, 1170 (9th Cir. 2007), citing *Grokster, supra*. "[A]n actor may be contributorily liable for intentionally encouraging direct infringement if the actor knowingly takes steps that are substantially certain to result in such direct infringement."  *Id.* at 1171.

Tiger quotes elements of inducement liability involving distribution of a device.  This case does not involve distribution of a device.  Tiger may have inducement liability through provision of software and services to direct infringers.  *Columbia Pictures Industries Inc. v. Fung*, 710 F.3d 1020, 1033 (9th Cir. 2013) (Fung provided torrent files that enabled users to search for and download infringing works stored on other's computers).

- 19 -

Here, Tiger induced infringement by maintaining a network with a reinforcing cycle of encouragement to Publishers to build traffic through the lure of infringement.  Tiger induced high speed acceptance of Publishers into its network with no scrutiny whatsoever.  Tiger's systems encouraged Publishers to increase traffic to their sites, so as to command higher payments from Advertisers.  Some Publishers chose to increase traffic, at no cost to them, by stealing infringing works. Tiger encouraged this behavior by refusing to enforce its own terms, keeping the direct infringers in its JuicyAds network, even with actual notice of infringement.  As Publishers increased traffic to their site through infringements, payments from Advertisers increased, as did Tiger's commission and payments to Publishers.  Once word was out that Tiger would not enforce its terms of service, others looking to earn money through the draw of infringement became members of Tiger's network.  This self-reinforcing cycle was particularly evident in the case of imgchili.net, which paid users to continuously upload infringing content.

This case is akin to *Grokster* and *Fung*.  In those two cases, as in this one, Tiger made no effort to use "filtering tools or other mechanisms" to detect infringing activity by Publishers.  710 F.3d at 1035, citing *Grokster*, 545 U.S. at 939.  Indeed, the JuicyAds system is so lacking in any form of filter or monitoring that a Publisher can gain access to the network even when proclaiming that its site contains only infringing content.  Here, as in *Grokster* and *Fung,* Tiger "'makes money by selling advertising space'" and thus relies upon "'high-volume use."  710 F.3d at 1035, citing *Grokster*, 545 U.S. at 940.  JuicyAds encouraged Publishers to join its network in droves.  JuicyAds touts the speedy and automated nature of its signup process, resulting in JuicyAds' network containing "172,000+ websites and 92,000+ clients, and more joining daily."  Realizing that enforcement of its own repeat infringer policy cost money, and knowing that sites with infringement could be detected at a glance,

- 20 -

JuicyAds employed zero discretion in taking in Publishers and signaled to its Publishers that it would not enforce its repeat infringer policy.

Tiger and Juicy Jay manifested a sophisticated understanding of copyright law, including direct and contributory liability, yet made a decision to ignore infringement notices and encourage Publishers to continue use of JuicyAds' system.  Tiger's heedless intake of Publishers, even evident infringers, together with its refusal to terminate repeat infringers, induced a continuous cycle of infringement by its Publishers.

ALS has not yet discovered communications between JuicyAds and its Publishers, and quoting communications not discovered is not ALS's burden at the pleading stage.  ALS is entitled to all inferences in its favor.  From the facts averred, it is reasonable to assume that discovery would adduce communications between Tiger and Publishers inducing infringement.  This and the manner in which Tiger maintained its network is a direct and actionable inducement of infringement.

In the unlikely event that the Court does not believe ALS has plausibly averred inducement liability, ALS prays that this question be deferred until after discovery.  *Fed. R. Civ. Proc. 12(i).*

## II.   ALS HAS ADEQUATELY PLEADED CLAIMS FOR VICARIOUS COPYRIGHT INFRINGEMENT.

Vicarious copyright liability exists where a defendant "'has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'"  *Napster,* 239 F.3d at 1022, quoting *Fonovisa,* 76 F.3d at 262.

### A.   ALS Has Adequately Pleaded Right and Ability to Supervise.

Here, Tiger admits it can "remove or block access to material that it believes in good faith to be copyrighted material that has been illegally copied

1   and distributed." This avers right and ability to supervise under the authorities

2   Tiger has cited.

3        Even assuming that Tiger's powers were limited to termination of

4   services and ejection of a Publisher from the JuicyAds network, this power is

5   sufficient for the right and ability to supervise element of vicarious liability.

6        Cybernet had the right and ability to supervise the infringing activity

7   because Cybernet retained the right to admit webmasters into, and terminate

8   them from, its network. *Cybernet*, 213 F.Supp.2d at 1173-74.

9        Tiger's ability to eject Publishers from its network creates a right and

10  ability to supervise akin to that of Napster. There, even though Napster could

11  not reach into user's computers to delete infringing files, Napster acted as the

12  essential connection without which users could not connect to exchange

13  infringing files. If Napster terminated users from its system, those users would

14  be deprived of Napster's connections. Further, like Tiger, Napster reserved

15  rights to police users, rights Napster did not exercise. *Napster, supra*, 239 F.3d

16  at 1023.

17       Here, Tiger serves as the essential connection through which traffic

18  drawn through the lure of infringement on Publisher sites may be purchased by

19  Advertisers in Tiger's network. If Tiger ejects users from its network, those

20  users will not have Tiger's network with which to trade traffic drawn through

21  the lure of infringement. Further, Tiger reserves rights to police user sites,

22  rights which Tiger refused to exercise.

23       Tiger's cases are off point. MTD pp.16-17. Unlike Tiger, neither

24  Amazon, Visa nor Google constructed, maintained and acted as the central link

25  in a network from which infringers could be ejected. Unlike Tiger, neither

26  Amazon nor Visa constructed and maintained search engines that enabled

27  Advertisers to locate infringing content and determine which Publishers

28  cultivated the most traffic through the lure of infringement.

**B.     ALS Has Adequately Pleaded Financial Benefit.**

"Financial benefit exists where the availability of infringing material 'acts as a "draw" for customers.'"  *Napster,* 239 F.3d at 1023, quoting *Fonovisa,* 76 F.3d at 263-64.  Further, financial benefit exists where future revenues are depending upon "increases in userbase."  *Id.*

Here, ALS has averred that Publishers drew traffic to their sites through the lure of infringing material.  Tiger encouraged these infringing actions by applying no scrutiny to Publisher sites in the intake process and refusing to enforce its own terms of service, even in the face of repeated notifications of infringement on Publisher sites within Tiger's JuicyAds network.  Tiger was motivated to so act because increased traffic to Publisher sites increased the prices Advertisers would pay to advertise on such sites, thus increasing Tiger's commission payments.  Further, as was the case with Napster, Tiger's revenues increase with increases in the number of users in the JuicyAds network.  Tiger brags about how its network members are numerous and growing daily.  Thus, Tiger thus had a direct financial interest in the Publishers' infringing activities.

**III.   ALS HAS ADEQUATELY PLEADED CLAIMS FOR SECONDARY TRADEMARK INFRINGEMENT.**

Contributory trademark infringement also has two branches, inducement and material contribution.  ALS has averred facts supporting both branches.

**A.     ALS Has Adequately Pleaded a Claim for Inducing Trademark Infringement.**

One may be secondarily liable for trademark infringement by inducing direct infringement.  *Inwood Lab. V. Ives Lab.*, 456 U.S. 844, 853-54 (1982); *Ninth Circuit Manual of Model Civil Jury Instructions 15.18.*  In *Gucci America, Inc. v. Frontline Processing Corp.*, 721 F.Supp.2d 228, 248-49 (S.D.N.Y. 2010), involving sales of fake Gucci products, a claim for inducement of trademark infringement was stated against Durango, which

specialized in obtaining credit card processing facilities for "high risk merchant accounts," including those who sell "replica products," statements calculated to induce business from those selling counterfeit products.

ALS has averred that its mark is displayed on its works, and that all of the notifications of infringement sent to, and ignored by, Tiger encompassed trademark infringement as well as copyright infringement. Here, with ample knowledge that Publishers in the JuicyAds network were infringing ALS trademarks, Tiger ignored its own terms of service and continued to provide advertising and promotional services, payment and support to said infringing Publishers. By making it clear to its Publishers that Tiger would do nothing to enforce its own terms of service, Tiger induced a continuous cycle where Publishers sought to boost their traffic through the lure of infringing content, which causes Advertisers to make higher payments for ads on such Publisher sites, which expanded membership in the JuicyAds' network and Tiger's commissions. These averments are sufficient to state a claim for inducing trademark infringement.

### B. ALS Has Adequately Pleaded a Claim for Material Contribution to Trademark Infringement.

One may also be contributorily liable for trademark infringement by continuing to provide goods or services to the direct trademark infringer with actual or constructive knowledge of the infringement. *Sealy, Inc. v. Easy Living, Inc.,* 743 F.2d 1378, 1382 (9th Cir.1984) ("[I]f a manufacturer or distributor . . . continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer is contributorily responsible for any harm done as a result of the deceit"); *Fonovisa, supra*, 76 F.3d at 265 (flea market turned a blind eye to continuous trademark infringement by its vendors, and thus plaintiff stated a claim for contributory trademark infringement).

- 24 -

1   Here, ALS has more than adequately plead that Tiger, with actual and

2   constructive knowledge of ongoing trademark infringement by Publishers,

3   refused to terminate such Publishers from its network and continued to provide

4   such Publishers with payment, support and services.

5   **IV.   ALS HAS ADEQUATELY PLEADED A CLAIM FOR UNFAIR**

6   **COMPETITION**

7   ALS agrees with Tiger's statement that a claim for unfair competition

8   based upon violation of trademark rights is substantially congruent with a claim

9   under the Lanham Act.  ALS disagrees that ALS has failed to state a claim

10  under the Lanham Act.  If the Court denies Tiger's motion on the trademark

11  claims, it should also deny its motion on the unfair competition claim.

12  <u>**CONCLUSION**</u>

13  Tiger's motion to dismiss should be denied.  In the unlikely event the

14  Court does not believe ALS has plausibly averred its claims, ALS prays for

15  leave to amend.  Additionally, ALS moves that the questions raised by Tiger be

16  deferred until after ALS has been able to conduct discovery.

17

18  DATED:  September 12, 2016          SPILLANE TRIAL GROUP PLC

19

20

21  By: _____

22          Jay M. Spillane
       Attorneys for Plaintiff ALS Scan, Inc.

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this action.  My business address is: 468 N. Camden Drive, Second Floor, Beverly Hills, CA 90210-4507.  A true and correct copy of the foregoing document entitled (*specify*): **FIRST PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS BY DEFENDANT TIGER MEDIA, INC.** will be served or was served **(a)** on the judge in chambers in the form and manner required by Local Rules and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and Local Rules, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) September 12, 2016, I checked the CM/ECF docket for this action and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Gary L. Bostwick– gbostwick@B1Law.com
Kevin S. Toll – kevin@silversteinlegal.com
Lawrence G. Walters – larry@firstamendment.com
Corey D. Silverstein – corey@silversteinlegal.com
Rachel H. Kassabian – rachelkassabian@quinnemanuel.com
Carolyn M. Homer – carolynhomer@quinnemanuel.com

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) September 12, 2016, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served by Overnight Mail***
Hon. George H. Wu
U.S. District Court
312 N. Spring Street
Courtroom 10 – Spring St. Floor
Los Angeles, CA 90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 9/12/2016 | Jessie Gietl | *Jessie Gietl* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |