Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE TRIAL GROUP PLC
468 N. Camden Drive
Second Floor
Beverly Hills, CA 90210
(424) 217-5980
(888) 590-1683 (fax)

Attorneys for Plaintiff ALS Scan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALS SCAN, INC., a Maryland corporation,<br><br>   Plaintiff,<br><br> vs.<br><br>CLOUDFLARE, INC., a Delaware corporation; TIGER MEDIA, INC., a Saskatchewan provincial corporation; GERARDUS VAN GINNEKEN aka "JUICY JAY," an individual; and DOES 1-10, inclusive,<br><br>   Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br><br>**PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT TIGER MEDIA, INC.**<br><br>**[Submitted Concurrently: Reply Penn Declaration]**<br><br>Date: October 3, 2016<br>Time: 8:30 a.m.<br>Place: Courtroom 10<br>   312 N. Spring Street<br>   Los Angeles, CA |

**Table of Contents**

SUMMARY OF REPLY ...................................................................................1

STATEMENT OF FACTS .............................................................................2

ARGUMENT ...............................................................................................10

I.    ALS HAS A PROBABLY SUCCESSFUL CLAIM AGAINST TIGER FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT..........................10

A.   ALS is Likely to Prevail on "Material Contribution" to Direct Infringement. ...........................................................................................10

B.   ALS is Likely to Prevail on its Claim for Inducement of Direct Infringement. ...........................................................................................17

II.    ALS IS LIKELY TO PREVAIL ON ITS CLAIMS FOR VICARIOUS COPYRIGHT INFRINGEMENT................................................................20

III.   ALS IS LIKELY TO PREVAIL ON ITS CLAIMS FOR SECONDARY TRADEMARK INFRINGEMENT. .............................................................21

IV.   ALS HAS SHOWN INADEQUACY OF LEGAL REMEDIES. .........22

V.   THE BALANCE OF EQUITIES TILTS TOWARD ALS, AND THE REQUESTED INJUNCTION IS SPECIFIC AND APPROPRIATE. ............23

VI.   THE COURT SHOULD ORDER NO, OR A MINIMAL, BOND.......24

CONCLUSION ...........................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Authorities

**Cases**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ........... 13, 20

*Columbia Pictures Industries Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013)........14

*Elsevier Ltd v. Chitika, Inc.*, 826 F.Supp.2d 398 (D. Mass. 2011) ....................15

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
443 F.2d 1159 (2d Cir.1971)..................................................................... 13, 15

*Gucci America, Inc. v. Frontline Processing Corp.*, 721 F.Supp.2d 228
(S.D.N.Y. 2010) ...........................................................................................21

*Inwood Lab. V. Ives Lab.*, 456 U.S. 844 (1982) ............................................21

*Perfect 10 v. Cybernet Ventures, Inc.*,
213 F.Supp.2d 1146 (2002)..................................................... 13, 20, 21, 23

*Perfect 10 v. Google*, 416 F.Supp.2d 828 (C.D. Cal. 2006),
*rev'd in part sub nom. Perfect 10 v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007)..................................................................... 15, 16

*Perfect 10 v. Visa Intern. Service Ass'n*,
494 F.3d 788 (9th Cir. 2007)....................................................... 13, 14, 15, 21

*Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*,
256 F.Supp. 399 (S.D.N.Y. 1966)...............................................................15

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417,
104 S.Ct. 774 (1984) ...................................................................................18

**Statutes**

*17 U.S.C. § 106* .......................................................................................19

*17 U.S.C. § 502(a)* ...................................................................................22

**Other Authorities**

*Ninth Circuit Manual of Model Civil Jury Instructions 15.18* ...........................21

Motion for Preliminary Injunction – Reply Memorandum

## **SUMMARY OF REPLY**

Tiger's opposition emphasizes a few select facts that fit its theme that it is supposedly a mere broker distant from direct infringement, while ignoring compelling evidence that Tiger has built a network in which infringement runs rampant, a network with Tiger at the hub that would disappear without Tiger's vital links.  In this network, users are free to draw traffic through the lure of infringing content, and resell such traffic to buyers in Tiger's virtual marketplace, without fear of termination of services from Tiger.

Tiger's Terms originally told its users that infringement would not be tolerated and that repeat infringers would be terminated from Tiger's system. Tiger enforced its system briefly.  When it realized that terminating users costs money, Tiger abandoned enforcement of its policies. Tiger received hundreds of notifications of infringement of ALS work on Tiger's network.  Tiger ignored the notices, continued to provide services and payment to direct infringers and thumbed its nose at ALS.

Tiger rationalizes its conduct through a theory, supported by no authorities and contradicted by many, that if one avoids serving or transmitting infringing works, one can induce and provide all manner of material contribution to direct infringement with immunity from secondary liability. This is not the law.

Tiger realized it did not look good to state Terms that clearly barred infringement and that repeat infringers will be terminated, only to do the opposite.  For this reason, Tiger has wholly rewritten its infringement policy, a travesty that cannot be reconciled with copyright law, and purports to permit Tiger to do anything, or nothing, in response to notification of infringement.

ALS has shown that it has no adequate remedy at law and that injunctive relief is warranted.  The terms are specific and narrowly tailored to ameliorate Tiger's infringing conduct.  The requested injunctive relief should issue.

### STATEMENT OF FACTS

Tiger addresses just a few facts underpinning ALS's injunction motion, but in a dissembling and unconvincing way.  Tiger ignored most of the facts showing why Tiger is likely liable for secondary infringement.

These are the facts of the case, taking into account Tiger's opposition and the evidence submitted with this reply.

### How Tiger's Network Works

Tiger contracts with Publishers, who sell ads, and Advertisers, who buy ads.  In Tiger's own words it has created a "network," a "marketplace," a "community" and a "platform."  (Penn Decl. ¶ 48 Ex. 11 – "network" and "marketplace"; Penn Decl. ¶ 51 Ex. 14 – "network" and "community"; Penn Decl. ¶ 49 Ex. 12 – "platform").

Tiger encourages Publishers to sign up for the JuicyAds network in droves.  "Serving 172,000+ websites and 92,000+ clients, and more joining daily."  (Penn Decl. ¶ 49 Ex. 12.)  The signup process is fully automated, without human review.  (Penn Decl. ¶¶ 53-57; Van Ginneken Decl. ¶ 9.)  This automated process permits a site such as stolenalspictures.com, which says on its face page that its content is infringing, to automatically become a Publisher in the JuicyAds network.  (Penn Decl. ¶¶ 53-57, Ex. 16.)

Once a Publisher has obtained a JuicyAds account, Tiger provides that Publisher with code that serves multiple purposes.  First, the code permits Tiger to serve an ad on the Publisher site.  (Penn Decl. ¶¶ 53-57; Van Ginneken Decl. ¶¶ 8-10.)  Second, the code enables Tiger to develop detailed analytics regarding the Publisher site that it uses to inform Advertisers and price ads. [See Penn. Decl. ¶ 59 Ex. 17 – under "Marketplace" heading, the top site, E-Hentai Galleries, had 16,266,382 daily views and 7,197 daily clicks, ads could be purchased at an estimated cost of $0.011 per click ("CPC"); Reply Penn Decl. Ex. 31 p.2 – detailed site profile page for tumview.com, showing page

impressions, cost-per-click, cost per impression and ad pricing[1]; Van Ginneken Decl. ¶ 8 – explaining the cost-per-click ("CPC") and cost-per-thousand impressions ("CPM") ad pricing models.]

This information is all gathered for the benefit of JuicyAds Advertisers, so that they can see how much traffic a Publisher site generates and how much they would pay for an ad.  For this reason, Tiger has made the JuicyAds search capabilities as robust as possible for the benefit of Advertisers.  The search capability allows Advertisers to filter, search and sort information about Publishers sites using various criterion.  (Penn Decl. ¶¶ 58-64, Exs. 17-21, ¶ 72 Ex. 28; Van Ginneken Decl. ¶ 7; Reply Penn Decl. generally.)  While the parties agree that the JuicyAds search utility permits robust searches for information about sites, not individual images, the JuicyAds search function has enabled ALS, in few steps and in only minutes, to locate additional infringing ALS images – bearing the ALS Scan mark – on Publisher sites within the JuicyAds network.  (See generally Reply Penn Decl.; Van Ginneken Dec. ¶ 7.)  The Complaint discloses ten JuicyAds Publishers which were the subject of repeated notifications of infringement from ALS.  Using JuicyAds' search engines, ALS quickly found another ten JuicyAds Publisher sites with infringing ALS content: tumview.com; xkeezmovies.com; pornve.com; datoporn.com; nuttit.com; pixsense.net; toppixxx.com; sexpornimg.com; damimage.com; and fuckdolls.com.  (Reply Penn Decl., Exs. 31, 32.)

---

[1]  The web page capture technology ALS is using always captures the web page so that on the .pdf document the content fills the screen.  However, for certain of these pages, there is an aspect ratio issue that renders the content on the page very thin when printed onto paper.  ALS looked into fixing this problem so that the Court's paper courtesy copies don't have pages that are thin and hard to read.  The only solutions identified thus far are unduly expensive and time consuming.  With apologies to the Court, for exhibits that look unduly narrow on paper the Court or its staff will need to view the .pdf file on a computer screen to clearly see the exhibit.

1    Once an Advertiser has successfully purchased an ad on a Publisher site,

2  JuicyAds uses the code it has supplied to Publishers to serve an ad on the

3  Publisher site with graphics that match the site of the purchasing Advertiser.  If

4  a consumer then clicks on the ad served by JuicyAds, the consumer is

5  transported momentarily to a page on a JuicyAds server and then the screen

6  resolves to the site of the purchasing Advertiser.  (Penn Decl ¶¶ 3, 4, 13; Van

7  Ginneken Decl. ¶¶ 8, 9.)  For example, in one notification sent to Tiger

8  concerning ALS infringements on imgchili.net, an ad appeared on a page

9  containing infringing ALS content saying "F*** an Asian Slut!"  [Penn Decl.

10  ¶¶ 3-17 (observations and page capture method), ¶ 18 Ex. 1 (capture of

11  observations concerning one notification to Tiger re imgchili.net), Ex 1 p. 15

12  (ad in question).]  Below the ad appears the words: "Ads by JuicyAds."  Ex. 1

13  p.15.  The source code for that page reveals that the ad was served on

14  juicyads.com.  Ex. 1 p.17.  Ex. 1 p.18 shows the traffic flow when the ad was

15  clicked, from juicyads.com to abctrk.com[2] to dateandfuck.me/Asian.  The page

16  of the purchasing Advertiser is shown in Ex. 1 p. 19.  The same traffic flow can

17  be observed on Penn Exs. 2-9.

18    Once an Advertiser buys a site, JuicyAds collects the advertising fee

19  from the Advertiser, retains its 25% commission and remits the net balance to

20  the Publisher.  (Penn Decl. ¶¶ 66-73, Exs. 22-29 – series of questions and

21  answers for Publishers and Advertisers.)

22    Tiger portrays its role on JuicyAds as remote and the system as fully

23  automated, however, this is not the message Tiger sends to its network

24  members. "We provide personal service and help to Publishers and Advertisers

25  everyday [sic].  Answering questions, helping people setup or buy ads, and

26

27  _____

[2]  From the name of the URL, it appears that Tiger uses the abctrk.com page to

28  track clicks on JuicyAds ads, which information Tiger then displays on its site

profiles in its search engine.

giving advice for using our service is just what we do.  If you need help, just ask."  (Penn Decl. ¶ 49 Ex. 12.)  "The Account Managers at JuicyAds are experienced, knowledgeable, and very well known in the adult industry. You can work directly with a member of the team to assist you in optimizing your campaigns."  (Penn Decl. ¶ 70 Ex. 26.)  Tiger even invites its client to members-only events to promote a sense of "community."  (Penn Decl. ¶ 51 Ex. 14.)

**<u>Tiger Ignored Hundreds of Infringement Notifications from ALS and Refused to Enforce its Own Repeat Infringer Policy</u>**

Before Tiger read ALS's injunction motion, Tiger maintained clear policies that Users must respect the copyright and trademark rights of third parties and Tiger would "remove and discontinue service to repeat offenders." (Penn Decl. ¶ 52 Ex. 15.)

Van Ginneken agrees that violating the copyright and trademark rights of third parties warrants enforcement of Tiger's terms: "If Tiger discovers that publisher [sic] has violated the TOS or otherwise engaged in misbehavior, including violating third parties' intellectual-property rights, its only recourse is to suspend or terminate the publisher's account and discontinue payment to any ad revenues to the publisher."  (Van Ginneken Decl. ¶ 17.)

At first, Tiger enforced this policy.

In response to an infringement notification from Steve Easton, on July 21, 2011 Van Ginneken said "I have suspended this domain from our network due to the repeated infringements."  (Easton Decl. ¶ 39, Ex. 10.)  When sent another notification from Easton, on July 26, 2011, Van Ginneken said "I suspended this website from our network . . I took a look at the site <u>and it was all stolen content</u>."  (Emphasis added.)  (Easton Decl. ¶ 40, Ex. 11.)

However, by January 2012, Van Ginneken realized that it "costs me money" to enforce Tiger's Terms.  (Easton Decl. ¶ 41, Ex. 12.)  From that point

1   until Tiger was served with the Complaint, Van Ginneken was surly,

2   threatening Easton with legal action for sending him repeated infringement

3   notifications.  (Easton Decl. ¶¶ 42, 44, 45, Exs. 13, 15, 16.)

4       Easton sent hundreds of notifications of infringing ALS content on ten

5   Tiger Publisher sites.  (See generally Easton Decl., Penn Decl., Notice of

6   Manual Filing.)  One site alone, imgchili.net, was the subject of 195 separate

7   infringement notifications to Tiger.  (Easton Decl. ¶¶ 9-12, Ex. 1; Penn Decl. ¶¶

8   18-20, Ex. 1; Notice of Manual Filing).

9       The number of these websites terminated from JuicyAds' network

10  pursuant to Tiger's repeat infringer policy prior to service of the Complaint:

11  zero.  (See generally Easton Decl., Penn Decl.)

12      Tiger's response to this evidence: deafening silence.

13      Once Tiger was served with the Complaint, Tiger said that it terminated

14  these ten Publishers from its network.  (Spillane Decl. ¶ 10, Ex. 6.)

15       Tiger's explanation for waiting until after a lawsuit was filed to enforce

16  its repeat infringer policy: deafening silence.

17  **<u>Tiger Still Says it Can Remove or Disable Infringing Content</u>**

18      Prior to reading ALS's injunction motion, Tiger told its Users: "It is

19  JuicyAds' policy to (1) remove or block access to material that it believes in

20  good faith to be copyrighted material that has been illegally copied and

21  distributed by any of our customers, advertisers, publishers, affiliates, members

22  or users; [and] (2) remove or disable access to material that is claimed in good

23  faith to be infringing upon copyrighted material upon notification to our

24  Designated Agent with terms in the notice required by the DMCA."  (Penn

25  Decl. ¶ 52 Ex. 15.)

26      Van Ginneken offers the tortured explanation that while this was a

27  statement of Tiger's "policy," Tiger couldn't actually carry out this policy.  Van

28  Ginneken Decl. ¶ 24.

However, Tiger's new policies, written in response to ALS's injunction motion, are internally contradictory and continue to assert, at least in part, that Tiger <u>can</u> remove and restore content on its network.  The new policy says in one place "JuicyAds does not control the content on third-party websites and is not able to remove websites from the Internet."  Van Ginneken Decl. ¶ 24, Ex. 2 p. 24.  However, the new policy also has a counter-notification procedure, by which a JuicyAds User which "believe[s] that [its] material has been removed or disabled by mistake or misidentification" may "provide JuicyAds with a written counter-notice" in certain form, which JuicyAds will then send "to the person who submitted the original DMCA notice."  If that person does not then present JuicyAds with notice of filing of a copyright lawsuit within ten days, "<u>JuicyAds will restore the removed or disabled materials</u>."  (Emphasis added.) Van Ginneken Decl. ¶ 24, Ex. 2 pp. 26-27.[3]

### Tiger can Tell Pirate Sites With a "Look"

Van Ginneken provides dissembling testimony that one can never tell the licensed or unlicensed nature of an image by looking at a website.  Van Ginneken Decl. ¶¶ 19, 23.  Tiger objects that it does not know what the term "pirate" website means.  Tiger Evidentiary Objections ¶¶ 2, 7.  Tiger's new infringement policy claims "[W]ithout specific and reliable notices from rights holders, JuicyAds lacks the knowledge and capability to identify and address infringement."  Van Ginneken Decl. ¶ 24, Ex. 2 p. 22.

Van Ginneken said the opposite before Tiger was sued.

In a July 26, 2011 email concerning infringements on freebirdnet.org, Van Ginneken said "I suspended this website from our network . . I took a look at the site <u>and it was all stolen content</u>."  (Emphasis added.)  He further said

---

[3]  This language is modeled directly from 17 U.S.C. § 512(g), which sets forth a content removal, counter-notification and content restoration system for Internet services providers that <u>do</u> have the ability to remove or replace content on websites or the websites themselves.

"Unfortunately, for the most part the ad networks seem to care about profits, not piracy. . . . We have taken a position to try and combat blatant piracy for those who refuse to comply or chronic offenders. . . . Ultimately, anyone we don't service in our network, is a potential client for them.  These pirates jump from network to network . . whoever will take them."  (Easton Decl. ¶ 40, Ex. 11.)

When Tiger wrote its new infringement policy, it knew what a pirate site was.  Tiger's new infringement policy uses the term "piracy" six times.  Van Ginneken Decl. ¶ 24, Ex. 2

Witnesses Easton and Walsh postulated five factors that would enable any observer to spot a pirate website.  (Walsh Decl. ¶¶ 18-22; Easton Decl. ¶ 3.)

Tiger's response to this evidence: deafening silence.

### Tiger Confirms it Accepts Publishers With no Review, Including Sites that Inform Tiger its Content is Infringing

ALS's experience was that Tiger's process for accepting Publishers into its network was fully automated, without human review.  (Penn Decl. ¶¶ 53-57, Ex. 16.)  This was confirmed by Van Ginneken.  Van Ginneken Decl. ¶ 19 ("Publishers are able to automatically register for an account on the JuicyAds network, without any manual approval process by Tiger").

Van Ginneken complains that Tiger would not be on notice of copyright infringement just from the <u>name</u> of the website stolenalspictures.com.  Van Ginneken Decl. ¶ 22.  Tiger did not address that the landing page of the site says: "we stole these copyrighted images from ALS without paying a license fee" and "we get advertisers who profit from copyright infringement to pay us for traffic."  (Penn Decl. ¶ 54, Ex. 16 p.1.)

Tiger provided no evidence that stolenalspictures.com has been ejected as a Publisher in the JuicyAds network despite informing Tiger that the site policy is to display infringing content.

**<u>Tiger's Incomprehensible New Infringement Policy Gives Tiger Room to do Anything, or Nothing, in Response to Repeated Notifications of Infringement</u>**.

After reading ALS's injunction motion, apparently realizing that it looked bad to state, and ignore, a clear policy to terminate repeat infringers, Tiger wrote a completely new "Intellectual Property Infringement Policy." Van Ginneken Decl. ¶ 24, Ex. 2.  While Van Ginneken claims that the only revision was to clarify that Tiger cannot actually remove infringing content, *id.*, the policy is entirely rewritten.

Tiger used to say it does tolerate infringement.  Tiger now says: "JuicyAds prohibits websites that are principally dedicated to selling counterfeit goods or actively engaging in copyright piracy and have no substantial non-infringing uses from participating in the JuicyAds ad network."  Van Ginneken Decl. ¶ 24, Ex. 2 p. 24.

When Easton challenged Van Ginneken concerning why he had not terminated imgchili.net from the JuicyAds network, Van Ginneken claimed it was supposedly "abusive" for Easton to send Tiger notifications concurrent with the notification to imgchili.net, as this did not give the Publisher time to take down the site.  (Easton Decl. ¶ 45, Ex. 16.)  Tiger's new policy reflects this exchange with Easton.  Now, copyright owners must first contact the Publisher and then wait two days, to determine how the Publisher responds, before sending an infringement notification to Tiger.  (Van Ginneken Decl. ¶ 24, Ex. 2 p. 24.)

Tiger now says that in response to infringement notifications it "may" (1) "request[] that the website no longer engage in . . . copyright piracy," (2) cease serving ads until the site no longer engages in "copyright piracy" or (3) "remov[e] the website from the JuicyAds ad network."  Van Ginneken Decl. ¶ 24, Ex. 2 p. 25.

**Tiger Tells One Thing to the Court and Another to its Users**

Tiger has represented to the Court that the portion of the Digital Millennium Copyright Act ("DMCA") codified at 17 U.S.C. § 512 does not apply to Tiger. Tiger Motion to Dismiss Memo. p. 7, Doc. 36; Tiger Opp. Memo. p. 8 n.2. However, Tiger's new "Intellectual Property Infringement Policy," published for the benefit of Tiger's Users and copyright owners, repeatedly uses the term "DMCA," contains policies and language based upon or quoted directly from Section 512 and indeed repeatedly provides citations to Section 512. Van Ginneken Decl. ¶ 24, Ex. 2. Among the statements on Tiger's new policy that appear calculated to dissuade copyright owners from bothering Tiger with infringement notifications: "If you file a DMCA notice when there is no infringing use, you could be liable for costs and attorneys' fees." This statement is drawn directly from 17 U.S.C. § 512(f).

**Infringement in the US**

Some of the direct infringements alleged herein occurred on websites hosted or cached by Cloudflare in Phoenix, Arizona. Reply Penn. Decl. ¶ 26 Ex. 33.

## ARGUMENT

I. **ALS HAS A PROBABLY SUCCESSFUL CLAIM AGAINST TIGER FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT.**

A. **ALS is Likely to Prevail on "Material Contribution" to Direct Infringement.**

1. **ALS Has Shown Direct Infringement.**

Tiger claims ALS has not shown direct infringement. Tiger Opp. Memo. p. 7. n.1. Tiger simply ignored ALS's evidence. Steve Easton declared that for each instance in which he emailed a notification of infringement of ALS works to Tiger, he personally observed infringing ALS works on web pages displaying a JuicyAds ads. Easton Decl. ¶¶ 4-36. Easton's emailed notifications of

infringement contain link after link to web pages displaying infringing ALS works and JuicyAds ads.  Easton Decl. ¶¶ 4-36, Exs. 1-9; directly lodged disc with all notification emails.  So that the Court could see examples of what Easton observed, Penn captured the notifications attached as Easton Exs. 1-9, then a series of web pages showing what one would see by clicking on one of the hyperlinks in the Easton notification, then the ads that were shown behind, in front of or on pages with infringing ALS content, including JuicyAds ads, and also showing the underlying source code and flow of web traffic if the ad was clicked.  [Penn Decl. ¶¶ 3-17 (observations and page capture method).] Each of Penn's series of page captures include captures of infringing ALS images next to a JuicyAds ad.  Penn Decl. ¶¶ 18-44, Exs. 1-9 – Ex. 1 pp.15, 17, 20, 23, ; Ex. 2 pp. 2-3, 9, 12; Ex. 3 pp. 17, 20, 23; Ex. 4 p. 4; Ex. 5 pp. 2, 3, 8, 13, 16; Ex. 6 pp. 17, 20, 36; Ex. 7 pp. 2-5, 8, 10, 13, 16, 19; Ex. 8 pp. 23, 26, 29, 31, 34, 45; Ex. 9 pp. 4, 7, 10.  Sarah Walsh also confirmed that all of the ALS content observed by Mr. Easton was infringing.  Walsh Decl. ¶ 17.

This is more than enough evidence to show the Court that direct infringement of ALS works occurred on Publisher pages wherein JuicyAds ads appeared on, before or behind the infringing content.  For purposes of showing likelihood of success, ALS need not have related each image to a specific registration.[4]

Tiger questions ALS's averment that some of the infringements alleged herein occurred in the United States, without offering any evidence suggesting it did not.  In any event, ALS has submitted with this reply evidence that some

---

[4]  *Media.net Advertising FZ-LLC v. NetSeer, Inc.*, 156 F. Supp. 3d 1052, 1068 (N.D. Cal. 2016) has nothing to do with this case, not limited to tying an alleged infringement to a registration certificate.  Tiger Opp. Memo. p. 7 n.1.  The plaintiff alleged that the defendant created a derivative work based upon certain copied HTML could, but failed to allege how the defendant accessed plaintiff's work and which code was copied.

of the infringements shown by ALS occurred on sites hosted or cached on a
Cloudflare server in Phoenix, Arizona.

## 2. Tiger's Contributions to Direct Infringement Were Material.

Tiger created and maintains JuicyAds, an online "network,"
"marketplace," "community" and "platform," members of which are Tiger, its
Publishers and Advertisers.  Tiger admits it received numerous notifications of
copyright and trademark infringement on sites in its "JuicyAds" network.
Publishers are accepted into the JuicyAds network at high speed with no
scrutiny whatsoever, even a site proclaiming that its content infringes copyright.
Publishers contract with Tiger to sell traffic to Advertisers.  Advertisers
contract with Tiger to pay for traffic from Publishers, from which Tiger takes a
commission.  Tiger creates, serves and maintains search capabilities permitting
Advertisers to search for and review Publisher sites using various criteria,
search engines that enabled ALS to find infringement in Tiger's network.  Tiger
provides detailed analytics regarding its Publishers' sites.  Advertisers pay for
traffic from Publisher sites based upon the perceived traffic to and strength of
the site.  Tiger provides code to Publishers that Publishers place on their
website, code which enables Tiger to serve a JuicyAds ad on the Publisher's
site.  In all cases Tiger's servers provide the indispensable connection between
Publisher and Advertiser sites, as consumers who click on a JuicyAds ad pass
through Tiger's servers on the way between Publisher and Advertiser sites.
Tiger provides technical advice and customer assistance to members of its
network.  Tiger requires Publishers and Advertisers to agree to terms of service,
pursuant to which copyright and trademark infringement is forbidden (or at
least used to be forbidden).

Tiger maintained a policy that it would not tolerate infringement of third
parties' rights, and would terminate service to users who did so.  Tiger should

have promptly terminated services to the offending users upon receipt of ALS's notifications of infringement.  Tiger ignored its own policies, and after hundreds of notifications of infringement on sites in its JuicyAds network, Tiger continued to provide all of the above material contributions to sites directly infringing ALS's copyrights and trademarks.[5]

This evidence is sufficient for the Court to conclude that ALS will likely prevail on its claim that Tiger is contributorily liable for the direct infringement of its Publishers.

Tiger's opposition hinges on its vast over reading of *Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788 (9th Cir. 2007), which it uses to urge that serving or transmitting infringing works are the <u>only</u> actionable forms of material contribution to direct infringement, such that a party, with knowledge of direct infringement, may provide all manner of other material contributions to that direct infringement with complete immunity.  The *Visa* case, like any case, rises and falls on its facts.  There, the only averred material contribution to direct infringement was that Visa worked with issuing banks in a fashion that indirectly facilitated payment to merchants with infringing content.  While the *Visa* court noted that Visa neither served nor transmitted infringing files, it did <u>not</u> say that in the online world an absence of these functions provides full immunity from secondary liability for infringement.

---

[5] Tiger's suggestion that it had no burden to enforce its own repeat infringer policy because it is not claiming a DMCA harbor is silly.  Tiger Opp. Memo. p. 8 n.2.  Continuing to provide services to direct infringers after knowledge of their infringing activities is the essential element for contributory infringement under the many cases that were decided before the DMCA was enacted and in later cases in which DMCA safe harbors were not claimed.  *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971)*; Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996)*; A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001); *Perfect 10 v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146 (2002).

1    Just one of the many cases ALS has cited that shatters Tiger's thesis is

2    *Metro-Golden-Mayer Studios, Inc. v. Grokster, Ltd.* 545 U.S. 913, 125 S.Ct.

3    2764 (2005), wherein the Supreme Court held Grokster could be secondarily

4    liable for infringement even though its peer-to-peer ("P2P") system permitted

5    Grokster to avoid serving or transmitting infringing works.

6    ALS has twice written a thorough response to Tiger's errant theory, first

7    in its memorandum in support of this injunction motion and most recently in its

8    opposition to Tiger's motion to dismiss. See ALS Memo. in Opp. to MTD, Doc

9    43 pp. 11-19. ALS incorporates the argument in its motion to dismiss

10   opposition herein by reference.

11   Further emphasis on *Columbia Pictures Industries Inc. v. Fung*, 710 F.3d

12   1020 (9th Cir. 2013) is warranted. *Fung* is a Ninth Circuit case that post-dates,

13   and indeed cites, *Visa*, yet Tiger's theory does not survive *Fung*. Fung contains

14   an excellent history of peer-to-peer and bit torrent technologies, including

15   explanations of how such systems enabled users to locate and download

16   infringing content without ever serving or transmitting the infringing files. 710

17   F.3d at 1024-28. The *Fung* court distinguished *Visa*, noting that "the 'causal

18   chain' between defendant credit card companies' services and infringing

19   activity by Internet uses was too attenuated." 710 F.3d at 1039. In Fung's case

20   he managed traffic for torrent files, directly assisting users to find and download

21   infringing content. *Id.* Fung's contributions to direct infringement were

22   sufficient such that the Ninth Circuit upheld rendition of summary judgment

23   against Fung for contributory liability and injunctive relief against Fung, albeit

24   in revised form. 710 F.3d at 1049.

25

26

27

28

3.      **Advertising Services May be Sufficiently Material Contribution to Direct Infringement for Purposes of Contributory Liability.**

Tiger's opposition ignores a line of cases holding that advertising services provided to direct infringers with knowledge of such infringement may result in contributory liability. *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971) (advertising concerts with infringing works); *Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*, 256 F.Supp. 399 (S.D.N.Y. 1966) (advertising bootleg albums with infringing tracks); *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) (advertising for vendors selling bootleg records); *Visa, supra,* 494 F.3d at 799-800 (noting that Visa did not provide advertising services to merchants).

Tiger's efforts to claim that advertising services cannot materially contribute to direct infringement are unpersuasive and misleading.

In *Elsevier Ltd v. Chitika, Inc.*, 826 F.Supp.2d 398 (D. Mass. 2011), Tiger Opp. p.9 n.3, there was no evidence that Chitika created, supported and served as the central hub of a network through which network members could purchase traffic drawn through the lure of infringements on network sites, which Tiger has done here. Additionally, as there was no evidence that Chitika had actual or constructive knowledge of infringement, the court did not reach the question of material contribution. 826 F.Supp.2d at 406.

Tiger cites p. 856 of the district court opinion in *Perfect 10, Inc. v. Google* for the proposition that the district judge did not believe that Google's "AdSense" program was sufficient to render Google contributorily liable for direct infringement. Tiger Opp. p. 9 n.4, *Perfect 10 v. Google*, 416 F.Supp.2d 828, 856 (C.D. Cal. 2006), *rev'd in part sub nom. Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). What Tiger does not disclose is that the Ninth Circuit <u>reversed</u> the district court's finding:

- 15 -

"Here, the district court held that even assuming Google had actual knowledge of infringing material available on its system, Google did not materially contribute to infringing conduct because it did not undertake any substantial promotional or advertising efforts to encourage visits to infringing websites, nor provide a significant revenue stream to the infringing websites. *Perfect 10,* 416 F.Supp.2d at 854-56. This analysis is erroneous. There is no dispute that Google substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access infringing materials. We cannot discount the effect of such a service on copyright owners, even though Google's assistance is available to all websites, not just infringing ones. Applying our test, Google could be held contributorily liable if it had knowledge that infringing Perfect 10 images were available using its search engine, could take simple measures to prevent further damage to Perfect 10's copyrighted works, and failed to take such steps."

508 F.3d at 1172.

Here, Tiger has structured its entire network to incentivize Publishers to boost Internet traffic through the lure of infringing content. Publishers are encouraged to sign up in droves, with no review for compliance with Terms of Service, which in any event Tiger won't enforce. If Publishers boost their page impressions and clicks by offering stolen high quality content, such as that owned by ALS, they are rewarded by the ability ask for higher ad prices. Tiger's servers host the ads for purchasing Advertisers and direct traffic drawn through the lure of infringement. All consumers drawn through the allure of stolen content pass through the Tiger server when clicking an ad on said server. Tiger collects the money paid by Advertisers, pays itself and pays the Publishers. Tiger's relationship to and involvement with its network users is much closer than was the relationship between Google and its AdSense buyers. *Perfect 10 v. Amazon* supports ALS, not Tiger.

- 16 -

**B.   ALS is Likely to Prevail on its Claim for Inducement of Direct Infringement.**

Tiger's criticism of ALS's evidence in support of its claim for inducing infringement is that ALS has not quoted Tiger as directly encouraging infringement.  The circumstantial evidence, however, strongly show that Tiger has directly encouraged Publishers to boost web impressions, clicks and advertising revenue, all of which increase Tiger's commissions, by maintaining sites that draw traffic through the lure of infringing content.

Tiger's shift in mind set, from following copyright law to encouraging infringement, are shown by the conduct of Tiger and its principal Van Ginneken.

Van Ginneken first said that Tiger would respect the rights of third parties and terminate repeat infringers, terminating "pirate" sites that he could identify with a "look."  However, when he realized obeying the law cost him money, Tiger's policies changed.

Tiger's encouragement of high volume signups, together with its complete abdication of any review in the intake process, encourages commerce with Publishers aiming to monetize traffic drawn through the lure of infringement.  Tiger's abject refusal to enforce its own Terms of Service amplifies the message: "infringers welcome."

Imgchili.net is a good example.  This is a site that pays uploaders for page views.  This site is not looking for people to upload their vacation pictures.  Those don't elicit page views.  The site is paying uploaders for entire galleries of infringing adult content, so that imgchili.net can then monetize the traffic drawn through the lure of infringing content with the help of Tiger.

Steve Easton sent 195 notification of infringing ALS content on imgchili.net to Tiger.  Imgchili.net "responded" by taking down the page complained of and putting up another gallery of infringing ALS content the

next day.  By the fifth, at the outside the tenth, notification Tiger was on notice that imgchili.net was a repeat infringer.  Yet Tiger took no action to terminate imgchili.net from the JuicyAds network.  Van Ginneken's rationalization for not terminating services to imgchili.net was that imgchili.net took the offending content down.  Van Ginneken even hectored Easton that simultaneously sending infringement notifications to both Tiger and imchili.net was somehow "abusive."  Thus, Tiger forced ALS to play a worthless game of "whack-a-mole" while Tiger and imgchili.net profited from a pattern of infringement. Van Ginneken need not have sent an email to the owners of imgchili.net saying "keep infringing" to encourage them to continue this endless pattern of taking down one infringing ALS gallery and putting up the next.

The intent, the *mens rea*, of Tiger and its principal, Van Ginneken, to encouragement infringement is shown in its wholly re-written policies regarding infringement.

Tiger's Terms used to say, correctly, that infringement of the copyrights or trademarks of third parties would not be tolerated.  Tiger's Terms used to say clearly that repeat infringers would be terminated from the JuicyAds' network.

Tiger's new policy is incomprehensible and irreconcilable with copyright law.

Tiger now says: "JuicyAds prohibits websites that are principally dedicated to selling counterfeit goods or actively engaging in copyright piracy and have no substantial non-infringing uses from participating in the JuicyAds ad network."  In other words, Tiger is now communicating to Publishers that so long as they steal only some of their content, they comply with Tiger's Terms.

Tiger's new policy was manufactured from, but completely misapprehends, the holding of *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774 (1984).  There, the Supreme Court borrowed from patent's "staple article of commerce doctrine" to hold that Sony was not

secondarily liable for distributing the Betamax videotape recorder, with
constructive knowledge that consumers could use the product to accomplish
direct infringement, where the product was capable of "substantial non-
infringing uses."  464 U.S. at 440.  Here, there are no devices being placed into
commerce.  Further, JuicyAds' Publishers are not secondarily liable for
infringement, they are the direct infringers.  The "Sony/Betamax" doctrine is no
defense to direct infringement.  The display of one infringing image on a
website violates copyright law.  *17 U.S.C. § 106.*

Now, if Tiger receives notification that half of a Publisher site contains
infringing ALS content, as long as Tiger draws any conclusion that the site has
other "substantial non-infringing uses," that Publisher is not violating Tiger's
brand new Terms.  These Terms are irreconcilable with copyright law, and
underscore Tiger's encouragement to its Publishers to build traffic through
infringement.

Tiger has also now codified Van Ginneken's incorrect statement that it is
"abusive" for copyright owners to contact Tiger before learning whether the
Publisher has taken down the page.  Now, copyright owners must supposedly
wait two days and see what the Publisher does before contacting Tiger.  This
codifies the imgchili.net "whack-a-mole" game.  These Terms are also
irreconcilable with copyright law, and underscore Tiger's encouragement to its
Publishers to build traffic through infringement.

Finally, Tiger's new policies say that it "may" but need not take various
actions in response to infringement notifications.  Thus, Tiger has purported to
now give itself the flexibility, at least in terms of its own policies, to do
anything, or nothing, in response to notices, even hundreds of notices, from
copyright owners of direct infringement by JuicyAds Publishers.

Short of putting a statement on the Tiger home page that "we love
infringement," Tiger could not be working harder to communicate to its

Motion for Preliminary Injunction – Reply Memorandum

1  Publishers that they can sell traffic drawn through the lure of infringement
2  through the JuicyAds network without fear of any reprisal from Tiger.

3  **II.    ALS IS LIKELY TO PREVAIL ON ITS CLAIMS FOR**
4        **VICARIOUS COPYRIGHT INFRINGEMENT.**

5        Tiger concedes that it received a direct financial benefit from direct
6  infringement by its Publishers.  Tiger's sole quarrel is with its right and ability
7  to supervise infringing content.

8        Tiger continues to say that it can remove or restore content on Publisher
9  sites.  This proves right and ability to supervise under the authorities Tiger has
10 cited.

11       Tiger also admits that it has the powers to terminate services and eject
12 Publishers from the JuicyAds network.  This power is sufficient for the right
13 and ability to supervise element of vicarious liability.  *Cybernet*, 213 F.Supp.2d
14 at 1173-74.  Tiger's ability to eject Publishers from its network creates a right
15 and ability to supervise akin to that of Napster.  There, even though Napster
16 could not reach into user's computers to delete infringing files, Napster acted as
17 the essential connection without which users could not connect to exchange
18 infringing files.  If Napster terminated users from its system, those users would
19 be deprived of Napster's connections.  Further, like Tiger, Napster reserved
20 rights to police users, rights Napster did not exercise. *Napster, supra*, 239 F.3d
21 at 1023.  Like Napster, Tiger maintains a "closed system requiring user
22 registration, and could terminate its users' accounts and block their access to the
23 [JuicyAds] system." *Napster, supra*, 239 F.3d at 1023-24.  Similarly, the
24 Cherry Auction flea market was vicariously liable for the infringing activities of
25 vendors selling bootleg albums because it declined to exercise its powers to
26 eject the vendors from its market.  *Fonovisa*, 76 F.3d at 263-64.

27       Here, Tiger has created a virtual market not unlike that established in
28 Fonovisa, and a closed Internet system not unlike that established by Napster

and Cybernet Ventures.  Tiger contracts with both Publishers and Advertisers to create a marketplace to buy traffic.  Tiger serves the ads that appear on Publisher sites and transports consumers from Publisher sites through the Tiger servers to Advertiser sites.  Without the essential link provided by Tiger the entire network would disappear.

Tiger's ability to eject Publishers from the network it created thus creates the requisite right and ability to supervise for purposes of vicarious liability.

Tiger's cases are off point.  To use an apt term from *Fung*, the relation between Visa, Google and the direct infringers was "attenuated."  Unlike Tiger, neither Visa nor Google constructed, maintained and acted as the central link in a network from which infringers could be ejected.

## III.   ALS IS LIKELY TO PREVAIL ON ITS CLAIMS FOR SECONDARY TRADEMARK INFRINGEMENT.

Contributory trademark infringement also has two branches, inducement and material contribution.  While ALS's memorandum in support of its injunction motion briefed material contribution liability, ALS has proven facts supporting both branches.

One may be secondarily liable for trademark infringement by inducing direct infringement.  *Inwood Lab. V. Ives Lab.*, 456 U.S. 844, 853-54 (1982); *Ninth Circuit Manual of Model Civil Jury Instructions 15.18; Gucci America, Inc. v. Frontline Processing Corp.*, 721 F.Supp.2d 228, 248-49 (S.D.N.Y. 2010) (defendant specialized in obtaining credit card processing facilities for "high risk merchant accounts," including those who sell "replica products," statements calculated to induce business from those selling counterfeit products).

The infringing ALS images not only infringed copyright, but also displayed the ALS mark.  Thus, the facts tending to show that Tiger is liable for

1  inducement copyright infringement also show inducement for trademark

2  infringement.

3         Concerning material contribution, Tiger's trademark argument contains

4  the same error Tiger made concerning right and ability to supervise for

5  purposes of vicarious copyright liability.  Where a provider maintains a site and

6  facility from which a trademark infringer may be ejected, it becomes

7  vicariously liable for trademark infringement by turning a blind eye to

8  infringing conduct.  *Fonovisa, supra*, 76 F.3d at 265 (flea market turned a blind

9  eye to continuous trademark infringement by its vendors, and thus plaintiff

10 stated a claim for contributory trademark infringement).

11        Here, ALS has more than adequately shown that Tiger, with actual and

12 constructive knowledge of ongoing trademark infringement by Publishers,

13 refused to terminate such Publishers from its network and continued to provide

14 such Publishers with payment, support and services.

15 **IV.   ALS HAS SHOWN INADEQUACY OF LEGAL REMEDIES.**

16        The Court may, and in this case should, grant a preliminary injunction "to

17 prevent or restrain infringement of a copyright."  *17 U.S.C. § 502(a)*.

18        Tiger's complaint that ALS has only shown injury in the form of money

19 unfairly diminishes the impact of ALS's evidence.  Tiger maintains, indeed

20 encourages, a system in which pirate Publishers persistently steal ALS's

21 proprietary content, then use the traffic drawn through the lure of infringing

22 content to send such traffic to ALS's competitors.  While ALS has certainly lost

23 money, this pattern of conduct, with Tiger as a central actor, causes marketplace

24 confusion and has also caused ALS to lose market share, goodwill and

25 reputation.  As the declaration of Sarah Walsh shows, the pattern wherein

26 pirates display entire galleries of infringing content almost immediately upon

27 release by the copyright owner, which conduct exists because of support from

28 third parties like Tiger, is an existential threat to companies like ALS.  If

something is not done to enjoin third party support for piracy, copyright owners will no longer be willing or able to produce copyrighted content.  This sort of injury is not wholly compensable through a money award.

Courts have had no difficulty issuing injunctive relief preventing third parties from contributing to copyright piracy under similar conditions. *Cybernet*, *supra*, 213 F.Supp.2d at 1194-95 (mandatory injunction issued requiring Cybernet to reform its policies with respect to its users); *Fung, supra*, 710 F.3d at 1047-49 (affirming district court's order granting injunctive relief in modified form).

## V.    THE BALANCE OF EQUITIES TILTS TOWARD ALS, AND THE REQUESTED INJUNCTION IS SPECIFIC AND APPROPRIATE.

Tiger complains that the requested injunction is overbroad, will inappropriately require Tiger to police the Internet for infringement and will end Tiger's busines.  Tiger also relies on hornbook law that mandatory injunctions face a higher bar.

The requested injunctive relief is highly specific, fashioned after the relief granted in *Cybernet*, *supra*, 213 F.Supp.2d at 1194-95.  It is no more onerous than the relief granted in *Fung, supra*, 710 F.3d at 1047-49.

Mandatory relief is warranted here.  ALS has adduced ample evidence that Tiger turned a blind eye to rampant infringement in its network, even to the extent of refusing to take action in the face of hundreds of notifications of infringement of ALS works.  Tiger's Terms used to correctly reflect copyright law; however, Tiger ignored its own Terms.  Tiger's new Terms do not reflect copyright law, and were purposely written to justify Tiger's policy of doing nothing to terminate users even in the face of numerous, even incessant, notice to Tiger of infringement by Tiger's users.

It will apparently take a Court order to force Tiger to apply copyright law to its network.

The order is tailored to the circumstances, and should not put Tiger out of business as it shrilly claims.

¶ 1 of the proposed injunction requires Tiger to cease payments to the accounts it says it has already terminated.

¶ 2 specifically requires Tiger to implement a responsible repeat infringer policy, such that the same violator cannot evade ejection from Tiger's network by perpetually shifting pirate sites from one domain to another.

¶ 3 requires Tiger to disclose the identity of the accounts it terminated for repeat infringement.

¶ 4 requires Tiger to employ the process Eric Penn has used to find sites using infringing ALS content within <u>minutes</u>.  Some of Tiger's Publishers have search utilities retrieving infringing ALS content using the search term "alsscan."  This is not hard.  Under the circumstances this relief is warranted.

¶ 5 implements Van Ginneken's admission that he can spot sites that pirate copyright content with a "look."  It requires Tiger to ask suspicious accounts, those manifesting the specific criteria set forth in ALS's papers, for rights documentation. This is specific and not unduly onerous given Tiger's conduct.

¶¶ 6 and 7 require human review of incoming proposed Publisher sites, first for ALS content and second for red flags of piracy.  This is a system Tiger should have been employing all along.

¶ 8 defines for Tiger how many notices of infringement identify a Tiger user as a repeat infringer – five.  Tiger should have articulated this or a similar threshold long ago.

The requested relief is specific, reasonable and warranted.

## VI.    THE COURT SHOULD ORDER NO, OR A MINIMAL, BOND.

ALS's level of proof that Tiger is likely liable for secondary infringement is high.  Contrary to Tiger's representations, the relief requested does not veer

- 24 -

from copyright law and is justified where a plaintiff has shown a likelihood of prevailing on claims of secondary infringement.  Tiger's aid to rampant piracy has depressed ALS's receipts, rendering it hard for ALS to afford a substantial bond.  The Court should not effectively thwart the relief to which ALS should be entitled by burdening ALS with a bond requirement it cannot meet.

## CONCLUSION

The Court should grant ALS's motion and issue a preliminary injunction in the form submitted.

DATED:  September 19, 2016              SPILLANE TRIAL GROUP PLC


By: _____
        Jay M. Spillane
Attorneys for Plaintiff ALS Scan, Inc.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this action.  My business address is: 468 N. Camden Drive, Second Floor, Beverly Hills, CA 90210-4507.  A true and correct copy of the foregoing document entitled (*specify*): **PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT TIGER MEDIA, INC.**

will be served or was served **(a)** on the judge in chambers in the form and manner required by Local Rules and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and Local Rules, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) September 19, 2016, I checked the CM/ECF docket for this action and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Gary L. Bostwick– gbostwick@B1Law.com
Kevin S. Toll – kevin@silversteinlegal.com
Lawrence G. Walters – larry@firstamendment.com
Corey D. Silverstein – corey@silversteinlegal.com
Rachel H. Kassabian – rachelkassabian@quinnemanuel.com
Carolyn M. Homer – carolynhomer@quinnemanuel.com

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) September 19, 2016, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served by Overnight Mail***
Hon. George H. Wu
U.S. District Court
312 N. Spring Street
Courtroom 10 – Spring St. Floor
Los Angeles, CA 90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 9/19/2016 | Jessie Gietl | *Jessie Gietl* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |