Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE TRIAL GROUP PLC
468 N. Camden Drive
Second Floor
Beverly Hills, CA 90210
(424) 217-5980
(888) 590-1683 (fax)

Attorneys for Plaintiff ALS Scan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALS SCAN, INC., a Maryland corporation,<br><br>   Plaintiff,<br><br> vs.<br><br>CLOUDFLARE, INC., a Delaware corporation, et al.,<br><br>   Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS BY DEFENDANT CLOUDFLARE, INC.**<br><br>**[Filed Concurrently: Spillane Declaration]**<br><br>Date: October 24, 2016<br>Time: 8:30 a.m.<br>Place: Courtroom 10<br>   312 N. Spring Street<br>   Los Angeles, CA |

# Table of Contents

SUMMARY OF OPPOSITION ............................................................................1

STATEMENT OF ALLEGED FACTS................................................................2

MOTION TO DISMISS STANDARDS ............................................................7

CONFERENCE OF COUNSEL.........................................................................8

ARGUMENT ......................................................................................................8

I.   ALS HAS PLAUSIBLY PLEADED A CLAIM AGAINST
CLOUDFLARE FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT. 8

   A.   ALS Has Adequately Pleaded "Material Contribution" to Direct
Infringement. ..................................................................................................8

   B.   ALS Has Adequately Pleaded "Inducement" of Direct Infringement...14

II.   ALS HAS PLAUSIBLY PLEADED CLAIMS FOR VICARIOUS
COPYRIGHT INFRINGEMENT.......................................................................16

   A.   ALS Has Plausibly Averred Right and Ability to Supervise.................16

   B.   ALS Has Plausibly Averred Direct Financial Benefit. .........................16

III.   ALS HAS PLAUSIBLY AVERRED DIRECT COPYRIGHT
INFRINGEMENT.............................................................................................17

IV.   ALS HAS PLAUSIBLY AVERRED CLAIMS FOR SECONDARY
TRADEMARK INFRINGEMENT. .................................................................19

   A.   ALS's Copyright Claims Do not Bar its Trademark Claims. ...............19

   B.   ALS Has Plausibly Averred Inducement of Trademark Infringement..21

   C.   ALS Has Adequately Pleaded a Claim for Material Contribution to
Trademark Infringement.................................................................................22

   D.   ALS Has Plausibly Pleaded Direct Trademark Infringement...............23

V.   ALS CONSENTS TO DISMISSAL OF THE CLAIM FOR UNFAIR
COMPETITION ............................................................................................24

CONCLUSION ............................................................................................24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Table of Authorities**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896 (N.D. Cal. 2000),

   *aff'd* 239 F.3d 1004 (9th Cir. 2001) ..................................................17

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ....... 8, 15, 16

*Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071 (9th Cir. 2015) ........................22

*Arista Records LLC v. Usenet.com, Inc.*,

   633 F.Supp.2d 124 (S.D.N.Y. 2009)..................................................10

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009)....................................17

*BMG Rights Management (US) LLC v. Cox Communications*, Inc.,

   149 F.Supp.3d 634 (E.D. Va. 2015)....................................................8

*BWP Media USA Inc. v. Hollywood Fan Sites LLC*,

   115 F.Supp.3d 397 (S.D.N.Y. 2015)..................................................11

*Capitol Records, Inc. v. MP3tunes, LLC*, 48 F.Supp.3d 703 (S.D.N.Y. 2014)..11

*Coach v. Sapatis*, 27 F.Supp.3d 239 (D.N.H. 2014) .........................................20

*Columbia Pictures Industries Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013)........13

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) .. 18, 19

*Designer Skin, LLC v. S & L Vitamins, Inc.*,

   560 F. Supp. 2d 811 (D. Ariz. 2008)..................................................22

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004).................................. 10, 16

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,

   443 F.2d 1159 (2d Cir.1971)..............................................................8

*Gucci America, Inc. v. Frontline Processing Corp.*,

   721 F.Supp.2d 228 (S.D.N.Y. 2010)..................................................20

*Inwood Lab. V. Ives Lab.*, 456 U.S. 844 (1982) ...............................................20

*Lions Gate Entertainment, Inc. v. TD Ameritrade*, CV-15-05024

   (3/14/16 C.D. Cal.)..........................................................................19

*Lockheed Martin Corp. v. Network Solutions, Inc.*,

  194 F.3d 980 (9th Cir. 1999)..................................................................21

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,

  658 F.3d 936 (9th Cir. 2011)..................................................... passim

*Microsoft Corp. v. Atek 3000 Computer Inc.*, No. 06 CV 6403,

  2008 WL 2884761, *5 (E.D.N.Y. July 23, 2008)...........................................20

*OSU Student Alliance v. Ray*, 699 F.3d 1053 (9th Cir. 2012)............................17

*Perfect 10 v. Amazon, Inc.*, 508 F.3d 1146 (9th Cir. 2007)........................ passim

*Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788 (9th Cir. 2007) ... 1, 11, 15

*Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102 (9th Cir. 2007) ......................23

*Phoenix Entertainment Partners, LLC v. Rumsey*, 15-2844 (7th Cir. 2016).........19

*Playboy Enterprises, Inc. v. Frena*, 829 F.Supp. 1552 (M.D. Fla. 1993) ..........11

*Religious Technology Center v. Netcom*,

  907 F.Supp.1361 (N.D. Cal. 1995) ...........................................................9, 10

*Sebastian International, Inc. v. Longs Drug Stores Corp.*,

  53 F.3d 1073 (9th Cir.1995)..................................................................23

*Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378 (9th Cir.1984) .......................21

*Slep-Tone Entm't Corp. v. Canton Phoenix Inc.*, No. 3:14-CV-00764,

  2014 WL 5817903, at *3 (D. Or. Nov. 7, 2014).............................................19

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)...........14

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ............................................7

*Stevo Design, Inc. v. SBR Mktg. Ltd.*, 919 F. Supp. 2d 1112 (D. Nev. 2013)....22

*United States v. Ziegler*, 474 F.3d 1184 (9th Cir.2007) ................................4

*Viacom Intern. Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012)....................10

*Zadrozny v. Bank of N.Y. Mellon*, 720 F.3d 1163 (9th Cir. 2013) ......................7

**Statutes**

*17 U.S.C. § 106* .............................................................................1, 11

**Other Authorities**

*Ninth Circuit Manual of Model Civil Jury Instructions 15.18* ...........................20

*Ninth Circuit Manual of Model Civil Jury Instructions 17.20* ............................8

**Rules**

*Fed R. Civ. P. 12(i)* ...................................................................... 2, 7, 15

*Fed R. Civ. P. 15(a)(2)* ....................................................................2, 7

## SUMMARY OF OPPOSITION

The Court should deny the motion by Defendant CloudFlare, Inc. ("CloudFlare") to dismiss the First Amended Complaint ("FAC") filed by Plaintiff ALS Scan, Inc. ("ALS").

Cloudflare creates multiple copies of client websites that CloudFlare "caches," "stores" and "serves" on Cloudflare's many servers throughout the world, essentially a mirror hosting service. Cloudflare does this so that consumers can access and view copies of these websites cached, stored or served – i.e. mirror hosted -- on the closest Cloudflare server. Cloudflare continued to copy, cache, store and serve websites even after being notified, hundreds of times, that certain CloudFlare client sites contained infringing ALS images. If Cloudflare had terminated services to its clients – "pulled the plug" – the multiple infringing copies of ALS's works on CloudFlare's servers would have been removed from the Internet. Cloudflare's inaction, with actual and constructive notice of infringement, materially assisted direct violations of ALS's exclusive rights to reproduce, display and distribute its copyrighted works. *17 U.S.C. § 106(1), (3), (5).* Cloudflare could have, but did not, "take simple measures to prevent further damage to [ALS's] copyrighted works." *Perfect 10 v. Amazon, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007). Cloudflare materially contributed to – indeed effectuated – infringement upon ALS's rights of "reproduction, . . . display and distributionof [ALS's] images over the Internet." *Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788, 796 (9th Cir. 2007). ALS has therefore stated a plausible claim for contributory coyright infringement.

Though Cloudflare has not distributed a device, it may be liable for inducing coypright infringement by providing services. Here, Cloudflare induced infringement by relying on high volume signups to increase profits, famously providing services to pirate websites such as The Pirate Bay,

1  informing clients that Cloudflare would continue to copy, cache and store
2  infringing content after notification of infringement by copyright owners and by
3  encouraging pirates to conceal their identities and those of their primary host
4  through Cloudflare's domain name service.

5       ALS has averred a plausible claim for vicarious copyright infringement.
6  CloudFlare can remove its cached, stored or served copies of infringing
7  materials from the Internet, and directly benefits financially from growth in its
8  user base.

9       The bootleg copies of ALS works on pirate sites displayed the ALS
10  mark.  ALS has averred a plausible claim for secondary trademark
11  infringement, because CloudFlare continued to copy, cache, store and serve
12  bootleg ALS works bearing the ALS mark after receiving multiple notices of
13  trademark infringement.  *Louis Vuitton Malletier, S.A. v. Akanoc Solutions,*
14  *Inc.*, 658 F.3d 936 (9th Cir. 2011).

15       In the unlikely event the Court concludes that ALS has not plausibly
16  averred its claims against Cloudfare, ALS moves for leave to amend, *Fed R.*
17  *Civ. P. 15(a)(2),* or deferral on ruling until after discovery.  *Fed R. Civ. P. 12(i).*

18  <u>**STATEMENT OF ALLEGED FACTS**</u>

19       CloudFlare teases select words from the FAC and spins them to claim
20  CloudFlare does nothing more than make the Internet faster.  The <u>results</u> of
21  CloudFlare's copying, caching, storing and serving activities may be a faster
22  Internet, but the Court should accept as true ALS's averments and all inferences
23  favorable to ALS, not CloudFlare's minimalist recast of those averments.

24  <u>**ALS Background**</u>

25       ALS was founded in 1996.  ALS owns a substantial library of adult
26  entertainment works.  ALS charges consumers fees to access ALS's adult
27  content on ALS's secure Internet sites.  ALS displays its trademark and
28  copyright information on its works.  (FAC ¶ 20.)

ALS has submitted hundreds of registrations for its copyrighted works to the U.S. Copyright Office, including registrations covering all of the works referenced in the notices of infringement submitted in connection with this motion.  (FAC ¶ 21, Ex. 1.)  ALS is the owner of registered trademarks for the mark "ALS Scan" in connection with adult entertainment.  (FAC ¶ 22, Ex. 2.)

**The Challenge Posed by Infringement on the Internet**

One of the most significant business threats faced by ALS is widespread infringement of its copyrighted works and trademarks on the Internet.  (FAC ¶ 24.)  The observed growth of infringing content on these networks coincided with noticeable decline in ALS's profits.  (FAC ¶ 25.)

"Pirate" sites – those with largely infringing material – would not be able to thrive were it not for third party service providers who provide valuable services to these sites.  These third party providers include services such as those provided by Cloudflare.  (FAC ¶¶ 26-28.)

**CloudFlare's Internet Services to Infringing Sites**

CloudFlare offers: (1) a content delivery network ("CDN"); (2) web content optimization; (3) website security; (4) DDoS (denial of service) protection; and (5) a managed domain name system (DNS) network.  (FAC ¶ 29.)

**CloudFlare Copies, Caches, Displays and Distributes Client Content**

CloudFlare's CDN is essentially a mirror hosting service offered to primary website hosts and operators.  CloudFlare's services do much more than make the Internet go faster.  CloudFlare creates multiples copies of websites that are cached, stored or served on CloudFlare servers.  CloudFlare thus enables and effectuates reproduction, display and distribution of content on websites.

CloudFlare says: "Once your website is a part of the CloudFlare community, its web traffic is routed through our intelligent global network."

1  (FAC ¶ 30.)   "CloudFlare caches your content across our global network,
2  bringing it closer to visitors from every region."
3  https://www.cloudflare.com/cdn/.[1]  (Spillane Decl. Ex. B.)  "CloudFlare
4  operates out of 86 data centers around the world. Our CDN automatically
5  caches your static files at our edge nodes so these files are stored closer to your
6  visitors while delivering your dynamic content directly from your web server.
7  CloudFlare then uses a technology called Anycast to route your visitors to the
8  nearest data center. The result is that your website, on average, loads twice as
9  fast for your visitors regardless of where they are located."  (FAC ¶ 32.)
10      "A content delivery network (CDN) takes your static content and stores a
11  copy closer to your visitors."  https://www.cloudflare.com/website-
12  optimization/  (Spillane Decl. Ex. C.)  "CloudFlare's Service is offered as a
13  platform to cache and serve web pages and websites."
14  https://www.cloudflare.com/terms/  (Spillane Decl. Ex. D.)
15      CloudFlare's managed domain name (DNS) service aids infringers by
16  helping them conceal information concerning the owner and primary host of a
17  website with infringements.  The domain registration information for some of
18  the pirate sites referenced in the FAC indicates that the sites reside on a
19  CloudFlare server in Phoenix, Arizona.  When presented with a notice of
20  infringement, however, CloudFlare asserts that it supposedly has legal
21  immunities even if it does not terminate services to its clients and refuses to
22  disclose the identity of the primary host and site owner.  In this fashion

---

25  [1] ALS requests that the Court take judicial notice of the contents of
26  CloudFlare's website, captures of which are attached to the Spillane
   Declaration.  *Fed. R. Evid. 201*.  CloudFlare quoted from its own website in its
27  motion to dismiss, evidencing CloudFlare's belief that its website may be
28  judicially noticed.

CloudFlare acts as a firewall protecting pirate sites and their hosts from legal recourse by copyright owners.  (FAC ¶ 33.)

CloudFlare opens its brief by touting an impressive client list.  However, CloudFlare continues to provide services to The Pirate Bay, even though The Pirate Bay has been raided by authorities and the site's owner has been arrested for chronic copyright infringement.  (FAC ¶ 37.)  The Digital Citizens Alliance, a Hollywood-affiliated group, has published a report highly critical of CloudFlare's role in providing invaluable services and cover for pirate sites. (FAC ¶ 38.)

### CloudFlare Alters Client Websites

CloudFlare does not copy client websites without modification, but rather reserves the right to modify its clients' sites.  "CloudFlare may modify the content of your site.  For example, CloudFlare may detect any email addresses and replace them with a script in order to keep it from being harvested, or CloudFlare may insert code to improve page load performance or enable a Third Party App."  https://www.cloudflare.com/terms/  CloudFlare may "[a]dd cookies to your domain to track visitors" and "[a]dd script to your pages to, for example, add services, Apps, or perform additional performance tracking."  *Id.*

### CloudFlare's Terms of Service

CloudFlare's Terms of Service provides that it retains the right to investigate its customers, their sites and "the materials comprising the sites" at any time.  The Terms further provide that any violation of law will justify termination of CloudFlare's services. "CloudFlare's policy is to investigate violations of these Terms of Service and terminate repeat infringers."  (FAC ¶ 31.)

Opposition to CloudFlare Motion to Dismiss

**Cloudflare Relies on High Volume, Rapid Signups and Growth in Userbase**

CloudFlare touts its "Growing Global Network Built for Scale: 10 Tbps Capacity and 100 Data Center Global Footprint."  https://www.cloudflare.com/ (Spillane Decl. Ex. E.)  CloudFlare says "Setting up CloudFlare is Easy," over a video showing how a webmaster can place its site on a CloudFlare domain server with a few points and clicks.  *Id.*  "Set up a domain in less than 5 minutes.  Keep your hosting provider.  No code changes required."  *Id.* "CloudFlare makes more than 4,000,000 Internet properties faster and safer. Join today!"  *Id.*

CloudFlare tells its clients "Everyone's Internet application can benefit from using CloudFlare.  Pick a plan that fits your need." https://www.cloudflare.com/plans/  (Spillane Decl. Ex. F.)  CloudFlare has a teaser "free" plan "[f]or personal websites."  *Id.*  CloudFlare touts a "Pro" plan, $20 per month per domain, for "professional websites," and a "Business" plan, $200 per month per domain, for "small eCommerce websites and businesses requiring advanced security and performance . . ."  *Id.*

**Notices of Infringement to CloudFlare; CloudFlare Won't Terminate Services to Repeat Infringers**

ALS's agent for infringement notifications, Mr. Easton, sent numerous notices to CloudFlare and others of infringement of ALS works on sites wherein publicly available information reflected that the sites resided on a server maintained by CloudFlare.  (FAC ¶¶ 34, 81.)  One of the worst offenders was imgchili.net, a site that was the subject of 195 infringement notifications and which pays users to upload infringing content.  (FAC ¶¶ 53, 66-68, 81.) CloudFlare has persisted in offering CDN and related services to pirate websites, notwithstanding numerous notifications of infringement on such sites. (FAC ¶ 35.)  When CloudFlare learned about this lawsuit, it contacted counsel

for ALS and offered to reveal its information concerning the owner(s) of the sites of which ALS complained, but only in exchange for a release of liability in favor of CloudFlare.  (FAC ¶ 36.)

To the extent CloudFlare claims a safe harbor under 17 U.S.C. § 512, it has lost that safe harbor through failure to reasonably implement a repeat infringer policy.  (FAC ¶ 87.)

### **The Infringements Include ALS's Trademarks**

The infringing ALS works that are the subject of the notifications averred above bear the registered ALS Scan trademarks.  The pirate sites listed above have directly infringed ALS's trademarks by using ALS's registered marks without ALS's knowledge or consent in a manner likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation or approval of such works.  The works being published by the direct infringers are counterfeits bearing the ALS marks without authority.  (FAC ¶ 85.)

### **MOTION TO DISMISS STANDARDS**

The Court must "accept as true all well pleaded facts in the complaint and construe them in the light most favorable to the nonmoving party." *Zadrozny v. Bank of N.Y. Mellon*, 720 F.3d 1163, 1167 (9th Cir. 2013).  When a pleading's allegations are susceptible of more than one inference, the court must adopt whichever plausible inference supports a valid claim.  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

If the court believes that any defect in the pleadings may be cured by amendment, leave to amend should be freely granted.  *Fed R. Civ. P. 15(a)(2)*. Additionally, if the conduct of discovery could help a plaintiff plead a plausible claim, the Court may defer ruling on a motion under Rule 12(b) until later in the case or to trial.  *Fed R. Civ. P. 12(i)*.

1   **CONFERENCE OF COUNSEL**

2       The conference of counsel did not take place on "September 19 and 20,

3   2016," as CloudFlare says in its motion.  (Spillane Decl.)

4   **ARGUMENT**

5   **I.  ALS HAS PLAUSIBLY PLEADED A CLAIM AGAINST**

6       **CLOUDFLARE FOR CONTRIBUTORY COPYRIGHT**

7       **INFRINGEMENT.**

8       ALS has plausibly pleaded claims against CloudFlare for both the

9   "material contribution" prong and the "inducement" prong of contributory

10  copyright infringement. *BMG Rights Management (US) LLC v. Cox*

11  *Communications, Inc.*, 149 F.Supp.3d 634, 671 (E.D. Va. 2015) (inducement

12  and material contribution are two branches of contributory infringement); *Ninth*

13  *Circuit Manual of Model Civil Jury Instructions 17.20* (inducement and

14  material contribution are alternatives).

15  **A.  ALS Has Adequately Pleaded "Material Contribution" to**

16      **Direct Infringement.**

17      "[O]ne who, with knowledge of the infringing activity, induces, causes or

18  materially contributes to the infringing conduct of another, may be held liable

19  as a 'contributory' infringer."  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d

20  1004, 1019 (9th Cir. 2001), citing *Gershwin Publ'g Corp. v. Columbia Artists*

21  *Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971); *Fonovisa v. Cherry Auction,*

22  *Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) ("[P]roviding the site and facilities for

23  known infringing activity is sufficient to establish contributory liability").

24      **1.  CloudFlare Concedes the Knowledge Element.**

25      CloudFlare concedes that ALS has adequately pleaded CloudFlare's

26  knowledge of direct infringement by pirate sites.  CloudFlare contends solely

27  that ALS has not pleaded the second element, material contribution.

28

1

## 2.    ALS has Adequately Pleaded Material Contribution.

2    Cloudflare "copies," "caches," "stores" and "serves" websites.

3    A "cache" is "a computer memory with very short access time used for

4    storage of frequently or recently used instructions or data." *United States v.*

5    *Ziegler,* 474 F.3d 1184, 1186 n. 3 (9th Cir.2007) (quoting MERRIAM-

6    WEBSTER'S COLLEGIATE DICTIONARY 171 (11th ed.2003)).  In *Perfect*

7    *10 v. Amazon, Inc., supra,* the court talked about two types of caches – browser

8    caches maintained by Google's computers to efficiently organize and index web

9    pages and user caches, copies of recently viewed web pages on a user's

10   computer.  508 F.3d at 1156 n.3.  Here, it does not appear that CloudFlare uses

11   the term "cache" in either of these two senses.  CloudFlare stores – for extended

12   time periods – multiple copies of a client's static website content on as many as

13   86 servers.  This would explain Cloudflare's alternate use of the terms "cache,"

14   "store" and "serve."  CloudFlare's services may best be described as mirror

15   hosting.

16   A system providing for automated copying and storage of content, not

17   unlike that offered by CloudFlare, was addressed in *Religious Technology*

18   *Center v. Netcom*, 907 F.Supp.1361 (N.D. Cal. 1995).  The plaintiff owned

19   copyrights in the works of L. Ron Hubbard, infringing copies of which were

20   uploaded by Erlich to an Internet "Bulletin Board Service" maintained by

21   Klemesrud.  Netcom maintained services that automatically copied and stored

22   the infringing material:

23
24        "Erlich . . . transmits his messages to Klemesrud's computer, where
          they are automatically briefly stored. According to a prearranged
25        pattern established by Netcom's software, Erlich's initial act of
          posting a message to the Usenet[2] results in the automatic copying
26

27    _____

28   [2]  "USENET is an abbreviation of 'user network.'  This term refers to an
      international collection of organizations and individuals (known as 'peers')

1
2
3
4
5
6
7
8

> of Erlich's message from Klemesrud's computer onto Netcom's computer and onto other computers on the Usenet. In order to ease transmission and for the convenience of Usenet users, Usenet servers maintain postings from newsgroups for a short period of time—eleven days for Netcom's system and three days for Klemesrud's system. Once on Netcom's computers, messages are available to Netcom's customers and Usenet neighbors, who may then download the messages to their own computers. Netcom's local server makes available its postings to a group of Usenet servers, which do the same for other servers until all Usenet sites worldwide have obtained access to the postings, which takes a matter of hours."

9
10
11
12
13
14
15
16

907 F.Supp. at 1367-68.  The court held, first, that digital "copies" were made of the plaintiff's works within the meaning of the Copyright Act.  "Even though the messages remained on their systems for at most eleven days, they were sufficiently 'fixed' to constitute recognizable copies under the Copyright Act."  907 F.Supp. at 1368.  The court held that Netcom could be secondarily liable for copyright infringement for continuing to enable copying and distribution of plaintiff's works.

17
18
19
20
21

> "[I]t is fair, assuming Netcom is able to take simple measures to prevent further damage to plaintiffs' copyrighted works, to hold Netcom liable for contributory infringement where Netcom has knowledge of Erlich's infringing postings yet continues to aid in the accomplishment of Erlich's purpose of publicly distributing the postings."

22
23
24
25
26
27

907 F.Supp. at 1375.

The Ninth Circuit reached a similar result in *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004), where AOL copied and temporarily stored files on Usenet news groups containing allegedly infringing works.  "[A] reasonable trier of fact could conclude that AOL materially contributed to the copyright infringement by storing infringing copies of Ellison's works on its USENET

28

whose computers connect to one another and exchange messages posted by USENET users."  *Ellison v. Robertson*, 357 F.3d 1072, 1074 n.1 (9th Cir. 2004).

groups and providing the groups' users with access to those copies."  357 F.3d at 1078.

Numerous other courts have held that copying, serving, storing, caching, displaying or distributing online files can be a material contribution to direct infringement.  *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936 (9th Cir. 2011) (web host liable for contributory copyright and trademark infringement by ignoring notices of infringements on hosted sites); *Arista Records LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124, 155 (S.D.N.Y. 2009) (music files stored and distributed through the Internet); *Viacom Intern. Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) (host of video upload site potentially secondarily liable for copyright infringement if acting with requisite knowledge); *Capitol Records, Inc. v. MP3tunes, LLC*, 48 F.Supp.3d 703 (S.D.N.Y. 2014) (Internet service provider secondarily liable for maintaining online "storage lockers" into which users could upload infringing files); *BWP Media USA Inc. v. Hollywood Fan Sites LLC*, 115 F.Supp.3d 397 (S.D.N.Y. 2015) (defendants hosting celebrity sites with infringing images not entitled to DMCA safe harbors).

In short, those who copy, cache, store and serve Internet content have long been seen as providing the "site and facilities" for infringement.  *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996)

If Cloudflare had terminated services to its clients – "pulled the plug" – the infringing copies of ALS's works – as many as 86 copies on CloudFlare servers throughout the world – would have been removed from the Internet. Cloudflare's inaction, with actual and constructive notice of infringement, materially assisted direct violations of ALS's exclusive rights to reproduce,

1  display and distribute its copyrighted works.  *17 U.S.C. § 106(1), (3), (5).*[3]

2  Cloudflare could have, but did not, "take simple measures to prevent further

3  damages to [ALS's] copyrighted works."  *Perfect 10 v. Amazon, Inc.*, 508 F.3d

4  1146, 1172 (9th Cir. 2007).  Cloudflare materially contributed to – indeed

5  effectuated – infringement upon ALS's rights of "reproduction, . . . display and

6  distribution of [ALS's] images over the Internet."  *Perfect 10 v. Visa Intern.*

7  *Service Ass'n*, 494 F.3d 788, 796 (9th Cir. 2007).

8      Additionally, CloudFlare's domain name service enables both infringers

9  and their primary hosts to conceal their identity from copyright owners.  When

10  ALS looked up publicly available information concerning the pirate sites in

11  question, the information was that the site was hosted by a CloudFlare server in

12  Phoenix, Arizona.  When CloudFlare was contacted by Steve Easton, it denied

13  that it was the primary host but would not disclose the identity of the primary

14  host or site owner.  When this suit was filed, CloudFlare conditioned disclosure

15  of the owners of the sites in question on a release of liability.  CloudFlare's

16  services provider site owners and hosts with cover to infringe in anonymity.

17      CloudFlare's key defense is that "If CloudFlare's services were

18  completely unavailable to the allegedly infringing websites, those websites

19  would still exist."  CloudFlare Memo. p.6.  What CloudFlare is saying is that

20  even if it removed the 86 copies of infringing material that it caches, stores, and

21  serves throughout the world, one copy would still remain, that on the primary

22  host.  CloudFlare fails to cite a single case holding that it has immunity from

23  secondary copyright liability if removing infringing copies of works from its

24  own site and facilities won't eradicate every single infringing copy of the work

25  on the Internet.  Under CloudFlare's theory, a primary host and a mirror host

26

27  [3] *Playboy Enterprises, Inc. v. Frena*, 829 F.Supp. 1552, 1556-57 (M.D. Fla.

28  1993) (display of Playboy images on Internet "bulletin board service" infringed
Playboy's display and distribution rights).

like CloudFlare could cross-immunize themselves from secondary liability by arguing that neither had the right to eradicate all copies of infringing works from the Internet.  That is not the law.

CloudFlare's sole published authority on material contribution, *Perfect 10 v. Amazon, Inc.*, supra, 508 F.3d at 1172, CloudFlare Memo. p. 6, concerned material contribution through searches, not caching, storing or serving websites.  CloudFlare's sole published citation works against its argument.  Google could not remove infringements from the Internet.  It could, however, take measures to stop helping people find them.

Courts have never afforded immunity from secondary liability to service providers because they could not eradicate all direct infringement.  Ultimately direct infringers can move on to another service provider if services are terminated due to repeat infringement or if the service provider shuts down.  In *Fonovisa, supra*, Cherry Auction could not stop sale of bootleg records, but was liable because it failed to eject vendors selling bootleg records from its site and facilities.  76 F.3d at 264.  After Napster was enjoined from contributing to infringement, *A&M Records, Inc. v. Napster, Inc., supra*, consumers could still copy and swap infringing music files directly, or with the aid of next generation peer-to-peer or bit torrent services.  *Metro-Golden-Mayer Studios, Inc. v. Grokster, Ltd.* 545 U.S. 913, 125 S.Ct. 2764 (2005) (peer-to-peer provider could be liable for inducing infringement); *Columbia Pictures Industries Inc. v. Fung*, 710 F.3d 1020, 1033 (9th Cir. 2013) (Fung contributorily liable by providing torrent files that enabled users to search for and download infringing works stored on other's computers).  Neither Napster, Grokster nor Fung could reach into other people's computers and delete infringing files, but they were liable because they helped people reproduce and distribute infringing files.

1    Here, CloudFlare could reject infringers on its own site and facilities,

2    even if it did not control all other sites and facilities on which infringement

3    occurred.

4    ALS has plausibly averred material contribution to direct infringement.

5    **B.    ALS Has Adequately Pleaded "Inducement" of Direct**

6    **Infringement.**

7    "'Liability under our jurisprudence may be predicated on actively

8    encouraging (or inducing) infringement through specific acts.'"  *Perfect 10 v.*

9    *Amazon, Inc.*, supra, 508 F.3d at 1170, citing *Grokster, supra*.  "[A]n actor may

10    be contributorily liable for intentionally encouraging direct infringement if the

11    actor knowingly takes steps that are substantially certain to result in such direct

12    infringement."  *Id.* at 1171.

13    Here, Cloudflare relies on "high volume use."  *Fung, supra*, 710 F.3d at

14    1035, citing *Grokster, supra*, 545 U.S. at 940.  CloudFlare says webmasters can

15    sign up for its service in five minutes and that it has 4,000,000 users.

16    CloudFlare makes no effort to use "filtering tools or other mechanisms" to

17    detect infringing activity by its clients.  710 F.3d at 1035, citing *Grokster*, 545

18    U.S. at 939.

19    CloudFlare further induced infringement by maintaining a network with a

20    reinforcing cycle of encouragement for pirate sites, enticed by CloudFlare's

21    promise of anonymity through its domain name service, to continue to draw

22    traffic through the lure of infringement.  CloudFlare famously maintained

23    services to Pirate Bay, one of the most notorious infringers on the Internet.

24    CloudFlare teaches its pirate site clients that its Terms of Service are for show

25    only, and that CloudFlare will continue to provide services to repeat infringers.

26    Once word was out that CloudFlare would not enforce its terms of service,

27    others looking to earn money through the draw of infringement became

28    CloudFlare clients.  This self-reinforcing cycle was particularly evident in the

1    case of imgchili.net, which paid users to continuously upload infringing

2    content.

3        CloudFlare confuses the issue before the Court by making reference to

4    *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442, 456

5    (1984) and the "staple article of commerce" doctrine.  *Sony* does not apply.

6    Sony sold Betamax video recorders, devices used by some consumers to

7    infringe copyright.  Once Sony sold a recorder the device was out of its hands,

8    and thus Sony could not terminate services to consumers who infringed

9    copyrights.  Under that fact pattern, it made sense to determine whether Sony

10   knew it was selling an infringement machine, or whether the recorder was

11   "capable of substantial non-infringing uses."  Here, by contrast, CloudFlare is

12   not selling goods to consumers, but services to clients using equipment owned

13   by CloudFlare.  "Nothing in *Sony* requires courts to ignore evidence of intent if

14   there is such evidence, and the case was never meant to foreclose rules of fault

15   based liability derived from the common law.  . . . [W]here evidence goes

16   beyond a product's characteristics or the knowledge that it may be put to

17   infringing uses, and shows statements or actions directed to promoting

18   infringement, *Sony* 's staple article rule will not preclude liability."  *Grokster,*

19   *supra*, 545 U.S. at 934-35.  In *Fung*, Fung did not distribute a product or device,

20   but was liable for inducing infringement by continuing to provide service to

21   repeat infringers.  *Fung, supra*, 710 F.3d at 1032-33.

22       ALS has not yet discovered communications between CloudFlare and its

23   clients.  Quoting communications not discovered is not ALS's burden at the

24   pleading stage.  ALS is entitled to all inferences in its favor.  From the facts

25   averred, it is reasonable to assume that discovery would adduce

26   communications between CloudFlare and its clients inducing infringement.

27

28

1    In the unlikely event that the Court does not believe ALS has plausibly

2 averred inducement liability, ALS prays that this question be deferred until after

3 discovery.  *Fed. R. Civ. Proc. 12(i).*

4 **II.    ALS HAS PLAUSIBLY PLEADED CLAIMS FOR VICARIOUS**

5 **COPYRIGHT INFRINGEMENT.**

6    Vicarious copyright liability exists where a defendant "'has the right and

7 ability to supervise the infringing activity and also has a direct financial interest

8 in such activities.'"  *Napster,* 239 F.3d at 1022, quoting *Fonovisa,* 76 F.3d at

9 262.

10    **A.    ALS Has Plausibly Averred Right and Ability to Supervise.**

11    CloudFlare can eliminate up to 86 copies of infringing works that

12 CloudFlare "caches," "stores" and "serves" on the Internet.  If CloudFlare did

13 so, it would cease its involvement in the reproduction, display and distribution

14 of infringing works.  CloudFlare can "remove [copies of] those websites from

15 the Internet" and can "block distribution" of the infringing works on its mirror

16 server system.  *Perfect 10, Inc. v. Visa, supra*, 494 F.3d at 805.  CloudFlare can

17 "exert substantial influence on the activities of users," *Fung, supra*, 710 F.3d at

18 1045, by deleting the 86 copies of infringing works that CloudFlare caches,

19 stores and serves.  ALS has therefore plausibly averred right and ability to

20 supervise.

21    **B.    ALS Has Plausibly Averred Direct Financial Benefit.**

22    "Financial benefit exists where the availability of infringing material

23 'acts as a "draw" for customers.'"  *Napster,* 239 F.3d at 1023, quoting

24 *Fonovisa,* 76 F.3d at 263-64.  Further, financial benefit exists where future

25 revenues depend upon "increases in user base."  *Id.*

26    Here, ALS has averred that CloudFlare's revenues are related to growth

27 in its user base, which growth relates to the draw of infringing content.

28 CloudFlare entices new users with fast signup and pricing plans for

"professional websites" and "eCommerce websites." CloudFlare encourages pirate sites to flock to CloudFlare. CloudFlare retained services to The Pirate Bay, the owner of which was arrested for chronic copyright infringement. CloudFlare's toleration of pirate sites spurred a Hollywood group to publish a report highly critical of CloudFlare's role in providing services and cover to pirate sites. CloudFlare encourages pirate site clients by offering anonymity to not only the pirate site but its primary host. CloudFlare further encourage pirates by tacitly communicating to its client base that CloudFlare's Terms are merely for public consumption and the CloudFlare will do nothing to terminate repeat infringers. These averment are sufficient to plausibly plead direct financial benefit from infringement.

CloudFlare's lead case, *Ellison v. Robertson, supra*, does not support CloudFlare on this issue. CloudFlare Memo. p.9. First, the *Ellison* court <u>followed</u> the holdings of *Napster, supra,* and *Fonovisa, supra*, that the requisite financial benefit exists for purposes of vicarious infringement where the defendant's revenues grow through the draw of infringement. 357 F.3d at 1078. Second, *Ellison* confirms that the increase in revenue due to infringement need not be "substantial," but must merely exist. 357 F.3d at 1079. Ellison's case was disposed of on summary judgment, not a motion to dismiss. Ellison's problem was that he did not offer <u>evidence</u> that AOL's subscriber base related at all to the draw of infringement. 357 F.3d at 1079. Here, ALS has plausibly averred the CloudFlare has increased its user base through toleration, if not encouragement, of a pirate site client base. Thus is sufficient for pleading purposes.

## III.   ALS HAS PLAUSIBLY AVERRED DIRECT COPYRIGHT INFRINGEMENT.

CloudFlare argues that ALS has not plausibly averred direct copyright infringement because ALS has not stated, in exhaustive detail, which picture set

was displayed on which page of which pirate site on which day.  CloudFlare Memo. 11-12.  Not surprisingly, CloudFlare fails to cite a single published case holding that meeting the plausible averment standard requires pleading one's case in full evidentiary detail.

To survive a motion to dismiss, a plaintiff need not make its case against a defendant by pleading specific evidentiary facts supporting each element of each cause of action.  *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1078 (9th Cir. 2012).  There Oregon State students challenged an alleged university policy to dump a student newspaper from newsbins, and that university official Martorello enforced the policy.  The plaintiff plausibly averred Martorello's alleged role even though it did not "prove the case on the pleadings."  *Id.*  "All that matters at this stage is that the allegation nudge this inference 'across the line from conceivable to plausible.'"  *Id.*, citing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1951 (2009).

Napster users were sharing approximately 10,000 music files per second.  *A&M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896, 902 (N.D. Cal. 2000), *aff'd* 239 F.3d 1004 (9th Cir. 2001).  The plaintiffs found that 87.1% of sampled files were owned or adminstered by plaintiffs or other music copyright holders.  114 F.Supp.2d at 903 n.6.  Would the court have dismissed the copyright owners' pleading under the *Iqbal* standard assuming they did not list each work infringed?  It seems impossible.  Surely a general averment that the plaintiffs owned thousands of copyrighted works that were traded through the Napster system would have sufficed.

Here, ALS has averred that it has spent twenty years amassing a large library of adult works, reflected in hundreds of copyright registrations.  ALS has averred that it sent hundreds of notifications of infringements of its works to CloudFlare and others, each notification containing numerous hyperlinks to numerous webpages each containing galleries of ALS works.  The scale of

1  infringement in this case is massive.  To plead which model was shown on

2  which web page on which site on which day would render the pleading

3  hundreds of pages long.  ALS need only plausibly aver direct infringement, not

4  plead detail sufficient to avoid a motion for judgment as a matter of law at trial.

5  ALS has done so.

## IV.   ALS HAS PLAUSIBLY AVERRED CLAIMS FOR SECONDARY TRADEMARK INFRINGEMENT.

### A.   ALS's Copyright Claims Do not Bar its Trademark Claims.

9  CloudFlare says that where defendants are secondarily involved in

10  trafficking in bootleg wares that infringe both copyright and trademark, the

11  owner must supposedly elect between a copyright and a trademark claim.

12  CloudFlare Memo. 13-14.  CloudFlare's authority, *Dastar Corp. v. Twentieth*

13  *Century Fox Film Corp.*, 539 U.S. 23 (2003) says no such thing.  The *Dastar*

14  line of cases deal with attempts to circumvent time-barred copyright claims

15  through a source of origin theory.  Here ALS's copyright claim is not time-

16  barred, nor is ALS pleading source of origin confusion.

17  In *Dastar* Fox failed to renew a registration on a "Crusade in Europe"

18  television series, which lapsed into the public domain.  Dastar then released a

19  video set containing elements from the Fox "Crusade" series.  Fox worked

20  around the barred copyright claim by complaining under 15 U.S.C. § 1125(a)

21  ["Section 43(a)"] of the Lanham Act that Dastar failed to credit Fox as the

22  "origin" of the material.  The problem the Court addressed was how the term

23  "origin" worked in that context.  On the pages cited by CloudFlare, 33 and 34,

24  the court said that copyright law's specific provision that a work in the public

25  domain may be copyrighted without attribution trumped the Lanham Act's

26  more general definition of "origin."  Nowhere did the *Dastar* court say that

27  where works protected under both copyright and trademark are infringed and

28

1    counterfeited, copyright preempts trademark or that the owner must elect
2    remedies.[4]

3    ALS has not plead source of origin confusion under Section 43(a), but
4    rather infringement of a registered mark and trademark counterfeiting.  Further,
5    ALS is not using trademark law to work around expired copyright protection.
6    The *Dastar* issue simply doesn't exist in this case.  Numerous courts, <u>including</u>
7    <u>the Ninth Circuit post-*Dastar*</u>, have held that where a defendant directly or
8    secondarily traffics in stolen works embodying both the plaintiff's copyright
9    and trademark, the owner may sue under both copyright and trademark.
10   *Fonovisa, supra* (swap meet owner liable for contributory copyright and
11   trademark infringement); *Perfect 10 v. Cybernet Ventures, supra* (age
12   verification service liable for both copyright and trademark infringement);
13   *Microsoft Corp. v. Atek 3000 Computer Inc.*, No. 06 CV 6403, 2008 WL
14   2884761, *5 (E.D.N.Y. July 23, 2008) (preliminary injunction for copyright and
15   trademark infringement for sale of bootleg Microsoft software); *Louis Vuitton,*
16   *supra* (web host secondarily liable for copyright and trademark infringement
17   from sale of counterfeit Louis Vuitton goods); *Coach v. Sapatis*, 27 F.Supp.3d

18

19   _____

[4] CloudFlare's unpublished cases discuss Lanham Act Section 43(a) and the
20   *Dastar* "origin" issue, but this is not an issue in this case.  None hold that
21   copyright preempts trademark or that owners of works protected by both
     copyright and trademark must elect remedies.  Both *Phoenix Entertaint*
22   *Partners, LLC v. Rumsey*, 15-2844 (7th Cir. 2016) and *Slep-Tone Entm't Corp.*
23   *v. Canton Phoenix Inc.*, No. 3:14-CV-00764, 2014 WL 5817903, at *3 (D. Or.
     Nov. 7, 2014) involve claims by Slep-Tone that defendants passed off bootleg
24   copies of Slep-Tone karaoke files as genuine tracks when played on a karaoke
25   machine.  The problem with Slep-Tone's theory was that the karaoke machines
     correctly displayed Slep-Tone as the source of the track, thus there could be no
26   source confusion.  In *Lions Gate Entertainment, Inc. v. TD Ameritrade*, CV-15-
27   05024 (3/14/16 C.D. Cal.) the court read *Dastar* as holding that trademark law
     cannot be used to extend copyright or patent rights that have expired.  Here
28   ALS is not asserting expired copyrights.

1  239 (D.N.H. 2014) (denying defense motion for summary judgment on claims

2  for copyright and trademark infringement for sale of counterfeit Coach goods).

3  **B.     ALS Has Plausibly Averred Inducement of Trademark**

4  **Infringement.**

5  One may be secondarily liable for trademark infringement by inducing

6  direct infringement.  *Inwood Lab. V. Ives Lab.*, 456 U.S. 844, 853-54 (1982);

7  *Ninth Circuit Manual of Model Civil Jury Instructions 15.18.*  In *Gucci*

8  *America, Inc. v. Frontline Processing Corp.*, 721 F.Supp.2d 228, 248-49

9  (S.D.N.Y. 2010), involving sales of fake Gucci products, a claim for

10  inducement of trademark infringement was stated against Durango, which

11  specialized in obtaining credit card processing facilities for "high risk merchant

12  accounts," including those who sell "replica products," statements calculated to

13  induce business from those selling counterfeit products.

14  Here, the same averments that plausibly plead CloudFlare induced

15  copyright infringement also plausibly plead CloudFlare induced trademark

16  infringement.  In *Gucci America, supra*, Gucci did not have to plead that

17  Durango posted a sign saying "trademark infringement welcome."  Rather,

18  reference to "high risk merchant accounts" and "replica products" was coded

19  language calculated to welcome clients that trafficked in or turned a blind eye to

20  counterfeit goods.  Here, CloudFlare has signaled to the Internet marketplace its

21  welcoming approach to pirate sites.  CloudFlare has retained services to a site

22  as infamous as The Pirate Bay, and has informed its client base that its Terms

23  are meaningless by failing to terminate services to even the most abject repeat

24  infringers.  ALS has not had an opportunity to discover communications by

25  CloudFlare that may further evidence inducement, but for purposes of a motion

26  to dismiss, ALS has plausibly plead a theory of inducement.

27

28

1   **C.   ALS Has Adequately Pleaded a Claim for Material**
2   **Contribution to Trademark Infringement.**

3       One may also be contributorily liable for trademark infringement by
4   continuing to provide goods or services to the direct trademark infringer with
5   actual or constructive knowledge of the infringement.  *Sealy, Inc. v. Easy*
6   *Living, Inc.,* 743 F.2d 1378, 1382 (9th Cir.1984) ("[I]f a manufacturer or
7   distributor . . . continues to supply its product to one whom it knows or has
8   reason to know is engaging in trademark infringement, the manufacturer is
9   contributorily responsible for any harm done as a result of the deceit");
10   *Fonovisa, supra*, 76 F.3d at 265 (flea market turned a blind eye to continuous
11   trademark infringement by its vendors, and thus plaintiff stated a claim for
12   contributory trademark infringement).

13       A defendant has "direct control and monitoring of the instrumentality
14   used by a third party to infringe the plaintiff's mark," *Lockheed Martin Corp. v.*
15   *Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999) where it can remove
16   copies of infringements from the Internet.  *Louis Vuitton, supra*, 658 F.3d at
17   942-43 (defendants liable for contributory trademark infringement for
18   continuing to host sites with infringing products).

19       Here, CloudFlare was put on notice that it was copying, caching, storing
20   and serving works that infringed ALS's trademarks.  CloudFlare could have
21   removed those infringing works from up to 86 of its servers, but it failed to do
22   so.  CloudFlare essentially argues that if it removed its 86 copies of infringing
23   works from its own servers, one copy would remain on the primary host.
24   However, ALS has plausibly averred that CloudFlare enjoys "direct control and
25   monitoring" of the 86 copies of websites CloudFlare caches, stores and serves.
26   No case CloudFlare cites supports its theory that CloudFlare needed to have
27   "direct control and monitoring" of all infringing works on the Internet to have
28   secondary liability for trademark infringement.

**D.      ALS Has Plausibly Pleaded Direct Trademark Infringement.**

ALS has plausibly pleaded direct trademark infringement with sufficient detail for pleading purposes.  ALS need not list each and every direct trademark infringement, but plausibly aver that the infringement occurred.  ALS has done so.

CloudFlare has not shown that ALS's trademark claims are facially barred by a nominative fair use defense.  CloudFlare misrepresents ALS's contention.  ALS has not alleged that its trademark has been placed on genuine ALS works.  Its trademark has been placed on stolen ALS works – knockoffs – copied, displayed, cached, served, stored and distributed by CloudFlare.  The fact that images on the Internet can be stolen with a right-click of a mouse, resulting in copies that are indistinguishable from the original, does not mean the stolen copy is genuine.  If in *Louis Vuitton, supra*, the knockoffs sold by the pirate had been created by a "Star-Trek" style replicator, the defendants would still have been liable for contributory trademark infringement even though the articles sold would have been indistinguishable from a real Louis Vuitton.

CloudFlare's nominal fair use authorities are off point.  *Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071 (9th Cir. 2015), *Stevo Design, Inc. v. SBR Mktg. Ltd.*, 919 F. Supp. 2d 1112 (D. Nev. 2013) and *Designer Skin, LLC v. S & L Vitamins, Inc.*, 560 F. Supp. 2d 811 (D. Ariz. 2008) all involved resale of genuine goods.  "[A] reseller of branded goods – who does not materially change the good – is not a trademark infringer."  *Stevo Design*, 919 F.Supp.2d at 1122, *citing Sebastian International, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir.1995).  CloudFlare is not a reseller of genuine goods.  CloudFlare enables reproduction, display and distribution of stolen goods.

**V.   ALS CONSENTS TO DISMISSAL OF THE CLAIM FOR UNFAIR**
**COMPETITION**

ALS disagrees with all but one of CloudFlare's unfair competition arguments.  ALS does agree that its state unfair competition claim is disposed of by the Communications Decency Act as interpreted in *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1107 (9th Cir. 2007), and thus will dismiss that claim for relief.

## CONCLUSION

CloudFlare's motion to dismiss should be denied.

In the unlikely event the Court does not believe ALS has plausibly averred its claims, ALS prays for leave to amend.  Additionally, ALS moves that the questions raised by CloudFlare be deferred until after ALS has been able to conduct discovery.

DATED:  October 3, 2016                    SPILLANE TRIAL GROUP PLC


By: _____
                    Jay M. Spillane
        Attorneys for Plaintiff ALS Scan, Inc.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this action.  My business address is: 468 N. Camden Drive, Second Floor, Beverly Hills, CA 90210-4507.  A true and correct copy of the foregoing document entitled (*specify*): **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS BY DEFENDANT CLOUDFLARE, INC.**
 will be served or was served **(a)** on the judge in chambers in the form and manner required by Local Rules and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and Local Rules, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) October 3, 2016, I checked the CM/ECF docket for this action and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Gary L. Bostwick– gbostwick@B1Law.com
Kevin S. Toll – kevin@silversteinlegal.com
Lawrence G. Walters – larry@firstamendment.com
Corey D. Silverstein – corey@silversteinlegal.com
Rachel H. Kassabian – rachelkassabian@quinnemanuel.com
Carolyn M. Homer – carolynhomer@quinnemanuel.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) October 3, 2016, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served by Overnight Mail***
Hon. George H. Wu
U.S. District Court
312 N. Spring Street
Courtroom 10 – Spring St. Floor
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

10/3/2016           Jessie Gietl                                      *Jessie Gietl*
_____          _____
*Date*                  *Printed Name*                              *Signature*