Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE TRIAL GROUP PLC
468 N. Camden Drive, Second Floor
Beverly Hills, CA 90210
(424) 217-5980
(888) 590-1683 (fax)

Attorneys for Plaintiff ALS Scan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALS SCAN, INC., a Maryland corporation, <br><br>         Plaintiff, <br><br>   vs. <br><br> CLOUDFLARE, INC., a Delaware corporation; DOLPHIN MEDIA LTD., a Hong Kong company; HIVELOCITY VENTURES CORPORATION, a Florida corporation; STEADFAST NETWORKS, LLC, a Delaware limited liability company; and DOES 1-10, inclusive, <br><br>         Defendants. | Case No.: 2:16-cv-05051-GW-AFM <br><br> **THIRD AMENDED COMPLAINT FOR:** <br><br> **1. DIRECT COPYRIGHT INFRINGEMENT;** <br> **2. CONTRIBUTORY COPYRIGHT INFRINGEMENT;** <br> **3. VICARIOUS COPYRIGHT INFRINGEMENT;** <br> **4. TRADEMARK INFRINGEMENT;** <br> **5. TRADEMARK COUNTERFEITING; AND** <br> **6. CONTRIBUTORY TRADEMARK INFRINGEMENT** <br><br> [Demand for Jury Trial] |

Plaintiff ALS Scan, Inc. ("ALS") avers:

**Jurisdiction and Venue**

1.     The Court has jurisdiction over this action because it arises under the Copyright Act and Lanham Act, 28 U.S.C. § 1338(a).

2.     Venue is proper in this District, in that the Defendants may be found in this District, 28 U.S.C. § 1400(a).

**Nature of Action**

3.     ALS owns a substantial library of copyrighted and trademark works of adult entertainment.

4.     This case involves chronic and willful infringement of ALS's copyrighted works on "pirate" Internet sites, those with no apparent function other than to display infringing adult content.

5.     Attempting to enforce copyright laws against pirate sites can be taxing.  They tend to be shadowy companies in far-flung jurisdictions.  Often the pirates register their web domains with a private registry, thus masking their identity.  Pirate websites or their hosts engage the services of content delivery networks, who cache a copy of a website and who are identified in searches as the situs for that website, yet who when contacted refuse to disclose the identity of the host or site owner.  The effort and expense of haling these pirate sites into Court may not be warranted, as they are likely to find it cheaper and easier to disappear and resume services on some other website under some other entity.

6.     The pirate sites would not be able to thrive were it not for third party service providers who provide valuable services to these sites.  These third party providers include hosts and content delivery networks.  These companies display terms of service saying they don't allow copyright or trademark infringement and reserve the right to terminate service to offenders. These terms are for public consumption, however, for even in the face of red flags of infringement, as well as actual notice of infringement, the companies

named herein have continued to provide valuable services to pirate sites, thus continuing to profit from the draw of infringement. On information and belief, none of the companies named herein have implemented a reasonable and consistent policy of terminating service to repeat infringers.

7.      To make matters worse, these third party providers confound the efforts of copyright owners like ALS who seek to terminate chronic infringement by pirate sites by asserting meritless defenses, claiming a distant relationship from the pirate sites and in some cases refusing to disclose information known to them about which persons or companies directly own, control or host the pirate sites.

8.      On information and belief, certain of the Defendants named herein have directly infringed upon ALS's copyrights and trademarks. On information and belief, certain of the Defendants named herein have, with actual and/or constructive knowledge of direct infringements of ALS works, materially contributed to or aided in such infringement. On information and belief, certain of the Defendants named herein, with the right and ability to control or supervise such infringing activity, have continued to profit from such activity. For these reasons, the parties named herein should be held liable for direct, contributory and vicarious copyright infringement and direct and contributory trademark infringement.

**Parties**

9.      ALS is a Maryland corporation with its principal office in Woodstock, Maryland. ALS is the sole owner of the copyrighted works that are the subject of this action, all of which have been registered with the U.S. Copyright Office. ALS is the sole owner of the trademarks at issue in this action, which have been registered with the US Patent and Trademark Office.

10.     On information and belief, CloudFlare, Inc. ("Cloudflare") is a Delaware corporation with its principal offices at 101 Townsend, San

Francisco, CA 94107.  On information and belief, CloudFlare provides a variety of Internet services to clients, including provision of a "content delivery network" that delivers services to hosts of pirate sites.

11.    On information and belief, Defendant Dolphin Media, Ltd. ("Dolphin") is a Hong Kong company with offices at Suite 801, 8/F, Singga Commercial Centre, 144-151 Connaught Road West, Hong Kong.  On information and belief, Dolphin owns and operates a pirate site, imgchili.net.

12.    On information and belief, Defendant Hivelocity Ventures Corporation ("Hivelocity") is a Florida corporation with offices at 8010 Woodlands Center Blvd., Suite 700, Tampa, Florida 33614.  On information and belief, Hivelocity hosts pirate sites, including namethatpornstar.com.

13.    On information and belief, Steadfast Networks, LLC ("Steadfast") is a Delaware limited liability company with offices at 800 S. Wells St., Suite 190, Chicago, IL 60607.  On information and belief, Steadfast operates servers on which pirate sites reside, and provides DNS services to such sites,  one of which is imagebam.com.

14.    ALS has no knowledge of the true names and capacities of the parties sued as Doe Defendants 1-10, inclusive, and therefore sues them using fictitious names.  ALS will amend this Complaint to identify these Doe Defendants specifically if and when their true names and capacities are ascertained.

15.    On information and belief, through their acts or omissions, Does 1-10 are responsible, along with the other specifically-named defendants, for the injuries alleged, and therefore are liable for them.  On information and belief, at all times, the specifically-named defendants and Does 1-10 were principals, agents, and representatives of each other, or acting in concert with one another, such that the acts or omissions of any of them can be ascribed to the others.

**ALS Background**

16.    ALS was founded in 1996.  ALS owns a substantial library of self-produced adult entertainment images and videos.  ALS was one of the first companies to provide consumers with access to adult entertainment on secure websites.  ALS charges consumers fees in consideration for a user identification and password which will provide the consumer with access to proprietary content on ALS's secure Internet sites.  ALS also sells proprietary ALS content on DVDs.  ALS displays its trademark and copyright information on its works.

17.    ALS has submitted hundreds of registrations for its copyrighted works to the U.S. Copyright Office, including registrations covering all of the works referenced in the notices of infringement averred herein.  A true and correct summary of the hundreds of copyright registrations submitted by ALS is attached hereto as Exhibit 1.

18.    ALS is the owner of Trademark Reg. No. 2137225, registered February 17, 1998 for the mark "ALS Scan" in connection with CD Roms featuring adult entertainment.  ALS is the owner of Trademark Reg. No. 3062202, registered February 28, 2006 for the mark "ALS Scan" in connection with web sites and multimedia materials featuring adult entertainment.  True and correct copies of these registrations are attached hereto as Exhibit 2.

19.    ALS content  always displays ALS's registered "ALS Scan" trademark.  Thus, unlawful display of an infringing ALS image infringes both ALS's copyrights and trademark rights.

**The Challenge Posed by Infringement on the Internet**

20.    One of the most significant business threats faced by ALS is widespread infringement of its copyrighted works and trademarks on the Internet.  Beginning around 2000, and continuing to the present, ALS images have been displayed on growing numbers of illicit websites, without the knowledge of or license from ALS.  Around this time consumers began to

1    graduate from relatively slow dial-up Internet access to dedicated higher speed

2    Internet connections.  The emergence of peer-to-peer file sharing networks and

3    "newsgroups" grew in use and popularity.  These networks allowed consumers

4    to upload and share content with others.  Enormous quantities of infringing

5    ALS content have been posted on these file sharing and newsgroup sites.  High

6    connection speeds have permitted massive download and upload of libraries of

7    infringing content.

8         21.    The observed growth of infringing content on these networks

9    coincided with noticeable decline in ALS's profits.  During this time ALS has

10   continued to produce high quality adult entertainment content, transitioning

11   from shooting with print film to high resolution digital content.  Despite these

12   efforts, sales have declined.  There are no material factors to explain this

13   decline other than the ubiquitous presence of infringing ALS content on the

14   Internet.

15        22.    Attempting to enforce copyright laws against pirate sites can be

16   taxing.  They tend to be shadowy companies in far-flung jurisdictions.  Often

17   the pirates register their web domains with a private registry, thus masking their

18   identity.  Pirate websites or their hosts engage the services of content delivery

19   networks, who cache a copy of a website and who are identified in searches as

20   the situs for that website, yet who when contacted refuse to disclose the identity

21   of the host or site owner.  The effort and expense of haling these pirate sites into

22   Court may not be warranted, as they are likely to find it cheaper and easier to

23   disappear and resume services on some other website under some other entity.

24        23.    The pirate sites would not be able to thrive were it not for third

25   party service providers who provide valuable services to these sites.  These

26   third party providers include hosts and content delivery networks.  These

27   companies display terms of service saying they don't allow copyright or

28   trademark infringement and reserve the right to terminate service to offenders.

These terms are for public consumption, however, for even in the face of red flags of infringement, as well as actual notice of infringement, the companies named herein have continued to provide valuable services to pirate sites, thus continuing to profit from the draw of infringement.  On information and belief, none of the companies named herein have implemented a policy of terminating service to repeat infringers.

24.     To make matters worse, these third party providers confound the efforts of copyright owners like ALS who seek to terminate chronic infringement by pirate sites by asserting meritless defenses, claiming a distant relationship from the pirate sites and in some cases refusing to disclose information known to them about which persons or companies directly own, control or host the pirate sites.  This case raises the problem of service providers who continue to do commerce with pirate sites even after receipt of actual knowledge of repetitive acts of infringement on such sites.  As averred below, these service provides turn a blind eye to actual notice that these sites are repeat infringers and continue to profit from doing business with these sites.  They have systematically failed to implement or enforce a repeat infringer policy.

**Cloudflare**

25.     CloudFlare, according to www.cloudflare.com, is a "web performance and security company."  Cloudflare says it offers: (1) a content delivery network ("CDN"); (2) web content optimization; (3) website security; (4) DDoS (denial of service) protection; and (5) a managed domain name system (DNS) network.

26.     Cloudflare says: "Once your website is a part of the CloudFlare community, its web traffic is routed through our intelligent global network. We automatically optimize the delivery of your web pages so your visitors get the fastest page load times and best performance. We also block threats and limit abusive bots and crawlers from wasting your bandwidth and server resources.

- 6 -

Third Amended Complaint

1   The result: CloudFlare-powered websites see a significant improvement in
2   performance and a decrease in spam and other attacks."

3       27.     CloudFlare's Terms of Service provides that it retains the right to
4   investigate its customers, their sites and "the materials comprising the sites" at
5   any time.  The Terms further provide that any violation of law will justify
6   termination of CloudFlare's services. "CloudFlare's policy is to investigate
7   violations of these Terms of Service and terminate repeat infringers."

8       28.     On information and belief, Cloudflare's CDN is a service offered
9   to website hosts and operators.  The point is to speed a consumer's access to the
10  website of Cloudflare's client through a series of data centers maintained by
11  Cloudflare that cache mirror copies of that site.  Thus, consumers seeking to
12  access the website of a Cloudflare client would retrieve the site from the closest
13  Cloudflare data center rather than accessing the site from the primary host.  In
14  Cloudflare's words: "CloudFlare operates out of 86 data centers around the
15  world. Our CDN automatically caches your static files at our edge nodes so
16  these files are stored closer to your visitors while delivering your dynamic
17  content directly from your web server. CloudFlare then uses a technology called
18  Anycast to route your visitors to the nearest data center. The result is that your
19  website, on average, loads twice as fast for your visitors regardless of where
20  they are located."

21      29.     On information and belief, another feature of Cloudflare's service
22  is to allow pirate sites and their hosts to conceal their identity from copyright
23  owners.  The domain registration information for some of the pirate sites
24  referenced herein indicate that the sites reside on a Cloudflare server in
25  Phoenix, Arizona.  When presented with a notice of infringement, however,
26  Cloudflare asserts that it is itself unable to remove any infringing content, that it
27  supposedly has legal immunities if it does not terminate services to its clients
28  and refuses to disclose the identity of the primary host and site owner.  In this

1    fashion Cloudflare acts as a firewall protecting pirate sites and their hosts from

2    legal recourse by copyright owners.

3         30.    "CloudFlare caches your content across our global network,

4    bringing it closer to visitors from every region."

5    https://www.cloudflare.com/cdn/  "A content delivery network (CDN) takes

6    your static content and stores a copy closer to your visitors."

7    https://www.cloudflare.com/website-optimization/  "CloudFlare's Service is

8    offered as a platform to cache and serve web pages and websites."

9    https://www.cloudflare.com/terms/

10        31.    CloudFlare does not copy client websites without modification, but

11   rather reserves the right to modify its clients' sites.  "CloudFlare may modify

12   the content of your site.  For example, CloudFlare may detect any email

13   addresses and replace them with a script in order to keep it from being

14   harvested, or CloudFlare may insert code to improve page load performance or

15   enable a Third Party App."  https://www.cloudflare.com/terms/  CloudFlare

16   may "[a]dd cookies to your domain to track visitors" and "[a]dd script to your

17   pages to, for example, add services, Apps, or perform additional performance

18   tracking."  *Id.*

19        32.    CloudFlare touts its "Growing Global Network Built for Scale: 10

20   Tbps Capacity and 100 Data Center Global Footprint."

21   https://www.cloudflare.com/  CloudFlare says "Setting up CloudFlare is Easy,"

22   over a video showing how a webmaster can place its site on a CloudFlare

23   domain server with a few points and clicks.  *Id.*  "Set up a domain in less than 5

24   minutes.  Keep your hosting provider.  No code changes required."  *Id.*

25   "CloudFlare makes more than 4,000,000 Internet properties faster and safer.

26   Join today!"  *Id.*

27        33.    CloudFlare tells its clients "Everyone's Internet application can

28   benefit from using CloudFlare.  Pick a plan that fits your need."

Third Amended Complaint

https://www.cloudflare.com/plans/  CloudFlare has a teaser "free" plan "[f]or personal websites."  *Id.*  CloudFlare touts a "Pro" plan, $20 per month per domain, for "professional websites," and a "Business" plan, $200 per month per domain, for "small eCommerce websites and businesses requiring advanced security and performance . . ."  *Id.*

34.    ALS's agent for infringement notifications, Mr. Easton, sent numerous notices to Cloudflare and others of infringement of ALS works on sites wherein publicly available information reflected that the sites resided on a server maintained by Cloudflare.  "Pinging" certain of the pirate websites as averred below also return data reflecting that the sites reside on a server maintained by Cloudflare.

35.    On information and belief, Cloudflare has persisted in offering CDN and related services in relation to pirate websites, notwithstanding numerous notifications of infringement on such sites.

36.    When Cloudflare learned about this lawsuit, it contacted counsel for ALS and, without making any effort to couch the conversation in settlement terms, said it would reveal its information concerning the owner(s) of the sites of which ALS complained, but only in exchange for a release of liability in favor of Cloudflare.

37.    On information and belief, Cloudflare continues to provide services to The Pirate Bay, even though The Pirate Bay has been raided by authorities and the site's owner has been arrested for chronic copyright infringement.

38.    The Digital Citizens Alliance, a Hollywood-affiliated group, has published a report highly critical of Cloudflare's role in providing invaluable services and cover for pirate sites.

39.    Cloudflare may defend itself by claiming it is at least one party removed from the direct site owner, in that Cloudflare may be contracting with

the pirate site hosts rather than the pirate sites themselves.  However, as averred herein, Cloudflare has induced, contributed to, profited from, aided and abetted infringement, failing and refusing all along to implement or enforce a repeat infringer policy, and is thus liable for the infringements alleged herein.

**Dolphin**

40.     On information and belief, Dolphin owns and operates one of the most egregious pirate sites averred herein, imgchili.net.  Entire galleries of infringing ALS content are regularly displayed on imgchili.net.  Rampant infringement of copyrighted content is not limited to ALS.  Simple web searches with terms such as "imgchili Playboy" return pages with numerous links to entire galleries of stolen content on imgchili.net owned by famous owners of adult copyrighted images.  The publicly available domain registration information for imgchili.net reflects only a private registry.  ALS found out about Dolphin only because Dolphin may have overlooked using a private registry service for imgchili.com, a subsidiary domain that redirects to imgchili.net.

41.     On numerous occasions, shortly after Mr. Easton sent an infringement notification of multiple pages of infringing ALS works on imgchili.net, usually by the next day fresh sets of infringing galleries of ALS images were up on another imgchili.net page.  Mr. Easton played a frustrating game of "whack-a-mole" wherein infringing galleries of ALS images simply rotated around various pages on the imgchili.net site.

42.     Almost nothing about the imgchili.net site can be seen by looking at the home page.  It contains spare information suggesting that users can sign up for an account and upload content.  This is no site like dropbox.com, however, which caters to consumers who want to share family pictures or personal oversize files.  Instead, Dolphin offers to pay imgchili.net members $4.50 per thousand views of images uploaded to imgchili.net.  Dolphin is not

Third Amended Complaint

offering to pay members money for page views of uploaded materials to encourage consumers to share pictures of their vacations.  On information and belief, Dolphin provides monetary incentives to induce members to steal and upload massive galleries of infringing adult content.

43.    On information and belief Dolphin is the direct owner and operator of imgchili.net.  Dolphin may take the position that it is simply a bulletin board operator and that the direct infringers are users who upload galleries of infringing content.  In the alternative, Dolphin provides direct infringers, uploading users, with server space, and thus its servers are an essential step in the infringement process.  On information and belief, as the owner and/or operator of servers on which imgchili.net resides, Dolphin can remove imgchili.net or its subpages from the Internet, thus blocking or eliminating the display and distribution of infringing content over the Internet, but Dolphin has failed to do so.  Dolphin has no safe harbor defenses for, among other reasons, it has not registered an agent for notification with the U.S. Copyright Office and has failed to implement or enforce a repeat infringer policy.

**Hivelocity**

44.    On information and belief, Hivelocity hosts pirate sites, including namethatpornstar.com.  ALS has sent numerous notifications to Hivelocity of infringing ALS content on namethatpornstar.com, but Hivelocity has failed to implement or enforce a repeat infringer policy by removing namethatpornstar.com from its servers.

45.    Hivelocity eventually enforced its terms of service by terminating namethatpornstar.com, but only after receiving a copy of the First Amended Complaint.

**Steadfast**

46.    On information and belief, Steadfast owns and/or operates servers on which pirate sites, including imagebam.com, reside.  On information and

belief, Steadfast provides direct infringers, including imagebam.com, with server space, and thus its servers are an essential step in the infringement process.  In Steadfast's words, Steadfast "providers computer storage." Steadfast MTD Memo. Doc. 90 p.1.

47.    Steve Easton, who acts as agent for ALS and other clients, witnessed countless incidents of content that infringes the copyrights of ALS or his other clients on imagebam.com.  Domain lookup tools for imagebam.com or its sub-pages reveal Steadfast's servers as the source of the site.  As of February 13, 2017 Easton had sent to Steadfast 192 notifications of infringing ALS content on imagebam.com and 1267 notifications to Steadfast of content that infringes the copyrights of his other clients on imagebam.com. Although Steadfast, as the operator of servers on which imagebam.com resides, could remove the infringing content or the site itself from the Internet, on information and belief at no time has Steadfast implemented or enforced a repeat infringer policy by removing imagebam.com from its servers.

48.    According to Steadfast, "Steadfast should be dismissed from this case because it has safe harbor protection under Section 512(c) of the DMCA." Steadfast MTD Memo. Doc. 90 p.3. Section 512(c) is a potential defense to "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  On information and belief, Steadfast provides storage at the direction of the owner/operator of imagebam.com for material that resides on systems or networks controlled or operated by or for Steadfast.

49.    On information and belief, as the owner and/or operator of servers on which imagebam.com resides, Steadfast can remove imagebam.com or its subpages from the Internet, thus blocking or eliminating the display and distribution of infringing content over the Internet, but Steadfast has failed to do so.

Third Amended Complaint

50.     Steadfast physically hosts websites including imagebam.com on its servers and route internet traffic to and from those websites. This service is the Internet equivalent of leasing real estate.  Steadfast had direct control over the "master switch" that kept websites for which it provides server space, including imagebam.com, online and available.

51.     On information and belief, Steadfast also provides DNS or "nameserver" services to its clients.  A "nameserver" operates in a manner not unlike an old school telephone operator, who used to route a phone call to the desired party at the request of a user.  On information and belief, where Steadfast provides such services, Internet traffic for a site for which Steadfast offers DNS services will first route through Steadfast's nameservers before being directed to content on an origin server.  Where Steadfast provides these services, domain lookups for sites with infringing content will reveal Steadfast as the server on which the content is located rather than revealing contact information for the operator of the origin servers.  In this way Steadfast has contributed to infringement of ALS's rights, as ALS cannot effectively protect its rights unless it can learn the identity of the owner/operator of origin servers and thus hold all parties who provide storage space to infringing sites accountable for their actions.  Additionally, were Steadfast to terminate nameserver services to a site, including imagebam.com, no Internet traffic would route to that site until the site owner updated domain records to reflect a different nameserver.  In this fashion the operator of DNS or nameserver services can prevent users from accessing infringing content, even if only temporarily.

**Notifications of Infringement of ALS's Copyrights and Trademarks**

52.     ALS, through its authorized agent Steve Easton, has sent numerous notifications alerting various of the Defendants in this action of the existence

- 13 -

Third Amended Complaint

and location of works on pirate sites that infringe upon copyrights and trademarks owned by ALS.  Easton followed the below method.

53.    First, he personally observed that one or more pages on an adult website displayed infringing ALS images, often bearing the ALS copyright notification and "ALS Scan" trademark.  Easton knows from ALS which sites have authority to display ALS images, and which do not.

54.    Second, each time Easton encountered a pirate site with infringing ALS images, he personally observe which companies appear to own or be providing services to the site.  These third parties included web hosts, content delivery networks and advertising networks.

55.    Third, Easton prepared a notification to each of the parties that owns or provides services to a site on which infringing content appears of the location of the infringing images.  The notice contains links to the web pages on which ALS infringing content appears.

56.    Fourth, Easton followed up to observe what happened after he sent notifications of infringement.  For some sites the infringing content remained. In some cases the content in the notification went down but other infringing ALS content appeared on the site shortly thereafter.  In all cases, except as noted below, the parties sued herein continued to provide services

57.    The following sites have been the subject of numerous notifications to the Defendants in this action of infringement of ALS's copyrights and trademarks.  In all of these cases, the notifications alerted the Defendants to thousands of pages on pirate sites displaying ALS's copyrighted works and the "ALS Scan" trademarks.  As noted below the following Defendants owned or provided services to the pirate sites.

> a.  imgchili.net (Dolphin, Cloudflare)
>
> b.  namethatpornstar.com (Hivelocity)
>
> c.  slimpics.com (Cloudflare)

- 14 -

d.  cumonmy.com (Cloudflare)

e.  bestofsexpics.com (Cloudflare)

f.  stooorage.com (Cloudflare)

g.  greenpiccs.com (Cloudflare)

h.  imagebam.com (Steadfast)

i.  imgsen.se (Cloudflare)

j.  imgspice.com (Cloudflare)

k.  imgspot.org (Cloudflare)

l.  img.yt (Cloudflare)

m.  vipergirls.to (Cloudflare)

n.  pornwire.net (Cloudflare)

o.  fboom.me (Cloudflare)

p.  imgflash.net (Cloudflare)

q.  imgtrex.com (Cloudflare)

r.  others as shown by proof at trial.

58.    In some of these cases, the direct infringer responded to the notices by taking down the works pinpointed in the notice, but as early as the next day the same set of infringing ALS images or a different set of infringing ALS images is uploaded to the same site.  In other cases the direct infringer ignored the notification and continued to display the infringing works.

59.    Even though the law requires parties to terminate business with repeat infringers, and even though Defendants' own terms state that they will terminate business with repeat infringers, with the few exceptions noted herein, none of the Defendants have terminated its business accounts with these chronic direct infringers.  On information and belief, this is because they make money by continuing to do commerce with sites that draw traffic through the lure of free infringing content.

Third Amended Complaint

60.     The infringing ALS works that are the subject of the notifications averred above bear the registered ALS Scan trademarks.  The pirate sites listed above have directly infringed ALS's trademarks by using ALS's registered marks without ALS's knowledge or consent in a manner likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation or approval of such works.  The works being published by the direct infringers are counterfeits bearing the ALS marks without authority.  The third party defendants named herein have induced or contributed to such trademark infringement by continuing to provide services, including services as advertising brokers and Internet services, to the directly infringing sites after actual or constructive knowledge of their acts of infringement.

61.     Many of the sites listed above reside on servers and/or content delivery networks within the United States.

62.     Some of the Defendants may claim safe harbors under 17 USC § 512.  ALS denies that any would apply, but if they do, such safe harbors have been lost through ignoring red flags of infringement, ignoring actual notifications of infringement, failure to adopt and reasonably implement a repeat infringer policy and failure to accommodate, and interference with, standard technical measures.

## First Claim for Relief – Against Dolphin and Does 1-5
## Direct Copyright Infringement

63.     For its First Claim for Relief, ALS incorporates by reference the averments of ¶¶ 1-62 above.

64.     Dolphin, on information and belief the owner and operator of imgchili.net, and Does 1-5, on information and belief the owners or operators of the above-listed pirate sites, have directly infringed on ALS's copyrighted works.

65.    As a result of these Defendants' acts of infringement, ALS is entitled to injunctive relief, damages, disgorgement of profits, statutory damages and attorneys' fees.

**Second Claim for Relief – Against All Defendants**

**and Does 6-10**

**Contributory Copyright Infringement**

66.    For its Second Claim for Relief, ALS incorporates by reference the averments of ¶¶ 1-65 above.

67.    All named Defendants, and Does 6-10, have, with actual and/or constructive knowledge of direct infringements of ALS's copyrighted works, materially contributed to or aided in such infringement.  Such defendants are thus liable for contributory copyright infringement.

68.    All named Defendants, and Does 6-10, have induced infringement of ALS's copyrights.

69.    As a result of these Defendants' acts of infringement, ALS is entitled to injunctive relief, damages, disgorgement of profits, statutory damages and attorneys' fees.

**Third Claim for Relief – Against**

**Dolphin, Hivelocity, Steadfast and Does 6-10**

**Vicarious Copyright Infringement**

70.    For its Third Claim for Relief, ALS incorporates by reference the averments of ¶¶ 1-69 above.

71.    Dolphin, Hivelocity, Steadfast and Does 6-10, have, with the right and ability to control or supervise the direct infringement averred herein, failed to exercise such right and ability and have directly benefited financially from such infringing activity.  On information and belief, such Defendants can remove infringing websites from the Internet, and can themselves block display

1 and distribution of infringing copyrighted content.  Said Defendants are thus

2 liable for vicarious copyright infringement.

3     72.    As a result of these Defendants' acts of infringement, ALS is

4 entitled to injunctive relief, damages, disgorgement of profits, statutory

5 damages and attorneys' fees.

6 **Fourth Claim for Relief – Against Dolphin and Does 1-5**

7 **Direct Trademark Infringement**

8     73.    For its Fourth Claim for Relief, ALS incorporates by reference the

9 averments of ¶¶ 1-72 above.

10     74.    Dolphin and Does 1-5 have directly infringed ALS's trademarks

11 by using in commerce reproductions, counterfeits and copies of ALS's

12 registered marks in a fashion likely to cause confusion, mistake or deception.

13     75.    As a result of these Defendants' acts of infringement, ALS is

14 entitled to injunctive relief, treble damages, disgorgement of profits and

15 attorneys' fees.

16 **Fifth Claim for Relief – Against Dolphin and Does 1-5**

17 **Direct Trademark Counterfeiting**

18     76.    For its Fifth Claim for Relief, ALS incorporates by reference the

19 averments of ¶¶ 1-75 above.

20     77.    Dolphin and Does 1-5 have used counterfeits of ALS's registered

21 marks in connection with the sale, offering for sale or distribution of goods or

22 services.

23     78.    As a result of these Defendants' acts of counterfeiting, ALS is

24 entitled to injunctive relief, treble damages, disgorgement of profits, statutory

25 damages and attorneys' fees.

26

27

28

1

2

3

<u>**Sixth Claim for Relief – Against Dolphin,**</u>

<u>**Dolphin, Hivelocity, Steadfast and Does 6-10**</u>

<u>**Contributory Trademark Infringement**</u>

4       79.     For its Sixth Claim for Relief, ALS incorporates by reference the

5    averments of ¶¶ 1-78 above.

6       80.     Dolphin, Hivelocity, Steadfast and Does 6-10 have continued to

7    provide services to the above sites with actual and constructive knowledge of

8    those sites' infringement of ALS's trademark, and are thus liable for inducing

9    and contributing to direct trademark infringement.  These parties physically

10   host websites on their servers and route internet traffic to and from those

11   websites. This service is the Internet equivalent of leasing real estate.  They

12   have direct control over the "master switch" that kept websites for which they

13   provides server space online and available.

14      81.     As a result of these Defendants' acts of inducing and contributing

15   to trademark infringement and counterfeiting, ALS is entitled to injunctive

16   relief, treble damages, disgorgement of profits, statutory damages and

17   attorneys' fees.

18                          <u>**PRAYER**</u>

19      ALS prays for entry of judgment including the following relief:

20      A.     Actual damages in a sum to be proven at time of trial, in no event

21   less than $10,000,000;

22      B.     Statutory damages;

23      C.     Disgorgement of Defendants' profits from their infringing

24   activities;

25      D.     Trebling of damages;

26      E.     Costs and attorneys' fees;

27      F.     Preliminary and permanent injunctive relief;

28

1     G.     An order requiring the Defendants to restore any money or

2  property that may have been acquired through the foregoing acts of unfair

3  competition

4     H.     Such other and further relief as the Court deems appropriate.

5

6  DATED:  March 20, 2017                    SPILLANE TRIAL GROUP PLC

7

8                                           By: _____

9                                                Jay M. Spillane
                                            Attorneys for Plaintiff ALS Scan, Inc.
10

11

12

13                           **JURY DEMAND**

14     ALS demands trial by jury.

15

16  DATED:  March 20, 2017                    SPILLANE TRIAL GROUP PLC

17

18                                           By: _____

19                                                Jay M. Spillane
                                            Attorneys for Plaintiff ALS Scan, Inc.
20

21

22

23

24

25

26

27

28

Third Amended Complaint

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this action. My business address is: 468 N. Camden Drive, Second Floor, Beverly Hills, CA 90210-4507. A true and correct copy of the foregoing document entitled (*specify*):

**THIRD AMENDED COMPLAINT**
 will be served or was served **(a)** on the judge in chambers in the form and manner required by Local Rules and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and Local Rules, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) March 20, 2017, I checked the CM/ECF docket for this action and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

| | |
|---|---|
| Gary L. Bostwick– gbostwick@B1Law.com <br> Kevin S. Toll – kevin@silversteinlegal.com <br> Lawrence G. Walters – larry@firstamendment.com <br> Corey D. Silverstein – corey@silversteinlegal.com <br> Rachel H. Kassabian – <br> rachelkassabian@quinnemanuel.com <br> Carolyn M. Homer – carolynhomer@quinnemanuel.com <br> John Lewis Holcomb – jholcomb@khslaw.com <br> Tammy X. Wu – twu@khslaw.com | Colin TJ O'Brien – tm@partridgepartnerspc.com <br> John L. Ambrogi – jla@partridgepartnerspc.com <br> Paul Supnick – paul@supnick.com <br> Raymond Katrinak – pkatrinak@kernanlaw.net <br> Ryan Carreon – rcarreon@kernanlaw.net <br> Stephen M Kernan – kernanlaw@gmail.com |

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) March 20, 2017, I served the following persons and/or entities at the last known addresses in this case by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling Local Rule, on (*date*) March 20, 2017, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served by Overnight Mail***
Hon. George H. Wu
U.S. District Court
312 N. Spring Street
Courtroom 10 – Spring St. Floor
Los Angeles, CA 90012                    ☐          Service information continued on attached page


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

3/20/2017              Jessie Gietl                      *Jessie Gietl*
_____          _____
*Date*              *Printed Name*                      *Signature*