UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-5051-GW(AFMx) | Date | March 30, 2017 |
|---|---|---|---|
| Title | *ALS Scan, Inc. v. Cloudflare, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Katie Thibodeaux | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Jay M. Spillane | Rachel H. Kassabian<br>Mark Gray |

**PROCEEDINGS: CLOUDFLARE, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING EXTRATERRITORIALITY [121]**

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. Parties will contact the court clerk by noon on March 30, 2017 whether a telephonic hearing at 3:00 p.m. will be necessary to resolve the deposition issue.

The Court sets a status conference for April 13, 2017 at 8:30 a.m. Parties will file a joint status report regarding the status of discovery and the offer of proof as to the territoriality/extraterritoriality issue by noon on April 11, 2017.

The above-entitled motion is continued to April 13, 2017 at 8:30 a.m.

: 25

Initials of Preparer JG

## I. Background

ALS Scan, Inc. ("Plaintiff") sues Cloudflare, Inc. ("Cloudflare"); Dolphin Media Ltd. ("Dolphin"); Hivelocity Ventures Corporation ("Hivelocity"); and Steadfast Networks, LLC ("Steadfast") (collectively, "Defendants")[1] for various claims related to Defendants' alleged infringement of Plaintiff's copyrighted and trademarked works. *See generally* Third Am. Compl. ("TAC"), Docket No. 148.[2] The TAC asserts six causes of action: (1) direct copyright infringement, against Dolphin; (2) contributory copyright infringement, against all Defendants; (3) vicarious copyright infringement, against Dolphin, Hivelocity, and Steadfast; (4) direct trademark infringement, against Dolphin; (5) direct trademark counterfeiting, against Dolphin; and (6) contributory trademark infringement, against Dolphin, Hivelocity, and Steadfast. *Id.*

Plaintiff owns a library of copyrighted and trademarked works of adult entertainment. *Id.* ¶ 3. Plaintiff alleges that its works are repeatedly infringed by pirate Internet sites, which display Plaintiff's works without Plaintiff's permission. *Id.* ¶ 4. These sites are allegedly supported by third-party service providers that continue doing business with the sites even after receiving actual notice of infringement from Plaintiff. *Id.* ¶ 6.

Cloudflare is a web performance and security company that offers a content delivery network ("CDN"), web content optimization, website security, denial of service (DDos) protection, and a managed domain name system network ("DNS"). *Id.* ¶ 25. Cloudflare's website advertises that its CDN caches[3] clients' content and "automatically optimize[s] the

---

[1] The Court previously granted Defendant Tiger Media, Inc.'s ("Tiger") motion to dismiss the First Amended Complaint as to Tiger. *See* Docket No. 53. Plaintiff did not seek to file an amended complaint against Tiger. In addition, on February 23, 2017, Plaintiff dismissed Defendants Hebergement OVH Inc. and OVH SAS from this action. *See* Docket No. 113.

[2] Plaintiff filed the Third Amended Complaint after the instant Motion was filed. However, the Third Amended Complaint did not change the allegations or the cause of action asserted against Cloudflare. Because the Third Amended Complaint is now the operative complaint in this action, the Court cites to this version rather than the Second Amended Complaint.

[3] "Generally, a 'cache' is a 'computer memory with very short access time used for storage of frequently or recently used instructions or data.'" *Perfect 10, Inc. v. Amazon.com, Inc.* 508 F.3d 1146, 1156 n.3 (9th Cir. 2007) (quoting *United States v. Ziegler*, 474 F.3d 1184, 1186 n.3 (9th Cir. 2007)).

delivery of your web pages so your visitors get the fastest page load times and best performance." *Id.* ¶ 26.

The TAC alleges that the purpose of Cloudflare's CDN is to "speed a customer's access to the website of Cloudflare's client through a series of data centers maintained by Cloudflare that cache mirror copies of that site." *Id.* ¶ 28. According to Plaintiff, this service allows consumers seeking to access a Cloudflare client's website to retrieve the website's content from the closest Cloudflare data center, rather than accessing the content from the primary host. *Id.* This purportedly results in a client's website content loading twice as fast for website users, regardless of where the users are located. *Id.*

In addition, the TAC alleges that Cloudflare's DNS services "allow pirate sites and their hosts to conceal their identity from copyright owners. The domain registration information for some of the pirate sites . . . indicate that the sites reside on a Cloudflare server in Phoenix, Arizona. When presented with a notice of infringement, however, Cloudflare . . . refuses to disclose the identity of the primary host and site owner. In this fashion Cloudflare acts as a firewall protecting pirate sites and their hosts from legal recourse by copyright owners." *Id.* ¶ 29.

Plaintiff alleges that it sent numerous notices to Cloudflare regarding the infringement of its copyrighted works by Cloudflare's clients. *Id.* ¶ 34. However, Plaintiff alleges that Cloudflare has continued to offer its CDN and related services to these clients, despite the infringement notifications. *Id.* ¶ 37.

Plaintiff seeks actual damages, statutory damages, disgorgement of profits obtained from the infringing activity, trebling of damages, costs and attorneys' fees, preliminary and permanent injunctive relief, and such other relief as the Court deems appropriate. *Id.* at 19:20-20:4.

On October 24, 2016, the Court granted-in-part and denied-in-part Cloudflare's Motion to Dismiss the First Amended Complaint. *See* Docket No. 60. The Court dismissed Plaintiff's claims for vicarious copyright infringement, contributory trademark infringement, and unfair competition on the grounds that the FAC failed to adequately plead these claims against Cloudflare. *Id.* However, the Court denied Cloudflare's motion to dismiss the contributory copyright claim, reasoning that Plaintiff had plausibly pled secondary liability based on a material contribution theory. *See id.* at pages 5-9. The Court reasoned that the FAC's allegations that Cloudflare's CDN services made it faster and easier for users to access infringing

images, and that consumers seeking access to infringing images retrieved the images from the closest Cloudflare data center rather than the primary host, were sufficient to state a claim for material contribution under Ninth Circuit precedent. *Id.* at page 7.

Now pending before the Court is Cloudflare's Motion for Partial Summary Judgment. *See* Mot. for Partial Summ. J. ("MSJ"), Docket No. 122. Cloudflare contends it is entitled to partial summary judgment with respect to 14 of the 15 alleged direct infringer websites because those websites are not located in the United States, and thus the alleged infringements are extraterritorial and not actionable. *Id.*

## II. Legal Standard

Summary judgment is proper when the pleadings, the discovery and disclosed materials on file, including any affidavits/declarations, show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[4] Fed. R. Civ. P. 56; *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005). To satisfy its burden at summary judgment, a moving party *with* the burden of persuasion must establish "beyond controversy every essential element of its [claim or defense]." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003); William W. Schwarzer, et al., Cal. Prac. Guide Fed. Civ. Proc. Before Trial (The Rutter Group 2016) § 14:126 at 14-45. By contrast, a moving party *without* the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, *specific facts* showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

---

[4] Under Federal Rule of Civil Procedure 56, the same legal standard applies to motions for partial summary judgment and ordinary motions for summary judgment. *See* Fed. R. Civ. P. 56(a): *see also California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998); *Barnes v. Cnty. of Placer*, 654 F.Supp.2d 1066, 1070 (E.D. Cal. 2009), *aff'd*, 386 F.App'x 633 (9th Cir. 2010) ("A motion for partial summary judgment is resolved under the same standard as a motion for summary judgment.").

(internal citations and quotation marks omitted, emphasis in original) (citing, among other cases, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *See FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). In addition, the evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(e); *see also Pelletier v. Fed. Home Loan Bank of S.F.*, 968 F.2d 865, 872 (9th Cir. 1992) (to survive summary judgment, the non-movant party "ordinarily must furnish affidavits containing admissible evidence tending to show the existence of a genuine dispute of material fact"). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). With that said, courts do not make credibility determinations or weigh conflicting evidence at the summary judgment stage, and must view all evidence and draw all inferences in the light most favorable to the non-moving party. *See T.W. Elec.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *see also Motley v. Parks*, 432 F.3d 1072, 1075, n.1 (9th Cir. 2005) (en banc).

## III. Analysis

### *A. Undisputed Facts*

Cloudflare provides internet services to optimize and protect websites, including by improving transmission of website content and website security for its clients. Def.'s Response to Statement of Genuine Disputes in Support of Def.'s Motion for Partial Summary Judgment ("DGSD") ¶ 1, Docket No. 145. Cloudflare's clients maintain complete existing websites independent of Cloudflare's services, including hosting facilities, internet connectivity, and technical applications required to operate their websites. *Id.* Cloudflare does not own or operate the physical "host"[5] computers that store the permanent copies of its clients' website content, and its services have no impact on the location or substance of those permanent copies. DGSD ¶¶ 4-5. Indeed, Cloudflare's Terms of Service specifies that its services are "offered as a platform to cache and serve web pages and websites and is not offered for other purposes, such as remote

[5] The parties use the term "host" in various inconsistent contexts. For example, Cloudflare's Terms of Service state that the primary purpose of Cloudflare's services is the "hosting and serving" of web pages. *See* Guinn Decl. Ex. A § 10. However, the parties agree that Cloudflare is not the host of its clients' websites, in that it does not provide *permanent* storage for its clients' website content. *See* DGSD ¶ 5. For purposes of the instant Motion, the Court uses the term "host" to designate the primary server that stores the permanent content of each client's website.

storage. Accordingly, [clients] understand and agree to use the [s]ervice solely for the purpose of hosting and serving web pages as viewed through a web browser or other application." *Id.* ¶ 2; Decl. of Trey Guinn ("Guinn Decl.") Ex. A § 10, Docket No. 128.

In order to improve transmission of website content, Cloudflare operates a CDN which "takes [clients'] static content and stores a copy closer to [clients'] visitors." Def.'s Response to Pl.'s Statement of Additional Genuine Disputes ("PGSD") ¶ 9(a),[6] Docket No. 145; Decl. of Jay Spillane ("Spillane Decl.") Ex. F, Docket No. 133-6. Cloudflare's CDN is comprised of 102 data centers located throughout the world, including 19 within the United States. PGSD ¶ 8(a); Spillane Decl. Ex. E, Docket No. 133-5. Cloudflare's Terms of Service states the following with respect to its CDN services:

> To speed up response time for a request that goes to one of our frontline servers, Cloudflare caches parts of websites that are static in these servers. For example, we cache things like images, CSS, and Javascript. We are very conservative with our caching because we never want to mess up dynamic content. So, for example, as a general rule we do not cache HTML. We also refresh the cache relatively frequently, so files are never more than a few hours old. Even being conservative, however, typically 50% of the resources on any given web page are cacheable.

*See* Spillane Decl. Ex. A at CLOUDFLARE00000131, Docket No. 133-1.

When an end user chooses to visit a Cloudflare client's website, the user is routed through the Cloudflare data server closest to the end user's computer. *Id.* ¶ 10(a). Cloudflare's content caching is dependent on two independent factors: (1) where the end user is located; and (2) how many times the website content is requested at a given data server. *Id.*; *see also* Spillane Decl. Ex. J at CLOUDFLARE00000144, Docket No. 133-10. Because each data server's cached content depends on how many times the website content is requested from that server, Cloudflare does not cache the same resources for a client's website at each data server location. *Id.* As a result, some files are served from Cloudflare's CDN cache, which occurs when the file is available at a particular data center, while other files are served from the origin host server of the client's website, which occurs when the file is not available at a particular data center.[7] *Id.* A

[6] The parties have each numbered their Statement of Genuine Disputes beginning at the number "1"; to avoid confusion, the Court denotes the facts delineated in Plaintiff's Statement of Genuine Disputes by adding the letter (a) following the number.

[7] The parties have not clarified whether multiple data centers are searched before the content is retrieved from the

user can determine whether it is viewing a file cached in a Cloudflare data server based on information contained in the header of a given web page. *Id.* ¶ 12. For example, Cloudflare's website explains to users that they can determine whether "Cloudflare is caching [a client's] site or a specific file by checking the responses shown in the 'CF-Cache-Status' header," and states that within the CF-Cache-Status header, "HIT" means "resource in cache, served from CDN Cache"; "MISS" means "resource not in cache, served from origin server"; and "EXPIRED" means "resource in cache but has since expired, served from origin server." *Id.*; *see also* Spillane Decl. Ex. J at CLOUDFLARE00000144, Docket No. 133-10.

As part of Cloudflare's provision of security services, clients must designate "two Cloudflare nameservers as the authoritative nameservers for the [client's] domain (e.g. bob.ns.cloudflare.com and sara.ns.cloudflare.com)." PGSD ¶ 2(a); *see also* Spillane Decl. Ex. A at CLOUDFLARE00000131. Cloudflare emphasizes that "[d]esignating Cloudflare as your authoritative nameservers doesn't change anything about your website. Your registrar remains your registrar, and your hosting provider remains your hosting provider, and so on." *Id.* Because Cloudflare is designated as the nameserver, an IP address lookup for a Cloudflare client's website traces to Cloudflare's nameserver address in San Francisco, California, rather than the origin host server address. PGSD ¶ 4(a). Cloudflare advertises that this service "will mask [client's] IP [address]," which helps protect client's host server from cyber-attacks, and also speeds up client's websites. *Id.* ¶ 5(a); Spillane Decl. Ex. 5 at CLOUDFLARE00000142, Docket No. 133-5.

Plaintiff alleges a claim for contributory copyright infringement against Cloudflare based on Cloudflare's provision of services to the following 15 alleged direct infringer websites:

- Bestofsexpics.com
- Cumonmy.com
- Fboom.me
- Greenpiccs.com
- Img.yt
- Imgchili.net
- Imgflash.net
- Imgsen.se
- Imgspice.com

---

host server – that is, if the data center nearest to the end user does not have the requested content, are other nearby data centers searched for the content, or is the search automatically routed back to the host server?

- Imgspot.org
- Imgtrex.com
- Pornwire.net
- Slimpics.com
- Stoorage.com
- Vipergirls.com

DGSD ¶ 3. Although each IP address is masked for these websites, Cloudflare's client records contain the actual IP address for each website, which can be used to trace the country in which the host server for each website is located. *Id.* ¶ 4. The IP addresses for 14 of the 15 websites (every website except cumonmy.com) trace to host servers located in foreign countries. *Id.* ¶ 8; *see also* Guinn Decl. ¶ 15, Exs. G-U.[8]

***B. Whether the Underlying Acts of Direct Infringement are Extraterritorial***

As discussed *supra*, the only remaining claim against Cloudflare is a claim for contributory copyright infringement. In order to establish a claim for contributory copyright infringement, Plaintiff must first establish the underlying acts of direct infringement by third parties that give rise to the contributory infringement claim. *See, e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.* ("*Amazon*"), 508 F.3d 1146, 1169 (9th Cir. 2007) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party." (internal quotation marks and citation omitted)).

Cloudflare contends that it is entitled to summary judgment with respect to 14 of the 15 direct infringer websites because each of those websites are hosted on foreign servers, and therefore Plaintiff's direct infringement claims against those websites consist of wholly extraterritorial acts that are not actionable. *See* MSJ at 3:18-4:1.

The Ninth Circuit has made clear that "the United States copyright laws do not reach acts of infringement that take place entirely abroad." *See Subafilms, Ltd. v. MGM-Pathe Comm'cns*

[8] Each exhibit uses basic IP address lookup tools to confirm the location of each at-issue website. *See* Guinn Decl. ¶ 14. The first five pages of each exhibit contain information regarding the respective website from Cloudflare's records; the sixth page contains the IP address lookup results for that website, including the host server location. *See, e.g.* Ex. G at page 6, Docket No. 128 at page 44 (providing lookup results for imgchili.net and listing France as the host server location). Plaintiff does not dispute the accuracy of these results, which were also included in Cloudflare's document production; rather, Plaintiff appears to dispute this fact based on its assertion that Cloudflare's services mask the IP address for each website, so the average user is unable to identify the site owner and origin host servers on their own – rather, an IP address lookup by the average user traces to Cloudflare's headquarters in San Francisco, California. *See* DGSD ¶ 8; PGSD ¶ 4. While relevant to the types of services Cloudflare provides to its clients, Plaintiff's contention fails to controvert the fact that 14 of the at-issue websites are in fact located outside of the United States.

*Co.*, 24 F.3d 1088, 1098 (9th Cir.) (en banc), *cert. denied*, 513 U.S. 1001 (1994); *see also Perfect 10, Inc. v. Yandex N.V.*, 962 F.Supp.2d 1146, 1152 (N.D. Cal. 2013) ("It is a well-established principle that, as a general rule, the Copyright Act has no extraterritorial application." (citations omitted)); *Aurora World, Inc. v. Ty Inc.*, 719 F.Supp.2d 1115, 1131 (C.D. Cal. 2009) ("The Ninth Circuit has spoken clearly on the extraterritoriality of the Copyright Act. As [plaintiff] has adduced no evidence of domestic infringement of [two of] its copyrights . . . the court declines to consider these copyrights."); *Danjaq S.A. v. MGM/UA Comm'cns, Co.*, 773 F.Supp. 194, 203 (C.D. Cal. 1991) (holding that unauthorized performance of U.S. copyrighted movie in Europe was not actionable under U.S. copyright laws because infringing performance took place entirely abroad). As such, a defendant is not liable for contributory copyright infringement where the underlying acts of direct infringement occur entirely abroad. *Subafilms*, 24 F.3d at 1094-95 (dismissing claim for contributory infringement where direct infringement took place entirely abroad and was therefore not actionable).

Cloudflare contends that there are no actionable acts of direct infringement against the at-issue websites because those websites are hosted on foreign servers. *See* MSJ at 6:26-7:10; *see also* DGSD ¶ 8; Guinn Decl. ¶ 15, Exs. G-U. For purposes of determining the location of an infringing act, Cloudflare asserts that under Ninth Circuit law, an infringing act occurring over the Internet "'takes place'" at the location of the computer responsible for "hosting" the allegedly infringing content.[9] *See* MSJ at 6:10-23. Because the websites are "hosted" on foreign servers,

[9] Cloudflare correctly refers to this as the "server test," however, Cloudflare's characterization of the test is not entirely correct. In *Amazon*, the Ninth Circuit affirmed the following standard for direct copyright infringement under the "server test" applied by the district court:

> [A] computer owner that stores an image as electronic information and serves that electronic information directly to the user . . . is displaying the electronic information in violation of a copyright holder's exclusive display right. Conversely, the owner of a computer that does not store and serve the electronic information to a user is not displaying that information, even if such owner in-line links to or frames the electronic information. The district court referred to this test as the "server test" . . . . As explained below, because this analysis comports with the language of the Copyright Act, we agree with the district court's resolution . . . .

*See* 508 F.3d at 1159.

Under the server test, courts have not limited liability for copyright infringement to the permanent copies of infringing images that are stored on the primary "host" computer, as that term has been used by the parties in this matter – *e.g.*, the origin server where the original copy is stored. Rather, the Ninth Circuit has made clear that liability for infringement exists where a copy of an infringing image is stored on a computer server, regardless of

Cloudflare contends that the infringing acts took place entirely abroad, and therefore are not actionable. *Id.*

In support, Cloudflare relies on *Amazon*, 508 F.3d at 1159-62. However, *Amazon* is not directly on point with the instant case. *Amazon* did not involve extraterritoriality, but rather revolved around whether Google could be liable for direct infringement (and separately, contributory infringement) based on its practice of linking users to websites that displayed infringing images, and also its practice of indexing and storing thumbnail copies of infringing images on its servers. The Ninth Circuit held that Google could not be liable for linking users to infringing images, because Google did not store actual copies of the infringing images – rather, Google used "HTML instructions that direct a user's browsers to the website publisher's computer that store the full-size photographic image." *Id.* at 1161. It was explained that "Google's cache merely stores the text of webpages," and "[p]roviding these HTML instructions is not equivalent to showing a copy." *Id.* The Ninth Circuit thus held that "[b]ecause Google's computers do not store the photographic images, Google does not have a copy of the images for purposes of the Copyright Act. In other words, Google does not have any 'material objects . . . in which a work is fixed . . . and from which the work can be perceived, reproduced, or otherwise communicated' and thus cannot communicate a copy.'" *Id.* at 1160-61 (quoting 17 U.S.C. § 101). Thus, Google's practice of linking users to infringing websites was not an infringing act under the server test. *See id.* at 1159.

However, the *Amazon* court separately held that Google *could* be liable for direct infringement based on its practice of indexing and storing thumbnail copies of infringing images, because those thumbnail copies were actually stored on Google's servers. *Id.* at 1160 (emphasizing that "[t]here is no dispute that Google's computers store thumbnail versions of [plaintiff's] copyrighted images and communicate copies of those thumbnails to Google's users"); *see also MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517-18 (9th Cir. 1993) (holding that a computer makes a "copy" of a software program for purposes of copyright infringement liability when it transfers the program from a third party computer into its own memory).

---

whether that computer is the primary "host" of the infringing website's content. *See Amazon*, 508 F.3d at 1160 (holding that Google could be held directly liable for thumbnail copies of images derived from infringing websites, even though Google was not primary host of those websites, because the thumbnail copies were stored on Google's computer servers).

Cloudflare also relies on *Perfect 10, Inc. v. Yandex N.V.* ("*Yandex*"), 962 F.Supp.2d 1146 (N.D. Cal. 2013), which held that a defendant could not be liable under U.S. copyright laws for user-uploaded infringing images hosted on a servers located in Russia. *See Yandex*, 962 F.Supp.2d at 1153. In *Yandex*, the court emphasized that the mere fact that copyrighted images could be downloaded from the foreign servers to computers in the United States did not establish that infringing acts had taken place in the United States. *Id.* However, the court also held that the plaintiff's alternative theory that infringing acts could have taken place in the United States because the defendant previously operated data servers located in the United States, which could have stored infringing images, was a "more plausible" variation of liability, but ultimately rejected it for lack of proof. *Id.* (emphasizing that the plaintiff failed to "demonstrate that [defendant] in fact stored or displayed full-sized copies of the [plaintiff's] images on [defendant's] United States servers").

Here, it is undisputed that actual copies of Cloudflare client's files are stored on Cloudflare's data servers; it is also undisputed that some of those data servers are located in the United States. *See* PGSD ¶ 9(a); Spillane Decl. Ex. F. Thus, to the extent infringing copies of Plaintiff's images have been stored on Cloudflare's U.S. servers, it appears that those copies would constitute infringing acts by the at-issue websites within the United States, and thus the underlying direct infringement was not wholly extraterritorial.

Indeed, Plaintiff provides several cases that support this conclusion. For example, Plaintiff cites *Los Angeles News Service v. Reuters Television International, Ltd.* ("*Reuters*"), 149 F.3d 987, 991-92 (9th Cir. 1998), in which the Ninth Circuit held that a defendant can be liable for direct infringement under U.S. copyright laws where at least one infringing act occurs within the United States. The Ninth Circuit distinguished *Subafilms*, explaining that in *Subafilms*, no infringing act had taken place within the United States – the only action that took place within the United States was the authorization of foreign distribution of the infringing material. *Id.* at 992. In contrast, in *Reuters*, the defendant had made copies of the infringing material in the United States, had transmitted the copies to a third party, which also made copies in the United States and then transmitted those copies to a foreign agency, which in turn distributed copies in a foreign country. *Id.* at 991. The court held that the defendant could be liable under U.S. copyright law for the foreign copies that were distributed, emphasizing that "[e]ach act of copying constituted a completed act of infringement," and since some of the acts

took place in the United States the infringing acts were not wholly extraterritorial. *Id.*

Plaintiff also relies on *Shropshire v. Canning*, 809 F.Supp.2d 1139 (N.D. Cal. 2011), in which a Canadian defendant uploaded an infringing video from Canada to YouTube, which caused copies of the video to be made on YouTube's servers in California. *Id.* at 1146. The court held that the defendant's actions were not wholly extraterritorial even though the original infringing copy was made in Canada because the defendant's "direct action led to the creation of a copy of the [infringing video] on YouTube's servers in California, and to the subsequent viewing of the video by potentially thousands in the United States." *Id.* The court further emphasized that notwithstanding the defendant's protests that it had only uploaded the video to YouTube's Canadian web address, the fact that copies ended up on YouTube's California servers rendered the defendant liable under U.S. copyright laws because "[d]irect infringement does not require intent or any particular state of mind." *Id.*

Similarly, in *L.A. News Serv. v. Conus Comm'cn Co. Ltd.* ("*Conus*"), 969 F.Supp. 579 (C.D. Cal. 1997), the court held that U.S. copyright laws applied to a Canadian broadcaster that broadcasted infringing material from Canada to Canadian residents, because the material was picked up by United States networks and viewed in the United States. *See* 969 F. Supp. at 583-84 (emphasizing that it did not matter whether the primary infringer (the broadcaster) intended for the infringing material to reach audiences in the United States).

In response, Cloudflare contends that the location of Cloudflare's data servers is irrelevant, because it is only the location of the underlying direct infringement that matters for purposes of contributory copyright liability. *See* MSJ at 8:8-22. Cloudflare points out that Plaintiff has not attempted to state a claim for direct infringement against Cloudflare. *Id.*

However, Plaintiff is not attempting to argue that Cloudflare is directly liable for the infringing content potentially stored on Cloudflare's U.S. servers – rather, Plaintiff's contention is that the third-party websites themselves are directly liable for the copies purportedly stored on Cloudflare's U.S. servers, and thus the underlying direct infringement is not wholly extraterritorial. *See* Opp'n at 14:9-14 ("Even accepting that the first infringing copy was made and stored on a foreign origin server, the site owners took action that caused reproduction, display and distribution of infringing works on Cloudflare's domestic servers."). Cloudflare has failed to explain why the infringing websites, as the primary infringers, would not be liable for the copies stored and distributed from Cloudflare's servers.

Cloudflare also argues that computer caching itself is an automatic, non-volitional process for which a defendant cannot be liable. *See* Reply at 6:21-9:3. However, the cases on which Cloudflare relies involve situations where the caching service (such as Cloudflare) itself is sued for direct infringement; they do not address whether the third party responsible for the infringing material can be liable for such copies. *See Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657 (9th Cir. 2017). Moreover, no court has actually held that cached copies that are transmitted and displayed to users are not infringing material; rather, the relevant case law holds that caching services cannot be directly liable when they take no volitional acts causing the cached copies to be made. For example, in *Giganews*, which Cloudflare heavily relies on, the Ninth Circuit held that to establish direct infringement, a plaintiff must "show causation (also referred to as 'volitional conduct') by the defendant." *Id.* at 666. The court explained that this term "does not really mean an 'act of willing or choosing' or an 'act of deciding,'" but rather "'simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts.'" *Id.* (citations omitted). Put simply, the court explained that this requires that a "defendant cause the copying." *Id.* (citation omitted). Thus, the *Giganews* court held that the plaintiff had failed to establish a direct infringement claim against an internet service provider that provided server storage to clients because the evidence only showed that the provider was a passive host pursuant to which users could post infringing images, which "does not demonstrate that [defendant] – as opposed to the user who called up the images – caused the [infringing] images to be displayed." *Id.* at 668. It was emphasized that there was "no evidence showing [defendant] exercised control (other than by general operation of [its] service); selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution." *Id.* at 670. Moreover, the Ninth Circuit distinguished *Amazon*, explaining that in *Amazon*, Google could be liable for storing thumbnail versions of infringing images on its servers because Google engaged in volitional conduct by initiating the indexing and organization of those images, and thus was more than a passive host. *Id.*; *see also Costar v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004) (holding that "automatic copying, storage, and transmission of copyrighted materials, *when instigated by others*, does not render an ISP strictly liable for copyright infringement . . . . An ISP, however, can become liable indirectly upon a showing of additional involvement sufficient to establish a contributory or vicarious violation of the [Copyright] Act." (emphasis added)).

Here, in contrast, the at-issue websites are not merely passive hosts. Rather, as in *Reuters*, *Shropshire*, and *Canning*, the at-issue websites created the copies of the infringing images and uploaded them to their websites, resulting in additional copies that were purportedly made in the United States.[10] *See Reuters*, 149 F.3d at 990-92 (holding news agency liable under U.S. copyright laws for making infringing copy in the United States and transmitting it to foreign news agency, which proceeded to make copies of the infringing copy and distribute in foreign country); *Shropshire*, 809 F.Supp.2d at 1146 (Canadian citizen liable under U.S. copyright laws for uploading infringing video in Canada because copies were then made on servers in United States); *Conus*, 969 F.Supp. at 583 (Canadian broadcaster liable under U.S. copyright laws for infringing broadcast picked up and displayed on U.S. television sets, regardless of fact that broadcast was intended to only reach television sets in Canada). As such, the at-issue websites could be liable under U.S. copyright laws because their infringing acts were not wholly extraterritorial.

However, Plaintiff has not proffered sufficient evidence that copies of Plaintiff's materials were ever actually stored on Cloudflare's U.S. servers. Plaintiff contends that it discovered "infringing ALS works that were reproduced, displayed and distributed from domestic Cloudflare servers. This is direct domestic infringement by Cloudflare's clients." *See* Opp'n at 11:22:12:2. Plaintiff points out that Cloudflare's website explains to clients that they can determine whether "Cloudflare is caching [client's] site or a specific file by checking the

---

[10] For the first time in its Reply, Cloudflare asserts that "infrastructure-level caching" is a fair use. *See* Reply at 9:5-11:12. In support, Cloudflare relies on *Amazon*, which is distinguishable from the instant case. In *Amazon*, the Ninth Circuit held that where an *individual user* links to an infringing website, and the user's computer automatically makes a cache copy of the infringing images, those copies are a fair use because the copy is "designed to enhance an individual's computer use, not to supersede the copyright holders' exploitation of their works." *See* 508 F.3d at 1169. Here, in contrast, the cache copies are not copies made on individual users' computers, but rather are the actual copies of the infringing images that are transmitted from Cloudflare's servers to users for display.

The other cases relied on by Cloudflare all hold that an internet search engine/service provider – not the third party responsible for distribution of the infringing images – cannot be liable for direct infringement based on cache copies automatically made on its servers. Cloudflare provides no case holding that the third party infringer that causes the infringing copies to be made and distributed is entitled to such a fair use defense. *See, e.g.*, *Rosen v. eBay, Inc.*, No. CV 13-6801 MWF (Ex), 2015 WL 1600081, *21 (C.D. Cal. Jan. 16, 2015) (holding that eBay's creation of CDN cache copies in connection with eBay users' sales of goods was a fair use because it was "designed to enhance a user's use, not to supersede the copyright holders' exploitation of their works"). Indeed, Cloudflare's entire argument with respect to this defense appears to be asserting that *Cloudflare* is entitled to a fair use defense, which is irrelevant to whether the third party websites are entitled to such a defense. *See, e.g.*, Reply at 10:5-11:2 (discussing why Cloudflare's services enhance an individual user's use and therefore constitute a fair use). In any event, because the Court may grant Cloudflare's MSJ on other grounds, it need not resolve the issue of fair use at this juncture.

responses shown in the 'CF-Cache-Status' header," and states that within the CF-Cache-Status header, "HIT" means "resource in cache, served from CDN Cache"; "MISS" means "resource not in cache, served from origin server"; and "EXPIRED" means "resource in cache but has since expired, served from origin server." *See* Opp'n at 6:4-7; PGSD ¶ 12(a); Spillane Decl. Ex. J at CLOUDFLARE000001444. Plaintiff then claims that for "twelve of the fifteen sites that are the subject of Cloudflare's motion, after service of Cloudflare's motion ALS confirmed that ALS works were being reproduced, displayed, and distributed on Cloudflare servers in the United States. For the other three sites Cloudflare lists in its motion, ALS has historical information showing that they used Cloudflare's services." *See* Opp'n at 6:9-14. In support, Plaintiff cites to "Penn Decl. ¶¶ 2-19, Exs. 1; Spillane Decl. ¶ 6, Ex. D." *Id.*

The evidence Plaintiff cites to in support of its contention fails to establish that any of its copyrighted images have actually been copied on Cloudflare's U.S. servers. The Declaration of Eric Penn purports to introduce IP address lookup reports for the at-issue websites and claims that each website's IP address is listed as Cloudflare's IP address in San Francisco. *See* Decl. of Eric Penn ("Penn Decl.") ¶¶ 2-19. However, as Cloudflare points out, this address is merely the nameserver that is substituted in for a client's IP address as part of Cloudflare's security services; it by no means establishes that Plaintiff's copyrighted images are actually stored on any of Cloudflare's U.S. servers. *See* MSJ at 8:8:13-7; Guinn Decl. ¶¶ 6-7.

The Penn Declaration also purports to introduce evidence that actual images are cached on Cloudflare's U.S. servers by submitting screen captures of "a lookup on redbot.org of the URL" ("Redbot report")[11] for purported copyrighted images that were allegedly copied onto Cloudflare's U.S. servers. *See, e.g.*, Penn Decl. ¶ 10, Ex. 6 at page 5 (Redbot report for image from imgchili.net). Plaintiff contends that the headers for each image state "CF-Cache-Status: HIT," which "confirms that the infringing ALS image was cached by Cloudflare on its CDN." *See* Penn Decl. ¶ 10. This evidence is deficient for numerous reasons. First, as Cloudflare points out, Plaintiff has submitted Redbot reports for only seven of the 14 at-issue websites, and has thus failed to defeat Plaintiff's MSJ with respect to seven of the at-issue websites. *See* Reply at 11:15-12:18 (providing chart of images provided for each website, with respective citations). Second, with respect to the remaining seven websites for which Plaintiff has provided Redbot

[11] Cloudflare explains that a Redbot report is a tool that reports server response headers. *See* Decl. of Kenneth Carter ("Carter Decl.") ¶ 7, Docket No. 144-2.

reports, the Court has not located a header reading "CF-Cache-Status: HIT" on any of the exhibits cited by Plaintiff.[12] Third, even assuming such a header existed, it would not establish that the image was copied on a Cloudflare server located in the *United States* – rather, the undisputed facts establish that the phrase "CF-Cache-Status: HIT" merely means that the image was cached on one of Cloudflare's 102 *global* servers. *See* PGSD ¶ 12(a). Finally, in its Reply, Cloudflare submits evidence that the images proffered by Plaintiff are actually cached on Cloudflare servers located in Sydney, Australia. *See* Reply at 12:19-24. Cloudflare points out that each Redbot report submitted by Plaintiff contains a line at the bottom of the report that reads "CF-RAY: [value]-SYD." *See* Carter Decl. ¶ 7. The Court has confirmed that each Redbot report does contain such a line. *See, e.g.,* Penn Ex. 6 at page 5 (Redbot report with bottom line reading "CF-RAY: 33c08af3bd0d96581-SYD"). Cloudflare indicates that it consulted with its engineering team, which confirmed "that this line identifies which Cloudflare caching data center is serving the cached content to the user requesting the report. The 'SYD' identifier is based on the International Air Transport (IATA) airport code for 'Sydney,' which we use to identify Cloudflare's caching data center in Sydney, Australia, and means that the image in question was served using a temporary cache copy stored there." *See* Carter Decl. ¶ 7.

Because Plaintiff has failed to establish that any of its images were actually stored on Cloudflare's U.S. data servers, the Court would find that Plaintiff has failed to establish that any of the 14 at-issue websites committed acts of infringement within the United States, and therefore the underlying infringement is not actionable under U.S. copyright laws.[13]

### *C. Plaintiff's Request for a Continuance*

After filing its Opposition, Plaintiff also filed a Request for Continuance, which states only that "[Plaintiff] requests that hearing on Cloudflare's motion for partially [sic] summary judgment be completed [sic] until ALS is able to complete discovery of Cloudflare's documents

---

[12] Plaintiff has not provided the Court with any specific citation to where it believes this header may be found, other than the general page range for each exhibit. However, the Court has reviewed the cited pages and has not located the header on any exhibit.

[13] Plaintiff repeatedly raises what appears to be an alternative theory of extraterritoriality based on the fact that Cloudflare masks its customers' actual IP addresses, which Plaintiff contends deprives copyright owners of contact information for site owners and origins servers. *See, e.g.*, Opp'n at 8:18-9:20. Plaintiff contends that this conduct has "domestic impact" that renders the 14 at-issue websites within the purview of U.S. copyright laws. *Id.* Plaintiff cites to no authority in support of this theory and, in any event, this theory was expressly rejected in *Subafilms. See Subfilms*, 24 F.3d at 1095 (holding that U.S. copyright laws do not extend to extraterritorial acts of infringement even "where such acts result in adverse effects within the United States").

and complete Cloudflare's deposition." *See* Docket No. 132. This request utterly fails to comply with Federal Rule of Civil Procedure 56(d), which requires that a party "show that '(1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment.'" *Mintz v. Mark Bartelstein & Assocs. Inc.*, 906 F.Supp.2d 1017, 1040 (C.D. Cal. 2012) (quoting *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008)). As such, the Court denied the Request. *See* Docket No. 142.

In its Reply, Cloudflare indicates that Plaintiff has confirmed to Cloudflare that it has produced all infringing images displayed on the at-issue websites. *See* Reply n.14; Decl. of Rachel Kassabian ¶ 4, Ex. B; *see also* Pl.'s Statement Re Status Conference at 1:4-10, Docket No. 136 (confirming it Plaintiff has produced all infringing images). Moreover, the discovery cutoff in this case is set for April 3, 2017. *See* Docket No. 69.

However, because the Court believes neither party adequately addressed the relevant case law governing the issues raised in this Motion, the Court would provide Plaintiff the opportunity to submit an offer of proof as to evidence that infringing copies of Plaintiff's copyrighted images were in fact stored on Cloudflare's U.S. servers. If Plaintiff is able to provide sufficient proof for each website, the Court would DENY Cloudflare's MSJ.

**IV. Conclusion**

In sum, the Court would allow Plaintiff the opportunity to submit an offer of proof establishing that the at-issue websites' acts of infringement were not wholly extraterritorial. If Plaintiff is able to do so, the Court would DENY Cloudflare's Motion for Partial Summary Judgment.

**V. Cloudflare's Request for Evidentiary Ruling on Specified Objections, Docket No. 146**

1. Sustained.
2. Sustained.
3. Sustained.
4. Overruled.
5. Sustained.
6. Sustained.
7. Sustained.
8. Sustained.