Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE LAW GROUP PLC
468 N. Camden Drive, Second Floor
Beverly Hills, CA 90210
(424) 217-5980
(888) 590-1683 (fax)

John P. Flynn (Az. Bar No. 015065)
Kevin D. Neal (Az. Bar No. 011640)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000
(602) 530-8500 (fax)
john.flynn@gknet.com
kevin.neal@gknet.com

Attorneys for Plaintiff ALS Scan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALS SCAN, INC., a Maryland corporation,<br><br>                    Plaintiff,<br><br>     vs.<br><br>CLOUDFLARE, INC., a Delaware corporation, et al.,<br><br>                    Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br><br>**DECLARATION OF JAY M. SPILLANE IN OPPOSITION TO MOTION BY DEFENDANT CLOUDFLARE, INC. FOR A PROTECTIVE ORDER**<br><br><br>Date: _____<br>Time: 10:00 a.m.<br>Place: Courtroom 840<br>          255 East Temple Street<br>          Los Angeles, CA 90012 |

I, Jay M. Spillane, declare:

1.      I am a member of the Bar of the State of California.  I am counsel for Plaintiff ALS Scan, Inc.  The following facts are stated on my personal knowledge.

2.      Among the central issues in this case is whether Cloudflare is entitled to DMCA safe harbors.  Cloudflare claims safe harbors under 17 U.S.C. §§ 512(a) and (b).  A central point of contention is whether, even assuming Cloudflare qualifies for these safe harbors, Cloudflare has lost them for failing to adopt and reasonably implement a policy of terminating repeat infringers.  17 U.S.C. § 512(i).

3.      ALS has propounded interrogatories asking Cloudflare to disclose all circumstances under which it has terminated customers as repeat infringers. The cited portions of Cloudflare's amended answers, served September 14, 2017, are attached hereto as Exhibit A.  Cloudflare answered that it has terminated customers as repeat infringers only upon receipt of a court order adjudicating a Cloudflare customer site as a copyright infringer.

4.      The questions that follow from this disclosure are i) who created this narrow policy of termination only upon receipt of court adjudication of infringement, ii) could this policy be changed, iii) who could change it and iv) why hasn't Cloudflare terminated any of the websites at issue in this case despite receipt by Cloudflare of tens, hundreds and in one case over one thousand emails from ALS's agent Steve Easton directly identifying copyright infringement on Cloudflare's customers' sites.

5.      On Friday September 15, 2017 I took the deposition of Cloudflare pursuant to FRCP R. 30(b)(6).  A true and correct copy of the deposition notice is attached hereto as Exhibit B.  A true and correct copy of Cloudflare's letter identifying the witnesses it would produce in response to the notice is attached hereto as Exhibit C.  Cloudflare produced Justin Paine, Cloudflare's Trust &

Safety Officer, to address terms of service issues.  Cloudflare produced Trey Guinn, a technical employee, to address technical issues, and also Topics 13-16, which pertained to and flowed from Matthew Prince's public statements about "kick[ing] a group of neo-Nazis off the internet."

6.     The questions of Mr. Paine underscored the formless and whimsical circumstances under which Cloudflare could choose to terminate a customer's account for violation of terms of service.  I placed before him two exhibits, Cloudflare's Terms of Service, Dep. Ex. 14 and its Abuse policy, Dep. Ex. 18, both published on Cloudflare's website.  True and correct copies of those exhibits are attached hereto as Exhibits D and E.  In § 11 of the Terms Cloudflare reserves the right to investigate and, if in Cloudflare's sole opinion, a customer violates law or terms, Cloudflare may terminate the customer's account.  I asked Mr. Paine to identify where Cloudflare defined or disclosed what specific conduct was prohibited and would result in termination.  He was unable to identify any such information:

> "Q. Well, can you direct my attention to any terms of the services where Cloudflare says customers aren't allowed to engage in illegal activities or violations of whatever the terms would be?
> A. I think that is in here, let me locate that for you specifically.
> Q. All right.
> A. (Witness reviews.)
> I am not seeing a specific mention of specific types of services or functionality that we expressly permit. If that is what you are specifically asking about.
> BY MR. SPILLANE:
> Q. Well, I was asking about terms that would state what sort of actions are forbidden, for example, websites if you engage in illegal activities that would be a violation of our terms?
> A. I believe that is mentioned in here.  However, at the moment, not locating it."

Opposition to Cloudflare Motion for Protective Order – Spillane Decl.

A true and correct copy of the cited portions of the rough transcript of the Justine Paine deposition is attached hereto as Exhibit F.  The quoted testimony appears on pp. 9 and 10.  A similar question and answer was asked and given when Mr. Paine reviewed Cloudflare's abuse page:

> Q. And I apologize for not having put this in front of you earlier but harkening back to my questions about where customers are told in writing what activities or violations of Cloudflare's terms,
> do you see any information here that provides that information?
> MS. KASSABIAN: Objection; vague.
> THE WITNESS: I don't see specific text that indicates precisely what would result in a termination.

The quoted testimony appears on pp. 14 and 15.

7.     Cloudflare's Terms also say that Cloudflare may terminate services to a customer for repeat infringement, § 15, yet nowhere does Cloudflare define or disclose how it will determine that a customer has engaged in repeat infringement.

> "Q. Where in the terms of service would Cloudflare's clients look to determine how they might be deemed by Cloudflare to be a repeat infringer?
> A. In our terms of service, we don't specifically outline how our policy is defined; however, we do indicate that is a cause for termination.
> Q. Is there anywhere in Cloudflare's terms, where it explains that Cloudflare's conclusion that a client has been a repeat infringer is limited to when there's been some outside determination or finding that that's the case?
> A. There is not specific text in the terms of service that indicate that; however, that is how our policy is applied."

The quoted testimony appears on pp. 13 and 14.

8.     I also deposed Trey Guinn, the other Cloudflare witness who was preferred as a 30(b)(6) witness.  The deposition notice included Topics 13 through 16, which inquired about Matthew's Prince's recent public statements about kicking neo-Nazis off the internet and why, this being the case,

Opposition to Cloudflare Motion for Protective Order – Spillane Decl.

1  Cloudflare does not do more to kick repeat copyright infringers off the Internet.
2  Mr. Guinn confirmed that he was prepared to address those topics.  (The cited
3  portions of the rough transcript of Mr. Guinn's testimony is attached hereto as
4  Exhibit G.  The cited testimony is on pp. 6-7.)
5       9.     I asked Trey Guinn about Matthew Prince's August 23, 2017
6  opinion piece in the Wall Street Journal, Ex. H. hereto and Dep. Ex. 15.  First,
7  Mr. Guinn confirmed that Mr. Prince is CEO of Cloudflare, a company with
8  about 500 employees.  (Guinn Rough Depo. Tr. p. 58.)  The first sentence of
9  Mr. Prince's piece says: "I helped kick a group of neo-Nazis off the Internet last
10 week . . ."  Mr. Guinn identified the "neo-Nazis" in question as Daily Stormer.
11 When I asked how Cloudflare kicked Daily Stormer off the Internet, I elicited
12 an objection from counsel and information that Mr. Prince was wrong:

13
14       "Q. Okay. So how did Cloudflare kick Daily Stormer off the internet?
         MS. KASSABIAN: Objection; misstates the article, misstates
15       testimony.
         THE WITNESS: I don't believe it's technically accurate to say
16       Cloudflare kicked them off the internet.
17       BY MR. SPILLANE:
         Q. Why not?
18       A. Because, when you remove Cloudflare service from a website, the
19       website is still on the internet."

20 The quoted testimony appears on p. 60.
21       10.    I asked Mr. Guinn whether, when Mr. Prince said he helped kick
22 neo-Nazis off the internet, he knew that this would not in fact happen.  Mr.
23 Guinn testified that Mr. Prince knew Daily Stormer would still be on the
24 internet after being terminated as a Cloudflare customer.  I then asked whether
25 Mr. Prince intended to mislead the public when he made this statement.  I
26 elicited non-responsive pablum:
27
28       "Q. Did Matthew Prince intend to mislead the public by telling the public
         that he helped kick a group of neo-Nazi off the internet?

- 4 -

A.  No. He was being illustrative to make the point that in a way, we
were complicit in making the website vulnerable to hackers, in which the
hackers could knock the website off the internet."

The quoted testimony appears on p. 79.

11.    I asked Mr. Guinn to state the <u>basis for</u> – the reasoning behind –
the decision that neo-Nazi hate speech was a violation of Cloudflare's terms
warranting termination of service.  I elicited non-responsive pablum, often over
the objection of counsel, vague statements about the intended <u>effect</u> of the
decision – to be "provocative" and "start a conversation:"

"Q. Who made the decisions as to where to draw the line?
MS. KASSABIAN: Objection; vague and ambiguous. Assumes facts not
in evidence.
THE WITNESS: Are you asking who made the decision of terminating
service?
BY MR. SPILLANE:
Q. Yeah.
A. Matthew Prince made the decision to terminate service to the Daily
Stormer.
Q. What was the basis of his decision?
MS. KASSABIAN: Objection; asked and answered.
THE WITNESS: Basis of his decision was to start a conversation about
internet censorship.  The -- he wanted to essentially be provocative."

(Guinn Rough Depo. Tr. p. 58.)  Mr. Guinn admitted that he had failed to
prepare for the 30(b)(6) deposition by actually speaking to Mr. Prince about his
public statements about kicking neo-Nazis off the internet, but rather deduced
his reasoning due to knowing Mr. Prince and reading statements that were
largely available to the public:

"Q. In preparing for this deposition, did you ask Mr. Prince what was the
-- what his reasoning was?
A. In preparing for this deposition, did not speak to him directly because
I felt I understand his reasoning.

. . .

Opposition to Cloudflare Motion for Protective Order – Spillane Decl.

Q. I think the question is, what was your basis for saying you knew his reasoning?

A. The basis of my understanding of his reasoning was from reading both, as I said, the opinion piece in the wall street journal, hearing interviews, reading our blog, and understanding our -- his general view on freedom of speech and due process as well as sort of.

Q. Well, did you -- is the basis for knowing Mr. Brings's [sic] reasoning anything other than that I could also read by looking at articles and things on the internet?

MS. KASSABIAN: Objection; asked and answered. Mischaracterizes testimony.

THE WITNESS: The basis, also the fact that I've worked with Mr. Prince for four and a half years and I know him personally as well as many other instances, where we have been questioned as a network provider, should we -- should we take a stance around providing -- should we be content-neutral, or not."

(Guinn Rough Depo. Tr. pp. 70-72.)  Mr. Guinn then sowed abject confusion by testifying that engaging in neo-Nazi hate speech was not a violation of Cloudflare's Terms of Service.  When asked again, that being the case, how Cloudflare had decided to terminate service based on speech content, I elicited the same rehearsed and non-responsive pablum about "being provocative" and "starting a conversation:"

"Q. What was the basis for Mr. Prince's decision to terminate services to -- for this particular kind of abuse, neo-Nazi as opposed to other forms of actions that could also be considered abusive?

MS. KASSABIAN: Objection; asked and answered twice. And assumes facts not in evidence.

THE WITNESS: I think it misrepresents.  Because this is not a form of abuse service.

BY MR. SPILLANE:

Q. Doesn't Cloudflare consider neo-Nazi hate speech to be a form of abuse?

A. Are you asking if it's an abuse of Cloudflare's service?

Q. An abuse of terms of service, yeah.

A. I'm not sure of the legal distinction here. But I don't believe we consider a certain form of speech be of an abuse of Cloudflare service.

- 6 -

Q. Why was Daily Stormer terminated as a Cloudflare client?
MS. KASSABIAN: Objection asked and answered three times. You can
answer get.
THE WITNESS: We terminated service to the Daily Stormer website
because we want essentially to be provocative to start a conversation
around freedom of speech."

I tried to follow up on Mr. Guinn's testimony about "starting a conversation,"
eliciting rambling answers in which Mr. Guinn simultaneously stated that
Cloudflare was being "provocative" yet had "bowed to public pressure," tried to
dish the answer to Justin Paine and ultimately, over repeated objections,
admitted that Cloudflare's grounds for termination of service consisted of the
"discretion" of Mr. Prince:

"Q. A conversation about what?
A. About whether or not a provider, like Cloudflare, should be content
neutral or not.  Cloudflare is, you know, one provider in a long
stream of providers, from -- that are involved in different technologies
that are involved in delivering things online. And should Cloudflare be
responsible for implementing censorship -- should a network like
Cloudflare be the point where you decide to do censorship.
Q. Did Cloudflare implement censorship?
MS. KASSABIAN: Objection. Calls for a legal conclusion. Vague.
THE WITNESS: Cloudflare just terminated our service.
BY MR. SPILLANE:
Q. But you -- you're using general terms that you wanted to be
provocative about -- about content neutral or not. Isn't it the case that
Cloudflare decided that it would not be content neutral in terms of to
terminate services based on speech?
MS. KASSABIAN: Objection; vague and ambiguous.
THE WITNESS: We purposefully in this instance decided to terminate
service because of -- basically **at the discretion of our of CEO** for a
hateful site, for a website that had hate speech on it in order to be
provocative and start the conversation online and in the media about,
should a network provider like Cloudflare, you know, be content neutral
or not.
BY MR. SPILLANE:

---

Opposition to Cloudflare Motion for Protective Order – Spillane Decl.

Q. Who made the ultimate determination as to whether Daily Stormer's speech was sufficiently hateful to warrant termination of service?

MS. KASSABIAN: Objection. Misstates the witness's testimony and the documents being examined.

THE WITNESS: The -- that was not actually the determination whether the speech was hateful enough. The general policy -- and to get into the specifics, you should talk to Justin. But the general policies that we are content neutral, but there is, you know, a very large sort of public pressure towards this website. And to public vow [sic] we -- we vowed [sic] to pressure -- to be provocative we terminated service what happens within the chain of providers involved in delivering content on the internet, where -- where would you want to try to implement censorship if you were going to implement censorship.

BY MR. SPILLANE:

Q. Who decided on where to draw the line speech warrants for termination as a Cloudflare client or not?

MS. KASSABIAN: Objection. Misstates testimony and the documents, asked and answered, assumes facts not in evidence.

THE WITNESS: I'm, can you repeat the question one more time.

MR. SPILLANE: Can you read it back please.

(Record read back by the reporter.)

MS. KASSABIAN: Same objections. And I'll also add that it's off topic in terms of this 30(b)(6) deposition.

THE WITNESS: **Matthew Prince as a CEO has the ultimate say of deciding whether or not to terminate service.**

(Guinn Rough Depo. Tr. pp. 74-76.)  (Emphases added.)

12.     I then asked questions which were verbatim from Topic 14, which reads: "Can Cloudflare kick copyright infringers off the internet? If not, how is it that Cloudflare can kick neo-Nazis off the Internet but not copyright infringers?"  In response, Cloudflare first attempted to withdraw Mr. Guinn as a witness for this topic, though Cloudflare's letter designated him for this topic and Mr. Guinn testified that he was prepared to address Topic 14.  Then, over repeated objections, Mr. Guinn admitted that the decision to terminate customers for copyright infringement was in the discretion of Mr. Prince:

"Q. Can Cloudflare kick copyright infringers off the internet?

A. No. Cloudflare doesn't have to ability to kick anyone off the internet.

Q. Can Cloudflare terminate services to copyright infringers?

A. Cloudflare has the ability to terminate services to anyone.

Q. How does Cloudflare decide whether to terminate services to copyright infringers as opposed to neo-Nazis or any form of abusive content?

MS. KASSABIAN: I'm going to object that questions regarding Cloudflare's copyright policies is not for this witness to answer and we've designated Mr. Paine to testify as to Cloudflare's copyright policy. So he's the proper designee for that question. I also think that the question as opposed here assumes facts not in evidence. But, Mr. Guinn, if you want it have it read back to you.  Let you know if you have any personal knowledge that does not involve attorney-client communications that you can use to answer that question, you may do so.  Ms. Reporter, I would you mind.  (Record read back by the reporter.)

MS. KASSABIAN: Same objections.

THE WITNESS: **Cloudflare make as decision whether or not to terminate discussions in general based on our terms of use, terms of service. And also up to the decision by our leadership.**

BY MR. SPILLANE:

Q. Leadership being who?

A. Sorry, what's the question?

MS. KASSABIAN: Objection; vague.

BY MR. SPILLANE:

Q. Leadership being who?

MS. KASSABIAN: Objection; vague.

THE WITNESS: **I mean, leadership can include clearly the CEO, Matthew Prince."**

(Guinn Rough Depo. Tr. pp. 82--84.)  (Emphases added.)

---

Opposition to Cloudflare Motion for Protective Order – Spillane Decl.

This declaration was executed on September 19, 2017, at Beverly Hills, California.  I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

_____

Jay M. Spillane

Opposition to Cloudflare Motion for Protective Order – Spillane Decl.