# Exhibit A

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Rachel Herrick Kassabian (Bar No. 191060)
  rachelkassabian@quinnemanuel.com
  Carolyn M. Homer (Bar No. 286441)
  carolynhomer@quinnemanuel.com
  Mark T. Gray (Bar No. 305251)
  markgray@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:   (650) 801-5000
Facsimile:    (650) 801-5100

*Attorneys for Defendant Cloudflare, Inc.*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| **ALS SCAN, INC.**, <br><br> Plaintiff, <br><br> vs. <br><br> **CLOUDFLARE, INC.**, et al., <br><br> Defendants. | Case No. 2:16-cv-05051-GW-AFM <br><br> **CLOUDFLARE, INC.'S OBJECTIONS AND AMENDED AND SUPPLEMENTAL RESPONSES TO ALS SCAN'S FIRST SET OF INTERROGATORIES** |

INTERROGATORY NO. 9:

Please state all facts showing how YOU have adopted and reasonably implemented, and inform YOUR subscribers and account holders of, a policy that provides for termination in appropriate circumstances of YOUR subscribers and account holders who are repeat infringers.

RESPONSE TO INTERROGATORY NO. 9:

In addition to Cloudflare's general objections, Cloudflare objects to this Interrogatory to the extent it seeks information subject to the attorney-work product doctrine or implicating the attorney-client privilege. Cloudflare further objects to this Interrogatory as vague and ambiguous. Subject to and without waiving these general and specific objections, Cloudflare responds as follows:

Pursuant to Fed. R. Civ. P. 33(d), Cloudflare identifies its Terms of Service, CLOUDFLARE00000124, also available at https://www.cloudflare.com/terms/, as responsive to this Interrogatory. Additionally, Cloudflare incorporates by reference its response to Interrogatory No. 10 below. Cloudflare terminates the accounts of any account holders who are adjudicated repeat infringers, upon receipt of notice of same.

INTERROGATORY NO. 10:

Please fully identify all of YOUR subscribers and account holders who YOU have terminated as repeat infringers.

RESPONSE TO INTERROGATORY NO. 10:

Cloudflare objects to this Interrogatory as vague and ambiguous as to the term "fully." Subject to and without waiving these general and specific objections, Cloudflare responds as follows:

Pursuant to Cloudflare's policies, Cloudflare has terminated the accounts associated with the following websites:

| WEBSITE | COURT ORDER |
|---------|-------------|
| Grooveshark.pw | *Arista Records LLC, et. al. v. Vita Tkach, et. al.*, No. 15-CV-03701, ECF 94, Default Judgment and Permanent Injunction Order (S.D.N.Y. Dec. 11, 2015) |
| Grooveshark.vc | *Id.* |
| Grooveshart.li | *Id.* |
| mp3skull.com | *Arista Records LLC, et. al. v. Monica Vasilenko, et. al.*, No. 15-CV-21450, ECF 37 (S.D. Fl. Mar. 22, 2016). |
| mp3skull.to | *Id.* |
| mp3skull.cr | *Id.* |
| mp3skull.is | *Id.* |
| mp3skull.ninja | *Id.* |
| mp3skull.la | *Id.* |
| mp3skull.wtf | *Id.* |
| mp3skull.yoga | *Id.* |
| mp3skull.club | *Id.* |

| WEBSITE | COURT ORDER |
|---|---|
| mp3skull.zone | *Id.* |
| mp3skull.mn | *Id.* |
| mp3skull.cm | *Id.* |
| mp3skull.cz | *Id.* |
| mp3skull.gd | *Id.* |
| mp3skull.ms | *Id.* |
| mp3skull.at | *Id.* |
| mp3skull.vg | *Id.* |
| mp3skull.pl | *Id.* |
| mp3skull.vodka | *Id.* |
| mp3skullreborn.com | *Id.* |
| pubfilm.ac | *Warner Bros. Entertainment, et al. v. Phat Bui, et al.*, No. 17-CV-875, ECF 52 (S.D.N.Y. Mar. 30, 2017) |
| pubfilm.is | *Id.* |
| pub77.com | *Id.* |
| pubfilm.cc | *Id.* |
| pubfilm.net | *Id.* |

| WEBSITE | COURT ORDER |
|---------|-------------|
| pubfilm.com | *Id.* |
| pubfilmno1.com | *Id.* |
| pubfilmhd.com | *Id.* |
| pidtv.com | *Id.* |
| top100film.com | *Id.* |
| idmca.net | *Id.* |
| player.pub77.com | *Id.* |
| player.pubfilm.ac | *Id.* |

INTERROGATORY NO. 11:

For each subscriber or account holder identified in response to Interrogatory No. 8, fully identify each copyright owner who provided notices of infringement on sites pertaining to such subscriber(s) or account holder(s) and how many infringement notices YOU received pertaining to such sites before terminating that subscriber or account holder.

AMENDED AND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:

In addition to Cloudflare's general objections, Cloudflare objects to this Interrogatory as vague and ambiguous as to the term "fully," and also because it seeks irrelevant information.  Subject to and without waiving these general and specific objections, Cloudflare responds as follows:

1   to serve"); *Shorter v. Baca,* No. 12-CV-7337, 2014 WL 12586116, at *12 (C.D. Cal.

2   June 23, 2014) ("This interrogatory is compound and encompasses numerous

3   requests for admissions. The [C]ourt finds that the burden of this interrogatory

4   outweighs its likely benefit given the minimal importance of this interrogatory in

5   resolving the issues in the case."); *Kim Laube & Co., Inc. v. Wahl Clipper Corp.,*

6   No. 09-CV-914, 2012 WL 12877945, at *4 (C.D. Cal. Aug. 28, 2012) ("[A]n

7   interrogatory which calls upon a party to state the factual basis for any response to a

8   request for admissions that is not an unqualified admission counts separately for

9   each applicable request for admission[.]").

10       Subject to and without waiving these general and specific objections,

11   Cloudflare responds as follows: Cloudflare's factual responses to ALS Scan's

12   Requests for Admission are set forth in its Objections and Responses to ALS Scan's

13   Requests for Admission themselves.

14

15   Dated:  September 14, 2017          QUINN EMANUEL URQUHART &
                                         SULLIVAN LLP
16

17

18                                       By

19                                          Rachel Kassabian

20                                          *Attorney for Defendant*
                                            *Cloudflare, Inc.*
21

22   Dated:  September 14, 2017          CLOUDFLARE, INC.

23

24

25                                       By

26                                          Justin Paine

27                                          *Head of Trust & Safety*
                                            *Cloudflare, Inc.*
28

-33-                                        Case No. 2:16-cv-05051-GW-AFM

# Exhibit B

Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE TRIAL GROUP PLC
468 N. Camden Drive, Second Floor
Beverly Hills, CA 90210
(424) 217-5980
(888) 590-1683 (fax)

John P. Flynn (Az. Bar No. 015065)
Kevin D. Neal (Az. Bar No. 011640)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona  85016-9225
(602) 530-8000
(602) 530-8500 (fax)
john.flynn@gknet.com
kevin.neal@gknet.com

Attorneys for Plaintiff ALS Scan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALS SCAN, INC., a Maryland corporation,<br><br>                    Plaintiff,<br><br>     vs.<br><br>CLOUDFLARE, INC., a Delaware corporation, et al.,<br><br>                    Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br><br>**PLAINTIFF'S SECOND REVISED NOTICE OF CONTINUED DEPOSITION OF DEFENDANT CLOUDFLARE, INC.** |

Plaintiff ALS Scan, Inc. ("ALS") hereby requests pursuant to FRCP Rule 30(b)(6) that Defendant Cloudflare, Inc. ("Cloudflare," "You" or "Your") appear for deposition on September 15, 2017 at 9:00 a.m. at Quinn Emanuel, 50 California Street, 22nd Floor, San Francisco, CA 94111.

The testimony will be recorded through audio, audiovisual and stenographic means, including without limitation by means of videotape.

**DEFINITIONS**

1.      "WEBSITE" or "WEBSITES" means any or all of the websites identified in ¶ 57 of the Third Amended Complaint that are alleged to be using Cloudflare's services, as well as those additionally disclosed in the June 23, 2017 updated infringement schedules, namely:

    a.  imgchili.net
    b.  slimpics.com
    c.  cumonmy.com
    d.  bestofsexpics.com
    e.  stooorage.com
    f.  greenpiccs.com
    g.  imgsen.se
    h.  imgspice.com
    i.  imgspot.org
    j.  img.yt
    k.  vipergirls.to
    l.  pornwire.net
    m. fboom.me
    n.  imgflash.net
    o.  imgtrex.com
    p.  namethatpornstar.com
    q.  artofx.com

- 1 -

r.  imagetwist.com

**SUBJECTS FOR DEPOSITION**

Pursuant to FRCP Rule 30(b)(6) Cloudflare is requested to designate one or more officers, directors or managing agents, or designate other persons who consent to testify on its behalf, concerning the following matters for examination:

1.     The extent to which Cloudflare transmits, routes or provides connections for content through a system or network controlled or operated by Cloudflare.  Is the answer different when the Cloudflare nameservers locate an image in Cloudflare's cache servers and when Cloudflare proxies an image from the origin server through the Cloudflare nameserver to the user.

2.     The extent and nature of modifications to client content as set forth in Section 7 of Cloudflare's terms.

3.     Whether Cloudflare provides product or services to consumers (as distinct from website owners and operators).

4.     The extent to which any or all of the WEBSITE owners, operators or hosts have used the Cloudflare DNS and/or CDN services.

5.     Cloudflare's receipt and actions taken in response to notifications of infringement of ALS works.

6.     Whether Cloudflare has terminated any accounts pertaining to the WEBSITES, and if so which ones and why.

7.     Why Cloudflare has not terminated accounts pertaining to the WEBSITES.

8.     How Cloudflare has adopted and reasonably implemented, and inform its subscribers and account holders of, a policy that provides for termination in appropriate circumstances of its subscribers and account holders who are repeat infringers.

9.      Whether Cloudflare has terminated any subscribers or account holders as repeat infringers under such policy.  If so, who are they, which copyright owners complained of infringement pertaining to such subscribers and account holders and how many infringement complaints were there before Cloudflare terminated the account?

10.      How Cloudflare records and/or tracks of the "thousands of infringement and abuse complaints [Cloudflare receives] every week." [October 21, 2106 letter from Doug Kramer to Christine Peterson.]  This includes how or whether Cloudflare records and/or tracks whether the infringing content in each such complaint is or is not removed, and how or whether Cloudflare records and/or tracks how many complaints are being received pertaining to any particular site, subscriber or account holder.

11.      The existence and contents of any documents that Cloudflare uses to track the "thousands of infringement and abuse complaints [YOU receive] every week."  [October 21, 2106 letter from Doug Kramer to Christine Peterson.]

12.      The nature and members of the "Trusted Reporter program," including how and under what circumstances copyright owners are informed of and participate in such a program.  [October 21, 2106 letter from Doug Kramer to Christine Peterson.]

13.      How did Cloudflare "kick a group of neo-Nazis off the internet?" Matthew Prince, Wall Street Journal, August 23, 2017.

14.      Can Cloudflare kick copyright infringers off the internet?  If not, how is it that Cloudflare can kick neo-Nazis off the Internet but not copyright infringers?

15.      Why hasn't Cloudflare kicked copyright infringers off the Internet, except upon receipt of a court order?

- 3 -

16.     If Cloudflare's "terms of use give [it] broad discretion to choose whom we allow to use our network," why hasn't Cloudflare used that discretion to choose not to allow the Websites to use Cloudflare's network?

DATED:  August 23, 2017            SPILLANE TRIAL GROUP PLC

By: _____
            Jay M. Spillane
Attorneys for Plaintiff ALS Scan, Inc.

- 4 -

## **PROOF OF SERVICE**

1.   At the time of service I was over 18 years of age and not a party to this action.  My business address is: Spillane Trial Group PLC, 468 N. Camden Drive, Second Floor, Beverly Hills, CA 90210-4507.

2.  On August 23, 2017 I served the following document(s):

**PLAINTIFF'S SECOND REVISED NOTICE OF CONTINUED DEPOSITION OF DEFENDANT CLOUDFLARE, INC.**

3.  I served these documents on the following person(s):

See attached service list.

4.  The document(s) in item 2 were served by the following means:

**X   By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 3 and *(specify one):*

   **X**   (1) deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

   ☐   (2) placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.
   I am a resident or employed in the county where the mailing occurred.  The envelope or package was placed as indicated above at Los Angeles, CA.

☐   **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 3. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

☐   **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 3. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

☐   **By electronic service.** Based on a court order or an agreement of the parties to accept electronic service, I caused the documents to be sent to the persons at the electronic service addresses listed in item 3.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: August 23, 2017

*Jessie Gietl*

_____

Jessie Gietl

*ALS v. Cloudflare*
USDC C.D. Cal. 2:16-cv-5051-GW-AFM
Mail Service List

<u>Attorneys for Cloudflare</u>:

Rachel Herrick Kassabian
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065

<u>Attorneys for Hivelocity</u>:

Shahrokh Sheik
KRAMER HOLCOMB SHEIK LLP
1925 Century Park East, Ste. 1180
Los Angeles, California 90067

<u>Attorneys for Steadfast</u>:

Colin O'Brien
John Ambrogi
Partridge Partners P.C.
321 North Clark, Suite 720
Chicago, Illinois 60654

Paul D. Supnik
9401 Wilshire Boulevard
Suite 1250
Beverly Hills, CA 90212

<u>Co-Counsel for ALS</u>:

John Flynn
Kevin Neal
Gallagher & Kennedy
2575 E. Camelback Road, Suite 1100
Phoenix, Arizona 85016-9225

Exhibit C

**quinn emanuel** trial lawyers | silicon valley

555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California 94065-2139 | TEL (650) 801-5000 FAX (650) 801-5100

WRITER'S DIRECT DIAL NO.
**(650) 801-5005**

WRITER'S EMAIL ADDRESS
**rachelkassabian@quinnemanuel.com**

September 5, 2017

<u>**VIA ELECTRONIC MAIL AND U.S. MAIL**</u>
JSPILLANE@SPILLANEPLC.COM

Jay M. Spillane
Spillane Law Group PLC
468 N. Camden Drive, Second Floor
Beverly Hills, California 90210

Re:     <u>*ALS Scan, Inc. v. Cloudflare, Inc., et al.*, Case No. 2:16-cv-05051 (C.D. Cal.):</u>
        <u>ALS Scan's Notice of 30(b)(6) Deposition of Cloudflare</u>

Dear Jay:

I write in response to ALS Scan, Inc.'s Second Revised Notice of Continued Deposition of Defendant Cloudflare, Inc. Subject to and without waiving its objections thereto, Cloudflare hereby designates Justin Paine on Topics 4-12 and Trey Guinn on Topics 1-3 and 13-16. Both witnesses will be available for questioning on the currently scheduled deposition date of September 15. Mr. Guinn shall be made available at 9 a.m., and Mr. Paine shall be made available at 1 p.m. Please let me know if you have any questions or concerns.

Sincerely,

Rachel Herrick Kassabian

Exhibit D

 

# Cloudflare Terms of Use

*Cloudflare, Inc, a Delaware corporation ("Cloudflare") provides this website located at www.Cloudflare.com ("Cloudflare.com"), all the content under this domain, certain related software, and its services to you subject to the following terms and conditions. By using Cloudflare.com you agree to be bound by the latest amended versions of this Agreement and Cloudflare's Privacy and Security Policy (see "Modifications" below).*

## SECTION 1: ACCEPTING THE TERMS

By using the information, tools, features and functionality located on Cloudflare.com, through any Cloudflare APIs, or through any software or other websites that interface with Cloudflare.com or its APIs (collectively the "Service"), you agree to be bound by this Agreement, whether you are a "Visitor" (meaning you merely browse the Cloudflare.com website) or you are a "Member" (meaning you have registered with Cloudflare). The term "you" or "User" refers to a Visitor or a Member. If you wish to become a Member and make use of the Service you must read this Agreement and indicate your acceptance during the Registration process. If you accept this Agreement, you represent that you have the capacity to be bound by it or, if you are acting on behalf of a company or entity, that you have the authority to bind such entity.

## SECTION 2: COPYRIGHTS

All content included on Cloudflare.com, such as text, graphics, logos, button icons, images, audio clips, digital downloads, data compilations, and software, as well as the compilation of that content into one, coherent website, is the property of Cloudflare and protected by United States and international copyright laws. Reproduction of the content of Cloudflare.com without the written permission of Cloudflare is prohibited.

## SECTION 3: TRADEMARKS AND SERVICEMARKS

Cloudflare®, the Cloudflare logo, and other Cloudflare graphics, logos, page headers, button icons, scripts, and service names are trademarks, certification marks, service marks, or other trade dress of Cloudflare or its subsidiaries. Cloudflare's trademarks, certification marks, service marks, and trade dress have inherent meaning and substantial value because of their restricted use. They may not be used in connection with any product or service that is not Cloudflare's, in any manner without Cloudflare's permission. All other trademarks not owned by Cloudflare or its subsidiaries that appear on Cloudflare.com are the property of their respective owners, who may or may not be affiliated with, connected to, or sponsored by Cloudflare or its subsidiaries.

## SECTION 4: LICENSE TO ACCESS CLOUDFLARE.COM AND SERVICES

In consideration for accessing Cloudflare.com and the Service, Cloudflare grants you a limited license to access and make personal use of the website. This license prohibits your downloading (other than page caching) or modifying any portion of it, except with express, written consent of Cloudflare. This license does not allow resale of Cloudflare's services without

CLOUDFLARE00000120

10060016.001





express written consent of Cloudflare. Any unauthorized use automatically terminates the permission or license granted by Cloudflare and may incur legal liabilities for any damages.

You are granted a limited, revocable, and nonexclusive right to create a hyperlink to any non-password protected directories. You may not use any of Cloudflare's proprietary graphics or trademarks as part of the link without express written permission.

## SECTION 5: ACCOUNTS AND PASSWORDS

If you are issued an account, you are responsible for maintaining the confidentiality of your account and password, and you agree to accept responsibility for all activities that occur under your account or password. Cloudflare reserves the right to, under its sole discretion, refuse service, suspend or terminate accounts, or otherwise restrict access to Cloudflare.com and the Cloudflare Service.

## SECTION 6: THIRD PARTY APPS

Cloudflare's Service allows you to install or utilize certain third party apps ("Apps"). These Apps are provided "AS IS" and governed by their own terms of service and privacy policies as set forth by the third parties that provide them. Cloudflare does not endorse and is not responsible or liable for the services or features provided by these Apps you choose to install. You acknowledge and agree that Cloudflare shall not be responsible or liable, directly or indirectly, for any damage or loss caused or alleged to be caused by or in connection with use of or reliance on any Apps.

## SECTION 7: YOUR CONTENT

You retain full copyrights in any materials served through Cloudflare. Depending on the features you select or Apps you enable, Cloudflare may modify the content of your site. For example, Cloudflare may detect any email addresses and replace them with a script in order to keep it from being harvested, or Cloudflare may insert code to improve page load performance or enable a Third Party App. Depending on the features you enable, you acknowledge Cloudflare may:

1. Intercept requests determined to be threats and present them with a challenge page.
2. Add cookies to your domain to track visitors, such as those who have successfully passed the CAPTCHA on a challenge page.
3. Add script to your pages to, for example, add services, Apps, or perform additional performance tracking.
4. Other changes to increase performance or security of your website.

Cloudflare will make it clear whenever a feature will modify your content and, whenever possible, provide you a mechanism to allow you to disable the feature.

## SECTION 8: RECORDS OF CLOUDFLARE.COM VISITOR USE AND ABUSE

As a visitor to Cloudflare.com and a user of the Cloudflare Service, you consent to having your Internet Protocol address recorded and your activities monitored to prevent abuse.

## SECTION 9: RECORDS OF YOUR VISITORS

CLOUDFLARE00000121

10060016.002

                                                                                                  ☰

permitted under the laws of your jurisdiction and you agree to indemnify and hold Cloudflare harmless if your use of the Service is in violation of local law. Where required by law, you agree to post a privacy policy on any that, at a minimum, discloses any and all uses of personal information that you collect from users including any information collected via the Service. You agree to indemnify and defend Cloudflare from and against any and all claims stemming from your failure to comply with this provision and/or your failure or refusal to abide by the terms and provisions of any applicable privacy policies. You acknowledge that Cloudflare may use this data to improve its service or enable other services (e.g., using visitor traffic logs or data posted through the service to detect threats so as to stop future attacks).

### SECTION 10: LIMITATION ON NON-HTML CACHING

You acknowledge that Cloudflare's Service is offered as a platform to cache and serve web pages and websites and is not offered for other purposes, such as remote storage. Accordingly, you understand and agree to use the Service solely for the purpose of hosting and serving web pages as viewed through a web browser or other application and the Hypertext Markup Language (HTML) protocol or other equivalent technology. Cloudflare's Service is also a shared web caching service, which means a number of customers' websites are cached from the same server. To ensure that Cloudflare's Service is reliable and available for the greatest number of users, a customer's usage cannot adversely affect the performance of other customers' sites. Additionally, the purpose of Cloudflare's Service is to proxy web content, not store data. Using an account primarily as an online storage space, including the storage or caching of a disproportionate percentage of pictures, movies, audio files, or other non-HTML content, is prohibited. You further agree that if, at Cloudflare's sole discretion, you are deemed to have violated this section, or if Cloudflare, in its sole discretion, deems it necessary due to excessive burden or potential adverse impact on Cloudflare's systems, potential adverse impact on other users, server processing power, server memory, abuse controls, or other reasons, Cloudflare may suspend or terminate your account without notice to or liability to you.

### SECTION 11: INVESTIGATION

Cloudflare reserves the right to investigate you, your business, and/or your owners, officers, directors, managers, and other principals, your sites, and the materials comprising the sites at any time. These investigations will be conducted solely for Cloudflare's benefit, and not for your benefit or that of any third party. If the investigation reveals any information, act, or omission, which in Cloudflare's sole opinion, constitutes a violation of any local, state, federal, or foreign law or regulation, this Agreement, or is otherwise deemed harm the Service, Cloudflare may immediately shut down your access to the Service. You agree to waive any cause of action or claim you may have against Cloudflare for such action, including but not limited to any disruption to your website. You acknowledge that Cloudflare may, at its own discretion, reveal the information about your web server to alleged copyright holders or other complaintants who have filed complaints with us.

### SECTION 12: INDEMNITY

You agree to indemnify and hold Cloudflare, and its subsidiaries, affiliates, officers, agents, co-branders or other partners, and employees, harmless from any claim or demand, including reasonable attorneys' fees, arising out of your use of the Service, your connection to the Service, your violation of the Terms of Service, or your violation of any rights of another.

### SECTION 13: DISCLAIMER OF WARRANTIES AND LIMITATION OF LIABILITY

CLOUDFLARE00000122

10060016.003

                                                                                    

CONTENT, MATERIALS, OR PRODUCTS INCLUDED ON CLOUDFLARE.COM. YOU EXPRESSLY AGREE THAT YOUR USE OF CLOUDFLARE.COM, THE CLOUDFLARE SERVICE, AND ANY DOWNLOADABLE SOFTWARE IS AT YOUR SOLE RISK. TO THE FULL EXTENT PERMISSIBLE BY APPLICABLE LAW, CLOUDFLARE DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. IN NO EVENT SHALL CLOUDFLARE BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; LOSS OF USE, DATA, OR PROFITS; OR BUSINESS INTERRUPTION) HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, WHETHER IN CONTRACT, STRICT LIABILITY, OR TORT (INCLUDING NEGLIGENCE OR OTHERWISE) ARISING IN ANY WAY OUT OF THE USE OF CLOUDFLARE.COM, THE CLOUDFLARE SERVICE, OR DOWNLOADABLE SOFTWARE, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

CLOUDFLARE MAKES REASONABLE EFFORTS, BUT DOES NOT WARRANT THAT CLOUDFLARE.COM, THE CLOUDFLARE SERVICE, ANY DOWNLOADABLE SOFTWARE, THE CLOUDFLARE SERVERS, OR EMAIL SENT FROM ANY OF ITS DOMAINS ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. CLOUDFLARE WILL NOT BE LIABLE FOR ANY DAMAGES OF ANY KIND ARISING FROM THE USE OF THE CLOUDFLARE.COM, THE CLOUDFLARE SERVICE, OR CLOUDFLARE DOWNLOADABLE SOFTWARE INCLUDING, BUT NOT LIMITED TO DIRECT, INDIRECT, INCIDENTAL, PUNITIVE, AND CONSEQUENTIAL DAMAGES.

Notwithstanding the foregoing, Cloudflare acknowledges that it is compliant with the Payment Card Industry Payment Card Industry Data Security Standard (PCI DSS) and is a PCI DSS Level 1 certified organization. As such Cloudflare is therefore responsible for the security of cardholder data that it transmits on behalf of its customers while that data is within Cloudflare's network. Cloudflare does not store cardholder data transmitted through its network at any point.

## SECTION 14: AUTOMATIC RENEWAL AND CANCELLATION

WHEN YOU REGISTER FOR THE SERVICE, YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT (A) CLOUDFLARE (OR OUR THIRD PARTY PAYMENT PROCESSOR) IS AUTHORIZED TO CHARGE YOU ON A MONTHLY BASIS FOR YOUR SUBSCRIPTION TO THE SERVICE (IN ADDITION TO ANY APPLICABLE TAXES AND OTHER CHARGES) FOR AS LONG AS YOUR SUBSCRIPTION TO THE SERVICE CONTINUES, AND (B) YOUR SUBSCRIPTION TO THE SERVICE IS CONTINUOUS UNTIL YOU CANCEL IT OR WE SUSPEND OR STOP PROVIDING ACCESS TO THE SERVICE IN ACCORDANCE WITH THESE TERMS OF USE.

IN ORDER TO PREVENT AUTO-RENEWAL OF YOUR SUBSCRIPTION, YOU MUST CANCEL YOUR SUBSCRIPTION THROUGH YOUR ACCOUNT DASHBOARD BEFORE THE BEGINNING OF YOUR NEXT MONTHLY BILLING PERIOD. YOU WILL BE BILLED IN FULL FOR THE MONTHLY BILLING PERIOD IN WHICH YOU CANCEL.

## SECTION 15: TERMINATION

Cloudflare's policy is to investigate violations of these Terms of Service and terminate repeat infringers. You agree that Cloudflare may, under certain circumstances and without prior notice, immediately terminate your Cloudflare account, any associated email address, and access to Cloudflare.com and associated Services. Cause for such termination shall include, but not be limited to: (a) breaches or violations of the Terms of Service or other incorporated agreements or guidelines; (b) requests by law enforcement or other government agencies; (c) a request by you (self-initiated account deletions); (d) discontinuance or material modification to the Service (or any part thereof); (e) unexpected technical or security issues or problems; (f) extended periods of inactivity; (g) you have engaged or are reasonably suspected to be engaged in fraudulent or illegal activities; (h) having provided false information as part of your account; (i) having failed to keep your account complete, true, and accurate; (j) any use of the Service deemed at Cloudflare's sole discretion to be prohibited; (k) use of fraudulent payment methods; and/or (l) nonpayment of any fees owed by you in connection with Cloudflare.com and

CLOUDFLARE00000123

10060016.004





you will not have any opportunity to cure. You further acknowledge and agree that notwithstanding any termination, your obligations to Cloudflare set forth in Sections 2, 3, 4, 8, 9, 11, 12, 13, 23, 24, 25 and 26 shall survive such termination.

## SECTION 16: DMCA & ABUSE REPORTS

Cloudflare is a pass-through network and, at most, caches content for a limited period in order to improve network performance. Cloudflare automatically removes content from our caches when it has been removed from our customer's origin web server. Cloudflare is not a hosting provider and has no way of removing abusive content on third party hosting services. Individuals or copyright holders concerned with content served through Cloudflare's network may submit a complaint for investigation to: https://www.cloudflare.com/abuse.

Cloudflare does not accept abuse complaints submitted over the telephone. If you would prefer not to use our complaint submission form, you may mail your complaint to:

Cloudflare, Inc.
Attn: Legal Department
101 Townsend St,
San Francisco, CA 94107

Please provide detailed information supporting your complaint as well as an affidavit attesting to its validity.

By submitting a complaint, you acknowledge that, at Cloudflare's sole discretion, copies of the complaint may be provided to the Cloudflare user, the user's hosting provider, posted on Cloudflare's website, and/or provided to third party services such as Lumen.

## SECTION 17: MODIFICATIONS

Cloudflare may modify this Agreement from time to time. Any and all changes to this Agreement will be posted on Cloudflare.com. In addition, the Agreement will indicate the date it was last revised. You are deemed to accept and agree to be bound by any changes to the Agreement when you use the Service after those changes are posted.

## SECTION 18: LINKS

The Service may provide, or third parties may provide, links to other websites or resources. Because Cloudflare has no control over such sites and resources, you acknowledge and agree that Cloudflare is not responsible for the availability of such external sites or resources, and does not endorse and is not responsible or liable for any content, advertising, products, or other materials on or available from such sites or resources. You further acknowledge and agree that Cloudflare shall not be responsible or liable, directly or indirectly, for any damage or loss caused or alleged to be caused by or in connection with use of or reliance on any such content.

## SECTION 19: PUBLICITY

Cloudflare shall be permitted to identify you as a customer, to use your website's name in connection with proposals to prospective customers, to hyperlink to your website's home page, to display your logo on the Cloudflare's web site, and to otherwise refer to you in print or electronic form for marketing or reference purposes.

CLOUDFLARE00000124

10060016.005





this Agreement.

## SECTION 21: WAIVER

The failure of Cloudflare to exercise or enforce any right or provision of this Agreement shall not constitute a waiver of such right or provision. If any provision of the Terms of Service is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision, and the other provisions of the Terms of Service remain in full force and effect.

## SECTION 22: SEVERABILITY OF TERMS

If any provision of the Terms of Service is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision, and the other provisions of the Terms of Service remain in full force and effect.

## SECTION 23: NON-TRANSFERABILITY OF ACCOUNTS

You agree that your Cloudflare account is non-transferable except with the written consent of Cloudflare.

## SECTION 24: TIME LIMITATIONS FOR CLAIMS

You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of Cloudflare.com must be filed within one year after such claim or cause of action arose or be forever barred.

## SECTION 25: APPLICABLE LAW

By visiting Cloudflare.com, you agree that the laws of the United States and, specifically, those of the state of California, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and Cloudflare or its affiliates. Any dispute or claim arising out of or in connection with this Agreement shall be adjudicated in San Francisco County, California, USA.

## SECTION 26: ARBITRATION

In the case of any disputes under this Agreement, the parties shall first attempt in good faith to resolve their dispute informally, or by means of commercial mediation, without the necessity of a formal proceeding.

Any controversy or dispute arising out of or relating to this Agreement, or the breach thereof, which cannot otherwise be resolved as provided above shall be resolved by arbitration conducted in accordance with the commercial arbitration rules of the American Arbitration Association ("AAA") and judgment upon the award rendered by the arbitral tribunal may be entered in any court having jurisdiction thereof. The arbitration tribunal shall consist of a single arbitrator mutually agreed by the parties, or in the absence of such agreement within thirty (30) calendar days from the first referral of the dispute to the AAA, designated by the AAA. The place of arbitration shall be San Francisco, California, U.S.A., unless the parties shall have agreed to another location within fifteen (15) calendar days from the first referral of the dispute to the AAA. The arbitral

CLOUDFLARE00000125

10060016.006



necessary and appropriate to protect the unauthorized disclosure of its proprietary or confidential information, and (iv) to enforce any decision of the arbitrator, including the final award.

The arbitration proceedings contemplated by this Section shall be as confidential and private as permitted by law. To that end, the parties shall not disclose the existence, content or results of any proceedings conducted in accordance with this Section, and materials submitted in connection with such proceedings shall not be admissible in any other proceeding, provided, however, that this confidentiality provision shall not prevent a petition to vacate or enforce an arbitral award, and shall not bar disclosures required by law.

## SECTION 27: VERSIONS

The authoritative version of Cloudflare's Terms of Service is available at: www.cloudflare.com/terms. While translations of these terms may be provided in multiple languages for your convenience, the English language version hosted at the link above is binding for all users of Cloudflare.com, the Cloudflare Service, and any Cloudflare Downloadable Software.

## SECTION 28: HEADINGS

The headings and section titles in the Terms of Service are for convenience only and have no legal or contractual effect.

Legal       ⌄

Have Questions?

If you have questions about these terms or anything else about Cloudflare, please don't hesitate to contact us:

+1 (650) 319-8930

101 Townsend St,
San Francisco, CA 94107
USA

**Policy date:** May 11, 2016



CLOUDFLARE00000126

10060016.007

Exhibit E




Home    Features    Help    Sign up    Login

# Abuse policy

Cloudflare offers network service solutions including a reverse proxy, pass-through security service, and a content distribution network (CDN). Because Cloudflare is a reverse proxy, our IP addresses appear in WHOIS and DNS records for websites using our services. We do not have access to our customer's content. Cloudflare is not a hosting provider.

## What can you do?

Cloudflare will forward all abuse reports that appear to be legitimate to the responsible hosting provider and to the website owner. In response to a legitimate abuse report Cloudflare will provide the complainant with the contact information for the responsible hosting provider so they can be contacted directly.

Complaint information may be shared with law enforcement officials in response to a legitimate request.

## What are we unable to do?

Since Cloudflare is not a hosting provider we do not have the capability to remove content from a website.

## How do I report?

If you do choose to file a report with Cloudflare, you'll want to select the the appropriate category for your report on the reporting form. Please provide a high level of detail in the description of the content, the exact steps needed to access the content, and the location of the content on the page. For reports of a sensitive nature, including nonconsensual pornography, please use the "violent threats and harassment" option. We only review reports of URLs resolving to Cloudflare IPs.

If you are making a "child pornography", "violent threats and harassment" , or "general" report, you will have the option to make your claim anonymously. If you select this option we will forward the substance of your complaint to the parties you've indicated (i.e., website host and/or website owner), but not any personal information about you. Be advised in such cases that the people who control the content that is the subject of your complaint will be aware of your issue, but will be significantly limited in their ability to follow up on your complaint.

Physical mail can be sent to:
Cloudflare, Inc.
Attn: Legal Department
101 Townsend St
San Francisco, CA 94107

## What if I'm a law enforcement official?

Law enforcement officials can contact us directly at abuse+law@cloudflare.com. You must include your badge & case number when contacting us to receive a response. It is a crime to falsely impersonate a law enforcement official.

### We accept the following kinds of reports:

- Copyright infringement & DMCA violations
- Trademark infringement
- Child pornography
- Phishing & malware
- Violent threats and harassment

Click here to submit an abuse report

| Contact | What we do | Community | Support | About us |
| --- | --- | --- | --- | --- |
| Contact support | Plans | Blog | Help center | Our team |

https://www.cloudflare.com/abuse/[9/13/2017 3:56:52 PM]

Cloudflare abuse form | Cloudflare | The web performance & security company

Contact sales

Call sales: +1 888 993 5273



Overview

Features

Network

Apps

Case studies

Partners

API

System status

Resources

Videos

Trust & Safety

Careers

Press

Terms of service

Privacy & security

© CloudFlare, Inc.

Exhibit F

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ALS SCAN, INC., a Maryland,

 5   corporation,

 6           Plaintiff,

 7   CLOUDFLARE, INC., a Delaware

 8   corporation, et al.,

 9           Defendants.

10    _____)

11

12         VIDEOTAPED DEPOSITION OF JUSTIN PAINE

13              **ROUGH DRAFT TRANSCRIPT**

14

15              San Francisco, California

16              Friday, September 15, 2017

17

18          **UNEDITED REALTIME TRANSCRIPT**

19            THIS REALTIME DRAFT IS UNEDITED AND

20   UNCERTIFIED AND MAY CONTAIN UNTRANSLATED

21   STENOGRAPHIC SYMBOLS, REPORTER NOTES, MISSPELLED

22   PROPER NAMES, AND/OR NONSENSICAL WORD COMBINATIONS.

23   ALL SUCH ENTRIES WILL BE CORRECTED ON THE FINAL

24   CERTIFIED TRANSCRIPT.  DUE TO THE NEED FOR THE

25   REPORTER TO CORRECT ENTRIES PRIOR TO CERTIFICATION,
```

1    Q.    Okay.  Do you have Exhibit 14,

2    Ms. Reporter?

3         Can you take a look at Exhibit 14.

4         And that's marked CLOUDFLARE 120 to '126.

5         Can you take a moment to look at that and

6    is this a copy of Cloudflare's terms of service?

7    A.    This does appear to be our terms of

8    service, yes.

9    Q.    Okay.  Now, does Cloudflare prescribe in

10   its terms of service certain uses by customers?

11   A.    Can you clarify what you mean by certain

12   uses?

13   Q.    Well, can you direct my attention to any

14   terms of the services where Cloudflare says

15   customers aren't allowed to engage in illegal

16   activities or violations of whatever the terms would

17   be?

18   A.    I think that is in here, let me locate

19   that for you specifically.

20   Q.    All right.

21   A.    (Witness reviews.)

22        I am not seeing a specific mention of

23   specific types of services or functionality that we

24   expressly permit.  If that is what you are

25   specifically asking about.

1    BY MR. SPILLANE:

2        Q.   Well, I was asking about terms that would

3    state what sort of actions are forbidden, for

4    example, websites if you engage in illegal

5    activities that would be a violation of our terms?

6        A.   I believe that is mentioned in here.

7    However, at the moment, not locating it.

8        Q.   Okay.  Well, do you see section -- let's

9    see.  Section 11 on page Cloudflare 122 talks about

10   investigation.

11            Do you see that?

12       A.   Yes, I do.

13       Q.   And about three sentences in it says if

14   the investigation reveals any information and act or

15   omission Cloudflare sole opinion violates of any

16   local, state, federal or foreign law or regulation,

17   this agreement -- or is deemed to harm the service,

18   Cloudflare may immediately shut down your access to

19   the service.

20            Do you see that?

21       A.   Yes, I do.

22       Q.   Do you have in mind specifically what

23   local, state, federal or foreign laws or regulation

24   are referenced here, or any?

25       A.   I would -- I can't speak to the specific

1    laws those would be referencing, other than we are

2    a -- a U.S.-based company.

3         Q.    Well, I gather that Cloudflare reserves

4    the right to terminate services to customers who

5    Cloudflare believes is violating the law, right?

6         A.    That is my understanding, yes.

7         Q.    All right.  And then in page 15 -- do you

8    have section 15?

9         A.    Yes, I do.

10        Q.    It says Cloudflare's policies to

11   investigate violations of these terms of service and

12   terminate repeat infringers.

13             Do you see that phrase?

14        A.    Yes, I do.

15        Q.    And does Cloudflare interpret the

16   phrase "repeat infringers" to include repeat

17   copyright infringers?

18        A.    I would confer with our legal term but

19   that is my understanding, yes.

20        Q.    How does Cloudflare define repeat

21   offenders?

22        A.    Cloudflare repeat infringer to be somebody

23   we have a notice from an independent finding of

24   repeated copyright infringements or multiple

25   findings of copyright infringement.

1      Q.    Did you say a notice and a finding, or

2   notice of a finding?

3      A.    My apologies, a notice of an independent

4   finding.

5      Q.    And what do you mean by independent

6   finding?

7      A.    Typically that comes in the form of a

8   court order, but I would discuss with our legal

9   team, they will determine what else might be an

10  independent finding to meet that criteria.

11  Typically that's a court order.

12     Q.    Is there any circumstance under which

13  Cloudflare would determine the customer to be repeat

14  infringe er absent a court order finding that they

15  had engaged in that conduct?

16          MS. KASSABIAN:   Objection; asked and

17  answered.  And just caution the witness obviously

18  not to disclose attorney-client communications but

19  you are welcome to explain the policy.

20          THE WITNESS:   Could you possibly repeat

21  the question.

22          MR. SPILLANE:   Yeah, why don't we have it

23  reread.

24          (Record read back by the reporter.)

25          THE WITNESS:   Thank you.

1          Our policy is that that would be a

2     determinant of a repeat infringer, that notice from

3     an independent finding.

4     BY MR. SPILLANE:

5          Q.   Right.

6          But my question was, assume there is no

7     court finding of infringement, is there any

8     circumstance under which Cloudflare would

9     nevertheless determine a customer to have been a

10    repeat copyright infringer?

11          MS. KASSABIAN:   Objection.   Asked and

12    answered.   And calls for a legal conclusion.

13          THE WITNESS:   Our policy is that we would

14    need an independent finding of someone being found

15    to be involved in copyright infringement.

16    BY MR. SPILLANE:

17         Q.   Okay.   And when you say independent

18    finding you're talk about some court finding that,

19    not for example, you look at it and making some

20    finding, right?

21         A.   A court or something -- or some other

22    finding that our legal team could to that criteria,

23    I'm not a lawyer to look at what that looks like.

24         Q.   Where in the terms of service would

25    Cloudflare's clients look to determine how they

1    might be deemed by Cloudflare to be a repeat

2    infringer?

3        A.    In our terms of service, we don't

4    specifically outline how our policy is defined;

5    however, we do indicate that is a cause for

6    termination.

7        Q.    Is there anywhere in Cloudflare's terms,

8    where it explains that Cloudflare's conclusion that

9    a client has been a repeat infringer is limited to

10   when there's been some outside determination or

11   finding that that's the case?

12       A.    There is not specific text in the terms of

13   service that indicate that; however, that is how our

14   policy is applied.

15           MR. SPILLANE:  Let's have this be our

16   Exhibit 18.

17           (Cloudflare Deposition Exhibit 18 was

18           marked.)

19   BY MR. SPILLANE:

20       Q.    Is Exhibit 18 a true and correct page

21   capture of Cloudflare's abuse policy as it appears

22   on Cloudflare's website?

23       A.    This appears to be the public facing web

24   page for our abuse reporting form.  That is true.

25       Q.    And I apologize for not having put this in

Exhibit G

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4    ALS SCAN, INC., a Maryland,

5    corporation,

6            Plaintiff,

7    CLOUDFLARE, INC., a Delaware

8    corporation, et al.,

9            Defendants.

10    _____)

11

12    VIDEOTAPED DEPOSITION OF ALBERT TREY GUINN, VOLUME 2

13            **ROUGH DRAFT TRANSCRIPT**

14

15            San Francisco, California

16            Friday, September 15, 2017

17

18

19        **UNEDITED REALTIME TRANSCRIPT**

20          THIS REALTIME DRAFT IS UNEDITED AND

21    UNCERTIFIED AND MAY CONTAIN UNTRANSLATED

22    STENOGRAPHIC SYMBOLS, REPORTER NOTES, MISSPELLED

23    PROPER NAMES, AND/OR NONSENSICAL WORD COMBINATIONS.

24    ALL SUCH ENTRIES WILL BE CORRECTED ON THE FINAL

25    CERTIFIED TRANSCRIPT.  DUE TO THE NEED FOR THE

1    got from Ms. Kassabian, Cloudflare's attorney.  Have

2    you seen this before today?

3         A.   I have not seen this letter before today.

4         Q.   All right.  Well, do you see where she

5    says kind of in the middle of the letter that "Trey

6    Guinn is going to speak on Topics 1 through 3, and

7    13 through 16"?

8         A.   I do see that, yes.

9         Q.   Okay.  So let's break it up into two

10   parts.  So do you see on page 2, there's three

11   topics numbered 1, 2, and 3?

12        A.   I do see those, yes.

13        Q.   All right.  And are those topics you came

14   intending to address today?

15        A.   Yes.  I'm prepared to -- to cover those

16   topics today.

17        Q.   All right.  And then let's turn to

18   page -- and Ms. Kassabian says here, "also going to

19   address Topics 13 through 16," which are various

20   ways of asking about and following up on some

21   comments that Matthew Prince made in the press.

22             Have -- have you read those topics?

23        A.   I am aware of the topics, yes.

24        Q.   All right.  And are those topics you're

25   also prepared and intending to address today?

6

1        A.    I'm prepared to address them, yes.

2        Q.    Okay.  So let's go Topic No. 1 on page 2,

3   "The extent to which Cloudflare transmits, routes or

4   provides connections for content through a system or

5   network controller operated by Cloudflare."

6             First of all, let me ask you some general

7   questions.  Does -- does Cloudflare offer a browser

8   to consumers?

9        A.    Cloudflare does not offer a browser to

10  consumers today.

11       Q.    Does Cloudflare have customers who are

12  consumers who don't have websites?

13            MS. KASSABIAN:  Objection.  Vague and

14  ambiguous.

15            THE WITNESS:  I'm going to ask, when you

16  say "consumers that don't have a website," what are

17  you referring to?

18  BY MR. SPILLANE:

19       Q.    Well, let me try it a different way.

20  Who -- in a general sense, who are Cloudflare's

21  customers?

22       A.    Cloudflare customers are website owners.

23       Q.    Okay.  So if I don't have a website, could

24  I become a customer of Cloudflare?

25       A.    Yes, you could become a Cloudflare

1      Q.    All right.  So, let's -- let me see.

2            So, let's flip to the topics that are at

3      the back half, and have this be Exhibit 15.

4            (Cloudflare Deposition Exhibit 15 was

5            marked.)

6      BY MR. SPILLANE:

7      Q.    So Exhibit 15 is a preprint of an article

8      in the Wall Street Journal that appeared on -- maybe

9      it's an opinion piece -- on August 23, 2017.

10           Have you seen this before today?

11     A.    I have seen this story before.  Not this

12     specific rendering or -- I mean, this piece of

13     paper.  But I'm familiar with this story from the

14     website.

15     Q.    You've seen the story online?

16     A.    Correct.

17     Q.    All right.

18           Who is Matthew Prince?

19     A.    Matthew Prince is the CEO of Cloudflare.

20     Q.    How many employees does Cloudflare have,

21     do you have a reasonable estimation?

22     A.    We are around 500 employees globally.

23     Q.    And what is Mr. Prince's position?

24     A.    He's the CEO of Cloudflare.

25     Q.    All right.  And in your -- you're

1  Cloudflare client?

2      A.   Yes, Daily Stormer was a Cloudflare

3  customer.

4      Q.   All right.  And what services were they

5  using?

6      A.   They were using our HTTP proxy service

7  and, I believe, our DNS service as well.

8      Q.   Okay.  So how did Cloudflare kick Daily

9  Stormer off the internet?

10         MS. KASSABIAN:  Objection; misstates the

11  article, misstates testimony.

12         THE WITNESS:  I don't believe it's

13  technically accurate to say Cloudflare kicked them

14  off the internet.

15  BY MR. SPILLANE:

16      Q.   Why not?

17      A.   Because, when you remove Cloudflare

18  service from a website, the website is still on the

19  internet.

20      Q.   Okay.  What did Cloudflare do pertaining

21  to, Daily Stormer?

22      A.   Cloudflare stopped providing our proxy

23  service to the website, Daily Stormer.

24      Q.   In other words, Cloudflare terminated

25  Daily Stormer as a customer?

1  ambiguous.  Assumes facts not in evidence.

2        THE WITNESS:  Are you asking who made the

3  decision of terminating service?

4  BY MR. SPILLANE:

5     Q.   Yeah.

6     A.   Matthew Prince made the decision to

7  terminate service to the Daily Stormer.

8     Q.   What was the basis of his decision?

9        MS. KASSABIAN:  Objection; asked and

10 answered.

11       THE WITNESS:  Basis of his decision was to

12 start a conversation about internet censorship.

13 The -- he wanted to essentially be provocative.

14 BY MR. SPILLANE:

15    Q.   How do you know that?

16    A.   This is discussed in his writings, opinion

17 piece, that you referenced in the Wall Street

18 Journal, as well as on our blog, as well as internal

19 e-mails.

20    Q.   In preparing for this deposition, did you

21 ask Mr. Prince what was the -- what his reasoning

22 was?

23    A.   In preparing for this deposition, did not

24 speak to him directly because I felt I understand

25 his reasoning.

1       Q.    On what basis?

2            MS. KASSABIAN:   And I'm just going to

3   caution the witness, to not disclose the substance

4   of our preparation discussions, because those

5   discussions are all privileged and you can answer

6   the question of did you meet with Mr. Prince but

7   please don't disclose the substance of our

8   discussions or your discussions with in-house

9   Cloudflare counsel in preparation for today.

10            THE WITNESS:   Okay.

11            Can you repeat the question?

12  BY MR. SPILLANE:

13       Q.    I think the question is, what was your

14  basis for saying you knew his reasoning?

15       A.    The basis of my understanding of his

16  reasoning was from reading both, as I said, the

17  opinion piece in the wall street journal, hearing

18  interviews, reading our blog, and understanding

19  our -- his general view on freedom of speech and due

20  process as well as sort of.

21       Q.    Well, did you -- is the basis for knowing

22  Mr. Brings's reasoning anything other than that I

23  could also read by looking at articles and things on

24  the internet?

25            MS. KASSABIAN:   Objection; asked and

 1    answered.   Mischaracterizes testimony.

 2              THE WITNESS:   The basis, also the fact

 3    that I've worked with Mr. Prince for four and a half

 4    years and I know him personally as well as many

 5    other instances, where we have been questioned as a

 6    network provider, should we -- should we take a

 7    stance around providing -- should we be

 8    content-neutral, or not.

 9    BY MR. SPILLANE:

10        Q.   What was the basis for Mr. Prince's

11    decision to terminate services to -- for this

12    particular kind of abuse, neo-Nazi as opposed to

13    other forms of actions that could also be considered

14    abusive?

15              MS. KASSABIAN:   Objection; asked and

16    answered twice.   And assumes facts not in evidence.

17              THE WITNESS:   I think it misrepresents.

18    Because this is not a form of abuse service.

19    BY MR. SPILLANE:

20        Q.   Doesn't Cloudflare consider neo-Nazi hate

21    speech to be a form of abuse?

22        A.   Are you asking if it's an abuse of

23    Cloudflare's service?

24        Q.   An abuse of terms of service, yeah.

25        A.   I'm not sure of the legal distinction

1    freedom of speech online.

2    BY MR. SPILLANE:

3         Q.   A conversation about what?

4         A.   About whether or not a provider, like

5    Cloudflare, should be content neutral or not.

6    Cloudflare is, you know, one provider in a long

7    stream of providers, from -- that are involved in

8    different technologies that are involved in

9    delivering things online.  And should Cloudflare be

10   responsible for implementing censorship -- should a

11   network like Cloudflare be the point where you

12   decide to do censorship.

13        Q.   Did Cloudflare implement censorship?

14             MS. KASSABIAN:  Objection.  Calls for a

15   legal conclusion.  Vague.

16             THE WITNESS:  Cloudflare just terminated

17   our service.

18   BY MR. SPILLANE:

19        Q.   But you -- you're using general terms that

20   you wanted to be provocative about -- about content

21   neutral or not.  Isn't it the case that Cloudflare

22   decided that it would not be content neutral in

23   terms of to terminate services based on speech?

24             MS. KASSABIAN:  Objection; vague and

25   ambiguous.

1          THE WITNESS:   We purposefully in this

2   instance decided to terminate service because of --

3   basically at the discretion of our of CEO for a

4   hateful site, for a website that had hate speech on

5   it in order to be provocative and start the

6   conversation online and in the media about, should a

7   network provider like Cloudflare, you know, be

8   content neutral or not.

9   BY MR. SPILLANE:

10      Q.   Who made the ultimate determination as to

11  whether Daily Stormer's speech was sufficiently

12  hateful to warrant termination of service?

13          MS. KASSABIAN:   Objection.  Misstates the

14  witness's testimony and the documents being

15  examined.

16          THE WITNESS:   The -- that was not actually

17  the determination whether the speech was hateful

18  enough.  The general policy -- and to get into the

19  specifics, you should talk to Justin.  But the

20  general policies that we are content neutral, but

21  there is, you know, a very large sort of public

22  pressure towards this website.  And to public vow

23  we -- we vowed to pressure -- to be provocative we

24  terminated service what happens within the chain of

25  providers involved in delivering content on the

1    internet, where -- where would you want to try to

2    implement censorship if you were going to implement

3    censorship.

4    BY MR. SPILLANE:

5        Q.   Who decided on where to draw the line

6    speech warrants for termination as a Cloudflare

7    client or not?

8            MS. KASSABIAN:  Objection.  Misstates

9    testimony and the documents, asked and answered,

10   assumes facts not in evidence.

11           THE WITNESS:  I'm, can you repeat the

12   question one more time.

13           MR. SPILLANE:  Can you read it back

14   please.

15           (Record read back by the reporter.)

16           MS. KASSABIAN:  Same objections.  And I'll

17   also add that it's off topic in terms of this

18   30(b)(6) deposition.

19           THE WITNESS:  Matthew Prince as a CEO has

20   the ultimate say of deciding whether or not to

21   terminate service.

22   BY MR. SPILLANE:

23       Q.   And what criterion did he employ to make

24   the decision that the speech of Daily Stormer

25   warranted termination?

1   to what was requested so that a conversation would

2   start around freedom and speech and censorship and

3   whether or not a network like Cloudflare is a place

4   to try to implement censorship.

5   BY MR. SPILLANE:

6        Q.   When Matthew Prince wrote, "I helped kick

7   a group of neo-Nazis off the internet," did he know

8   that the termination of Cloudflare services would

9   not have the result of kicking them off the

10  internet?

11       A.   Can you repeat that question?

12       Q.   When Matthew Prince said I helped kick a

13  group of neo-Nazis off the internet, did he know

14  that the result of Cloudflare's termination of

15  services would not be kicking them off the internet?

16       A.   Yes, he knew that, when we terminate

17  service, that the website would still be on the

18  internet.

19       Q.   Did Matthew Prince intend to mislead the

20  public by telling the public that he helped kick a

21  group of neo-Nazi off the internet?

22       A.   No.  He was being illustrative to make the

23  point that in a way, we were complicit in making the

24  website vulnerable to hackers, in which the hackers

25  could knock the website off the internet.

1  and answered I think we're heading on ten times or

2  so.  And it's getting to the point of abusive or

3  harassing.  If Mr. Guinn if you ant to answer the

4  question again, please do.

5          THE WITNESS:  So the thought behind -- the

6  purpose of terminating service to the Daily Stormer

7  was to -- to demonstrate -- to demonstrate what

8  would happen, if content neutral network like

9  Cloudflare decided to try to implement censorship,

10 essentially to the provocative, that's likely not a

11 good place to do censorship on the internet.

12 BY MR. SPILLANE:

13     Q.   So the point of kicking Daily Stormer off

14 of Cloudflare's services was to demonstrate that

15 this kind of content base decision is not a good

16 idea; is that what you meant?

17     A.   Yes.  The purpose was to show that -- to

18 show the implication of a content neutral network

19 taking a decision.  We -- we transmit data packets

20 back and forth.  And to demonstrate what happens

21 when a provider like that essentially gets in the

22 censorship game.  To cause a conversation to have

23 people ask, do we want, you know, Time Warner or

24 AT&T to make -- to make a content decision.

25     Q.   Can Cloudflare kick copyright infringers

1  off the internet?

2      A.    No.   Cloudflare doesn't have to ability to

3  kick anyone off the internet.

4      Q.    Can Cloudflare terminate services to

5  copyright infringers?

6      A.    Cloudflare has the ability to terminate

7  services to anyone.

8      Q.    How does Cloudflare decide whether to

9  terminate services to copyright infringers as

10  opposed to neo-Nazis or any form of abusive content?

11          MS. KASSABIAN:  I'm going to object that

12  questions regarding Cloudflare's copyright policies

13  is not for this witness to answer and we've

14  designated Mr. Paine to testify as to Cloudflare's

15  copyright policy.  So he's the proper designee for

16  that question.  I also think that the question as

17  opposed here assumes facts not in evidence.  But,

18  Mr. Guinn, if you want it have it read back to you.

19  Let me know if you have any personal knowledge that

20  does not involve attorney-client communications that

21  you can use to answer that question, you may do so.

22          Ms. Reporter, I would you mind.

23          (Record read back by the reporter.)

24          MS. KASSABIAN:  Same objections.

25          THE WITNESS:  Cloudflare make as decision

     1    whether or not to terminate discussions in general

     2    based on our terms of use, terms of service.  And

     3    also up to the decision by our leadership.

     4    BY MR. SPILLANE:

     5         Q.    Leadership being who?

     6         A.    Sorry, what's the question?

     7               MS. KASSABIAN:  Objection; vague.

     8    BY MR. SPILLANE:

     9         Q.    Leadership being who?

    10               MS. KASSABIAN:  Objection; vague.

    11               THE WITNESS:  I mean, leadership can

    12    include clearly the CEO, Matthew Prince.

    13    BY MR. SPILLANE:

    14         Q.    If Cloudflare's terms of service -- excuse

    15    me.

    16               If Cloudflare's terms of use gives it

    17    broad discretion to choose whom Cloudflare to allow

    18    its network, why hasn't Cloudflare used that

    19    discretion to choose not to allow the websites that

    20    ALS is complaining in this case to use Cloudflare's

    21    network?

    22               MS. KASSABIAN:  Objection.  That question

    23    clearly calls for attorney-client communications and

    24    I instruct the witness not to disclose that

    25    information.  If you have technical information you

Exhibit H

THE WALL STREET JOURNAL.

Wednesday, August 23, 2017 | A15

## OPINION

# Was I Right to Pull the Plug on a Nazi Website?

**By Matthew Prince**

I helped kick a group of neo-Nazis off the internet last week, but since then I've wondered whether I made the right decision. I'm the co-founder and CEO of Cloudflare. We run a global network that makes internet applications faster and protects them from cyberattacks. If you haven't heard of us, I'm not surprised. We're part of the internet's infrastructure, one of the groups operating behind the scenes to bring you everything you enjoy online.

Although Cloudflare isn't a household name, nearly 10% of all internet requests from 2.8 billion people pass through our network each month. We have almost 10 million customers, from small businesses to large financial institutions.

**A handful of private companies control whether speech can appear online. That's reason to worry.**

During the 2016 presidential election, 17 major-party candidates used Cloudflare to protect their campaigns from hackers. (Hillary Clinton was the notable exception.) Chances are you've used our network hundreds of times in the past 24 hours and, if we're doing our job, all you've noticed is fast internet.

Nearly all of our clients are upstanding people and businesses. But every once in a while, someone will use one of our services to protect content I would consider repugnant.



DAVID GOTHARD

Such was the case with the Daily Stormer, a bulletin board for self-proclaimed white supremacists.

The site was used to help plan the neo-Nazi demonstrations in Charlottesville, Va. After Heather Heyer was murdered there, the Daily Stormer's founder and editor mocked her as a "fat, childless 32-year-old slut" and a "drain on society." By any reasonable standard it was vile. Not surprisingly, the site was constantly targeted by anti-Nazi hackers trying to knock it offline. Cloudflare had helped foil those cyberattacks until last week when I pulled the plug.

At some level, it's easy to fire Nazis as customers. They don't pay you much, if anything, since Cloudflare offers a free version of its service. Our terms of use give us broad discretion to choose whom we allow to use our network. Beyond the horrible content, the Daily Stormer began claiming that we secretly supported their ideology, causing a major distraction to our team. Firing a Nazi

customer gets you glowing notes from around the world thanking you for standing up to hate.

But a week later, I continue to worry about this power and the potential precedent being set. The reality of today's internet is that if you are publishing anything even remotely controversial, your site will get cyberattacked. Without a massive global network similar to Cloudflare's, it is nearly impossible to withstand the barrage. Only a small group of companies—names you know, like Facebook, Google and Microsoft, along with a handful of others you may not, like Cloudflare—have sufficient scale to keep their users online.

The upshot is that a few private companies have effectively become the gatekeepers to the public square—the blogs and social media that serve as today's soapboxes and pamphlets. If a handful of tech executives decide to block you from their services, your content effectively can't be on the internet.

Before terminating the Daily Stormer, Cloudflare's policy had been to stay neutral to the content that used our network. We'd comply with the law in the jurisdictions where we operate, but we wouldn't bow to political or public pressure to boot anyone off our network. And make no mistake, there is pressure: Hackers actually tweeted to us asking that we get out of the way so they could take down the Daily Stormer.

When standing up to government requests or angry Twitter demands to silence unpopular speech, it was powerful to be able to say we'd never terminated a customer due to political pressure. I'm not sure we can say that anymore.

I'd like to fall back on the First Amendment. I'm the son of a journalist. I grew up with discussions around the dinner table on the importance of freedom of speech. But the First Amendment doesn't compel private companies to let anyone broadcast on their platforms. Moreover, Cloudflare

operates infrastructure in 70 countries, few of which have anything approaching American-style speech protections.

Yet in all nations, there is (or should be) a reasonable expectation of due process. It is the idea that no one is penalized without first receiving a fair hearing and a fair shake. In civilized societies, the law is applied equally by independent decision makers, not capriciously by mobs and tyrants.

Did we meet the standard of due process in this case? I worry we didn't. And at some level I'm not sure we ever could. It doesn't sit right to have a private company, invisible but ubiquitous, making editorial decisions about what can and cannot be online. The pre-internet analogy would be if Ma Bell listened in on phone calls and could terminate your line if it didn't like what you were talking about.

Cloudflare is an expert at stopping cyberattacks, but we do not have the expertise to pass judgment on which of our 20 trillion monthly internet requests is racist, reprehensible or offensive. Even if we could solve the technical challenge of filtering them out, hidden behind the scenes is a problem of political legitimacy.

We're going to have a long debate at Cloudflare to think these issues over. But terminating the Daily Stormer is likely to be the exception that proves the importance of content neutrality. My moral compass alone should not determine who gets to stay online.

*Mr. Prince is the co-founder and CEO of Cloudflare.*