Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE LAW GROUP PLC
468 N. Camden Drive
Second Floor
Beverly Hills, CA 90210
(424) 217-5980
(888) 590-1683 (fax)

John P. Flynn (Az. Bar No. 015065)
Kevin D. Neal (Az. Bar No. 011640)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000
(602) 530-8500 (fax)
john.flynn@gknet.com
kevin.neal@gknet.com

Attorneys for Plaintiff ALS Scan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALS SCAN, INC., a Maryland corporation,<br><br>        Plaintiff,<br><br>  vs.<br><br>CLOUDFLARE, INC., a Delaware corporation, et al.,<br><br>        Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT STEADFAST NETWORKS, LLC**<br><br>Filed Concurrently: Spillane Declaration; Easton Declaration; Walsh Declaration; Penn Declaration; Statement of Undisputed Issues; Notice of Lodging<br><br>Date: January 4, 2018<br>Time: 8:30 a.m.<br>Place: Courtroom 9D<br>      350 W. 1st Street<br>      Los Angeles, CA |

# Table of Contents

SUMMARY OF MOTION.................................................................................1

UNDISPUTED FACTS ...................................................................................1

   A.   The Problem ALS Faces With Rampant Infringement...........................1

   B.   Imagebam.com is a Chronic Pirate Site. ..................................................3

   C.   Steadfast Provided Storage on Servers for Imagebam.com....................4

   D.   Steadfast Failed to Either Respond Expeditiously to Infringement
Notices or Enforce its Repeat Infringer Policy.........................................5

SUMMARY JUDGMENT STANDARDS .......................................................10

ARGUMENT ................................................................................................11

I.    STEADFAST IS LIABLE FOR CONTRIBUTORY COPYRIGHT
INFRINGEMENT. ........................................................................................11

II.    STEADFAST DOES NOT QUALIFY FOR SAFE HARBOR
DEFENSES. .................................................................................................14

III.    STEADFAST HAS LOST ANY SAFE HARBOR PROTECTIONS TO
WHICH IT MAY HAVE BEEN ENTITLED UNDER 17 U.S.C. § 512(i)....16

   A.   Steadfast Has Not Adopted and Informed Account Holders of a Policy
of Termination for Repeat Infringement. ...................................................17

   B.   Steadfast Has Not Reasonably Implemented a Policy of Termination for
Repeat Infringement. ...................................................................................18

IV.    STEADFAST IS CONTRIBUTORIY LIABLE FOR INFRINGEMENT
OF ALS'S TRADEMARKS. ..........................................................................24

CONCLUSION ..............................................................................................25

# Table of Authorities

**Cases**

*BMG Rights Mgmt. v. Cox*, 149 F.Supp.3d 634 (E.D. Va. 2015) ... 11, 17, 18, 19

*Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F.Supp.2d 627
(S.D.N.Y. 2011) ....................................................................16

*Capitol Records, LLC v. Escape Media Group, Inc.*, 2015 WL 1402049
(S.D.N.Y. 2015) ........................................................ 11, 17, 20

*Disney Enterprises, Inc. v. Hotfile Corp.*, 1:11-cv-20427-KMW,
2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) .............................20

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) .........................12

*Experience Hendrix LLC v. Hendrixlicensing.com Ltd.*, 762 F.3d 829
(9th Cir. 2014) ....................................................................11

*Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)................... 11, 12

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159
(2d Cir. 1971) ....................................................................11

*Io Group, Inc. v. Veoh Networks, Inc.*, 586 F.Supp.2d 1132 (N.D Cal. 2008) ..15

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F.Supp.2d 1098
(N.D.Cal.2008) ........................................................ 12, 24

*Louis Vuitton Malletier, S.A. v. Akonic Solutions, Inc.*, 658 F.3d 936
(9th Cir. 2011) .................................................. 12, 13, 24

*Nissan Fire & Marine Ins. Co. Ltd. v. Fritz Cos., Inc.*, 201 F.3d 1099
(9th Cir. 2000) ....................................................................10

*Perfect 10 v. Cybernet Ventures*, 213 F.Supp.2d 1146 (C.D. Cal. 2002)...........23

*Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788 (9th Cir. 2007) .............12

*Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102 (9th Cir. 2007) ........................19

*Perfect 10, Inc. v. Google, Inc.*, 2:04-cv-09484-AHM (7/26/10) .......................15

*Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) .....10

*UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F.Supp.2d 1099

  (C.D. Cal. 2009) ............................................................................17

**Statutes**

*17 U.S.C. § 106* ............................................................................11

*17 U.S.C. § 512(c)* .......................................................... 1, 14, 15, 16

*17 U.S.C. § 512(i)* .......................................................... passim

**Rules**

Fed. R. Civ. P. 56(a) .........................................................................10

## SUMMARY OF MOTION

Plaintiff ALS Scan, Inc. ("ALS") moves for partial summary judgment against Defendant Steadfast Networks LLC ("Steadfast"). ALS urges that, based on uncontroverted facts, no reasonable juror could fail to find Steadfast contributorily liable for infringement of ALS's copyrights and trademarks on imagebam.com. ALS also urges that Steadfast does not enjoy a safe harbor for copyright infringement under 17 U.S.C. § 512(c) because Steadfast failed to "act" or "respond" to hundreds of notifications of infringement of ALS works on imagebam.com. ALS also urges that Steadfast has failed to meet the conditions for safe harbor eligibility under 17 U.S.C. § 512(i), because Steadfast has failed to either adopt or reasonably implement a policy of termination of the accounts of repeat infringers. Here, Steadfast failed to inform account holders of its policy for termination for repeat infringement. Further, Steadfast received over 1500 notices of copyright infringement on imagebam.com, yet declined to terminate imagebam.com for repeat infringement.

The Court should enter the findings and conclusions submitted concurrently. Steadfast's liability would be established without further proof at trial, and Steadfast would have no safe harbors for copyright infringement. Trial of the case would remain to assess damages.

## UNDISPUTED FACTS

### A.  The Problem ALS Faces With Rampant Infringement.

ALS produces high quality proprietary adult content. ALS's content is available on secure web pages, access to which is exclusive to paying members of ALS's websites, alsangels.com and alsscan.com. ALS has registered its works with the Copyright Office. (Walsh Decl. ¶¶ 2, 3; Third Amended Complaint ["TAC"] Ex. 1.)

- 1 -

ALS is also owner of the registered mark "ALS Scan" in connection with web sites and multimedia materials featuring adult entertainment.  ALS content always displays ALS's registered "ALS Scan" trademark.  Thus, unlawful display of an infringing ALS image infringes both ALS's copyrights and trademark rights.  (Walsh Decl. ¶ 4; TAC Ex. 2.)

ALS's largest business problem is the ubiquitous availability of infringing ALS content on Internet sites with no apparent function other than to provide storage on servers to entire galleries of stolen adult content – "pirate" sites.  (Walsh Decl. ¶¶ 5-7.)

ALS has observed an endless loop of systematic infringement: 1) within hours after ALS posts a new content gallery on its secure webpages a stolen copy of the entire gallery is displayed for free on a pirate site; 2) adult "fan" forums (e.g. vipergirls.to) provide surfers with links to the free stolen ALS galleries; 3) infringing content on the pirate sites is juxtaposed with advertisements placed by ad brokers who pay for clicks or joins; 4) ALS sends notice(s) of infringing content on the pirate site and, sometimes, the infringing content is taken down; but 5) that gallery or another stolen ALS gallery appears on another page of the same pirate site shortly thereafter; and 6) the cycle continues endlessly.  (Walsh Decl. ¶ 8.)

Providing notice of infringement to, and seeking to hold parties responsible for, infringing activity is a time consuming, expensive and fraught endeavor.  ALS pays an agent, Steve Easton, to observe and send notices of infringement on ALS's behalf.  However, even where a pirate site complies with a takedown notice, other infringing ALS content appears on the same site.  ALS gives notice where it can to companies providing services to the pirate sites, such as storage of the pirate sites on servers, but too often the service providers decline to terminate services.  Thus, ALS is forced to play an endless

1    game of "whack-a-mole" with no abatement in infringement of its content.

2    (Walsh Decl. ¶ 9.)

3        **B.**     **Imagebam.com is a Chronic Pirate Site.**

4        Imagebam.com has frequently stored and displayed infringing galleries

5    of ALS content.  From December 26, 2013 through June 22, 2017 Steve Easton

6    sent 853 notices of infringement to imagebam.com and Steadfast of infringing

7    content belonging to ALS or other of Steve Easton's adult clients that was

8    reproduced, displayed and distributed without authority on imagebam.com.

9    (Easton Decl.; Notice of Manual Filing; Penn Decl. ¶¶ 2-4, Exs. 1-19; Walsh

10   Decl.¶¶ 10, 11.)  Of those notices from Easton, 185 gave notice of copyright

11   and trademark infringement pertaining to ALS's content.  (*Id.*)  A single email

12   often gave notice of infringement of dozens, if not two hundred or more,

13   copyrighted works.  (*Id.*)

14       Steadfast admitted to receiving a total of 1517 notifications of

15   infringement on imagebam.com since 2013.  (Spillane Decl. ¶ 2, Ex. 1,

16   Response to Interrogatory 13.)

17       Imagebam.com has been one of the worst sites in terms of regularly

18   displaying entire galleries of infringing ALS works.  While imagebam.com

19   apparently claims to be a content neutral share site for third-party uploaded

20   content, thus claiming the privileges of the DMCA, even a short time looking at

21   imagebam.com reveals key attributes of "pirate" sites, ones primarily dedicated

22   to storing galleries of infringing adult content – "red flags" of infringement.  In

23   short, these sites are tooled to maximize upload of high volumes of alluring

24   content while minimizing consequences to users uploading content without

25   authority.  More specifically, imagebam.com, like other pirate sites: 1) offers

26   alternative high volume upload capacities not typically offered on "mainstream"

27   content-share sites; 2) fails to offer limitations such that only friends or invitees

28   may view content, but rather uploads all content to unsecure publicly viewable

pages; 3) monetizes uploaded content through advertisements over, under and proximate to uploaded content, ads that do not direct traffic to the copyright owner; 4) provides code or hyperlinks that can be quickly used to publish the location of the imagebam.com page on adult "fan" forums, sites offering links to free stolen adult content galleries; 5) requires no verifiable personal information to upload content and has weak ability to track and terminate users; and 6) fail to display information indicating compliance with 18 USC § 2257, requiring record keeping of the age of models appearing in adult content.  (Penn Decl. ¶¶ 8-32, Exs. 20-22.)

### C.  <u>Steadfast Provided Storage on Servers for Imagebam.com</u>.

Steadfast is a company providing Cloud Services, Dedicated Servers, Data Center Colocation, Disaster Recovery & Business Continuity, Managed Security and IT Consulting.  (www.steadfast.net; Spillane Decl. ¶ 3, Ex. 2.)  In the words of Karl Zimmerman, Managing Member of Steadfast, Steadfast provides "IT Infrastructure Services."  Zimmerman Depo. pp. 12-13.[1]

One of Steadfast's clients was Flixya Entertainment, which operated imagebam.com.  Flixya opened an account with Steadfast in July 2006.  Flixya leased dedicated servers owned by Steadfast, on which was stored imagebam.com.  Steadfast maintained the physical server.  *Id.* pp. 14-16.

Flixya leased three dedicated servers from Steadfast with 3 Terabyte upload capacities.  Flixya also purchased basic management services.  *Id.* pp. 16-21, Exs. 1, 2.  Steadfast is not aware of any sites Flixya placed on the servers leased from Steadfast other than imagebam.com.  *Id.* 22:6-9.

Steadfast provided and configured the servers leased by Flixya and placed the servers on racks in Steadfast's data center.  *Id.* pp. 30-31.

---

[1]  The pages of the Deposition of Steadfast, through Karl Zimmerman, cited herein are attached to the Spillane Declaration as Exhibit 3.

In March 2007 Flixya raised a technical quarrel about the system performance they were obtaining from the servers provided and configured by Steadast.  Id. pp. 33-36, Ex. 4.  In the discussion Flixya said "Last night in just under ten hours 33,000 videos were uploaded without a single crash."  *Id.* 39:14-18, Ex. 4 STF 37844.  Mr. Zimmerman did not wonder why imagebam.com was uploading 33,000 videos.  *Id.* 39:19-21.  Steadfast did not ask what kind of videos were being uploaded.  *Id.* 40:1-3.  Flixya said that the technical issues had resulted in "decreased ad revenues."  *Id.* 40:8-18.

Steadfast looked at imagebam.com and saw that advertisements were placed at the top of pages.  *Id.* 40:19-41:1.  Steadfast did not see the drop box indicating a choice to upload "adult" or "family friendly" content.  Steadfast did not ask whether imagebam.com was receiving primarily adult content.  *Id.* 41:19-42:3.

The Steadfast servers leased by Flixya also stored imagebam.com's MySQL database, "a standard open-sourced database platform."  *Id.* pp. 44, 62-63.

If Steadfast had powered down the servers leased by imagebam.com, the front page of the site would have been inaccessible until Flixya could perform operations to direct users to the page on some other company's server.  *Id.* pp. 46-48.

Steadfast stored on its servers, at a minimum, the front page of imagebam.com, which supported the entire upload capacity, and the MySQL database.  *Id.* pp. 33-48; Penn Decl. ¶¶ 8-20, Exs. 20-22.

### D.    **Steadfast Failed to Either Respond Expeditiously to Infringement Notices or Enforce its Repeat Infringer Policy.**

On August 31, 2017 Karl Zimmerman appeared as Steadfast's sole witness in response to ALS notice of the deposition of Steadfast under FRCP R. 30(b)(6).  Mr. Zimmerman confirmed that he was Steadfast's designated

witness for all subjects in the Notice, including Topic 7, "Whether Steadfast has terminated its account in relation to www.imagebam.com; If not, why not?" and Topic 8, "How Steadfast has adopted and reasonably implemented, and informed its subscribers and account holders of, a policy that provides for termination in appropriate circumstances of its subscribers and account holders who are repeat infringers." *Id.* pp. 10-11, Ex. 1.

Mr. Zimmerman, as Steadfast's corporate witness, was not able to recall what policy Steadfast maintained for termination for repeat infringement; he relied on website Terms produced in the case. *Id.* pp. 88-89. However, Steadfast's website says little to nothing on this subject. Steadfast has no links on its homepage or anywhere else on its site using the terms "DMCA," "Abuse" or "Infringement." Steadfast's home page has a small link at the bottom titled "Legal Info and Privacy Policy," which when clicked resolves to Steadfast's "Acceptable Use Policy (AUP)/Terms of Service." (Spillane Decl. ¶ 5, Ex. 4.) That page, https://www.steadfast.net/legal-information,says it was "last updated January 30, 2017." That was shortly after Steadfast first appeared in this case. (12/8/16 Stipulation to Vacate Default, Doc. 75.) The current page says "Steadfast responds to notices of alleged copyright infringement and terminates accounts of repeat infringers according to the process set out in the U.S. Digital Millennium Copyright Act." (*Id.*) In discovery Steadfast said "Steadfast has not defined the term 'repeat infringer' as even the DMCA is silent as to any definition." (Zimmerman Depo. pp. 121-24, Ex. 10, p. 3 ¶ 5.1.) Steadfast's Terms as of September 27, 2016, before Steadfast appeared in this case, which were last updated August 6, 2015, said only "[a]ny illegal activity may result in your site being suspended immediately, without notification. . . . Steadfast will be the sole arbiter as to what constitutes a violation of this provision." (Spillane Decl. ¶ 6, Ex. 5.)

1    The first complaint of infringement on imagebam.com came not long
2  after Flixya opened an account with imagebam.com.  As the site "grew in size
3  and popularity," the number of infringement complaints grew.  Zimmerman
4  Depo. pp.55-56.

5    In March 2011 Steadfast received "hundreds of DMCA complaints from
6  Groupfivephotosports.com" about imagebam.com.  *Id.* pp. 64-65, Ex. 7.  The
7  notifications "escalated" to Karl Zimmerman, who inquired of Flixya.  "They
8  provided the IPs of the users and had indicated that those users had been
9  terminated."  *Id.* pp. 69-70.  Flixya's primary method for tracking uploaders
10  was IP ("Internet protocol").  However, the same person could log onto
11  imagebam.com from different IPs by logging in from different locations.  *Id.*
12  pp. 29-30.

13    In response to the Groupfive contentions Steadfast wanted proof that
14  Flixya was blocking the IPs from which the infringing uploads had occurred for
15  Steadfast's protection.  "We needed to assure that they were taken care of and
16  dealing with repeat infringers."  Id. 85:16-86:7.  Steadfast did not believe,
17  however, that Steadfast has to terminate repeat infringers in order to maintain
18  legal protections.  *Id.* 86:19-22.  Steadfast wanted proof that <u>Flixya</u> was
19  implementing <u>Flixya's</u> repeat infringer policy, but Steadfast did not need the
20  information for compliance with <u>its own</u> repeat infringer policy.  *Id.* p. 87.

21    Steadfast does not believe that its own repeat infringer policy would
22  "apply" whenever Steadfast's client was an Internet service provider and
23  supplied evidence that <u>they</u> complied with the DMCA.

24
25    **"Q.    So if theoretically Steadfast received 100,000**
26    **notifications of infringement on ImageBam, you don't believe**
27    **that requires Steadfast to terminate ImageBam as long as**
28    **ImageBam is providing you with assurance that they are in**
     **turn terminating their users who are responsible for those**
     **notices?**

A.    Yes, as long as the customer is in compliance with the law, I
would not see, yeah, any reason to -- for further action, and no
other further action seems to be required by law."

Id. 91:6-17.

After the Groupfivephotosports situation, Steadfast received hundreds of

notification of infringement on imagebam.com from Steve Easton.  *Id.* pp. 95-

96.  Steadfast knew that Mr. Easton's email notifications infringement of ALS's

works contained hyperlinks.  Mr. Zimmerman never clicked on any of those

hyperlinks or asked anyone else to do so.  *Id.* pp. 105-06.  Steadfast never

looked at the drop box on imagebam.com asking the user to designate content

as either "adult" or "family friendly."  *Id.* 41:19-42:3.  Mr. Zimmerman did not

speak to Mr. Easton.  *Id.* 96:19-22.  Worse, Steadfast did not ask Flixya to

supply evidence of what they were doing in response to the Easton

notifications.  The only reason Steadfast asked for evidence from Flixya

concerning their response to the Groupfivephotosports notifications was

because the <u>copyright owner</u> asked for that evidence.  Since <u>Easton</u> did not ask

for the same evidence, Steadfast did not bother to contact Flixya to find out

what they were doing in response to the Easton notifications.  *Id.* pp. 98-102.

**"Q.    [I]n response to the Easton notifications, did you contact
ImageBam to see what they were doing about those notices?**
A.    I don't remember.
**Q.    Did you speak to Ivan Wong [Steadfast's contact at Flixa]
to say, Are you guys acting on these?**
A.    I don't remember.
**Q.    Do you remember talking to anybody at ImageBam about
what they were doing about the Easton notifications?**
A.    I do not remember.
**Q.    Do you remember asking them, Hey, are you guys taking
these images down that Easton's complaining about?**
A.    I do not remember.
**Q.    Is the reason you don't remember is because they
demonstrated to your satisfaction that they were acting**

- 8 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**correctly for the Group Five Photosports situation and you assumed they were continuing to do so?**

A.    The issue -- or the item is that they've proven before that they were following -- following everything required of them and that we got no further complaints from Steve Easton that they were not complying.

So we had no reason to believe that they were not complying.  We had been provided no indication, evidence, even a proposal that they were not complying.

**Q.    [I]n giving these statements in the last five or ten minutes, what evidence do you have to rely upon that ImageBam was complying other than the Group Five Photosports information we have in the last few exhibits?**

A.    Other than, I mean, their stated policy of what it was and that we know in a case they followed it and zero evidence beyond that that they did not follow it.  No one has produced any -- any type of indication or evidence that they were not following the policy.

**Q.    Do you have evidence that they were responsibly applying repeat -- repeat infringer policies with respect to any copyright owner other than Group Five Photosports?**

A.    I do not recall."

*Id.* 102:15-104:13.

Steadfast never bothered to find out what Flixya was doing to terminate users that were eliciting Mr. Easton's complaint because Steadfast put the burden on Mr. Easton to claim there was a repeat infringement problem.  *Id.* p. 112.  Since Flixya had demonstrated that they enforced a repeat infringer policy in response to the Groupfivephotosports situation, Steadfast did nothing to find out what Flixya did to terminate repeat infringers in responses to the Easton notifications.

**"Q.    Well, in the Group Five Photosports  situation, ImageBam communicated that there seemed to be a few bad users who were uploading the stuff and they terminated those accounts, right?**

A.    Correct.

- 9 -

**Q.    Was there any attempt by Steadfast to ascertain whether the same phenomenon existed pertaining to the Easton notices?**
A.    They had stated their repeat infringer policy and what that was, and there was no reason to believe they weren't following that.  And so we did not -- could you repeat the question?
MR. SPILLANE:  Can you read the question back.
(WHEREUPON, the record was read by the reporter.)
BY THE WITNESS:
A.    Yeah, due to the fact that they had established that they had a policy and were following it, we did not take -- ask any further questions on that."

*Id.* 116:11-117:9.

**"Q: [Y]ou have zero information one way or the other about whether ImageBam ever terminated anybody on account of the Easton notifications; is that correct?**
A.    Correct."

*Id.* 118:2-6.

Steadfast has never terminated a customer for repeat infringement.  (*Id.* 123:22-124:6; Spillane Declaration ¶ 7, Ex. 6, Response to Interrogatory No. 6.)

## SUMMARY JUDGMENT STANDARDS

Summary judgment is warranted on a claim or defense, or part thereof, where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Court may enter summary judgment in favor of the plaintiff on its claim for relief where no reasonable trier of fact could find other than for the plaintiff.  *Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).  The Court may also enter summary judgment against a defendant on one or more of its affirmative defenses by either disproving an element of the defense or "showing" the opposing party lacks proof of an essential element of the defense.  *Nissan Fire & Marine Ins. Co. Ltd. v. Fritz Cos., Inc.*, 201 F.3d 1099, 1102 (9th Cir. 2000).

Summary adjudication may be obtained on "part of each claim or defense" – "partial summary judgment."  FRCP R. 56(a).  The Court has the power to grant ALS's instant motion, one for summary judgment on liability while leaving damages to trial.  *Experience Hendrix LLC v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 833 (9th Cir. 2014) (court granted partial summary judgment on trademark infringement; damages were determined at trial); *BMG Rights Mgmt. v. Cox*, 149 F.Supp.3d 634, 662 (E.D. Va. 2015) (court granted partial summary judgment determining that Cox did not qualify for a safe harbor defense against copyright infringement); *Capitol Records, LLC v. Escape Media Group, Inc.*, 2015 WL 1402049 (S.D.N.Y. 2015) (court summarily adjudicated certain of plaintiff's claims for copyright infringement including Escape's entitlement to DMCA safe harbors).

## ARGUMENT

## I.  STEADFAST IS LIABLE FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT.

Steadfast has contributed to infringement of ALS's exclusive rights under 17 U.S.C. § 106, namely ALS's exclusive rights to reproduce, display and distribute its copyrighted works.  *17 U.S.C. § 106(1), (3), (5)*.  Steadfast is, without controversy, contributorily liable for copyright infringement on a client site, imagebam.com, by continuing to provide storage and related services to the site after repeated notice to Steadfast that ALS's copyrights were infringed on imagebam.com.

"[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."  *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996), quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971).  Express promotion or encouragement of infringement is not required.  Rather, "providing the site and facilities for

- 11 -
ALS MSJ – Steadfast - Memorandum

known infringing activity is sufficient to establish contributory liability." *Fonovisa*, 76 F.3d at 264 (swap meet operator failed to evict vendor selling counterfeit recordings after raids and notice by law enforcement).

In the online world, a party may be contributorily liable for infringement by continuing to provide storage for websites on servers with knowledge of infringement on such sites. *Louis Vuitton Malletier, S.A. v. Akonic Solutions, Inc.*, 658 F.3d 936, 943 (9th Cir. 2011) ("[t]here is no question that providing direct infringers with server space" "'substantially assists' direct [copyright] infringement"); *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004) (a 'reasonable trier of fact could conclude that [internet service provider] materially contributed to the copyright infringement by storing infringing copies of [the infringing] works on its [network] and providing [] users with access to those copies'); *Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788, 796 (9th Cir. 2007) (contributory liability exists where a service provider aids in the "reproduction, . . . display and distribution of [plaintiff's] images over the Internet").

In *Fonovisa, supra,* the swap meet vendor was contributorily liable for infringement by continuing to provide real estate – stall space – to vendors selling bootleg records even after sheriffs' raids and written notice of ongoing infringing activity. Providing server space to websites is the Internet equivalent of leasing real estate.

> "[W]ebsites are not ethereal; while they exist, virtually, in cyberspace, they would not exist at all without physical roots in servers and internet services. As the district court held, Appellants 'physically host websites on their servers and route internet traffic to and from those websites. This service is the Internet equivalent of leasing real estate.' *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,* 591 F.Supp.2d 1098, 1112 (N.D.Cal.2008). Appellants had control over the services and servers provided to the websites. Stated another way, Appellants had direct control

over the 'master switch' that kept the websites online and available."

*Louis Vuitton, supra,* 658 F.3d at 943.

In *Louis Vuitton*, Akanoc operated servers and leased server space to customers.  Louis Vuitton sent eighteen notices of infringement of its trademarks and copyrights on websites stored on Akanoc's servers, yet no action was taken.  659 F.3d at 940.  The jury returned a verdict for contributory trademark and copyright infringement for Louis Vuitton against Akanoc and others.  659 F.3d at 941.  The Ninth Circuit affirmed the contributory copyright infringement award against Akanoc:

> "Material contribution turns on whether the activity in question 'substantially assists' direct infringement.  *Amazon.com,* 487 F.3d at 729. There is no question that providing direct infringers with server space satisfies that standard. In *Visa,* 494 F.3d at 799–800, we held as a matter of law that defendants did not materially contribute to infringement because '[t]hey d[id] not operate the servers on which [the infringing images] reside[d].' The opposite is true here. Akanoc's servers are 'an essential step in the infringement process.' *Id.* at 812 (Kozinski, C.J., dissenting).

659 F.3d at 943-44.

Here, Steadfast provided Internet real estate – three dedicated servers each with three terabyte bandwidth – to Flixya.  Steadfast's servers stored the imagebam.com website.  If Steadfast had powered down the servers on which imagebam.com was stored, the site would have been offline until Flixya could direct the site to another server.  Steadfast thus had "direct control over the 'master switch' that kept [imagebam.com] online and available."

Steadfast continued to lease this Internet real estate for storage of imagebam.com even after receipt of 1517 notifications of infringement on imagebam.com since 2013.  If Akanoc was contributorily liable for continuing to store websites that infringed on Louis Vuitton's rights after eighteen

1    notifications, no reasonable juror could find that Steadfast failed to contribute to

2    copyright infringement by continuing to store imagebam.com after <u>1517</u> notices

3    of infringement.

4        Steadfast may claim that it only stored the front end of the

5    imagebam.com website and the actual picture galleries were stored on another

6    server.  This would, however, be insufficient to raise a triable dispute of fact

7    regarding Steadfast's contributory liability.  The front end of the

8    imagebam.com site was not merely static.  Flixya did not need to lease three

9    servers with three terabyte bandwidth to support a simple landing page.  Rather,

10   the front end of the imagebam.com site was the portal through which the

11   content uploads occurred.   At one point in time 33,000 videos were uploaded in

12   ten hours through the server space leased by Flixya from Steadfast.  Steadfast

13   also stored the relational database – "MySQL" – for the imagebam.com site.

14   These services materially contributed to infringement.

15       The Court should determine without controversy that Steadfast is

16   contributorily liable for copyright infringement.

17   **II.   STEADFAST DOES NOT QUALIFY FOR SAFE HARBOR**

18   **DEFENSES.**

19       Steadfast claims it is entitled to a safe harbor against liability under 17

20   U.S.C. § 512(c).  However, the evidence establishes without controversy that

21   Steadfast is not entitled to such safe harbor.

22       An Internet service provider may enjoy a safe harbor from liability for

23   "infringement of copyright by reason of the storage at the direction of a user of

24   material that resides on a system or network controlled or operated by or for the

25   service provider" – the so-called "hosting" safe harbor.  *17 U.S.C. § 512(c).*

26   However, to enjoy this safe harbor, the host must, having acquired actual or

27   constructive knowledge of infringement, "act" or "respond" "expeditiously to

28   remove, or disable access to, the material."  *17 U.S.C. §§ 512(c)(1)(A)(iii),*

*512(c)(1)(C). Cf. Io Group, Inc. v. Veoh Networks, Inc.*, 586 F.Supp.2d 1132, 1150 (N.D Cal. 2008) (Veoh responded and removed or disabled access to material within one day, which was sufficiently "expeditious"); *with Perfect 10, Inc. v. Google, Inc., 2:04-cv-09484-AHM* (7/26/10) (Google failed to show it responded expeditiously to infringement notices when there was evidence it waited months to respond and some notices were not processed at all).

Here, in response to hundreds of notifications of infringement on imagebam.com from Steve Easton, Steadfast did <u>nothing</u>. It did not "act." It did not "respond." It did not remove material. It did not disable access to material. It did not contact Flixya to learn how Flixya was responding to Easton's notifications. In response the Groupfivephotosports notices, when the coypright owner pressed for evidence of action, Steadfast asked for and received evidence that Flixya was blocking IP addresses. After that interaction, Steadfast simply <u>assumed</u> that Flixya was handling infringement notices correctly. Steadfast put the burden on ALS or Easton to demand evidence before it would "act" or "respond."

When Congress said that an Internet service provider must "act" or "respond" upon receipt of notifications of infringement in order to enjoy a safe harbor, it clearly meant that the Internet service provider had to <u>do something</u>. Assuming everything is okay and doing nothing is not doing something. Section 512(c) does not put the onus on the copyright owner to not only provide notice of infringement but also send additional follow up demands for action or information before the ISP first "acts" or "responds."

Steadfast may claim that it could not remove or disable particular images or sets of images on imagebam.com. At a minimum, however, Steadfast should have, and did not, contacted Flixya to learn how Flixya was responding to infringement notifications. Having obtained a response from Flixya, Steadfast should have, and did not, report the results to the notifying party. Steadfast

1  could have, but did not, pulled the plug on the servers storing the

2  imagebam.com site.  Steadfast did none of these things.

3       Steadfast's failure to "act" or "respond" in response to Easton's

4  notifications means that it is not entitled to a safe harbor under Section 512(c).

5  **III.   STEADFAST HAS LOST ANY SAFE HARBOR PROTECTIONS TO**

6  **WHICH IT MAY HAVE BEEN ENTITLED UNDER 17 U.S.C. § 512(i).**

7       Even if Steadfast acted in the manner required to maintain a safe harbor

8  under Section 512(c), Steadfast nevertheless failed to fulfill the conditions for

9  eligibility for this safe harbor.

10
11       "(i) Conditions for Eligibility.—

12       (1) Accommodation of technology.—The limitations on liability
         established by this section shall apply to a service provider only if the
13       service provider—

14       (A) has adopted and reasonably implemented, and informs subscribers
         and account holders of the service provider's system or network of, a
15       policy that provides for the termination in appropriate circumstances of
         subscribers and account holders of the service provider's system or
16       network who are repeat infringers; and

17       (B) accommodates and does not interfere with standard technical
18       measures."

19  *17 U.S.C. § 512(i).*

20       The requirement that service providers implement a repeat infringer

21  policy is a "fundamental safeguard for copyright owners" and "essential to

22  maintain[ing] the strong incentives for service providers to prevent their

23  services from becoming safe havens or conduits for known repeat copyright

24  infringers."  *Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F.Supp.2d 627, 637

25  (S.D.N.Y. 2011).

26
27
28

**A.      Steadfast Has Not Adopted and Informed Account Holders of a Policy of Termination for Repeat Infringement.**

To qualify for safe harbors, Steadfast must have 1) "adopted" and 2) "inform[ed] . . . account holders" of a "policy" providing for "termination" of "repeat infringers."

ISPs must "adopt" and then "inform" account holders of terms that prohibit infringing activity and provide for termination of services to repeat infringers.  The "inform[ation]" should be published in the ISP's website and, where applicable, in account holder agreements.  *See UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F.Supp.2d 1099, 1102 (C.D. Cal. 2009) ("Veoh's Terms of Use has always contained language prohibiting users from uploading videos that infringe copyrights and reserving Veoh's right to remove videos and terminate repeat infringers"); *Capitol Records, LLC v. Escape Media Group, Inc.*, 2015 WL 1402049 *10 (S.D.N.Y. 2015) (quoting terms explaining actions Escape may take in response to notification of infringement and process for termination of an account for repeat infringement); *BMG Rights Mgmt., supra,* 149 F.Supp.3d at 640 (Cox published AUP providing that violation of terms could result in suspension or termination of the account, and also informed account holders of this policy in account holder agreements).

Here, Steadfast neither "adopted" nor "informed" account holders of a policy for termination of repeat infringers.

Prior to being sued in this case, Steadfast maintained Terms that merely stated "[a]ny illegal activity may result in your site being suspended immediately, without notification. . . . Steadfast will be the sole arbiter as to what constitutes a violation of this provision."  Steadfast's Terms said nothing about what Steadfast would or could do in response to a notice of copyright infringement.  Steadfast's policy made on reference to "repeat infringers." Its Terms called for "suspension" of accounts, however, Section 512(i) requires a

- 17 -

1    policy of <u>termination</u> of account holders.  *BMG Rights Mgmt., supra,* 149

2    F.Supp.3d at 658 (the penalty for repeat infringement must be termination).

3    The Terms did not inform account holders of the criterion by which Steadfast

4    would determine an account holder to be a repeat infringer or terminate

5    services.  Steadfast reservation to act as the "sole arbiter" of what actions would

6    result in suspension or termination is not a "policy."

7         After being sued, Steadfast revised its Terms, but the new version is little

8    improved and still legally inadequate.  Now, Steadfast says "Steadfast responds

9    to notices of alleged copyright infringement and terminates accounts of repeat

10   infringers according to the process set out in the U.S. Digital Millennium

11   Copyright Act."  But this is circular and meaningless.  Steadfast's Terms do not

12   disclose what Steadfast has admitted in discovery, that "Steadfast has not

13   defined the term 'repeat infringer' as even the DMCA is silent as to any

14   definition."  Steadfast's Terms do not disclose Karl Zimmerman's theory that

15   Steadfast has <u>no</u> burden to implement its own repeat infringer policy whenever

16   Steadfast's client itself is an ISP claiming safe harbors under Section 512.  In

17   deposition, Mr. Zimmerman, Steadfast's corporate representative, was not able to

18   recall or articulate Steadfast's policy for termination repeat infringers.

19   Steadfast has never terminated an account for repeat infringement.

20        Steadfast has not "adopted" or "informed account holders" of a "policy"

21   for termination of repeat infringers.  Steadfast does whatever Mr. Zimmerman

22   wants to do, whenever he wants to do it.  This is not a policy.  This is caprice.

23       **B.**    **<u>Steadfast Has Not Reasonably Implemented a Policy of</u>**

24             **<u>Termination for Repeat Infringement.</u>**

25        To qualify for safe harbors, an ISP must not only adopt and inform

26   account holders of its repeat infringer policy, it must "reasonably implement[]"

27   that policy.  In other words, it must actually do what it says it will do.

28

1      To comply with Section 512(i), the service provider must have a

2  "working notification system" and "a procedure for dealing with DMCA-

3  compliant notifications."  The provider must "not actively prevent copyright

4  owners from collecting information needed to issue [infringement]

5  notifications."  *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1109 (9th Cir.

6  2007).  "[A] substantial failure to record webmasters associated with allegedly

7  infringing websites may raise a genuine issue of material fact as to the

8  implementation of the service provider's repeat infringer policy."  *Id.* at 1110

9  (CCBill reasonably implemented a repeat infringer policy by maintaining a

10  "DMCA Log" tracking infringement complaints and results).

11      Assessing a party's eligibility for safe harbors under Section 512(i)

12  involves an assessment of that party's actions with respect to copyright holders

13  not party to the litigation because the court must assess implementation of a

14  "policy," not merely treatment of a particular copyright holder.  *Id.* at 1113.  "A

15  policy is unreasonable . . . if the service provider failed to respond when it had

16  knowledge of the infringement."  *Id.* at 1113.

17      "To implement the repeat infringer policy contemplated by § 512(i), the

18  penalty imposed by service providers must be termination."  *BMG Rights*

19  *Mgmt., supra*, 149 F.Supp.3d at 658.

20      Recently courts have granted a plaintiff's motion for partial summary

21  judgment determining that the defendant ISP failed to meet the conditions for

22  safe harbor liability under Section 512(i).

23      In *BMG Rights Mgmt., supra*, BMG owned a catalog of musical

24  compositions.  Cox provided high-speed Internet services to users who

25  allegedly used those services to access file sharing sites with infringing copies

26  of BMG's works.  The court rejected Cox's defense that it needed terminate

27  only <u>adjudicated</u> infringers, holding that Cox had a burden to implement a

28  repeat infringer policy where it had <u>knowledge</u> of infringement.  149 F.Supp.3d

at 654, 661.  Before Fall 2012, Cox stated a policy to terminate repeat infringers but failed to enforce the policy, following an unwritten policy to reinstate any terminated account holder on request.  149 F.Supp.3d at 654.  After Fall 2012, Cox enhanced its procedures to impose graduated responses to infringement but in fact terminated almost no customers.  149 F.Supp.3d at 658-59.  With respect to certain accounts, Cox received <u>fourteen</u> notices of infringement pertaining to such accounts within a six month period, yet failed to terminate those accounts. 149 F.Supp.3d at 661-62.  The trial court granted BMG's motion for summary judgment that Cox lost its safe harbors due to failure to reasonably implement a policy for termination of repeat infringers.  149 F.Supp.3d at 662.

In *Disney Enterprises, Inc. v. Hotfile Corp.*, 1:11-cv-20427-KMW, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) Hotfile received over eight million infringement notices pertaining to five million users.  *Id.* at *22.  Hotfile terminated only 43 users by the time the lawsuit commenced; however another 61 users had accumulated more than 300 notices each without termination. *Id.* While Hotfile publicly claimed it implemented a repeat infringer policy, in practice, it only terminated users over a threat of litigation or court order. *Id.* at *24. Indeed, Hotfile was "unable to point to a single specific user who was terminated pursuant to its policy of manual review and exercise of 'discretion.'" *Id.* Therefore, the court determined Hotfile did not reasonably implement its policy. *Id.  See also Capitol Records v. Escape Media*, 2015 WL 1402049, at *13 ("[P]erhaps the strongest indicator of Escape's failure to terminate the uploading privileges of repeat infringers in appropriate circumstances is the undisputed facts showing that hundreds or thousands of users were not stripped of their uploading privileges after receiving notices of infringement.")

The facts are not in dispute.  In response to a demand from a copyright owner, on one occasion Steadfast asked for and reviewed evidence that Flixya, operator of imagebam.com, was blocking IP addresses in response to

infringement complaints.  From that point, Steadfast simply <u>assumed</u> that Flixya was terminating IP addresses in response to over 800 infringement notifications from Mr. Easton and over 1500 from all copyright owners, all concerning copyright infringement on imagebam.com, without doing <u>anything</u> to find out what Flixya was actually doing in response to this flood of notices.

Steadfast should, at the absolute minimum, made inquiries concerning the flood of infringement notifications on imagebam.com, and indeed <u>look at the site</u> to learn why imagebam.com was the subject of chronic infringement notifications.  Even a short time looking at imagebam.com would have revealed information – "red flags" – tending to show that imagebam.com was structured to maximize the ability of users to upload galleries of adult content while minimizing the consequence to users of an infringement notice.  Steadfast saw that content on imagebam.com was framed with advertisement, an indication that users and imagebam.com were anticipating significant page views from surfers drawn to the lure of infringing content.

Steadfast was not spared the burden of terminating imagebam.com for repeat infringement until it received court adjudication that imagebam.com was liable for infringement, nor proof positive that its actions contributed to infringement.  Steadfast needed to terminate its account holder upon "information" of repeat infringement.  Steadfast received more than enough information to warrant termination of Flixya's account at Steadfast.

Even assuming that Flixya was doing its best to take down infringing images and terminate IP addresses in response to notices, at some point the sheer number of infringement notifications pertaining to imagebam.com should have caused Steadfast to terminate the account for that site and remove the site from its servers.  If Cox lost its safe harbors by failing to terminate account holders in response to <u>fourteen</u> infringement notices, no reasonable juror could

find that Steadfast could receive over 800 notices from Easton and 1500 notices from all copyright owners without terminating its account for imagebam.com.

ALS is aware of no authority supporting Steadfast's rogue theory that when its account holder is file share site potentially entitled to its own safe harbor defenses, Steadfast simply has no burden to terminate such account holder in response to receipt of numerous notifications of infringement. Steadfast's theory, an unwarranted blanket immunity from secondary liability for infringement, would eviscerate the bargain Congress struck between ISPs and copyright holders in the DMCA, providing ISPs with safe harbors from liability on the condition that they cooperate with copyright holders and terminate account holders upon acquiring knowledge of repeat infringement.

Steadfast's theory would exacerbate the "whack-a-mole" problem faced by copyright owners. Here, ALS pays Steve Easton to send infringement notifications, thousands of them. Site owners might take down the specific content in the notice, but on the chronic "pirate" sites named in this action another infringing set of ALS images appears another day. The cycle continues endlessly with little to no abatement to infringement while pirate sites monetize stolen ALS traffic through ad sales to surfers drawn to the allure of free infringing content. Exasperated, ALS looks for domestic companies providing services to pirate sites for recompense. The content delivery network says it's not responsible, look to the origin host. The origin host says we're not responsible, look to the site owner, which itself operates as a host. The site owner claims it is a content neutral file share site, look to the users. But the site owner only tracks users through IP addresses. Under Steadfast's theory ALS has no recourse. Section 512(i) is supposed to be a "fundamental safeguard for copyright owners." Steadfast would erase 512(i) and turn the DMCA into a blanket immunity. This is not what Congress intended.

1    If Congress wanted to limit the sweep of Section 512(i) to termination of

2    repeat *direct* infringers it could have so provided, but did not.  The Section says

3    that ISPs must terminate repeat "infringers," which plainly encompasses repeat

4    direct <u>or contributory</u> infringers.  In *Perfect 10 v. Cybernet Ventures*, 213

5    F.Supp.2d 1146, 1178 (C.D. Cal. 2002) this Court "recognize[d] that online

6    service providers are meant to have strong incentives to work with copyright

7    holders.  The possible loss of the safe harbor provides that incentive and

8    furthers a regulatory scheme in which courts are meant to play a secondary role

9    to self-regulation."  Steadfast's theory would eviscerate these "incentives" and

10   destroy "self-regulation."

11   Whether or not Steadfast was able to terminate imagebam.com's account

12   holders or remove specific infringing images, at some point, well before receipt

13   of over 1500 notices of infringement, in order to maintain safe harbors Steadfast

14   should have terminated the imagebam.com site  from its servers.  "Making the

15   entrance into the safe harbor too wide would allow service providers acting in

16   complicity with infringers to approach copyright infringement on an image by

17   image basis without ever targeting the source of these images." *Cybernet*

18   *Ventures, supra*, 213 F.Supp.2d at 1177 (C.D. Cal. 2002).

19   Nor can Steadfast complain that termination of imagebam.com from its

20   servers would have removed the site from the Internet only momentarily, or

21   perhaps not at all.  *Cybernet Ventures* operated an "Adult Verification

22   Network" in which it verified the age of users and provided search and index

23   functions to allow users to find participating sites, all run by third parties.

24   Cybernet complained that it only had the capacity to remove a site from search

25   engines and delete hyperlinks, none of which would remove the site from the

26   Internet, and if terminated the site would simply jump to a competing AVN.

27   This Court rejected these complaints, holding that Cybernet Ventures lost safe

28   harbors for failing to undertake whatever actions termination of the accounts of

repeat infringers entailed.  "Cybernet has taken great pains to avoid shouldering the burdens of the copyright regime, all the while profiting from pirates."  213 F.Supp.2d at 1178.

Here, Steadfast has taken great pains to avoid shouldering the burdens of the copyright regime, while profiting from pirates.  The Court should determine that Steadfast failed to meet the conditions for safe harbors under Section 512(i).

## IV.    STEADFAST IS CONTRIBUTORIY LIABLE FOR INFRINGEMENT OF ALS'S TRADEMARKS.

Each of ALS's copyrighted works also bears ALS's protected mark.  Steadfast contributed to infringement of such mark through multiple infringing displays of that mark on imagebam.com.

*Louis Vuitton, supra*, is directly on point.  Akanoc operated servers storing sites that purveyed bootleg goods with counterfeit "Louis Vuitton" marks.  The jury found Akanoc contributorily liable for trademark infringement.  The Ninth Circuit upheld the verdict.  "To prevail on its claim of contributory trademark infringement, Louis Vuitton had to establish that Appellants continued to supply its services to one who it knew or had reason to know was engaging in trademark infringement."  Akanoc objected that as the host and not site operator is lacked sufficient control over the "means of infringement."  The district court and Ninth Circuit rejected this argument.

> "Appellants 'physically host websites on their servers and route internet traffic to and from those websites. This service is the Internet equivalent of leasing real estate.' *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,* 591 F.Supp.2d 1098, 1112 (N.D.Cal.2008). Appellants had control over the services and servers provided to the websites. Stated another way, Appellants had direct control over the 'master switch' that kept the websites online and available."

- 24 -

658 F.3d at 942-43.  The Ninth Circuit also rejected the contention that Akanoc had to act "intentionally."

> "Plaintiffs asserting contributory trademark infringement claims must prove that defendants provided their services with actual or constructive knowledge that the users of their services were engaging in trademark infringement.  *See Inwood Labs.*, 456 U.S. at 854, 102 S.Ct. 2182; *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir.2007). An express finding of intent is not required."

658 F.3d at 943.

Here, no reasonable juror could fail to conclude that Steadfast contributed to trademark infringement on imagebam.com.  Steve Easton submitted to Steadfast 185 notices of infringement of ALS's trademarks on imagebam.com.  Each notice gave evidence of infringement of multiple images bearing the ALS mark.  Yet, in response to these notices, Steadfast continued to provide storage services for the imagebam.com site.  Steadfast is, without controversy, contributorily liable for infringement of ALS's trademarks.

## CONCLUSION

ALS's motion for partial summary judgment should be granted.  The Court should determine that Steadfast contributed to infringement of ALS's copyrights and trademarks and that it has no safe harbor.  The trial would thus be devoted to an award of damages.

DATED:  December 1, 2017   SPILLANE LAW GROUP PLC
             GHALLAGHER & KENNEDY P.A.

             By: _____
               Jay M. Spillane
            Attorneys for Plaintiff ALS Scan, Inc.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this action.  My business address is: 468 N. Camden Drive, Second Floor, Beverly Hills, CA 90210-4507.  A true and correct copy of the foregoing document entitled (*specify*):
**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT STEADFAST NETWORKS, LLC** will be served or was served **(a)** on the judge in chambers in the form and manner required by Local Rules and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and Local Rules, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) December 1, 2017, I checked the CM/ECF docket for this action and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Gary L. Bostwick– gbostwick@B1Law.com
Kevin S. Toll – kevin@silversteinlegal.com
Lawrence G. Walters – larry@firstamendment.com
Corey D. Silverstein – corey@silversteinlegal.com
Rachel Kassabian – rachelkassabian@quinnemanuel.com
Carolyn M. Homer – carolynhomer@quinnemanuel.com
Mark Thomas Gray    markgray@quinnemanuel.com
Armen Nercessian    anercessian@fenwick.com
Jedediah Wakefield     jwakefield@fenwick.com
Sapna S Mehta    smehta@fenwick.com

Colin TJ O'Brien – tm@partridgepartnerspc.com
John L. Ambrogi – jla@partridgepartnerspc.com
Daniel L Rogna     daniel@partridgepartnerspc.com
Paul Supnick – paul@supnick.com
Raymond Katrinak – pkatrinak@kernanlaw.net
Ryan Carreon – rcarreon@kernanlaw.net
Stephen M Kernan – kernanlaw@gmail.com
John P Flynn    john.flynn@gknet.com
Kevin D Neal    kevin.neal@gknet.com

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) December 1, 2017, I served the following persons and/or entities at the last known addresses in this case by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling Local Rule, on (*date*) December 1, 2017, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served by Overnight Mail or Attorney Service***
Hon. George H. Wu
U.S. District Court
350 W. 1st Street
Courtroom 9D
Los Angeles, CA 90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/1/2017 | Jessie Gietl | *Jessie Gietl* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |