Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE LAW GROUP PLC
468 N. Camden Drive
Second Floor
Beverly Hills, CA 90210
(424) 217-5980
(888) 590-1683 (fax)

John P. Flynn (Az. Bar No. 015065)
Kevin D. Neal (Az. Bar No. 011640)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000
(602) 530-8500 (fax)
john.flynn@gknet.com
kevin.neal@gknet.com

Attorneys for Plaintiff ALS Scan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALS SCAN, INC., a Maryland corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CLOUDFLARE, INC., a Delaware corporation, et al.,<br><br>Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br><br>**PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT STEADFAST NETWORKS, LLC**<br><br>**Filed Concurrently: Reply Declaration of Eric Penn**<br><br>Date: January 4, 2018<br>Time: 8:30 a.m.<br>Place: Courtroom 9D<br>      350 W. 1st Street<br>      Los Angeles, CA |

**Table of Contents**

SUMMARY OF REPLY ...................................................................................1

UNDISPUTED FACTS ....................................................................................2

ARGUMENT .....................................................................................................6

   I.   STEADFAST IS LIABLE FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT. ..................................................................................6

   II.   STEADFAST DOES NOT QUALIFY FOR SAFE HARBOR DEFENSES. ..............................................................................................10

   III.   STEADFAST HAS LOST ANY SAFE HARBOR PROTECTIONS TO WHICH IT MAY HAVE BEEN ENTITLED UNDER 17 U.S.C. § 512(i)....11

   IV.   STEADFAST IS CONTRIBUTORILY LIABLE FOR INFRINGEMENT OF ALS'S TRADEMARKS. .............................................12

CONCLUSION................................................................................................13

# Table of Authorities

**Cases**

*ALS Scan, Inc. v. Remarq Communities*, 239 F.3d 619 (4th Cir. 2001)..............10

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) ...........................................8

*Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996).............................7

*Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ..........................9

*Perfect 10 v. Cybernet Ventures*, 213 F.Supp.2d 1146 (C.D. Cal. 2002)...........12

*Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788 (9th Cir. 2007) ................9

*Rainey v. American Forest & Paper Ass'n, Inc.*, 26 F.Supp.2d 82
 (D. D.C. 1998).....................................................................................................6

*Reilly v. NatWest Markets Group, Inc.*, 181 F.3d 253 (2d Cir. 1999).................6

*Religious Tech Ctr. v. Netcom Online Communications Servs., Inc.*,
 907 F.Supp. 1361 (N.D. Cal. 1995) ...................................................................9

**Statutes**

17 U.S.C. § 512(c) ...............................................................................................10

## SUMMARY OF REPLY

As Plaintiff ALS Scan, Inc. ("ALS") predicted, Defendant Steadfast Networks LLC ("Steadfast") opposed ALS's summary judgment motion with a novel and meritless theory. According to Steadfast, it can own, operate and maintain servers on which its clients' website, imagebam.com, resides, and enjoy <u>full immunity</u> from contributory copyright liability despite receipt of over one thousand notifications of infringement on imagebam.com, with no burden to terminate services to that site, merely because imagebam.com is itself an ISP with its own notice and takedown procedure. Steadfast's concoction is entirely without support in the Copyright Act or case law.

In enacting Section 512 of the Copyright Act, Congress intended to strike a <u>balance</u> between service providers and copyright owners. In exchange for safe harbors from liability, service providers were incentivized by potential loss of those safe harbors to cooperate with copyright owners, including by informing account holders of, and enforcing, a policy of termination of services for repeat infringement.

Steadfast's rogue theory eviscerates that balance, leaving service providers with tacit immunities and copyright owners without recourse to responsible parties in US courts. ALS has shown without controversy that it suffers from an endless infringement ecosystem, in which entire galleries of its content are incessantly posted without authority on pirate free host sites such as imagebam.com, ostensibly content-neutral yet with no apparent significant purpose other than hosting stolen adult content. The locations of the stolen galleries are published on adult fan sites to entice surfers drawn to the allure of free infringing content. Imagebam.com monetizes the Internet traffic through advertisements. If ALS or other copyright owners send infringement notices to Steadfast and imagebam.com, the stolen gallery comes down one day and another appears the next. Under Steadfast's theory, ALS must send endless

infringement notifications to Steadfast and imagebam.com with no claim against Steadfast when it refuses to terminate services, leaving ALS recourse only against anonymous uploaders, impecunious and largely foreign surfers who imagebam.com "tracks" only through IP addresses.

This is not the law.

The facts are not disputed. The only dispute is the legal conclusion to draw from these facts. Steadfast is wrong. The Court should grant ALS's motion. Steadfast should be adjudged liable for contributory copyright and trademark infringement. Trial would remain to assess damages.

## UNDISPUTED FACTS

Steadfast raised picayune quarrels with some of ALS's undisputed facts, none giving rise to triable issues of fact. The material undisputed facts warrant summary judgment in favor of ALS.

The following facts are without dispute.

ALS owns a library of proprietary adult content. The content is protected by copyright and trademark.[1]

ALS has observed an endless loop of systematic infringement: 1) within hours after ALS posts a new content gallery on its secure webpages a stolen copy of the entire gallery is displayed for free on a pirate site; 2) adult "fan" forums (e.g. vipergirls.to) provide surfers with links to the free stolen ALS galleries; 3) infringing content on the pirate sites is juxtaposed with advertisements placed by ad brokers who pay for clicks or joins; 4) ALS sends

---

[1] Steadfast conjured an example of an ALS image supposedly not bearing the trademark. Steadfast took an image from a free tour page on alsscan.com which appears under the ALS Scan mark on the page. The images on the tour pages have a different aspect ratio than the images on the members' page, thus the example picked by Steadfast was cropped above the mark. The same image from the members' area shows the mark in the lower right. Penn Reply Decl.

1  notice(s) of infringing content on the pirate site and, sometimes, the infringing
2  content is taken down; but 5) that gallery or another stolen ALS gallery appears
3  on another page of the same pirate site shortly thereafter; and 6) the cycle
4  continues endlessly.
5      Imagebam.com is a pirate site with which ALS has had chronic
6  infringement issues.  While imagebam.com apparently claims to be a content
7  neutral share site for third-party uploaded content, thus claiming the privileges
8  of the DMCA, even a short time looking at imagebam.com reveals key
9  attributes of "pirate" sites, ones primarily dedicated to storing galleries of
10 infringing adult content – "red flags" of infringement.  Imagebam.com, like
11 other pirate sites: 1) offers alternative high volume upload capacities not
12 typically offered on "mainstream" content-share sites; 2) fails to offer
13 limitations such that only friends or invitees may view content, but rather
14 uploads all content to unsecure publicly viewable pages; 3) monetizes uploaded
15 content through advertisements over, under and proximate to uploaded content,
16 ads that do not direct traffic to the copyright owner; 4) provides code or
17 hyperlinks that can be quickly used to publish the location of the
18 imagebam.com page on adult "fan" forums, sites offering links to free stolen
19 adult content galleries; 5) requires no verifiable personal information to upload
20 content and has weak ability to track and terminate users; and 6) fail to display
21 information indicating compliance with 18 USC § 2257, requiring record
22 keeping of the age of models appearing in adult content.
23     Steadfast "owned" servers that were leased on a "dedicated" basis to
24 Flixya, the owner/operator of imagebam.com.[2]  Flixya leased three dedicated

---

[2] Steadfast attempts to spin the Zimmerman testimony as Steadfast's representative with a correcting and even contradictory declaration from Kevin Stange.  These undisputed facts are drawn directly from Mr. Zimmeman's testimony. Zimmerman 30(b)(6) Depo. 15:12-18

servers from Steadfast.[3] Steadfast maintained and supported the servers' physical hardware.[4] The servers were located in Steadfast's data center.[5] Steadfast configured the servers to Flixya's needs.[6] Steadfast could "pull" the server on which imagebam.com resided, in other words, "shut it down."[7]

ALS has hired an agent, Steve Easton to observe infringing ALS images on the Internet and send notifications of infringement to those directly or secondarily responsible for the infringement ("DMCA notices"). Steve Easton regularly observed infringing ALS images – often entire galleries – on imagebam.com. He prepared email notifications of infringement, including the language required by Section 512(c) and a hyperlink to each infringing image on imagebam.com. He sent the notifications to those directly or secondarily responsible for infringement.

Mr. Easton regularly observed infringing galleries of ALS content on imagebam.com. Mr. Easton sent sent 853 notices of infringement to imagebam.com and Steadfast concerning infringing images belonging to his clients – ALS and other adult content owners – on imagebam.com. Of those, 185 complained of infringing ALS images. The notifications were sent to the email addresses designated by imagebam.com and Steadfast to receive notification of infringement.

In total, just in the last three years, Steadfast received 1517 notifications of infringement on imagebam.com.

Steadfast has not adopted and informed account holders of a policy of termination of accounts for repeat infringement. Steadfast has no links on its

---

[3] Zimmerman 30(b)(6) Depo. 21:14-19
[4] Zimmerman 30(b)(6) Depo. 16:1-4
[5] Zimmerman 30(b)(6) Depo. 18:1-3
[6] Zimmerman 30(b)(6) Depo. 31:2-22
[7] Zimmerman 30(b)(6) Depo. 53:15-23

homepage or anywhere else on its site using the terms "DMCA," "Abuse" or "Infringement." Steadfast's home page has a small link at the bottom titled "Legal Info and Privacy Policy," which when clicked resolves to Steadfast's "Acceptable Use Policy (AUP)/Terms of Service." Prior to receipt of service in this case, that page said only "[a]ny illegal activity may result in your site being suspended immediately, without notification. . . . Steadfast will be the sole arbiter as to what constitutes a violation of this provision." After being sued, Steadfast made a modest but inadequate improvement in the terms. Now the page says: "Steadfast responds to notices of alleged copyright infringement and terminates accounts of repeat infringers according to the process set out in the U.S. Digital Millennium Copyright Act." In discovery Steadfast said "Steadfast has not defined the term 'repeat infringer' as even the DMCA is silent as to any definition."

In response to receipt of over 800 notices of infringement from Steve Easton, Steadfast did absolutely nothing.[8]

---

[8] In response to a 30(b)(6) deposition notice, Steadfast produced Karl Zimmerman as the sole designee. The notice asked Steadfast to produce one or more witnesses to address for the company what Steadfast had done in response to the infringement notices, including Steadfast's efforts to terminate repeat infringers. Zimmerman Depo. pp. 10-11, Ex. 1. Mr. Zimmerman testified on behalf of Steadfast that the company made no effort to follow up on the infringement notices because imagebam.com had shown on a prior occasion that it had a notice and takedown procedure. Mr. Zimmerman also testified for Steadfast that the company felt it had no burden to act until Mr. Easton notified Steadfast that material had not been removed in response to the notice.

In response to ALS's motion, Steadfast provided the declaration of Kevin Stange, who corrected and even contradicted Mr. Zimmerman by saying that Steadfast responded to Mr. Easton's notifications through a ticketing system. The Court should ignore this declaration. Mr. Zimmerman was testifying for the company, not merely to his own recollection. A party may not testify one way in a corporate deposition and later adduce contradictory testimony from an employee. *Rainey v. American Forest & Paper Ass'n, Inc.*, 26 F.Supp.2d 82,

1 Steadfast had information that imagebam.com was receiving high volume
2 uploads, and could have obtained further information about imagebam.com's
3 operations simply by looking at the site. A look at imagebam.com would have
4 revealed that imagebam.com was accepting high volume uploads of adult
5 content and other "red flags" of infringement.
6 Steadfast maintained its own theory that if its own client was an Internet
7 service provider, Steadfast had no burden to terminate services to its client, or
8 indeed take any action, in response to notifications of infringement.
9 Steadfast did not terminate Flixya's account. Steadfast did not "pull the
10 plug" on the servers on which imagebam.com resided. Steadfast has never
11 terminated an account for repeat infringement.

## ARGUMENT

**I. STEADFAST IS LIABLE FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT.**

The parties agree that Steadfast was notified 185 times that infringing ALS content resided on imagebam.com. A single notification provided the location of numerous infringing ALS images, often entire galleries. Steadfast owned, stored, configured and maintained the servers on which imagebam.com and the infringing content resided. Yet, Steadfast never terminated services to Flixya or "pulled the plug" on the servers on which imagebam.com resided.

Steadfast's continued ownership, storage and maintenance of servers on which infringing ALS content appeared, in the face of repeated notifications of infringement, renders Steadfast a contributory infringer. This case is squarely within the ambit of *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir.

---

95 (D. D.C. 1998) [corporate party bound by 30(b)(6) testimony and could not use conflicting affidavits in summary judgment motion]; *Reilly v. NatWest Markets Group, Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) (more knowledgeable witness prevented from testifying at trial).

- 6 -
ALS MSJ – Steadfast – Reply Memorandum

1996) and *Louis Vuitton Malletier, S.A. v. Akonic Solutions, Inc.*, 658 F.3d 936, 943 (9th Cir. 2011). Steadfast provided the Internet equivalent of real estate – the "site and facilities" – on which chronic infringement occurred.

Steadfast's distinction of these cases is specious.

Steadfast is not an absentee landlord. Steadfast owned, configured, maintained and stored the servers on which imagebam.com resided. Steadfast is like the owner of the flea market in *Cherry Auction*. The flea market operator received repeat notifications – many fewer than Steadfast received here – that vendors in its flea market were selling bootleg merchandise. However the operator failed to eject the offending vendor(s) from the flea market, thus rendering it liable for contributory infringement.

Would the results of *Cherry Auction* have changed if the vendors were selling bootleg merchandise on consignment from third parties rather than procuring it directly? Would the flea market operator have evaded contributory liability by complaining it had no ability to prevent third parties from providing stolen merchandise to its vendors on consignment? No. Whether the vendors procured stolen merchandise themselves or from third parties, in either case the flea market operator had to cease providing its site and facilities to the vendor in question or become a contributory infringer.

Concerning *Louis Vuitton,* Steadfast is not in the position of MSG. MSG leased servers to Akanoc, its only customer. Steadfast is like Akanoc. It was Akanoc that operated the servers and had customer relationships with website owners. The infringing Louis Vuitton merchandise appeared on sites that resided on servers Akanoc operated. Akanoc was liable for contributory infringement because it continued to store such sites after notice of infringement (eighteen). Here, like Akanoc, Steadfast contracted with Flixya to store imagebam.com on servers operated by Steadfast. Infringing ALS content appeared on sites owned, stored and maintained by Steadfast. That Steadfast

owned the servers on which the infringing ALS content resided means that Steadfast was in a stronger position than Akanoc to contribute to infringement.

Steadfast is contributorily liable because it continued to provide storage and maintenance services to imagebam.com, a site on which infringing ALS content chronically resided. Whether imagebam.com directly procured the infringing ALS content or received infringing content from third party uploaders is beside the point. Either way Steadfast maintained the site and facilities for infringement.

Steadfast wrongly insists that imagebam.com's uploaders are the direct infringers and that contributory infringement exists only where the service provider can, and does not, withdraw services from the direct infringer. Not so. The law is that a service provider must stop providing services to whomever it is providing such services as long as such services materially contribute to infringement.

Steadfast cites *Louis Vuitton,* 658 F.3d at 942, but this page pertains to MSG, which did not operate servers on which infringing content resided. Rather, like Steadfast, it was Akanoc that leased server space to website operators. The direct infringers were in China. Akanoc provided testimony that some of its customers were "resellers," in other words, companies that leased server space from Akanoc and then resold that space to direct infringers. However, the Ninth Circuit held that the presence of an intervening reseller between Akanoc and the Chinese direct infringers "would not alter our analysis." 658 F.3d at 940 n.4. Whether the direct infringer was Akanoc's client or the client of a reseller was immaterial. Akanoc was a contributory infringer for continuing to provide storage services to websites on which infringement occurred. 658 F.3d at 940-41.

Similarly, in *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004), AOL was removed from the direct infringer, Robertson. The nature of USENETs

1  was that an upload from one person caused the material to propagate to multiple
2  USENETs.  "After Robertson made the infringing copies of Ellison's works
3  accessible to the news-group, the works were forwarded and copied throughout
4  the USENET to servers all over the world, including those belonging to AOL.
5  As a result, AOL's subscribers had access to the news-group containing the
6  infringing copies of Ellison's works."  357 F.3d at 1075.  Even though AOL had
7  no direct relationship with Robertson, it could nevertheless have been
8  contributorily liable "by storing infringing copies of [the infringing] works on
9  its [network] and providing [] users with access to those copies."  357 F.3d at
10 1078.  *See also Religious Tech Ctr. v. Netcom Online Communications Servs.,*
11 *Inc.*, 907 F.Supp. 1361, 1375 (N.D. Cal. 1995) (Netcom potentially
12 contributorily liable for storing USENET on which infringing content
13 appeared).

14 Other courts have made clear that a contributory infringer need not have
15 an account with the direct infringer, so long as continuing to provide services
16 after knowledge of infringement materially contributes to infringement.
17 "Google could be held contributorily liable if it had knowledge that infringing
18 Perfect 10 images were available using its search engine, could take simple
19 measures to prevent further damage to Perfect 10's copyrighted works, and
20 failed to take such steps."  *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1172
21 (9th Cir. 2007); *Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788, 796 (9th
22 Cir. 2007) (contributory liability exists where a service provider aids in the
23 "reproduction, . . . display and distribution of [plaintiff's] images over the
24 Internet").

25 Steadfast deflects scrutiny of its own behavior, the only issue raised by
26 ALS's motion, with irrelevant and distracting critiques of ALS's behavior.  The
27 cited testimony confirms that, if indeed ALS members were downloading and
28 then uploading ALS content to pirate site, this would violate ALS's terms of

service. Ambrogi Decl. Ex. B p. 99. No ALS representative testified that they knew the identity of any of its members that may have violated ALS's terms. Ambrogi Decl. Exs. A, B. ALS has not employed digitial rights management ("DRM") technology, but no ALS witness testified, and Steadfast did not show, that any existing DRM would have revealed the identity of a person uploading ALS content in violation of ALS's terms. In any event, this is all a distraction. Steadfast cites no authority that ALS's rights under the Copyright Act were conditioned on use of technologies that Steadfast thinks ALS should have employed. Steadfast cites no authority that ALS's rights under copyright fade or disappear under theories of contributory negligence or mitigation of damage for failure to use DRM technologies. These arguments are red herrings.

## II. STEADFAST DOES NOT QUALIFY FOR SAFE HARBOR DEFENSES.

Steadfast is not entitled to a safe harbor against liability under 17 U.S.C. § 512(c).

Steadfast's argument that Steve Easton sent his infringement notifications to the wrong party, or to Steadfast in error, is wrong. Easton didn't send his notifications to Steadfast as a substitute for notifying imagebam.com, or expecting Steadfast to forward his notice to imagebam.com. Easton sent his notifications to both Steadfast and imagebam.com.

Steadfast repeatedly says that Easton's notifications weren't compliant, but they never say how or why. The DMCA does not require notifications to be strictly complaint, but rather substantially compliant. *ALS Scan, Inc. v. Remarq Communities*, 239 F.3d 619, 624 (4th Cir. 2001). Here, Mr. Easton's notifications substantially complied with all elements of Section 512(c)(3). Easton provided a hyperlink for each and every work infringed, which simultaeneously identified the work infringed as well as the location from which the infringing work could be removed. Steadfast does not say why this is

1 not at least substantially compliant. Easton's notification also provide the other
2 elements (contact information, affirmation that the sender was authorized, etc.).

3 Steadfast does not show how it "acted" or "responded" to Easton's
4 notifications. Steadfast admitted in its 30(b)(6) testimony that it did nothing.
5 Steadfast's current effort to create controversy by having an employee give
6 contradictory testimony that Steadfast really did do something in response to
7 infringement notices should be rejected.

8 Steadfast did not "act" or "respond" upon receipt of notifications that
9 were perfectly compliant, or at least substantially compliant, with Section 512.
10 Steadfast is not entitled to that safe harbor.

11 **III.  STEADFAST HAS LOST ANY SAFE HARBOR PROTECTIONS TO**
12 **WHICH IT MAY HAVE BEEN ENTITLED UNDER 17 U.S.C. § 512(i).**

13 As an alternative, Steadfast has, without controversy, lost safe harbors for
14 failure to comply with Section 512(i).

15 Steadfast's argument that it "adopted" a repeat infringer policy is wrong.
16 Steadfast only addresses its current policy, adopted after it realized it had been
17 sued in this case for copyright infringement. The current policy vaguely says
18 that Steadfast may terminate services to repeat infringers as provided in the
19 DMCA, but in discovery Steadfast said the DMCA does not define repeat
20 infringement. This is lip service, a cover story for Steadfast's actual policy, to
21 terminate no accounts for repeat infringement and rationalize its conduct only
22 after being haled into court.

23 Steadfast did not address its "policy" before it was served with process in
24 this case. Prior to being sued, during a time period covering most of the
25 infringement notices from Easton, Steadfast published no policy saying that it
26 would or could terminate accounts for repeat infringement.

27 Steadfast's argument that it reasonably implemented whatever repeat
28 infringer policy it claims is adopted is meritless. Steadfast has terminated no

accounts for repeat infringement. Steadfast says it is not obliged to "seek out" infringers, but this is not the issue. Steadfast received 1517 notices of infringement on imagebam.com yet did not terminate that account for repeat infringement. Steadfast simply assumed, without actually verifying, that Flixya complied with infringement notices by taking down the infringing content. Even if this is the case, which Steadfast did not verify, at some point, much earlier than 1517 notices, the sheer number of infringement notices on imagebam.com put Steadfast to the choice of terminating imagebam.com's account or losing safe harbors. *Louis Vuitton, supra* (host contributorily liable for failing to act after eighteen notices); *BMG Rights Mgmt. v. Cox*, 149 F.Supp.3d 634 (E.D. Va. 2015) [Cox lost safe harbors under Section 512(i) for failing to act after fourteen notices].

Steadfast failed to distinguish or address ALS's authorities that Congress intended to strike a balance between copyright owners and ISPs, motivating ISPs to terminate services to infringers for fear of losing safe harbors. *Perfect 10 v. Cybernet Ventures*, 213 F.Supp.2d 1146, 1178 (C.D. Cal. 2002) ("[O]nline service providers are meant to have strong incentives to work with copyright holders. The possible loss of the safe harbor provides that incentive and furthers a regulatory scheme in which courts are meant to play a secondary role to self-regulation"). Steadfast's rogue theory eviscerates that balance, leaving service providers with tacit immunities and copyright owners without recourse to responsible parties in US courts.

### IV. STEADFAST IS CONTRIBUTORILY LIABLE FOR INFRINGEMENT OF ALS'S TRADEMARKS.

Steadfast did not address ALS's motion for summary judgment for contributory trademark infringement. Under *Louis Vuitton, supra*, continuing to provide storage services to websites on which trademarks are infringed is a

contribution to trademark infringement.  Steadfast is, without controversy, contributorily liable for infringement of ALS's trademarks.

## **CONCLUSION**

ALS's motion for partial summary judgment should be granted.  The Court should determine that Steadfast contributed to infringement of ALS's copyrights and trademarks and that it has no safe harbor.  The trial would thus be devoted to an award of damages.

DATED:  December 21, 2017        SPILLANE LAW GROUP PLC
                                 GHALLAGHER & KENNEDY P.A.

                                 By: _____
                                           Jay M. Spillane
                                 Attorneys for Plaintiff ALS Scan, Inc.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this action. My business address is: 468 N. Camden Drive, Second Floor, Beverly Hills, CA 90210-4507. A true and correct copy of the foregoing document entitled (*specify*): **PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT STEADFAST NETWORKS, LLC** will be served or was served **(a)** on the judge in chambers in the form and manner required by Local Rules and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and Local Rules, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) December 21, 2017, I checked the CM/ECF docket for this action and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

| | |
|---|---|
| Gary L. Bostwick– gbostwick@B1Law.com | Colin TJ O'Brien – tm@partridgepartnerspc.com |
| Kevin S. Toll – kevin@silversteinlegal.com | John L. Ambrogi – jla@partridgepartnerspc.com |
| Lawrence G. Walters – larry@firstamendment.com | Daniel L Rogna    daniel@partridgepartnerspc.com |
| Corey D. Silverstein – corey@silversteinlegal.com | Paul Supnick – paul@supnick.com |
| Rachel Kassabian – rachelkassabian@quinnemanuel.com | Raymond Katrinak – pkatrinak@kernanlaw.net |
| Carolyn M. Homer – carolynhomer@quinnemanuel.com | Ryan Carreon – rcarreon@kernanlaw.net |
| Mark Thomas Gray    markgray@quinnemanuel.com | Stephen M Kernan – kernanlaw@gmail.com |
| Armen Nercessian    anercessian@fenwick.com | John P Flynn    john.flynn@gknet.com |
| Jedediah Wakefield    jwakefield@fenwick.com | Kevin D Neal    kevin.neal@gknet.com |
| Sapna S Mehta    smehta@fenwick.com | |

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) December 21, 2017, I served the following persons and/or entities at the last known addresses in this case by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling Local Rule, on (*date*) December 21, 2017, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

*Served by Overnight Mail or Attorney Service*
Hon. George H. Wu
U.S. District Court
350 W. 1st Street
Courtroom 9D
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/21/2017 | Jessie Gietl | *Jessie Gietl* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |