ANDREW P. BRIDGES (CSB No. 122761)
abridges@fenwick.com
JEDEDIAH WAKEFIELD (CSB No. 178058)
jwakefield@fenwick.com
ARMEN NERCESSIAN (CSB No. 284906)
anercessian@fenwick.com
SAPNA MEHTA (CSB No. 288238)
smehta@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:   415.875.2300
Facsimile:   415.281.1350

Attorneys for Defendant
CLOUDFLARE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ALS SCAN, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>CLOUDFLARE, INC., et al.,<br><br>                    Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br><br>**DEFENDANT CLOUDFLARE'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**[REDACTED PUBLIC VERSION]**<br><br>Date:          March 5, 2018<br>Time:          8:30 A.M.<br>Courtroom:  9D<br>Judge:        George H. Wu<br><br>Trial Date:   April 24, 2018 |

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ............................................................................... 2

Cloudflare's Services and Technology ........................................................ 2

How Cloudflare Responds to Complaints .................................................... 5

The Third-Party Websites at Issue .............................................................. 8

Interactions between ALS and Cloudflare ................................................... 9

ALS's Claims and Earlier Proceedings ....................................................... 9

ARGUMENT ..................................................................................................... 10

I.      The Standard for Summary Judgment ............................................... 10

II.     Cloudflare Has Not Engaged in Contributory Infringement
        of ALS's Works. ............................................................................... 10

        A.      ALS Has Provided No Competent Evidence of Primary
                Infringements for Which Cloudflare Is Responsible ............... 11

        B.      Cloudflare Has Not Induced Direct Infringement of
                ALS's Works. ......................................................................... 11

                1.      Cloudflare's services have many non-infringing
                        uses. ............................................................................. 12

                2.      Cloudflare has not encouraged or induced direct
                        infringement of ALS's copyrights by clear
                        expression or other affirmative steps to foster
                        infringement. ................................................................ 12

        C.      Cloudflare Has Not Engaged in Contributory Infringement
                of ALS's Works Under a "Material Contribution" Theory ...... 13

                1.      Cloudflare has not substantially assisted primary
                        infringers. .................................................................... 14

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF CONTENTS**
**(continued)**

Page

        a.    The evidence shows that Cloudflare's alleged speed improvement is not material to infringements. ...................................................... 15

        b.    Cloudflare does not help websites conceal identities. .............................................................. 17

    2.    Cloudflare did not fail to take simple measures to prevent further damage to ALS's works. ...................... 18

        a.    ALS's agent did not give actionable information or provide actual knowledge of specific infringements. ......................................... 20

        b.    Cloudflare has no available simple measures to prevent further damage to ALS's copyrights. ......................................................... 22

CONCLUSION ....................................................................................... 25

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*A&M Records, Inc., v. Napster, Inc.,*
  239 F.3d 1004 (9th Cir. 2001)...................................................................13, 19, 23

*ALS Scan, Inc. v. RemarQ Communities, Inc.,*
  239 F.3d 619 (4th Cir. 2001).............................................................................17

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986).........................................................................................10

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986).........................................................................................10

*Collins v. Wayne Corp.,*
  621 F.2d 777 (5th Cir. 1980).............................................................................21

*Columbia Pictures Indus., Inc. v. Fung,*
  710 F.3d 1010 (9th Cir. 2013)...........................................................................12

*Ellison v. Robertson,*
  357 F.3d 1072 (9th Cir. 2004)...........................................................................17

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,*
  658 F.3d 936 (9th Cir. 2011).......................................................................15, 23

*Luvdarts, LLC v. AT&T Mobility, LLC,*
  710 F.3d 1068 (9th Cir. 2013)...........................................................................22

*Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd.,*
  545 U.S. 913 (2005)..............................................................................10, 11, 12

*Nelson v. Pima Community College,*
  83 F.3d 1075 (9th Cir. 1996).......................................................................10, 23

*Perfect 10, Inc. v. Amazon.com, Inc.,*
  508 F.3d 1146 (9th Cir. 2007)..................................................................... *passim*

*Perfect 10, Inc., v. Giganews, Inc.,*
  2014 WL 8628031 (C.D. Cal. 2014), *aff'd,* 847 F.3d 657 (9th Cir. 2017), *cert. denied,* 138 S.Ct. 504 (2017) .........................................................................8, 19, 22

*Perfect 10, Inc., v. Giganews, Inc.,*
  847 F.3d 657 (9th Cir. 2017), *cert. denied,* ___ S.Ct. ___ (2017) ................... *passim*

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,*
  494 F.3d 788 (9th Cir. 2007)....................................................................14, 15, 16, 24

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES
## (continued)

CASES                                                                                    PAGE(S)

*Religious Technology Center v. Netcom On-Line Communication
    Services, Inc.*, 907 F.Supp. 1361 (N.D.Cal.1995).........................................................13, 17, 19

STATUTES AND RULES

Copyright Act Section 512(*l*), 17 U.S.C. § 512(*l*) ..........................................................24

Digital Millennium Copyright Act...............................................................................24

Federal Rule of Evidence 801(d)(2)(C) ......................................................................21

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**INTRODUCTION**

Cloudflare is a major global provider of services to promote the performance, security and reliability of millions of websites of all kinds. It handles massive amounts of data passing between websites and users, and it helps direct network traffic more efficiently and securely around the globe.

This case concerns a claim that Cloudflare should be liable for contributory infringement of ALS's copyrights for not terminating services to Cloudflare customers based on unconfirmed complaints of infringements occurring on customers' websites. But at another level, the case is a gambit by a failing online porn business, which ███████████████████████████████, to gin up a shot at windfall statutory damages many times over the entire value of ALS's business. The allure of a chance at the statutory damages Super Lotto jackpot incentivizes companies like ALS to promote conflict rather than collaboration and cooperation with service providers to combat infringement. A recent Ninth Circuit decision, *Perfect 10, Inc., v. Giganews, Inc.,* 847 F.3d 657 (9th Cir. 2017), *cert. denied,* 138 S.Ct. 504 (2017), effectively put an end to a similar plaintiff's litigation business model. That case is an important new landmark addressing the special contributory infringement standard for online services that the Ninth Circuit created in *Perfect 10, Inc., v. Amazon.com, Inc.,* 508 F.3d 1146 (9th Cir. 2007). Under that standard, ALS must show not only that Cloudflare provided substantial assistance to primary infringers, but also that Cloudflare had *actual* knowledge of *specific* infringing material and failed to take simple measures to prevent further damage to the copyrighted works. The undisputed facts establish that ALS's claim fails.

Cloudflare has a thoughtful and efficient system for working with complainants and large numbers of abuse complaints of all types. The nature of Cloudflare's services and technology means that it cannot control what data passes through its system or resides temporarily in its caches. It cannot monitor the traffic for specific works, it cannot filter out part of website transmissions for copyright

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

issues, and it cannot remove materials from its customers' websites. It passes copyright complaints on to its customers' hosting providers, and it provides information to the complainant about the hosting provider. Beyond that, there are no measures it can take to prevent copyright infringements by its customers. Terminating its protection and optimization services to its customers—who use other companies as their domain registrars and hosting providers—would do nothing to avoid further damage to anyone's copyrights. It would on the other hand expose websites, their owners, and their users to a wide range of malicious threats. That would be a dangerous step for a security service to take on the basis of untested and self-serving complaints, especially in an environment where hackers and other malicious actors abuse processes as much as they abuse technology.

At the pleading stage, the Court ruled ALS had alleged material contribution to infringements of ALS's copyrights by Cloudflare, focusing on allegations that Cloudflare's services promote twice-as-fast access to websites and that Cloudflare helps customers conceal their identities. Dkt. 60 at 5-9. After extensive discovery, ALS failed to produce evidence to establish that Cloudflare induces infringement or provides substantial assistance to primary infringers. Undisputed evidence now shows that the speed difference is immaterial and that the allegation about Cloudflare's concealment of identities was false. Moreover, Cloudflare does not fail to take any available simple measures to curb infringements with *actual* knowledge of *specific* infringing material. For these reasons Cloudflare does not materially contribute to any infringements and is entitled to summary judgment.

## FACTUAL BACKGROUND

### Cloudflare's Services and Technology

With a mission to "help build a better Internet," Cloudflare is one of the major pillars of the Internet's infrastructure, along with a number of other major companies and institutions that provide connections, technologies, and services that contribute to the existence of an extraordinary, accessible, decentralized, efficient,

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

secure, and open global Internet. *See* Declaration of Albert Lee Guinn III in Support of Cloudflare, Inc.'s Motion for Summary Judgment ("Guinn Dec.") ¶ 3. Cloudflare provides Internet security and traffic optimization services, on both a free and a paid basis, to operators of seven million web properties: major financial institutions, universities, entertainment companies, retailers and other e-commerce companies, governments and agencies, and political campaigns. *Id.* For a wide range of customers, from OKCupid to NASDAQ, Cloudflare's services improve website performance, protect websites from malicious attack, and make the Internet safer for all. *Id.* In 2016 Cloudflare customers included the campaigns of Donald Trump, Bernie Sanders, and more than a dozen other major candidates, fending off hundreds of thousands of attacks *per day*; Cloudflare also serves opposition party or dissident websites that challenge authoritarian regimes around the world. *Id.*

To provide its services, Cloudflare operates one of the largest content delivery networks on the Internet, like those of Akamai and Amazon's AWS CloudFront. *Id*. ¶ 9. Cloudflare's is a pass-through network (or conduit) for transmission of virtually any kind of data, typically between the servers that host its customers' websites and users, such as between a bank's website and customers accessing that site. *Id.* ¶ 9, Ex. E.

Cloudflare's services protect against malicious attacks and optimize Internet performance through 120 data centers or "points of presence" (PoPs) around the world. *Id.* ¶ 12; *see also* Declaration of Nick Sullivan ("Sullivan Dec.") ¶ 3. When an Internet user seeks a Cloudflare customer's website, the user's ISP directs the traffic to the closest or most convenient PoP, where it is screened for telltale signs of threats, such as distributed denial of service (DDoS) attacks, "bots" and other "malware" that may incapacitate networks, harm computers, or steal data. Guinn Dec. ¶¶ 11-12; Sullivan Dec. ¶ 3. If Cloudflare's system clears the data, the system communicates with the website's host to receive and then relay data to users. Sullivan Dec. ¶ 3. This relaying function is known as "reverse proxying." *Id.*;

Guinn Dec. ¶ 11. Reverse proxying also involves use of Cloudflare's Internet Protocol (IP) addresses (numbers such as 103.21.244.0), instead of the customer's addresses, so that traffic for the customer is first directed to Cloudflare. *Id.* ¶ 11.

Cloudflare also assists the overall function of the Internet by providing an "authoritative DNS" service. *Id.* ¶ 9. This provides the numerical IP addresses that correspond to domain names, allowing devices and computers to recognize and reach their Internet destinations. *Id.* ¶ 10.

Cloudflare's services also facilitate and improve Internet performance by caching commonly requested materials in the same way that many other Internet infrastructure providers do. *Id.* ¶ 13. When a user's browser seeks a web page from a Cloudflare customer, the request comes through Cloudflare, causing one of its PoPs to store temporarily some materials from the page to respond to other requests for the same materials that come soon thereafter. *Id.* Such caching is an extremely common feature of Internet transmissions at several points in cloud-based services; for example consumers' web browsers do it, as do routers providing Wi-Fi access points in public locations like hotel lobbies or on airplanes. *Id.* The effect is to lighten traffic loads to customers' websites, helping to protect against DDoS attacks, and improving the speed of access to those websites. *Id.* ¶ 16.

Cloudflare's cache automatically clears data when new requests for the same data do not soon arrive. *Id.* ¶ 13. Thus Cloudflare's cache servers function like mirrors, reflecting what is on a website only temporarily. *Id.* ¶ 6; Sullivan ¶ 4.

Cloudflare's system can help users access websites faster and using less bandwidth because some of the recently accessed data may be closer to the user, but the actual speed difference depends on a vast number of factors, such as locations of visitors and customers, computer and networking equipment, ISP routing, and ISP speeds. *Id.* ¶¶ 16-17. Plaintiff's technical expert Dr. Ghandeharizadeh gave an estimated the difference in web page loading time between an East Coast user and a German user to access a West Coast website at 60 milliseconds (60/1000 or 6/100

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

of a second), whereas the speed of the blink of an eye is generally 100 milliseconds. Declaration of Andrew P. Bridges ("Bridges Dec.") ¶¶ 9w, 9z, Ex. 13 at 75:25-76:21, 79:23-80:21, 81:4-82:1; *see also* Guinn Dec. ¶ 18.

Cloudflare does not provide a hosting service. Guinn Dec. ¶ 7, Exhibit E; *see also* Paine Dec. ¶ 3; Sullivan Dec. ¶ 4. To use Cloudflare's services, a customer must already have an existing website with its own Internet hosting and transmission facilities or services. Guinn Dec. ¶ 7; Sullivan Dec. ¶ 6.

Customers using Cloudflare's services must have their own domain registrar and hosting provider. Guinn Dec. ¶¶ 7-8. They will have their own WHOIS directory entry identifying the domain name registrant and several types of contact information. *Id.* ¶ 8. Cloudflare customers must designate Cloudflare's servers as their "nameservers," which link the customer's domains to Cloudflare's IP addresses, to take advantage of Cloudflare's other services. *Id.* ¶ 10. WHOIS data will show that Cloudflare provides the nameservers, but Cloudflare's services do not change the information about the identity or contact details of the domain registrant. *Id.*; *see also* Declaration of Justin Paine in Support of Cloudflare, Inc.'s Motion for Summary Judgment ("Paine Dec.") ¶ 2. Some domain registrars sell privacy services to their customers, which substitute the privacy service's name for the customer's name on WHOIS domain ownership records. Guinn Dec. ¶ 8. Cloudflare does not provide those privacy services. *Id.* Cloudflare customers who use privacy services do so independently of Cloudflare's services. *Id.*

Cloudflare's services do not alter the substantive content of websites. *Id.* ¶ 14. For optimization and protection purposes, Cloudflare may compress data, insert metadata, and "obfuscate" email addresses so that humans but not bots can see them. *Id.* These processes do not change the website itself or its content. *Id.* To users, sites appear exactly the same with or without Cloudflare's services. *Id.*

**How Cloudflare Responds to Complaints**

Cloudflare regularly gets complaints about content that passes through its

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

network, including for spam, malware, phishing, child abuse materials, infringement, and other problems. Paine Dec. ¶ 4, Ex. 1. It has developed a thoughtful, robust, streamlined, fast, and effective process for addressing complaints and facilitating their resolution; Cloudflare, as a pass-through service and not a host, has no ability to achieve such a resolution itself. *Id.* ¶¶ 3-4.

For accusations of copyright infringement, Cloudflare provides an easy-to-use web form that collects information Cloudflare needs in order to share the complaint effectively with the website host. *Id.* ¶ 5, Ex. 2. That form feeds information into an automated process that transmits the complaint to the website owner, the host, or both, at the complainant's direction. *Id.* ¶¶ 5-6, Exs. 3-4. If someone sends complaints by other means, Cloudflare promptly responds to direct the person to the web form. *Id.* ¶ 10. Other forms of notification, such as email, are error-prone and may slow down processing as they can vary in form and content, can be difficult to interpret, and may require manual review and transcription. *Id.* At the scale Cloudflare operates, such methods are unworkable. *Id.*

Upon receiving a web form complaint of infringement, Cloudflare forwards it to its customer and/or the customer's hosting provider. *Id.* ¶ 6. Cloudflare also promptly provides the complainant with information about the identity and contact information for the hosting provider so that a complainant may follow up directly with the hosting provider. *Id.*, Exs. 5-6. Unlike Cloudflare, the hosting provider generally has the ability to remove materials or shut down websites. *Id.* ¶ 5; Sullivan Dec. ¶ 4. Cloudflare has found that, in practice, referring complaints to the host of a website frequently results in the accused materials being removed or disabled from the website. Paine Dec. ¶ 7.

In contrast, terminating Cloudflare's service to a website will not "take down" any websites or materials; it will merely remove the threat-detection function the Cloudflare PoPs perform and reduce the security of the website. *Id.* ¶¶ 2-3; Sullivan Dec. ¶¶ 4-5. Doing that could make persons who count on that

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

website—especially customers or users of that website—vulnerable to attack. Sullivan Dec. ¶ 5. Terminating Cloudflare's services could also increase risks of infringement. *Id.* One benefit of Cloudflare's services is the identification and blocking of automated tools involved in "scraping," or wholesale downloading, of customers' sites. *Id.* Scraping can collect content from one website for purposes of disseminating it to other websites. *Id.* Thus, while terminating Cloudflare's services for a customer account would not only fail to prevent access to allegedly infringed material but also could make infringing material more available. *See id.* ¶¶ 4-5.

Cloudflare does not induce or encourage copyright infringement by its customers. Sullivan Dec. ¶ 7; Paine Dec. ¶ 4. It does not advertise or urge infringements or take other affirmative steps to foster infringement. Paine Dec. ¶ 4. To the contrary, the system it has put in place has assisted a wide range of copyright holders in combatting infringements. Paine Dec. ¶¶ 4, 7.

**ALS's Business**

ALS operates websites with pornographic images and videos of nude young women. Third Amended Complaint (TAC) (Dkt. 148) ¶ 19. Wayne Kirn founded ALS in 1996; ███████████████████████████████████████ ████████████████████ TAC, ¶¶ 9, 16; Bridges Dec. ¶ 2f, Ex. 1 at 197:12-198:18, Ex. 2. ████████████████████████ *Id.* ¶ 4a, Ex. 5 at 11:8-12:1.

ALS makes money selling subscriptions for access to its password-protected websites. TAC ¶ 16; Bridges Dec. ¶ 2a, 2c, 2d, Ex.1 at 74:1-25, 129:1-25, 132:1-133:25. ALS does not sell access to its images or "galleries" (collections of images) on an individual basis. A subscriber can view or download any of the images or videos on ALS. *Id.* at 2c-2d, Ex. 1 at 129:1-25, 132:1-133:25.

The direct infringers underlying the claims in this case must be ALS subscribers who access ALS's password-protected websites in order to access the material they disseminate elsewhere. *See id.* ████████████████████████ ███████████████████████████████████████████████████████

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Bridges Dec. ¶ 5a, Ex. 6 at 98:1-100:6. ████████████████

████████████   *Id.* ALS's "practice was never to use any sort of technology or tracking to see an image come off of our server and then follow it as that user took it and you know, tried to disseminate it elsewhere." *Id.*

Contrary to virtually all other copyright claimants with which Cloudflare has worked, ALS refuses to take advantage of Cloudflare's simple, speedy, and accurate process for processing complaints. ALS's agent, who represents several similar copyright holders, used Cloudflare's web form a few times for ALS but then switched to sending unworkable and defective email communications instead—all the while continuing to use Cloudflare's web form for his other clients. Paine Dec. ¶¶ 11- 17, Exs. 14-24; Bridges Dec. ¶ 7i, 7l, 7m, 7n, 7p, 7s, Ex. 7 at 81:13-25, 105:1-9, 109:5-7, 119:5-122:19, 124:4-125:20, 152:18-25.

ALS does not cooperate with Cloudflare to address infringements. Like the plaintiff in *Perfect 10, Inc., v. Giganews, Inc.,* 2014 WL 8628031 (C.D. Cal. 2014), *aff'd,* 847 F.3d 657 (9th Cir. 2017), *cert. denied,* 138 S.Ct. 504 (2017), ALS avoids sending complaints through Cloudflare's system, instead demanding a right to burden Cloudflare unnecessarily. This approach is a mere pretext for ALS, which has invested little in its business, to seek windfall statutory damages in litigation.

**The Third-Party Websites at Issue**

ALS's claims pertain to Cloudflare's content delivery network and related services to 17 websites or their hosting services.[1] Plaintiff concedes Cloudflare does not own or operate any of those websites. Bridges Dec. ¶ 15a-15d, Ex. 23 at 1-3. Cloudflare provided varying services at different times for the 17 websites. Paine Dec. ¶¶ 19-20. Like most of the over seven million websites to which Cloudflare

---

[1] The websites are imgchili.net; slimpics.com; cumonmy.com, bestofsexpics.com, stooorage.com, greenpiccs.com, imgsen.se, imgspice.com, imgspot.org, img.yt, vipergirls.to, fboom.me, imgflash.net, imgtrex.com, imagetwist.com, artofx.org, and namethatpornstar.com. TAC ¶¶ 35, 39, 57; Dkt. 188 (granting Cloudflare's Motion for Partial Summary Judgment regarding pornwire.net); Dkt. 325 at 1 (list of websites at issue).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

provides services, the majority of the websites in question use Cloudflare's free services. *Id.* ¶ 20, Ex. 25. Two of them no longer use Cloudflare's services. *Id.* ¶ 19.

At least 11 of the 17 websites are user-generated content (UGC) sites. Bridges Dec. ¶ 2l, 4h, 4i, Exs 1, 5. Materials on them come from uploads by their customers. *Id.* The sites publish terms of service for users with guidelines to copyright owners for notifications of claimed copyright infringement. Bridges Dec. ¶ 17-21, Exs.25-29. One of the sites advises persons that they can contact an administrator for "Removal of Copyright Material" and can "expect a response [on] the same day." *Id.* at 22, Ex. 30. ALS's copyright enforcement agent complained to several of the accused sites, which led to removal of the images. Bridges Dec. ¶ 6b-6h, Ex. 7.

**Interactions between ALS and Cloudflare**

ALS used an agent, Stephen Easton, to send complaints to Cloudflare. He is not a lawyer. Bridges Dec. ¶ 6a, Ex. 7. Easton acts for several copyright holders. *Id.* For other clients he regularly used Cloudflare's web form. Paine Dec. ¶ 11. But for ALS he almost exclusively sent email messages. *Id.* ¶ 12. Cloudflare's system automatically responded, advising him to use the web form. He refused and sent large numbers of complaints by email. *Id.* Relishing imposing a burden, Easton told ALS that he "split up" a complaint "into numerous notices to drive [Cloudflare] crazy." Bridges Dec. ¶ 6k, Exs. 7-8. Others complained about his e-mailed complaints. Bridges Dec. ¶ 6s, Ex. 7 at 152:18-25. Easton admitted that, while email complaints took him half an hour on average, and up to two hours, the Cloudflare web form takes no more than 10-15 minutes. *Id.* ¶ 6s, Ex. 7 at 105:1-9. On the rare occasions, early on, that ALS used Cloudflare's web form, Cloudflare immediately forwarded the complaint to the customer and/or host and also provided information about the host to ALS. *Id.* ¶ 6s, Ex. 7 at 81:13-25; Paine Dec. ¶ 13.

**ALS's Claims and Earlier Proceedings**

The Court previously dismissed claims against Cloudflare for "inducement"

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

of copyright infringement, vicarious copyright infringement, contributory trademark infringement, and unfair competition. (Dkt. 60, Oct. 24, 2016). The current complaint claims only contributory copyright infringement. TAC ¶¶ 57, 66-69. Paragraph 68 alleges Cloudflare "induced infringement of ALS's copyrights" even though the Court had previously dismissed that claim.

## ARGUMENT

## I.     THE STANDARD FOR SUMMARY JUDGMENT

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those papers that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party has the burden of proof, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *See id*. If the moving party meets its initial burden, the non-moving party must provide evidence of "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment; "mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996). The "mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient" to defeat a summary judgment. *Liberty Lobby*, 477 U.S. at 252.

## II.    CLOUDFLARE HAS NOT ENGAGED IN CONTRIBUTORY INFRINGEMENT OF ALS'S WORKS.

Cloudflare is entitled to summary judgment under any standard of contributory copyright infringement. Cloudflare believes that the only standard for contributory infringement after *Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd.*, 545 U.S. 913 (2005), is the "inducement" standard. Because the Ninth Circuit recognizes a coexisting "material contribution" standard, however, Cloudflare will

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  address both standards.

2      **A.      ALS Has Provided No Competent Evidence of Primary**

3           **Infringements for Which Cloudflare Is Responsible.**

4      Contributory infringement liability turns upon proof of an underlying direct,

5  or primary, infringement for which a defendant is liable. *Perfect 10, Inc. v.*

6  *Amazon.com, Inc*., 508 F.3d at 1172 (9th Cir. 2007).

7      Cloudflare does not concede any direct infringements of ALS's copyrights

8  for which Cloudflare can be liable. ALS has not proffered competent evidence

9  about the assumed primary infringers or their conduct in this case: the primary

10 infringers in fact must be *ALS's own customers*, who abuse their subscriptions and

11 access to ALS's sites to obtain images that they then post to other websites. It is

12 ALS, not Cloudflare, which appears to have an actual relationship with the primary

13 infringers or an ability to control them. ███████████████████████

14 █████████████    Bridges Dec. ¶ 5a, Ex. 6 at 98:1-100:6.

15     ALS's allegations and claimed evidence have focused entirely on

16 Cloudflare's customers. There is no competent evidence to meet all the elements of

17 proof that those customers are primary infringers.[2]

18     **B.      Cloudflare Has Not Induced Direct Infringement of ALS's Works.**

19     Under *Grokster,* ALS must show that Cloudflare intentionally induces direct

20 infringement of its works either (a) by imputing culpable intent from provision of a

21 service that is incapable of substantial noninfringing uses or (b) showing clear

22 expression or other affirmative steps to foster infringement. ALS can show neither.[3]

23

24 [2] Moreover, there is no competent evidence to establish all the elements of proof of
25 contributory infringement claims against Cloudflare's customers; to the contrary, at
   least with a number of them, there is evidence that they removed infringing works
26 when they received complaints, which suggests no liability for them under
   *Amazon.com*.
27 [3] ALS pleaded an inducement theory of contributory infringement in its First
   Amended Complaint (Dkt. 33), and the Court dismissed that claim. Dkt. 60 at 9-10.
28 ALS repleaded the claim in its current Third Amended Complaint (Dkt. 148).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### 1. Cloudflare's services have many non-infringing uses.

Wrongful intent to induce infringement may not be imputed from knowledge that a service is being used to infringe where it is capable of substantial non-infringing uses. *See Grokster*, 545 U.S. at 933 (following *Sony*, 464 U.S. at 442); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1010, 1033 (9th Cir. 2013) (standard applies to services). Undisputed evidence shows that Cloudflare's service has many noninfringing uses, including improving performance and protecting the websites of major businesses, universities, and agencies. Guinn Dec. ¶¶ 3-5 Sullivan Dec. ¶¶ 3, 7; Bridges Dec. ¶ 9o-9r, 9cc-9ee, 9oo-9pp, Ex. 13 [G dep.].

### 2. Cloudflare has not encouraged or induced direct infringement of ALS's copyrights by clear expression or other affirmative steps to foster infringement.

ALS must prove Cloudflare provided services "with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement." *Grokster* 545 U.S. at 936-37; *Fung*, 710 F.3d at 1034. *Grokster* "requires a high degree of proof of the improper object" *Id.* "[M]ere knowledge of infringing potential or of actual infringing uses" is insufficient. *Id.* "Nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability in themselves." *Id.*

ALS cannot show Cloudflare made any clear expressions or took any other affirmative steps to foster infringement. Cloudflare did not advertise or encourage direct infringements of ALS's copyrights in any way, and ALS has no evidence to the contrary. The record reflects that Cloudflare has taken active steps to *discourage* copyright infringement on its services through its terms of service, its provision of easy to use web forms and prompt processing of compliant notices, and its communications to hosts and complainants. Paine Dec. ¶¶ 5-8, 10 and Exs. 2-12.

---

Cloudflare believes that the claim is no longer part of the case but addresses it in an abundance of caution.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## C. Cloudflare Has Not Engaged in Contributory Infringement of ALS's Works Under a "Material Contribution" Theory.

In the Ninth Circuit, a plaintiff suing an online service for "material contribution" must show that the defendant (1) substantially assists direct infringers of the plaintiff's copyrights and (2) fails to take available simple measures to prevent further damage to the copyrights after receiving actual knowledge of specific infringements. ALS can show no evidence to support either element.

As this Court observed, "[a] third party can only be liable for materially contributing to infringement where its participation in the infringing conduct of the primary infringer is 'substantial.'" Dkt. 60 at 6 (quoting *A&M Records, Inc., v. Napster, Inc.,* 239 F.3d 1004, 1022 (9th Cir. 2001)).

The Ninth Circuit discussed both (1) "substantial assistance" as a threshold consideration and (2) the availability of simple measures after actual knowledge as the central focus used to assess a material contribution claim against an online service provider in *Amazon.com, Inc.,* 508 F.3d at 1172. Explaining substantial assistance in the context of a powerful search engine that helps users find even obscure sources on the web, the Ninth Circuit observed that "services or products that facilitate access to websites throughout the world can significantly magnify the effects of otherwise immaterial infringing activities." *Id.* Against that backdrop, the Ninth Circuit then articulated a further specific requirement for online services: "we hold that a computer system operator can be held contributorily liable if it 'has *actual* knowledge that *specific* infringing material is available using its system,' and can 'take simple measures to prevent further damage' to copyrighted works, yet continues to provide access to infringing works." *Id.* (quoting *Napster,* 239 F.3d at 1022, and *Religious Technology Center v. Netcom On-Line Commc'n Services, Inc.,* 907 F. Supp. 1361, 1375 (N.D. Cal. 1995)).

Applying that framework to Google, the Ninth Circuit held that Google substantially assisted infringing websites and a worldwide audience of users.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Amazon.com*, 508 F.3d at 1172. Yet that observation did not conclude the analysis and justify liability. It merely set the stage for the next inquiry: "Google could be held contributorily liable if it had knowledge that infringing Perfect 10 images were available using its search engine, could take simple measures to prevent further damage to Perfect 10's copyrighted works, and failed to take such steps." *Id.* The court remanded the case for the district court to address that part of the material contribution standard, which involved factual disputes over the adequacy of the plaintiff's notices to Google of the infringement and Google's responses to the notices, as well as factual disputes over whether there was a reasonable and feasible means for Google to refrain from providing access to the infringing websites. *Amazon.com*, 508 F.3d. at 1172-73; Dkt. 60 at 6.

### 1.    Cloudflare has not substantially assisted primary infringers.

In *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,* 494 F.3d 788 (9th Cir. 2007), the Ninth Circuit distinguished between services that do and do not substantially assist infringement. Reviewing a dismissal, the Ninth Circuit rejected as inadequate allegations that payment processors could materially contribute to infringement by "offering services that allow it to happen on larger scale than would otherwise be possible" and by making infringement "more widespread than it otherwise might be." *Id.* at 799. The court stated, "Defendants have the power to undermine the commercial viability of infringement does not demonstrate that the Defendants materially contribute to that infringement." *Id.* at 800.

*Visa* held: "We acknowledge that Defendants' payment systems make it easier for… infringement to be profitable, and… have the effect of increasing such infringement, but because infringement of Perfect 10's copyrights can occur without using Defendants' payment system, we hold that payment processing by the Defendants . . . does not constitute a 'material contribution'. . . ." *Id.* at 797-78.

Here, there is no evidence that Cloudflare's services make any difference to the alleged infringements, much less that Cloudflare makes infringement more

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

widespread like Visa and other payment processors—a difference that failed to support a contributory infringement claim. Cloudflare's services are like those of "peripherally-involved third parties, such as computer display companies, storage device companies, and software companies that make the software necessary to alter and view the pictures and even utility companies that provide electricity to the Internet," which do not provide substantial assistance. *Visa,* 494 F.3d at 800.

Similarly, Cloudflare's services are not essential to infringements on any websites.[4] Termination of its services for a particular website has no effect on the website's availability or the appearance of the website. Cloudflare's absence may merely make a website more vulnerable to malicious attack. Sullivan Dec. ¶ 5. But the infringements ALS alleges here would occur with or without Cloudflare.

### a.   The evidence shows that Cloudflare's alleged speed improvement is not material to infringements.

ALS alleged that Cloudflare advertised that websites using its service would load twice as fast. Without reference to the actual times or effect, the allegation hinted at a significant time difference that might be material to infringement. But the evidence now shows that the actual speed difference is a fraction of a fraction of a second. ALS's technical expert Dr. Ghandeharizadeh could identify no evidence of any meaningful speed difference that Cloudflare caused, much less any effect it had on particular images, websites, or users. To the contrary, when giving an example of the speed benefits of caching material closer to website visitors the way

---

[4] In the ruling on the motion to dismiss, this Court rejected the argument that Cloudflare's services were not necessary to the infringements, citing to the fact that infringing websites would still exist even if Google did not index them in its search engine. Dkt. 60 at 8 n.5. But the *Visa* holding shows that whether a defendant's service is essential to infringement is an important consideration. *Visa,* 494 F.3d at 797-98. Being an "essential step in the infringement process" was apparently the sole factor in *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936 (9th Cir. 2011), which involved a hosting provider unlike Cloudflare. In any event, in *Google* the Ninth Circuit emphasized that Google significantly magnified otherwise immaterial infringements. There are no similar facts here.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Cloudflare does, he testified that the difference in transmission from one site on the West Coast to a closer user on the East Coast or to a more distant user in Germany would be approximately 60 milliseconds (or .006 of a second), less than the blink of an eye. Bridges Dec. ¶¶ 9z, 93, Ex. 13 at 75:25-76:21, 79:23-80:21, 81:4-82:1. Many other non-Cloudflare technologies necessary to accessing a website, like ISP speed, network traffic, router demands, and proximity to a Wi-Fi router, can have a larger effect. Guinn Dec. ¶ 17; Bridges Dec. ¶ 9bb, Ex. 13 at 82:14-85:20.

The Ninth Circuit in *Visa* distinguished between Visa and Google. The fact that Visa could make infringements more profitable and therefore more widespread was not enough to create Visa's liability. The court of appeals explained that Google could substantially assist infringements by enabling persons to locate and distribute otherwise unavailable infringing material; what really made the difference was Google's *location* service as a search engine. That made it possible to find images that, as a practical matter, a user likely could never find without it. "Because location services lead Internet users directly to infringing images and display them on the website of the service itself, we find that location services are more important and more essential—indeed, more 'material'—to infringement than payment services are." *Visa*, 494 F.3d at 797-98 and n.8.

The Ninth Circuit's discussions of Napster and Grokster focused on their enabling persons to locate and obtain infringing material that many users could not find otherwise. Transmission speed was not an issue. *Id.* at 797. In fact, those companies did not transmit infringing content: they provided indexes allowing users to find and get material from others, which the court called "distribution." A Google user would go directly to the website to which Google pointed; Napster and Grokster users engaged in peer-to-peer transmissions with other users.

Imagine how long it would take, and how hard it would be, for a person to find something without Google's search engine: the elapsed time could be days, and finding it might be impossible. The same was true for persons searching for

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

music from "peers" on the Internet with Napster. Cloudflare does not help persons discover content on the Internet and is vastly different from the content discovery services and tools of Google (Web search) or Napster (centralized index of music files). Cloudflare's service is also unlike Usenet services in *Netcom* or *Ellison v. Robertson,* 357 F.3d 1072 (9th Cir. 2004), where defendants hosted repositories with news groups organized by topic. *Compare also ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619 (4th Cir. 2001)(service hosted newsgroups with "ALS" in their names: "alt.binaries.pictures.erotica.als" and "alt.als").

In this context, a 60 millisecond difference for a web user in accessing an infringing site he or she had *already discovered through other means* is immaterial. *ALS has no evidence that the speed difference makes a difference to any infringer*.

Moreover, as this Court noted, the "substantial assistance" Google provided was to "significantly magnify the effects of otherwise immaterial infringing activities." Dkt. 60 at 6 (quoting *Amazon.com,* 508 F.3d at 1172). There is no evidence that Cloudflare's speeding access to web pages by less than the blink of an eye *significantly magnifies* infringing activities. Nor can ALS show Cloudflare magnifies *otherwise immaterial* infringing activities: persons using Cloudflare to visit a web site have already identified the destination that they want to visit by other means, such as search engines or links from other web sites.

For these reasons, Cloudflare's speed difference neither "substantially assists" otherwise "immaterial infringing activities," nor makes infringement more widespread than it otherwise would be, so as a matter of law Cloudflare does not materially contribute to infringements of ALS's works.

### b.    Cloudflare does not help websites conceal identities.

Undisputed evidence shows the falsity of the allegation that Cloudflare "allows pirate sites and their hosts to conceal their identity from copyright owners," Dkt. 60 at 9. Although some domain registrars provide website owner privacy services that change owner information for domains in the WHOIS database to

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

mask the identity of owners or operators, Cloudflare does not provide such a service. Guinn Dec. ¶ 8. Cloudflare's DNS services do not change any owner information for websites in the WHOIS database. When a website owner starts using Cloudflare, it switches the IP address of the "nameserver" to direct others to the Cloudflare network instead of to its hosting provider, and the associated ownership information for those IP addresses (but not for the domain) will be for Cloudflare. Guinn Dec. ¶ 10; Paine Dec. ¶ 2. Cloudflare does not generally give customer origin IP addresses to complainants, for an important reason: as a security company it knows that malicious actors can seek origin IP addresses to circumvent Cloudflare's protections and launch cyberattacks, like DDoS attacks, directly against the website's hosting servers. Paine Dec. ¶ 8.

Cloudflare's use of an automated web form is consistent with industry practice. Paine Dec. ¶ 10. Cloudflare's process provides, in a transparent, automated, and efficient way, the exact information that ALS suggests it is concealing. When someone sends a complaint through the web form, Cloudflare responds by identifying the host and providing its contact information, the same information that would be available through the WHOIS IP address database if the customer had not changed the "nameserver" to Cloudflare. The only difference is that the IP address is not revealed, preventing attacks at that address. Cloudflare also responds to subpoenas requesting the same information.  Paine Dec. ¶ 16.

### 2.    Cloudflare did not fail to take simple measures to prevent further damage to ALS's works.

Even if it can show that Cloudflare materially contributed to the alleged infringements, which it cannot, ALS's claim fails because ALS cannot meet the additional requirement of showing that Cloudflare "'has *actual* knowledge that *specific* infringing material is available using its system,' and can 'take simple measures to prevent further damage' to copyrighted works, yet continues to provide access to infringing works." *Amazon.com,* 508 F.3d at 1172 (emphasis in original)

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(citations omitted); *Giganews*, 847 F.3d at 671.

Simple measures must target specific infringements. The court of appeals said Napster had contributed to infringement because it knew of the availability of infringing music files, assisted users in accessing the files, and failed to block access to the files. *Amazon.com*, 508 F.3d at 1171 (citing *Napster*, 239 F.3d at 1022). It also said that, in *Netcom*, the provider could be liable for failing to cancel an infringing message on its bulletin board. *Id.* at 1172 (citing *Netcom*, 907 F. Supp. 1374). *Amazon.com, Napster,* and *Netcom* all focused on actual or potential actions of the service providers regarding *specific infringing files or messages*.

The Ninth Circuit revisited contributory infringement most recently in *Giganews*. There defendants operated Usenet servers hosting news groups with millions of public messages. Perfect 10, another pornographer like ALS here, sued after a standoff over Perfect 10's refusal to provide machine-readable copyright complaints. The *Giganews* defendants also asked Perfect 10 to provide Message-IDs in order to identify and remove specific messages. Perfect 10 refused to do so, instead sending messages and faxes with screenshots and search recommendations to locate the messages. *See Giganews,* 2014 WL 8628031 at *9-10.

Granting summary judgment to defendants, the district court held that defendants lacked actual knowledge of specific infringements. The district court did not reach the question of material contribution. 2014 WL 8628031 at *7-11.

The Ninth Circuit affirmed summary judgment for defendants on the "material contribution" theory without reaching actual knowledge of specific infringements. *Giganews*, 847 F.3d at 670-72. The court focused on "simple measures" available in the face of Perfect 10's refusal to provide machine-readable message identifiers for the specific messages that Perfect 10 complained about. The court concluded: "we hold that there were no simple measures available that Giganews failed to take to remove Perfect 10's works from its servers." *Id.* at 671.

Here, there is no evidence that Cloudflare had actual knowledge of specific

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

infringements or that Cloudflare failed to take simple measures to prevent those infringements. For this reason, ALS's contributory infringement claim fails.

### a. ALS's agent did not give actionable information or provide actual knowledge of specific infringements.

The sole basis for ALS's claim of "knowledge of specific infringements" is that ALS's agent sent lots of emails to Cloudflare. Those messages did not provide actionable information in two ways: first, as unstructured emails they could not work in an automated system that depends upon web form submissions for accurate and fast handling of complaints; second, their contents were wildly inadequate.

The vast majority of ALS's email messages used ambiguous blended references to "copyright and/or trademark" and listed long strings of HTML code, including URLs (links to web pages), without explaining what they were. Paine Dec. ¶ 17. Most of the form emails did not state that that any images on particular websites were identical to ALS images. *Id.* Nor did they identify or describe copyrighted materials that ALS claimed to own. *Id.* When Cloudflare advised ALS to use its web form and explained that Cloudflare does not host and cannot remove material, ALS's agent responded with increasingly belligerent messages, even threatening to report Cloudflare to the police. Paine Dec. ¶ 16, Exs. 19-23.

In the few instances where Cloudflare received complete complaints from ALS through its web form, Cloudflare immediately took the only steps it could: it transmitted the complaints to customers and their hosts and also responded to ALS with information for contacting the hosting providers. Paine Dec. ¶¶ 12-13.[5]

Apart from the few web form submissions from ALS that Cloudflare received, all the communications from ALS were unusable by Cloudflare's system,

---

[5] Even those web form submissions did not give Cloudflare actual knowledge of infringements, because the notices are mere complaints or accusations. Cloudflare cannot investigate and evaluate the veracity and accuracy of such complaints, or render legal conclusions about them. It simply acts on complaints that appear well-formed for its systems' needs. Paine Dec. ¶ 9.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

and they also provided no actual knowledge of specific copyright infringements.

Whenever it received an email, Cloudflare's system repeatedly responded with a request that ALS's agent Mr. Easton submit the complaint through the web form. Paine Dec. ¶ 10. Had Mr. Easton used Cloudflare's web form, order could have emerged from his chaos. But Mr. Easton, with ALS's apparent blessing, chose not to do so. Mr. Easton shared his pleasure with ALS over his effort to burden Cloudflare with his notices. Bridges Dec. ¶ 6k, Ex. 8.

Apart from other inadequacies, the emails did not create actual knowledge of specific infringements. Plaintiff's technical expert Dr. Ghandeharizadeh,[6] reviewing representative emails to Cloudflare from Easton, could not tell whether images at any URLs in the emails were infringing. Bridges Dec. ¶ 9g-9h, Ex.13-15. The same was true of Plaintiff's damages expert Dr. Luna. Bridges Dec. ¶ 10i, Ex.17-18. Indeed, Dr. Luna has opined (for damages purposes) that Cloudflare saved money by not hiring a phalanx of expert copyright lawyers to evaluate the copyright complaints it receives from copyright holders *to determine if there was infringement or not*. Bridges Dec. ¶ 10b, Ex. 17 at 36:14-37:23, Ex. 24 [Luna Report 6-8]. She admitted that "just because somebody says there's been infringement, you don't know if that's true or not" adding "[b]ut someone with a legal background should be looking at it . . . ." *Id.* ¶ 10j, Ex.17 at 112:25-113:8.

The facts of this case are remarkably similar to those of *Giganews*, where Perfect 10 burdened defendants with communications that they could not

---

[6] Cloudflare can rely upon these statements by ALS's experts even though it may challenge their qualifications and expertise, and the untimeliness of the disclosure of their opinions, in an upcoming motion and may also object to some of their purported expert testimony. Under Federal Rule of Evidence 801(d)(2)(C), this Court should treat Dr. Ghandeharizadeh's statements confirming the lack of actual knowledge of specific infringements from ALS's complaints, like those of Dr. Luna, as party admissions attributable to ALS itself. *See, e.g., Collins v. Wayne Corp.*, 621 F.2d 777, 780 (5th Cir. 1980) (expert statements are treated as party admissions under Rule 801(d)(2)(C) once a party has designated an individual as an expert and that expert has provided opinions in the case).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

reasonably manage at the scale at which they operated and that lacked specifics about the particular alleged infringements. The district court in *Giganews* found that they provided no actual notice of specific infringements without reaching the question of simple measures. 2014 WL 8628031 at *7-11. Here also ALS's communications do not provide actual knowledge of specific infringements, and on that basis alone ALS cannot sustain its contributory infringement claim. The facts here are also similar to those in *Luvdarts, LLC v. AT&T Mobility, LLC,* 710 F.3d 1068, 1072-73 (9th Cir. 2013), in which the Ninth Circuit ruled that the plaintiff's notices failed to provide actual knowledge of specific infringements.

### b.     Cloudflare has no available simple measures to prevent further damage to ALS's copyrights.

For the same reasons that ALS's communications provided no actual knowledge of specific infringements, they also did not enable Cloudflare to take simple measures of any sort. The court of appeals in *Giganews* affirmed summary judgment for the defendants because they could take no simple measures to limit infringements based on the complaints Perfect 10 sent. *See Giganews*, 847 F.3d at 671-72. Here also there were no simple measures Cloudflare could take with unusable and inadequate e-mail complaints. Paine Dec. ¶¶ 14, 17.

Even if ALS could show actionable communications and actual knowledge of specific infringements, however, no evidence in the record suggests that simple measures are available for Cloudflare to prevent further damage to ALS's works; if anything, ALS's experts prove the absence of simple measures. Cloudflare's systems are entirely automatic, and Cloudflare has no control over specific materials that pass through its system and network. Cloudflare handles a vast amount of data for the more than 7 million web properties that use its services. Guinn Dec. ¶ 3. Importantly, it cannot edit or otherwise control its customer's websites, and it cannot provide visitors with "edited" experiences of its customers' websites. Cloudflare has no capability, either technical or practical, to identify any

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

data as infringing or even as matching data that constitute particular images. Guinn Dec. ¶ 14; Declaration of Nick Sullivan (Sullivan Dec.) ¶ 7.

Cloudflare does not host or control any websites like the defendants in *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936 (9th Cir. 2011). It provides no essential step or service of infringement as in *Akanoc*. It does not provide any service to help anyone locate any specific files, images, messages, or other material like the defendants in *Napster* and *Amazon.com*. Cloudflare's only option would be to discontinue services to an entire website, which would then route traffic directly to the original host, which would continue to serve the same content but merely become vulnerable to cyberattack. The only "simple measure" to remove infringements from Cloudflare's system is for Cloudflare's customers to remove infringements from their websites at the hosts; for that reason Cloudflare implemented a system for speedily passing complaints on to customers and their hosting providers, and for giving complainants information about the hosting providers so that they can also contact those providers directly. Paine Dec. ¶¶ 5-6.

Termination of service based upon copyright complaints, as ALS wants, would also not be a simple measure. Instead it would be ineffective; overbroad; affecting far more persons than the alleged primary infringers; and dangerous.

*Ineffective*: Cloudflare has shown that customers' websites would continue to operate with their regular content without its service. Sullivan Dec. ¶ 5. Without Cloudflare, the alleged infringements would continue. There is no evidence that the loss of Cloudflare's speed difference would affect infringement at all. As the Ninth Circuit stated, "mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson,* 83 F.3d at 1081-82. For these reasons, Cloudflare cannot affect "further damage" to copyrighted works by any measure.

*Overbroad*: Termination of Cloudflare service in response to copyright complaints would be overbroad in two ways. First, termination would not target *specific* infringements but would apply to all activities and content of a customer's

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

website, which may include lawful material of many users. The Ninth Circuit's standard, focusing on *specific* infringements, does not create an obligation to take action at a wholesale level against entire sites. Throwing a baby out with bathwater is not a simple measure targeting bathwater. The earlier decisions that *Amazon.com* cited all involved online service providers with the ability to target their measures to specific links, files, or messages on their systems.[7] *Cloudflare cannot do that*. In that respect, Cloudflare is like Visa, or the other "peripherally-involved third parties," *Visa*, 494 F.3d at 800, who are not contributory infringers.[8] Second, termination of service to an entire site because of complaints against one user may affect countless other, lawful users of that site. Most of the websites at issue are user-generated-content websites; their users and the website operators might lose important protection against cyberattacks simply because one user has provoked a complaint of copyright infringement.

*Dangerous*: Termination of Cloudflare's services can leave sites and their users vulnerable to malicious attacks. Cloudflare regularly receives bogus complaints by persons who intend mischief to its customers and who would like Cloudflare to drop its protections in order to leave customers and their users vulnerable. A security company like Cloudflare—which provides services to government agencies, dissident websites and political campaigns, large and small businesses, universities, and government agencies—cannot adopt a system that

---

[7] *See Amazon.com*, 508 F.3d at 1171-72 (reference to Napster's knowledge of availability of "infringing music files," assistance in accessing "such files" and failure to block "such files" and potential liability for Netcom from "failure to simply cancel [the] infringing message"); *Visa*, 494 F.3d at 796 (describing Google's "links to specific infringing images" in *Amazon.com*).

[8] ALS occasionally confuses the substantive standards of contributory copyright infringement with the conditions for the optional remedies safe harbor in the Digital Millennium Copyright Act. One condition of the safe harbor is that a service provider have and implement a policy for terminating repeat infringers in appropriate circumstances. There is no similar substantive liability criterion. Section 512(*l*) of the Copyright Act, 17 U.S.C. § 512(*l*), makes clear that the safe harbor conditions do not have any effect on the substantive infringement standards.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  allows abusers to game the system. That would defeat the very purpose of security

2  services. Guinn Dec. ¶ 3; Paine Dec. ¶ 8; Sullivan Dec. ¶ 3.

3       In sum, taking into account ALS's communications and Cloudflare's

4  services, Cloudflare has not failed to take any available simple measures to prevent

5  further damage to ALS's copyrighted works with actual knowledge of specific

6  infringements. *Cf. Giganews*, 847 F.3d at 671 ("no simple measures available that

7  Giganews failed to take). Cloudflare therefore did not materially contribute to direct

8  infringements of ALS's works. It is entitled to summary judgment.

9                                    **CONCLUSION**

10      Cloudflare provides important and legitimate services for website security

11  and optimization and a major component of the Internet's infrastructure. As

12  sophisticated as its technology is, it cannot do more than it has done. It stands ready

13  to work with good-faith copyright holders. It responds to their concerns, passing

14  copyright complaints through to its customers or their hosting providers and

15  providing reasonable information back to complainants to enable them to address

16  their claims to the hosting providers. The undisputed facts show that Cloudflare has

17  not engaged in contributory infringement of ALS's copyrights, and Cloudflare

18  respectfully requests that the Court grant its motion for summary judgment.

19  Dated:  February 1, 2018              FENWICK & WEST LLP

20                                By:   _/s/ Andrew P. Bridges_

21                                      Andrew P. Bridges

22                                      Attorneys for Defendant
                                        CLOUDFLARE, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO