Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE LAW GROUP PLC
468 N. Camden Drive
Second Floor
Beverly Hills, CA 90210
(424) 217-5980
(888) 590-1683 (fax)

Kevin D. Neal (Az. Bar No. 011640)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona  85016-9225
(602) 530-8000
(602) 530-8500 (fax)
john.flynn@gknet.com
kevin.neal@gknet.com

Attorneys for Plaintiff ALS Scan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALS SCAN, INC., a Maryland corporation, <br><br> Plaintiff, <br><br> vs. <br><br> CLOUDFLARE, INC., a Delaware corporation, et al., <br><br> Defendants. | Case No.: 2:16-cv-05051-GW-AFM <br><br> **PLAINTIFF'S OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT BY STEADFAST NETWORKS, LLC** <br><br> Filed Concurrently: Statements of Genuine Issues <br><br> Date: March 12, 2018 <br> Time: 8:30 a.m. <br> Place: Courtroom 9D <br> 350 W. 1st Street <br> Los Angeles, CA |

# Table of Contents

SUMMARY OF OPPOSITION ...............................................................1

DISPUTED AND UNDISPUTED FACTS............................................1

   A.   The Problem ALS Faces With Rampant Infringement............................1

   B.   Imagebam.com is a Chronic Pirate Site. ...................................3

   C.   Steadfast Provided Storage on Servers for Imagebam.com....................4

   D.   Steadfast Failed to Either Respond Expeditiously to Infringement
Notices or Enforce its Repeat Infringer Policy.................................6

ARGUMENT .........................................................................10

I.   THERE ARE TRIABLE DISPUTES REGARDING STEADFAST'S
LIABILITY FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT......10

II.   STEADFAST DOES NOT QUALIFY FOR SAFE HARBOR
DEFENSES. ........................................................................14

III.   STEADFAST HAS LOST ANY SAFE HARBOR PROTECTIONS TO
WHICH IT MAY HAVE BEEN ENTITLED UNDER 17 U.S.C. § 512(i)....16

   A.   Steadfast Has Not Adopted and Informed Account Holders of a Policy
of Termination for Repeat Infringement. ....................................16

   B.   Steadfast Has Not Reasonably Implemented a Policy of Termination for
Repeat Infringement. .........................................................18

IV.   STEADFAST IS CONTRIBUTORILY LIABLE FOR
INFRINGEMENT OF ALS'S TRADEMARKS.............................24

CONCLUSION .....................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Table of Authorities

**Cases**

*ALS Scan, Inc. v. Remarq Communities*, 239 F.3d 619 (4th Cir. 2001)..............15

*Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F.Supp.2d 627
(S.D.N.Y. 2011) ...............................................................................16

*Disney Enterprises, Inc. v. Hotfile Corp.*, 1:11-cv-20427-KMW,
2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) .................................20

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) .........................11

*Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)...........................11

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159
(2d Cir. 1971) .................................................................................11

*Io Group, Inc. v. Veoh Networks, Inc.*, 586 F.Supp.2d 1132 (N.D Cal. 2008) ..14

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,* 591 F.Supp.2d 1098
(N.D.Cal.2008)............................................................... 12, 24

*Louis Vuitton Malletier, S.A. v. Akonic Solutions, Inc.*, 658 F.3d 936
(9th Cir. 2011) ........................................................... 11, 12, 13, 24

*Perfect 10 v. Cybernet Ventures*, 213 F.Supp.2d 1146 (C.D. Cal. 2002).... 22, 23

*Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788 (9th Cir. 2007) ..............11

*Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102 (9th Cir. 2007) .........................18

*Perfect 10, Inc. v. Google, Inc.*, 2:04-cv-09484-AHM (7/26/10) .......................14

*UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F.Supp.2d 1099 (C.D. Cal.
2009)..............................................................................17

**Statutes**

*17 U.S.C. § 106* ...............................................................................10

*17 U.S.C. § 512(c)* ................................................... 1, 14, 15, 16

*17 U.S.C. § 512(i)* .................................................................. passim

**SUMMARY OF OPPOSITION**

The Court has already determined that triable issues of fact likely prevent summary judgment in favor of Defendant Steadfast Networks LLC ("Steadfast").  Steadfast's motions provide no reason to change that conclusion.

Triable issues of disputed fact show that Steadfast contributed to direct copyright infringement by continuing to provide storage services to imagebam.com even after receipt of over 1500 notices of infringement on that site.  ALS's notices of infringement to Steadfast were compliant, or at least substantially so.  Steadfast does not enjoy a safe harbor for copyright infringement under 17 U.S.C. § 512(c) because Steadfast failed to "act" or "respond" to hundreds of notifications of infringement of ALS works on imagebam.com.  Steadfast has failed to meet the conditions for safe harbor eligibility under 17 U.S.C. § 512(i), because Steadfast has failed to either adopt or reasonably implement a policy of termination of the accounts of repeat infringers.  Here, Steadfast failed to inform account holders of its policy for termination for repeat infringement.  Further, Steadfast received over 1500 notices of copyright infringement on imagebam.com, yet declined to terminate imagebam.com for repeat infringement.

ALS concedes vicarious copyright infringement.

ALS has submitted ample evidence from which a jury could find for ALS on contributory trademark infringement.  Steadfast continued to provide storage services for the imagebam.com after receipt of copious information showing that the site was infringing ALS's marks.

Steadfast's motions should be denied.  The case should go to the jury.

**DISPUTED AND UNDISPUTED FACTS**

**A.   The Problem ALS Faces With Rampant Infringement.**

ALS produces high quality proprietary adult content.  ALS's content is available on secure web pages, access to which is exclusive to paying members

of ALS's websites, alsangels.com and alsscan.com.  ALS has registered its works with the Copyright Office.  (12/1/17 Walsh Decl. Doc 302 ¶¶ 2, 3; Third Amended Complaint ["TAC"] Ex. 1.)

ALS is also owner of the registered mark "ALS Scan" in connection with web sites and multimedia materials featuring adult entertainment.  ALS content always displays ALS's registered "ALS Scan" trademark.  Thus, unlawful display of an infringing ALS image infringes both ALS's copyrights and trademark rights.  (12/1/17 Walsh Decl. Doc 302 ¶ 4; TAC Ex. 2.)

ALS's largest business problem is the ubiquitous availability of infringing ALS content on Internet sites with no apparent function other than to provide storage on servers to entire galleries of stolen adult content – "pirate" sites.  (12/1/17 Walsh Decl. Doc 302 ¶¶ 5-7.)

ALS has observed an endless loop of systematic infringement: 1) within hours after ALS posts a new content gallery on its secure webpages a stolen copy of the entire gallery is displayed for free on a pirate site; 2) adult "fan" forums (e.g. vipergirls.to) provide surfers with links to the free stolen ALS galleries; 3) infringing content on the pirate sites is juxtaposed with advertisements placed by ad brokers who pay for clicks or joins; 4) ALS sends notice(s) of infringing content on the pirate site and, sometimes, the infringing content is taken down; but 5) that gallery or another stolen ALS gallery appears on another page of the same pirate site shortly thereafter; and 6) the cycle continues endlessly.  (12/1/17 Walsh Decl. Doc 302 ¶ 8.)

Providing notice of infringement to, and seeking to hold parties responsible for, infringing activity is a time consuming, expensive and fraught endeavor.  ALS pays an agent, Steve Easton, to observe and send notices of infringement on ALS's behalf.  However, even where a pirate site complies with a takedown notice, other infringing ALS content appears on the same site. ALS gives notice where it can to companies providing services to the pirate

1   sites, such as storage of the pirate sites on servers, but too often the service

2   providers decline to terminate services.  Thus, ALS is forced to play an endless

3   game of "whack-a-mole" with no abatement in infringement of its content.

4   (12/1/17 Walsh Decl. Doc 302 ¶ 9.)

5       **B.      Imagebam.com is a Chronic Pirate Site.**

6       Imagebam.com has frequently stored and displayed infringing galleries

7   of ALS content.  From December 26, 2013 through June 22, 2017 Steve Easton

8   sent 853 notices of infringement to imagebam.com and Steadfast of infringing

9   content belonging to ALS or other of Steve Easton's adult clients that was

10  reproduced, displayed and distributed without authority on imagebam.com.

11  (12/1/17 Easton Decl. Doc 299; 12/1/17 Notice of Manual Filing Doc 299-1;

12  12/1/17 Penn Decl. Doc 300 ¶¶ 2-4, Ex. 1; 12/1/17 Walsh Decl. Doc 302¶¶ 10,

13  11.)  Of those notices from Easton, 185 gave notice of copyright and trademark

14  infringement pertaining to ALS's content.  (*Id.*)  A single email often gave

15  notice of infringement of dozens, if not two hundred or more, copyrighted

16  works.  (*Id.*)

17      Steadfast admitted to receiving a total of 1517 notifications of

18  infringement on imagebam.com since 2013.  (12/1/17 Spillane Decl. Doc 301 ¶

19  2, Ex. 1, Response to Interrogatory 13.)

20      Imagebam.com has been one of the worst sites in terms of regularly

21  displaying entire galleries of infringing ALS works.  While imagebam.com

22  apparently claims to be a content neutral share site for third-party uploaded

23  content, thus claiming the privileges of the DMCA, even a short time looking at

24  imagebam.com reveals key attributes of "pirate" sites, ones primarily dedicated

25  to storing galleries of infringing adult content – "red flags" of infringement.  In

26  short, these sites are tooled to maximize upload of high volumes of alluring

27  content while minimizing consequences to users uploading content without

28  authority.  More specifically, imagebam.com, like other pirate sites: 1) offers

alternative high volume upload capacities not typically offered on "mainstream" content-share sites; 2) fails to offer limitations such that only friends or invitees may view content, but rather uploads all content to unsecure publicly viewable pages; 3) monetizes uploaded content through advertisements over, under and proximate to uploaded content, ads that do not direct traffic to the copyright owner; 4) provides code or hyperlinks that can be quickly used to publish the location of the imagebam.com page on adult "fan" forums, sites offering links to free stolen adult content galleries; 5) requires no verifiable personal information to upload content and has weak ability to track and terminate users; and 6) fail to display information indicating compliance with 18 USC § 2257, requiring record keeping of the age of models appearing in adult content. (12/1/17 Penn Decl. Doc 300 ¶¶ 8-32, Exs. 20-22.)

### C.   Steadfast Provided Storage on Servers for Imagebam.com.

Steadfast is a company providing Cloud Services, Dedicated Servers, Data Center Colocation, Disaster Recovery & Business Continuity, Managed Security and IT Consulting.  (www.steadfast.net; 12/1/17 Spillane Decl. Doc 301 ¶ 3, Ex. 2.)  In the words of Karl Zimmerman, Managing Member of Steadfast, Steadfast provides "IT Infrastructure Services."  Zimmerman Depo. pp. 12-13.[1]

One of Steadfast's clients was Flixya Entertainment, which operated imagebam.com.  Flixya opened an account with Steadfast in July 2006.  Flixya leased dedicated servers owned by Steadfast, on which was stored imagebam.com.  Steadfast maintained the physical server.  *Id.* pp. 14-16.

Flixya leased three dedicated servers from Steadfast with 3 Terabyte upload capacities.  Flixya also purchased basic management services.  *Id.* pp.

---

[1] The pages of the Deposition of Steadfast, through Karl Zimmerman, cited herein are attached to the 12/1/17 Spillane Declaration Doc. 301 as Exhibit 3.

1   16-21, Exs. 1, 2.  Steadfast is not aware of any sites Flixya placed on the servers

2   leased from Steadfast other than imagebam.com.  *Id.* 22:6-9.

3        Steadfast provided and configured the servers leased by Flixya and

4   placed the servers on racks in Steadfast's data center.  *Id.* pp. 30-31.

5        In March 2007 Flixya raised a technical quarrel about the system

6   performance they were obtaining from the servers provided and configured by

7   Steadast.  Id. pp. 33-36, Ex. 4.  In the discussion Flixya said "Last night in just

8   under ten hours 33,000 videos were uploaded without a single crash."  *Id.*

9   39:14-18, Ex. 4 STF 37844.  Mr. Zimmerman did not wonder why

10  imagebam.com was uploading 33,000 videos.  *Id.* 39:19-21.  Steadfast did not

11  ask what kind of videos were being uploaded.  *Id.* 40:1-3.  Flixya said that the

12  technical issues had resulted in "decreased ad revenues."  *Id.* 40:8-18.

13       Steadfast looked at imagebam.com and saw that advertisements were

14  placed at the top of pages.  *Id.* 40:19-41:1.  Steadfast did not see the drop box

15  indicating a choice to upload "adult" or "family friendly" content.  Steadfast did

16  not ask whether imagebam.com was receiving primarily adult content.  *Id.*

17  41:19-42:3.

18       The Steadfast servers leased by Flixya also stored imagebam.com's

19  MySQL database, "a standard open-sourced database platform."  *Id.* pp. 44, 62-

20  63.

21       If Steadfast had powered down the servers leased by imagebam.com, the

22  front page of the site would have been inaccessible until Flixya could perform

23  operations to direct users to the page on some other company's server.  *Id.* pp.

24  46-48.

25       Steadfast stored on its servers, at a minimum, the front page of

26  imagebam.com, which supported the entire upload capacity, and the MySQL

27  database.  *Id.* pp. 33-48; 12/1/17 Penn Decl. Doc 300 ¶¶ 8-20, Exs. 20-22.

28

**D.**     **Steadfast Failed to Either Respond Expeditiously to**
           **Infringement Notices or Enforce its Repeat Infringer Policy.**

On August 31, 2017 Karl Zimmerman appeared as Steadfast's sole witness in response to ALS notice of the deposition of Steadfast under FRCP R. 30(b)(6).  Mr. Zimmerman confirmed that he was Steadfast's designated witness for all subjects in the Notice, including Topic 7, "Whether Steadfast has terminated its account in relation to www.imagebam.com; If not, why not?" and Topic 8, "How Steadfast has adopted and reasonably implemented, and informed its subscribers and account holders of, a policy that provides for termination in appropriate circumstances of its subscribers and account holders who are repeat infringers."  *Id.* pp. 10-11, Ex. 1.

Mr. Zimmerman, as Steadfast's corporate witness, was not able to recall what policy Steadfast maintained for termination for repeat infringement; he relied on website Terms produced in the case.  *Id.* pp. 88-89.  However, Steadfast's website says little to nothing on this subject.  Steadfast has no links on its homepage or anywhere else on its site using the terms "DMCA," "Abuse" or "Infringement."  Steadfast's home page has a small link at the bottom titled "Legal Info and Privacy Policy," which when clicked resolves to Steadfast's "Acceptable Use Policy (AUP)/Terms of Service." (12/1/17 Spillane Decl. Doc 301 ¶ 5, Ex. 4.)  That page, https://www.steadfast.net/legal-information,says it was "last updated January 30, 2017."  That was shortly after Steadfast first appeared in this case.  (12/8/16 Stipulation to Vacate Default, Doc. 75.)  The current page says "Steadfast responds to notices of alleged copyright infringement and terminates accounts of repeat infringers according to the process set out in the U.S. Digital Millennium Copyright Act."  (*Id.*)  In discovery Steadfast said "Steadfast has not defined the term 'repeat infringer' as even the DMCA is silent as to any definition."  (Zimmerman Depo. pp. 121-24, Ex. 10, p. 3 ¶ 5.1.)  Steadfast's Terms as of September 27, 2016, before

Steadfast appeared in this case, which were last updated August 6, 2015, said only "[a]ny illegal activity may result in your site being suspended immediately, without notification. . . . Steadfast will be the sole arbiter as to what constitutes a violation of this provision."  (12/1/17 Spillane Decl. Doc 301 ¶ 6, Ex. 5.)

The first complaint of infringement on imagebam.com came not long after Flixya opened an account with imagebam.com.  As the site "grew in size and popularity," the number of infringement complaints grew.  Zimmerman Depo. pp.55-56.

In March 2011 Steadfast received "hundreds of DMCA complaints from Groupfivephotosports.com" about imagebam.com.  *Id.* pp. 64-65, Ex. 7.  The notifications "escalated" to Karl Zimmerman, who inquired of Flixya.  "They provided the IPs of the users and had indicated that those users had been terminated."  *Id.* pp. 69-70.  Flixya's primary method for tracking uploaders was IP ("Internet protocol").  However, the same person could log onto imagebam.com from different IPs by logging in from different locations.  *Id.* pp. 29-30.

In response to the Groupfive contentions Steadfast wanted proof that Flixya was blocking the IPs from which the infringing uploads had occurred for Steadfast's protection.  "We needed to assure that they were taken care of and dealing with repeat infringers."  Id. 85:16-86:7.  Steadfast did not believe, however, that Steadfast has to terminate repeat infringers in order to maintain legal protections.  *Id.* 86:19-22.  Steadfast wanted proof that Flixya was implementing Flixya's repeat infringer policy, but Steadfast did not need the information for compliance with its own repeat infringer policy.  *Id.* p. 87.

Steadfast does not believe that its own repeat infringer policy would "apply" whenever Steadfast's client was an Internet service provider and supplied evidence that they complied with the DMCA.

**"Q.     So if theoretically Steadfast received 100,000 notifications of infringement on ImageBam, you don't believe that requires Steadfast to terminate ImageBam as long as ImageBam is providing you with assurance that they are in turn terminating their users who are responsible for those notices?**
A.     Yes, as long as the customer is in compliance with the law, I would not see, yeah, any reason to -- for further action, and no other further action seems to be required by law."

Id. 91:6-17.

After the Groupfivephotosports situation, Steadfast received hundreds of notification of infringement on imagebam.com from Steve Easton. *Id.* pp. 95-96. Steadfast knew that Mr. Easton's email notifications infringement of ALS's works contained hyperlinks. Mr. Zimmerman never clicked on any of those hyperlinks or asked anyone else to do so. *Id.* pp. 105-06. Steadfast never looked at the drop box on imagebam.com asking the user to designate content as either "adult" or "family friendly." *Id.* 41:19-42:3. Mr. Zimmerman did not speak to Mr. Easton. *Id.* 96:19-22. Worse, Steadfast did not ask Flixya to supply evidence of what they were doing in response to the Easton notifications. The only reason Steadfast asked for evidence from Flixya concerning their response to the Groupfivephotosports notifications was because the <u>copyright owner</u> asked for that evidence. Since <u>Easton</u> did not ask for the same evidence, Steadfast did not bother to contact Flixya to find out what they were doing in response to the Easton notifications. *Id.* pp. 98-102.

**"Q.     [I]n response to the Easton notifications, did you contact ImageBam to see what they were doing about those notices?**
A.     I don't remember.
**Q.     Did you speak to Ivan Wong [Steadfast's contact at Flixa] to say, Are you guys acting on these?**
A.     I don't remember.
**Q.     Do you remember talking to anybody at ImageBam about what they were doing about the Easton notifications?**

A.    I do not remember.

**Q.    Do you remember asking them, Hey, are you guys taking these images down that Easton's complaining about?**

A.    I do not remember.

**Q.    Is the reason you don't remember is because they demonstrated to your satisfaction that they were acting correctly for the Group Five Photosports situation and you assumed they were continuing to do so?**

A.    The issue -- or the item is that they've proven before that they were following -- following everything required of them and that we got no further complaints from Steve Easton that they were not complying.

So we had no reason to believe that they were not complying.  We had been provided no indication, evidence, even a proposal that they were not complying.

**Q.    [I]n giving these statements in the last five or ten minutes, what evidence do you have to rely upon that ImageBam was complying other than the Group Five Photosports information we have in the last few exhibits?**

A.    Other than, I mean, their stated policy of what it was and that we know in a case they followed it and zero evidence beyond that that they did not follow it.  No one has produced any -- any type of indication or evidence that they were not following the policy.

**Q.    Do you have evidence that they were responsibly applying repeat -- repeat infringer policies with respect to any copyright owner other than Group Five Photosports?**

A.    I do not recall."

*Id.* 102:15-104:13.

Steadfast never bothered to find out what Flixya was doing to terminate users that were eliciting Mr. Easton's complaint because Steadfast put the burden on Mr. Easton to claim there was a repeat infringement problem.  *Id.* p. 112.  Since Flixya had demonstrated that they enforced a repeat infringer policy in response to the Groupfivephotosports situation, Steadfast did nothing to find out what Flixya did to terminate repeat infringers in responses to the Easton notifications.

**"Q.    Well, in the Group Five Photosports  situation, ImageBam communicated that there seemed to be a few bad users who were uploading the stuff and they terminated those accounts, right?**

A.    Correct.

**Q.    Was there any attempt by Steadfast to ascertain whether the same phenomenon existed pertaining to the Easton notices?**

A.    They had stated their repeat infringer policy and what that was, and there was no reason to believe they weren't following that.  And so we did not -- could you repeat the question?

MR. SPILLANE:  Can you read the question back.

(WHEREUPON, the record was read by the reporter.)

BY THE WITNESS:

A.    Yeah, due to the fact that they had established that they had a policy and were following it, we did not take -- ask any further questions on that."

*Id.* 116:11-117:9.

**"Q: [Y]ou have zero information one way or the other about whether ImageBam ever terminated anybody on account of the Easton notifications; is that correct?**

A.    Correct."

*Id.* 118:2-6.

Steadfast has never terminated a customer for repeat infringement.  (*Id.* 123:22-124:6; Spillane Declaration ¶ 7, Ex. 6, Response to Interrogatory No. 6.)

<u>ARGUMENT</u>

**I.    THERE ARE TRIABLE DISPUTES REGARDING STEADFAST'S LIABILITY FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT.**

Steadfast has contributed to infringement of ALS's exclusive rights under 17 U.S.C. § 106, namely ALS's exclusive rights to reproduce, display and distribute its copyrighted works.  *17 U.S.C. § 106(1), (3), (5).*  Steadfast is contributorily liable for copyright infringement on a client site, imagebam.com,

by continuing to provide storage and related services to the site after repeated notice to Steadfast that ALS's copyrights were infringed on imagebam.com.

"[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996), quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971).  Express promotion or encouragement of infringement is not required.  Rather, "providing the site and facilities for known infringing activity is sufficient to establish contributory liability." *Fonovisa*, 76 F.3d at 264 (swap meet operator failed to evict vendor selling counterfeit recordings after raids and notice by law enforcement).

In the online world, a party may be contributorily liable for infringement by continuing to provide storage for websites on servers with knowledge of infringement on such sites.  *Louis Vuitton Malletier, S.A. v. Akonic Solutions, Inc.*, 658 F.3d 936, 943 (9th Cir. 2011) ("[t]here is no question that providing direct infringers with server space" "'substantially assists' direct [copyright] infringement"); *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004) (a 'reasonable trier of fact could conclude that [internet service provider] materially contributed to the copyright infringement by storing infringing copies of [the infringing] works on its [network] and providing [] users with access to those copies'); *Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788, 796 (9th Cir. 2007) (contributory liability exists where a service provider aids in the "reproduction, . . . display and distribution of [plaintiff's] images over the Internet").

In *Fonovisa, supra,* the swap meet vendor was contributorily liable for infringement by continuing to provide real estate – stall space – to vendors selling bootleg records even after sheriffs' raids and written notice of ongoing

infringing activity.  Providing server space to websites is the Internet equivalent of leasing real estate.

> "[W]ebsites are not ethereal; while they exist, virtually, in cyberspace, they would not exist at all without physical roots in servers and internet services. As the district court held, Appellants 'physically host websites on their servers and route internet traffic to and from those websites. This service is the Internet equivalent of leasing real estate.' *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,* 591 F.Supp.2d 1098, 1112 (N.D.Cal.2008). Appellants had control over the services and servers provided to the websites. Stated another way, Appellants had direct control over the 'master switch' that kept the websites online and available."

*Louis Vuitton, supra,* 658 F.3d at 943.

In *Louis Vuitton*, Akanoc operated servers and leased server space to customers.  Louis Vuitton sent eighteen notices of infringement of its trademarks and copyrights on websites stored on Akanoc's servers, yet no action was taken.  659 F.3d at 940.  The jury returned a verdict for contributory trademark and copyright infringement for Louis Vuitton against Akanoc and others.  659 F.3d at 941.  The Ninth Circuit affirmed the contributory copyright infringement award against Akanoc:

> "Material contribution turns on whether the activity in question 'substantially assists' direct infringement.  *Amazon.com,* 487 F.3d at 729. There is no question that providing direct infringers with server space satisfies that standard. In *Visa,* 494 F.3d at 799–800, we held as a matter of law that defendants did not materially contribute to infringement because '[t]hey d[id] not operate the servers on which [the infringing images] reside[d].' The opposite is true here. Akanoc's servers are 'an essential step in the infringement process.' *Id.* at 812 (Kozinski, C.J., dissenting).

659 F.3d at 943-44.

- 12 -

1      Here, Steadfast provided Internet real estate – three dedicated servers

2  each with three terabyte bandwidth – to Flixya.  Steadfast's servers stored the

3  imagebam.com website.  If Steadfast had powered down the servers on which

4  imagebam.com was stored, the site would have been offline until Flixya could

5  direct the site to another server.  Steadfast thus had "direct control over the

6  'master switch' that kept [imagebam.com] online and available."

7      Steadfast continued to lease this Internet real estate for storage of

8  imagebam.com even after receipt of <u>1517</u> notifications of infringement on

9  imagebam.com since 2013.  If Akanoc was contributorily liable for continuing

10  to store websites that infringed on Louis Vuitton's rights after <u>eighteen</u>

11  notifications, no reasonable juror could find that Steadfast failed to contribute to

12  copyright infringement by continuing to store imagebam.com after <u>1517</u> notices

13  of infringement.

14      Steadfast may claim that it only stored the front end of the

15  imagebam.com website and the actual picture galleries were stored on another

16  server.  This would, however, be insufficient to raise a triable dispute of fact

17  regarding Steadfast's contributory liability.  The front end of the

18  imagebam.com site was not merely static.  Flixya did not need to lease three

19  servers with three terabyte bandwidth to support a simple landing page.  Rather,

20  the front end of the imagebam.com site was the portal through which the

21  content uploads occurred.   At one point in time 33,000 videos were uploaded in

22  ten hours through the server space leased by Flixya from Steadfast.  Steadfast

23  also stored the relational database – "MySQL" – for the imagebam.com site.

24  These services materially contributed to infringement.

25      The jury should determine whether Steadfast is contributorily liable for

26  copyright infringement.

27

28

**II.    STEADFAST DOES NOT QUALIFY FOR SAFE HARBOR DEFENSES.**

Steadfast claims it is entitled to a safe harbor against liability under 17 U.S.C. § 512(c).  However, the evidence establishes without controversy that Steadfast is not entitled to such safe harbor.

An Internet service provider may enjoy a safe harbor from liability for "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider" – the so-called "hosting" safe harbor.  *17 U.S.C. § 512(c).* However, to enjoy this safe harbor, the host must, having acquired actual or constructive knowledge of infringement, "act" or "respond" "expeditiously to remove, or disable access to, the material."  *17 U.S.C. §§ 512(c)(1)(A)(iii), 512(c)(1)(C).  Cf. Io Group, Inc. v. Veoh Networks, Inc.*, 586 F.Supp.2d 1132, 1150 (N.D Cal. 2008) (Veoh responded and removed or disabled access to material within one day, which was sufficiently "expeditious"); *with Perfect 10, Inc. v. Google, Inc., 2:04-cv-09484-AHM* (7/26/10) (Google failed to show it responded expeditiously to infringement notices when there was evidence it waited months to respond and some notices were not processed at all).

Here, in response to hundreds of notifications of infringement on imagebam.com from Steve Easton, Steadfast did <u>nothing</u>.  It did not "act."  It did not "respond."  It did not remove material.  It did not disable access to material.  It did not contact Flixya to learn how Flixya was responding to Easton's notifications.  In response the Groupfivephotosports notices, when the coypright owner pressed for evidence of action, Steadfast asked for and received evidence that Flixya was blocking IP addresses.  After that interaction, Steadfast simply <u>assumed</u> that Flixya was handling infringement notices correctly.  Steadfast put the burden on ALS or Easton to demand evidence before it would "act" or "respond."

When Congress said that an Internet service provider must "act" or "respond" upon receipt of notifications of infringement in order to enjoy a safe harbor, it clearly meant that the Internet service provider had to <u>do something</u>. Assuming everything is okay and doing nothing is not doing something. Section 512(c) does not put the onus on the copyright owner to not only provide notice of infringement but also send additional follow up demands for action or information before the ISP first "acts" or "responds."

Steadfast may claim that it could not remove or disable particular images or sets of images on imagebam.com.  At a minimum, however, Steadfast should have, and did not, contacted Flixya to learn how Flixya was responding to infringement notifications.  Having obtained a response from Flixya, Steadfast should have, and did not, report the results to the notifying party.  Steadfast could have, but did not, pulled the plug on the servers storing the imagebam.com site.  Steadfast did none of these things.

Steadfast says that Easton's notifications weren't compliant, but with no convincing force.  The DMCA does not require notifications to be strictly complaint, but rather substantially compliant.  *ALS Scan, Inc. v. Remarq Communities*, 239 F.3d 619, 624 (4th Cir. 2001).  Here, Mr. Easton's notifications substantially complied with all elements of Section 512(c)(3). Easton provided a hyperlink for each and every work infringed, which simultaeneously identified the work infringed as well as the location of the infringing work on imagebam.com.  Steadfast fails to show why this is not at least substantially compliant.  Easton's notification also provide the other elements (contact information, affirmation that the sender was authorized, etc.).

Steadfast's failure to "act" or "respond" in response to Easton's notifications means that it is not entitled to a safe harbor under Section 512(c).

**III.  STEADFAST HAS LOST ANY SAFE HARBOR PROTECTIONS TO WHICH IT MAY HAVE BEEN ENTITLED UNDER 17 U.S.C. § 512(i).**

Even if Steadfast acted in the manner required to maintain a safe harbor under Section 512(c), Steadfast nevertheless failed to fulfill the conditions for eligibility for this safe harbor.

> "(i) Conditions for Eligibility.—
>
> (1) Accommodation of technology.—The limitations on liability established by this section shall apply to a service provider only if the service provider—
>
> (A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and
>
> (B) accommodates and does not interfere with standard technical measures."

*17 U.S.C. § 512(i).*

The requirement that service providers implement a repeat infringer policy is a "fundamental safeguard for copyright owners" and "essential to maintain[ing] the strong incentives for service providers to prevent their services from becoming safe havens or conduits for known repeat copyright infringers." *Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F.Supp.2d 627, 637 (S.D.N.Y. 2011).

**A.  Steadfast Has Not Adopted and Informed Account Holders of a Policy of Termination for Repeat Infringement.**

To qualify for safe harbors, Steadfast must have 1) "adopted" and 2) "inform[ed] . . . account holders" of a "policy" providing for "termination" of "repeat infringers."

ISPs must "adopt" and then "inform" account holders of terms that prohibit infringing activity and provide for termination of services to repeat

infringers.  The "inform[ation]" should be published in the ISP's website and, where applicable, in account holder agreements.  *See UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F.Supp.2d 1099, 1102 (C.D. Cal. 2009) ("Veoh's Terms of Use has always contained language prohibiting users from uploading videos that infringe copyrights and reserving Veoh's right to remove videos and terminate repeat infringers"); *Capitol Records, LLC v. Escape Media Group, Inc.*, 2015 WL 1402049 *10 (S.D.N.Y. 2015) (quoting terms explaining actions Escape may take in response to notification of infringement and process for termination of an account for repeat infringement); *BMG Rights Mgmt., supra,* 149 F.Supp.3d at 640 (Cox published AUP providing that violation of terms could result in suspension or termination of the account, and also informed account holders of this policy in account holder agreements).

Here, Steadfast neither "adopted" nor "informed" account holders of a policy for termination of repeat infringers.

Prior to being sued in this case, Steadfast maintained Terms that merely stated "[a]ny illegal activity may result in your site being suspended immediately, without notification. . . . Steadfast will be the sole arbiter as to what constitutes a violation of this provision."  Steadfast's Terms said nothing about what Steadfast would or could do in response to a notice of copyright infringement.  Steadfast's policy made on reference to "repeat infringers." Its Terms called for "suspension" of accounts, however, Section 512(i) requires a policy of <u>termination</u> of account holders.  *BMG Rights Mgmt., supra,* 149 F.Supp.3d at 658 (the penalty for repeat infringement must be termination). The Terms did not inform account holders of the criterion by which Steadfast would determine an account holder to be a repeat infringer or terminate services.  Steadfast reservation to act as the "sole arbiter" of what actions would result in suspension or termination is not a "policy."

After being sued, Steadfast revised its Terms, but the new version is little improved and still legally inadequate.  Now, Steadfast says "Steadfast responds to notices of alleged copyright infringement and terminates accounts of repeat infringers according to the process set out in the U.S. Digital Millennium Copyright Act."  But this is circular and meaningless.  Steadfast's Terms do not disclose what Steadfast has admitted in discovery, that "Steadfast has not defined the term 'repeat infringer' as even the DMCA is silent as to any definition."  Steadfast's Terms do not disclose Karl Zimmerman's theory that Steadfast has <u>no</u> burden to implement its own repeat infringer policy whenever Steadfast's client itself is an ISP claiming safe harbors under Section 512.  In deposition, Mr. Zimmerman, Steadfast's corporate representative, was not able to recall or articulate Steadfast's policy for termination repeat infringers.  Steadfast has never terminated an account for repeat infringement.

Steadfast has not "adopted" or "informed account holders" of a "policy" for termination of repeat infringers.  Steadfast does whatever Mr. Zimmerman wants to do, whenever he wants to do it.  This is not a policy.  This is caprice.

### B.   <u>Steadfast Has Not Reasonably Implemented a Policy of Termination for Repeat Infringement.</u>

To qualify for safe harbors, an ISP must not only adopt and inform account holders of its repeat infringer policy, it must "reasonably implement[]" that policy.  In other words, it must actually do what it says it will do.

To comply with Section 512(i), the service provider must have a "working notification system" and "a procedure for dealing with DMCA-compliant notifications."  The provider must "not actively prevent copyright owners from collecting information needed to issue [infringement] notifications."  *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007).  "[A] substantial failure to record webmasters associated with allegedly infringing websites may raise a genuine issue of material fact as to the

1    implementation of the service provider's repeat infringer policy." *Id.* at 1110

2    (CCBill reasonably implemented a repeat infringer policy by maintaining a

3    "DMCA Log" tracking infringement complaints and results).

4         Assessing a party's eligibility for safe harbors under Section 512(i)

5    involves an assessment of that party's actions with respect to copyright holders

6    not party to the litigation because the court must assess implementation of a

7    "policy," not merely treatment of a particular copyright holder. *Id.* at 1113. "A

8    policy is unreasonable . . . if the service provider failed to respond when it had

9    knowledge of the infringement." *Id.* at 1113.

10        "To implement the repeat infringer policy contemplated by § 512(i), the

11   penalty imposed by service providers must be termination." *BMG Rights*

12   *Mgmt., supra*, 149 F.Supp.3d at 658.

13        Recently courts have granted a plaintiff's motion for partial summary

14   judgment determining that the defendant ISP failed to meet the conditions for

15   safe harbor liability under Section 512(i).

16        In *BMG Rights Mgmt., supra*, BMG owned a catalog of musical

17   compositions.  Cox provided high-speed Internet services to users who

18   allegedly used those services to access file sharing sites with infringing copies

19   of BMG's works.  The court rejected Cox's defense that it needed terminate

20   only <u>adjudicated</u> infringers, holding that Cox had a burden to implement a

21   repeat infringer policy where it had <u>knowledge</u> of infringement.  149 F.Supp.3d

22   at 654, 661.  Before Fall 2012, Cox stated a policy to terminate repeat infringers

23   but failed to enforce the policy, following an unwritten policy to reinstate any

24   terminated account holder on request.  149 F.Supp.3d at 654.  After Fall 2012,

25   Cox enhanced its procedures to impose graduated responses to infringement but

26   in fact terminated almost no customers.  149 F.Supp.3d at 658-59.  With respect

27   to certain accounts, Cox received <u>fourteen</u> notices of infringement pertaining to

28   such accounts within a six month period, yet failed to terminate those accounts.

149 F.Supp.3d at 661-62.  The trial court granted BMG's motion for summary judgment that Cox lost its safe harbors due to failure to reasonably implement a policy for termination of repeat infringers.  149 F.Supp.3d at 662.

In *Disney Enterprises, Inc. v. Hotfile Corp.*, 1:11-cv-20427-KMW, 2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) Hotfile received over eight million infringement notices pertaining to five million users.  *Id.* at *22.  Hotfile terminated only 43 users by the time the lawsuit commenced; however another 61 users had accumulated more than 300 notices each without termination. *Id.* While Hotfile publicly claimed it implemented a repeat infringer policy, in practice, it only terminated users over a threat of litigation or court order. *Id.* at *24. Indeed, Hotfile was "unable to point to a single specific user who was terminated pursuant to its policy of manual review and exercise of 'discretion.'" *Id.* Therefore, the court determined Hotfile did not reasonably implement its policy. *Id.  See also Capitol Records v. Escape Media*, 2015 WL 1402049, at *13 ("[P]erhaps the strongest indicator of Escape's failure to terminate the uploading privileges of repeat infringers in appropriate circumstances is the undisputed facts showing that hundreds or thousands of users were not stripped of their uploading privileges after receiving notices of infringement.")

The jury could find for ALS.  In response to a demand from a copyright owner, on one occasion Steadfast asked for and reviewed evidence that Flixya, operator of imagebam.com, was blocking IP addresses in response to infringement complaints.  From that point, Steadfast simply <u>assumed</u> that Flixya was terminating IP addresses in response to over 800 infringement notifications from Mr. Easton and over 1500 from all copyright owners, all concerning copyright infringement on imagebam.com, without doing <u>anything</u> to find out what Flixya was actually doing in response to this flood of notices.

Steadfast should, at the absolute minimum, made inquiries concerning the flood of infringement notifications on imagebam.com, and indeed <u>look at</u>

the site to learn why imagebam.com was the subject of chronic infringement notifications.  Even a short time looking at imagebam.com would have revealed information – "red flags" – tending to show that imagebam.com was structured to maximize the ability of users to upload galleries of adult content while minimizing the consequence to users of an infringement notice.  Steadfast saw that content on imagebam.com was framed with advertisement, an indication that users and imagebam.com were anticipating significant page views from surfers drawn to the lure of infringing content.

Steadfast was not spared the burden of terminating imagebam.com for repeat infringement until it received court adjudication that imagebam.com was liable for infringement, nor proof positive that its actions contributed to infringement.  Steadfast needed to terminate its account holder upon "information" of repeat infringement.  Steadfast received more than enough information to warrant termination of Flixya's account at Steadfast.

Even assuming that Flixya was doing its best to take down infringing images and terminate IP addresses in response to notices, at some point the sheer number of infringement notifications pertaining to imagebam.com should have caused Steadfast to terminate the account for that site and remove the site from its servers.  If Cox lost its safe harbors by failing to terminate account holders in response to fourteen infringement notices, no reasonable juror could find that Steadfast could receive over 800 notices from Easton and 1500 notices from all copyright owners without terminating its account for imagebam.com.

ALS is aware of no authority supporting Steadfast's rogue theory that when its account holder is file share site potentially entitled to its own safe harbor defenses, Steadfast simply has no burden to terminate such account holder in response to receipt of numerous notifications of infringement.  Steadfast's theory, an unwarranted blanket immunity from secondary liability for infringement, would eviscerate the bargain Congress struck between ISPs

1   and copyright holders in the DMCA, providing ISPs with safe harbors from

2   liability on the condition that they cooperate with copyright holders and

3   terminate account holders upon acquiring knowledge of repeat infringement.

4       Steadfast's theory would exacerbate the "whack-a-mole" problem faced

5   by copyright owners.  Here, ALS pays Steve Easton to send infringement

6   notifications, thousands of them.  Site owners might take down the specific

7   content in the notice, but on the chronic "pirate" sites named in this action

8   another infringing set of ALS images appears another day.  The cycle continues

9   endlessly with little to no abatement to infringement while pirate sites monetize

10  stolen ALS traffic through ad sales to surfers drawn to the allure of free

11  infringing content.  Exasperated, ALS looks for domestic companies providing

12  services to pirate sites for recompense.  The content delivery network says it's

13  not responsible, look to the origin host.  The origin host says we're not

14  responsible, look to the site owner, which itself operates as a host.  The site

15  owner claims it is a content neutral file share site, look to the users.  But the site

16  owner only tracks users through IP addresses.  Under Steadfast's theory ALS

17  has no recourse.  Section 512(i) is supposed to be a "fundamental safeguard for

18  copyright owners."  Steadfast would erase 512(i) and turn the DMCA into a

19  blanket immunity.  This is not what Congress intended.

20      If Congress wanted to limit the sweep of Section 512(i) to termination of

21  repeat *direct* infringers it could have so provided, but did not.  The Section says

22  that ISPs must terminate repeat "infringers," which plainly encompasses repeat

23  direct or contributory infringers.  In *Perfect 10 v. Cybernet Ventures*, 213

24  F.Supp.2d 1146, 1178 (C.D. Cal. 2002) this Court "recognize[d] that online

25  service providers are meant to have strong incentives to work with copyright

26  holders.  The possible loss of the safe harbor provides that incentive and

27  furthers a regulatory scheme in which courts are meant to play a secondary role

28

to self-regulation."  Steadfast's theory would eviscerate these "incentives" and destroy "self-regulation."

Whether or not Steadfast was able to terminate imagebam.com's account holders or remove specific infringing images, at some point, well before receipt of over 1500 notices of infringement, in order to maintain safe harbors Steadfast should have terminated the imagebam.com site  from its servers.  "Making the entrance into the safe harbor too wide would allow service providers acting in complicity with infringers to approach copyright infringement on an image by image basis without ever targeting the source of these images."  *Cybernet Ventures, supra*, 213 F.Supp.2d at 1177 (C.D. Cal. 2002).

Nor can Steadfast complain that termination of imagebam.com from its servers would have removed the site from the Internet only momentarily, or perhaps not at all.  *Cybernet Ventures* operated an "Adult Verification Network" in which it verified the age of users and provided search and index functions to allow users to find participating sites, all run by third parties. Cybernet complained that it only had the capacity to remove a site from search engines and delete hyperlinks, none of which would remove the site from the Internet, and if terminated the site would simply jump to a competing AVN. This Court rejected these complaints, holding that Cybernet Ventures lost safe harbors for failing to undertake whatever actions termination of the accounts of repeat infringers entailed.  "Cybernet has taken great pains to avoid shouldering the burdens of the copyright regime, all the while profiting from pirates."  213 F.Supp.2d at 1178.

Here, Steadfast has taken great pains to avoid shouldering the burdens of the copyright regime, while profiting from pirates.  The Court, or the jury, should determine that Steadfast failed to meet the conditions for safe harbors under Section 512(i).

**IV.    STEADFAST IS CONTRIBUTORILY LIABLE FOR INFRINGEMENT OF ALS'S TRADEMARKS.**

Each of ALS's copyrighted works also bears ALS's protected mark. Steadfast contributed to infringement of such mark through multiple infringing displays of that mark on imagebam.com.

*Louis Vuitton, supra*, is directly on point.  Akanoc operated servers storing sites that purveyed bootleg goods with counterfeit "Louis Vuitton" marks.  The jury found Akanoc contributorily liable for trademark infringement.  The Ninth Circuit upheld the verdict.  "To prevail on its claim of contributory trademark infringement, Louis Vuitton had to establish that Appellants continued to supply its services to one who it knew or had reason to know was engaging in trademark infringement."  Akanoc objected that as the host and not site operator is lacked sufficient control over the "means of infringement."  The district court and Ninth Circuit rejected this argument.

> "Appellants 'physically host websites on their servers and route internet traffic to and from those websites. This service is the Internet equivalent of leasing real estate.' *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,* 591 F.Supp.2d 1098, 1112 (N.D.Cal.2008). Appellants had control over the services and servers provided to the websites. Stated another way, Appellants had direct control over the 'master switch' that kept the websites online and available."

658 F.3d at 942-43.  The Ninth Circuit also rejected the contention that Akanoc had to act "intentionally."

> "Plaintiffs asserting contributory trademark infringement claims must prove that defendants provided their services with actual or constructive knowledge that the users of their services were engaging in trademark infringement. *See Inwood Labs.,* 456 U.S. at 854, 102 S.Ct. 2182; *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,*

- 24 -

494 F.3d 788, 807 (9th Cir.2007). An express finding of intent is not required."

658 F.3d at 943.

Here, a jury could conclude that Steadfast contributed to trademark infringement on imagebam.com.  Steve Easton submitted to Steadfast 185 notices of infringement of ALS's trademarks on imagebam.com.  Each notice gave evidence of infringement of multiple images bearing the ALS mark.  Yet, in response to these notices, Steadfast continued to provide storage services for the imagebam.com site.  Steadfast is, without controversy, contributorily liable for infringement of ALS's trademarks.

## CONCLUSION

Steadfast's motions should be denied.  The jury should determine the claims against Steadfast.

DATED:  February 16, 2018

SPILLANE LAW GROUP PLC
GHALLAGHER & KENNEDY P.A.

By: _____
      Jay M. Spillane
Attorneys for Plaintiff ALS Scan, Inc.

- 25 -

Steadfast MSJs – Omnibus Opposition Memorandum

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this action.  My business address is: 468 N. Camden Drive, Second Floor, Beverly Hills, CA 90210-4507.  A true and correct copy of the foregoing document entitled (*specify*):
**PLAINTIFF'S OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT BY STEADFAST NETWORKS, LLC** will be served or was served **(a)** on the judge in chambers in the form and manner required by Local Rules and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and Local Rules, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) February 16, 2018, I checked the CM/ECF docket for this action and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

| | |
|---|---|
| Gary L. Bostwick– gbostwick@B1Law.com | Colin TJ O'Brien – tm@partridgepartnerspc.com |
| Kevin S. Toll – kevin@silversteinlegal.com | John L. Ambrogi – jla@partridgepartnerspc.com |
| Lawrence G. Walters – larry@firstamendment.com | Daniel L Rogna    daniel@partridgepartnerspc.com |
| Corey D. Silverstein – corey@silversteinlegal.com | Paul Supnik – paul@supnik.com |
| Andrew P. Bridges – abridges@fenwick.com | Raymond Katrinak – pkatrinak@kernanlaw.net |
| Armen Nercessian    anercessian@fenwick.com | Ryan Carreon – rcarreon@kernanlaw.net |
| Jedediah Wakefield    jwakefield@fenwick.com | Stephen M Kernan – kernanlaw@gmail.com |
| Sapna S Mehta    smehta@fenwick.com | John P Flynn    john.flynn@gknet.com |
| | Kevin D Neal    kevin.neal@gknet.com |

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) February 16, 2018, I served the following persons and/or entities at the last known addresses in this case by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling Local Rule, on (*date*) February 16, 2018, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served by Overnight Mail or Attorney Service***
Hon. George H. Wu
U.S. District Court
350 W. 1st Street
Courtroom 9D
Los Angeles, CA 90012          ☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

2/16/2018          Jessie Gietl          *Jessie Gietl*

| | | |
|---|---|---|
| Date | Printed Name | Signature |