Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE LAW GROUP PLC
468 N. Camden Drive
Second Floor
Beverly Hills, CA 90210
(424) 217-5980
(888) 590-1683 (fax)

Kevin D. Neal (Az. Bar No. 011640)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona  85016-9225
(602) 530-8000
(602) 530-8500 (fax)
john.flynn@gknet.com
kevin.neal@gknet.com

Attorneys for Plaintiff ALS Scan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALS SCAN, INC., a Maryland corporation,<br><br>          Plaintiff,<br><br>   vs.<br><br>CLOUDFLARE, INC., a Delaware corporation, et al.,<br><br>          Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANT CLOUDFLARE, INC.**<br><br>Filed Concurrently: Ghandeharizadeh Declaration; Penn Declaration; Spillane Declaration; Statement of Genuine Issues<br><br>Date: March 12, 2018<br>Time: 8:30 a.m.<br>Place: Courtroom 9D<br>          350 W. 1st Street<br>          Los Angeles, CA |

# Table of Contents

SUMMARY OF OPPOSITION ...............................................................................1

DISPUTED AND UNDISPUTED FACTS.........................................................2

   A.   ALS's Content, Infringement and the Sites at Issue. ..............................2

   B.   Cloudflare's Services. ...............................................................................3

   C.   Cloudflare's DNS Service Deprives Copyright Owners of Vital Information. ................................................................................................4

   D.   Cloudflare's CDN Reproduces, Distributes and Displays Copyrighted Works.........................................................................................................6

   E.   Cloudflare Modifies Content. ...................................................................9

   F.   Notices of Infringing ALS Works on Subject Sites.................................9

   G.   Cloudflare has Failed to Adopt and Reasonably Implement a Repeat Infringer Policy.......................................................................................11

   H.   Cloudflare Fails to Accommodate, and Interferes with, Standard Technical Measures. ...............................................................................13

   I.   Months After Notice of Infringement to Cloudflare From ALS, Infringing ALS Content Remains Live on the Origin Server and in Cloudflare's Cache. ....................................................................................15

   J.   Abuse Complaints Submitted Through Cloudflare's Abuse Page Elicit Erratic Responses and Don't Result in Removal of the Infringing Content. 15

   K.   Cloudflare Has Failed to Take Simple Measures Despite Receipt of Numerous Machine-Readable Hyperlinks Identifying the Work Infringed and its Location on a Cloudflare Client Site. .................................................16

ARGUMENT .................................................................................................17

I.    THERE ARE, AT MINIMUM, TRIABLE DISPUTES OF FACT ON
CLOUDFLARE'S LIABILITY FOR CONTRIBUTORY COPYRIGHT
INFRINGEMENT. ........................................................................................17

A.   Cloudflare Materially Contributes to Reproduction, Distribution and
Display of Infringing Works...........................................................................17

B.   Cloudflare Failed to Take "Simple Measures" to Prevent Further
Damage from Infringement. .........................................................................22

C.   Cloudflare Materially Contributes to Infringement By Blocking
Information Copyright Owners Need to Hold Service Providers
Accountable. ................................................................................................24

CONCLUSION ............................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Authorities

**Cases**

*A&M Records, Inc. v. Napster*, 114 F.Supp.2d 896 (N.D. Cal. 2000) ..............20

*Arista Records LLC v. Tkach*, 122 F.Supp.3d 32 (S.D.N.Y. 2015)....................21

*BMG Rights Mgmt. (US) LLC v. Cox Communs.*, 149 F.Supp.3d 634
  (E.D. Va. 2015) ...................................................................................... 17, 20

*Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210 (D. Minn. 2008).........17

*Columbia Pictures Indus. v. Gary Fung*, 710 F.3d 1020 (9th Cir. 2013)............17

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004)...........................................19

*Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)...........................18

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159
  (2d Cir. 1971) ..................................................................................................18

*Louis Vuitton Malletier, S.A. v. Akonic Solutions, Inc.*, 658 F.3d 936
  (9th Cir. 2011) ..................................................................................................19

*MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993) ..............17

*MGM v. Grokster*, 545 U.S. 913 (2005) ..............................................................24

*Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ........................20

*Perfect 10, Inc v. Amazon.com, Inc*, 508 F.3d 1146 (9th Cir. 2007)...................24

*Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657 (9th Cir. 2017)........................23

*Religious Tech. Ctr. v. Netcom*, 907 F.Supp. 1361 (N.D. Cal. 1995) ...............19

*Screen Gems-Columbia Music, Inc.*, 256 F.Supp. 399 (S.D.N.Y. 1966)...........20

*Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000) .....................17

**Statutes**

*17 U.S.C. § 106* ..............................................................................................1, 17

**Other Authorities**

9th Cir. Manual of Model Civil Jury Instr. No. 17.21 .........................................22

## SUMMARY OF OPPOSITION

Cloudflare contributes to infringement of ALS works by Cloudflare customers. Cloudflare reproduces infringing works throughout its data centers worldwide. When a consumer requests an infringing work, Cloudflare searches for a reproduction of that work in cache in its data centers. Cloudflare then distributes a reproduction of the infringing work, either from its cache or from the origin server, to the consumer. The infringing reproduction so distributed to the consumer is then displayed on the consumer's screen.

Thus, Cloudflare materially contributes to direct infringement of ALS's exclusive rights to reproduce, distribute and display its copyrighted works. *17 U.S.C. § 106(1), (3), (5)*. Contributory liability exists where a service provider aids in the "reproduction, . . . display and distribution of [plaintiff's] images over the Internet." *Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788, 796 (9th Cir. 2007).

While the Ninth Circuit has been inconsistent about requiring a showing of "simple measures" to mitigate further damage from infringement, if applicable Cloudflare has failed to take such simple measures:

- Cloudflare won't act on notices of infringement submitted via email, though Congress has required service providers to provide copyright owners with an email contact;

- Cloudflare won't forward email notices of infringement to hosts or site owners.

- Submission of notice of infringement through Cloudflare's web abuse page doesn't result in removal of the infringing material;

- Submission of notice of infringement through Cloudflare's web abuse page sometimes elicits sham responses from Cloudflare that the notice was supposedly defective;

- Though ALS's email notices contain machine-readable hyperlinks identifying the copyrighted work in question and the location of the infringing copy on a Cloudflare customer site, Cloudflare does not follow up to ascertain whether the infringing content was removed;

- Cloudflare does not follow up on notifications submitted via its abuse page to ascertain whether the infringing content was removed;

- Cloudflare does not remove infringing copies of ALS works from its cache where the content is not removed from the origin server;

- Cloudflare has not terminated services to any of its customers, even upon receipt of numerous infringement notices, except upon receipt of a court order;

- Cloudflare could reveal contact information for the origin host on whois lookups even though the site owner has designated Cloudflare's servers as its authoritative nameservers;

- Cloudflare could machine read and record ALS images submitted via email or abuse page, remove such images from cache and block those specific images from being re-cached; and

- Cloudflare could employ image recognition technology to recognize and block caching or distribution of ALS works.

ALS believes that the facts are undisputed and in its favor.  At the very minimum, the facts are disputed and should go to the jury.  Summary judgment in favor of Cloudflare is not warranted.

## DISPUTED AND UNDISPUTED FACTS

### A.    ALS's Content, Infringement and the Sites at Issue.

ALS owns the copyright to a library of adult content.  ALS's content is displayed on two websites, alsscan.com and alsangels.com.  Other than limited "teaser" selections of ALS works on public tour pages for these sites, or made available to advertisers for the purpose of directing Internet traffic to ALS's

1    sites, ALS's content is lawfully available only to paying members of ALS's

2    sites.  ALS does not sell or license its copyrighted content.  [1/30/18 Walsh

3    Decl. Doc. 326 ¶¶ 2-4; Complaint Ex. 1.]

4            ALS has been faced with the repeated availability of infringing ALS

5    content on Internet sites.  [1/30/18 Walsh Decl. Doc. 326 ¶¶ 5-12; 1/30/18 Penn

6    Decl. Doc. 328 *passim*; 1/30/18 Easton Decl. Doc. 328 *passim*; Notice of

7    Manual Filing Doc. 330.]  This motion involves infringement of ALS works on

8    the following sites, all Cloudflare customers: artofx.org, bestofsexpics.com,

9    cumonmy.com, fboom.me, greenpiccs.com, imagetwist.com, imgchili.net,

10   imgflash.net, imgsen.se, imgspice.com, imgspot.org, imgtrex.com, img.yt,

11   namethatpornstar.com, slimpics.com, stooorage.com and vipergirls.to

12   (collectively the "Cloudflare Customer Sites").  [1/30/18 Walsh Decl. Doc. 326

13   ¶¶ 5-12; 1/30/18 Penn Decl. Doc. 328 *passim*; 1/30/18 Easton Decl. Doc. 328

14   *passim*; Notice of Manual Filing Doc. 330; Cloudflare Response to

15   Interrogatory No. 20, 1/30/18 Spillane Decl. Doc. 327 ¶ 2, Ex. A.]

16           Cloudflare may say that the Cloudflare Customer Sites are themselves

17   service providers entitled to DMCA protections, however, none have qualified

18   for safe harbors by submitting the required notices to the US Copyright Office.

19   [1/30/18 Spillane Decl. Doc. 327 ¶ 14.]

20           **B.    Cloudflare's Services.**

21           "Cloudflare provides internet services to optimize and protect websites,

22   including by increasing the speed at which website content is delivered to end

23   users, making such delivery considerably more bandwidth efficient, and by

24   adding security services to prevent malicious attacks."  (3/2/17 Guinn Decl.,

25   Doc. 124-2 ¶ 3.)  Says Cloudflare: "Cloudflare's global Anycast network of 119

26   data centers across 58 countries reduces latency and time to first byte by

27   delivering content closer to visitors.  Cloudflare's size and distribution of

28   internet connects gives customers fast, reliable delivery throughout the world."

[1/30/18 Spillane Decl. Doc. 327 ¶ 3, Ex. B; https://www.cloudflare.com/performance/.] See also 2/16/18 Ghandeharizadeh Decl. ¶¶ 2-13.

To accomplish these results, CloudFlare offers, among other services, a managed domain name system ("DNS") and a content delivery network ("CDN"). (3/2/17 Guinn Decl., Doc. 124-2, *passim*.)

## C.   Cloudflare's DNS Service Deprives Copyright Owners of Vital Information.

To become a Cloudflare client, Cloudflare requires the client to name two Cloudflare nameservers as the authoritative nameservers for their website domain.[1] (3/2/17 Guinn Decl. ¶ 7, Doc. 124-2; 4/5/17 Guinn Depo. 13:14-14:22, Ex. 1.)[2] "This service is why an IP address WHOIS lookup regarding a website operated by a Cloudflare customer traces to Cloudflare -- because the customer has designated Cloudflare as its domain nameserver." (3/2/17 Guinn Decl. ¶ 7, Doc. 124-2.)

**Q**    … [W]hy does Cloudflare have customers designate two Cloudflare nameservers?

---

[1] **"**Nameservers convert the text-based Uniform Resource Locator ("URL") of a website into a computer-readable address to point users and internet browsers in the direction of content stored elsewhere. Stated another way, nameservers give directions by telling a user's personal computer where to look to find the website the user is searching for." (3/2/17 Guinn Decl.¶ 6, Doc 124-2.)

[2] The pages and exhibits from the Guinn Deposition, plus errata and signature sheets, are attached to the 1/30/18 Spillane Declaration as Exhibits C (4/5/17), D (9/15/17) and E (1/22/18).

A   Cloudflare has customers designate Cloudflare nameservers in order to route Internet requests to Cloudflare so that [its][3] service can operate.

**Q   And what does that enable Cloudflare to do?**

A   It enables Cloudflare to direct website visitors to Cloudflare servers.

(4/5/17 Guinn Depo. 14:23-15:5.)

Cloudflare's DNS system frustrates efforts by copyright owners to find information about direct and contributory infringers and to send notification of infringement.  Says Cloudflare: "Cloud Flare will mask your IP."  (1/30/18 Spillane Decl. Doc. 327 ¶ 7, Ex. F, Cloudflare 142.)  When copyright owners look for information about Cloudflare customers on standard whois lookup services, no information is available regarding the company storing the site on its server (the "host") or the site owner.  No information is available concerning the IP address for the site in question.  The only available information regarding nameservers and IP is for Cloudflare.  [1/30/18 Penn Decl. Doc. 328 ¶¶ 25-30, Exs. 18-23; 1/30/18 Easton Decl. Doc. 328 ¶¶ 15-16.]

Two sites at issue show the problem.  imagebam.com and namethatpornstar.com weren't previously Cloudflare customers, which is how ALS discovered, provided notice to and ultimately sued their respective hosts, Steadfast and former defendant Hivelocity.  Now that both sites have moved to Cloudflare, ALS can no longer see site owner or host information for those sites on whois lookups.  [1/30/18 Penn Decl. Doc. 328 ¶¶ 29, 30, Exs. 20-23.]

While Cloudflare will in some cases respond to an infringement notice with the name of, and an email contact for, the site host, it does not disclose the IP address for the infringing website, which web hosts want in order to locate the site, nor does Cloudflare disclose any information concern the site owner or

---

[3] Corrections from the deposition errata sheet are incorporated in brackets.

1   operator.  [1/30/18 Easton Decl. Doc. 328 ¶¶ 15-16; 1/30/18 Spillane Decl.
2   Doc. 327 ¶¶ 8-9, Ex. G.]

3       **D.**    **Cloudflare's CDN Reproduces, Distributes and Displays**
4              **Copyrighted Works.**

5       Cloudflare's CDN, its "Global Anycast Network," as of March 2017
6   comprised 102 data centers throughout the world.  (3/9/17 Spillane Decl. ¶ 7,
7   Ex. E, Cloudflare 133, Doc. 133; 4/5/17 Guinn Depo. 19:12-21:9, Ex. 4.)  "The
8   Cloudflare . . . Global Anycast network contains caching servers[4] as well as
9   nameservers."  (4/5/17 Guinn Depo. 16:2-5.)

10      "A content delivery network (CDN) takes your static content and stores a
11  copy closer to your visitors."  (3/9/17 Spillane Decl. ¶ 8, Ex. F, Doc. 133.)
12  "When an end user chooses to visit a Cloudflare customer's website, the user is
13  routed through the Cloudflare caching server closest to that end user's
14  computer. *See* Ex. B (Cloudflare Support > Getting Started > Cloudflare 101 >
15  Step 1)."  (3/2/17 Guinn Decl. ¶ 8, Ex. B, Doc 124-2; 1/30/18 Penn Decl. Doc.
16  328 ¶ 24, 4/20/17 Penn Decl. Doc. 170; 4/20/17 Spillane Decl. Doc 171.)

17      The ALS images in question in this suit are .jpg static files.  (3/9/17 Penn
18  Decl. ¶ 4, Doc. 134.)  "Cloudflare's CDN caches [.jpg files] for all account
19  types by default."  (4/5/17 Guinn Depo. 21:23-24:9 Ex. 5.)

20
21
22
23  _____

[4]  "Caching servers are servers that temporarily cache content, typically for a
24  few hours before being cleared (also known as 'evicted') in order to improve
    the time it takes for website content from the host server to reach the end users
25  in a particular geographic area. The more geographically distant an end user is
    from a server, the longer it takes for content from that server to reach that end
26  user. A caching server that is located nearer to the end user than the host server
    shortens the physical distance that the host's content must travel, and therefore
27  also shortens the time it takes for the content to load in an end user's browser."
    (3/2/17 Guinn Decl. ¶ 6, Doc. 124-2; see also 4/5/17 Guinn Depo. 90:25-91:11.)
28

**Q      … [I]s there . . . a step after [a query reaches a Cloudflare DNS server] which the DNS server employs to send the visitor to the nearest Cloudflare caching server, provided that the user's seeking to access something that is cached?**

Ms. Kassabian: Objection.  Vague

A    Yes.

**Q    Please explain how that works.**

A    So when a visitor visits a website, they first do a DNS lookup. It's similar to looking up someone's phone number in the phone book. . . . The DNS server responds with an IP address of the web server, and in that instance, the second request which is similar to making the phone call after doing a lookup in the phone book is the request to a Cloudflare caching server.

**Q    So . . . in this process, the Cloudflare DNS server will direct the user to the nearest Cloudflare caching server?**

A    Yes.

**Q    And . . . that's the nearest Cloudflare caching server within the Cloudflare global AnyCast network?**

A    Correct.

(4/5/17 Guinn Depo. 17:1-18:1; see also 4/5/17 Guinn Depo. 28:9-13.)

**Q: [S]ay I'm sitting at my computer in Los Angeles, and I put into the browser bar a URL imgchili.net, slash, whatever ending in .jpg.  Okay?  Now, if I then hit enter, where do I first go?**

MS. KASSABIAN:  Objection.  Incomplete hypothetical.

You can answer.

THE WITNESS:  What will happen is you will do a DNS lookup. That DNS response will come from a DNS server in the region, very likely in Los Angeles.  The -- then you make an H[T]TP request for that -- that URL which ends in .jpg, potentially to the Los Angeles data center.  If that file is in the cache, we can deliver it from our temporary cache, and if the file is not in cache, we would proxy the request through to the web server and take a copy of the file from the web server and deliver it to the web browser.

(4/5/17 Guinn Depo. 25:10-26:2.)  When a copy of a requested image is proxied from the origin server, the delivery path is from the origin server, through the Cloudflare caching server then to the consumer.  (4/5/17 Guinn Depo. 29:9-24.)

1
2
3
4
5
6
7
8
9
10

When a consumer requests an image on a Cloudflare client site, whether the image is in cache or is proxied from the origin server, Cloudflare distributes a copy of the requested content to the consumer's computer, where it would reside in the consumer's hard drive or RAM.  The data on the consumer's computer would then result in a display of the request image on the consumer's browser.  [01/22/18 Guinn Depo. 36:21-40:23; 09/15/17 Guinn Depo. 129:8-22.]  "[W]e want to deliver essentially what the website publisher has published.  We want to deliver that so it shows up the same way to the website visitor.  We just want to optimize the delivery."  [09/15/17 Guinn Depo. 205:3-11.]  See also Ghandeharizeh Decl. ¶ 14.

11
12
13
14
15
16
17
18
19
20

Whether or not a file is stored on a Cloudflare caching server is a function of "popularity."  "[W]hen there are multiple requests for the same object all hitting the same data center, we will cache that object in that data center so that . . . once a request is popular or an object is popular, we can serve requests for that object from that data center."  (Guinn Depo. 30:4-15; 4/20/17 Spillane Decl. ¶ 6 Ex. 11.)  A file cached in a Cloudflare caching server through popular requests has a two hour "time to live" or "TTL."  Further requests for that file during the TTL will cause Cloudflare to query the origin server to validate if the object has changed, and if not Cloudflare will restart the two hour TTL.  (Guinn Depo. 30:16-31:18; 4/20/17 Spillane Decl. ¶ 6 Ex. 11.)

21
22
23
24
25

If the origin server storing a Cloudflare client site went down, say from a malicious attack, for a time consumers could still request and retrieve images from that site stored in Cloudflare's cache.  [01/22/18 Guinn Depo. 70:12-71:3; ("for a short period of time, if a website was unavailable, we could potentially deliver the assets from cache").]

26
27
28

1

**E.      Cloudflare Modifies Content.**

Cloudflare modifies content that it delivers to consumers.  [09/15/17 Guinn Depo. 148:16-150:20.] "There are many ways in which [Cloudflare] may modify content of a site."  [09/15/17 Guinn Depo. 150:11-12.]

**F.      Notices of Infringing ALS Works on Subject Sites**

ALS has engaged Steve Easton to observe infringement of ALS works on the Internet and send notice of infringement to responsible parties.  [1/30/18 Walsh Decl. Doc. 326 ¶¶ 9-12; 1/30/18 Easton Decl. Doc. 328 *passim*.]  Mr. Easton also represents other adult copyright owners and has the same level of knowledge regarding their content.  [1/30/18 Easton Decl. Doc. 328 ¶ 4.]

Mr. Easton personally observed infringing copies of his clients' works, including ALS, on the Cloudflare Customer Sites.  Mr. Easton prepared a notice of infringement via email.  He addressed the email to the site operator and service providers if he knew the email addresses of these parties.  The email contained, in the body, hyperlinks to each and every web page on which the infringing content appeared.  His intent in providing hyperlinks for each infringing work was to simultaneously disclose the work in question and also the location of the infringing copy on the Internet.  Mr. Easton is familiar with, and provided the other information required by, 17 U.S.C. § 512(c).  [1/30/18 Easton Decl. Doc. 328 ¶¶ 4-6.]

Mr. Easton observed infringing content belonging to ALS and his other clients on the Cloudflare Customer Sites.  Between January 26, 2014 to June 23, 2017, Mr. Easton sent email infringement notifications to Cloudflare, on behalf of ALS and others, pertaining to the following sites in the following numbers: a) artofx: 24 total, 14 ALS; b) bestofsexpics: 21 total, 14 ALS; c) cumonmy: 17 total, 17 ALS; d) fboom: 29 total, 29 ALS; e) greenpiccs: 29 total, 25 ALS; f) imagetwist: 82 total, 25 ALS; g) imgchili: 1175 total, 361 ALS; h) imgflash: 8 total, 8 ALS; i) imgsen.se: 20 total, 12 ALS; j) imgspice:

149 total, 15 ALS; k) imgspot: 11 total, 6 ALS; l) imgtrex: 30 total, 27 ALS; m) img.yt: 147 total,; 42 ALS; n) namethatpornstar: 4 total, 4 ALS; o) slimpics: 25 total, 25 ALS; p) stooorage: 11 total, 11 ALS; and q) vipergirls: 21 total, 10 ALS.  The grand total: 1,803 total, 645 ALS.  [1/30/18 Easton Decl. Doc. 328 ¶¶ 4-10; 1/30/18 Penn Decl. Doc. 328 ¶¶ 5-23, Exs. 1-17; Notice of Manual Filing Doc. 330.]

Cloudflare has received additional infringement notifications from other copyright owners about the sites at issue.[5]  [Cloudflare Response to Interrogatory No. 22; 1/30/18 Spillane Decl. Doc. 327 ¶ 2, Ex. A.]

While some of the content went down in response to these notices, in some cases, despite notice to Cloudflare, the infringing ALS content remains live on the Cloudflare customer site, months after Mr. Easton's notices. [1/30/18 Penn Decl. Doc. 328 ¶¶ 7, 35, 37-42, Exs. 1-3, 5, 7, 14, 26-31.]

At no time in response to these notices did Mr. Easton receive a "bounce" notice indicating that Cloudflare did not receive the emails, nor did Mr. Easton receive any counter-notifications, in other words, a reply from the site operator that the content in a notice was authorized.  [1/30/18 Easton Decl. Doc. 328 ¶¶ 11-12.]

Cloudflare has taken the litigation position that none of Mr. Easton's notices were "valid" and therefore Cloudflare was under no burden to respond or take them into account in enforcing its (alleged) repeat infringer policy. [Cloudfare Response to Interrogatory Nos. 7 & 8 (no valid notices received regarding the at-issue websites), No. 15 (Easton notices not "valid" because he

_____

[5]  The complaint count submitted by Cloudflare cannot include the Easton notifications.  For most sites the number of complaints listed are fewer, in some cases many fewer, than the number sent by Easton alone.  Given Cloudflare's blunderbuss position that email notices are not "valid," the count likely reflects only complaints submitted through Cloudflare's web form.

1   did not submit through the web page and failed to provide information required

2   by DMCA), [1/30/18 Spillane Decl. Doc. 327 ¶ 12, Ex. J.]

3        This is not what Cloudflare said at the time.  Of the emails from

4   Cloudflare to Easton, only one said that Cloudflare would not process

5   infringement notices submitted via email.  [1/30/18 Easton Decl. Doc. 328 ¶ 13;

6   1/30/18 Spillane Decl. Doc. 327 ¶¶ 8-9, Ex. G.]  Many said that to "expedite"

7   his complaints would he "please" submit through the web form.  [*Id.*]  Others

8   said generally that Cloudflare could not respond to each notice but would take

9   "enforcement action."  [*Id.*]  Still others responded to his email notices with

10  information about the host and an email contact, yet declining to provide an IP

11  address for the subject site to the copyright owner.  [*Id.*]  None of these

12  communications said that Mr. Easton's emails were not "valid" or would not be

13  considered or acted upon.  [*Id.*]

14       Cloudflare sent some emails telling Mr. Easton that his notices lacked

15  one or more elements required by the DMCA.  However, only three pertained to

16  the sites at issue, and only one pertained to any of the 1,803 email infringement

17  notices submitted with this motion.  [1/30/18 Easton Decl. Doc. 328 ¶ 13;

18  1/30/18 Spillane Decl. Doc. 327 ¶ 10, Ex. H.]  Even this one notice from

19  Cloudflare was incorrect.  [Cf. 1/30/18 Spillane Decl. Doc. 327 ¶ 10, Ex. H p.3;

20  1/30/18 Spillane Decl. Doc. 327 ¶ 11, Ex. I.]

21       **G.**   **Cloudflare has Failed to Adopt and Reasonably Implement a**

22            **Repeat Infringer Policy.**

23       Cloudflare has stated a nominal policy to investigate infringement

24  complaints and terminate repeat infringers, https://www.cloudflare.com/terms/,

25  1/30/18 Spillane Decl. Doc. 327 ¶ 13, Ex. K.  Cloudflare makes a passing

26  reference to termination of service in § 11, but does not say what conduct is

27  prohibited nor how Cloudflare would determine whether to terminate an

28  account.  Cloudflare makes the ultimate statement that it could terminate a

customer for repeat infringement at § 15, yet there is no information concerning how Cloudflare would make that determination. *Id.*

In fact Cloudflare has only terminated its customers for repeat copyright infringement upon receipt of a court order finding that customer liable for infringement. [Cloudflare Response to Interrogatory No. 10, 1/30/18 Spillane Decl. Doc. 327 ¶ 12, Ex. J.]

Cloudflare can and has terminated a customer without a court order. Cloudflare terminated services to the Daily Stormer because it was a neo-Nazi site. [1/30/18 Spillane Decl. Doc. 327 ¶ 17, Ex. N.] Matthew Prince made that decision because he woke up "in a bad mood," decided "the people behind the Daily Stormer are assholes" "and decided to kick them off the Internet." [9/15/17 Guinn Depo. 182:15-24; 1/30/18 Spillane Decl. Doc. 327 ¶ 18, Ex. O.] Cloudflare could also terminate services to copyright infringers, as determined by its abuse policies and by "leadership," including Matthew Prince. [9/15/17 Guinn Depo. 196:21-198:12, 202:4-9.] Cloudflare could stop or limit alleged copyright infringement by terminating services to Cloudflare customers who are infringers. [1/22/18 Guinn Depo. 67:5-11.]

However, despite receipt of over 1800 notices of infringement from Mr. Easton concerning the at-issue sites, and more from other copyright owners, Cloudflare has not terminated a single such site for repeat infringement. [Cloudflare Response to Interrogatory No. 7, 1/30/18 Spillane Decl. Doc. 327 ¶ 12, Ex. J, ("Cloudflare has not terminated any of the accounts associated with those WEBSITES").]

It appears that Cloudflare has no policy to follow up on infringement notifications to determine whether the infringing content was removed. In some cases ALS sent notification to Cloudflare of infringing ALS content on Cloudflare Customer Sites and the infringing content remains live. [1/30/18 Penn Decl. Doc. 328 ¶¶ 7, 35, 37-42, Exs. 1-3, 5, 7, 14, 26-31.]

During discovery Cloudflare asked why ALS did not submit notices through Cloudflare's abuse page.  ALS tried doing that, but that effort did not result in removal of the infringing content.  [1/30/18 Penn Decl. Doc. 328 ¶¶ 43-44, Ex. 32.]

Cloudflare says some of the at-issue websites are user-upload sites, potentially entitled to protections under the DMCA.  However, none have submitted the required information to the Copyright Office to maintain any safe harbors.  [1/30/18 Spillane Decl. Doc. 327 ¶ 14.]

Cloudflare complains that it cannot ascertain whether an image is infringing, and that determination of doctrines such as fair use are best left to "courts, or at best, lawyers highly experienced in copyright law."  [Cloudflare Expert Disclosures, Spillane Dec. ¶ 15, Ex. L.]  *Id.* pp. 9-10.  However, Cloudflare does not employee any attorneys in its Trust & Safety department, which is responsible for infringement complaints.  [01/22/18 Justin Paine Depo. 26:23-28:3, 39:2-18.][6]

## H.   **Cloudflare Fails to Accommodate, and Interferes with, Standard Technical Measures**.

While Cloudflare has disclosed a contact email address for infringement complaints in the form submitted to the Copyright Office, Cloudflare has not published an email address on its website which copyright owners can use to submit infringement notifications via email.  [1/30/18 Easton Decl. Doc. 328 ¶ 14 Ex. A; Penn. Decl. ¶¶ 31-32, Exs. 24, 25.]

Cloudflare has taken the position with respect to Mr. Easton's emails that none were "valid" and thus required no response.  [Cloudfare Response to Interrogatory Nos. 7 & 8 (no valid notices received regarding the at-issue

---

[6] The cited pages from the Justin Paine deposition are attached to the 1/30/18 Spillane Decl. as Ex. M.

websites), No. 15 (Easton notices not "valid" because he did not submit through the web page and failed to provide information required by DMCA), 1/30/18 Spillane Decl. Doc. 327 ¶ 12, Ex. J.]

Cloudflare does not forward email infringement notices from copyright owners to its customers, but rather responds to the sender redirecting his attention to the abuse form.  [1/30/18 Penn Decl. Doc. 328 ¶¶ 7, 35, 37-42, Exs. 1-3, 5, 7, 14, 26-31.]; 01/22/18 Paine Depo. 22:18-23:5.]  Submissions via Cloudflare's web form populate automatically into a database.  [01/22/18 Paine Depo. 13:7-14:3.]  However, Cloudflare would have to hire additional staff to read and process email submissions.  [01/22/18 Paine Depo. 23:6-24:5.]

Cloudflare's web abuse form has qualities that limit the ability of copyright owners to provide notice of infringement.  First, it says that only ten infringement complaints may be submitted through the form at one time. [1/30/18 Easton Decl. Doc. 328 ¶ 18 Ex. B.]  ALS's DMCA agent, Steve Easton, frequently sends notification of infringement of hundreds of ALS works, which would require splitting up the notice to Cloudflare into multiple submissions through the online form.  [1/30/18 Easton Decl. Doc. 328 ¶¶ 17-18.]  Second, Cloudflare's abuse pages say Cloudflare will act only if the submission is "legitimate" or "valid," terms nowhere defined on Cloudflare's website.  [1/30/18 Penn Decl. Doc. 328 ¶¶ 31, 32, Exs. 24, 25.]  Third, the online form seeks to intimidate copyright owners through a statement that "you understand, under 17 U.S.C. § 512(f), you may be liable for any damages, including costs and attorneys' fees, if you knowingly materially misrepresent reported material," even though no such acknowledgement is a required element of a DMCA notification under 17 U.S.C. § 512(c)(3)(A).  Id.  Fourth, ALS can afford to pay Mr. Easton relatively little to send DMCA notifications on its behalf.  Sending notification by email is a far more time and cost efficient method compared to having to submit notices to each provider through web

forms.  If Mr. Easton were required to submit notification only through web forms, ALS's infringement notification procedures would become unaffordable and break down.  [1/30/18 Easton Decl. Doc. 328 ¶¶ 17-18; 1/30/18 Walsh Decl. Doc. 326 ¶ 10.]

> **I.      Months After Notice of Infringement to Cloudflare From ALS, Infringing ALS Content Remains Live on the Origin Server and in Cloudflare's Cache.**

In a number of cases, months after delivery to Cloudflare of notice of infringing of ALS works on a Cloudflare customer site, the infringing content remains live on the origin server and copies of the infringing works remain in cache.  2/16/18 Penn Decl. *passim*; 2/16/18 Spillane Decl. ¶¶ 2-14, Exs. 1-11.

> **J.      Abuse Complaints Submitted Through Cloudflare's Abuse Page Elicit Erratic Responses and Don't Result in Removal of the Infringing Content.**

Throughout this case Cloudflare has complained that ALS doesn't submit its infringement complaints through its web abuse page, www.cloudflare.com/abuse/form.  However, use of this page elicits inconsistent responses.  Even when filled out completely and in a consistent manner, and even when one checks the boxes that opt to forward complaints the site host and operator, sometimes Cloudflare emails a response confirming the URL submitted and sometimes Cloudflare send a sham response claiming that the notice lacked multiple categories of information required by 17 U.S.C. § 512(c).  Cloudflare's abuse template is obviously set up to satisfy all elements of Section 512(c) when fully filled out.  Further, even submission of infringing content through Cloudflare's abuse page does not result in removal of infringing material.  2/16/18 Spillane Decl. ¶¶ 15-27, Exs. 12-19.

**K.** **Cloudflare Has Failed to Take Simple Measures Despite Receipt of Numerous Machine-Readable Hyperlinks Identifying the Work Infringed and its Location on a Cloudflare Client Site.**

The numerous infringement notification emails from Steve Easton submitted to Cloudflare contain live hyperlinks pertaining to each and every infringing work in question.  The hyperlinks simultaneously disclose the work infringed and its location on the Cloudflare client site.  1/30/18 Walsh Decl. Doc. 326; 1/30/18 East Decl. Doc. 328; Notice of Manual Filing Doc. 330.

The hyperlinks in the Easton emails are machine-readable.  2/16/18 Ghandeharizadeh Decl. ¶ 15.  Once Cloudflare receives notice of infringing ALS Scan images on a website that is a customer of Cloudflare, Cloudflare may employ software techniques to detect these images with a high accuracy to either remove them from its caches, prevent them from being cached, or both. Ghandeharizadeh Decl. ¶ 16.

In its simplest form, a software technique may use the URL of a pirated image to author a filter.  Cloudflare's cache servers may use these filters to identify images associated with them and purge them from their cache. These filters can also be used to prevent caching of images identified as infringing. Ghandeharizadeh Decl. ¶ 17.

A more complex approach may use either metadata associated with an image, an image content recognition software, or both to detect pirated images. With an identified copyrighted ALS Scan image, an image content recognition technique such as the one by Facebook may identify facial features of models and their relative position in the image. This information can be used to identify images with similar characteristics, removing them from caches of Cloudflare. Ghandeharizadeh Decl. ¶ 18.

1

## ARGUMENT

**I.    THERE ARE, AT MINIMUM, TRIABLE DISPUTES OF FACT ON CLOUDFLARE'S LIABILITY FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT.**

### A.    Cloudflare Materially Contributes to Reproduction, Distribution and Display of Infringing Works.

Cloudflare has materially contributed to direct infringement[7] of ALS's exclusive rights to reproduce,[8] distribute and display its copyrighted works. *17 U.S.C. § 106(1), (3), (5).*[9]

---

[7] Cloudflare says there isn't "competent evidence" of direct infringement. To the contrary, Steve Easton's testimony is that he observed the direct infringement and recorded the work and its location on the infringing site in his notifications. In case of doubt he checked with Sarah Walsh. Sarah Walsh testified she was familiar with Easton's notifications and none of the content was authorized. This is direct, or at minimum, circumstantial, evidence of infringement. Plaintiff is not required to present direct evidence of copying for each image at issue to survive summary judgment. *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000) (noting copying may be shown through circumstantial evidence and often is); *Columbia Pictures Indus. v. Gary Fung*, 710 F.3d 1020 (9th Cir. 2013) (same); *see also Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1225 (D. Minn. 2008) ("[D]irect proof of actual dissemination is not required by the Copyright Act. Plaintiffs are free to employ circumstantial evidence to attempt to prove [a violation]."); *see also BMG Rights Mgmt. (US) LLC v. Cox Communs.*, 149 F.Supp.3d 634, 663 (E.D. Va. 2015).

[8] An electronic reproduction of a copyrighted work need not be "permanent" in order to violate the copyright owner's exclusive rights. In *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993) the court held that a temporary copy of a computer program, copied from a permanent storage device into a computer's random active memory ("RAM"), constitutes "copying" under the Copyright Act.

1    "[O]ne who, with knowledge of the infringing activity … materially

2    contributes[10] to the infringing conduct of another, may be held liable as a

3    'contributory' infringer." *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th

4    Cir. 1996), quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,

5    443 F.2d 1159, 1162 (2d Cir. 1971).

6    Contributory liability exists where a service provider aids in the

7    "reproduction, . . . display and distribution of [plaintiff's] images over the

8    Internet." *Perfect 10 v. Visa Intern. Service Ass'n*, 494 F.3d 788, 796 (9th Cir.

9    2007).

10   Courts have long recognized that continuing to provide services to direct

11   infringers after knowledge of infringement contributes to infringement.

12   In *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) Cherry

13   Auction operated a swap meet. Vendors paid a fee for booth space. The sheriff

14   raided the swap meet and seized thousands of counterfeit recordings. The

15   following year, finding that vendors were still selling counterfeit recordings, the

16   sheriff notified Cherry Auction of ongoing sales of infringing materials. The

17   plaintiff sent an investigator to the Cherry Auction site and observed sales of

18   counterfeit recordings. Cherry Auction was liable for contributory infringement

19   because, with actual knowledge of direct infringement by vendors, Cherry

---

[9]  In its order of October 24, 2016, Doc. 60, the Court found that ALS had sufficiently averred that Cloudflare materially contributed to infringement through its content delivery network ("CDN"), by storing copies of copyrighted works on its caching servers and distributing such works to be displayed on consumers' computer screens. Doc. 60 pp. 7-8. Also, the court found that ALS had sufficiently averred that Cloudflare's domain name service ("DNS") masks information about pirate sites and their hosts, thus hindering the ability of copyright owners to hold such parties accountable. Doc. 60 pp. 8. Here, the evidence backs up the averments.

[10]  ALS is not proceeding under an inducement theory.

Auction continued to provide support services to such vendors including "space, utilities, parking, advertisement, plumbing and customers." 76 F.3d at 264. "[P]roviding the site and facilities for known infringing activity is sufficient to establish contributory liability." *Id.*

The online world is no different. Courts have long held that providing storage (even transitory storage) and distribution services for copyrighted works with knowledge of infringement can be a form of contributory infringement. *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004) ("[A] reasonable trier of fact could conclude that AOL materially contributed to the copyright infringement by storing infringing copies of Ellison's works on its USENET groups and providing the groups' users with access to those copies"); *Louis Vuitton Malletier, S.A. v. Akonic Solutions, Inc.*, 658 F.3d 936, 943 (9th Cir. 2011) ("[t]here is no question that providing direct infringers with server space" satisfies the material contribution standard); *Religious Tech. Ctr. v. Netcom*, 907 F.Supp. 1361, 1375 (N.D. Cal. 1995) (finding internet service provider liable for contributory infringement because the provider "'allows [the primary infringer's] infringing messages to remain on its system and be further distributed to other [users] worldwide.'").

Service providers may also contribute to infringement by helping consumers access infringing content:

> There is no dispute that Google substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access infringing materials. We cannot discount the effect of such a service on copyright owners, even though Google's assistance is available to all websites, not just infringing ones. Applying our test, Google could be held contributorily liable if it had knowledge that infringing Perfect 10 images were available using its search engine, could take simple measures to prevent further damage to Perfect 10's copyrighted works, and failed to take such steps."

*Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007).  Napster materially contributed to direct infringement because "Napster [] supplie[d] the proprietary software, search engine, servers, and means of establishing a connection between users' computers.   Without the support services defendant provide[d], Napster users could not find and download the music they want with the ease of which defendant boasts."  *A&M Records, Inc. v. Napster*, 114 F.Supp.2d 896, 920 (N.D. Cal. 2000).  Similarly, in *Perfect 10 v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146 (2002), Cybernet Ventures maintained and promoted a network of "300,000 'regular' sites and 14,000 'Gold' sites."  213 F.Supp.2d at 1158.  Cybernet advertised and provided means by which consumers could search for websites in the Cybernet network.  213 F.Supp.2d at 1158-59.  Cybernet had actual knowledge of direct infringement and materially contributed to such infringement by continuing to provide advertising and search services to infringing webmasters in its network.  213 F.Supp.2d at 1169-70.

Material contribution to infringement can also consist of aiding distribution of copyrighted material even without storage services.  In *BMG Rights Management (US) LLC v. Cox Communications*, No. 16-1972 (4th Cir. 2/1/18), the jury found Cox liable for contributory copyright infringement for continuing to provide users with conduit Internet services after information that users were using Cox's service to access infringing works on bit torrent sites.  *See also Screen Gems-Columbia Music, Inc.*, 256 F.Supp. 399, 405 (S.D.N.Y. 1966) (company that packaged and shipped infringing records could be liable for contributory infringement).

Finally, material contribution may consist of "easing" access to infringing material.  *Napster,* 239 F.3d. at 1022 ("Napster materially contribute[d] to the infringing activity" because, "[w]ithout the support services

1  defendant provides, Napster users could not find and download the music they

2  want with the ease of which defendant boasts").

3      Cloudflare was held to have acted in concert with direct infringers in

4  *Arista Records LLC v. Tkach*, 122 F.Supp.3d 32 (S.D.N.Y. 2015).  The court

5  entered an injunction against "grooveshark" for trademark infringement.  Arista

6  moved for an order requiring Cloudflare to comply with the TRO under FRCP

7  R. 65 for being in "active concert or participation" with grooveshark.  The court

8  granted Arista's motion because Cloudflare's DNS service helped consumers

9  find grooveshark and its CDN service improved the performance of the site.

> "CloudFlare's authoritative domain name server translates
> grooveshark.li as entered in a search browser into the correct IP
> address associated with that site, thus allowing the user to connect
> to the site. Connecting internet users to grooveshark.li in this
> manner benefits Defendants and quite fundamentally assists them
> in violating the injunction because, without it, users would not be
> able to connect to Defendants' site unless they knew the specific IP
> address for the site. Beyond the authoritative domain name server,
> CloudFlare also provides additional services that it describes as
> improving the performance of the grooveshark.li site."

122 F.Supp.3d at 36.

19      Here, Cloudflare has contributed to infringement by all of these

20  measures.  Cloudflare reproduces infringing works throughout its data centers

21  worldwide.  The storage is not ephemeral, but rather in continuing chunks of

22  two hour "time to live" depending upon popularity.  When a consumer requests

23  an infringing work, the requested is routed to Cloudflare through its DNS

24  system.  Cloudflare searches for a reproduction of that work in cache in its data

25  centers.  Cloudflare then distributes a reproduction of the infringing work,

26  either from the nearest cache or from the origin server, to the consumer.  The

27  infringing reproduction so distributed to the consumer is then displayed on the

28  consumer's screen.  Even if the origin server goes down, infringing content will

remain in Cloudflare's caching servers.  Cloudflare's systems are designed so that consumers will receive their infringing works faster and in a more reliable fashion.

Cloudflare contributes to reproduction, distribution and display of infringing ALS works.  Cloudflare's caching servers provide the site and facility for infringement.  Cloudflare helps consumers find and access infringing content.  Cloudflare "eases" access to infringing works.

Cloudflare has contributed to direct infringement.

**B.** **Cloudflare Failed to Take "Simple Measures" to Prevent Further Damage from Infringement.**

Cloudflare claims that it could not take "simple measures" to prevent further damage from infringement.  The degree to which a copyright plaintiff must show failure to take "simple measures" to prove contributory infringement is not clear.  Some cases say this.  However, some do not.  *See Louis Vuitton, supra,* 658 F.3d at 933-34.  This phrase has not made its way into the pattern instruction.  9th Cir. Manual of Model Civil Jury Instr. No. 17.21.

Perhaps the point is that contribution to infringement may consist not only in what one does, but what one does not do.  By this standard, Cloudflare has failed to take simple measures to mitigate damage from infringement:

- Cloudflare won't act on notices of infringement submitted via email, though Congress has required service providers to provide copyright owners with an email contact;

- Cloudflare won't forward email notices of infringement to hosts or site owners.

- Submission of notice of infringement through Cloudflare's web abuse page doesn't result in removal of the infringing material;

1 •   Submission of notice of infringement through Cloudflare's web

2 abuse page sometimes elicits sham responses from Cloudflare that the notice

3 was supposedly defective;

4 •   Though ALS's email notices contain machine-readable hyperlinks

5 identifying the copyrighted work in question and the location of the infringing

6 copy on a Cloudflare customer site, Cloudflare does not follow up to ascertain

7 whether the infringing content was removed;

8 •   Cloudflare does not follow up on notifications submitted via its

9 abuse page to ascertain whether the infringing content was removed;

10 •   Cloudflare does not remove infringing copies of ALS works from

11 its cache where the content is not removed from the origin server;

12 •   Cloudflare has not terminated services to any of its customers,

13 even upon receipt of numerous infringement notices, except upon receipt of a

14 court order;

15 •   Cloudflare could reveal contact information for the origin host on

16 whois lookups even though the site owner has designated Cloudflare's servers

17 as its authoritative nameservers;

18 •   Cloudflare could machine read and record ALS images submitted

19 via email or abuse page, remove such images from cache and block those

20 specific images from being re-cached; and

21 •   Cloudflare could employ image recognition technology to

22 recognize and block caching or distribution of ALS works.

23 Cloudflare relies heavily on *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d

24 657 (9th Cir. 2017), but the facts are far from this case.  Giganews operated a

25 newsgroup, which received information propagated from other newsgroups.

26 The case doesn't say that Giganews's own users were uploading the infringing

27 content, such that Giganews could have terminated its own subscribers.

28 Giganews did act in response to receipt of Message ID's in "machine-readable"

- 23 -

format, but for the most part Perfect 10 did not provide such information.  Here, by contrast, Cloudflare knows full well which of its customers are the subject of repeated notice of infringement, yet has not terminated any such customer. Cloudflare has received many thousand "machine-readable" hyperlinks from Steve Easton identifying the ALS works infringed and their location on the Internet, yet Cloudflare refused to take simple measures in response to receipt of this information.

Cloudflare says its systems afford substantial non-infringing uses.  This may be true, but this factor only where a plaintiff claims that knowledge of infringement may be imputed by distribution of a staple article of commerce with knowledge that the article is being used for infringement.  *MGM v. Grokster*, 545 U.S. 913, 933 (2005).  This claim is not being raised here.

**C.    Cloudflare Materially Contributes to Infringement by Blocking Information Copyright Owners Need to Hold Service Providers Accountable.**

Cloudflare also materially contributes to copyright infringement by making it harder to locate, if not entirely concealing, information ALS and other copyright owners need to enforce their rights and by erecting barriers to copyright owners' ability to economically send notice of infringement.  *See Perfect 10, Inc v. Amazon.com, Inc*, 508 F.3d 1146, 1172 (9th Cir. 2007) ('copyright holders cannot protect their rights in a meaningful way unless they can hold providers of [internet] services or products accountable'); *MGM v. Grokster*, 545 U.S. 913, 929-30 (2005) ("When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers.").

Says Cloudflare: "Cloud Flare will mask your IP."  When copyright owners seek information about site owners and hosts on standard whois lookups, they retrieve information about Cloudflare instead.  The IP addresses

1  listed, which hosts want to find sites on their servers, are Cloudflare IPs, not the
2  IP of the website.  Cloudflare says that copyright owners can get the IP address
3  to hosts, but only through a multi-step run around.

4  These actions by Cloudflare constitute material contribution to
5  infringement.

6  <u>**CONCLUSION**</u>

7  Cloudflare's motion for summary judgment should be denied.

8

9  DATED:  February 16, 2018            SPILLANE LAW GROUP PLC
                                       GALLAGHER & KENNEDY, P.A.
10

11

12

13                                     By: _____

14                                            Jay M. Spillane
                                       Attorneys for Plaintiff ALS Scan, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 25 -

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this action.  My business address is: 468 N. Camden Drive, Second Floor, Beverly Hills, CA 90210-4507.  A true and correct copy of the foregoing document entitled (*specify*):

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANT CLOUDFLARE, INC.

will be served or was served **(a)** on the judge in chambers in the form and manner required by Local Rules and **(b)** in the manner stated below:

1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and Local Rules, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) February 16, 2018, I checked the CM/ECF docket for this action and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Gary L. Bostwick– gbostwick@B1Law.com
Kevin S. Toll – kevin@silversteinlegal.com
Lawrence G. Walters – larry@firstamendment.com
Corey D. Silverstein – corey@silversteinlegal.com
Andrew P. Bridges – abridges@fenwick.com
Armen Nercessian    anercessian@fenwick.com
Jedediah Wakefield    jwakefield@fenwick.com
Sapna S Mehta    smehta@fenwick.com

Colin TJ O'Brien – tm@partridgepartnerspc.com
John L. Ambrogi – jla@partridgepartnerspc.com
Daniel L Rogna    daniel@partridgepartnerspc.com
Paul Supnik – paul@supnik.com
Raymond Katrinak – pkatrinak@kernanlaw.net
Ryan Carreon – rcarreon@kernanlaw.net
Stephen M Kernan – kernanlaw@gmail.com
John P Flynn    john.flynn@gknet.com
Kevin D Neal    kevin.neal@gknet.com

☐ Service information continued on attached page

2.  **SERVED BY UNITED STATES MAIL**:
On (*date*) February 16, 2018, I served the following persons and/or entities at the last known addresses in this case by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3.  **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling Local Rule, on (*date*) February 16, 2018, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served by Overnight Mail or Attorney Service***
Hon. George H. Wu
U.S. District Court
350 W. 1st Street
Courtroom 9D
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

2/16/2018            Jessie Gietl

_____            _____            _____
*Date*                       *Printed Name*                    *Signature*