ANDREW P. BRIDGES (CSB No. 122761)
abridges@fenwick.com
JEDEDIAH WAKEFIELD (CSB No. 178058)
jwakefield@fenwick.com
ARMEN NERCESSIAN (CSB No. 284906)
anercessian@fenwick.com
SAPNA MEHTA (CSB No. 288238)
smehta@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:  415.875.2300
Facsimile:   415.281.1350

Attorneys for Defendant
CLOUDFLARE, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ALS SCAN, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CLOUDFLARE, INC., et al.,<br><br>Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br><br>**CLOUDFLARE'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[PUBLIC REDACTED VERSION]**<br><br>Date:        March 12, 2018<br>Time:       8:30 A.M.<br>Courtroom:  9D<br>Judge:      George H. Wu<br><br>Trial Date:   April 24, 2018 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

FACTUAL SUMMARY ........................................................................ 1

    Cloudflare's Services and Technology ........................................... 1

    How Cloudflare Responds to Complaints ...................................... 5

    Cloudflare's Policy for Terminating Repeat Infringers .................. 6

    ALS's Business .............................................................................. 7

    Interactions between ALS and Cloudflare ..................................... 8

ARGUMENT ........................................................................................ 9

I.      THE STANDARD FOR SUMMARY JUDGMENT ........................ 9

II.    ALS CANNOT SHOW CONTRIBUTORY INFRINGEMENT. ....... 9

    A.    ALS has not proved direct infringements of its works by any person whom Cloudflare has assisted. ................................ 9

    B.    ALS fails to address the *Grokster* standard, and the evidence forecloses summary judgment for ALS under that standard. ........................................................................... 10

    C.    ALS fails to discuss, or provide evidence satisfying, the standard of contributory copyright infringement for computer system operators in *Amazon.com* and *Giganews*. .... 11

III.   ALS FAILS TO SHOW THAT THE OPTIONAL DMCA "SAFE HARBORS" DO NOT APPLY TO CLOUDFLARE. ........... 13

    A.    Evidence shows that Cloudflare qualifies for two safe harbors. ................................................................................ 15

        1.    Section 512(a) applies to Cloudflare's conduit operations. ..................................................................... 15

        2.    Section 512(b) applies to Cloudflare's cache operations. ..................................................................... 18

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3.    Cloudflare meets the general conditions of
section 512(i). .............................................................. 20

a.    Cloudflare adopted, notified others of, and
reasonably implemented its policy of
terminating repeat infringers in appropriate
circumstances. ...................................................... 20

b.    Cloudflare accommodates, and does not
interfere with, any "standard technical
measures." ............................................................. 24

CONCLUSION .................................................................................... 25

STATUTORY APPENDIX

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**CASES**

4

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986) ........................................................................ 9

5

6

*Arista Records, LLC v. Tkach*,
   122 F. Supp. 3d 32 (S.D.N.Y. 2015) ............................................. 12

7

8

*BMG Rights Management (US) LLC v. Cox Communications, Inc.*,
   No. 16-1972 (4th Cir. Feb. 1, 2018) .............................................. 23

9

10

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*,
   213 F.3d 474 (9th Cir. 2000) ........................................................... 9

11

12

*Collins v. Wayne Corp.*,
   621 F.2d 777 (5th Cir. 1980) ......................................................... 11

13

14

*Columbia Pictures Industries, Inc., v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) ......................................... 10, 16, 17

15

16

*Corbis Corp. v. Amazon.com, Inc.*,
   351 F. Supp. 2d 1090 (W.D. Wash. 2004) ........................... 9, 21, 23

17

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ................................................. 13, 15

18

19

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
   658 F.3d 936 (9th Cir. 2011) ......................................................... 12

20

21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ......................................................................... 9

22

23

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) ............................................................. 9, 10, 11

24

25

*Perfect 10, Inc. v. CCBill Ltd.*,
   488 F.3d 1102 (9th Cir. 2007) ..................................... 4, 21, 24, 25

26

*Perfect 10 v. Amazon.com*,
   508 F.3d 1146 (9th Cir. 2007) .................................... 1, 11, 12, 19

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Perfect 10 v. Giganews,*
    847 F.3d 657 (9th Cir. 2017), *cert. denied,*
    138 S. Ct. 504 (2017) ....................................................................1, 8, 9, 10, 11

*VHT, Inc., v. Zillow Grp. Inc.,*
    No. C15-1096 JLR, 2017 WL 2654583 (W.D. Wash. June 20,
    2017) ..............................................................................................................12

*Viacom Int'l, Inc. v. YouTube, Inc.,*
    676 F.3d 19 (2d Cir. 2012) .............................................................................24

**STATUTES**

Online Copyright Infringement Liability Limitation Act (OCILLA),
    enacted as Title II of Digital Millennium Copyright Act (DMCA),
    17 U.S.C. § 512 .....................................................................................*passim*

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65.................................................................................................12

Fed. R. Evid. 801 ................................................................................................11

H.R. Rep. 105-796 ..............................................................................................14

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# INTRODUCTION

Cloudflare's own motion established why it is entitled to summary judgment on the one remaining claim against it for contributory copyright infringement. The same evidence precludes partial summary judgment for ALS on its motion.

ALS's motion does not seriously address the merits of its contributory infringement claim, for good reason: it cannot establish the claim. ALS devotes a mere three pages to arguments in support of the claim; it fails to discuss *Perfect 10 v. Amazon.com,* 508 F.3d 1146 (9th Cir. 2007), the leading Ninth Circuit precedent on contributory infringement for computer system operators like Cloudflare; and it fails to discuss the most recent Ninth Circuit contributory infringement decision, *Perfect 10 v. Giganews*, 847 F.3d 657 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 504 (2017), which applied the *Amazon.com* standard to affirm summary judgment for defendants against claims similar to, but stronger than, ALS's claim here.

ALS devotes most of its brief to a flawed attack on Cloudflare's eligibility for the optional remedies limitation of the Digital Millennium Copyright Act (DMCA). But the DMCA safe harbor is merely a limitation on remedies, and it has no bearing on a claim of infringement. *See* 17 U.S.C. § 512(l). Because Cloudflare is not liable for infringement, the Court need not reach the safe harbor issue. In all events, the evidence demonstrates that Cloudflare is entitled to the safe harbor protections of section 512(a) and (b) of the Copyright Act.

# FACTUAL SUMMARY

## Cloudflare's Services and Technology

With a mission to "help build a better Internet," Cloudflare is one of the major pillars of the Internet's infrastructure, along with a number of other major companies and institutions that provide connections, technologies, and services that contribute to the existence of an extraordinary, accessible, decentralized, efficient, secure, and open global Internet. *See* Declaration of Albert Lee Guinn III ("Guinn Opp. Decl.") ¶ 3. Handling nearly ten percent of global Internet requests from

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2.5 billion discrete Internet users every month, Cloudflare provides Internet security and traffic optimization services, on both a free and a paid basis, to operators of seven million web properties: major financial institutions, universities, entertainment companies, retailers and other e-commerce companies, governments and agencies, and political campaigns. *Id.* For a wide range of customers, from the Library of Congress and the United States Copyright Office to NASDAQ, Cloudflare's services improve website performance, protect websites from malicious attack, and make the Internet safer for all. *Id.* In 2016 Cloudflare customers included the campaigns of Donald Trump, Bernie Sanders, and at least eight other major presidential candidates, fending off hundreds of thousands of attacks *per day*; Cloudflare also serves opposition party or dissident websites that challenge authoritarian regimes. *Id.*

Cloudflare's service uses one of the largest content delivery networks on the Internet, like Akamai and Amazon's AWS CloudFront. *Id.* ¶ 9. Cloudflare's is a pass-through network (or conduit) for transmission of virtually any kind of data, typically between the servers that host its customers' websites and users, such as between a bank's website and its customers. *Id.* ¶ 9, Ex. E.

Cloudflare's services protect against malicious attacks and optimize Internet performance through 120 data centers or "points of presence" (PoPs) around the world. *Id.* ¶¶ 11-12; *see also* Declaration of Nick Sullivan ("Sullivan Opp. Decl.") ¶ 3. When an Internet user seeks a Cloudflare customer's website, the user's ISP directs the traffic to the closest or most convenient PoP. Although Cloudflare cannot access the *content* of any Internet traffic, Cloudflare screens the traffic for telltale signs of threats, such as distributed denial of service (DDoS) attacks, bots, and other malware that may incapacitate networks, harm computers, or steal data. Guinn Opp. Decl. ¶¶ 11-12; Sullivan Opp. Decl. ¶¶ 3, 8. If Cloudflare's system clears the request, the system communicates with the website's host to receive and then relay data to users. Sullivan Opp. Decl. ¶ 3. This relaying function is known as

"reverse proxying." *Id.*; Guinn Opp. Decl. ¶ 11. Reverse proxying also involves use of Cloudflare's Internet Protocol (IP) addresses (numbers such as 103.21.244.0), instead of the customer's addresses, so that traffic for the customer is first directed to Cloudflare. *Id.* ¶ 11.

Cloudflare also provides an "authoritative DNS" service that provides numerical IP addresses that correspond to domain names, allowing devices and computers to recognize and reach their destinations. *Id.* ¶¶ 9-10.

Cloudflare's services improve Internet performance by caching commonly requested materials in the same way that many other Internet infrastructure providers do. *Id.* ¶ 13. When a browser seeks a web page from a Cloudflare customer, the request comes through Cloudflare, causing one of its PoPs to store temporarily some materials from the page to respond to other requests for the same materials that come soon thereafter. *Id.* Caching is an extremely common feature of Internet transmissions at several points in cloud-based services; consumers' web browsers do it, as do routers providing Wi-Fi access points in public locations like hotel lobbies or on airplanes. *Id.* It lightens traffic to customers' websites, helping protect against DDoS attacks and improving access speed. *Id.* ¶¶ 16, 19.

Cloudflare's cache automatically clears data when new requests for the same data do not soon arrive. *Id.* ¶ 14. Thus Cloudflare's caches function like mirrors, reflecting what is on a website only temporarily. *Id.* ¶ 6; Sullivan Opp. Decl. ¶ 4.

Cloudflare's system can help users access websites faster and using less bandwidth because some of the recently accessed data may be closer to the user, but the actual speed difference depends on a vast number of factors, such as locations of visitors and customers, computer and networking equipment, ISP routing, and ISP speeds. Guinn Decl. ¶¶ 19-20. Plaintiff's technical expert Dr. Ghandeharizadeh estimated the difference in web page loading time between an East Coast user and a German user to access a West Coast website at 60 milliseconds (60/1000 or 6/100 of a second), whereas the speed of the blink of an eye is generally 100 milliseconds.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  Declaration of Andrew P. Bridges ("Bridges Opp. Decl.") ¶¶ 10w, 10z, Ex. 13 at

2  75:25-76:21, 79:23-80:21, 81:4-82:1; *see also* Guinn Opp. Decl. ¶ 21. This is

3  consistent with the description of Internet transmissions as occurring "in

4  milliseconds" in *Perfect 10, Inc. v. CCBill Ltd.,* 488 F.3d 1102, 1116 (9th Cir. 2007).

5       Cloudflare does not provide a hosting service. Guinn Opp. Decl. ¶ 7, Ex. E;

6  *see also* Declaration of Justin Paine in Support of Cloudflare, Inc.'s Opposition to

7  ALS Scan, Inc.'s Motion for Partial Summary Judgment (Paine Opp. Decl.) ¶ 4;

8  Sullivan Opp. Decl. ¶ 4. To use Cloudflare, a customer must already have an

9  existing website with its own Internet hosting and transmission facilities or

10  services. Guinn Opp. Decl. ¶ 7; Sullivan Opp. Decl. ¶ 7.

11       Cloudflare's customers must have a domain registrar and hosting provider.

12  Guinn Opp. Decl. ¶¶ 7-8. They will have their own WHOIS directory entry

13  identifying the domain name registrant and several types of contact information. *Id.*

14  ¶ 8. Cloudflare customers must designate Cloudflare "nameservers," which link the

15  customer's domains to Cloudflare's IP addresses, to take advantage of Cloudflare's

16  other services. *Id.* ¶ 10. After that, WHOIS data will show that Cloudflare provides

17  the nameservers, but Cloudflare's services do not change the identity or contact

18  details of the domain registrant. *Id.* Some domain registrars sell privacy services to

19  their customers, which substitute the privacy service's name for the customer's

20  name on WHOIS domain ownership records. Guinn Opp. Decl. ¶ 8. Cloudflare

21  does not provide privacy services. *Id.* Cloudflare customers using privacy services

22  do so independently of Cloudflare's services. *Id.*

23       Cloudflare's services do not alter the substantive content of websites. *Id.* ¶ 16.

24  To optimize and protect sites, Cloudflare may compress data, insert metadata, and

25  "obfuscate" email addresses so that humans but not bots can see them. *Id.* These

26  automated processes do not change a website itself or its content. *Id.* To users, sites

27  appear exactly the same with or without Cloudflare's services. *Id.*

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**How Cloudflare Responds to Complaints**

Cloudflare regularly gets complaints about content that passes through its network, including spam, malware, phishing, child abuse materials, infringement, and other problems. Paine Opp. Decl. ¶ 5, Ex. 1. It has developed a thoughtful, robust, streamlined, fast, and effective process for addressing complaints and facilitating their resolution; Cloudflare, as a pass-through service and not a host, has no ability to achieve such a resolution itself. *Id.* ¶¶ 4-5.

For copyright complaints, Cloudflare provides an easy-to-use web form that collects information that Cloudflare needs in order to share the complaint effectively with the website host. *Id.* ¶ 6, Ex. 2. That form feeds information into an automated process that transmits the complaint to the website owner, the host, or both, at the complainant's direction. *Id.* ¶¶ 6-7, Exs. 3-4. If someone sends complaints by other means, Cloudflare promptly responds to direct the person to the web form. *Id.* ¶ 11. Other forms of notification are error-prone and may slow down processing as they can vary in form and content, can be difficult to interpret, may include incomplete information, and may require manual review and transcription. *Id.* At the scale Cloudflare operates, such methods are unworkable. *Id.*

Upon receiving a web form complaint of infringement, Cloudflare forwards it to its customer and/or the customer's hosting provider. *Id.* ¶ 7. Cloudflare also provides the complainant the identity and contact information of the host so that the complainant may follow up directly with it. *Id.*, Exs. 5-6. Unlike Cloudflare, the hosting provider generally has the ability to remove materials or shut down websites. *Id.* ¶¶ 4-5, 7; Sullivan Opp. Decl. ¶ 5. Cloudflare has found that referring complaints to the host of a website frequently results in the accused materials being removed or disabled from the website. Paine Opp. Decl. ¶ 8.

In contrast, terminating Cloudflare's service to a website will not "take down" any websites or materials; it will merely remove the threat-detection function the Cloudflare PoPs perform and reduce the security of the website. *Id.*

¶¶ 2, 4; Sullivan Opp. Decl. ¶¶ 4-5. Doing that could make persons who count on that website—especially customers or users of that website—vulnerable to attack. Sullivan Opp. Decl. ¶ 5-6. Terminating Cloudflare's services could also increase risks of infringement. *Id.* ¶ 5. One benefit of Cloudflare's services is the identification and blocking of automated tools involved in "scraping," or wholesale downloading, of customers' sites. *Id.* Scraping can collect content from one website for purposes of disseminating it to other websites. *Id.* Thus, terminating Cloudflare's services would not only fail to prevent access to allegedly infringing material but also could make infringing material more available. *See id.* ¶¶ 4-5.

Cloudflare does not induce or encourage copyright infringement by its customers. Sullivan Opp. Decl. ¶ 8; Paine Opp. Decl. ¶ 5. It does not advertise or urge infringements or take other affirmative steps to foster infringement. Paine Opp. Decl. ¶ 5. To the contrary, the system it has put in place has assisted a wide range of copyright holders in combatting infringements. Paine Opp. Decl. ¶¶ 5-8

**Cloudflare's Policy for Terminating Repeat Infringers**

Cloudflare's terms of service, under "Termination," state "Cloudflare's policy is to investigate violations of these Terms of Service and terminate repeat infringers." Paine Opp. Decl. ¶ 24, Ex. 26 at § 15. Under "Investigation," Cloudflare states: "Cloudflare may, at its own discretion, reveal the information about your web server to alleged copyright holders or other complainants who have filed complaints with us." Paine Opp. Decl. ¶ 24, Ex. 26 at § 11.

Cloudflare has had a consistent policy of terminating customers for copyright infringement when a court has specifically directed Cloudflare to do so. Paine Opp. Decl. ¶ 25. Cloudflare has terminated customers for that reason. Paine Opp. Decl. ¶ 25, Ex. 27.

"Appropriate circumstances" for termination of repeat infringers are rare, for good reason: termination of a customer's service does not materially affect any infringements but could cause significant security problems throughout the Internet.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

A website without protection against cyberattacks may unwittingly become a tool for further attacks against countless websites, particularly by "bots" (or automated processes) that interact with them. Sullivan Opp. Decl. ¶ 6. Bots can take control of a website's network and use it to attack other networks and their resources, often by creating a massive "botnet" of coordinated networks and devices under the control of a malicious actor that can launch massive coordinated attacks against others, such as denial of service attacks. Sullivan Opp. Decl. ¶ 6, Ex. A. Cloudflare protects millions of websites against bots. Protection of websites is so important to the Internet as a whole that Cloudflare offers its basic service to many websites, including most in this case, *for free*. Paine Opp. Decl. ¶¶ 22-23.

**ALS's Business**

ALS operates websites with pornographic images and videos of nude young women. Third Amended Complaint ("TAC") (Dkt. 148) ¶ 16.

ALS makes money selling subscriptions for access to its password-protected websites. TAC ¶ 16; Bridges Opp. Decl. ¶ 3a, 3c, 3d, Ex.1 at 74:1-24, 129:1-20, 131:25-133:24. ALS does not sell access to its images or "galleries" (collections of images) on an individual basis. A subscriber can view or download any of the images or videos on ALS. *Id.* ¶¶ 3c-3d, Ex. 1 at 129:1-20, 131:25-133:24.

The direct infringers underlying the claims in this case must be ALS subscribers who access ALS's password-protected websites in order to obtain the material they disseminate elsewhere. *See id.* ████████████

Fenwick & West LLP
Attorneys at Law
San Francisco

**Interactions between ALS and Cloudflare**

Unlike virtually all other copyright claimants with which Cloudflare has worked, ALS refuses to use Cloudflare's simple and accurate process for processing complaints. ALS's agent, Steve Easton, a non-lawyer who represents several pornography businesses, used Cloudflare's web form a few times for ALS but switched to sending unworkable and defective email communications instead—while continuing to use Cloudflare's web form successfully for his other clients. Paine Opp. Decl. ¶¶ 12-19, Exs. 14-24; Bridges Opp. Decl. ¶¶ 7a, 7i, 7l, 7m, 7n, 7p, 7s, Ex. 7 at 12:1-17:25, 81:13-25, 105:1-9, 109:5-7, 119:5-122:19, 124:4-125:20, 152:18-25.

Instead of using Cloudflare's web form as he did for his other clients, Mr. Easton almost exclusively sent email messages. Paine Opp. Decl. ¶ 12. Cloudflare's system automatically responded, advising him to use the web form. *Id.* at 19. He refused and sent large numbers of complaints by email. *Id.* Relishing imposing a burden, Easton told ALS he "split up" a complaint "into numerous notices to drive [Cloudflare] crazy." Bridges Opp. Decl. ¶ 7k, Exs. 7-8. Others criticized his complaints. Bridges Opp. Decl. ¶ 7s, Ex. 7 at 152:18-25. Easton admitted that, while email complaints took him half an hour on average, and up to two hours, the Cloudflare web form takes 10-15 minutes. *Id.* ¶ 7l, Ex. 7 at 105:1-9. On the rare early occasions when ALS used the web form, Cloudflare immediately forwarded the complaint to the customer and/or host and provided information about the host to ALS. *Id.* ¶ 7i, Ex. 7 at 81:13-25; Paine Opp. Decl. ¶ 15.

ALS is like the plaintiff in *Giganews*. ALS avoids sending complaints through Cloudflare's efficient system, instead demanding a right to burden Cloudflare unnecessarily. This approach is a mere pretext for ALS, which has invested little in its business, to seek windfall statutory damages in litigation.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# ARGUMENT

## I.    THE STANDARD FOR SUMMARY JUDGMENT

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). At the summary judgment stage, a court does not make credibility determinations or weigh conflicting evidence. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986). A court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    ALS CANNOT SHOW CONTRIBUTORY INFRINGEMENT.

ALS's motion remarkably ignores the bulk of relevant Supreme Court and Ninth Circuit precedent in its three-page argument on contributory infringement. Under any standard,[1] ALS cannot satisfy the requirement for summary judgment. To the contrary, Cloudflare deserves summary judgment on the claim, as it explained in its own summary judgment motion.

### A.    ALS has not proved direct infringements of its works by any person whom Cloudflare has assisted.

Proof of contributory infringement requires proof of an underlying direct, or primary, infringement for which a defendant is liable. *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1172 (W.D. Wash. 2004).

Cloudflare does not concede any direct infringements for which it can be liable. ALS has not provided evidence about primary infringers or their conduct.

---

[1] Cloudflare believes that the only standard for contributory infringement after *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), is the "inducement" standard. Because the Ninth Circuit recognizes a coexisting "material contribution" standard, however, Cloudflare will address both standards.

Direct infringement requires volition or causation by the direct infringer. *Giganews,* 847 F.3d at 666-70. ALS has shown no evidence of volition or causation by Cloudflare's customers. Its declarations refer to material that may *appear* on websites, but that does not establish direct infringement by those sites, just as appearance of infringing images in newsgroups did not constitute direct infringement by Usenet server operators in *Giganews*.

      The Walsh declaration (at ¶ 5) and Penn declaration (at ¶ 4) suggest that *customers of Cloudflare's customers* are the direct infringers, which would make Cloudflare's customers secondary infringers most. Any primary infringers here are evidently *ALS's own customers*, who abuse their subscriptions and access to ALS's sites to obtain images that they then post to other websites. But ALS has provided no evidence of a causal connection between its own customers and either Cloudflare or Cloudflare's customers. ALS has an actual relationship with the primary infringers but ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bridges Opp. Decl. ¶ 6a, Ex. 6 at 98:1-100:6. Without showing evidence of direct infringement by Cloudflare's customers, ALS's contributory infringement claim fails to take flight.

**B.**     **ALS fails to address the *Grokster* standard, and the evidence forecloses summary judgment for ALS under that standard.**

      ALS must show that Cloudflare intentionally induces direct infringement of its works by either (a) imputing culpable intent from provision of a service that is incapable of substantial noninfringing uses or (b) showing clear expression or other affirmative steps to foster infringement. *See Grokster*, 545 U.S. at 933, 936-37; *Columbia Pictures Industries, Inc., v. Fung*, 710 F.3d 1020, 1033-34 (9th Cir. 2013). ALS has neither discussed nor provided evidence on either standard.

      By contrast, Cloudflare has shown evidence negating both of those elements. *See* Guinn Opp. Decl. ¶¶ 3-4, 16; Sullivan Opp. Decl. ¶¶ 3, 8; Paine Opp. Decl. ¶¶ 5-8, and Exs. 2-12; Bridges Opp. Decl. ¶¶ 10o-10r, 10cc-10ee, 10oo-10pp, Ex. 13.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### C. ALS fails to discuss, or provide evidence satisfying, the standard of contributory copyright infringement for computer system operators in *Amazon.com* and *Giganews.*

In the Ninth Circuit, a plaintiff suing a computer system operator for the "material contribution" branch of contributory copyright infringement must show the defendant (1) substantially assists direct infringers of the plaintiff's copyrights and (2) fails to take available simple measures to prevent further damage to the copyrights after receiving actual knowledge of specific infringements. *See Amazon.com,* 508 F.3d at 1172-73; *Giganews*, 847 F.3d at 671-72. ALS does not acknowledge, discuss, or adduce evidence of Cloudflare's failure to take any available simple measures to prevent further damages.

Moreover, ALS cannot establish that Cloudflare had actual knowledge of specific infringements. ALS relies solely on the supposed effect of complaints its agent Easton sent, but those complaints were inadequate to convey knowledge for numerous reasons.[2] ALS's own experts, reviewing examples of those complaints, admitted they gained no knowledge from them. Bridges Opp. Decl. ¶¶ 10g-10k, Ex. 13-15 (Ghandeharizadeh); *Id*. ¶¶ 11i, 11j, Ex.17 at 111:24-113:14, Ex.18 (Luna).[3]

---

[2] The vast majority of ALS's email messages used ambiguous blended references to "copyright and/or trademark" and listed long strings of HTML code, including URLs (links to web pages), without explaining what they were. Paine Opp. Decl. ¶ 19. Most of the form emails did not state that any images on particular websites were identical to ALS images. *Id.* Nor did they identify or describe copyrighted materials that ALS claimed to own. *Id.*

[3] Cloudflare can rely upon these statements by ALS's experts even though it may challenge their qualifications and expertise, and the untimeliness of the disclosure of their opinions, in an upcoming motion and may also object to some of their purported expert testimony. Under Federal Rule of Evidence 801(d)(2)(C), this Court should treat Dr. Ghandeharizadeh's statements confirming the lack of actual knowledge of specific infringements from ALS's complaints, like those of Dr. Luna, as party admissions attributable to ALS itself. *See, e.g., Collins v. Wayne Corp.*, 621 F.2d 777, 780 (5th Cir. 1980) (expert statements are treated as party admissions under Rule 801(d)(2)(C) once a party has designated an individual as an expert and that expert has provided opinions in the case).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Ignoring the *Amazon.com* standard, which the Ninth Circuit reinforced and applied in *Giganews*, ALS turns instead to older cases that pre-dated the Ninth Circuit's modern formulations of contributory infringement after *Grokster*; it omits key discussions by the courts of those cases; and it fails to put the cases in their modern context. ALS dwells on conclusory statements that Cloudflare assisted its customers,[4] but it fails to provide evidence that Cloudflare's assistance significantly magnified otherwise immaterial infringements.[5] *See* Dkt. 60 at 6 (quoting *Amazon.com,* 508 F.3d at 1172). ALS also ignores the Ninth Circuit's extended discussion in *Amazon.com,* 508 F.3d at 1172, which showed that Google's substantial assistance—which *did* significantly magnify otherwise immaterial infringements—did *not* create liability but instead merely triggered application of the "simple measures upon actual knowledge of specific infringements" test.

Ample evidence shows that Cloudflare's service has no effect on infringements: Cloudflare's service makes no difference to the material on its customers' websites, their domain ownership, or their domain owner identification in WHOIS databases. Sullivan Opp. Decl. ¶¶ 5, 7; Ginn Opp. Decl. ¶¶ 7-8. 16; Paine Opp. Decl. ¶¶ 3-4. There is no evidence that any speed difference Cloudflare causes to web page loading makes a difference to infringements; to the contrary, the

---

[4] ALS relies upon *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936 (9th Cir. 2011), without analysis. That decision affirmed a finding of contributory infringement because the defendant's service provided an "essential step" to infringement. *Id.* at 944. There is no such evidence here; in fact the evidence is to the contrary. Sullivan Opp. Decl. ¶¶ 5, 7-8; Guinn Opp. Decl. ¶¶ 7, 16-18. Moreover, to the extent that decision, which fell between *Amazon.com* and *Giganews,* is contrary to them, it cannot overrule the earlier *Amazon.com* precedent. A recent district court decision rejected an "alternative material contribution" formulation like that of ALS here, resting on *Akanoc*, in favor of the correct formulation in *Amazon.com* and *Giganews* that Cloudflare has explained here. *See VHT, Inc., v. Zillow Grp. Inc.,* No. C15-1096 JLR, 2017 WL 2654583 (W.D. Wash. June 20, 2017) at *16.

[5] ALS also relies upon *Arista Records, LLC v. Tkach,* 122 F. Supp. 3d 32 (S.D.N.Y. 2015), but that is irrelevant. The decision concerned extension of an injunction to a non-party in a trademark infringement case under Fed. R. Civ. P. 65.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

evidence showed the speed benefit to be a fraction of a second, which is immaterial.
Bridges Opp. Decl. ¶¶ 10w, 10z, Ex. 13 at 75:25-76:21, 78:23-80:21, 81:4-82:1; *see
also* Guinn Opp. Decl. ¶ 21. And Cloudflare's evidence debunked ALS's claim that
Cloudflare assists infringers to conceal their identities. Guinn Opp. Decl. ¶¶ 8, 10;
Paine Opp. Decl. ¶¶ 3, 9.

For all these reasons, ALS neither provided evidence of contributory
infringement nor countered Cloudflare's abundant evidence that forecloses the claim.
The Court should deny ALS's motion for partial summary judgment on its
contributory infringement claim and grant summary judgment in favor of Cloudflare.

Because the "safe harbors" are merely optional limitations on remedies,[6]
a court need not address them unless a plaintiff establishes liability.[7] Accordingly,
the Court need not reach ALS's motion with respect to the safe harbors.

## III.   ALS FAILS TO SHOW THAT THE OPTIONAL DMCA "SAFE HARBORS" DO NOT APPLY TO CLOUDFLARE.

ALS attacks Cloudflare's eligibility for the "safe harbor" limitations on
remedies afforded by the Online Copyright Infringement Liability Limitation Act
("OCILLA") (Title II of the Digital Millennium Copyright Act), 17 U.S.C. § 512.
Congress passed the law to preserve "strong incentives for service providers and
copyright owners to cooperate to detect and deal with copyright infringements" and
to provide "greater certainty to service providers concerning their legal exposure for

---

[6] Each of the key provisions begins: "A service provider shall not be liable for
monetary relief, or, except as provided in subsection (j), for injunctive or other
equitable relief, for infringement of copyright by reason of [specified activities] . . .
if . . . ." *See* 17 U.S.C. § 512(a), (b)(1), (c)(1), (d).

[7] "Far short of adopting enhanced or wholly new standards to evaluate claims of
copyright infringement against online service providers, Congress provided that
OCILLA's 'limitations of liability apply if the provider is found to be liable *under
existing principles of law.'* S. Rep. 105-190, at 19 (emphasis added)." *Ellison v.
Robertson,* 357 F.3d 1072, 1077 (9th Cir. 2004).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

infringements that may occur in the course of their activities." H.R. Rep. 105-796 (Conference Report) at 72.

Congress protected four different major categories of online service activities with distinct safe harbors under subsections (a)-(d) of section 512. The distinctions deserve close scrutiny. Providers of multiple services may enjoy multiple safe harbors, with each safe harbor applying to different services. 17 U.S.C. § 512(n).

Providers of *transitory digital network communications* have safe harbor under section 512(a) without any provision for notifications of claimed infringement; without a designated agent requirement; and without "knowledge," "red flag," or "direct financial interest and right and ability to control" disqualifying conditions. Providers of *system caching* services have safe harbor under section 512(b) also without "knowledge," "red flag," or "direct financial interest and right and ability to control" disqualifying conditions. Under section 512(b) there is also a narrow and strict provision for notifications of claimed infringement that require a showing that either the source of the cache has removed the material or that a court has ordered it removed. Providers of *storage at the direction of the user* (typically hosting sites or user-contributed content sites) have a safe harbor under section 512(c) but with additional conditions, including expeditious responses to notifications of claimed infringement that have fewer requirements and with important disqualifying conditions of knowledge, red flags, and direct financial benefit from infringing activity with a right and ability to control the activity. Providers of *information location tools* (such as search engines or directories) have a safe harbor under section 512(d), with conditions like those of section 512(c), but with an additional requirement for notifications. Cloudflare now turns to its two safe harbors, under section 512(a) and (b).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

A. **Evidence shows that Cloudflare qualifies for two safe harbors.**

1. **Section 512(a) applies to Cloudflare's conduit operations.**

Section 512(a) provides a safe harbor for a "service provider" that "offer[s] the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k)(1)(A) (definition of "service provider" for purpose of section 512(a)). Cloudflare meets that definition. The exact service that Cloudflare markets and delivers to its users is a network that transmits and routes Internet communications at the user's direction without modifying the content. Guinn Opp. Decl. ¶¶ 10-11, 16; Paine Opp. Decl. ¶ 2; Sullivan Opp. Decl. ¶¶ 3, 5, 7.

Section 512(a), for "transitory digital network communications," is known as the "conduit" safe harbor. *Ellison,* 357 F.3d at 1080-81. This safe harbor lacks any provision for notifications of claimed infringement, commonly called "takedown" requests, because this type of service provider cannot "take down" anything.

Although ALS did not discuss most of the specific qualifications of that safe harbor, the evidence shows that Cloudflare meets them. It acts upon transmissions at the direction of others; it transmits, routes, provides connections for, and makes only intermediate and transient storage of material by automated means without selecting the material; and it does not select recipients of the material except by automated responses to their requests. Guinn Opp. Decl. ¶¶ 9-11, 15-16; Sullivan Opp. Decl. ¶¶ 3-4; *cf.* 17 U.S.C. § 512(a)(1)-(3). In its "conduit" role under section 512(a), as opposed to its "cache" role under section 512(b), Cloudflare does not maintain copies of material accessible to anyone other than those who requested the material, and it does not maintain copies for longer than reasonably necessary for the conduit role. Guinn Opp. Decl. ¶ 15; *cf.* 17 U.S.C. § 512(a)(4). As Cloudflare explained above, it transmits material through its system or network without

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CLOUDFLARE'S MEMO IN OPP'N TO ALS'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

15

CASE NO. 2:16-CV-05051-GW-AFM

1    modification of its content. Guinn Opp. Decl. ¶¶ 9-11, 16; Sullivan Opp. Decl. ¶¶ 3,

2    7; *cf.* 17 U.S.C. § 512(a)(5).

3         ALS's arguments against Cloudflare's section 512(a) safe harbor rest on no

4    law or evidence. *First*, ALS ignores evidence that Cloudflare's systems literally

5    transmit material of users' choosing: it transmits material that its customers

6    (website operators) choose to pass through Cloudflare's system from their websites.

7    Guinn Opp. Decl. ¶¶ 15-16; Paine Opp. Decl. ¶ 2; Sullivan Opp. Decl. ¶¶ 3, 7. The

8    fact that some of the data may at some point pass over *other* systems or networks

9    that others operate before reaching Cloudflare for transmission is irrelevant: the

10   section 512(a) safe harbor does not apply only when one service provider controls

11   all links in the transmission process. In the context of the Internet—a network of

12   networks—that would be an absurd requirement, and it finds no support in the

13   statute or case law. *See* Guinn Opp. Decl. ¶¶ 3, 5, 9; Paine Opp. Decl. ¶¶ 2, 4;

14   Sullivan Opp. Decl. ¶ 3.

15        *Second*, ALS sidesteps the fact that Cloudflare offers *routing* of transmissions

16   through its system; that is the essence of Cloudflare's services. *See* Guinn Opp.

17   Decl. ¶¶ 9-11; Paine Opp. Decl. ¶ 2; Sullivan Opp. Decl. ¶¶ 3, 7. ALS appears to

18   count *against* Cloudflare a fact that counts *for* it when it argues that "it is Cloudflare,

19   not the user, which determines the point from which the requested work will be

20   delivered." Mot. at 19:11-12. To begin with, ALS misstates the law, which applies to

21   "transmission, routing, or providing of connections for digital online

22   communications, between or among points specified by a user, of material of the

23   user's choosing." Cloudflare's customers authorize Cloudflare to obtain

24   communications from their websites, to transmit those communications through

25   Cloudflare's system, and to transmit them on to persons who have sought the

26   materials.[8] Guinn Opp. Decl. ¶¶ 9-11, 15. That "points of presence" (PoPs) may

27

28   [8] This (among other things) distinguishes Cloudflare's service from the BitTorrent
     tracker at issue in *Fung*, 710 F.3d 1020 at 1041, which selected which users would

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

participate in the routing or transmissions in the Internet's dynamic environment does not alter that fact, and it would be absurd to construe the statutory language of the safe harbors for online services in a way that ignores fundamental characteristics of the Internet. Guinn Opp. Decl. ¶¶ 3, 5, 9-12; Sullivan Opp. Decl. ¶¶ 3, 8.

*Third*, ALS misleadingly argues that Cloudflare modifies "content of a site." Cloudflare does not do so. Guinn Opp. Decl. ¶¶ 9-11, 16; Sullivan Opp. Decl. ¶¶ 3, 7. Cloudflare is a "content delivery service" that by definition delivers the customers' content as it appears on the source web sites, following rules or instructions that the customers set. Guinn Opp. Decl. ¶ 9. While the term "content" can mean a variety of different things, the statute distinguishes between "material" and "content"; it implicitly envisions that a service may modify one but not the other. Cloudflare may compress some data in transit for purpose of efficiency, for example causing an image file to use less bandwidth, but it does not alter the appearance of the image. Guinn Opp. Decl. ¶ 16. Similarly, Cloudflare uses "obfuscation" to cause email addresses to appear to persons but to be obscured from bots that may try to harvest them automatically. Guinn Opp. Decl. ¶ 16; Sullivan Opp. Decl. ¶ 5. In the statutory distinction between "material" and "content," where "material" may refer to raw data consisting of zeroes and ones but "content" refers to the substance of what a person perceives (such as an image or text), Cloudflare may alter "material" but does not alter the "content."

*Fourth,* ALS provides no support for its simplistic suggestion that section 512(a) applies only to services offering "a 'dumb' pipeline." All online services actively manage their traffic using a variety of technologies and techniques. Guinn Opp. Decl. ¶¶ 10-12; Sullivan Opp. Decl. ¶¶ 3-4.

---

communicate with each other. The Ninth Circuit implied that the tracker might fall within the section 512(d) safe harbor as an information location tool, but it held the defendant there failed to meet specific qualifications of that safe harbor. *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Finally*, ALS argues disingenuously that it sues Cloudflare not for its transmission but for reproduction, distribution, and display of material from Cloudflare data centers or from origin hosts through conduits owned by third parties. ALS Mot. at 18. ALS has confused the cache function ("material from Cloudflare data centers") with the conduit function ("material . . . from the origin host"). To the extent that caching is a common part of the modern Internet, Cloudflare will address the system caching safe harbor below. For transmission services, section 512(a) applies to *any* actions (including reproduction, distribution, or display) that occur "*by reason of*" Cloudflare's "transmitting, routing, or providing connections for, material" or "*by reason of* the intermediate and transient storage of that material" in those activities. 17 U.S.C. § 512(a) (emphasis added). Cloudflare thus meets the qualifications of the section 512(a) safe harbor.

## 2. Section 512(b) applies to Cloudflare's cache operations.

As a "service provider" for purposes of section 512(a), Cloudflare may also obtain the distinct safe harbor under section 512(b) for its system caching services.[9] This safe harbor has a strict limitation on notifications of claimed infringement: a copyright complainant must, *in addition to* providing information typically required for a notification to a section 512(c) storage or hosting service provider, show that the source website of the cached material has taken the material down at the source or that a court has ordered removal of material from the source. *Id.* § 512(b)(2)(E)(ii). The reason is that cache service providers mirror what is occurring at the source. Cloudflare continually and rapidly refreshes its caches to reflect the content of its customers' websites as the websites change. When something disappears from a customer's website, it will quickly and automatically disappear from Cloudflare's cache. Guinn Opp. Decl. ¶¶ 14, 18. Because Cloudflare

---

[9] In addition to being eligible as a service provider because of its status under section 512(a), Cloudflare is also "a provider of online services" and operates facilities for those services. Guinn Opp. Decl. ¶¶ . 13-14; Paine Opp. Decl. ¶¶ 2, 4; Sullivan Opp. Decl. ¶¶ 3-4. *See* 17 U.S.C. § 512(k)(1)(B).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

refreshes its cache so frequently and speedily, as a practical matter there is no need for a copyright owner to send Cloudflare notifications of claimed infringement that comply with the cache notification requirements after a customer has removed the material. *Id*. In any event, Cloudflare also responds expeditiously to remove, or disable access to, material that is claimed to be infringing, if a complainant meets the requirements of sections 512(c)(3), 512(b)(2)(E)(i) and 512(b)(2)(E)(ii). Paine Opp. Decl. ¶ 8. *ALS has never sent Cloudflare any complaints that met the requirements of sections 512(c)(3), 512(b)(2)(E)(i), and 512(b)(2)(E)(ii).* Paine Opp. Decl. ¶ 19.

The evidence shows that Cloudflare meets all the qualifications and conditions of section 512(b). It automatically and temporarily stores material that Cloudflare's customers make available online; it also transmits the material from its customers to other persons only when they request the material from the customers' websites. Guinn Opp. Decl. ¶ 13-15; Sullivan Opp. Decl. ¶ 4; *cf.* 17 U.S.C. § 512(b)(1). Cloudflare transmits the material without modification to its *content* from the manner in which the *material* was transmitted from its customers. Guinn Opp. Decl. ¶ 16; Sullivan Opp. Decl. ¶ 4; *cf.* 17 U.S.C. § 512(b)(2)(A). It complies with rules and protocols for refreshing, reloading, or updating of material from its customers' websites. Guinn Opp. Decl. ¶ 14; Sullivan Opp. Decl. ¶ 4; *cf.* 17 U.S.C. § 512(b)(2)(B). It does not interfere with any technologies associated with the material to return to Cloudflare's customers' information that would have been available to them by direct connections from persons requesting the material. Guinn Opp. Decl. ¶ 17; Sullivan Opp. Decl. ¶ 4; *cf.* 17 U.S.C. § 512(b)(2)(C). Cloudflare does not alter or interfere with conditions that its customers set for access to their materials, such as passwords or payments. Guinn Opp. Decl. ¶ 17; Sullivan Opp. Decl. ¶ 4; *cf.* 17 U.S.C. § 512(b)(2)(D).

ALS's argument regarding the application of section 512(b) contains nothing but wild and unsupported statements about the law. The discussion of caches in *Amazon.com* that it invokes is irrelevant: the discussion was not about the safe

Fenwick & West LLP
Attorneys at Law
San Francisco

harbor or the type of cache at issue here. *See Amazon.com*, 508 F.3d at 1156 and n.3; Guinn Opp. Decl. ¶ 13-14; Sullivan Opp. Decl. ¶ 4. Cloudflare thus meets all the qualifications and conditions of the section 512(b) safe harbor.

### 3.      Cloudflare meets the general conditions of section 512(i).

OCILLA states two general conditions for eligibility for any of the safe harbors, namely that a service provider "(A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and (B) accommodates and does not interfere with standard technical measures." 17 U.S.C. § 512(i)(1). The section defines "standard technical measures" but not "repeat infringers." *See id.* § 512(i). The section also does not provide any guidelines for a policy, for reasonable implementation of a policy, or of "appropriate circumstances" for termination. *Id.*

### a.      Cloudflare adopted, notified others of, and reasonably implemented its policy of terminating repeat infringers in appropriate circumstances.

Evidence supports the facts that Cloudflare has complied with the general condition regarding a policy for terminating account holders who are repeat infringers in appropriate circumstances. ALS criticizes Cloudflare's policy and notification of it in general terms without actually specifying it. Mot. at 21-22. Evidence of adoption and notification of the policy is clear. *See, e.g.*, Paine Opp. Decl. ¶ 24, Ex. 26.

ALS criticizes Cloudflare for expressing its policy "in only the sparest ultimate terms." Mot. at 22. But Cloudflare need not do more. The statute says a service provider must inform account holders *of* a policy, not *about* a policy; informing them of the existence of a policy suffices. There is no obligation to publicize detailed internal operating guidelines, especially since the touchstone of

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

termination is "appropriate circumstances," which may vary. In *Corbis*, 351 F. Supp. 2d at 1100-01, Corbis argued, like ALS here, that Amazon had a vague public-facing policy and a detailed internal policy with criteria that Amazon never conveyed to the public. The court rejected the argument, saying: "Section 512(i), however, is not so exacting. Amazon need only inform users that, in appropriate circumstances, it may terminate the user's accounts for repeated copyright infringement. The statute does not suggest what criteria should be considered by a service provider, much less require the service provider to reveal its decision-making criteria to the user. Amazon need only put users on notice that they face exclusion from the service if they repeatedly violate copyright laws." *Id.* (citations omitted).

In *CCBill* the Ninth Circuit stated: "We hold that a service provider 'implements' a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications." 488 F.3d at 1109. The court tested the reasonableness of implementation in light of the plaintiff's notice: "the district court found that Perfect 10 did not provide notices that substantially complied with the requirements of § 512(c)(3), and thus did not raise a genuine issue of material fact as to whether CCBill and CWIE reasonably implemented their repeat infringer policy. We agree." *Id.* at 1111-12.

*CCBill* involved claims against a storage provider that fell within section 512(c), but the same principle applies with even more force here. Section 512(a), which applies to Cloudflare's conduit function, does not provide for notifications because a transmission service cannot remove or disable access to any material. Section 512(b), which applies to the cache function, requires complainants to affirm that the source of the material has removed it or that a court has ordered its removal. *See* 17 U.S.C. § 512(b)(1)(E)(i) and (ii). *ALS never sent Cloudflare a notification with that information*. Paine Dec. ¶ 19. Thus, under *CCBill*, Cloudflare had no need to apply a termination policy based on ALS's complaints.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ALS makes an argument that depends on ignoring the obvious: Cloudflare at all times has had a working complaint notification system. It is not the system that *ALS* wants, but it is effective in passing information to source website hosts and operators. Paine Opp. Decl. ¶¶ 7-9. ALS alleges that Cloudflare did not put its email address on its website, but ALS communicated regularly to Cloudflare by email, and Cloudflare regularly responded by directing ALS to the web form process. *Id.* ¶ 19. In doing so, Cloudflare did not actively prevent ALS from making complaints; to the contrary, it actively encouraged ALS to make the complaints in a way that would allow Cloudflare to handle them promptly and accurately, as is necessary for a large-scale operation. ALS refused. *Id.* The reason is evident: ALS embraces conflict, not cooperation, with service providers in order to seek a shot at statutory damages vastly beyond any revenue potential of its operating business.

ALS's allegation (Mot. at 23) that Cloudflare blocks complainants from collecting information for notifications is false. *Had ALS used Cloudflare's system,* ALS would have responded with contact information for its customers' hosting providers. Paine Opp. Decl. ¶ 7. Cloudflare does not hide contact information of domain owners and does not alter domain WHOIS information.[10] *Id.* ¶ 3.

Finally, ALS falsely alleges that Cloudflare has not terminated a single account. Mot. at 23. Cloudflare *has* in fact done so. Paine Opp. Decl. ¶ 25. Cloudflare has terminated accounts when court orders have clearly identified Cloudflare customers as infringers with a direction that Cloudflare should terminate service. *Id.* That is consistent with section 512(b)(2)(E) regarding notification of court orders pertaining to cached material. ALS has provided no evidence that Cloudflare failed to terminate subscribers or account holders whom Cloudflare has

---

[10] Cloudflare's customers use other companies to host websites, and Cloudflare does not offer privacy services for domains. Guinn Opp. Decl. ¶ 8; Paine Opp. Decl. ¶ 3.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

actual knowledge of being repeat direct infringers, and ALS's own witnesses admitted that ALS's notices did not create actual knowledge of infringements.[11]

Cloudflare relies on court adjudications to determine when it should terminate service, for entirely appropriate reasons. First, court rulings are authoritative on questions of infringement. Cloudflare is a security company, not a judge, and it cannot determine accurately whether a customer is a repeat copyright infringer without an authoritative determination from a court. *See* Paine Opp. Decl. ¶¶ 9-10, 25. As the court stated in *Corbis*, complaints do not, in themselves, provide evidence of blatant copyright infringement. 351 F. Supp. 2d at 1105. This is true no matter how many complaints a service receives about a particular customer: accusations are not determinations, and there is no magic number at which accusations become proof. Cloudflare protects its customers against malicious conduct on the Internet, but malicious conduct doesn't stop there. It can also extend to processes for copyright complaints; a malicious actor wanting to attack a Cloudflare customer's website could use a complaint process to try to get Cloudflare to cancel protection for the website. Paine Opp. Decl. ¶ 9.

Second, while Cloudflare's service does not materially increase any infringement, termination of service can leave websites vulnerable to cyberattacks. Cyberattacks not only can harm websites but can also corrupt and weaponize websites to attack others over the Internet, particularly with malware that spreads bots and causes denial-of-service attacks. Protection of one website against cyberattacks contributes to protection of others on the Internet, including persons who have never visited the website. Paine Opp. Decl. ¶ 2; Sullivan Opp. Decl. ¶¶ 5-6. For these reasons, terminations of Cloudflare's services should be rare.

---

[11] Cloudflare differs dramatically from defendants in *BMG Rights Management (US) LLC v. Cox Communications, Inc.*, No. 16-1972 (4th Cir. Feb. 1, 2018). There the service providers' customers were the alleged direct infringers, and the plaintiff "provided evidence of particular instances in which [they] failed to terminate subscribers whom [their] employees regarded as repeat infringers." *Id*. at *18.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  In these circumstances, Cloudflare has abundant reasons for implementing its
2  repeat infringer termination policy exactly as it has, because the "appropriate
3  circumstances" for termination in its context are extremely narrow. Cloudflare is
4  entitled to summary judgment on this point as a non-moving party; at a minimum, it
5  has shown ample evidence to block summary judgment for ALS.

6  **b.    Cloudflare accommodates, and does not interfere with,**
7  **any "standard technical measures."**

8  ALS gives one paragraph, with no analysis or case law, to this point. The
9  evidence supporting Cloudflare, however, is clear. Cloudflare does not interfere
10 with any copyright holder's ability to identify or protect copyrights, whether
11 through "standard technical measures" or otherwise. Guinn Opp. Decl. ¶¶ 8, 16;
12 Paine Opp. Decl. ¶ 3. Cloudflare does not change the appearance of materials,
13 remove watermarks or alter images. Guinn Opp. Decl. ¶ 16.

14 ALS repackages its criticisms of Cloudflare's complaint processes as
15 interference with "standard technical measures,"[12] but that is false. Cloudflare's
16 processes are not ALS's "standard technical measures." *See Viacom Int'l, Inc. v.*
17 *YouTube, Inc.*, 676 F.3d 19, 40-41 (2d Cir. 2012); 17 U.S.C. § 512(i)(2) (definition).
18 More importantly, Cloudflare specifically designed its processes and policies to get
19 accurate, actionable information from complainants to its customers' hosts quickly
20 and efficiently, while also immediately providing complainants contact information
21 for the hosting services so that the complainants can follow up directly. Paine Opp.
22 Decl. ¶¶ 2-7. Many complainants use Cloudflare's processes satisfactorily, and
23 Cloudflare's actions are the opposite of interference. Paine Opp. Decl. ¶ 8.

24 This point underscores ALS's litigation-as-a-business model: ALS makes no
25 legitimate effort to protect its copyrights. It allows its own subscribers to download

27 [12] In any event, ALS has not identified any "standard technical measure" it uses and
has provided no evidence of meeting the detailed requirements of 17 U.S.C.
28 § 512(i)(2); *cf. CCBill*, 488 F.3d at 1115.

without restriction its complete library of approximately half a million images. It has made no effort to identify the individuals—*its own customers*—who are the root cause of any infringements. It uses no technological tools to identify, monitor, or track its images. It pays its agent $450 *per quarter*—less than the minimum wage for one hour per day—to generate complaints with gibberish while avoiding use of Cloudflare's process that would be both more efficient for him and also more effective at targeting infringements. *See* Dkt. 329 ¶ 17. As the Ninth Circuit stated in *CCBill*, the DMCA places "the burden of policing copyright infringement— identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright. We decline to shift a substantial burden from the copyright owner to the provider." 488 F.3d at 1113. Using CCBill's former lawyers for this case, ALS should know better.

The evidence in the case establishes that Cloudflare meets all conditions for the safe harbors of section 512(a) and (b). The Court should deny partial summary judgment to ALS and grant it, instead, to Cloudflare as the non-moving party.

## CONCLUSION

ALS's motion for partial summary judgment exposed the flaws in its case. Failing to address key elements of the contributory infringement standard under either the Supreme Court's or the Ninth Circuit's standards, ALS showed it cannot prove a case. Its scattered shots at a few of the criteria for the distinctive safe harbors for conduit and cache functions under section 512(a) and (b), lacking any ground in the law or the evidence, not only fail to undermine Cloudflare's safe harbor eligibility but also support Cloudflare's safe harbor all the more. For all these reasons, the Court should deny ALS's motion for partial summary judgment. The Court should also grant summary judgment to Cloudflare as the non-moving party on both the contributory infringement claim and on the elements at issue here of its qualification for the safe harbor.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Dated:  February 16, 2018                    FENWICK & WEST LLP

2

3                                    By:     /s/ Andrew P. Bridges

4                                            Andrew P. Bridges
                                             Attorneys for Defendant
5                                            CLOUDFLARE, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# STATUTORY APPENDIX

## 17 U.S.C. §§ 512(a)-(d); §512(i); §512(k); §512(m); §512(n)

| Subsection | |
|---|---|
| 17 U.S.C. § 512(a) | **(a)   Transitory Digital Network Communications**. --A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections, if-- <br><br> **(1)** the transmission of the material was initiated by or at the direction of a person other than the service provider; <br><br> **(2)** the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider; <br><br> **(3)** the service provider does not select the recipients of the material except as an automatic response to the request of another person**;** <br><br> **(4)** no copy of the material made by the service provider in the course of such intermediate or transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections; and <br><br> **(5)** the material is transmitted through the system or network without modification of its content. |

| Subsection | |
|---|---|
| 17 U.S.C. § 512(b) | **(b)  System Caching. --**<br><br>     **(1)  Limitation on liability. --**A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the intermediate and temporary storage of material on a system or network controlled or operated by or for the service provider in a case in which—<br><br>          **(A)** the material is made available online by a person other than the service provider;<br><br>          **(B)** the material is transmitted from the person described in subparagraph (A) through the system or network to a person other than the person described in subparagraph (A) at the direction of that other person; and<br><br>          **(C)** the storage is carried out through an automatic technical process for the purpose of making the material available to users of the system or network who, after the material is transmitted as described in subparagraph (B), request access to the material from the person described in subparagraph (A),<br><br>if the conditions set forth in paragraph (2) are met.<br><br>**(2) Conditions. --**The conditions referred to in paragraph (1) are that—<br><br>**(A)** the material described in paragraph (1) is transmitted to the subsequent users described in paragraph (1)(C) without modification to its content from the manner in which the material was transmitted from the person described in paragraph (1)(A); |

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Subsection | |
|---|---|
| | **(B)** the service provider described in paragraph (1) complies with rules concerning the refreshing, reloading, or other updating of the material when specified by the person making the material available online in accordance with a generally accepted industry standard data communications protocol for the system or network through which that person makes the material available, except that this subparagraph applies only if those rules are not used by the person described in paragraph (1)(A) to prevent or unreasonably impair the intermediate storage to which this subsection applies;

**(C)** the service provider does not interfere with the ability of technology associated with the material to return to the person described in paragraph (1)(A) the information that would have been available to that person if the material had been obtained by the subsequent users described in paragraph (1)(C) directly from that person, except that this subparagraph applies only if that technology--

**(i)** does not significantly interfere with the performance of the provider's system or network or with the intermediate storage of the material;

**(ii)** is consistent with generally accepted industry standard communications protocols; and

**(iii)** does not extract information from the provider's system or network other than the information that would have been available to the person described in paragraph (1)(A) if the subsequent users had gained access to the material directly from that person;

**(D)** if the person described in paragraph (1)(A) has in effect a condition that a person must meet prior to having access to the material, such as a condition based on payment of a fee or provision of a password or other information, the service provider permits access to the stored material in significant part only to users of its system or network that have met those conditions and only in accordance with those conditions; and |

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Subsection | |
|---|---|
| | **(E)** if the person described in paragraph (1)(A) makes that material available online without the authorization of the copyright owner of the material, the service provider responds expeditiously to remove, or disable access to, the material that is claimed to be infringing upon notification of claimed infringement as described in subsection (c)(3), except that this subparagraph applies only if— |
| | **(i)** the material has previously been removed from the originating site or access to it has been disabled, or a court has ordered that the material be removed from the originating site or that access to the material on the originating site be disabled; and |
| | **(ii)** the party giving the notification includes in the notification a statement confirming that the material has been removed from the originating site or access to it has been disabled or that a court has ordered that the material be removed from the originating site or that access to the material on the originating site be disabled. |
| 17 U.S.C. § 512(c) | **(c) Information Residing on Systems or Networks At Direction of Users.—** |
| | **(1) In general.--**A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider-- |
| | **(A)(i)** does not have actual knowledge that the material or an activity using the material on the system or network is infringing; |
| | **(ii)** in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or |

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Subsection | |
|---|---|
| | **(iii)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;<br><br>**(B)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and<br><br>**(C)** upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.<br><br>**(2) Designated agent.--**The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:<br><br>**(A)** the name, address, phone number, and electronic mail address of the agent.<br><br>**(B)** other contact information which the Register of Copyrights may deem appropriate.<br><br>The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, and may require payment of a fee by service providers to cover the costs of maintaining the directory.<br><br>**(3) Elements of notification.--**<br><br>**(A)** To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following: |

| Subsection | |
|---|---|
| | **(i)** A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.<br><br>**(ii)** Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.<br><br>**(iii)** Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.<br><br>**(iv)** Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.<br><br>**(v)** A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.<br><br>**(vi)** A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.<br><br>**(B)(i)** Subject to clause (ii), a notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.<br><br>**(ii)** In a case in which the notification that is provided to the |

| Subsection | |
|---|---|
| | service provider's designated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A), clause (i) of this subparagraph applies only if the service provider promptly attempts to contact the person making the notification or takes other reasonable steps to assist in the receipt of notification that substantially complies with all the provisions of subparagraph (A). |
| 17 U.S.C. § 512(d) | **(d) Information location tools.--**A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link, if the service provider—

**(1) (A)** does not have actual knowledge that the material or activity is infringing;

**(1) (B)** in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

**(1) (C)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

**(2)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

**(3)** upon notification of claimed infringement as described in subsection (c)(3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity, except that, for purposes of this paragraph, the information described in subsection (c)(3)(A)(iii) shall be identification of the reference or link, to material or activity claimed to be infringing, that is to be removed or access to which is to be disabled, and information |

Fenwick & West LLP
Attorneys at Law
San Francisco

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Subsection | |
|---|---|
| | reasonably sufficient to permit the service provider to locate that reference or link. |
| 17 U.S.C. § 512(i) | **(i) Conditions for eligibility.--**<br><br>**(1) Accommodation of technology.--**The limitations on liability established by this section shall apply to a service provider only if the service provider--<br><br>**(A)** has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and<br><br>**(B)** accommodates and does not interfere with standard technical measures.<br><br>**(2) Definition.--**As used in this subsection, the term "standard technical measures" means technical measures that are used by copyright owners to identify or protect copyrighted works and--<br>**(A)** have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;<br><br>**(B)** are available to any person on reasonable and nondiscriminatory terms; and<br><br>**(C)** do not impose substantial costs on service providers or substantial burdens on their systems or networks. |
| 17 U.S.C. § 512(k) | **(k) Definitions.—**<br><br>**(1) Service provider.--**<br><br>**(A)** As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or |

| Subsection | |
|---|---|
| | providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.<br><br>**(B)** As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A). |
| 17 U.S.C. § 512(m) | **(m) Protection of privacy.--**Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on—<br><br>**(1)** a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i); or<br><br>**(2)** a service provider gaining access to, removing, or disabling access to material in cases in which such conduct is prohibited<br>by law. |
| 17 U.S.C. § 512(n) | **(n) Construction.--**Subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section. Whether a service provider qualifies for the limitation on liability in any one of those subsections shall be based solely on the criteria in that subsection, and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection. |

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO