## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 16-5051-GW(AFMx) | Date | March 12, 2018 |
|---|---|---|---|
| Title | *ALS Scan, Inc. v. Cloudflare, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Phyllis Preston | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Jay M. Spillane | John L. Ambrogi |
| | Jebediah Wakefield |
| | Andrew Bridges |

**PROCEEDINGS:**   **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT CLOUDFLARE INC. [324];**

   **DEFENDANT CLOUDFLARE, INC.'S MOTION FOR SUMMARY JUDGMENT [347]**

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, the above-entitled motions are TAKEN UNDER SUBMISSION. Court to issue ruling.

|  | : | 25 |
|---|---|---|
| Initials of Preparer | JG | |

*ALS Scan, Inc. v. Cloudflare, Inc., et al.*, Case No. CV-16-5051-GW-(AFMx)
Tentative Rulings on: (1) Defendant Cloudflare Inc.'s Motion for Summary Judgment, and (2)
Plaintiff's Motion for Summary Judgement against Cloudflare

## I. Background

ALS Scan, Inc. ("Plaintiff") sues Cloudflare, Inc. ("Cloudflare"); Dolphin Media Ltd. ("Dolphin"); Hivelocity Ventures Corporation ("Hivelocity"); and Steadfast Networks, LLC ("Steadfast") (collectively, "Defendants")[1] for various claims related to Defendants' alleged infringement of Plaintiff's copyrighted and trademarked works. *See generally* Third Am. Compl. ("TAC"), Docket No. 148. The TAC asserts six causes of action: (1) direct copyright infringement, against Dolphin; (2) contributory copyright infringement, against all Defendants; (3) vicarious copyright infringement, against Dolphin, Hivelocity, and Steadfast; (4) direct trademark infringement, against Dolphin; (5) direct trademark counterfeiting, against Dolphin; and (6) contributory trademark infringement, against Dolphin, Hivelocity, and Steadfast. *Id.* Plaintiff owns a library of copyrighted and trademarked works of adult entertainment. *Id.* ¶ 3. Plaintiff alleges that its works are repeatedly infringed by pirate Internet sites, which display Plaintiff's works without Plaintiff's permission. *Id.* ¶ 4. These sites are allegedly supported by third-party service providers that continue doing business with the sites even after receiving actual notices of infringement from Plaintiff. *Id.* ¶ 6.

Cloudflare is a web performance and security company that offers a content delivery network ("CDN"), web content optimization, website security, denial of service (DDos) protection, and a managed domain name system network ("DNS"). *Id.* ¶ 25. Cloudflare's website advertises that its CDN caches[2] clients' content and "automatically optimize[s] the delivery of your web pages so your visitors get the fastest page load times and best performance." *Id.* ¶ 26.

The TAC alleges that the purpose of Cloudflare's CDN is to "speed a customer's access

---

[1] The Court previously granted Defendant Tiger Media, Inc.'s ("Tiger") motion to dismiss the First Amended Complaint as to it. *See* Docket No. 53. Plaintiff did not seek to file an amended complaint against Tiger. In addition, on February 23, 2017, Plaintiff dismissed Defendants Hebergement OVH Inc. and OVH SAS from this action. *See* Docket No. 113.

[2] "Generally, a 'cache' is a 'computer memory with very short access time used for storage of frequently or recently used instructions or data.'" *Perfect 10, Inc. v. Amazon.com, Inc.* 508 F.3d 1146, 1156 n.3 (9th Cir. 2007) (quoting *United States v. Ziegler*, 474 F.3d 1184, 1186 n.3 (9th Cir. 2007)).

to the website of Cloudflare's client through a series of data centers maintained by Cloudflare that cache mirror copies of that site." *Id.* ¶ 28. According to Plaintiff, this service allows consumers seeking to access a Cloudflare client's website to retrieve the website's content from the closest Cloudflare data center, rather than accessing the content from the primary host. *Id.* This purportedly results in a client's website content loading twice as fast for website users, regardless of where the users are located. *Id.*

In addition, the TAC alleges that Cloudflare's DNS services "allow pirate sites and their hosts to conceal their identity from copyright owners. The domain registration information for some of the pirate sites . . . indicate that the sites reside on a Cloudflare server in Phoenix, Arizona." *Id.* ¶ 29.

Plaintiff alleges that it sent numerous notices to Cloudflare regarding the infringement of its copyrighted works by Cloudflare's clients. *Id.* ¶ 34. However, Plaintiff alleges that Cloudflare has continued to offer its CDN and related services to these clients, despite the infringement notifications. *Id.* ¶ 37.

Plaintiff seeks actual damages, statutory damages, disgorgement of profits obtained from the infringing activity, trebling of damages, costs and attorney's fees, preliminary and permanent injunctive relief, and such other relief as the Court deems appropriate. *Id.* at 19:20-20:4.

On October 24, 2016, the Court granted-in-part and denied-in-part Cloudflare's Motion to Dismiss the First Amended Complaint. *See* Final Ruling on Cloudflare's Motion to Dismiss the First Amended Complaint ("MTD Ruling"), Docket No. 60. The Court dismissed Plaintiff's claims for vicarious copyright infringement, contributory trademark infringement, and unfair competition on the grounds that the FAC failed to adequately plead these claims against Cloudflare. *Id.* However, the Court denied Cloudflare's motion to dismiss Plaintiff's contributory copyright infringement claim, reasoning that Plaintiff had plausibly pled secondary liability based on a material contribution theory. *See id.* at pages 5-9. The Court reasoned that the FAC's allegations that Cloudflare's CDN services made it faster and easier for users to access infringing images, and that consumers seeking access to infringing images retrieved the images from the closest Cloudflare data center rather than the primary host, were sufficient to state a claim for material contribution under Ninth Circuit precedent. *Id.* at page 7. The Court also found that Plaintiff's allegations that Cloudflare's DNS service allows infringers to conceal their identities supported a material contribution claim. *Id.* at page 8.

On March 2, 2017, Cloudflare filed a Motion for Partial Summary Judgment as to Extraterritoriality. *See* Docket No. 122. In that motion, Cloudflare argued that it was entitled to judgment in its favor with respect to 14 of the 15 alleged direct infringer websites because those websites are not located in the United States, and thus the alleged infringements were extraterritorial and not actionable. *Id.* After several rounds of briefing and three hearings, the Court denied Cloudflare's Motion. *See* Final Ruling On Motion For Partial Summary Judgment Regarding Extraterritoriality ("Ruling on MSJ I"), Docket No. 188. The Court denied the motion with respect to thirteen of the fourteen sites because Plaintiff demonstrated that its copyrighted images were either created or displayed domestically by 13 of the 14 sites. *Id.* at page 11 ("[T]o the extent cache copies of Plaintiff's images have been stored on Cloudflare's U.S. servers, the creation of those copies would be an act of direct infringement by a given host website within the United States."); *see also id.* at page 16 (finding that Plaintiff presented direct evidence of cache copies on Cloudflare's U.S. servers for four of the host sites); *id.* at 25 (finding that third party websites' creation of cache copies is not a fair use); *id.* at 27 (finding that Plaintiff established domestic infringement of its display rights for 13 of the 14 host sites).[3]

Four summary judgment motions are currently pending before the Court. Cloudflare has filed another Motion for Summary Judgment. *See* Cloudflare's Motion for Summary Judgment, Docket No. 347; Cloudflare's Memorandum Of Points and Authorities In Support of Its Motion For Summary Judgement ("Cl.'s MSJ"), Docket No. 347-1. Plaintiff opposes the motion. *See* Plaintiff's Memorandum Of Points And Authorities in Opposition to Motion for Summary Judgment By Defendant Cloudflare ("Pl.'s Opp'n"), Docket No. 370. Cloudflare has filed a Reply. *See* Cloudflare's Reply in Support of Motion for Summary Judgment ("Cl.'s Reply"), Docket No. 387.

Plaintiff has also moved for summary against Cloudflare. *See* Plaintiff's Memorandum Of Points and Authorities in Support of Its Motion for Partial Summary Judgement Against Cloudflare ("Pl.'s MSJ"), Docket No. 325. Cloudflare opposes the motion. *See* Cloudflare's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Cl.'s Opp'n"), Docket No. 376. Plaintiff has also filed a Reply. *See* Plaintiff's Reply ("Pl.'s Reply"),

---

[3] Cloudflare's pending motion for summary judgment ignores certain aspects of this ruling. Cloudflare ignores two important conclusions: (1) that third party websites commit acts of infringement by utilizing Cloudflare's service to create cache copies closer to end users and (2) that those same sites commit acts of infringement when they display those images on domestic computer screens. *See* Ruling on MSJ I at pages 11, 27.

Docket No. 400.[4]

There is significant overlap in the parties' briefing and evidence.  For that reason, the Court will address the parties' motions together.

## II.  Cross-Motions for Summary Judgement

### A.  Legal Standard

Summary judgment is proper when the pleadings, the discovery and disclosed materials on file, including any affidavits/declarations, show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[5]  Fed. R. Civ. P. 56; *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005).  To satisfy its burden at summary judgment, a moving party *with* the burden of persuasion must establish "beyond controversy every essential element of its [claim or defense]."  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003); William W. Schwarzer, et al., Cal. Prac. Guide Fed. Civ. Proc. Before Trial (The Rutter Group 2016) § 14:126 at 14-45.  By contrast, a moving party *without* the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, *specific facts* showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal citations and quotation marks omitted, emphasis in original) (citing, among other cases, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

"A non-movant's bald assertions or a mere scintilla of evidence in his favor are both

---

[4] Defendant Steadfast has also filed two thirty-page motions for summary judgment that will be addressed in a separate ruling to be issued ahead of a March 26, 2018 hearing.

[5] Under Federal Rule of Civil Procedure 56, the same legal standard applies to motions for partial summary judgment and ordinary motions for summary judgment.  *See* Fed. R. Civ. P. 56(a): *see also California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998); *Barnes v. Cnty. of Placer*, 654 F.Supp.2d 1066, 1070 (E.D. Cal. 2009), *aff'd*, 386 F.App'x 633 (9th Cir. 2010) ("A motion for partial summary judgment is resolved under the same standard as a motion for summary judgment.").

insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). In addition, the evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(e); *see also Pelletier v. Fed. Home Loan Bank of S.F.*, 968 F.2d 865, 872 (9th Cir. 1992) (to survive summary judgment, the non-movant party "ordinarily must furnish affidavits containing admissible evidence tending to show the existence of a genuine dispute of material fact"). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). With that said, courts do not make credibility determinations or weigh conflicting evidence at the summary judgment stage, and must view all evidence and draw all inferences in the light most favorable to the non-moving party. *See T.W. Elec.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *see also Motley v. Parks*, 432 F.3d 1072, 1075, n.1 (9th Cir. 2005) (en banc).

   **B. Undisputed Facts[6]**

      *1. ALS*

   ALS owns the copyright to a library of adult content. *See* Defendant Cloudflare's Response to ALS Scan Inc.'s Statement of Genuine Disputes in Opposition to Cloudflare's Motion for Summary Judgment ("DSGD"), Docket No. 389 at ¶ 54.[7] ALS's content is displayed on two websites, alsscan.com and alsangels.com. *Id.* Other than limited "teaser" selections of ALS works on public tour pages for these sites, or made available to advertisers for the purpose of directing Internet traffic to ALS's sites, ALS's content is lawfully available only to paying members of ALS's sites. *Id.* ALS does not sell or license its copyrighted content. *Id.*

---

[6] Some of the underlying "undisputed" facts cited herein have been disputed by Plaintiff or Defendant. The Court has reviewed such disputes and has included in this summary only facts that are supported by the cited evidence, altering the proffered facts if necessary to accurately reflect the uncontroverted evidence. To the extent that the cited underlying "undisputed" facts have been disputed, the Court finds that the stated disputes: (1) fail to controvert the proffered "undisputed" facts, (2) dispute the facts on grounds not germane to the below statements, and/or (3) fail to cite evidence in support of the disputing party's position. As such, the Court treats such facts as undisputed. Any proffered facts not included in this Tentative Ruling were found to be: (1) improper opinions or conclusions rather than facts, (2) were unsupported by admissible evidence, (3) were deemed irrelevant to the Court's present analysis, or (4) some combination thereof.

[7] The parties also filed Separate Statements in connection with Plaintiff's MSJ. *See* Plaintiff's Response to Statement of Genuine Response to Statement of Genuine Dispute Re Motion For Partial Sumary Judgment Against Cloudflare ("PSGD"), Docket No. 401. The documents appear to mirror one another such that the DSGD contains citations to all relevant facts. For convenience sake, this ruling cites to the DSGD. The Court is mindful that in evaluating each parties' respective motion, it must view all evidence and draw all inferences in the light most favorable to the non-moving party. *See T.W. Elec.*, 809 F.2d at 630-31. Both parties failed to cite directly to either the DSGD or the PSGD in their briefing, despite explicit instructions from the Court to this effect.

### 2. *Cloudflare*

Cloudflare provides internet services to optimize and protect websites, including by increasing the speed at which website content is delivered to end users, making such delivery considerably more bandwidth efficient, and by adding security services to prevent malicious attacks. *Id.* ¶ 57. According to Cloudflare's website its "global Anycast network of 119 data centers across 58 countries reduces latency and time to first byte by delivering content closer to visitors. Cloudflare's size and distribution of internet connects gives customers fast, reliable delivery throughout the world." *Id.*

Cloudflare does not host websites, directly provide website hosting services, or offer permanent storage for websites. *Id.* ¶¶ 1-2, 4. For these reasons, customers must already have an existing website, an internet host, and transmission facilities in order to use Cloudflare's services. *Id.* ¶ 5. CloudFlare offers, among other services, a managed domain name system ("DNS") and a content delivery network ("CDN"). *See*, *id.* ¶¶ 57-58, 61, 63. These services make websites perform better and make the internet safer for website visitors and operators. *Id.* ¶ 7.

#### a. DNS Service

To become a Cloudflare client, Cloudflare requires the client to name two Cloudflare nameservers as the authoritative nameservers for their website domain. *Id.* ¶¶ 10, 58. The result is that a "WHOIS" lookup regarding a website operated by a Cloudflare customer traces to Cloudflare. *Id.* ¶¶ 11, 58. For example, if a copyright owner looked up a Cloudflare customer on a standard "WHOIS" lookup service, no information is available regarding the company that actually hosts the site, or the site owner. *Id.* Instead, the only information available will be for Cloudflare. *Id.* Cloudflare's describes this process as having the effect of "masking" its customers' IP addresses, a service it says has a security function. *Id.* ¶ 59.[8]

#### b. Cloudflare's Content Delivery Network

Cloudflare's CDN, its "Global Anycast Network," as of March 2017 comprised 102 data centers throughout the world." *Id.* ¶ 61. "The Cloudflare . . . Global Anycast network

---

[8] Cloudflare does not offer what it describes as "privacy services" that affirmatively conceal the identity of a domain or website owner in WHOIS. *Id.* ¶ 13. Cloudflare does not explain the difference between such services, and its DNS service, which Cloudflare admits alters the information found in a WHOIS lookup for its customers. *Id.* ¶¶ 58-59.

contains caching servers as well as nameservers."[9]  *Id.*  A CDN takes static content and stores a copy closer to your visitors.  *Id.* ¶ 63.  When an end user chooses to visit a Cloudflare customer's website to view an image, the user may, but will not necessarily, be routed through the Cloudflare caching server closest to that end user's computer.  *Id.* ¶ 65.  If the requested image is in Cloudflare's cache, Cloudflare will deliver a copy of that image to the user directly from its caching server.  *Id.* ¶ 66.  If that image is not in the caching server, the Cloudflare system will route a copy from its customer site, through its CDN, to the end user.  *Id.*  Cache copies of images are created, and sometimes stored temporarily in Cloudflare's caching servers, for approximately two hours, depending on the popularity of the image.  *Id.* ¶ 68.[10]

### 3. ALS Images On Cloudflare Client Sites

ALS has engaged Steve Easton ("Easton") to observe infringement of ALS works on the Internet and send notice of infringement to responsible parties.  *Id.* ¶ 71.  Easton also represents other adult copyright owners and has the same level of knowledge regarding their content.  *Id.*  Easton personally observed infringing copies of his clients' works, including ALS, on the Cloudflare Customer Sites.  *Id.* ¶ 72.  Mr. Easton prepared and sent emails to Cloudflare that contained, in the body, hyperlinks to each and every web page on which he believed infringing content appeared that also linked to the specific image he believed was infringing his clients' copyrights.  *Id.* ¶ 72.  His intent in providing hyperlinks for each infringing work was to simultaneously disclose the work in question and also the location of the infringing copy on the Internet.  *Id.*  Between January 26, 2014 and June 23, 2017, Easton sent emails of this nature on behalf of ALS and other content providers to Cloudflare regarding supposed ALS proprietary content observed on the following sites, all of which are Cloudflare customers: artofx.org, bestofsexpics.com, cumonmy.com, fboom.me, greenpiccs.com, imagetwist.com, imgchili.net,

---

[9] Caching servers are servers that temporarily cache content, typically for a few hours before being cleared (also known as 'evicted') in order to improve the time it takes for website content from the host server to reach the end users in a particular geographic area.  *Id.* ¶ 62.  The more geographically distant an end user is from a server, the longer it takes for content from that server to reach that end user.  *Id.*  A caching server that is located nearer to the end user than the host server shortens the physical distance that the host's content must travel, and therefore also shortens the time it takes for the content to load in an end user's browser.  *Id.*

[10] The parties dispute the extent to which the CDN system, and the caching servers Cloudflare employs actually improves the speed of content delivery.  *See id.* ¶¶ 36-37.  According to Cloudflare, there is no evidence that the system actually increases speed by more than nanoseconds.  *Id.*  Plaintiff contends that Cloudflare's promotes its services as increasing speed.  Cloudflare also appears to admit that many factors determine the speed with which an item is retrieved.  However, Cloudflare does not dispute the fact that, as a result of its CDN Network, temporary cache copies of images from its customer's websites are created and stored temporarily.

imgflash.net, imgsen.se, imgspice.com, imgspot.org, imgtrex.com, img.yt, namethatporn-star.com, slimpics.com, stooorage.com and vipergirls.to (collectively the "Cloudflare Customer Sites"). *Id.* ¶¶ 55, 73.[11]

### 4. *Cloudflare's Notification System*

Cloudflare maintains its own webform designed to allow copyright owners to submit notifications of claimed infringement on its customers' sites. *Id.* ¶ 39. Generally, Cloudflare sends these complaints on to its customer or customer's hosts. *Id.* ¶ 41. According to Cloudflare, although it has no ability to remove individual images from its customers' sites, the act of passing along complaints submitted by copyright owners through its webform has resulted in that material being removed. *See id.* ¶¶ 43, 46-47. Cloudflare also provides the complainant with certain contact information for the host, though not the Host's IP address. *Id.* ¶ 42. Cloudflare has only terminated customers for infringement when it receives a court order. *See id.* ¶ 80.

Cloudflare's response to Easton's emails was to direct him to its webform procedures. *Id.* ¶ 40. Cloudflare also told Easton that it would not process complaints sent via email. *Id.* ¶¶ 77-78. Cloudflare does not in fact, forward complaints received in email form along to its customers, and has taken the position that Easton's emails were invalid notifications. *See id.* ¶¶ 89-90. Easton did use the webform on a few occasions but found that it was more time consuming and less efficient in his view than an email based approach. *See id.* ¶¶ 85, 91. At least some ALS images that were referenced in Easton's emails remained online well into this litigation. *See id.* ¶ 92.

### C. Contributory Trademark Infringement

The only cause of action that remains against Cloudflare is for Contributory Copyright Infringement. *See* MTD Ruling. According to Plaintiff, Cloudflare should be held contributorily liable for acts of infringement that occur on, or by its customer sites, because it knows of that infringement, but continues to provide its customers with its DNS and CDN services. *See*

---

[11] Easton sent email infringement notifications to Cloudflare, on behalf of ALS and others, pertaining to the following sites in the following numbers: a) artofx: 24 total, 14 ALS; b) bestofsexpics: 21 total, 14 ALS; c) cumonmy: 17 total, 17 ALS; d) fboom: 29 total, 29 ALS; e) greenpiccs: 29 total, 25 ALS; f) imagetwist: 82 total, 25 ALS; g) imgchili: 1175 total, 361 ALS; h) imgflash: 8 total, 8 ALS; i) imgsen.se: 20 total, 12 ALS; j) imgspice: 149 total, 15 ALS; k) imgspot: 11 total, 6 ALS; l) imgtrex: 30 total, 27 ALS; m) img.yt: 147 total,; 42 ALS; n) namethatpornstar: 4 total, 4 ALS; o) slimpics: 25 total, 25 ALS; p) stooorage: 11 total, 11 ALS; and q) vipergirls: 21 total, 10 ALS. In all Easton sent emails containing links to 1,803 total images, 645 of which related to ALS content. *Id.* ¶ 73.

*generally* TAC.   Both parties seek summary judgment on this claim.

Contributory copyright infringement "may be imposed for intentionally encouraging infringement through specific acts." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170 (9th Cir. 2007) ("*Amazon.com*") (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("*Grokster*")).   Thus, "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Id.* (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)); *see also Perfect 10, Inc. v. Visa Intern. Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007) ("*Visa*") (explaining that contributory infringement can be established through either material contribution or inducement).

A third party can only be liable for materially contributing to infringement where its participation in the infringing conduct of the primary infringer is "substantial." *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F.Supp. 1361, 1375 (9th Cir. 1995) ("*Netcom*") (citing *Gershwin Publ'g*, 443 F.3d at 1162; *Apple Computer, Inc. v. Microsoft Corp.*, 821 F.Supp. 616, 625 (N.D. Cal. 1993); *Demetriades v. Kaufmann*, 690 F.Supp. 289, 294 (S.D.N.Y. 1988)).

In *Amazon.com*, the Ninth Circuit analyzed the material contribution prong in the context of an Internet search engine operator (Google) and held that:

> a computer system operator can be held contributorily liable if it "has *actual* knowledge that *specific* infringing material is available using its system," and can "take simple measures to prevent further damage" to copyrighted works, yet continues to provide access to infringing works.

508 F.3d at 1172 (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001); *Netcom*, 907 F.Supp. at 1375 (emphasis in original).   Although an "actor's contribution to infringement must be material to warrant the imposition of contributory liability," the Ninth Circuit emphasized that "services or products that facilitate access to [infringing] websites throughout the world can significantly magnify the effects of otherwise immaterial infringing activities." *Id.* (internal quotations and citations omitted).

In *Amazon.com*, the district court had dismissed a contributory copyright infringement claim against Google, holding that even assuming Google had knowledge that links to websites displaying infringing material were made available using its search engine, because Google did

not undertake promotional or advertising efforts to encourage visits to the infringing websites, it could not be liable for contributory infringement.  *Id.*  The Ninth Circuit reversed, reasoning that:

> [t]here is no dispute that Google substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access infringing materials.  We cannot discount the effect of such a service on copyright owners, even though Google's assistance is available to all websites, not just infringing ones.  Applying our test, Google could be held contributorily liable if it had knowledge that infringing [copies of plaintiff's] images were available using its search engine, could take simple measures to prevent further damage to [plaintiff's] copyrighted works, and failed to take such steps.

*Id.*  The Ninth Circuit thereafter remanded the case to the district court to resolve factual disputes over the adequacy of the plaintiff's notices to Google of the infringement and Google's responses to the notices, as well as factual disputes over whether there was a reasonable and feasible means for Google to refrain from providing access to the infringing websites.  *Id.* at 1172-73.

Shortly after *Amazon.com*, the Ninth Circuit issued its decision in *Perfect 10, Inc. v. Visa Intern. Serv. Ass'n* ("*Visa*"), 494 F.3d 788 (9th Cir. 2007).  In that case, the plaintiff sued various credit card companies for contributory copyright infringement, alleging that the credit card companies had contracted with issuing banks to issue branded credit cards to consumers, and the issuing banks then contracted with merchant banks to settle transactions using those cards, including transactions for payments to Internet websites that infringed the plaintiff's copyrights.  *See Visa*, 494 F.3d at 792.  The plaintiff claimed that the credit card companies had materially contributed to the websites' infringement because they were aware of the infringement, yet continued to process credit card payments for the infringing websites.  *Id.* at 795.

The Ninth Circuit held that the plaintiff had failed to allege facts sufficient to establish material contribution, because the credit card companies:

> cannot be said to materially contribute to the infringement because they have no direct connection to that infringement.  Here, the infringement rests on the reproduction, alteration, display and distribution of [plaintiff's] images over the Internet.  *[Plaintiff] has not alleged that any infringing material passes over [d]efendants' payment networks or through their payment processing systems, or that [d]efendants' systems are used to alter or display the infringing images* . . . . Here, [] the services provided by the credit card companies do not help locate and *are not used to distribute*

10

> *the infringing images.* While [plaintiff] has alleged that
> [d]efendants make it easier for websites to profit from this
> infringing activity, the issue here is reproduction, alteration,
> display and distribution, which can occur without payment. Even
> if infringing images were not paid for, there would still be
> infringement.

*Id.* at 796 (emphasis added). The Court further distinguished *Amazon.com*, emphasizing that "Google may materially contribute to infringement by making it fast and easy for third parties to locate and distribute infringing material, whereas [d]efendants make it easier for infringement to be *profitable*," which the Court emphasized could not be the basis of contributory copyright liability. *Id.* at 797 (emphasis in original).[12] The distinction drawn in *Amazon* was thus,

---

[12] The Ninth Circuit has also recognized that a third party may materially contribute to infringement, at least in part, by providing physical space to known infringers, or, in the online context, by providing server space to known infringers. *See Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) ("*Fonovisa*") ("[W]e agree with the Third Circuit's analysis…that providing the site and facilities for known infringing activity is sufficient to establish contributory liability."); *see also, Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 943 (9th Cir. 2011) ("*Louis Vuitton*") ("Material contribution turns on whether the activity in question 'substantially assists' direct infringement…. There is no question that providing direct infringers with server space satisfies that standard.").

For example, in *Fonovisa*, the Ninth Circuit held that a swap meet operator could be liable for contributory infringement because the operator provided infringers with "space, utilities, parking, advertising, plumbing, and customers," and, most importantly, the provision of the "site and facility for known infringing activity." 76 F.3d at 264. The Ninth Circuit emphasized that the swap meet operator "actively strives to provide the environment and the market for counterfeit recording sales to thrive. Its participation in the [infringing] sales cannot be termed 'passive.'" *Id.*

*Louis Vuitton* examined an analogous setting in the online world. In *Louis Vuitton*, the plaintiff sued three different defendants − MSG, Akanoc, and Chen-for contributory copyright and trademark infringement for their role in hosting websites that directly infringed on Louis Vuitton's trademarks and copyrights. 658 F.3d at 939-40. MSG and Akanoc were in the "web hosting business" and were both owned by Chen. *Id.* MSG leased servers, bandwidth, and IP addresses to Akanoc. *Id.* Akanoc operated the servers and leased packages of server space, bandwidth, and IP addresses to customers, who, in turn, directly infringed on Louis Vuitton's copyrights and trademarks. *Id.* The case went to trial and the jury returned a verdict for plaintiff against all three defendants for contributory infringement. *Id.* at 941. The defendants filed a motion for judgment as a matter of law seeking to overturn the verdict. *Id.* The district court denied the JMOL as to both Akanoc and Chen, but granted it as to MSG. *Id.*

The Ninth Circuit affirmed both rulings. With respect to MSG, the Ninth Circuit agreed with the district court that "no evidence presented at trial showed that MSG operated the servers that hosted the direct infringers' websites." *Id.* at 942. The panel reasoned that "even assuming that the direct infringers could be construed as MSG's customers, [plaintiff] presented no evidence that MSG had reasonable means to withdraw services to the direct infringers." *Id.* Alternatively, the Ninth Circuit found that Akanoc and Chen were contributory liable because they "physically [hosted] websites on their servers and [routed] internet traffic to and from those [infringing] websites." *Id.* at 942.

Neither *Fonovosia* or *Louis Vuitton* hold that merely providing space to known infringers, be it physical or online, constitutes material contribution as a matter of law. Rather, in both cases, the third party provided space, additional services, and had a reasonable means to withdraw services. *See, e.g., Fonovisa*, 76 F.3d at 264; *Louis Vuitton*, 658 F.3d at 942. *Louis Vuitton* illustrates this distinction: MSG was not liable because it merely leased servers to Akanoc but *Akanoc was liable* because it physically hosted the websites, routed internet traffic to and from the sites, and "had direct control over the 'master switch' that kept the websites online and available." *Id.* at 943.

qualitative as opposed to quantitative.  In other words, the Ninth Circuit did not find a lack of contributory liability because Visa provided *less* assistance to the infringing sites, rather the Circuit found that the assistance provided did not directly aid in the distribution of infringing copies.  *See id.* at 796.[13]

The Ninth Circuit has also recognized that a third party may materially contribute to infringement, at least in part, by providing physical space to known infringers, or, in the online context, by providing server space to known infringers.  *See Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) ("*Fonovisa*") ("[W]e agree with the Third Circuit's analysis…that providing the site and facilities for known infringing activity is sufficient to establish contributory liability."); *see also*, *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 943 (9th Cir. 2011) ("*Louis Vuitton*") ("Material contribution turns on whether the activity in question 'substantially assists' direct infringement…. There is no question that providing direct infringers with server space satisfies that standard.").

To summarize: "[O]ne contributorily infringes when he: (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement."  *VHT, Inc., v. Zillow Group Inc.*, C15-1096JLR, 2017 WL 2654583, *14 (W.D. Wash. June 20, 2017) (quoting *Perfect 10*, 484 F.3d at 795).  Under a material contribution theory, in the internet context, a plaintiff can establish liability if it shows "that a computer system operator . . . 'has actual knowledge that specific infringing material is available using its system,' and can 'take simple measures to prevent further damage' to copyrighted works, yet continues to provide access to infringing works."  *Amazon.com, Inc.*, 508 F.3d at 1172 (quoting *Napster*, 239 F.3d at 1022; *Netcom*, 907 F. Supp. at 1375); *see also Giganews*, 847 F.3d at 671.

However, it is unclear that these three requirements − (1) actual knowledge, (2) availability of "simple steps" to prevent further damage, and (3) continued access − are *required* to finding contributory infringement on a material contribution theory in the internet age.  *See Louis Vuitton,* 658 F.3d at 943 ("("Material contribution turns on whether the activity in question 'substantially assists' direct infringement…. There is no question that providing direct infringers with server space satisfies that standard."); *but see*, *VHT, Inc.*, 2017 WL 2654583 at *16. (rejecting plaintiff's theory of liability that it could prove material contribution without proof of

---

[13] Although it did not use this language, the *Visa* decision suggests that finding substantial assistance may turn, at least in part, on whether the assistance, for lack of a better term, "touches and concerns" the infringement.

the availability of "simple measures" as "contrary to *Amazon, Inc.* and *Giganews*.").   The approach most consistent with that of the Ninth Circuit is to compare each individual case to the Ninth Circuit's test-defining cases and proceed by analogy.   *See Visa*, 494 F.3d at 795 ("Viewed in isolation, the language of the tests described is quite broad, but when one reviews the details of the actual "cases and controversies" before the relevant court in each of the test-defining cases and the actual holdings in those cases, it is clear that the factual circumstances in this case are not analogous.").   That being said, the three elements of (1) actual knowledge, (2) the ability to take simple steps to stop infringement, and (3) continued access are sufficient, even if not necessary, to establish liability.   *See Amazon.com, Inc.*, 508 F.3d at 1172.   For that reason, they represent a useful starting point, and, in the present case are sufficient to resolve the pending motions.

Cloudflare argues that it is entitled to summary judgment because Plaintiff cannot establish several elements that it contends are required for a contributory infringement action in this setting, including (1) evidence that direct infringement occurred for which it may be liable under a contribution theory ("primary infringement"), (2) evidence that Cloudflare provides substantial assistance to primary infringers, (3) evidence that Cloudflare knew about specific acts of infringement, and (4) evidence that Cloudflare could have, but failed to take steps to prevent additional infringement.   *See generally* Cl.'s MSJ at 11-25.

As indicated above, an internet service provider may be contributory liability if it: (1) has actual knowledge of specific infringing activity, (2) is able, but fails to take simple measures to stop that infringement, and (3) continues to provide services to known infringers.   *See Amazon*, 508 F.3d at 1172.   It is also clear that, as a threshold matter, the assistance provided must be substantial.   Furthermore, inherent in the "actual knowledge requirement" is that there be an underling act of primary infringement.   *See Amazon*, 508 F.3d at 1172.

### *1. Whether Cloudflare Had Specific Knowledge of Infringing Activity*

"[C]ontributory infringement requires 'actual knowledge of specific acts of infringement' or '[w]illful blindness of specific facts.'"   *BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc.*, No. 16-1972, 2018 U.S. App. LEXIS 2487, *35, 881 F.3d 293 (4th Cir. Feb. 1, 2018) (quoting *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072-73 (9th Cir. 2013)).

Here, Plaintiff contends that Cloudflare's customers illegally copy and display its images in violation of its copyrights and use Cloudflare's system to do so.   *See* Pl.'s Opp'n at 6. Plaintiff further contends that Cloudflare was aware of this activity through Easton's emails.   *See*

*id.* at 9-11.  Plaintiff supports both contentions with evidence, including Easton's testimony and emails to Cloudflare containing hyperlinks to over 1,000 images appearing across 13 Cloudflare Client Sites, over 600 of which relate to ALS images.  *Id.* ¶ 73.  The Court would find that Easton's testimony and emails raise a triable issue of fact as to Cloudflare's knowledge.[14]  *See Ellison*, 357 F.3d at 1077 (finding that a reasonable trier of fact could find that AOL has reason to know that infringing copies of plaintiff's work were stored on servers based on evidence of a phone call and evidence that AOL changed its email address to avoid email complaints sent by plaintiff's attorney); *see also, e.g.*, *Miller v. Facebook, Inc.*, No. C 10-00264, 2010 U.S. Dist. LEXIS 61711, *21-22 (N.D. Cal. May 28, 2010) (finding that plaintiff's single letter to Facebook demanding that it remove infringing image clearly established actual knowledge).

Defendant's arguments for summary judgment on this issue are unavailing.

Defendant first argues that there is no competent evidence of any direct infringement by Cloudflare's customers.  *See* Cl.'s MSJ at 11:2-17.  Defendant asserts that the actual primary infringers are its clients' users, and thus, its clients committed no direct infringement, which, in turn, shields Cloudflare from liability.  *Id.*

While Cloudflare is correct that contributory infringement depends on an underlying act of infringement, this argument fails for two reasons.  *See Amazon*, 508 F.3d at 1172.  First, this Court has already determined that thirteen of fourteen sites committed acts of infringement by causing the creation of cache copies, and causing the display of ALS's copyrighted images.  *See* Ruling on MSJ I at 16, *id.* at 27.  Cloudflare's motion essentially ignores these findings.[15]  Even without them, Easton's testimony and corresponding emails create a triable issue of fact as to whether Cloudflare's Customer Sites committed acts of infringement.[16]

Cloudflare's argument also fails for a legal reason: it cites no authority for the proposition that pinning the first instance of direct infringement on its customers' users, as opposed to its

---

[14] Even a cursory review of the pages that Easton's emails hyperlink to reveal that images bearing the ALS markings appear on sites that are not ALS.  *See* Declaration of Jay Spillane Exs. 2-11, Docket No. 373.  A jury could reasonably conclude that a company that receives an email with a hyperlink to such an image has actual or constructive knowledge that copyrights are being infringed on its customers' sites.

[15] At times, Cloudflare's moving papers read as if Cloudflare's new counsel ignored its client's first attempt at summary judgment altogether.

[16] Cloudflare provides little evidence or argument establishing that its clients' users are the only infringers.  Simply asserting that they are not primary infringers does not entitle them to summary judgment, particularly in light of the Court's ruling on its first motion for summary judgment.

customers, shields Cloudflare from liability.  *See* Cl's Reply at 1.   The Ninth Circuit has observed only that *an* act of direct infringement is required.  *See Napster*, 239 F.3d at 1013 n.2. While the district court case cited by Cloudflare disapproved of what it deemed "tertiary liability", the Ninth Circuit has not recognized such a defense.  Such a rule appears to be at odds with previous case law, where system providers were held liable for infringing information posted on their site or server, by an individual upstream user, through an intermediary service. *See, e.g.*, *Netcomm*, 907 F.Supp. at 1375; *see also*, 3 Nimmer on Copyright § 12.04[A][2][a] at 12–73 ("in order to be deemed a contributory infringer, the…assistance must bear some direct relationship to the infringing acts, and the person rendering such assistance or giving such authorization must be acting in concert with the infringer").  Moreover, Defendant has frequently asserted, but never proven, that its customers are not engaged in acts of direct infringement.  It must do more to escape liability on this ground.

Defendant also asserts that it never had knowledge of specific infringements because Easton's emails were difficult to understand and were not submitted in the format that it preferred.  *See* Cl.'s MSJ at 20-22.  Easton sent dozens of emails detailing over 1,000 examples of claimed infringement on 14 of its customers' sites over a two to three year period.  A fact-finder could reasonably conclude that Cloudflare knew which of customers were infringing, and what specific form that infringement was taking.  Alternatively, as in *Ellison*, a jury could determine that Easton's emails and the fact that Cloudflare refused to act on them, establishes constructive, if not actual knowledge.  *See* 357 F.3d at 1077.

For these reasons, the Court would find that Plaintiff's evidence raises a triable issue of fact as to whether Cloudflare had actual knowledge that acts of infringement were occurring on its client sites.  As such, it would not grant summary judgment in Cloudflare's favor on this ground.

Alternatively, the Court would find that Easton's emails do not establish knowledge *beyond dispute*.  In other words, when all inferences are drawn in *Cloudflare's* favor, and all evidence viewed in the light most favorable to Cloudflare − as the Court must do in evaluating *Plaintiff's* MSJ − a trier of fact could reasonably conclude that Easton's emails were insufficient to establish knowledge.  For that reason, Plaintiff's motion for summary judgement as to liability is denied.

*2. Substantial Assistance*

15

Both parties seek summary judgment on the issue of substantial assistance.

As indicated above, a third party can only be liable for materially contributing to infringement where its participation in the infringing conduct of the primary infringer is "substantial." *See Netcom*, 907 F.Supp. at 1375. Website hosts, server operators, and search engines meet this threshold test, whereas credit card companies do not. *Compare Louis Vuitton*, 658 F.3d at 943 and *Amazon.com, Inc.*, 508 F.3d at 1172 to *Visa,* 494 F.3d at 796.

Here, Plaintiff contends that Cloudflare substantially assists primary infringement in three ways. The Court would find that Plaintiff raises a triable issue of fact as to at least two of these reasons. First, the Court finds that Cloudflare's CDN service allows its customers to create and store copies of the allegedly infringing images on its cache servers. *See* DSGD ¶¶ 63, 66. Second, the Court finds that triable issues of fact remains as to whether Cloudflare's CDN network lets its customers send infringing images faster and/or more efficiently than they could otherwise.

Defendant identifies three reasons why it does not substantively assist in infringement, none of which preclude a finding of material assistance. First, Cloudflare claims its services "make no difference to the alleged infringements" because they do not increase network speed or meaningfully conceal website information. Cloudflare also argues that, even if it were to terminate infringing customers, the infringing material would remain online.

The first and most important problem with Cloudflare's position is that it ignores the critical roll it plays in its customers' creation of copies of Plaintiff's images on Cloudflare's cache servers. *See id.* As the Court previously held, these copies represent actionable primary infringement. *See* Ruling on MSJ I at 14. It is undisputed that, without Cloudflare, the copies would not be made. *See* DSGD ¶¶ 63, 66. Indeed, as Cloudflare's first motion for summary judgment revealed, without Cloudflare, *there would be no domestic copying* of Plaintiff's images at all. *See generally* Ruling on MSJ I. Thus, even without reaching the issue of increased delivery time, Plaintiff can, at the very least establish Cloudflare "substantially assisted" in the creation of cache copies through its CDN Network.

Further, the Court is not convinced that a single line of expert testimony about the negligible effect of the CDN network on the speed of content delivery precludes a finding of substantial assistance. Cloudflare's own website information claims increased speed and

16

performance.  *See* DSGD ¶¶ 63-68.[17]  It also concedes that speed of any content is variable.  *Id.*  As such, it is at least a disputed issue of fact as to whether Cloudflare's services increase the availability of infringing material in a manner sufficient to meet the Ninth Circuit's ever evolving understanding of this term in the age of the modern internet.

Moreover, Cloudflare's assistance to its customers is directly related to the infringing images.  *See supra* at 11-12 (discussing *Visa*, 494 F.3d at 796).  It is thus decidedly unlike a credit card company or ad company whose services simply make infringement more profitable without directly facilitating the distribution of the infringing material.  Instead, Cloudflare, by its own estimate seeks to provide its customers, with a faster, safer, and more efficient means by which they can deliver their content, *i.e.* to infringe.  This places Cloudflare well within the confines of the Ninth Circuit's substantial assistance framework.  *See Louis Vuitton*, 658 F.3d at 943; *Amazon.com, Inc.*, 508 F.3d at 1172.

Defendant's final argument − that it cannot end its clients' infringing activity on its own, is also not convincing.  First of all, as to the infringements that are the cache copies, Cloudflare does appear to have the master switch.  Second of all, just because the infringing images will remain online, does not mean the assistance is insubstantial.  If that were true, than liability based on server space would rely on whether or not an infringing site had, or could acquire a backup server.  Similarly, the presence of other search engines besides Google, of which there were and remain many, would render its assistance insubstantial.  Nothing in the Ninth Circuit precedent requires Plaintiff to show that the help Cloudflare provides is *essential* to its customers' ability to infringe.

In sum, the Court would find that Cloudflare fails to establish that its services do not substantially assist its customers as a matter of law.  As such, the Court would not grant summary judgment in its favor on that ground.

Alternatively, for the purposes of Plaintiffs' motion for summary judgment, the Court would find that Cloudflare's CDN network provides material assistance, as a matter of law, when it helps customers create cache copies.  However, the Court would not find that Plaintiff has

---

[17] In fact, several pages of Cloudflare's briefing describes it herculean efforts to make a safer and faster internet.  *See* Cl's MSJ at 2-4.  These statements appear to undermine Cloudflare's argument that its services have no material effect on its users' ability to deliver content.  Along these lines, the Court would ask Cloudflare's counsel the following question: assuming Cloudflare had a customer whose sole business is the distribution of infringing images, and Cloudflare had full, actionable knowledge of that infringement, is it Cloudflare's position that continuing to offer services to such a customer would not trigger liability under a material contribution theory?

necessarily proven that such copying has occurred as a matter of fact. Additionally, whether or not Cloudflare's other services materially assist its infringement, would be an issue for the jury, and will likely require findings of fact related to the actual effect of Cloudflare on its customers' ability to deliver content.

### 3. Simple Measures

The parties dispute whether Plaintiff must prove that simple measures exist by which Cloudflare could prevent further infringement. Both sides also devote significant argument to the technological feasibility of Cloudflare implementing a system by which it could keep certain images out of its cache, or off its network. Much of this discussion is unnecessary to resolve the issue at hand. The simple answer as to whether Cloudflare could have done something simple to stop the infringement is "yes": Cloudflare can, but does not, end its business relationship with websites that it knows (or arguably knows) are serial infringers.

Cloudflare's response to this obvious step is to contend that the internet would be a more dangerous place if it withheld its services from sites like bestofsexpics.com and cumonmy.com. While that may or may not be the case, if Cloudflare's logic were accepted, there would be no web content too illegal, or dangerous, to justify termination of its services. While Cloudflare may do amazing things for internet security, the Court would have a hard time accepting that Cloudflare's security features give it license to assist in *any* online activity.

In sum, the Court would not grant Defendant's MSJ based on this grounds.

### 4. Conclusion

In sum, the Court would find that Defendant fails to carry its burden to prevail on summary judgment. A reasonable jury could determine that: (1) Cloudflare knew about its customers' infringement, (2) that its services materially assist that infringement, and (3) that Cloudflare could have, but did not, withhold its services.

Conversely, Plaintiff also fails to establish liability as matter of law. As indicated above, knowledge of actionable infringement will be an issue for the jury. Additionally, it will be for the jury to determine whether Cloudflare's services substantially assist in infringement. As such, both motions for summary judgment are denied. The Court would decline to consider every element of Plaintiff's motion with respect to the DMCA safe harbor provision at this time. It would however find that, the issue of Cloudflare's compliance with 17 U.S.C. § 512(i) must be determined by the jury, in light of the factual disputes as to Easton's emails and the usefulness of

Cloudflare's webform process.  *See Ellison*, 357 F.3d at 1080 ("[I]t is difficult to conclude as a matter of law [that a defendant] ha[s] 'reasonably implemented' a policy against repeat infringers."); *see also BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F.Supp.3d 342, 358-59 (S.D.N.Y. 2014) ("At the complaint stage, there are insufficient facts to demonstrate that the Defendants named in this action satisfy even the threshold requirements [of the DMCA]. Defendants bring no credible argument that the complaint, and attachments themselves, establish, for instance, that they have 'reasonably implemented' a repeat infringer policy."); *Viacom Int'l*, 676 F.3d at 41 (vacating district court's grant of summary judgment on DMCA defense, explaining that "further fact-finding is required to determine whether [defendant] is ultimately entitled to safe harbor protection in this case").

## III.  Evidentiary Rulings[18]

### A.  Cloudflare's Request for Evidentiary Rulings on Specified Objections − Docket No. 390

1.  The following objections are Sustained in Part, Overruled in part: 1, 3, 5, 8, 28-32, 37, 44-49, 56.

2.  The following Objections are Overruled: 2, 4, 6, 7, 9-20; 22-24, 26, 27, 33-36, 38-43, 54. 55. 57-60.

3.  The following Objections are Sustained: 21, 25, 49-53.

### B.  Cloudflare's Request for Evidentiary Ruling on Specified Objections − Docket No. 377.

1.  The following objections are Sustained in part, Overruled in part: 11, 24, 33, 35, 36, 37. 38, 39, 40-60.

2.  The following objections are Overruled: 1-10, 12, 23-23, 26-28, 31, 32, 34.

3.  The following objections are Sustained: 13, 25, 29, 30.

## IV.  Conclusion

The Court would DENY Cloudflare's Motion for Summary Judgment in its entirety.  The

---

[18] Plaintiff's objections fail to properly identify the specific testimony being objected to, and instead simply object to the "facts" themselves.  For that reason, Plaintiff's objections are not evidentiary in nature and fail.  The Court pointed out this shortcoming in Plaintiff's objections filed in connection with its motion for summary judgment as to Steadfast.

A large number of Defendant's objections fail to specify which aspects of a given piece of evidence it objects to and for what reason.  For the vast majority of the "sustained in part overruled in part" objections the Court sustained the objections to statements that are plainly conclusions of law, or otherwise conclusory factual statements.

Court would DENY in part and GRANT in part Plaintiff's MSJ.  The Court would GRANT Plaintiff's MSJ with respect to one legal question and find that Cloudflare's CDN Network, to the extent it permits Cloudflare's customers to cause new cache copies of infringing images to be created and served to end users, "materially assists" in infringement by Cloudflare's customers and/or its customers' users.  The Court makes no conclusions of fact, one way or another, as to whether any specific infringing images were created as cache copies.