Jay M. Spillane (Bar No. 126364)
jspillane@spillaneplc.com
SPILLANE LAW GROUP PLC
468 N. Camden Drive
Second Floor
Beverly Hills, CA 90210
(424) 217-5980
(888) 590-1683 (fax)

Kevin D. Neal (Az. Bar No. 011640)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000
(602) 530-8500 (fax)
kevin.neal@gknet.com

Attorneys for Plaintiff ALS Scan, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALS SCAN, INC., a Maryland corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CLOUDFLARE, INC., a Delaware corporation, et al.,<br><br>Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br>**PLAINTIFF'S TRIAL BRIEF**<br>**L.R. 16-10**<br>Trial Date: May 1, 2018<br>Time: 8:30 a.m.<br>Place: Courtroom 9D<br>      350 W. 1st Street<br>      Los Angeles, CA |

## **Table of Contents**

I. ACTUAL DAMAGES, ALS'S TAX RETURNS, THE SALE OF ALS TO WALSH, "VALUE" OF ALS'S WORKS AND THE KINRICH REPORT..................................................................................................1

II. CLOUDFLARE SEEKS TO CONFUSE THE JURY THROUGH AN LLM COURSE IN INAPPLICABLE COPYRIGHT MAXIMS. ....................4

   A. Compilations and Collective Works (Joint Instr. 36) ..............................4

   B. Fair Use (Joint Instr. 37) ..........................................................................6

   C. Implied License (Joint Instr. 38) ..............................................................7

   D. First Sale – 17 U.S.C. § 109(a) (Joint Instr. 39) ......................................7

   E. First Sale – 17 U.S.C. §109(c) (Joint Instr. 40) .......................................8

   F. Acquiescence (Joint Instr. 41)..................................................................9

   G. Confusing Multiple Instructions on Standards for Contributory Liability (Joint Instrs. 42-45)...................................................................................9

   H. Copyright Misuse (Joint Instr. 46) ........................................................10

   I. Limitation on Liability – 17 U.S.C. § 512(a) (Joint Instr. 47)...............10

   J. Limitation on Liability – 17 U.S.C. § 512(b) (Joint Instr. 48)...............13

# **Table of Authorities**

**Cases**

*Adams v. Agrusa*, No. 2:15-CV-07270-SVW-RAO, 2016 WL 7665767
   (C.D. Cal. July 20, 2016) ................................................................................1

*Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 747 F.3d 673
   (9th Cir. 2014) ...............................................................................................4

*Apple Inc. v. Psystar Corp.*, 673 F.Supp.2d 926 (N.D. Cal. 2009) ......................1

*BMG Rights Mgmt. v. Cox*, 149 F.Supp.3d 634 (E.D. Va. 2015) ............... 11, 12

*BMG Rights Management (US) LLC v. Cox Communications*, No. 16-1972
   (4th Cir. 2/1/18) ...........................................................................................10

*Controversy Music v. Shiferaw*, 3:02-cv-05254-MJJ Doc. 19
   (7/7/13 N.D. Cal.) .........................................................................................2

*Curtis v. Illumination Arts, Inc.*, 2:12-cv-00991-JLR Doc. 97
   (7/17/14 W.D. Wash) ....................................................................................2

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) .........................5

*Feltner v. Columbia Pictures Television*, 523 U.S. 340 (1998) ..........................1

*Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110
   (2d Cir. 1986) ....................................................................................... 1, 2, 4

*Getty Images (US) Inc. v. Virtual Clinics*, 2:13-cv-00626-JLR
   (1/31/14 W.D. Wash.) ...................................................................................2

*Microsoft Corp. v. Nop*, 549 F.Supp.2d 1233 (N.D. Cal. 2008) ..........................1

*New Form Inc. v. Tekila Films, Inc.*, 08-56001 (9th Cir. 12/12/09) .....................4

*Peermusic III, Ltd. v. LiveUniverse, Inc.*, 2:09-cv-06160-GW Doc. 215
   (10/9/12 C.D. Cal.) .......................................................................................2

*Perfect 10, Inc. v. Visa Intern. Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007)...........9

*Practice Management Information Corp. v. American Medical Association*,
   121 F.3d 516 (9th Cir. 1997) .......................................................................10

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ...10

**Statutes**

17 U.S.C. § 101 .................................................................................................... 5

17 U.S.C. § 102(a)(5) ........................................................................................... 4

17 U.S.C. § 103(b) ............................................................................................... 6

17 U.S.C. § 109(a) ............................................................................................... 8

17 U.S.C. § 109(c) ............................................................................................... 8

17 U.S.C. § 504(c)(1) ........................................................................................... 5

17 U.S.C. § 512(b)(1) ........................................................................................ 13

17 U.S.C. § 512(b)(1)(A) ................................................................................... 13

17 U.S.C. § 512(b)(1)(B) ................................................................................... 13

17 U.S.C. § 512(b)(1)(C) ................................................................................... 13

17 U.S.C. § 512(b)(2)(A) ................................................................................... 14

17 U.S.C. § 512(k)(1)(A) ............................................................................. 12, 13

**Regulations**

CFR § 202.3(b)(3)(A) ........................................................................................... 6

# I. ACTUAL DAMAGES, ALS'S TAX RETURNS, THE SALE OF ALS TO WALSH, "VALUE" OF ALS'S WORKS AND THE KINRICH REPORT.

Cloudflare seeks to introduce ALS's tax returns, evidence of the sale of ALS from Alex Kirn to Sarah Walsh and, based thereon, the report of Jeff Kinrich, in which he uses the tax returns to opine that ALS was a failing business that Cloudflare did not damage, and in which he uses the sale price to derive a market value for ALS's images. None of this information may be admitted to the jury to inform their decision concerning statutory damages.

In this regard, ALS would like draw the Court's attention to certain authorities which, while admittedly not "new" in the sense of being handed down in the last month, are relatively recent and which ALS newly discovered, all of which shed light on the inadmissible nature of the proffered testimony.

Cloudflare emphasizes that some courts look at certain "factors" that could bear on the amount of statutory damages awarded, citing *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1117 (2d Cir. 1986) and *Apple Inc. v. Psystar Corp.*, 673 F.Supp.2d 926, 928 (N.D. Cal. 2009). However, *Fitzgerald* was handed down prior to *Feltner v. Columbia Pictures Television*, 523 U.S. 340 (1998), in which the Supreme Court held that the question of statutory damages must go to the jury. Cloudflare cites no authority in which the *Fitzgerald* factors were given to a jury to inform their deliberations on statutory damages. In *Psystar Corp.*, the court cited *Microsoft Corp. v. Nop*, 549 F.Supp.2d 1233, 1237 (N.D. Cal. 2008), where that court quoted a case that quoted *Fitzgerald*. Cloudflare cites *Adams v. Agrusa*, No. 2:15-CV-07270-SVW-RAO, 2016 WL 7665767, at *3 (C.D. Cal. July 20, 2016), but that was a default case in which Judge Wilson relied on *Fitzgerald*. Thus, Cloudflare's entire line of authority is tainted as deriving from *Fitzgerald*.

ALS has become aware of a line of cases applying the *Fitzgerald* factors in <u>default</u> cases, where there would be no right to jury trial. However, even those cases do not support introduction of the disputed evidence. The only factor that relates to the plaintiff and revenues pertains to the plaintiff's <u>lost revenues due to the infringement</u>, not revenues actually received. The accepted method for assessing lost receipts from copyright infringement is a license or royalty rate. This was the type of evidence courts have relied upon in weighing what statutory damage to award in a default setting. This Court recognized this approach in *Peermusic III, Ltd. v. LiveUniverse, Inc.*, 2:09-cv-06160-GW Doc. 215 (10/9/12 C.D. Cal.) in which the Court asked for and relied upon "the licensing fees which Defendants would have been charged had they properly obtained licenses to use the copyrighted lyrics in the first place". *See also Getty Images (US) Inc. v. Virtual Clinics*, 2:13-cv-00626-JLR (1/31/14 W.D. Wash.) (on default judgment court considered licensing fees for Getty's images); *Curtis v. Illumination Arts, Inc.*, 2:12-cv-00991-JLR Doc. 97 (7/17/14 W.D. Wash) (on default judgment court considered royalty rates for children's books); *Controversy Music v. Shiferaw*, 3:02-cv-05254-MJJ Doc. 19 (7/7/13 N.D. Cal.) (on default judgment court considered ASCAP licensing rates for plaintiffs' music).

Here, even if the Court were to instruct the jury concerning the *Fitzgerald* factors, or permit Cloudflare to argue the factors irrespective of an instruction, neither Cloudflare nor Kinrich address lost licensing fees or royalty rates for the ALS images infringed. This is because ALS does not have license or royalty rates. Rather, ALS charges a fee, for example $29.95 per month, for access to all content on the secure web pages on its two sites, alsscan.com and alsangels.com. ALS does not license its images to third parties for a fee. The only licenses it extends are to authorized advertising affiliates who are given

rights without charge to limited sample sets for the sole purpose of directing traffic to ALS's sites.

Neither Cloudflare nor Kinrich calculate or estimate revenues that ALS lost due to infringement. What they seek to do is introduce evidence of revenues ALS did receive in spite of infringement, including for years prior to the first at-issue infringements, to paint ALS as a failing business model.

Kinrich opines improperly on causation, proclaiming "ALS's lost revenues are not attributable to Cloudflare's alleged contributory infringement." Kinrich Report pp. i., 15. He starts by stating ALS's actual revenues from 1996 to 2012, "before the point ALS alleges Cloudflare's acts began to contribute to infringement of ALS's copyrights." Kinrich Report pp. i., 16, Exs. 3, 4. Not only is this a discussion of revenue received, not revenue lost due to infringement, but the period before the first infringement at issue in the case can have nothing to do with lost revenues from infringement. Kinrich then moves on to revenues actually received by ALS from 2013 to 2016, the period in which Cloudflare is alleged to have contributed to infringement. Kinrich Report pp. i., 17-19, Exs. 3-6. Kinrich improperly trashes ALS as a business on the decline. Yet the trajectory of revenues ALS actually received, whether or not downward sloping, have no relation to lost license fees from infringed content.

Kinrich concludes by relying on testimony from Alex Kirn and Sarah Walsh and documents concerning sale of ALS from Kirn to Walsh. Kinrich takes the sale prices, ascribes a portion to the intellectual property, divides by the number of images and arrives at a per-image "value" of less than the minimum statutory damage, $750. However, even assuming a jury was permitted to consider the "value" of copyrighted works, Cloudflare cites no authority supporting the approach used by Kinrich. The Kinrich analysis is barred by the proscription in *New Form Inc. v. Tekila Films, Inc.*, 08-56001 (9th

Cir. 12/12/09) against assessing statutory damages by the measure of the "fair market value" of the copyrighted work.

## II. CLOUDFLARE SEEKS TO CONFUSE THE JURY THROUGH AN LLM COURSE IN INAPPLICABLE COPYRIGHT MAXIMS.

This case is about whether Cloudflare contributed to infringement, and if so, what damages should be awarded. Pure and simple.

Apparently hoping to confuse the jury, Cloudflare has requested instructions compromising an LLM course in copyright maxims, none having fair application to the case. Doc. 460.

In *BMG Rights Mgmt. v. Cox*, a contributory infringement case tried for the defense by Messrs. Bridges and Wakefield, the court gave succint instructions on copyright. The instructions, taken from the parties' Joint Appendix on appeal, are attached hereto. JA 2075-2081. While ALS does not agree with every word of the instructions, especially the court's decision to instruct on *Fitzgerald*-style factors and mitigation of damages, those instructions exemplify the succint nature of the instructions that should be given in this case.

### A. Compilations and Collective Works (Joint Instr. 36)

ALS shoots its photos of a model at one time. Once the resulting images are reviewed and edited, the best pictures, say 250, are released on the website. While ALS refers to and releases "sets" of its images (e.g. "Susie on the beach"), each individual photo is a "work" for purposes of the Copyright Act and, significantly, for purposes of statutory damages. "When a photographer has fixed in image in a tangible medium of expression, he owns the copyright." *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 747 F.3d 673, 678 (9th Cir. 2014); *17 U.S.C. § 102(a)(5)* (copyright protection subsists in "pictorial . . . works").

Cloudflare, realizing that the number of works involved portend a large award if the jury finds liability, seeks to reduce the number of contested "works" by requesting inapplicable instructions on compilations and collective works. See 17 U.S.C. § 504(c)(1) ("for purposes of [statutory damages] all the parts of a compilation or derivative work constitute one work"). However, these copyright doctrines have no application to the facts of the case.

> "A 'collective work' is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.
>
> "A 'compilation' is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term 'compilation' includes collective works.
>
> . . .
>
> A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications, which, as a whole, represent an original work of authorship, is a "derivative work".

*17 U.S.C. § 101*. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) (arrangement of pre-existing elements, for example a phone book, could be a compilation); *Alaska Stock, supra* (photos of different copyright owners assembled into a collection.

When a compilation or derivative work is assembled, copyright in the compilation or derivative work "extends only to the material contributed by the

1  author of such work." *17 U.S.C. § 103(b).*  In other words, if an author created
2  a coffee table book with a new compilation of Ansel Adams photographs with a
3  license from Adams' heirs, the compilation creator would own copyright in the
4  new materials, for example the forward and perhaps the arrangement of photos,
5  but not in the Adams photos themselves.  Similarly the owner of a motion
6  picture based upon a John Grisham novel would own copyright to the visual
7  elements and story not based on the book, but not the story in the book.

8      Here, the concepts of compilations or derivative works simply don't
9  apply.  ALS did not assemble pre-existing works into new compilations.
10 Rather, it created multiple new works in one shoot, then released the individual
11 works derived from the shoot at the same time.  ALS does not merely own the
12 rights to elements it contributed to a collection of underlying works.  ALS has
13 ownership of every photo it shoots.

14      Notably, Form VA, the Copyright Office form for registration of works
15 of visual arts, has a field, No. 6, for the copyright registrant to indicate that the
16 registered work is a derivative work or compilation.
17 https://www.copyright.gov/forms/formva.pdf  None of ALS's copyright
18 registration reflect that its works were derivatives or compilations.  Tr. Ex. 6.
19 To the contrary, ALS was authorized to, and did, register numerous separate
20 photo "works" on a single registration form.  CFR § 202.3(b)(3)(A).

21      **B.**    <u>**Fair Use (Joint Instr. 37)**</u>

22      This instruction has no potential application to the facts of the case, has
23 already been rejected and is intended to confuse the jury.  Fair use is a potential
24 defense to <u>direct infringement</u>.  As the Court has already ruled, there is no
25 potential theory under which placing copies of infringing ALS works on the
26 subject pirate sites, and causing copies of such works to be placed on
27 Cloudflare's caching servers by engaging Cloudflare, has any kind of public
28 interest which would render those uses fair uses.  The Court has also rejected

6
Plaintiff's Trial Brief

1  Cloudflare's theory that "infrastructure level caching" is a form of "fair use."
2  Doc. 188 pp.19-25.

### C. Implied License (Joint Instr. 38)

ALS's Terms say: "[Y]ou are authorized to view, play, print and download Content for personal, informational and noncommercial purposes only.  You may not modify any of the Content and you may not copy, distribute, transmit, display, perform, reproduce, publish, license, create derivative works from, transfer or sell any Content, information or work contained in this website."  Tr. Ex. 10.

Cloudflare's rationale for this instruction is that "[a]mple evidence shows that ALS advertised, facilitated, and expressly allowed its users to download its images. Evidence also shows that ALS knowingly tolerated the appearance of its images, which likely came from its customers, on other sites."  To the contrary, the evidence is that ALS offered its users a limited download right for personal consumption, for example, if a user wanted to download ALS content onto a phone or laptop for viewing pleasure.  However ALS users are specifically prohibited from any other use, including reproducing downloaded content and uploading those infringing copies onto a pirate site where they can be seen by the world for free.  Cloudflare has zero good faith evidence to put the issue of implied license to the jury.

### D. First Sale – 17 U.S.C. § 109(a) (Joint Instr. 39)

The first sale doctrine has nothing to do with the facts of this case.  This doctrine applies where a copyright owner offers a copy of its work for purchase and sale.  For example, if one purchased a Led Zeppelin album back when record stores existed, one could sell <u>that copy</u> to someone else without the consent of the copyright owner.  This does not mean the purchaser of the Led Zeppelin album could violate any other right of the copyright owner, such as

making reproduction of the record or selling tickets to a venue where the record would be played.

ALS granted its subscribers a limited license to download one or more images strictly for purposes of personal viewing convenience. There is no evidence that ALS sells its right, title and interest in copies of its works to subscribers. *17 U.S.C. § 109(a).* Plus, the "first sale" doctrine under Section 109(a) only enables the owner of a purchased copy to resell that copy without violating the copyright owner's distribution rights under 17 U.S.C. § 106(3). *17 U.S.C. § 109(a).* A "first sale" right to an ALS photograph would therefore not allow the buyer to make copies of that copy and upload the copy onto a pirate site for public display. Additionally, Cloudflare has not shown that the first sale doctrine is a defense to contributory infringement. Finally, Cloudlfare has significantly re-written the pattern instruction.

### E. First Sale – 17 U.S.C. §109(c) (Joint Instr. 40)

This instruction has no fair basis in the evidence. ALS granted its subscribers a limited license to download one or more images strictly for purposes of personal viewing convenience. There is no evidence that ALS sells its right, title and interest in copies of its works to subscribers. Plus, even if ALS had sold copies of its works to subscribers, the § 109(c) first sale right would only permit the owner of that copy to display the copy "no more than one image at a time, to viewers present at the place where the copy is located." 17 U.S.C. § 109(c). In other words, an ALS subscriber could show guests of a purchased ALS photo at a party at his home. Even if this first sale doctrine were available, this would not permit the owner of the copy to upload that copy to a site with no license or authority from ALS, where the copy could be seen by anyone in the world with an Internet connection.

### F. Acquiescence (Joint Instr. 41)

This instruction is based on the same nonsense that ALS somehow permitted its users to upload copies of ALS's works to pirate sites so the world could consume free infringing copies of ALS's works. ALS granted its subscribers a limited license to download one or more images strictly for purposes of personal viewing convenience. There is no evidence that ALS "acquiesced" in users uploading infringing copies of ALS works to pirate sites with no right or authority from ALS. There is no evidence that ALS knew who the direct infringers were or that ALS did anything to lead the direct infringers to believe that ALS was okay with uploading ALS content to sites where it could be viewed by the world for free.

### G. Confusing Multiple Instructions on Standards for Contributory Liability (Joint Instrs. 42-45)

The Ninth Circuit has published a pattern instruction on standards for contributory infringement. Ninth Circuit Manual of Model Jury Instr. 17.21. The Court should give that instruction.

Cloudflare rewrote the Ninth Circuit pattern instruction by making up a section on inducement liability, when the Court has already agreed that inducement is an alternative to material contribution. Instr. 42. Doc. 405 p.9 ["*Perfect 10, Inc. v. Visa Intern. Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007) ("*Visa*") (explaining that contributory infringement can be established through either material contribution or inducement)."]

Cloudflare then teases out wording variations among various Ninth Circuit decisions and offers yet further variations on the contributory infringement standards, all unauthorized re-writes of Instr. 17.21. Instrs. 43-44.

Finally, Cloudflare makes another attempt to interject the inapplicable "staple article of commerce" standard into the case. Instr. 45. These cases involve the "staple article of commerce" doctrine, whereby a plaintiff seeks to

impute knowledge of infringement to the defendant because of the capability of an article placed into the stream of commerce to be put to infringing uses. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) (whether VCR maker had knolwedge of infringement due to capabilities of machine to assist infringement). This has nothing to do with the facts of the case. Here, Steve Easton provided actual notice to Cloudflare of the nature and location of every infringing work at issue. The Court has already agreed with ALS that the staple article of commerce doctrine does not apply here. See Doc. 405. *BMG Rights Management (US) LLC v. Cox Communications*, No. 16-1972 (4th Cir. 2/1/18) (rejecting this instruction).

### H. Copyright Misuse (Joint Instr. 46)

"Copyright misuse" pertains to "use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright [Act]?" *Practice Management Information Corp. v. American Medical Association*, 121 F.3d 516, 520 (9th Cir. 1997). Here, ALS seeks nothing more than to enforce its copyright to its own works. This doctrine has nothing to do with the facts of this case.

### I. Limitation on Liability – 17 U.S.C. § 512(a) (Joint Instr. 47)

This defense does not apply as a matter of law. ALS moved for summary judgment on this defense, but the Court "punted." Doc. 405 p. 19 ("The Court would decline to consider every element of Plaintiff's motion with respect to the DMCA safe harbor provision at this time").

The DMCA, including new Section 512 of the Copyright Act, was passed in 1996, the Internet Stone Age. Content delivery networks did not exist. Service providers were being sued for contribution for doing nothing other than

laying down the fiber-optic cables – the "conduits"[1] – through which infringing works were transmitted from a server to a consumer. For example, if a consumer who obtained Internet connectivity from AOL downloaded infringing songs from Napster, AOL could be sued by the record companies solely because infringing works moved through its conduits.

Conduit service providers' systems don't do the same things as content delivery networks. Conduit service providers aren't creating reproductions of the infringing works, don't place copies of works on caching servers close to the consumers, don't employ algorithms to intelligently determine and select which copy from which location the requested work shall be delivered or employ technology to determine the fastest delivery route. In deposition, Cloudflare admitted that it does not provide Internet connectivity to users. Cloudflare also admitted that once Cloudflare's servers determine whether a requested work can be delivered from cache or will be proxied from the origin server, and once Cloudflare determines the delivery path, when the work exits the Cloudflare data center it will transit through the conduits of <u>other</u> service providers, say Level 3 or Cox. Doc. 324-1 ¶ 16.

---

[1] The Ninth Circuit has referred to Section 512(a) as the "conduit" safe harbor. *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1041-42 (9th Cir. 2013). See also *BMG Rights Mgmt. v. Cox*, 149 F.Supp.3d 634, 653 (E.D. Va. 2015).

1     This graphic depicts the proxy path:



§ 512(a)

If ALS had sued Level 3 or Cox because they provided the conduit through which infringing ALS works had traveled, <u>those</u> service providers would have Section 512(a) defenses. That was the theory in *BMG Rights Mgmt. v. Cox*, 149 F.Supp.3d 634 (E.D. Va. 2015). But that's not the theory against Cloudflare. Here, Cloudflare is being sued because its systems field all queries for its customers' content and intelligently searches for the most optimal point from which the requested work can be delivered, hopefully from a nearby Cloudflare caching server but if not then from the origin server. Cloudflare simply isn't a conduit service provider. Its systems did not exist in 1996 and its operations cannot be crammed within the narrow confines of Section 512(a).

    Additionally, Section 512(a) is not available to Cloudflare because it only applies to "dumb" conduits, those which passively transmit data from <u>two points specified by the user</u>. *17 U.S.C. § 512(k)(1)(A)*. Here, Cloudflare's intelligent systems determine the point from which delivery of a requested work will originate, either a copy in cache or the origin server. In this sense Cloudflare's system is closer to that employed by Fung, who did not operate a 512(a) service because his program intelligently selected the point from which a request for a work would be fulfilled. *Fung, supra*, 710 F.3d at 1041-42.

Finally, to qualify as a 512(a) service provider, Cloudflare must not modify content. *17 U.S.C. § 512(k)(1)(A)*. Cloudflare does modify content. Doc. 401 ¶ 18.

### J. Limitation on Liability – 17 U.S.C. § 512(b) (Joint Instr. 48)

The Section 512(b) safe harbor exists where a service provider caches content requested by one of its customers for later delivery to another customer of that service provider. A service provider may have a safe harbor against liability for caching material on its "system or network," *17 U.S.C. § 512(b)(1)*, where the material is made available online by a website operator, *17 U.S.C. § 512(b)(1)(A)*, requested by one consumer, *17 U.S.C. § 512(b)(1)(B)*, then automatically stored in cache for delivery to another user of that service provider's "system or network." *17 U.S.C. § 512(b)(1)(C)*.

In other words, a query for website material from a Google user can result in Google caching the requested information for later delivery to another Google user. *See* Perfect 10, Inc. v. *Amazon, Inc.,* 508 F.3d 1146, 1156 n.3 (9th Cir. 2007) (discussing computer and browser caching).

Section 512(b) doesn't describe a content delivery network, a service provider that didn't exist in 1998. Consumers aren't users of Cloudfare's system or network. Cloudflare doesn't create or publish a browser for consumers. Instead, website operators are users of Cloudflare's system or network. As Matthew Prince said, "If you haven't heard of us, I'm not surprised. We're part of the internet's infrastructure, one of the groups operating behind the scenes to bring you everything you enjoy online." ALS Sep. St., Doc. 324-1 ¶ 17.

Here, a query for material on a Cloudflare customer website from a user of another provider's browser, say Google, will result in Cloudflare storing a copy on its caching servers for later delivery to another user of another provider's system or network, not Cloudflare's system or network.

Additionally, Cloudflare is not entitled to Section 512(b) safe harbors because Cloudflare modifies content. *17 U.S.C. § 512(b)(2)(A)*. ALS Sep. St., Doc. 324-1 ¶ 18.

Cloudflare's remedy is to ask Congress to amend Section 512 to capture the activities of content delivery networks. However, until then, Cloudflare is not entitled to safe harbors.

DATED: April 24, 2018

SPILLANE LAW GROUP PLC
GALLAGHER & KENNEDY, P.A.

By: _____
Jay M. Spillane
Attorneys for Plaintiff ALS Scan, Inc.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this action. My business address is: 468 N. Camden Drive, Second Floor, Beverly Hills, CA 90210-4507. A true and correct copy of the foregoing document entitled (*specify*):
**PLAINTIFF'S TRIAL BRIEF**  will be served or was served **(a)** on the judge in chambers in the form and manner required by Local Rules and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and Local Rules, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) April 24, 2018, I checked the CM/ECF docket for this action and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

| | |
|---|---|
| Gary L. Bostwick– gbostwick@B1Law.com | Colin TJ O'Brien – tm@partridgepartnerspc.com |
| Kevin S. Toll – kevin@silversteinlegal.com | John L. Ambrogi – jla@partridgepartnerspc.com |
| Lawrence G. Walters – larry@firstamendment.com | Daniel L Rogna   daniel@partridgepartnerspc.com |
| Corey D. Silverstein – corey@silversteinlegal.com | Paul Supnick – paul@supnick.com |
| Rachel Kassabian – rachelkassabian@quinnemanuel.com | Raymond Katrinak – pkatrinak@kernanlaw.net |
| Carolyn M. Homer – carolynhomer@quinnemanuel.com | Ryan Carreon – rcarreon@kernanlaw.net |
| Mark Thomas Gray    markgray@quinnemanuel.com | Stephen M Kernan – kernanlaw@gmail.com |
| Armen Nercessian    anercessian@fenwick.com | John P Flynn    john.flynn@gknet.com |
| Jedediah Wakefield    jwakefield@fenwick.com | Kevin D Neal    kevin.neal@gknet.com |
| Sapna S Mehta    smehta@fenwick.com | |

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) April 24, 2018, I served the following persons and/or entities at the last known addresses in this case by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling Local Rule, on (*date*) April 24, 2018, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served by Overnight Mail or Attorney Service***
Hon. George H. Wu
U.S. District Court
350 W. 1st Street
Courtroom 9D
Los Angeles, CA 90012              ☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 4/24/2018 | Jessie Gietl | *Jessie Gietl* |
|---|---|---|
| Date | Printed Name | Signature |