ANDREW P. BRIDGES (CSB No. 122761)
abridges@fenwick.com
JEDEDIAH WAKEFIELD (CSB No. 178058)
jwakefield@fenwick.com
ARMEN NERCESSIAN (CSB No. 284906)
anercessian@fenwick.com
SAPNA MEHTA (CSB No. 288238)
smehta@fenwick.com
CRYSTAL NWANERI (CSB No. 318955)
cnwaneri@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:  415.875.2300
Facsimile:   415.281.1350

Attorneys for Defendant
CLOUDFLARE, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ALS SCAN, INC., | Case No.: 2:16-cv-05051-GW-AFM |
| Plaintiff, | **CLOUDFLARE, INC.'S RESPONSE TO ALS SCAN, INC.'S "TRIAL BRIEF"** |
| v. | |
| CLOUDFLARE, INC., et al., | Date:        May 1, 2018 |
| Defendants. | Time:        8:30 AM |
| | Judge:      Hon. George H. Wu |
| | Trial Date:  April 24, 2018 |

# TABLE OF CONTENTS

Page

I.  THE COURT SHOULD ENTIRELY DISREGARD ALS SCAN'S NONCONFORMING AND ILLEGITIMATE "TRIAL BRIEF." ................................................................. 1

II.  ALS SCAN'S EFFORT TO DEPRIVE THE JURY OF GUIDANCE ON STATUTORY DAMAGES, AND TO EXCLUDE RELEVANT EVIDENCE, RELIES ON FUNDAMENTAL MISTAKES. ........................................................ 2

III.  THE COURT SHOULD REJECT ALS SCAN'S CHALLENGES TO NUMEROUS APPROPRIATE AND CORRECT JURY INSTRUCTIONS. ................................................................... 6

A.  "Compilations" and "Derivative Works" Are Relevant to Statutory Damages, and Both Jury Instruction No. 36 and the Language Regarding Compilations and Derivative Works that Cloudflare Proposed in Instruction No. 52 Are Essential .................... 7

B.  Fair Use is Relevant in Two Different Ways, Justifying Cloudflare's Jury Instruction No. 37. ..................................................... 9

C.  Implied License is Relevant to ALS's Claims, and Therefore Cloudflare's Jury Instruction No. 38 Is Appropriate. ......................... 11

D.  To the Extent ALS Pursues "Distribution" and "Display" Claims, the Limitations of Section 109, and Therefore Cloudflare's Jury Instructions Nos. 39 and 40, Are Relevant. .......... 11

E.  Acquiescence Is a Live Issue in the Case, and Cloudflare's Instruction No. 41 Is Relevant. ..................................................... 13

F.  Cloudflare's Proposal of Several Alternative Contributory Infringement Standards in Instructions Nos. 42-45 Offers Several Different Options and Ranks Them in Order. ....................... 14

G.  The Jury Deserves to Consider Copyright Misuse and to Receive Instruction No. 46. ................................................................ 14

H.  Cloudflare's Services Fall Within the Section 512(a) Safe Harbor, and Instruction No. 47 Is Proper. ........................................... 15

I.  Cloudflare's Services Fall Within the Section 512(b) Safe Harbor, and Instruction No. 48 Is Proper. ........................................... 20

FENWICK & WEST LLP
ATTORNEYS AT LAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Agence France Presse v. Morel*,
   111 U.S.P.Q. 2d (BNA) 2017 (S.D.N.Y. Aug. 13, 2014) ...................................3

*BMG Rights Management (US) LLC v. Cox Commc'ns, Inc.*,
   No. 1:14-cv-1611 (E.D. Va. 2015) ...........................................................................2

*Bryant v. Media Right Prods. Inc.*,
   603 F.3d 135 (2nd Cir. 2010) ..............................................................................3, 8

*Capitol Records, Inc., v. MP3TUNES, LLC*,
   28 F. Supp. 3d 190 (S.D.N.Y. 2014) .......................................................................8

*Cartoon Network, LP, LLLP v. CSC Holdings, Inc.*,
   536 F.3d 121 (2d Cir. 2008) ..................................................................................13

*Davis v. Tampa Bay Arena, Ltd.*,
   No. 8:12-CV-60-T-30MAP, 2013 WL 3285278
   (M.D. Fla. June 27, 2013) ........................................................................................11

*Dream Games of Arizona, Inc. v. PC Onsite*,
   561 F.3d 983 (9th Cir. 2009) ....................................................................................5

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ................................................................................19

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*,
   344 U.S. 228 (1952) .....................................................................................................5

*Feltner v. Columbia Pictures Television, Inc.*,
   523 U.S. 340 (1998) ...............................................................................................2, 4

*Fitzgerald Pub. Co. v. Baylor Pub. Co.*,
   807 F.2d 1110 (2d Circ. 1986) ........................................................................2, 3, 5

*Jenkins v. Union Pac. R. Co.*,
   22 F.3d 206 (9th Cir. 1994) ....................................................................................13

*Lenz v. Universal Music Corp.*,
   815 F.3d 1145 (9th Cir. 2015) ..................................................................................9

*Louis Vuitton Malletier SA v. Akanoc Solutions, Inc.*,
   658 F.3d 936 (9th Cir. 2011) ..................................................................................10

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ................................................................. 14

*New Form, Inc. v. Tekila Films, Inc.*,
  357 Fed. Appx. 10 (9th Cir. 2009) ........................................... 6

*Peer Int'l Corp. v. Pausa Records, Inc.*
  909 F.2d 1332 (9th Cir. 1990) ................................................. 5

*Perfect 10, Inc., v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ................................. 10, 14, 21

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) ................................................. 14

*Perfect 10, Inc. v. Visa Intern'l Serv. Assn.*,
  494 F.3d 788 ........................................................................... 10

*Shive v. J&C Baseball Clubhouse, Inc.*,
  No. CIV 15-0406 ..................................................................... 4

*Sony BMG Music Ent. v. Tenenbaum*,
  719 F.3d 67 (1st Cir. 2013) ......................................... 3, 5, 10

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ........................................................... 9, 10

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
  718 F.3d 1006 (9th Cir 2013) ................................................ 19

*Viacom Intern., Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012) .................................................... 19

*Xoom, Inc. v. Imageline, Inc.*,
  323 F.3d 279 (4th Cir. 2003) ................................................... 8

**STATUTES AND RULES**

17 U.S.C. 512(a)(5) ................................................................... 18

17 U.S.C. § 101 ................................................................... 7, 12

17 U.S.C. § 106(3) .................................................................... 12

17 U.S.C. § 106(5) .................................................................... 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

17 U.S.C. § 109 ...................................................................................... 11, 12

17 U.S.C. § 512(a) ....................................................................................... *passim*

17 U.S.C. § 512(a)(1)-(3) ................................................................................ 16

17 U.S.C. § 512(a)(4) ...................................................................................... 16

17 U.S.C. § 512(a)(5) ...................................................................................... 16

17 U.S.C. § 512(b) ............................................................................... 16, 19, 20, 21

17 U.S.C. § 512(b)(1) ...................................................................................... 20

17 U.S.C. § 512(b)(2)(A) .................................................................................. 20

17 U.S.C. § 512(b)(2)(B) .................................................................................. 20

17 U.S.C. § 512(b)(2)(C) .................................................................................. 21

17 U.S.C. § 512(b)(2)(D) .................................................................................. 21

17 U.S.C. § 512(k)(1)(A) .................................................................................. 15

Copyright Act Section 504(c), 17 U.S.C. § 504(c) .................................................. 7

DMCA .............................................................................................................. 14

Local Rule 16-10 ............................................................................................... 1

**OTHER AUTHORITIES**

Copyright Office Circular 14, "Copyright in Compilations and
    Derivative Works," (available at
    https://www.copyright.gov/circs/circ14.pdf ) .................................................. 8, 9

## I.   THE COURT SHOULD ENTIRELY DISREGARD ALS SCAN'S NONCONFORMING AND ILLEGITIMATE "TRIAL BRIEF."

ALS's "trial brief" is a last-ditch and illegitimate attempt to rehash numerous arguments it has made before, this time citing old authorities that it claims it "newly discovered," to continue its arguments on jury instructions, and to press what is essentially an untimely *Daubert* motion on Cloudflare's expert Jeffrey Kinrich.

Local Rule 16-10 provides for optional trial briefs as follows:

Unless the Court otherwise orders, at least seven (7) days before trial is scheduled to commence, each party may serve and file a trial brief which may:

(a) Update the Memorandum of Contentions of Fact and Law by citing newly decided cases;

(b) Brief such issues as directed by the Court; and

(c) Reply to the Memorandum of Contentions of Fact and Law of any other party.

ALS Scan's Memorandum of Contentions of Fact and Law contained *one* citation to case law. *See* Dkt 413 (filed March 22, 2018).  That is no excuse for a last-minute trial brief to do the job the memorandum was supposed to do, with *zero* "newly decided cases."

The Court did not direct the parties to brief any issues that ALS Scan's "trial brief" raises.  Nor does ALS Scan's "trial brief" devote any attention to replying to Cloudflare's detailed and clear Memorandum of Contentions of Fact and Law.

Ignoring all the standards of a trial brief under the Local Rule, ALS Scan instead continues its cavalier, "cowboy," approach to its obligations and Court rules in this case.  It uses the document as a vehicle for supplemental briefing on motions in limine and for extended argument on more than the three jury instructions that the Court directed both parties to address.  For that reason, the Court should entirely disregard ALS Scan's filing.

FENWICK & WEST LLP
ATTORNEYS AT LAW

## II.   ALS SCAN'S EFFORT TO DEPRIVE THE JURY OF GUIDANCE ON STATUTORY DAMAGES, AND TO EXCLUDE RELEVANT EVIDENCE, RELIES ON FUNDAMENTAL MISTAKES.

ALS dismisses the authorities that Cloudflare previously presented about the survival of non-exhaustive statutory damages factors under *Fitzgerald Pub. Co. v. Baylor Pub. Co.,* 807 F.2d 1110 (2d Circ. 1986), after the Supreme Court's decision in *Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340 (1998).  While *Feltner* made clear that there was a right to a jury trial on statutory damages, it did not change years of guidance that courts have developed for the trier of fact on statutory damages.

ALS wrongly stated that the *Fitzgerald* factors have applied only in default contexts, and it claimed that Cloudflare had not shown instances where the factors were given to a jury to inform their deliberations on statutory damages.  But ALS concedes (at p. 4) that the Eastern District of Virginia instructed the jury on many *Fitzgerald* factors in *BMG Rights Management (US) LLC v. Cox Commc'ns, Inc.,* no. 1:14-cv-1611, Trial Transcript at 2149-2150 (E.D. Va. 2015).[1]

_____

[1] In *BMG,* the court instructed the jury as follows:  "You should award as statutory damages an amount that you find to be fair under the circumstances. In determining the appropriate amount to award, you may consider the following factors: The profits that Cox earned because of the infringement; the expenses Cox saved because of the infringement; the revenues that BMG lost because of the infringement; the difficulty of proving BMG's damages; the circumstances of the infringement; whether Cox acted willfully or intentionally in contributorily or vicariously infringing BMG's copyrights; deterrence of future infringement; and the amount of harm, in the form of monetary loss, that BMG could reasonably have avoided but for the failure to mitigate damages, if you find that BMG did fail to mitigate.  You should award statutory damages whether or not there is evidence of the actual damage suffered by BMG, and your statutory damage award need not be based on the actual damages suffered by BMG."  *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW

1    Cloudflare now identifies more examples.  The First Circuit discussed and

2    approved the district court's jury instructions in *Sony BMG Music Ent. v.*

3    *Tenenbaum,* 719 F.3d 67 (1st Cir. 2013).  The First Circuit stated:

4            The court also gave the jury a set of non-exhaustive factors that
5            it might wish to consider in issuing its award, including the
             nature of the infringement; the defendant's purpose and intent;
6            the profit that the defendant reaped, if any, or the expense that
7            the defendant saved; the revenue lost by the plaintiff as a result
             of the infringement; the value of the copyright; the duration of
8            the infringement; the defendant's continuation of infringement
9            after notice or knowledge of copyright claims; and the need to
             deter this defendant and other potential infringers.
10

11   *Id.,* 719 F.3d at 69.  The Southern District of New York in *Agence France Presse v.*

12   *Morel,* 111 U.S.P.Q. 2d (BNA) 2017 (S.D.N.Y. Aug. 13, 2014), upheld a statutory

13   damages award noting that it had instructed the jury consistently with the First

14   Circuit's decision in *Tenenbaum.  Agence France Presse,* 111 U.S.P.Q 2d 2017, at

15   *12 n.6.  The district court had given the jury "*Bryant*" factors that it considered

16   similar to the *Fitzgerald* factors.  *Id.*

17       In *Psihoyos v. John Wiley & Sons, Inc.*, the Second Circuit stated (in the

18   context of the district court's review of the jury's damages award) that "[a]lthough

19   revenue lost is one factor to consider, we have not held that there must be a direct

20   correlation between statutory damages and actual damages."  748 F.3d 120, 127 (2d

21   Cir. 2014).  The jury instruction was not in the opinion because the Court of

22   Appeals found complaints about jury instructions waived (see n.9).  Appendix A to

23   this brief is a copy of the instructions from the joint appendix in that appeal.  The

24   court instructed "[w]ithin certain broad limits, the amount of statutory damages you

25   may award on each infringed photograph rests in your discretion. However, in

26   exercising that discretion, here are some factors you should consider. . . ."  It then

27   listed nine factors: "(1) the defendant's state of mind (in particular whether the

28   defendant's conduct was willful, merely negligent, or innocent); (2) the expenses

saved, and profits earned, by the defendant; (3) whether defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; (4) whether the defendant continued the infringing activity after notice or knowledge of the infringement or in reckless disregard of the infringement (5) the revenue lost by the plaintiff; (6) the value of the copyright; (7) the deterrent effect on the defendant and third parties; (8) the conduct and attitude of the parties; and (9) any other factor that you deem relevant, provided it is firmly based on the actual evidence in this case, and not on speculation or sympathy or any other extrinsic factor." Appendix A (Joint Appendix at 2116-2117).

Earlier this month a district court held a jury trial on damages after entry of default. The plaintiff elected statutory damages and the district court instructed the jury it could consider "(1) the infringer's state of mind; (2) the expenses saved, and profits earned by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties." *Shive v. J&C Baseball Clubhouse, Inc.*, No. CIV 15-0406 JB/JHR, 2018 WL 1801278, at *2 (D.N.M. Mar. 5, 2018) (citing *Bryant v. Media Right Prods. Inc.*, 603 F.3d 135, 144 (2nd Cir. 2010)), report and recommendation adopted, No. CV 15-0406 JB/JHR, 2018 WL 1801909 (D.N.M. Apr. 12, 2018).

Given numerous instances of juries receiving instructions like the instruction Cloudflare offers, ALS's suggestion that there were no such instances is characteristic of its cavalier attitude toward the law.

Moreover, ALS Scan's argument that *Feltner* eliminated the need for guidance to a trier of fact, simply because the trier of fact is a jury and not a district judge, is silly. Courts have consistently referred to non-controlling guidance in the assessment of statutory damages, and it is useful for the jury to hear various factors that they may consider. The Ninth Circuit has expressly referred to guidance for a

FENWICK & WEST LLP
ATTORNEYS AT LAW

1  jury:  "The jury is guided by 'what is just in the particular case, considering the

2  nature of the copyright, the circumstances of the infringement and the like . . . .'"

3  *Dream Games of Arizona, Inc. v. PC Onsite,* 561 F.3d 983, 993 (9th Cir. 2009)

4  (internal quotations omitted) (citing *Peer Int'l Corp. v. Pausa Records, Inc*. 909

5  F.2d 1332, 1336 (9th Cir. 1990), in turn quoting *F.W. Woolworth Co. v.*

6  *Contemporary Arts, Inc.*, 344 U.S. 228, 232 (1952)).

7       It would be improper for the Court to deprive the jury of appropriate

8  guidance on statutory damages and to exclude testimony by Cloudflare's expert to

9  illuminate some of the relevant topics of consideration.  The Court should deny

10  ALS's effort to do so here.

11       ALS Scan also gallops into a wild discussion of the relevance of lost

12  licensing fees and royalty revenues by claiming that the "only factor relating to the

13  plaintiff and revenues" pertains to a plaintiff's *lost revenues*, not the revenues a

14  plaintiff has actually received.  ALS then seems to chide Mr. Kinrich and

15  Cloudflare for not addressing lost licensing fees or royalty rates—but ALS then

16  admits that it doesn't charge for any licenses it gives to others and thus that it hasn't

17  lost any licensing fees or royalties.  ALS has also suggested that Cloudflare is to

18  blame for its declining revenues.  In that context, ALS's revenues are relevant: the

19  constant downward trend in those revenues, beginning long before Cloudflare

20  existed, without any effect by Cloudflare, is revealing.  ALS evidently wants to

21  avoid the question of "revenues lost" because the lack of lost revenues may weigh

22  in favor of a small statutory damages award.  That does not mean that the

23  consideration of how much revenues a plaintiff lost and evidence suggesting no lost

24  revenues are irrelevant to the jury's consideration.

25       Finally, ALS wants to keep the jury from hearing about the paltry value of

26  ALS Scan's copyrights.  But the value of the copyrights is a legitimate

27  consideration for the jury.  *See Sony*, 660 F.3d at 490; *Fitzgerald,* 807 F.2d at 1117.

28  ALS clings to an unpublished Ninth Circuit opinion as a counterweight to those

FENWICK & WEST LLP
ATTORNEYS AT LAW

1   reasoned decisions, and it misdescribes the unpublished opinion to boot.  That

2   opinion addressed an argument by a defendant that the district court's failure to

3   give an instruction that *directed* a jury to assess damages by measuring the market

4   value of a work.  *New Form, Inc. v. Tekila Films, Inc.*, 357 Fed. Appx. 10, 11 (9th

5   Cir. 2009).  As the panel explained, "Tekila Films's excessive-verdict claim turns

6   on the incorrect premise that statutory damages *must* be tethered to actual

7   damages." *Id.* at 12 (emphasis added).  "There is no *required* nexus between actual

8   and statutory damages. . . .  Accordingly, the district court did not err in refusing

9   Tekila Films's proposed instruction, which itself would have been a misstatement

10  of the law." *Id.* at 11-12 (emphasis added).

11      Here, in contrast, Cloudflare seeks an instruction that does not *require* the

12  jury to tether a statutory damages award to actual damages.  Rather, its proposed

13  jury instruction simply tracks well established precedent that plaintiff's lost

14  revenue, among other factors, is relevant.

15      The jury has wide discretion but deserves guidance on considerations that

16  numerous courts have identified as relevant to triers of fact, whether judges or

17  juries.  The Court should give jury instruction no. 55, and it should not restrict Mr.

18  Kinrich's expert testimony on the relevant considerations.

19  ## III.   THE COURT SHOULD REJECT ALS SCAN'S CHALLENGES TO

20  ## NUMEROUS APPROPRIATE AND CORRECT JURY

21  ## INSTRUCTIONS.

22      Pages 4-14 of ALS's "trial brief" are a bold maneuver to escape the

23  limitations that the Court imposed on the parties when it directed them to address

24  only three jury instructions each in a joint filing.[2]  Nevertheless, Cloudflare will

25  address each of ALS's arguments below.

26  _____

27  [2] The joint filing became impossible when ALS Scan unilaterally blew off the joint

28  effort.  The Court may note that a number of earlier filings in the case were late, and there have been earlier unilateral filings.  Those resulted from repeated refusals

FENWICK & WEST LLP
ATTORNEYS AT LAW

A.   **"Compilations" and "Derivative Works" Are Relevant to Statutory Damages, and Both Jury Instruction No. 36 and the Language Regarding Compilations and Derivative Works that Cloudflare Proposed in Instruction No. 52 Are Essential.**

ALS Scan seeks a big payday by claiming that "compilations" and "derivative works" are irrelevant.  That allows it to seek billions of dollars by multiplying its claim of tens of thousands of "works" up to $150,000 per work.  But the Copyright Act does not allow it to do so.  Section 504(c) of the Copyright Act, 17 U.S.C. § 504(c), sets a range for "an award of statutory damages for all infringements involved in the action, with respect to any one work.…"  It then provides:  "For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work."  *Id.*

This case emphatically concerns compilations and collective works. ALS has consistently referred to its "library," its "photosets," its "galleries," and its "websites." Each of those is a compilation: it consists of a collection of individual photographs into a group.  Moreover, the evidence shows that ALS regularly added "updates" consisting of new galleries to its website. Those updates consisted of groups of individual photographs. ALS selected, combined, and assembled those photographs into "galleries," which it adorned with "cover pages" just like magazines. Moreover, by selecting, assembling, and adding updates to preexisting versions of the ALS websites, ALS caused each of its two websites to be a compilation of compilations and at the same time a series of updated compilations (each of which was a derivative work of its predecessors within the meaning of 17 U.S.C. § 101 (definition of "derivative work")).

ALS did not help itself by trying to argue otherwise.  It stated, at 6:  "ALS did not assemble pre-existing works into new compilations.  Rather, it created

of ALS's counsel to respect deadlines or requirements calling for joint efforts.

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

multiple new works in one shoot, then released the individual works derived from the shoot at the same time." By ALS's own terms, one "shoot" was a either a combination of multiple works onto a recording medium or the unfolding of a single work with multiple components (much as a single motion picture consists of many individual still image frames). That is a classic "compilation" *and* derivative work of all the individual component works. ALS's situation is similar to that of a record producer creating an album. The Second Circuit recognized that albums of musical recordings constituted compilations of the underlying sound recordings, and it affirmed a statutory damages award that treated them all as one work. *See Bryant v. Media Right Prod'ns, Inc.*, 603 F.3d 135, 140-143 (2d Cir. 2010); *see also Capitol Records, Inc., v. MP3TUNES, LLC*, 28 F. Supp. 3d 190, 191-92 (S.D.N.Y. 2014). The fact that ALS may not have registered its works as compilations makes no difference. *See Bryant*, 603 F.3d at 140 and n.4 (individual songs separately copyrighted, yet only one award per album). "Although parts of a compilation or derivative work may be 'regarded as independent works for other purposes[,]' for purposes of statutory damages, they constitute one work. *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003) (quoting H.R.Rep. No. 94-1476, at 162 (1976)).

Moreover, when ALS "released the individual works," that entailed adding them (in groups it called "updates") to ALS's two websites. Those websites consisted of selections and arrangements of those individual works, and they also derived from the various updates and the individual images that were components of those updates. At the end of the day, all of the images at issue in this case were parts of two websites: alsscan.com and alsangels.com. The Copyright Office specifically identifies "a revision of a website" as a typical derivative work. *See* Copyright Office Circular 14, "Copyright in Compilations and Derivative Works," at 1 (available at https://www.copyright.gov/circs/circ14.pdf). The same circular identifies "a website containing text, photos, and graphics" as a typical compilation.

1   *Id.* All the images at issue in this case are parts of alsscan.com or alsangels.com,

2   and thus there are at most—for statutory damages purposes—two "works." The

3   jury must understand the law of statutory damages with respect to compilations and

4   derivative works.

### B.   Fair Use is Relevant in Two Different Ways, Justifying Cloudflare's Jury Instruction No. 37.

7   ALS concedes (at 6) that fair use is relevant to direct infringement.  That

8   makes it relevant to this case because ALS must prove underlying direct

9   infringements by others in order to establish contributory infringement by

10  Cloudflare.

11  While fair use *by a defendant* is a defense that the defendant must establish,

12  fair use *by a non-party* is different.  The landmark case by the Supreme Court on

13  both fair use and contributory infringement, *Sony Corp. of Am. v. Universal City*

14  *Studios, Inc.,* 464 U.S. 417 (1984), had to consider whether Sony's customers

15  engaged in fair use or infringing activities by their use of Sony's Betamax tape

16  recorder to record broadcasts.   In analyzing the fair use factors, the Court ruled that

17  "respondents [the plaintiffs] failed to carry their burden with regard to home time-

18  shifting." *Id.,* 464 U.S. at 451.  The Ninth Circuit also recognized, in the

19  notification context (very much at issue here), that a copyright owner must address

20  fair use in sending notifications of claimed infringement:  "We hold that the statute

21  requires copyright holders to consider fair use before sending a takedown

22  notification." *Lenz v. Universal Music Corp.,* 815 F.3d 1145, 1148 (9th Cir. 2015).

23  That reflects the reality that, while a person may have an obligation to defend his or

24  her own uses as fair, when a copyright holder accuses third parties of infringement,

25  the copyright holder must deal with the question and not fob it off on the person

26  receiving the accusation about someone else.  Here, that means that ALS must

27  address the questions of fair use by non-parties.  There are substantial reasons why

28  a jury may find that any reproductions that others caused in Cloudflare's cache are

Fenwick & West LLP
Attorneys at Law

fair use:  they exist for the sole purpose of efficient Internet communications; they are transient technological measures, thus with a transformative use; they "use" no more of any works than is necessary to carry out their technological function; and they do not do not affect the market value of the original works.  In *Amazon.com* Google's reproductions and displays from caches were fair use, even where they came from infringing sources.  *See Perfect 10, Inc., v. Amazon.com, Inc.,* 508 F.3d 1146, 1163-68 (9th Cir. 2007).

The fair use doctrine may also apply to Cloudflare's defense of the contributory infringement claim.  The Supreme Court in *Sony* approved the trial court's statement that "the lines between direct infringement, contributory infringement and vicarious liability are not clearly drawn . . . ," adding that "reasoned analysis of respondents' unprecedented contributory infringement claim necessarily entails consideration of arguments and case law which may also be forwarded under the other labels."  *Sony*, 464 U.S. at 435 n.17 (citing 480 F. Supp., at 457-458).  With vague boundaries among the different theories, there is no reason to confine application of the fair use doctrine rigidly.

The majority of the panel in *Visa* twice criticized Judge Kozinski's proposal in dissent of an "essential step" standard as blurring the distinction between direct infringement and contributory infringement.  *See Perfect 10, Inc. v. Visa Intern'l Serv. Assn.,* 494 F.3d 788, 797 n.6, 800 n.11 (9th Cir. 2007).  As Cloudflare has previously explained, the decision in *Louis Vuitton* both quoted and rested upon that dissent.  *See Louis Vuitton Malletier SA v. Akanoc Solutions, Inc.,* 658 F.3d 936, 944 (9th Cir. 2011)(quoting *Visa,* 494 F.3d at 812 (Kozinski, J., dissenting)).  Thus, because ALS Scan, invoking *Louis Vuitton,* seeks to blur the line between direct and contributory copyright infringement, the fair use doctrine is relevant to the contributory infringement claim here.

Fenwick & West LLP
Attorneys at Law

FENWICK & WEST LLP
ATTORNEYS AT LAW

C.  **Implied License is Relevant to ALS's Claims, and Therefore Cloudflare's Jury Instruction No. 38 Is Appropriate.**

There is sufficient evidence of ALS's conduct giving rise to an implied license to instruct the jury on the issue.  ALS points only to its terms of service.  The evidence shows, however, that ALS knew its users were using the unlimited download functionality that ALS offered and then uploading content to free websites.  *See e.g.*, Dkt. 12 ¶ 47.  Courts have found comparable conduct sufficient to establish implied license.  *See Davis v. Tampa Bay Arena, Ltd.*, No. 8:12-CV-60-T-30MAP, 2013 WL 3285278, at *9 (M.D. Fla. June 27, 2013) (finding the record "clear" despite "the conditions [plaintiff] may have placed on the [defendant's] use of his images on its Facebook page, [plaintiff] did not withdraw his permission to allow the [defendant] to use his images on Facebook even after [plaintiff] was placed on notice numerous times during the parties' relationship that the [defendant] was not complying with the conditions").  Moreover, ALS does not impose the terms it invokes for viewing its free hosted galleries, which may be the source of infringements here.  (TX1133).  And ALS has uploaded its images to free third party websites, where its terms do not apply.  *See, e.g.*, Dkt. 106 ¶ 16; Dkt. 300 ¶ 29.

D.  **To the Extent ALS Pursues "Distribution" and "Display" Claims, the Limitations of Section 109, and Therefore Cloudflare's Jury Instructions Nos. 39 and 40, Are Relevant.**

ALS misunderstands the point of the Section 109 limitations on the distribution and display rights: they allow the lawful owner of "copies" of works to distribute them, or to display them in certain conditions, free of any control by the copyright owner.  Those activities are not infringements.  ALS must show that any persons engaging in distribution or display violate its rights notwithstanding the statutory limitations on those rights.

The rights of an owner of a "copy" under section 109 do not depend on having purchased the copy.  Despite the name "first sale doctrine," the rights depend solely on owning a lawful copy, which may include copies acquired by means other than sale.  See 17 U.S.C. § 109.  Here, they may include copies that *ALS authorized* with its customer download option.

Any violation of the distribution or display rights in this case must involve copies and not mere intangible transmissions.  Specifically, to violate the "distribution" right under 17 U.S.C. § 106(3), one must "distribute copies of a copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."  Section 101 of the Copyright Act, 17 U.S.C. § 101, defines "copies" as material objects.  Cloudflare's activities do not involve distributions of material objects.  ALS appears to argue otherwise.  To the extent the distribution right is a live issue in this case, so is the section 109(a) limitation on that right, and ALS must prove that violations of that right have occurred notwithstanding the limitation.

To violate the public display right, one must "display the copyrighted work publicly."  17 U.S.C. § 106(5).  "To 'display' a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially."  17 U.S.C. § 101 (definition).  "To perform or display a work 'publicly' means (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times."  Id. (definition).

FENWICK & WEST LLP
ATTORNEYS AT LAW

1    A public display by transmission, like a public performance by transmission,

2  requires transmission to multiple persons from a single "copy."  The Second Circuit

3  made that explicit with respect to public performances in *Cartoon Network, LP,*

4  *LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 134-40 (2d Cir. 2008).  To begin with,

5  Cloudflare believes that ALS Scan has no proof of any actual public displays.  If

6  there are any public displays, however, ALS Scan must prove that they fall outside

7  the limitations of Section 109(c).  As plaintiff with the burden of proof to establish

8  the scope of its rights, ALS will need to marshal and present admissible evidence

9  about the circumstances of any alleged displays.

10    If ALS abandons its "distribution" and "display" claims, these jury

11  instructions would no longer be necessary.

12   **E.    Acquiescence Is a Live Issue in the Case, and Cloudflare's**

13   **Instruction No. 41 Is Relevant.**

14    ALS recycles the same argument it included in the parties' proposed Joint

15  Jury Instructions (Dkt. 460).  It overlooks the unfavorable evidence against it in an

16  attempt to usurp the jury's role.  In reality, its *own testimony and evidence* show

17  that ALS advertised and permitted its users to download all of its images from its

18  websites (*e.g.*, Dkt. 349-3 ¶¶ 2c, 2d), and that it knew some members promptly

19  uploaded its content to other websites (*e.g.*, Dkt. 12 ¶ 47 ("I believe users are

20  subscribing to ALS . . . then uploading that content without authority to

21  imgchili.net"); Dkt. 328 ¶ 4 ("within hours after ALS posts a new content gallery

22  on its secure webpages a stolen copy of the entire gallery is displayed for free on a

23  pirate site . . . .")).

24    Moreover, ALS expressly accepted and tolerated the presence of its images

25  on unauthorized websites, calling it "free advertising."  (*e.g.*, TX734, TX800).

26  Notably, it itself has uploaded images to accused websites.  (*e.g.*, Dkt. 106 ¶ 16).

27  This ample evidence is more than sufficient to instruct the jury and allow it to

28  consider the defense.  *See Jenkins v. Union Pac. R. Co.*, 22 F.3d 206, 210 (9th Cir.

FENWICK & WEST LLP
ATTORNEYS AT LAW

1994), as amended (July 7, 1994) ("A party is entitled to an instruction concerning his or her theory of the case if it is supported by law and has some foundation in the evidence.").

### F. Cloudflare's Proposal of Several Alternative Contributory Infringement Standards in Instructions Nos. 42-45 Offers Several Different Options and Ranks Them in Order.

Cloudflare maintains that the standard following *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 934-35 (2005), controls, and it thus asks the Court to instruct the jury with Cloudflare's proposed instructions no. 42 (elements and burden of proof) and no. 45 (product or service capable of substantial non-infringing use). *See* Joint Jury Instructions (Dkt. 460). Cloudflare anticipated, however, that the Court will not give that instruction under *Grokster* because of its focus on the "material contribution" standard and ALS's disavowal of any "inducement" claim. Accordingly, Cloudflare offered its instruction no. 43 as an "alternative" proposal, without waiving its primary request for instructions nos. 42 and 45. Cloudflare's proposed instruction no. 43 articulates the law under *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007), and *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 67 (9th Cir. 2017). Cloudflare offered another alternative, instruction no. 44, in the event that the Court rejects *both* its position that instruction nos. 42 and 45 control, and its alternative request for instruction no. 43. Cloudflare presents these multiple instructions out of an abundance of caution and to avoid any suggestion of waiver.

### G. The Jury Deserves to Consider Copyright Misuse and to Receive Instruction No. 46.

ALS has unclean hands and misuses its copyrights by making threats and demands to coerce Cloudflare into removing cybersecurity services from websites, even when ALS knew that those websites respected and acted on DMCA take-down notifications. ALS claims that the websites were "pirate sites" dedicated to

FENWICK & WEST LLP
ATTORNEYS AT LAW

infringement, but – as with its claims against ImageBam – ALS has no evidence of what percentage of materials on accused websites was legitimate and lawful.  *See* Dkt. 443 at 15, n. 14 (While Plaintiff asserted that imagebam.com's website "engaged in rampant infringement of adult content (see DSGD, Docket No. 396 at ¶ 7), there is no evidence as to the percentage of the content on the site that was, in fact, violative of any person's copyrights.").  ALS also admits that it faces competition from free lawful pornography. This includes amateur adult materials that users can upload to free websites and monetize through advertising.  And ALS also placed its own materials on websites that it has accused of infringement in this lawsuit.  Thus, the evidence shows that ALS misuses its copyrights by planting its own materials on sites that it accuses of infringement, and using copyright claims to cripple websites with whom it did not want to compete, by stripping those websites of security protection from unlawful cyberattacks.

In this context, ALS seeks to use the statutory monopoly of copyright far beyond its proper bounds, namely to control Cloudflare's automated technology and to stifle lawful activities on the sites of Cloudflare's customers.

### H.    Cloudflare's Services Fall Within the Section 512(a) Safe Harbor, and Instruction No. 47 Is Proper.

Section 512(a) provides a safe harbor for a "service provider" that "offer[s] the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k)(1)(A) (definition of "service provider" for purpose of section 512(a)). Cloudflare meets that definition. The exact service that Cloudflare markets and delivers to its users is a network that transmits and routes Internet communications at the user's direction without modifying the content. Dkt. 381

("Guinn Opp. Decl.") ¶¶ 10-11, 16; Dkt. 383("Paine Opp. Decl.") ¶ 2; Dkt. 382
("Sullivan Opp. Decl.") ¶¶ 3, 5, 7.[3]

Although ALS did not discuss most of the specific qualifications of that safe
harbor, the evidence shows that Cloudflare meets them, and the jury should receive
an appropriate instruction.  It acts upon transmissions at the direction of others; it
transmits, routes, provides connections for, and makes only intermediate and
transient storage of material by automated means without selecting the material;
and it does not select recipients of the material except by automated responses to
their requests.  Guinn Opp. Decl. ¶¶ 9-11, 15-16; Sullivan Opp. Decl. ¶¶ 3-4; *cf.* 17
U.S.C. § 512(a)(1)-(3).  In its "conduit" role under section 512(a), as opposed to its
"cache" role under section 512(b), Cloudflare does not maintain copies of material
accessible to anyone other than those who requested the material, and it does not
maintain copies for longer than reasonably necessary for the conduit role. Guinn
Opp. Decl. ¶ 15; *cf.* 17 U.S.C. § 512(a)(4). As Cloudflare explained above, it
transmits material through its system or network without modification of its
content. Guinn Opp. Decl. ¶¶ 9-11, 16; Sullivan Opp. Decl. ¶¶ 3, 7; *cf.* 17 U.S.C.
§ 512(a)(5).

ALS's arguments against Cloudflare's section 512(a) safe harbor rest on no
law or evidence. *First*, ALS ignores evidence that Cloudflare's systems literally
transmit material of users' choosing: it transmits material that its customers
(website operators) choose to pass through Cloudflare's system from their websites.
Guinn Opp. Decl. ¶¶ 15-16; Paine Opp. Decl. ¶ 2; Sullivan Opp. Decl. ¶¶ 3, 7.  The
fact that some of the data may at some point pass over *other* systems or networks
that others operate before reaching Cloudflare for transmission is irrelevant: the

---

[3] Because ALS's arguments on this issue are a rehash of its arguments on its motion
for partial summary judgment, the citations in this section are to documents that
Cloudflare filed in opposition to that motion (Guinn Opp. Decl. is Dkt. 381;
Sullivan Opp. Decl. is Dkt. 382; and Paine Opp. Decl. is Dkt. 383).

FENWICK & WEST LLP
ATTORNEYS AT LAW

section 512(a) safe harbor does not apply only when one service provider controls all links in the transmission process.  In the context of the Internet—a network of networks—that would be an absurd requirement, and it finds no support in the statute or case law.  *See* Guinn Opp. Decl. ¶¶ 3, 5, 9; Paine Opp. Decl. ¶¶ 2, 4; Sullivan Opp. Decl. ¶ 3.

*Second*, ALS sidesteps the fact that Cloudflare offers *routing* of transmissions through its system; that is the essence of Cloudflare's services. *See* Guinn Opp. Decl. ¶¶ 9-11; Paine Opp. Decl. ¶ 2; Sullivan Opp. Decl. ¶¶ 3, 7. To begin with, ALS misstates the law, which applies to "transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing." Cloudflare's customers authorize Cloudflare to obtain communications from their websites, to transmit those communications through Cloudflare's system, and to transmit them on to persons who have sought the materials.[4] Guinn Opp. Decl. ¶¶ 9-11, 15. That "points of presence" (PoPs) may participate in the routing or transmissions in the Internet's dynamic environment does not alter that fact, and it would be absurd to construe the statutory language of the safe harbors for online services in a way that ignores fundamental characteristics of the Internet. Guinn Opp. Decl. ¶¶ 3, 5, 9-12; Sullivan Opp. Decl. ¶¶ 3, 8.  Indeed, inherent in Section 512's references to material transmitted across a "system or network" (groups or set of interconnected things) is a recognition that multiple, and often complex, components may be involved in such transmissions.

*Third*, ALS misleadingly argues that Cloudflare modifies "content of a site." Cloudflare does not do so. Guinn Opp. Decl. ¶¶ 9-11, 16; Sullivan Opp. Decl. ¶¶ 3,

---

[4] This (among other things) distinguishes Cloudflare's service from the BitTorrent tracker at issue in *Fung*, 710 F.3d 1020 at 1041, which selected which users would communicate with each other. The Ninth Circuit implied that the tracker might fall within the section 512(d) safe harbor as an information location tool, but it held the defendant there failed to meet specific qualifications of that safe harbor. *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW

7. Cloudflare is a "content delivery service" that by definition delivers the customers' content as it appears on the source web sites, following rules or instructions that the customers set.  Guinn Opp. Decl. ¶ 9.  While the term "content" can mean a variety of different things, the statute distinguishes between "material" and its "content"; it implicitly envisions that a service may modify one but not the other.  *See* 17 U.S.C. 512(a)(5) ("the *material* is transmitted through the system or network without modification of *its content*") (emphasis added). Cloudflare may compress some data in transit for purpose of efficiency, for example causing an image file to use less bandwidth, but it does not alter the appearance of the image—that is, the *content* of the material.  Guinn Opp. Decl. ¶ 16.  Similarly, Cloudflare uses "obfuscation" to cause email addresses to appear to persons but to be obscured from bots that may try to harvest them automatically. Guinn Opp. Decl. ¶ 16; Sullivan Opp. Decl. ¶ 5.  In the statutory distinction between "material" and "content," where "material" may refer to raw data consisting of zeroes and ones but "content" refers to the substance of what a person perceives (such as an image or text), Cloudflare may alter "material" but does not alter its "content."

*Fourth,* ALS provides no support for its simplistic suggestion that section 512(a) applies only to services offering "a 'dumb' pipeline."  All online services actively manage their traffic using a variety of technologies and techniques. Guinn Opp. Decl. ¶¶ 10-12; Sullivan Opp. Decl. ¶¶ 3-4.  This was true in the '90s and remains true today.

*Finally*, ALS argues disingenuously that it sues Cloudflare not for its transmission but for reproduction, distribution, and display of material from Cloudflare data centers or from origin hosts through conduits owned by third parties.  ALS has confused the cache function ("material from Cloudflare data centers") with the conduit function ("material . . . from the origin host"). To the extent that caching is a common part of the modern Internet, Cloudflare will

FENWICK & WEST LLP
ATTORNEYS AT LAW

address the system caching safe harbor below.  For transmission services, section 512(a) applies to *any* actions (including reproduction, distribution, or display) that occur "*by reason of*" Cloudflare's "transmitting, routing, or providing connections for, material" or "*by reason of* the intermediate and transient storage of that material" in those activities.  17 U.S.C. § 512(a) (emphasis added).

In any event, safe harbors protect service providers for a number of activities that occur *by reason of* the core activities, and the Ninth Circuit and Second Circuit expressly rejected arguments that the safe harbors did not protect activities that are ancillary to the core activities.  In *UMG Recordings, Inc. v. Shelter Capital Partners LLC,* 718 F.3d 1006, 1015-20 (9th Cir 2013), the Ninth Circuit explained that the "by reason of" phrasing of the safe harbor intended to encompass and protect numerous additional activities that flowed from the core activity of the safe harbor.  In that case the court of appeals found that the creation of chunked and Flash files, the making of multiple reproductions and transmissions, and the providing of access through streaming and downloads were all "by reason of" storage at the direction of a user under section 512(c).  *See also Viacom Intern., Inc. v. YouTube, Inc.,* 676 F.3d 19, 38-40 (2d Cir. 2012) (transcoding, playback, and "related videos" functions were by reason of storage of materials at direction of user).

While Cloudflare qualifies *also* for the safe harbor under section 512(b) for its system caching function, the cache does not disqualify Cloudflare from the Section 512(a) safe harbor.  The Ninth Circuit expressly approved application of section 512(a) to a service provider that maintained storage of materials for up to 14 days—which the court of appeals considered to meet the standard of "intermediate and transient," and which was not longer than was reasonably necessary—in *Ellison v. Robertson,* 357 F.3d 1072, 1081 (9th Cir. 2004).

Cloudflare thus meets the qualifications of the section 512(a) safe harbor, and the jury should receive Instruction No. 47.

### I.      Cloudflare's Services Fall Within the Section 512(b) Safe Harbor, and Instruction No. 48 Is Proper.

Cloudflare also qualifies for the distinct safe harbor under section 512(b) for its system caching services, and the Court should give instruction no. 48.

There is no wonder why ALS wants to avoid any discussion of section 512(b): this safe harbor has a strict limitation on notifications of claimed infringement to a service provider that provides caching: a copyright complainant must, *in addition to* providing information typically required for a notification to a section 512(c) storage or hosting service provider under section 512(c)(3), show that the source website of the cached material has taken the material down at the source or that a court has ordered removal of material from the source.  *Id.* § 512(b)(2)(E)(ii).  Cloudflare responds expeditiously to remove, or disable access to, material that is claimed to be infringing, if a complainant meets the requirements of sections 512(c)(3), 512(b)(2)(E)(i) and 512(b)(2)(E)(ii).  Paine Opp. Decl. ¶ 8.  *ALS has never sent Cloudflare any complaints that met the requirements of sections 512(c)(3), 512(b)(2)(E)(i), and 512(b)(2)(E)(ii).*  Paine Opp. Decl. ¶ 19.

The evidence shows that Cloudflare meets all the qualifications and conditions of section 512(b). It automatically and temporarily stores material that Cloudflare's customers make available online; it also transmits the material from its customers to other persons only when they request the material from the customers' websites.  Guinn Opp. Decl. ¶ 13-15; Sullivan Opp. Decl. ¶ 4; *cf.* 17 U.S.C. § 512(b)(1). Cloudflare transmits the material without modification to its *content* from the manner in which the *material* was transmitted from its customers. Guinn Opp. Decl. ¶ 16; Sullivan Opp. Decl. ¶ 4; *cf.* 17 U.S.C. § 512(b)(2)(A). It complies with rules and protocols for refreshing, reloading, or updating of material from its customers' websites. Guinn Opp. Decl. ¶ 14; Sullivan Opp. Decl. ¶ 4; *cf.* 17 U.S.C. § 512(b)(2)(B). It does not interfere with any technologies associated with the material to return to Cloudflare's customers' information that would have been

FENWICK & WEST LLP
ATTORNEYS AT LAW

available to them by direct connections from persons requesting the material. Guinn Opp. Decl. ¶ 17; Sullivan Opp. Decl. ¶ 4; *cf.* 17 U.S.C. § 512(b)(2)(C). Cloudflare does not alter or interfere with conditions that its customers set for access to their materials, such as passwords or payments. Guinn Opp. Decl. ¶ 17; Sullivan Opp. Decl. ¶ 4; *cf.* 17 U.S.C. § 512(b)(2)(D).

ALS's argument regarding the application of section 512(b) contains nothing but wild and unsupported statements about the law.  ALS's argument that Section 512(b) only applies where caching is for later use by a "customer" is wrong. Section 512(b) applies where the cached materials are made available by "a person other than the service provider" and are transmitted through the system or network to a different person.  17 U.S.C. § 512(b).  Nothing in the statute says that such subsequent users of the system or network must be "customers."  And ALS's bald assertion that "Consumers aren't users of Cloudfare's system or network" is utterly false.  Ordinary consumers use Cloudflare's services all the time, when they visit websites that are Cloudflare customers.  Nothing in Section 512 supports ALS's contrived argument that the safe harbor protections apply only when consumers are familiar with the providers or even the existence of the many systems or networks that handle their Internet activities.

Likewise, the discussion of caches in *Amazon.com* that ALS invokes is irrelevant: the discussion was not about the safe harbor or the type of cache at issue here. *See Amazon.com*, 508 F.3d at 1156 and n.3; Guinn Opp. Decl. ¶ 13-14; Sullivan Opp. Decl. ¶ 4. Cloudflare thus meets all the qualifications and conditions of the section 512(b) safe harbor.  The Court should therefore give the jury instruction no. 48.

FENWICK & WEST LLP
ATTORNEYS AT LAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  April 25, 2018

Respectfully submitted,

FENWICK & WEST LLP

By: /s/ Andrew P. Bridges
    Andrew P. Bridges

Attorneys for Defendant
CLOUDFLARE, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW