ANDREW P. BRIDGES (CSB No. 122761)
abridges@fenwick.com
JEDEDIAH WAKEFIELD (CSB No. 178058)
jwakefield@fenwick.com
ARMEN NERCESSIAN (CSB No. 284906)
anercessian@fenwick.com
SAPNA MEHTA (CSB No. 288238)
smehta@fenwick.com
CRYSTAL NWANERI (CSB No. 318955)
cnwaneri@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:  415.875.2300
Facsimile:   415.281.1350

Attorneys for Defendant
CLOUDFLARE, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ALS SCAN, INC.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CLOUDFLARE, INC., et al.,<br><br>　　　　　Defendants. | Case No.: 2:16-cv-05051-GW-AFM<br><br>**SUPPLEMENTAL TRIAL BRIEF ON SAFE HARBOR ELIGIBILITY UNDER 17 U.S.C. 512(B)**<br><br>Date:　　　　April 30, 2018<br>Time:　　　　10:00 AM<br>Judge:　　　Hon. George H. Wu<br>Trial Date:　May 1, 2018 |

1        At the Court's request at the final pretrial conference on April 27, 2018,

2   Cloudflare submits this brief to respond to Plaintiff's latest arguments about

3   Cloudflare's eligibility for safe harbor protection under 17 U.S.C. § 512(b).  As the

4   Court will recall, Cloudflare claims safe harbor protection under both Sections

5   512(a) and 512(b).  Cloudflare's earlier briefing on safe harbor issues in general

6   was in its opposition to ALS's partial summary judgment motion (Dkt. 376 at

7   pp. 13-25), and its response to ALS's "trial brief" (Dkt. 502, pp 15-21).

8        Section 512(b) provides safe harbor protection for service providers who,

9   like Cloudflare, perform system caching—that is, "intermediate and temporary

10  storage of material on a system or network controlled or operated by or for the

11  service provider."  15 U.S.C § 512(b)(1).  ALS has argued that the language "users

12  of the system or network" in section 512(b)(1)(c) applies only to persons that

13  *knowingly* use the system or network of a service provider, such as subscribers or

14  account holders of the service provider.  According to ALS, because people using

15  Cloudflare's network to access materials from a Cloudflare customer website may

16  not *know* that they are using Cloudflare's network, they are not "users" of

17  Cloudflare's network, and § 512(b) would therefore not apply.  ALS's position

18  makes no sense, and cannot be reconciled with the plain language of the statute.

19       Section 512 provides no specialized definition for what a "user" is.

20  "When terms used in a statute are undefined, we give them their ordinary meaning."

21  *Hamilton v. Lanning*, 130 S. Ct. 2464, 2471 (2010); *accord United States v. Daas*,

22  198 F.3d 1167, 1174 (9th Cir. 1999).  "The word 'user' in the DMCA is

23  straightforward and unambiguous."  *BWP Media USA, Inc. v. Clarity Digital Grp.*,

24  LLC, 820 F.3d 1175, 1179 (10th Cir. 2016).  "Simply put, a 'user' is 'one that

25  uses.'"  *Id.* (quoting *Merriam–Webster's Collegiate Dictionary* 1297 (10th ed.

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

2001)).[1]  Thus, people who use Cloudflare's system or network, knowingly or not, are "users."

The DMCA does not contemplate any limitations on the term "user" to apply only to persons, like account holders, who knowingly use a specific service provider or have a formal relationship with a service provider.  To the contrary, when Congress intended a narrower scope, it used different language; for instance, the DMCA expressly distinguishes between "users" of a network or system, on the one hand, and "subscribers and account holders of the service provider's system or network," on the other.  *See* 17 U.S.C. § 512(i)(1)(A) (conditioning safe harbor eligibility on whether a service provider "has adopted and reasonably implemented, and informs *subscribers and account holders of the service provider's system or network* of, a policy that provides for the termination in appropriate circumstances of *subscribers and account holders of the service provider's system or network* who are repeat infringers") (emphases added).

Section 512(b)(1) defines a cast of characters involved in system caching: (A) a website that makes materials available online, (B) a system provider through

---

[1] *BWP* addressed § 512(c).  There, the Tenth Circuit agreed with the district court that, in context of § 512(c) safe harbor provision, a "'user' describes a person or entity who avails itself of the service provider's system or network to store material."  ALS may argue that the Ninth Circuit's decision in *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045 (9th Cir. 2017), rejected *BWP*'s plain meaning of the term "user."  But *Mavrix* dealt with a different question than the one at issue here: whether people working on behalf of the service provider counted as were "users" or counted as the service provider itself, reasoning that the statute distinguishes between service providers and users of the service provider.  In particular, it concerned whether the acts of "moderators in screening and posting users' submissions" who worked for the service provider could be attributed to the service provider.  873 F.3d at 1053.  The distinction in *Mavrix* between actions of "users" and the service provider itself has no bearing on the question here.  Nothing in Mavrix suggests that "users" must have knowledge of the system or network they are using.

FENWICK & WEST LLP
ATTORNEYS AT LAW

which the website transmits information to another person, and (C) persons who request access to the materials from the website.

First, § 512 (b)(1)(A) requires that "the material is made available online by a person other than the service provider." In the allegations in this case, that would be one of the websites accused of making the material available online, like imgchili.

Second, § 512 (b)(1)(B) requires that "the material is transmitted from the person described in subparagraph (A)" (again, someone other than Cloudflare, like imgchili) "through the system or network" (here, Cloudflare's network) "to a person other than the person described in subparagraph (A)" (here, someone visiting the imgchili website) "at the direction of that other person" (again, this would be a visitor to imgchili).

Third, § 512 (b)(1)(C) requires that "the storage is carried out through an automatic technical process for the purpose of making the material available to users of the system or network who, after the material is transmitted as described in subparagraph (B) request access to the material from the person described in subparagraph (A)" (again, someone other than Cloudflare, like imgchili).[2]

Section 512(b)(2), with its discussion of "subsequent users described in paragraph 1(C)," further confirms that these "users" are persons who request access to the material from the website that made it available online, which must be someone "other than the service provider." But Plaintiff argues the opposite, claiming that a "user" must be someone who requests material *from Cloudflare*. That simply cannot be reconciled with the requirement that the material be made available by someone other than the service provider, and that the user is someone who requests material from that other website.

_____

[2] Whether a cached version of an asset appears in a Cloudflare caching server depends on several factors, including whether the initial request for an asset went through that same data center as subsequent requests, whether caching is enabled by the originating site, and how much time has passed between requests from users.

FENWICK & WEST LLP
ATTORNEYS AT LAW

The legislative history of the DMCA is also consistent with the plain language meaning of a "user." It reflects that a user is a person requesting material from the originating *website*, who may have no knowledge that he is using a particular service provider as an intermediary. In describing caching services, the Senate Report notes that caching "storage is intermediate in the sense that the service provider serves as *an intermediary between the originating site and ultimate user*." S. Rep. 105-190 at 42 (1998) (emphasis added). The Senate Report continues: "For subsection (b) to apply, the material must be made available on an originating site, transmitted at the direction of another person through the system or network operated by or for the service provider to a different person, and stored through an automatic technical process so that *users of the system or network who subsequently request access to the material from the originating site* may obtain access to the material from the system or network." *Id.* (emphasis added).

In short, there is no legal or logical support for ALS's interpretation of the safe harbor for system caching under section 512(b). ALS ignores the plain text of the DMCA, contradicts its legislative history, and evinces ignorance of what caching services are and how they operate. As it was in 1998, the Internet is a decentralized network of networks and connections; that a visitor to a website may be unaware of the different systems or networks through which his or her requests get routed does not make the visitor any less a "user" of those systems or networks. The Court should reject ALS's misreading of the statute, and it should accordingly adopt Cloudflare's proposed jury instruction number 48. *See* Dkt. 460 at 46-48.[3]

---

[3] This brief focuses on the safe harbor under § 512(b), as the Court and the parties have not recently focused on the safe harbor under § 512(a). That provision also applies to Cloudflare, and ALS's arguments against that safe harbor fail for the same reasons that its argument fails here. That safe harbor has similar uses of the same words.

FENWICK & WEST LLP
ATTORNEYS AT LAW

1   Dated:  April 28, 2018

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

FENWICK & WEST LLP


By:   */s/ Andrew P. Bridges*
      Andrew P. Bridges

Attorneys for Defendant
CLOUDFLARE, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW